# Exhibit 16

## Case Nos. 22-55209 (L), 22-55247

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

NETLIST INC.,
a Delaware corporation,
*Plaintiff-Appellee,*

v.

SAMSUNG ELECTRONICS CO., LTD.,
a Korean corporation,
*Defendant-Appellant.*

*Appeal from the United States District Court for the Central District of California (Santa Ana),*
*Case No. 8:20-cv-00993-MCS-ADS · Honorable Mark C. Scarsi, District Judge*

## FIRST BRIEF ON CROSS-APPEAL
## [APPELLANT'S OPENING BRIEF]

ANTON METLITSK
EPHRAIM MCDOWELL
O'MELVENY & MYERS, LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
ametlitsky@omm.com
emcdowell@omm.com

MICHAEL G. YODER
MARC F. FEINSTEIN
O'MELVENY & MYERS, LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
myoder@omm.com
mfeinstein@omm.com

*Attorneys for Appellant Samsung Electronics Co., Ltd.*

 

## CORPORATE DISCLOSURE STATEMENT

Samsung Electronics Co., Ltd. ("Samsung") is a publicly traded company organized under the laws of the Republic of South Korea. No publicly held company owns more than 10% of Samsung's stock, and Samsung has no parent corporation.

Dated:  June 6, 2022                               /s/ Michael G. Yoder

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ..................................................... 4

QUESTIONS PRESENTED ................................................................ 4

STATEMENT OF THE CASE ............................................................. 5

    A.    Samsung And Netlist's Longstanding Business Relationship ........................................................................ 5

    B.    Samsung And Netlist Negotiate The JDLA .............................. 6

    C.    The Joint Development And License Agreement ...................... 7

    D.    The Parties' Post-JDLA Conduct ........................................... 10

    E.    Samsung's Payment To Netlist And Tax Withholding ............12

    F.    Procedural History ....................................................................13

SUMMARY OF ARGUMENT .........................................................17

STANDARD OF REVIEW ............................................................... 22

ARGUMENT.................................................................................... 23

I.    Samsung Is Entitled To Judgment On Netlist's Supply-Obligation Claim ................................................................... 23

    A.    Samsung Did Not Breach Section 6.2 Because That Provision Only Requires Samsung To Fulfill DRAM And NAND Orders Related To The NVDIMM-P Joint-Development Project ........................................................... 23

        1.    Section 6.2 Unambiguously Requires Samsung To Fulfill DRAM And NAND Orders Only For The NVDIMM-P Joint-Development Project ....................... 24

        2.    At Minimum, Section 6.2 Is Ambiguous, And The Extrinsic Evidence Compels Samsung's Interpretation................................................................30

    B.    The Jury's Finding That No Damage Resulted From Any Violation Of Section 6.2 Independently Requires Judgment For Samsung On Netlist's Supply-Obligation Claim.................................................................................... 36

# TABLE OF CONTENTS
## (continued)

Page

1. Resulting Damages Is An Essential Element Of Netlist's Supply-Obligation Claim, And The Jury Found No Such Damages .................................................. 36

2. The District Court Erred By Awarding Nominal Damages ........................................................................ 38

II. Samsung Is Entitled To Judgment On Netlist's Tax-Withholding Claim ............................................................... 41

A. Samsung Did Not Violate Section 3.1 By Reasonably Withholding Taxes .............................................................. 42

B. The District Court's Finding That No Damage Resulted From Any Violation Of Section 3.1 Independently Requires Judgment For Samsung On Netlist's Tax-Withholding Claim .............................................................. 45

III. Samsung Is Entitled To Judgment, Or At Least A Trial, On Netlist's Declaratory-Relief Claim ..................................... 46

A. Even If Samsung Breached The JDLA, There Is At Least A Fact Question Whether Any Breach Was Material .................. 47

B. The District Court Erred In Rejecting Samsung's Waiver Defense To Netlist's Third Claim ...................................... 56

IV. The District Court Erred In Precluding Samsung From Raising Its Affirmative Defenses ....................................... 60

A. The District Court Erred In Deeming Samsung's Waiver, Acquiescence, And Estoppel Defenses Waived ..................... 60

B. The District Court Erred In Precluding Samsung From Raising Its Election-Of-Remedies Defense ......................... 62

CONCLUSION ........................................................................... 65

CERTIFICATE OF COMPLIANCE ........................................... 66

STATEMENT OF RELATED CASES ...................................... 67

CERTIFICATE OF SERVICE ................................................. 68

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*67 Wall St. Co. v. Franklin Nat'l Bank,*
37 N.Y.2d 245 (1975) ........................................................................ 31

*Advanced Water Techs. v. Amiad USA, Inc.,*
2019 WL 4805330 (S.D.N.Y. 2019).................................................48

*Alexander v. Gardner-Denver Co.,*
415 U.S. 36 (1974)..............................................................................63

*Allergan Inc. v. Athena,*
2012 WL 12898344 (C.D. Cal. May 24, 2012) ........................... 53

*Am. Canoe Ass'n v. Murphy Farms, Inc.,*
326 F.3d 505 (4th Cir. 2003) ........................................................ 54

*Awards.com, LLC v. Kinko's, Inc.,*
42 A.D.3d 178 N.Y. App. Div. 2007)..........................................64

*Bank of N.Y. v. Amoco Oil Co.,*
35 F.3d 643 (2d Cir. 1994)........................................................31, 34

*Beal Sav. Bank v. Sommer,*
8 N.Y.3d 318 (2007) ................................................................ 24, 25

*Bear, Stearns Funding, Inc. v. Interface Grp.-Nev., Inc.,*
361 F. Supp. 2d 283 (S.D.N.Y. 2005) ................................passim

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)........................................................................ 61

*Chimart Assocs. v. Paul,*
66 N.Y.2d 570 (1986) ....................................................................30

*China Privatization Fund (Del.) v. Galaxy Entm't Grp. Ltd.,*
187 A.D.3d 596 N.Y. App. Div. 2020).......................................33

*Cobell v. Jewell,*
802 F.3d 12 (D.C. Cir. 2015)........................................................ 54

*Cole v. Macklowe,*
99 A.D.3d 595 N.Y. App. Div. 2012)................................... 25, 27

*Cramer v. Spada,*
203 A.D.2d 739 (N.Y. App. Div. 1994)..................................... 37

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,*
631 F.3d 42 (2d Cir. 2011) ............................................................ 36

*Disability Law Ctr. of Alaska, Inc. v. Anchorage Sch. Dist.,*
581 F.3d 936 (9th Cir. 2009) ........................................................ 23

*Doe v. United States,*
419 F.3d 1058 (9th Cir. 2005) ...................................................... 22

*Doner-Hedrick v. N.Y. Inst. of Tech.,*
874 F. Supp. 2d 227 (S.D.N.Y. 2012) .......................................... 56

*ERE LLP v. Spanierman Gallery, LLC,*
94 A.D.3d 492 N.Y. App. Div. 2012) ........................................... 36

*ESPN, Inc. v. Off. of Comm'r of Baseball,*
76 F. Supp. 2d 383 (S.D.N.Y. 1999) ............................................ 65

*Fellion v. Darling,*
14 A.D.3d 904 (N.Y. App. Div. 2005) ............................... 36, 37, 38

*Flynn v. AK Peters, Ltd.,*
377 F.3d 13 (1st Cir. 2004) .......................................................... 38

*Freund v. Washington Sq. Press,*
34 N.Y.2d 379 (1974) ................................................................... 40

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,*
7 N.Y.3d 96 (2006) ....................................................................... 61

*Greenfield v. Philles Records, Inc.,*
98 N.Y.2d 562 (2002) ............................................................ 24, 31

*Hines v. Ward,*
53 P. 427 (Cal. 1898) ................................................................... 63

*Hoehn v. Schenck,*
221 A.D. 371 (N.Y. App. Div. 1927) ............................................. 63

*Holland Loader Co. v. FLSmidth A/S,*
313 F. Supp. 3d 447 (S.D.N.Y. 2018) ........................................... 37

*Holland Loader Co. v. FLSmidth A/S,*
769 F. App'x 40 (2d Cir. 2019) ............................................... 40, 41

*Hooper Assocs., Ltd. v. AGS Comps., Inc.,*
74 N.Y.2d 487 (1989) .......................................................... 25, 26, 28

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Hunt v. Cnty. Of Orange,*
672 F.3d 606 (9th Cir. 2012) ..................................................38

*Huss v. King Co.,*
338 F.3d 647 (6th Cir. 2003)..................................................53

*Kamco Supply Corp. v. On the Right Track, LLC,*
149 A.D.3d 275 (N.Y. App. Div. 2017) ................................59, 61

*Kohler v. Flava Enters., Inc.,*
779 F.3d 1016 (9th Cir. 2015) ............................................... 63

*Kronos, Inc. v. AVX Corp.,*
81 N.Y.2d 90 (1993).........................................................38, 39, 40

*L.F. v. Lake Wash. Sch. Dist. #414,*
947 F.3d 621 (9th Cir. 2020) ................................................ 22

*Lexington 360 Assocs. v. First Union Nat'l Bank of N.C.,*
234 A.D.2d 187 N.Y. App. Div. 1996) ...................................... 37

*Long v. Howard Univ.,*
550 F.3d 21 (D.C. Cir. 2008) ..............................................60

*Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur*
*Chemische Industrie,*
784 F.3d 78 (2d Cir. 2015)....................................................58

*Macarthur Props. I, LLC v. Galbraith,*
2018 WL 3412830 (N.Y. Sup. Ct. July 13, 2018) ...................... 57

*Marx v. Gen. Revenue Corp.,*
568 U.S. 371 (2013) ........................................................28

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
460 U.S. 1 (1983) ........................................................53, 54, 55

*Mosher Mfg. Co. v. Eastland, W.F. & G.R. Co.,*
259 S.W. 253 (Tex. Civ. App. 1924) ...................................... 63

*Neidermeyer v. Caldwell,*
2015 WL 13687950 (C.D. Cal. Dec. 16, 2015)..........................53

*Process Am., Inc. v. Cynergy Holdings, LLC,*
839 F.3d 125 (2d Cir. 2016)..................................................48

*Proper v. State Farm Mut. Auto. Ins. Co.,*
63 A.D.3d 1486 (N.Y. App. Div. 2009)....................................36

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Qualcomm Inc. v. Tex. Instruments Inc.*,
875 A.2d 626 (Del. 2005) ................................................................. 49

*Raymond Corp. v. Nat'l Union Fire Ins. Co.*,
5 N.Y.3d 157 (2005) ....................................................................... 45

*Reuter v. Jax Ltd., Inc.*,
711 F.3d 918 (8th Cir. 2013) ........................................................... 47

*Reyelt v. Danzell*,
533 F.3d 28 (1st Cir. 2008) ............................................................. 51

*S. Road Assocs., LLC v. IBM Corp.*,
4 N.Y.3d 272 (2005) ....................................................................... 23

*Septembertide Publ'g, B.V. v. Stein & Day, Inc.*,
884 F.2d 675 (2d Cir. 1989) ........................................................... 52

*State ex rel. Easley v. Rich Food Servs., Inc.*,
535 S.E.2d 84 (N.C. Ct. App. 2000) ................................................ 63

*Stromberg v. Moore*,
170 S.W.3d 26 (Mo. Ct. App. 2005) ................................................ 63

*t'Bear v. Forman*,
2020 WL 703888 (N.D. Cal. Feb. 12, 2020) ................................... 64

*Teleflex Med. Inc. v. Nat'l Union Fire Ins. Co.*,
851 F.3d 976 (9th Cir. 2017) .......................................................... 39

*Town of Hempstead v. Inc. Vill. of Freeport*,
15 A.D.3d 567 (N.Y. App. Div. 2005) .............................................. 57

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
487 F.3d 89 (2d Cir. 2007) ............................................................. 41

*Travellers Int'l AG v. Trans World Airlines, Inc.*,
722 F. Supp. 1087 (S.D.N.Y. 1989) ........................................... 58, 59

*Uribe v. Merchants Bank of N.Y.*,
91 N.Y.2d 336 (1998) .......................................................... 25, 27, 45

*Viacom Outdoor Inc. v. Wixon Jewelers, Inc.*,
82 A.D.3d 604 N.Y. App. Div. 2011) ............................................... 36

*Wakeman v. Wheeler & Wilson Mfg. Co.*,
101 N.Y. 205 (1886) ....................................................................... 40

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Westmoreland Coal Co. v. Entech, Inc.,*
  100 N.Y.2d 352 (2003) .............................................................. 24, 25, 26

*WILJEFF, LLC v. United Realty Mgmt. Corp.,*
  82 A.D.3d 1616 (2011) .......................................................................... 54

*Wyshak v. City Nat'l Bank,*
  607 F.2d 824 (9th Cir. 1979) ............................................................... 63

**Rules**

C.D. Cal. R. 7-18 ................................................................................... 55

Fed. R. Civ. P. 54(b) ....................................................................... passim

Fed. R. Civ. P. 56(a) ............................................................................. 60

Fed. R. Civ. P. 59(e) ............................................................................. 54

Fed. R. Civ. P. 8(b)(1) .......................................................................... 63

**Treatises**

Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1274 (4th ed.) ......................... 63

## INTRODUCTION

This appeal arises from a contract dispute between defendant-appellant Samsung Electronics Co., Ltd. ("Samsung") and plaintiff-appellee Netlist Inc. ("Netlist"). Samsung produces and sells (among many other things) memory products, including DRAM and NAND memory. Netlist has been purchasing memory products from Samsung since 2001.

In 2015, Samsung and Netlist signed a Joint Development and License Agreement ("JDLA"). The JDLA principally addresses two items: (1) the parties' joint development of a new memory module called NVDIMM-P, and (2) the parties' exchange of patent cross-licenses. After signing the JDLA, Samsung and Netlist continued their normal supplier-customer relationship—the sale of NAND and DRAM for purposes unrelated to NVDIMM-P—along one track, while also pursuing the NVDIMM-P joint-development project along another track. The joint-development project, however, ultimately failed, and the NVDIMM-P product was never commercialized.

In 2020, Netlist sued Samsung in the Central District of California, alleging that Samsung breached two provisions of the 2015 JDLA. First, Netlist alleged that Samsung violated JDLA section 6.2, which required

Samsung to "supply NAND and DRAM products to Netlist on Netlist's request at a competitive price." Five years after signing the JDLA, Netlist argued that this provision imposed on Samsung an unlimited obligation to supply *all* NAND and DRAM that Netlist requested for *any* purpose—which would include even resale to third parties. But the JDLA unambiguously forecloses that interpretation. The contract provides for Samsung's supply of NAND and DRAM as "components" of the NVDIMM-P product at the heart of the JDLA—a requirement that Samsung undisputedly fulfilled. That is not only what the contract says, but also how the parties themselves read it, based on their negotiations, public statements to shareholders, and course of conduct. Even if the JDLA did not unambiguously foreclose Netlist's position, the extrinsic evidence overwhelmingly confirms Samsung's interpretation.

Second, Netlist alleged that Samsung breached JDLA section 3.1, which required Samsung to pay Netlist $8 million in fees. But a tandem provision allows Samsung to deduct "any withholding taxes [that] are required by applicable law." Samsung initially withheld 16.5% of its payment to Netlist and remitted it to the Korean tax authority, because it believed Korean law required as much. The Korean tax review body initially agreed, before a higher tribunal determined that no withholding was necessary.

Netlist then received a full refund *with interest.* Despite Samsung's compliance with the agreement and Netlist suffering no harm, Netlist claims that Samsung breached its payment obligation anyway. That is wrong. The provision expressly contemplates good faith but mistaken withholdings. In fact, it requires Samsung to cooperate with Netlist in obtaining a refund, which could only happen if a withholding payment to Korean tax authorities was made in error. Samsung cannot breach the JDLA by making good faith payments the agreement expressly contemplates.

Nonetheless, the district court agreed with Netlist's contract construction, and granted it summary judgment on all elements of both contract-breaches other than damages, which were left for trial. Significantly, at trial, the jury found that Netlist failed to prove any damages resulting from any breach of section 6.2, and the court found that Netlist failed to prove compensable damages resulting from breach of section 3.1, but the district court *still* awarded Netlist nominal damages and a judgment in its favor. The district court also granted Netlist a declaratory judgment that it had validly terminated the JDLA, holding that Samsung's breaches were material as a matter of law because sections 3.1 and 6.2 are important JDLA provisions. This was error. Under New York law, what matters for materiality is not whether breached provisions were material to the contract,

but rather whether the breaches themselves were material. That question is answered by a multi-factor test, and under it, there is at least a dispute of fact as to materiality, especially because the alleged breaches resulted in no compensable harm to Netlist, and New York's multi-factor materiality test turns heavily on whether any breach resulted in harm.

As further explained below, the district court misread the JDLA, misapplied New York law, and committed numerous procedural missteps that denied Samsung the right to raise valid affirmative defenses to Netlist's claims. Respectfully, the district court's judgment should be reversed.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332(a) because Netlist is a citizen of California, Samsung is a citizen of South Korea, and the amount in controversy exceeds $75,000. *See* 7-ER-1528 (¶ 3). On February 15, 2022, the district court entered final judgment for Netlist. 1-ER-2. Samsung noticed its appeal on February 25, 2022. ECF 309. This Court has jurisdiction under 28 U.S.C. § 1291.

## QUESTIONS PRESENTED

1. Whether the district court erred in granting Netlist judgment on its claim that Samsung breached JDLA section 6.2.

2. Whether the district court erred in granting Netlist judgment on its claim that Samsung breached JDLA section 3.1.

-4-

3.  Whether the district court erred in granting Netlist a declaratory judgment that it properly terminated the JDLA.

4.  Whether the district court erred in rejecting Samsung's affirmative defenses.

## STATEMENT OF THE CASE

### A.  Samsung And Netlist's Longstanding Business Relationship

Samsung is a leading producer and seller of memory products, including DRAM and NAND.  *See* 7-ER-1529 (¶ 8); 2-ER-99 (¶¶ 7-8).  Netlist designs and manufactures a variety of memory products for various applications, 2-ER-98 (¶ 2), and serves as a reseller of these products, 4-ER-600.

DRAM and NAND manufacturers are limited in how much DRAM and NAND they can produce, and there are sometimes shortages of these products.  2-ER-271 (¶ 4); 2-ER-101 (¶ 16).  Samsung's customers therefore provide forecasts of how much DRAM and NAND they wish to purchase, and Samsung provides them with projections of how much DRAM and NAND it can allocate and sell.  2-ER-271 (¶ 5); 2-ER-110-111 (¶¶ 61-62).

Netlist has been Samsung's customer since 2001.  2-ER-270 (¶ 1).  Between 2001 and 2021, Netlist purchased over $200 million of products from Samsung, including NAND and DRAM.  *Id.*  Following the practice

described above, Netlist provided its projections to Samsung, and Netlist would issue purchase orders for specific amounts of product. 2-ER-271 (¶¶ 5-6). Samsung would then accept and fill some purchase orders, put some on backlog, and reject others. 2-ER-271 (¶ 7). This protocol remained constant throughout the parties' business relationship, including after the parties signed the JDLA. 2-ER-271-272 (¶ 8).

### B. Samsung And Netlist Negotiate The JDLA

In early 2015, Netlist and Samsung began discussing jointly developing a new product based on a standard called NVDIMM-P. *See* 2-ER-272 (¶ 9). An NVDIMM-P product is a type of "memory module" that "combines a smaller density of fast memory like DRAM with a higher density of slower memory like NAND." 4-ER-711, § 1. According to Netlist's CEO, this new product would be a "game changer" in a $15 billion industry. 2-ER-272 (¶ 10). The parties also discussed licensing each other's patents. 2-ER-99-100 (¶¶ 12-13). Netlist's position in this litigation is that the parties' eventual agreement—the JDLA—also required Samsung to provide Netlist with an unlimited supply of DRAM and NAND, unconnected to the joint-development project.

Netlist's position is not reflected in the parties' negotiations (or in their subsequent course of conduct or the agreement itself, *see infra* Part I.A). As

described in more detail below, Netlist's CEO testified that the negotiations only referenced NAND and DRAM as components for the NVDIMM-P product. 2-ER-276-277 (¶¶ 25-26, 28); 3-ER-378-380; *see also infra* at 31-32. These negotiations resulted in a memorandum of understanding ("MOU"). 2-ER-278-279 (¶ 32). Section 6 of the MOU obliged Samsung to supply DRAM and NAND, but again, as confirmed by Netlist's CEO, Samsung's supply obligation was tied to the NVDIMM-P project. 2-ER-278-279 (¶ 32). When the parties began converting the MOU into a final agreement, Samsung proposed a section 6.2 containing the qualification that the agreement would "not … require Samsung to supply any products to Netlist." 2-ER-279 (¶ 33); 2-ER-101 (¶ 19). But Netlist objected on the ground that Samsung's proposal conflicted with the MOU's requirement that Samsung supply NAND and DRAM components for the joint-development project. 2-ER-278-280 (¶¶ 32, 35); 2-ER-102 (¶ 21). Samsung agreed to Netlist's edit, demonstrating both parties' alignment on what the MOU (and eventual JDLA) required.

### C.    The Joint Development And License Agreement

Samsung and Netlist entered into the JDLA in November 2015. 2-ER-272 (¶ 13). The JDLA was principally an agreement to (1) jointly develop the NVDIMM-P product; and (2) cross-license patents. The JDLA also sets forth

(3) the fees and costs that the parties agreed to pay; and (4) the remedies available in the event of a breach.

1. *Joint Development of NVDIMM-P Product*: The JDLA's preamble provides that "the Parties intend to work together to jointly develop an interface and associated technologies for certain memory modules," 4-ER-709—namely, the "NVDIMM-P Product developed by the Parties." 4-ER-710, § 1.

The JDLA then spells out the parties' detailed plans to develop the NVDIMM-P product. 4-ER-712-713, § 2. Upon completion of product development, the parties agreed to "work together to bring a Developed Product to market." 4-ER-714, § 5.3.

In this context, section 6 provides for the "Supply of Components." 4-ER-714-715, § 6. Section 6.1 addresses "Supply by Netlist," stating "Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer." 4-ER-714, § 6.1. Section 6.2, in turn, addresses "Supply by Samsung," stating that "Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (*i.e.*, among customers purchasing similar volumes of similar products)." 4-ER-714-715, § 6.2. Together, these provisions effectuate the MOU, which, as Netlist's own CEO testified, was

limited to NVDIMM-P product development and commercialization. *See supra* at 7.

2. *Patent Cross-Licenses*: The JDLA separately addresses the parties' agreement to cross-license their patents. The preamble provides that "the Parties wish to grant to each other a cross license under each Party's patents." 4-ER-709. The JDLA then defines the parties' "Licensed Patents" broadly to mean "any and all Patents owned or controlled by [the party] or any of its Subsidiaries"; Netlist's "Licensed Products" to mean "all Memory Solution Products manufactured or have manufactured by or for Netlist or its Subsidiaries"; and Samsung's "Licensed Products" to mean "all semiconductor products manufactured or have manufactured by or for Samsung or its Subsidiaries." 4-ER-711, § 1. Section 8 states that Netlist and Samsung each "grant" to the other perpetual patent licenses, 4-ER-716, § 8, and section 7 releases each party from patent-infringement liability arising from any prior infringing use, 4-ER-715, § 7.

3. *Fees and Costs*: JDLA section 3.1 addresses "development costs," stating that Samsung "shall pay" Netlist $8 million in nonrefundable, non-recurring engineering fees. 4-ER-713, § 3.1. Section 3.2 specifies that "[a]ll taxes imposed as a result of the existence or performance of this Agreement shall be borne and paid by the Party required to do so by applicable law," 4-

-9-

ER-713, § 3.2, and that "Samsung may deduct any applicable withholding taxes due or payable under the laws of Korea in remitting payment to Netlist under this Agreement," *id.* In so doing, Samsung must "pay such withholding taxes to the Korean tax authorities and ... reasonably cooperate with Netlist in any lawful efforts to claim a ... refund ... with respect to any such withholding taxes." *Id.*

4. *Remedies*: As relevant here, section 12.5 precludes liability for "consequential damages in connection with or arising out of this agreement." 4-ER-719, § 12.5. Section 13.2, meanwhile, gives both parties "a right to terminate this Agreement upon written notice to a Party if ... such Party is in material breach of this Agreement and it is not cured within thirty (30) days period from the other Party's written demand." 4-ER-720, § 13.2. Upon termination, the breaching party loses its patent licenses whereas the non-breaching party retains its licenses. *Id.*

## D. The Parties' Post-JDLA Conduct

After signing the JDLA, Netlist did not claim that it had secured an unlimited NAND and DRAM supply commitment from Samsung. To the contrary, Netlist's audited 10-K annual reports to its shareholders and the Securities and Exchange Commission ("SEC") for five years following the 2015 JDLA stated that Netlist had "no long-term ... DRAM or NAND flash

-10-

supply contracts." 2-ER-281-282 (¶¶ 42-43). Had Netlist secured an unlimited supply obligation in a supply-constrained memory market, as it now alleges, it presumably would have told its shareholders so.

The parties' business conduct also reflects their understanding that the JDLA did not constitute an unlimited supply agreement. From 2015 into 2017, while the parties' joint-development project proceeded on one track, their normal business transactions proceeded on another: Netlist would request NAND and DRAM from Samsung through purchase orders stating that the orders represented "the entire agreement between [the] parties with respect to the subject matter"; and Samsung would fulfill some orders but not others. 2-ER-284-286 (¶¶ 49, 51, 52, 55, 56); 2-ER-111-112 (¶¶ 62, 64, 71). Netlist does not dispute that Samsung performed its JDLA obligations during this period. *See* 2-ER-283-284 (¶ 48); 2-ER-214 (¶ 48); 2-ER-112 (¶ 71).

In early 2017, Netlist asked Samsung to provide "Product allocation support" for Netlist through an "Official-Distributor Partnership Agreement" related to NAND and DRAM. 2-ER-212 (¶ 45). This request, which Samsung denied, *id.*, would have made no sense if the JDLA already required Samsung to supply NAND and DRAM without limitation.

By the second quarter of 2017, as a result of a worldwide memory shortage, 4-ER-606, Samsung reduced Netlist's allocation, as well as those of other Samsung customers, and more frequently declined to fulfill Netlist's and other customers' orders, although Samsung still continued to sell some NAND and DRAM to Netlist. 2-ER-265 (¶ 85); 2-ER-110-111 (¶ 66, ¶ 77). As a result, later in 2017, Netlist expressed concerns to Samsung about the lack of NAND and DRAM supply allocation. *See* 2-ER-119 (¶¶ 102-04).

Meanwhile, the parties' joint-development project failed to advance past the initial stages, and the NVDIMM-P product was never commercialized. *See* 2-ER-214 (¶ 47).

## E.    Samsung's Payment To Netlist And Tax Withholding

After the parties signed the JDLA, Samsung paid Netlist $8 million, less $1.32 million based on a tax withholding. 2-ER-256 (¶ 73); 2-ER-107 (¶ 46). Samsung paid that $1.32 million to the Korean tax authority, reasonably believing that Korean law required the tax remittance because the $8 million payment included royalties for Netlist's grant of patent licenses. 2-ER-256-257 (¶¶ 73-74).

Netlist sought a refund, arguing that the $8 million payment did not include a patent royalty payment. 2-ER-260 (¶ 77). While the lower Korean tax review body agreed with Samsung (which did not participate as a party

-12-

in these proceedings) that a 16.5% tax applied, 3-ER-432-433 (¶ 52), the higher tribunal agreed with Netlist, 3-ER-433 (¶ 53). Netlist then received a full refund plus interest. 2-ER-261 (¶ 78).

## F.   Procedural History

1. On May 27, 2020, Netlist sent Samsung a letter claiming that Samsung had materially breached the JDLA, 1-ER-30, and a day later, Netlist sued Samsung for breach of contract in the district court, ECF 1. On July 15, 2020, Netlist purported to terminate the JDLA on the ground that Samsung (i) materially breached section 6.2 by failing to supply Netlist NAND and DRAM on demand, and (ii) materially breached section 3.1 by withholding 16.5% in taxes from its $8 million payment to Netlist. 1-ER-30. Netlist waited until 2020 to purport to terminate the JDLA based on Samsung's alleged breaches of sections 6.2 and 3.1 even though (i) Netlist first complained in 2017 that Samsung cut the supply in breach of the JDLA, three years before Netlist's purported termination, and (ii) Samsung withheld taxes from its $8 million payment to Netlist in 2015, five years before Netlist's purported termination.

Netlist then filed a first amended complaint ("FAC"). The FAC alleges three claims: (i) breach of JDLA section 6.2 based on Samsung's failure to supply Netlist with DRAM and NAND "on request," 7-ER-1532 (¶¶ 25-29);

(ii) breach of section 3.1 based on Samsung's withholding of taxes on its $8 million payment,[1] 7-ER-1532-1533 (¶¶ 30-34); and (iii) a declaratory-relief claim seeking a judgment that Netlist had validly terminated the JDLA based on Samsung's two allegedly material breaches, 7-ER-1533-1534 (¶¶ 35-41).

Samsung moved for judgment on the pleadings, arguing (among other things) that Netlist could not validly terminate under the doctrine of election of remedies, as Netlist had waited years after the alleged breaches to terminate the JDLA. ECF 60 at 22-23. The court denied Samsung's motion, 1-ER-49, finding Samsung's election-of-remedies argument waived because Samsung did not expressly plead it as a defense in its answer, 1-ER-55.

2. The parties then completed discovery and cross-moved for summary judgment. The district court granted partial summary judgment to Netlist, as follows. 1-ER-27.

As to Netlist's first claim (the supply-obligation claim), the court construed JDLA section 6.2 to "unambiguously create[] a mandatory obligation on Samsung"—unconnected to the NVDIMM-P joint-development project—"to supply [NAND and DRAM] products to Netlist on

---

[1] Netlist also alleged that Samsung failed to reasonably cooperate in Netlist's effort to obtain a tax refund, 7-ER-1533 (¶ 32), but later abandoned this claim, *see* 2-ER-94.

request," 1-ER-34, and concluded that Samsung had breached that obligation, 1-ER-36. The court determined that a jury should decide the "element[]" of damages resulting from Samsung's breach. 1-ER-48.

As to Netlist's second claim (the tax-withholding claim), the court held that Samsung's withholding of 16.5% of its $ 8 million payment breached JDLA section 3.1, because Samsung may withhold taxes only as "required by applicable law." 1-ER-41. Samsung's withholding was not required by law, the court reasoned, because the Korean tax authority, after originally siding with Samsung, ultimately "concluded that the ... fees were not a patent royalty payment subject to tax withholding." 1-ER-41-42. The court, however, left open the question of damages resulting from Samsung's breach. 1-ER-48.

The court also granted Netlist summary judgment as to its third claim for a declaratory judgment that it properly terminated the JDLA. 1-ER-44. The court found that Samsung's breaches were material. 1-ER-45. And the court found that Netlist had not waived its right to terminate the JDLA by delaying termination proceedings until years after the alleged breaches. 1-ER-46.

Finally, the court held that JDLA section 12.5 precludes Netlist from recovering consequential damages. 1-ER-47.

3. In advance of trial, Netlist clarified that the only damages it sought based on its section 3.1 breach claim were fees it paid its tax consultant, PricewaterhouseCoopers ("PwC"), for assistance in obtaining a refund, and the parties agreed that whether those were barred consequential damages presented a legal issue for the court, not the jury. *See* 1-ER-5. Moreover, although Netlist had never moved for summary judgment as to Samsung's affirmative defenses—including waiver, estoppel, or acquiescence—the district court held that Samsung had forfeited those defenses by not itself raising them at summary judgment. 1-ER-17. Thus, the case proceeded to a jury trial only on the "element" of "damages to the plaintiff caused by the defendant's breach [of section 6.2]," 2-ER-90: the court asked the jury whether Netlist "prove[d] that it suffered damages as a result of Samsung's failure to fulfill Netlist's orders for NAND and DRAM products in breach of Section 6.2," and the jury answered "No." 2-ER-59.

4. Both parties then moved for entry of judgment in their favor, and the court entered judgment for Netlist. 1-ER-2.

As to the section 6.2 supply-obligation claim, the court entered judgment for Netlist with a nominal-damages award, holding that "nominal damages are always available" even when the plaintiff establishes "no loss" resulting from the alleged breach. 1-ER-6. As to the section 3.1

-16-

tax-withholding claim, the court held that the fees Netlist paid PwC were barred consequential damages, 1-ER-7, but again found that nominal damages were available for this and all contract violations, 1-ER-9.

Finally, the court denied Samsung's request that the court alter its previous interlocutory grant of summary judgment on Netlist's declaratory-relief claim under Federal Rule of Civil Procedure 54(b). The court considered Samsung's arguments on the merits and reiterated its summary judgment ruling that Samsung's alleged breaches were material as a matter of law. 1-ER-11.

## SUMMARY OF ARGUMENT

I. Samsung is entitled to judgment on Netlist's first claim—i.e., its supply-obligation claim.

A. Section 6.2 is an obligation to supply memory components for the NVDIMM-P joint-development project, not an unlimited obligation to supply NAND and DRAM for any purpose.

1. Read in light of the JDLA as a whole, section 6.2 unambiguously requires Samsung to fulfill only Netlist's NAND and DRAM orders related to the NVDIMM-P joint-development project. The JDLA's text, context, and structure show that its core purpose was to establish the terms of the parties' agreement to jointly develop a new NVDIMM-P product. Under New York

law, section 6.2 must be read consistently with that purpose—i.e., a supply obligation tied to the joint-development project, giving rise to the supply provision. The district court's contrary reading flouts a reasonable businessperson's expectations, because it presupposes the parties intended an unlimited supply guarantee asymmetrical to Netlist's NVDIMM-P-related obligations under the agreement, and inconsistent with the agreement's purpose.

2. At the very least, section 6.2 is ambiguous. The Court may thus consider extrinsic evidence, and the undisputed extrinsic evidence compels Samsung's interpretation. The parties' negotiations and drafting history show that they intended to link Samsung's supply obligation to the NVDIMM-P product. And the parties' post-signing representations and course of conduct, including Netlist's audited SEC filings, confirm as much.

Because Netlist does not allege that Samsung failed to supply NAND and DRAM for the NVDIMM-P project, Samsung is entitled to judgment on this claim.

B. Moreover, Samsung is entitled to judgment because Netlist failed to establish an essential element of its contract claim: damages resulting from any breach.

-18-

1. Damages are an essential element of a breach-of-contract claim under New York law.  The jury found that Netlist had suffered no damages resulting from any breach of section 6.2.

2. The district court's decision to award nominal damages and enter judgment for Netlist was legal error.  New York law makes nominal damages available only when a plaintiff establishes the existence of resulting damages but fails to quantify the amount of those damages—not when a plaintiff, like Netlist, establishes *no* resulting damages at all.

II. Samsung is also entitled to judgment on Netlist's second claim—i.e., its tax-withholding claim.

A. Samsung did not violate section 3.1 by reasonably paying taxes to Korean authorities.  Sections 3.1 and 3.2 obligated Samsung to pay Netlist an $8 million fee but also allowed Samsung to withhold applicable taxes.  Samsung withheld 16.5% of its payment based on a reasonable interpretation of Korean law—indeed, the lower Korean tax authority agreed with Samsung.  The district court's view that a reasonable but mistaken tax withholding constitutes a breach of section 3.1, is irreconcilable with section 3.2, which requires Samsung to "reasonably cooperate with Netlist in any lawful efforts to claim a … refund … with respect to any … withholding taxes."  Because section 3.2 expressly contemplates refunds—and a refund would be

-19-

necessary only after an erroneous withholding—erroneous withholdings are part of the contractual design, not a breach. That result is confirmed by section 13.2, which imposes a severe remedy for material contractual breaches. No reasonable businessperson would have agreed to section 13.2 if they knew that they risked such severe remedies through a reasonable but mistaken interpretation of Korean tax law.

B. Even if Samsung breached section 3.1, it would still be entitled to judgment because Netlist failed to show damages resulting from Samsung's breach. The district court's award of nominal damages was again legally erroneous for the reasons explained above.

III. Netlist's third claim sought a declaratory judgment that Netlist properly terminated the agreement upon material breaches by Samsung. As an initial matter, that claim fails because there were no breaches. But even if there were, there is a fact question as to their materiality that only a jury could properly decide.

A. New York law sets forth a multi-factor materiality test to determine whether a breach of contract is material or not. But rather than applying that multi-factor test (or allowing the jury, which typically applies the test, to do so), the district court concluded that Samsung's alleged breaches of sections 6.2 and 3.1 were material because those sections were important to the

-20-

JDLA. That was legal error—materiality turns not on whether the breached provisions are important, but rather on whether the breaches themselves were material. That question is answered by applying New York's multi-factor test, which is usually for the jury to consider. And here, a reasonable jury could have easily applied those factors to find that any breach by Samsung was not material. To take one example, several of the New York materiality factors consider the level of harm caused by the breach, and the jury and district court found that the breaches resulted in *no* damages. The district court's determination that Samsung's alleged breaches were material as a matter of law was thus divorced from New York's multi-factor materiality test.

B. The district court also wrongly concluded that the JDLA's no-waiver provision precludes a finding of waiver as to Netlist's third claim for relief even though Netlist waited years before attempting to terminate the JDLA, despite knowledge of the alleged breaches. The district court misconstrued the no-waiver provision and ignored New York law, preventing parties from relying on such provisions in the circumstances presented here.

IV. The district court also erred in not allowing Samsung to pursue its affirmative defenses at trial.

A. The district court erroneously precluded Samsung from raising at trial affirmative defenses of waiver, estoppel, and acquiescence on the ground that Samsung did not raise them at summary judgment. It is black-letter law that unless the plaintiff seeks summary judgment on an affirmative defense, that defense is preserved for trial even if the defendant does not raise the defense in its own summary-judgment papers. Netlist did not move for summary judgment on Samsung's affirmative defenses, and the district court erred in precluding Samsung from raising them at trial.

B. The district court also erroneously held that Samsung forfeited its election-of-remedies defense by not pleading it in its answer. But election of remedies is already encompassed in a defense that Samsung *did* plead—estoppel—and was thus preserved under the federal rules.

## STANDARD OF REVIEW

This appeal arises from the district court's partial grant of summary judgment to Netlist. "A grant of summary judgment is reviewed de novo." *L.F. v. Lake Wash. Sch. Dist. #414*, 947 F.3d 621, 625 (9th Cir. 2020). So too are denials of motions for judgment on the pleadings. *See Doe v. United States,* 419 F.3d 1058, 1061 (9th Cir. 2005).

As explained below, later proceedings confirmed that summary judgment as to Netlist's claims was erroneous, but the district court declined

to revise its ruling under Federal Rule of Civil Procedure 54(b) before entering judgment. That decision is likewise reviewed de novo: as explained in Part III.A below, the district court's decision to stick with its interlocutory summary judgment ruling was based on its view that Samsung's alleged breaches of contract were material as a matter of New York law, and questions of law are reviewed de novo, *see Disability Law Ctr. of Alaska, Inc. v. Anchorage Sch. Dist.*, 581 F.3d 936, 938 (9th Cir. 2009).

The substantive law of New York governs this dispute. *See* 4-ER-720, § 14 (JDLA choice-of-law provision).

## ARGUMENT

## I.   Samsung Is Entitled To Judgment On Netlist's Supply-Obligation Claim

Judgment on Netlist's first claim—that Samsung violated section 6.2 by failing to meet its NAND and DRAM supply obligations—cannot stand for multiple reasons.

### A.   Samsung Did Not Breach Section 6.2 Because That Provision Only Requires Samsung To Fulfill DRAM And NAND Orders Related To The NVDIMM-P Joint-Development Project

New York contract interpretation follows a two-step process. Courts first determine "[w]hether a contract is ambiguous" as "a question of law." *S. Road Assocs., LLC v. IBM Corp.*, 4 N.Y.3d 272, 278 (2005). If the contract is unambiguous, then a court must "enforce[] [it] according to its terms."

-23-

*Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007). Where a contract is "ambiguous," however, "[e]xtrinsic evidence of the parties' intent may be considered." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002).

Here, the JDLA unambiguously provides that section 6.2's supply obligation is limited to the parties' NVDIMM-P joint-development project. But at minimum, the contract is ambiguous, and the undisputed extrinsic evidence overwhelmingly supports Samsung's reading. Because Netlist does not argue that Samsung failed to supply NVDIMM-P-related memory components, judgment for Samsung is required on this claim.

1. *Section 6.2 Unambiguously Requires Samsung To Fulfill DRAM And NAND Orders Only For The NVDIMM-P Joint-Development Project*

a. To determine whether a contract is unambiguous, New York courts must discern "the intention of the parties [as] gathered from the four corners of the instrument." *Beal*, 8 N.Y.3d at 324. Three interpretive principles are especially salient here.

*First,* courts must read the document "as a whole, and every part will be interpreted with reference to the whole." *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003).

*Second*, courts must discern from the contractual language and structure "the apparent purpose of the parties," and then construe the

"[w]ords in [the] contract … to achieve th[at] apparent purpose." *Hooper Assocs., Ltd. v. AGS Comps., Inc.*, 74 N.Y.2d 487, 491 (1989); *see Beal*, 8 N.Y.3d at 324-25.

*Third*, courts disfavor constructions that produce "commercially unreasonable" results that the parties likely did not intend. *Cole v. Macklowe*, 99 A.D.3d 595, 596 (N.Y. App. Div. 2012); *see Uribe v. Merchants Bank of N.Y.*, 91 N.Y.2d 336, 340 (1998) (the "reasonable expectation and purpose of the ordinary business[person] when making an ordinary business contract serve as the guideposts").

b. Under these principles, Samsung's section 6.2 supply obligation is unambiguously tied to the NVDIMM-P product that the parties were jointly developing.

When the JDLA is read "as a whole," *Westmoreland Coal*, 100 N.Y.2d at 358, it is clear that the parties' "apparent purpose," *Hooper Assocs.*, 74 N.Y.2d at 491, was to jointly develop a new NVDIMM-P product. The contract's title is "Joint Development and License Agreement," and its preamble states that "the Parties intend to work together to jointly develop an interface and associated technologies for certain memory modules." 4-ER-709. The contract defines the "joint development project" to mean "the collaborative efforts by the Parties to develop" the "NVDIMM-P Product." 4-

-25-

ER-711, § 1.  The contract outlines the parties' multi-phase plans to develop the NVDIMM-P product.  4-ER-712-713, § 2.  And the parties agreed that once the product was developed, they would "work together to bring a Developed Product to market."  4-ER-714, § 5.3.  In short, the JDLA's core purpose is to establish terms under which the parties would jointly develop and bring to market a new NVDIMM-P product.

Section 6 must be interpreted "to achieve [this] apparent purpose of the parties," *Hooper Assocs.*, 74 N.Y.2d at 491, and "with reference to the whole" JDLA, *Westmoreland Coal, Inc.*, 100 N.Y.2d at 358.  Section 6 is entitled "Supply of **Components**," 4-ER-714-715, § 6 (emphasis added)—so naturally, the referenced "components" are those necessary to jointly develop the NVDIMM-P product, not products promised in unlimited quantities to be used for any purpose.  Section 6.1 states that "Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer."  4-ER-714, § 6.1.  Correspondingly, section 6.2 provides that "Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (*i.e.*, among customers purchasing similar volumes of similar products)."  4-ER-714-715, § 6.2.  Each provision requires one party to supply the other with applicable components for NVDIMM-P products.  *See infra* at 28-29.

-26-

This construction follows naturally from the "reasonable expectation and purpose of the ordinary business[person] when making an ordinary business contract." *Uribe*, 91 N.Y.2d at 341. When agreeing to a contract principally addressing joint development of a particular product, an ordinary businessperson would understand that their obligation to supply "components" is tethered to that particular product. They would not understand their obligation to be an unlimited promise to supply all products the counterparty might need for any reason, including for reselling to third parties in a supply-constrained memory market. Such a reading runs afoul of the "well settled principle that a contract should not be interpreted to produce ... commercially unreasonable" results. *Cole*, 99 A.D.3d at 596.

c. The district court nevertheless held that section 6.2 "unambiguously creates a mandatory obligation on Samsung to supply" unlimited NAND and DRAM on request, even when unrelated to the NVDIMM-P joint-development project. 1-ER-34; *see* 1-ER-33-35. That conclusion flowed from three independent legal errors.

First, the court failed to read section 6.2's language in the context of the JDLA as a whole. Section 6.2 is not a "straightforward," 1-ER-33, term for the supply of goods generally that just happened to be placed into a joint development agreement, but rather is a term for the "supply of components"

-27-

(to quote section 6's title) that are necessary for the particular product to be jointly developed by the parties.  New York courts recognize that sometimes the words of a single provision (here, section 6.2) "might seem to admit of a larger sense," but in fact "should be restrained to the particular occasion and to the particular object"—here, the joint-development project—"which the parties had in view."  *Hooper Assocs.*, 74 N.Y.2d at 491.  The district court failed to heed this admonition.

Second, the court drew an inappropriate negative inference from section 6.1.  *See* 1-ER-35.  Because section 6.1 specifically references NVDIMM-P and section 6.2 does not, the court reasoned, section 6.2 must reach *all* NAND and DRAM, whether or not related to NVDIMM-P.  *Id.*  But the "force of any negative implication ... depends on context," *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013), and the contractual context here precludes the court's conclusion.  Netlist promised to provide controllers for NVDIMM-P products, not any generic controller.  Section 6.1 refers to an "NVDIMM-P controller" because that is what Netlist agreed to supply.  The products that section 6.2 required Samsung to supply, in contrast, are generic types of memory that can be used for many computing purposes, not just the NVDIMM-P product.  For example, the JDLA defines "NVDIMM-P Product" to mean a "memory module" that "combines a smaller density of

-28-

fast memory like DRAM with a higher density of slower memory like NAND", 4-ER-711, § 1—NAND and DRAM are described generically as components of the NVDIMM-P product.  Section 6.2 thus accurately describes exactly what Samsung was required to supply for the NVDIMM-P project—namely, generic NAND and DRAM, full stop.  Sections 6.1 and 6.2 are, in other words, complementary to each other—they each set forth the components that the other party agreed to supply for the NVDIMM-P joint-development project.

Third, the court reasoned that because JDLA sections 7 and 8—which grant mutual release of patent-infringement claims and cross-licensing of patents—do not "pertain specifically to the NVDIMM-P project," section 6.2 may be read in the same manner.  1-ER-34-35.  This reading misunderstands the contract's structure.  As the JDLA's title shows, the agreement addresses two distinct items: (1) "joint development" of the NVDIMM-P product and (2) "licens[ing]" of the parties' patents.  4-ER-709.  Sections 7 and 8 speak to the patent licenses.  It therefore makes sense that Sections 7 and 8 do not speak in NVDIMM-P-specific terms.  *See, e.g.,* 4-ER-711, § 1 (defining "Netlist's Licensed Patents" to mean "*any and all* Patents owned or controlled by Netlist or any of its Subsidiaries" (emphasis added)); *id.* (defining Samsung's "Licensed Products" to mean "*all* semiconductor

-29-

products manufactured or have manufactured by or for Samsung or its Subsidiaries" (emphasis added)).

Section 6, by contrast, sets out obligations for effectuating the joint development project.  For one thing, the section is labeled "Supply of *Components*," which naturally relates to the new technology the parties were developing rather than to patent licensing.  That is confirmed by section 6.1, under which "Netlist will provide Samsung any NVDIMM-P controller," 4-ER-714, § 6.1—an NVDIMM-P component.  It would be anomalous if section 6 covered only NVDIMM-P components in its first subpart, but included non-NVDIMM-P products in its second subpart.  And indeed, NAND and DRAM—the focus of section 6.2—are two of the main components of NVDIMM-P. *See supra* at 28.  So while it is true that sections 7 and 8 do not "pertain specifically to the NVDIMM-P project," 1-ER-34-35, that says nothing about section 6.2's scope.  When read in context, section 6.2 unambiguously imposes an obligation on Samsung to supply NAND and DRAM only for the parties' joint-development project.

  2. *At Minimum, Section 6.2 Is Ambiguous, And The Extrinsic Evidence Compels Samsung's Interpretation*

At the very least, the contract is "reasonably susceptible" of Samsung's construction. *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 572 (1986).  When faced with an ambiguous contract, "the courts of New York will examine the

record as a whole in an effort to interpret the agreement so as to effectuate the intent of the parties." *Bank of N.Y. v. Amoco Oil Co.*, 35 F.3d 643, 661 (2d Cir. 1994); *see Greenfield*, 98 N.Y.2d at 569. Here, the undisputed extrinsic evidence shows that Samsung's section 6.2 supply obligation is limited to components for NVDIMM-P products.

The parties' contractual negotiations are revealing. *See, e.g.*, *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248-49 (1975) ("evidence of conversations, negotiations and agreements made prior to or contemporaneous with the execution of a [contract] ... is generally admissible to explain ambiguities therein"). An early Netlist proposal included a section called "Technology Collaboration," under which "Samsung [would] supply NAND [and] DRAM" as "Raw Materials" for that Technology Collaboration on "mutually agreed terms." 2-ER-276 (¶ 24). Netlist's CEO testified that "Technology Collaboration" referenced the "NVDIMM-P technology," 3-ER-376, and "Raw Materials" referenced "the components themselves," i.e., "DRAM" and "NAND," 3-ER-377. Another Netlist proposal included a section called "Phase 2: Technology Productization," under which the parties would "work together to bring an NVDIMM-P product to market," and Samsung would "supply NAND and DRAM" as "Raw Materials" for that product on "mutually agreed terms." 2-

ER-276-277 (¶ 27); *see also* 3-ER-379 (Netlist's CEO testifying that "Raw Materials" referenced DRAM and NAND "provided in connection with the commercialization of the dash P product [the NVDIMM-P product].").

Importantly, section 6 of the MOU stated that as "Raw Materials," "Samsung will provide competitive pricing (i.e. among customers purchasing the same products and similar volumes) for the supply of Samsung NAND and DRAM products." 2-ER-278-279 (¶ 32). Reflecting the earlier proposals, Netlist's CEO testified that Samsung's supply obligation under this section applied to "[t]he dash P product"—i.e., the NVDIMM-P product—"if it ever … became commercialized" (which never occurred). 3-ER-380. There is no plausible basis to construe the JDLA as departing so drastically from the MOU on which the JDLA was explicitly based.

Moreover, if the JDLA had granted Netlist an unlimited supply of NAND and DRAM, Netlist presumably would have announced this momentous fact to the market and its shareholders in SEC filings—such a supply guarantee would have been a significant accomplishment in an industry plagued by unstable supply. *See supra* at 11-12. Yet Netlist's audited annual 10-K reports to its shareholders and the SEC following the JDLA—which Netlist's lawyers surely examined in detail—described the JDLA's joint-development and licensing provisions without mentioning any

-32-

long-term supply commitment with Samsung, 4-ER-627, and instead stated (for the five years following the JDLA) that Netlist had "*no long-term … supply contracts*" for DRAM and NAND, 4-ER-606 (emphasis added); 2-ER-282-283 (¶¶ 43-44).  If section 6.2 actually established an unlimited supply obligation, that sort of audited statement to shareholders and the SEC would be inexplicable.  Moreover, when Netlist actually *did* enter into a long-term supply contract with another supplier (SK Hynix) in 2021, it reported the contract to the SEC immediately.  5-ER-902 ("The Supply Agreement entitles Netlist to purchase up to $600,000,000 of SK Hynix memory products during the term of the Supply Agreement.").

The parties' "post-contract course of performance"—"which is highly probative of their state of mind at the time the contract was signed," *China Privatization Fund (Del.) v. Galaxy Entm't Grp. Ltd.*, 187 A.D.3d 596, 597 (N.Y. App. Div. 2020)—confirms the point.  From 2015 into 2017, while the parties' joint-development project proceeded on one track, their normal business transactions—which started before the JDLA and continued after it—proceeded on another: Netlist would request NAND and DRAM from Samsung through purchase orders stating that they represented "the entire agreement between [the] parties with respect to the subject matter"; and Samsung would fulfill some orders but not others. *See* 2-ER-283-285 (¶¶ 46-

-33-

53); *supra* at 11.  For instance, in April 2016, Netlist wrote to Samsung in hopes of buying more NAND: "I know it's insane but want to … try our luck." 3-ER-447 (¶ 71).  And when Samsung did not provide Netlist with the amount of NAND and DRAM it wanted, Netlist sought a larger "monthly allocation." 2-ER-119-120 (¶ 104).  Netlist does not dispute that Samsung complied with its supply obligations during this period.  *See* 2-ER-214 (¶ 48); 2-ER-112 (¶ 71).  Yet this course of conduct would make no sense if the JDLA had already secured Netlist the right to buy all the NAND and DRAM it wanted.

Nor would Netlist's February 2017 request for a "New Partner Type" relationship and an "Official-Distributor Partnership Agreement" that would require Samsung to provide additional NAND and DRAM "Product Allocation support for Netlist."  2-ER-283 (¶ 45); 2-ER-212 (¶ 45).  Netlist would not have needed to make this request for additional supply of NAND and DRAM products if the JDLA *already* guaranteed unlimited supply outside of the joint-development project.

Finally, because the JDLA was "negotiated by counsel for sophisticated commercial parties," the Court should interpret any "ambiguous language to realize the reasonable expectations of the ordinary businessperson."  *Bank of N.Y.*, 35 F.3d at 662.  No ordinary businessperson in Samsung's position would agree to supply an unquantified amount of DRAM and NAND to a

-34-

single customer on "request at a competitive price." 4-ER-714-715, § 6.2. Samsung is one of the world's leading suppliers in a memory industry that experiences endemic supply shortages, *see supra* at 5, 12, so an unlimited supply commitment to one customer would seriously jeopardize Samsung's sales to its many *other* customers. Assuming such a commitment is especially unreasonable where (as here) Netlist's own supply obligation is narrowly tailored to the NVDIMM-P context, which would make Samsung's supply obligation bizarrely and unfairly asymmetrical.[2]

\* \* \*

The only plausible reading of section 6.2 is that Samsung's supply obligation was tied to the NVDIMM-P joint-development project. Netlist does not claim that Samsung failed to supply sufficient NAND and DRAM for the NVDIMM-P project. *See* ECF 192 at 14. Samsung is thus entitled to judgment on Netlist's first claim.

---

[2] For the reasons given, if the Court finds section 6.2 ambiguous, it should reverse the district court's judgment on the ground that the undisputed extrinsic evidence compels Samsung's interpretation. If the Court finds, however, that the extrinsic evidence is disputed, it should remand for a trial on section 6.2's scope.

## B. The Jury's Finding That No Damage Resulted From Any Violation Of Section 6.2 Independently Requires Judgment For Samsung On Netlist's Supply-Obligation Claim

Samsung is independently entitled to judgment on Netlist's supply-obligation claim because Netlist did not establish the essential element of damages resulting from a breach.

### 1. Resulting Damages Is An Essential Element Of Netlist's Supply-Obligation Claim, And The Jury Found No Such Damages

Under New York law, "[i]n order to recover from a defendant for breach of contract, a plaintiff must prove ... (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). Each element is essential, and as New York appellate courts have repeatedly held, "[f]ailure to prove the essential element of damages is fatal to a cause of action for breach of contract." *Proper v. State Farm Mut. Auto. Ins. Co.*, 63 A.D.3d 1486, 1487 (N.Y. App. Div. 2009).[3] Thus, even if a plaintiff is

---

[3] *See also*, *e.g.*, *ERE LLP v. Spanierman Gallery*, LLC, 94 A.D.3d 492, 493 (N.Y. App. Div. 2012); *Viacom Outdoor Inc. v. Wixon Jewelers, Inc.*, 82 A.D.3d 604 (N.Y. App. Div. 2011); *Fellion v. Darling*, 14 A.D.3d 904 (N.Y.

"shafted by [a] [d]efendant's breach of its duties …, the Court is constrained to find in favor of [a] Defendant" where a plaintiff "has failed to prove by a preponderance of the evidence that it suffered damages as a result of [the] Defendant's breach." *Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 480 (S.D.N.Y. 2018).

The Appellate Division's decision in *Fellion v. Darling*, 14 A.D.3d 904 (N.Y. App. Div. 2005), illustrates this principle. There, the defendants owned two fuel-transportation businesses (Econo Fuels and Trans Fuel) and sold one of them (Trans Fuel) to the plaintiffs. *Id.* at 905. The plaintiffs sued for breach of contract, arguing that the defendants had "continue[d] to use the Trans Fuel name, identification numbers, access card and manifests after sale." *Id.* at 906-07. The trial court found that these actions violated the contract terms, but also found that the plaintiffs "failed to demonstrate any resultant damages from such conduct." *Id.* at 907. And the Appellate Division held that this "failure to prove damages is … fatal to plaintiff[s'] breach of contract cause of action." *Id.*

---

App. Div. 2005); *Lexington 360 Assocs. v. First Union Nat'l Bank of N.C.*, 234 A.D.2d 187, 191-92 (N.Y. App. Div. 1996); *Cramer v. Spada*, 203 A.D.2d 739, 741 (N.Y. App. Div. 1994).

Judgment on Netlist's breach-of-contract claim under section 6.2 cannot stand under these principles. The district court instructed the jury on the four "elements of a cause of action for breach of contract." 2-ER-90. Because the court had already granted Netlist summary judgment on the first three elements, the only question for the jury was whether Netlist had "prove[d] that it suffered damages as a result of Samsung's failure to fulfill Netlist's orders for NAND and DRAM products in breach of Section 6.2 of the JDLA." 2-ER-59. And the jury answered "No." *Id.* Thus, the jury's finding means that Netlist failed "to demonstrate any resultant damages from such conduct." *Fellion*, 14 A.D.3d at 907. "Th[is] failure to prove damages" is "fatal to [Netlist's] breach of contract cause of action." *Id.*

2. *The District Court Erred By Awarding Nominal Damages*

Yet despite the jury's no-damages verdict, the district court entered judgment for Netlist. 1-ER-6. In so doing, the court erroneously concluded "that '[n]ominal damages are *always* available in breach of contract actions.'" *Id.* (quoting *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 95 (1993)).[4]

---

[4] The district court did so even though Netlist forfeited its nominal-damages claim by failing to seek such damages in its pretrial order or before the jury. *See Hunt v. Cnty. Of Orange*, 672 F.3d 606, 617 (9th Cir. 2012) ("issues not preserved in the pretrial order [are] eliminated from the action"); *Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 23 (1st Cir. 2004) (plaintiff

The district court's analysis—which would render the damages element meaningless—is flawed.

In diversity cases, when "there is relevant precedent from the state's intermediate appellate court, the federal court must follow the state's intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it." *Teleflex Med. Inc. v. Nat'l Union Fire Ins. Co.*, 851 F.3d 976, 982 (9th Cir. 2017) (quotation omitted). As shown above, a long line of intermediate New York appellate precedent holds that resulting damages is an essential element of a breach-of-contract claim. *See supra* at 36-37 & n. 4. There is no "convincing evidence" that the New York Court of Appeals would disagree.

To support its ruling, the district court relied on a passing sentence from *Kronos*, a 1993 Court of Appeals decision addressing a tort claim—*not* a breach-of-contract claim. *See* 81 N.Y.2d at 95. According to the district court, New York's appellate courts have consistently misunderstood New York law by holding that resulting damages is an essential element of contract breach. *See supra* at 36-37 & n.4. In fact, however, the intermediate

---

"unmistakably forfeited her claim" to nominal damages by failing to propose jury instruction and to argue for nominal damages at trial).

appellate precedent described above is entirely consistent with *Kronos*, which simply notes the general rule that a plaintiff who shows at least *some* resulting damages but cannot quantify them can still obtain nominal damages and judgment.  Where "it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount," a "person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain."  *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209 (1886); *see Freund v. Washington Sq. Press*, 34 N.Y.2d 379, 383-84 (1974) (where amount of damages was "not proved with the required certainty," "nominal damages alone are recoverable").  But *Kronos* does not hold that a plaintiff can sustain a contract-breach claim without proving *any* resulting damages at all.  Again, such a reading of *Kronos* would render the essential element of resulting damages meaningless.

The Second Circuit recently explained this distinction.  In *Holland Loader Co. v. FLSmidth A/S*, 769 F. App'x 40 (2d Cir. 2019), the plaintiff "argue[d] that the district court erred in ignoring the long-standing New York rule that '[a] person violating his contract should not be permitted entirely to escape liability because the amount of damage which he has caused is uncertain.'"  *Id.* at 43.  But "this rule," the Second Circuit explained,

-40-

"applies only *after* the existence or fact—as opposed to the amount—of damages is determined to be reasonably certain." *Id.* "Because the district court held that [the plaintiff] failed to prove the *fact* of damage with reasonable certainty," the Second Circuit reasoned, "it never reached the question of the amount of damages" and thus "did not err in not invoking the wrongdoer rule." *Id.*; *see Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 111 (2d Cir. 2007) (distinguishing between "the fact of damage [being] established" and "a reasonable estimate [of damages]").

The failure to prove the *fact* of resulting damages is what doomed the claims in the intermediate appellate decisions described above. And it is what dooms Netlist's claim here: the jury unequivocally answered "no" when asked whether Netlist had suffered damages resulting from Samsung's breach of section 6.2. 2-ER-59. That ends the matter, and Samsung is entitled to judgment.

## II. Samsung Is Entitled To Judgment On Netlist's Tax-Withholding Claim

Netlist's second claim—its tax-withholding claim—asserts that Samsung breached JDLA section 3.1 by withholding 16.5% ($1.32 million) of its $8 million payment to Netlist and paying that sum to the Korean tax authority. Again, the district court erred twice over in entering judgment for Netlist on that claim.

-41-

## A. Samsung Did Not Violate Section 3.1 By Reasonably Withholding Taxes

JDLA section 3.1 requires Samsung to pay Netlist $8 million. 4-ER-713, § 3.1. Section 3.2 then provides that "[t]o the extent that any withholding taxes are required by applicable law for the payment set forth in this Agreement, Samsung may deduct any applicable withholding taxes due or payable under the laws of Korea in remitting payment to Netlist." 4-ER-713, § 3.2. Section 3.2 further provides that if Samsung deducts withholding taxes, it must "reasonably cooperate with Netlist in any lawful efforts to claim … a refund or exemption with respect to any such withholding taxes." *Id.*

The district court did not question the reasonableness of Samsung's withholding of 16.5% of its $8 million payment. Nor could it. Upon consulting with Netlist, Samsung determined that Korean law required the payment to Korean tax authorities because Samsung's payment included royalties for Netlist's grant of patent licenses, and a 16.5% rate applied to royalty payments. 2-ER-289-290 (¶¶ 73-75). Before the parties signed the JDLA, Samsung also sent Netlist a tax form indicating that the 16.5% tax rate applicable to royalty payments would apply, and Netlist's CFO signed and returned the form to Samsung. 2-ER-289 (¶¶ 70-71). Also, when Netlist sought review of Samsung's determination by Korean tax authorities, the lower Korean tax authority agreed with Samsung's withholding. 3-ER-432-

-42-

433 (¶ 52). While the higher tax tribunal ultimately agreed with Netlist, 3-ER-433 (¶ 53), that ruling does not undermine the reasonableness of Samsung's position on a debatable question of Korean tax law. Following the tribunal's ruling, Netlist received a full refund with interest. 2-ER-261 (¶ 78).

The district court nevertheless held that "the reasonableness of Samsung's position is immaterial to whether it breached its obligation" because "the JDLA leaves no room for Samsung's reasonable misinterpretation of Korean tax law." 1-ER-42. The court therefore entered judgment for Netlist "on the breach element." *Id.* The district court erred by reading a strict-liability standard into section 3.

1. Section 3.1 must be read in the context of the contract as a whole, including its neighboring provision, section 3.2. *See supra* at 24. Section 3.2 requires Samsung to "reasonably cooperate with Netlist in any lawful efforts to claim a ... refund ... with respect to any ... withholding taxes." 4-ER-713, § 3.2. By referencing the need "to claim a ... refund," section 3.2 contemplates that Samsung may reasonably but erroneously withhold taxes—after all, a refund would be necessary only after an erroneous withholding. And Samsung cannot breach section 3.1 by reasonably doing something—erroneously withholding taxes—that section 3.2 plans for and seeks to remedy. Said otherwise, section 3.2 treats reasonable but erroneous

-43-

withholdings as part of the contractual design, and directs the parties how to respond to such withholdings (by cooperating to claim a refund). Deeming those same withholdings per se contractual violations is inconsistent with that design.

The district court's construction—that all erroneous withholdings constitute breaches—also leads to absurd results. The JDLA requires that Samsung "reasonably cooperate" to obtain a refund of erroneously paid Korean taxes, which, under the district court's view that all erroneous withholdings are automatic breaches, would mean that Samsung is contractually obligated to "reasonably cooperate" in establishing *its own breach*. The parties plainly did not intend to place Samsung in that untenable position. Rather, the only sensible construction of section 3 is that Samsung fulfills its obligations so long as it reasonably interprets Korean tax law and reasonably cooperates in Netlist's refund efforts.

2. The broader context—including the JDLA's purpose and the parties' reasonable expectations, *see supra* at 24-25—confirms this result. Section 13.2 allows a party to terminate the JDLA if the other party materially breaches the agreement. *See* 4-ER-720, § 13.2. And the effect of such a termination is severe: "all licenses and other rights granted to [the] defaulting Party pursuant to this Agreement will cease forthwith as of the

-44-

effective date of such termination," whereas "the license granted to the non-defaulting Party will continue in full force and effect." 4-ER-720, § 13.3.

No ordinary businessperson would agree to this sweeping breach-of-contract remedy if he knew that he could risk triggering it merely by adopting a reasonable but mistaken interpretation of Korean tax law. *See Uribe*, 91 N.Y.2d at 341 (construing contract in accordance with the "reasonable expectation and purpose of the ordinary business[person] when making an ordinary business contract"); *Raymond Corp. v. Nat'l Union Fire Ins. Co.*, 5 N.Y.3d 157, 165 (2005) (construing contract in accordance with "common and economic sense"). The proper reading of section 3.1, then, is that a reasonable withholding is no breach at all. That requires judgment for Samsung on Netlist's second claim.

## B. The District Court's Finding That No Damage Resulted From Any Violation Of Section 3.1 Independently Requires Judgment For Samsung On Netlist's Tax-Withholding Claim

Samsung is also entitled to judgment because Netlist failed to prove the resulting-damages element of a breach-of-contract action—just as it did with its supply-obligation claim. *See supra* at 37.

Netlist's only alleged damages resulting from Samsung's supposed breach of section 3.1 were the fees it paid PwC for assisting in Netlist's refund effort. *See supra* at 16. The district court properly held that "Netlist did not

-45-

incur the PwC fees as a direct result of Samsung's breach of its payment obligation" and thus was not entitled to damages under the JDLA's consequential-damages bar.  1-ER-7.  Yet the district court still awarded nominal damages because it thought nominal damages were always required, even without proof of resulting damages.  1-ER-9.

For the reasons explained above, Netlist's failure to demonstrate damages resulting from any breach means that it has not established an essential element of its claim.  *See supra* 36-37 & n.4.  The district court thus should have granted Samsung judgment on Netlist's tax-withholding claim on this basis as well.

## III. Samsung Is Entitled To Judgment, Or At Least A Trial, On Netlist's Declaratory-Relief Claim

Samsung is entitled to judgment, or at least a trial, on Netlist's third claim, seeking a declaration that Netlist validly terminated the JDLA.  Section 13.2 gives both parties "a right to terminate this Agreement upon written notice to a Party if … such Party is in material breach of this Agreement."  4-ER-720, § 13.2.  Because there was no breach at all, *see supra* Parts I & II, there was no "material breach" as required to justify termination under the JDLA.  That is both because the district court's breach-of-contract findings turned on erroneous constructions of sections 6.2 and 3.1, and because Netlist failed to establish the essential damages element as to either

-46-

alleged breach, *see, e.g.*, *Reuter v. Jax Ltd., Inc.*, 711 F.3d 918, 920-21 (8th Cir. 2013) (no material breach to justify termination where plaintiff failed to prove damages element of breach-of-contract claim).   Samsung is thus entitled to judgment on Netlist's claim that it validly terminated the JDLA.

But even if there were a breach of contract, there is a factual dispute about whether any such breach was material, and whether Netlist waived its right to terminate the contract.   The district court's judgment as to Netlist's third claim for relief should be reversed for these reasons as well.

### A.    Even If Samsung Breached The JDLA, There Is At Least A Fact Question Whether Any Breach Was Material

1. Even if there were a technical breach of section 6.2 or section 3.1 (or both), there is at least a fact question whether such a breach was material.

a. Under New York's multi-factor materiality test, "five elements … guide the determination of whether a failure to render performance constitutes a material breach: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the

extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." *Bear, Stearns Funding, Inc. v. Interface Grp.-Nev., Inc.*, 361 F. Supp. 2d 283, 296 (S.D.N.Y. 2005).

Two of these factors concern the damage suffered by the non-breaching party: the extent to which the party was "deprived of the benefit which [it] reasonably expected," *id.*—i.e., the "absolute and relative magnitude of the default," *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016)—and the extent to which the party can be "adequately compensated," *Bear, Stearns*, 361 F. Supp. 2d at 296. Given the test's fact-intensive nature, "the determination whether a material breach has occurred is generally a question of fact" for the jury. *Advanced Water Techs. v. Amiad USA, Inc.*, 2019 WL 4805330, at *14 (S.D.N.Y. 2019). And that is especially so because Netlist suffered zero dollars in compensable harm for any breach of section 6.2; a harmless breach here was certainly not material *as a matter of law.*

The fact that the district court did not determine damages at summary judgment—and, certainly, the ultimate zero-damages verdict—would suffice to render any breach of section 6.2 at least arguably immaterial, but there is more. The third New York materiality factor is the extent to which the party

-48-

failing to perform will suffer forfeiture.  If the breach of section 6.2 were material, Samsung would lose its patent licenses while Netlist retains its licenses.  *See* 4-ER-720, § 13.2.[5]  "Where, as here, a finding of materiality would result in a forfeiture, the Restatement counsels that the breach is 'less likely to be regarded as material.'"  *Qualcomm Inc. v. Tex. Instruments Inc.*, 875 A.2d 626, 629 (Del. 2005); *accord Bear, Stearns*, 361 F. Supp. 2d at 296.

Finally, the fourth factor of New York's materiality test considers the likelihood that the party failing to perform will cure.  *Bear, Stearns* 361 F. Supp. 2d at 296.   Here, however, Samsung's ability to cure was made impossible by Netlist's failure to give timely notice, as the JDLA requires as a condition precedent to termination.  *See* 4-ER-720, § 13.2; *see also* Trial Ex. 1425 at 1-2.  Netlist waited *years* after knowing of Samsung's alleged breach of section 6.2 to serve a notice of termination—Netlist did not purport to terminate the agreement until 2020 even though Netlist first complained in 2017 that Samsung declined to fully fill Netlist's DRAM and NAND requests in breach of the JDLA—all the while purchasing DRAM and NAND from other suppliers, 2-ER-111 (¶ 67); 2-ER-270-271 (¶ 3), which precluded

---

[5] Indeed, after Netlist claimed to have terminated the agreement, it brought an infringement action against Samsung that now challenges six patents that would be covered by the JDLA's license.  *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, 2:21-cv-00463-JRG (E.D. Tex.).

Samsung from curing any breach. Thus, to the extent Samsung was unable to cure any breach, that is a consequence of Netlist's failure to give Samsung proper notice under the JDLA.

b. There is at least a fact question whether a breach of section 3.1 was material for the same reasons, including the lack of compensable damages. But there are also additional reasons.

*First*, as explained earlier, the fact that section 3.2 requires Samsung to reasonably assist Netlist in obtaining a refund precludes any finding that a reasonable but mistaken withholding is a breach of contract. *See supra* at 43-45. But even if the Court disagrees, reasonably but erroneously withholding taxes and then reasonably assisting in obtaining a refund would mean there was no *material* breach—again, no one would agree to a contract with draconian penalties (here, one-sided termination of patent licenses) that could be triggered based on a reasonable but mistaken view of Korean law and for which it would be required to assist in proving its own supposed breach.

*Second*, one of the materiality factors is whether the breaching party acted in bad faith, *Bear, Stearns*, 361 F. Supp. 2d at 296, and it was indisputable that Samsung's withholding was not unreasonable or in bad faith. *See supra* at 42.

*Third*, the payment of $1.32 million to Korean tax authorities was 16.5% of the $8 million fee Samsung owed under section 3.1, and a jury could reasonably find that this amount is immaterial when Netlist was able to seek a refund and was later made whole, including obtaining interest.

2. Because there were disputes of material fact under New York's multi-factor materiality test, summary judgment was inappropriate. And indeed, the court cited *Bear, Stearns* itself as setting forth the appropriate materiality standard, even noting that this question "is generally left to the factfinder." 1-ER-45. But the court nevertheless concluded that Samsung materially breached section 6.2, the supply obligation provision, because "the term is an integral part of the parties' agreement, one that Netlist valued highly, as demonstrated by its negotiation and post-execution conduct." *Id.* That was legal error. In determining materiality, the "question is whether the breach is material, not whether there was a breach of a material term." *Reyelt v. Danzell*, 533 F.3d 28, 32 (1st Cir. 2008). And New York's multi-factor materiality test, which the court failed to apply, answers *that* question in the negative.

The district court also determined that Samsung materially breached section 3.1, the tax-withholding provision, because "[i]t is axiomatic that failure to pay is a material breach of a contract." 1-ER-45. But again, the

mere fact that the tax withholding involved the non-payment of money does not *per se* amount to a material breach under New York's multi-factor test. *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 679 (2d Cir. 1989) (failure to pay final one-third of a royalty payment was "a far cry from a total failure to pay"). Indeed, the district court's analysis is flawed even as a matter of common sense. If a party mistakenly failed to pay one cent of a multi-million dollar agreement (perhaps because of a calculation or transcription error), that failure would plainly not be material under New York law—certainly, it would not be *automatically* material—but it would under the district court's analysis.

The court also rejected Samsung's argument that any breach was immaterial because Netlist was made whole with interest, on the ground that materiality is determined at the time of the breach. *See* 1-ER-45. But that is contrary to New York law; several of the factors in the multi-factor materiality test focus on the magnitude of harm, which can *only* be determined after the breach. Moreover, the district court's analysis ignores that one of the materiality factors is "the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances," *Bear, Stearns*, 361 F. Supp. 2d at 296, and at the time of the breach, Samsung was obligated to reasonably cooperate in helping Netlist

obtain a refund.  It also ignores that another factor is the breaching party's good faith, *id.*, which was indisputable at the time of the breach, *see supra* at 42.

Even if it had not been clear at summary judgment that there were fact disputes about materiality, these fact disputes certainly became clear after the jury's verdict and district court's determination that Netlist suffered no compensable harm as to either alleged breach.  Under Federal Rule of Civil Procedure 54(b), a court can revise an interlocutory summary judgment order "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities," Fed. R. Civ. P. 54(b), and courts in this Circuit routinely do just that.  *See, e.g., Neidermeyer v. Caldwell*, 2015 WL 13687950, at *3–4 (C.D. Cal. Dec. 16, 2015); *Allergan Inc. v. Athena*, 2012 WL 12898344, at *3 (C.D. Cal. May 24, 2012); *see also Huss v. King Co.*, 338 F.3d 647, 650-51 (6th Cir. 2003) (amending summary judgment liability determination because trial evidence revealed that plaintiff was not entitled to any damages).  The district court seemed to believe that it had no authority to revise its prior interlocutory order because Samsung asked it to, 1-ER-9, but that makes no sense—the question is not who asked for revision of a prior interlocutory order under Rule 54(b), but whether "sufficient cause [was] shown" that revision was warranted, *Moses H. Cone Mem'l Hosp. v.*

*Mercury Constr. Corp.*, 460 U.S. 1, 12 n.14 (1983), which it clearly was here for the reasons explained.

Nevertheless, the district court ultimately considered the merits of Samsung's materiality argument in its order entering final judgment, and declined to alter its interlocutory summary judgment order because, in the court's view of the law, "evidence concerning materiality is and was 'clear and substantially uncontradicted,' so the Court's ruling at summary judgment on the issue stands." 1-ER-11 (quoting *WILJEFF, LLC v. United Realty Mgmt. Corp.*, 82 A.D.3d 1616, 1617 (N.Y. App. Div. 2011)). But the court's view of the law was erroneous for the same reason as in its summary judgment decision—it declined to apply New York's multi-factor test.[6]

---

[6] In its order entering judgment for Netlist, the district court stated that it was considering Samsung's argument under Rule 59(e). 1-ER-10. But that rule only applies once a judgment has been entered—Rule 54(b) does not impose any heightened requirement on district courts for altering interlocutory orders *before* judgment was entered. *See, e.g.*, *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003) (motions to revise interlocutory orders under Rule 54(b) "are not subject to the strict standards applicable to motions for reconsideration of a final judgment"); *Cobell v. Jewell*, 802 F.3d 12, 25-26 (D.C. Cir. 2015) (similar). Regardless, nothing turns on the distinction—as explained in the accompanying text, the district court ultimately did not rely on any heightened standard, but rather on its view that Samsung's alleged breaches were material as a matter of law despite the lack of compensable damages or any of the other factors in New York's multi-factor materiality test. That view of New York law is wrong and requires reversal.

Indeed, the court reiterated its summary judgment analysis nearly verbatim. 1-ER-11. These grounds for the court's materiality finding were wrong under New York law upon the entry of final judgment for exactly the same reasons they were wrong at summary judgment.

The only additional basis for finding materiality that the court provided was its explanation that the lack of any compensable harm did not matter. According to the court, this was not a new fact at all: "the facts have not changed since the summary judgment ruling" despite the intervening jury verdict as to section 6.2 and the court's finding of no compensable damages as to section 3.1 because the "Court entered summary judgment on the declaratory judgment claim with the understanding that the reasoning would hold even if Netlist failed to establish compensable damages." 1-ER-9.[7] The lack of compensable harm was legally irrelevant, the court believed,

_____

[7] The court made this statement while explaining why Local Rule 7-18, which authorizes reconsideration when there are "new material facts" that arise after the original order, was not met. *See* 1-ER-9; C.D. Cal. R. 7-18. This local rule is beside the point, because Rule 54(b) expressly authorizes district courts to alter prior interlocutory summary judgment rulings "at any time before the entry of a judgment," Fed. R. Civ. P. 54(b), so long as "sufficient cause is shown," *Moses H. Cone*, 460 U.S. at 12 n.14. Even if the local rule applied, the jury verdict and district court consequential-damages ruling surely would have counted as new material facts if they had in fact introduced new facts into the case—a proposition with which the district court did not disagree. Rather, the court believed that these post-summary-

because materiality "does not depend upon the amount of provable money damages, it depends upon whether the nonbreaching party lost the benefit of its bargain." *Id.* at 8 (quoting *Doner-Hedrick v. N.Y. Inst. of Tech.*, 874 F. Supp. 2d 227, 242 (S.D.N.Y. 2012)). That view of New York law is simply wrong. Again, the materiality question is answered by the multi-factor materiality test described above. Even if it were true that some breaches *may* be material when there are no provable damages because some of the factors are unrelated to damages, the amount of damages is centrally relevant, and thus the district court's contrary analysis is legally erroneous.

## B. The District Court Erred In Rejecting Samsung's Waiver Defense To Netlist's Third Claim

At summary judgment, the district court rejected as a matter of law Samsung's contention that Netlist had waived its right to terminate the JDLA because of the JDLA's so-called "no-waiver" clause. 1-ER-46. That decision was erroneous for two reasons.

---

judgment events did not constitute new material facts because the court had already anticipated the possibility of zero damages when granting summary judgment. 1-ER-9. The fact that the Court considered the possibility that the alleged breaches here might be harmless but still found them material as a matter of law only underscores the error in the original summary judgment ruling. That ruling was erroneous when made, and should in all events have been altered before entry of judgment, just as Rule 54(b) authorizes.

*First*, the district court erred in construing the no-waiver clause as applying to retrospective breaches. The court adopted Netlist's argument that it could not have waived its right to terminate the JDLA when it declined to do so for years despite knowledge of Samsung's alleged breaches, because of the JDLA clause providing that "[t]he failure by either party to enforce any of the terms and conditions of this Agreement shall not constitute a waiver of such Party's right thereafter to enforce that or any other terms and conditions of this Agreement." 4-ER-721, § 16.2. But that clause means only that a party's failure to enforce a provision at the time of a specific breach would not waive that party's right to enforce that provision if there is a future breach of the same kind—that is why the clause says that there is no "waiver of such Party's right *thereafter* to enforce" the relevant provision. *Cf. Town of Hempstead v. Inc. Vill. of Freeport*, 15 A.D.3d 567, 569 (N.Y. App. Div. 2005) ("[P]laintiffs' lack of enforcement of [certain] provisions of the [agreement] before 1996 did not effect a waiver of those provisions for the entire term of the [agreement].").

The clause cannot be reasonably read, however, as allowing a party to resurrect a *past breach* years later where the party made a calculated decision not to assert the breach and to leave it dormant for an extended period. *See Macarthur Props. I, LLC v. Galbraith*, 2018 WL 3412830, at *5

(N.Y. Sup. Ct. July 13, 2018) (while a similar no-waiver provision may have applied prospectively, the parties' "extended course of conduct" created a factual issue over whether the condominium board waived the right to recover past-due fees). Yet that is what the district court allowed Netlist to do here—allege a material breach based on years of alleged contractual non-compliance even when Netlist knowingly decided not to assert breach and seek termination for all that time. The JDLA's no-waiver provision does not preclude a finding of waiver in those circumstances.

*Second*, even under the district court's broad interpretation of the no-waiver clause, the court erred in concluding that there are no disputed facts as to whether Netlist waived the no-waiver clause itself. "New York law allows the parties to waive such a no-waiver provision by a subsequent course of conduct." *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087, 1098 (S.D.N.Y. 1989); *accord Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015) ("[A] so-called 'no-waiver' clause may itself be impliedly waived under certain circumstances.").

Here, there is at least a fact question whether Netlist waived any right to terminate by waiting years to do so, despite knowing for years that (i) Samsung repeatedly did not meet Netlist's requests for NAND and DRAM,

-58-

and (ii) Samsung had withheld $1.32 million in taxes from the $8 million fee owed under section 3.1. *See Travellers Int'l AG*, 722 F. Supp. at 1098 (where party "accepted the benefits under the Contract for over a year after" the alleged breach justifying termination occurred, it waived the right to terminate despite no-waiver provision); *Kamco Supply Corp. v. On the Right Track, LLC*, 149 A.D.3d 275, 285-86 (N.Y. App. Div. 2017) (similar).

The case for precluding Netlist from relying on the no-waiver provision is particularly strong here because of the prejudice to Samsung. As noted above, *see supra* at 49-50, the JDLA's termination provision requires as a condition precedent that Netlist give Samsung notice and 30 days to cure any breach. *See* 4-ER-720, § 13.2. Netlist failed to satisfy that condition precedent—it waited years to give Samsung notice of any breach, purchased product from other suppliers, and thus made impossible any opportunity for Samsung to cure and avoid termination of the JDLA and the resulting dissolution of its patent licenses. There is thus at least a fact question whether Netlist may rely on the JDLA's no-waiver clause despite the significant prejudice to Samsung from Netlist's long-delayed notice of breach.

-59-

## IV. The District Court Erred In Precluding Samsung From Raising Its Affirmative Defenses

The district court also legally erred in precluding Samsung from raising several of its affirmative defenses.

### A. The District Court Erred In Deeming Samsung's Waiver, Acquiescence, And Estoppel Defenses Waived

Before trial, the court issued an order "deem[ing] Samsung's failure to raise the waiver, estoppel, and acquiescence defenses at summary judgment as its abandonment of those defenses," 1-ER-17, even though Netlist never put those defenses at issue in its summary-judgment motion.[8]  That order was wrong:  Under the Federal Rules, "there is no requirement that a party assert [an affirmative] defense in opposition to a summary-judgment motion in order to assert it at trial.  On the contrary, the defense can be raised at trial so long as it was properly asserted in the answer and not thereafter affirmatively waived."  *Long v. Howard Univ.*, 550 F.3d 21, 24 (D.C. Cir. 2008).  This conclusion comports with Rule 56's language and framework.  Rule 56 provides that a summary-judgment motion must "identify[] each claim *or defense*—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a) (emphasis added).  The movant

---

[8] Samsung did explicitly raise the waiver defense at summary judgment as to Netlist's third claim for relief.

-60-

"always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Netlist did not move for summary judgment on Samsung's defenses, so those defenses should have been available at trial.

The prejudice to Samsung based on the district court's inexplicable rejection of its defenses, meanwhile, is obvious. Take, for example, the estoppel defense. Under New York law, a party who delays in seeking to enforce a contract term is estopped from doing so if the delay prejudiced the counter-party. *See Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 106-07 (2006). Crucially, estoppel applies even if the elements of waiver are not satisfied, and despite the presence of a contractual no-waiver clause. *Kamco*, 149 A.D.3d at 285-86 (party equitably estopped from invoking no-waiver provision). That means, for example, that Samsung would have a complete defense to Netlist's third claim if it could demonstrate prejudice notwithstanding the JDLA's no-waiver clause. And that prejudice was manifest on the record: again, by waiting years before giving written notice of a material breach, Netlist deprived Samsung of the ability to cure by supplying the requested product before Netlist purchased it from a third party. The district court's erroneous dismissal of Samsung's

affirmative defenses thus deprived Samsung of potentially dispositive defenses against Netlist's third claim.

### B. The District Court Erred In Precluding Samsung From Raising Its Election-Of-Remedies Defense

Finally, the district court erred when it held that Samsung had waived an election-of-remedies affirmative defense.

In Samsung's motion for judgment on the pleadings, it argued that Netlist's declaratory-judgment claim failed because "even assuming *arguendo* that Netlist properly alleges breach of contract claims, it cannot terminate on that basis because it has long since elected an alternative remedy—to continue on with the JDLA." ECF 60 at 22-23. In opposition, Netlist said that "[b]ecause Samsung did not plead election of remedies in its answer, it has waived that defense and cannot now raise it in its motion." ECF 89 at 22. The district court accepted the contention that Samsung had not raised election of remedies in its answer, treated Samsung's motion as a motion for leave to amend the district court's scheduling order to add that defense, and concluded that Samsung had not shown good cause to amend as required by Rule 16. *See* 1-ER-55. That was error, because no amendment was required.

Election of remedies is properly encompassed within Samsung's estoppel defense, which all agree *was* pleaded. Federal Rule 8(b) requires a

party to "state in short and plain terms its defenses to each claim asserted against it." Fed. R. Civ. P. 8(b)(1). "The key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense." *Wyshak v. City Nat'l Bank,* 607 F.2d 824, 827 (9th Cir. 1979); *accord Kohler v. Flava Enters., Inc.*, 779 F.3d 1016, 1019 (9th Cir. 2015); Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1274 (4th ed.) ("[A]n affirmative defense may be pleaded in general terms and will be held to be sufficient … as long as it gives the plaintiff fair notice of the nature of the defense.").

Samsung pleaded estoppel, *see* 7-ER-1523, and election of remedies is a form of estoppel. *See, e.g.*, *Hoehn v. Schenck*, 221 A.D. 371, 374 (N.Y. App. Div. 1927) (referring to election-of-remedies defense as "estoppel by election of remedies"); *Mosher Mfg. Co. v. Eastland, W.F. & G.R. Co.*, 259 S.W. 253, 255 (Tex. Civ. App. 1924) ("The doctrine of election of remedies is an application of the law of estoppel[.]"); *accord Stromberg v. Moore*, 170 S.W.3d 26, 30 (Mo. Ct. App. 2005); *Hines v. Ward*, 53 P. 427, 429 (Cal. 1898); *State ex rel. Easley v. Rich Food Servs., Inc.*, 535 S.E.2d 84, 92–93 (N.C. Ct. App. 2000). Indeed, the two doctrines are often described interchangeably. *Cf. Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49 n.10 (1974) ("essence" of cases "based in part on the doctrine of election of

remedies" and cases "resting instead on the doctrine of equitable estoppel"
is "the same"). Raising an election-of-remedies defense is therefore
permissible where the defendant pleaded an estoppel defense. *See t'Bear v.
Forman*, 2020 WL 703888, at *21 (N.D. Cal. Feb. 12, 2020) (considering,
though rejecting on merits, affirmative defense raised "in the context of the
election of remedies doctrine" where defendant pleaded estoppel).

The significant doctrinal overlap between estoppel and election of
remedies means that Netlist was undoubtedly on notice that Samsung
intended to press this sort of defense. Netlist has never argued otherwise—
or claimed that Samsung's election-of-remedies defense caused it prejudice,
or that it lacked sufficient notice of that defense.

The district court's ruling, moreover, prejudiced Samsung because
Samsung would likely have prevailed on its election-of-remedies defense if
allowed to raise it. Under that doctrine, "[w]hen a party materially breaches
a contract, the non-breaching party must choose between two remedies: it
can elect to terminate the contract or continue it. If it chooses the latter
course, it loses its right to terminate the contract because of the default."
*Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 188 (N.Y. App. Div. 2007).
Netlist alleges Samsung improperly withheld taxes shortly after entering into
the JDLA in 2015, and failed to supply products requested beginning in 2017.

-64-

Yet Netlist chose not to terminate the contract until 2020. This is exactly what the election-of-remedies doctrine precludes. *See ESPN, Inc. v. Off. of Comm'r of Baseball*, 76 F. Supp. 2d 383, 391-92 (S.D.N.Y. 1999) (allowing nonbreaching party to "terminate the contract based on breaches that occurred almost two years ago would violate important principles of contract law"). And the JDLA's no-waiver provision does not excuse Netlist's failure to seek termination. *See id.* at 390 (a "standard 'no-waiver' provision does not immunize or excuse parties from the requirements and consequences of election"). Thus, Samsung should have been allowed to raise this defense.

## CONCLUSION

For the foregoing reasons, the judgment below should be reversed.

Respectfully Submitted,

Dated: June 6, 2022                     By: /s/ Michael G. Yoder

Anton Metlitsky                         Michael G. Yoder
Ephraim McDowell                        Marc Feinstein
O'Melveny & Myers LLP                    O'Melveny & Myers LLP
Times Square Tower                      400 South Hope Street
7 Times Square                          18th Floor
New York, NY 10036                      Los Angeles, CA 90071

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**  22-55209 (L), 22-55247

I am the attorney or self-represented party.

**This brief contains 13,995 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[] complies with the word limit of Cir. R. 32-1.

[XX] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

 [ ] it is a joint brief submitted by separately represented parties;

 [ ] a party or parties are filing a single brief in response to multiple briefs; or

 [ ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Dated:  June 6, 2022                          /s/ Michael G. Yoder

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant
## to Circuit Rule 28-2.6

**9th Cir. Case Number(s)**  22-55209 (L), 22-55247

The undersigned attorney or self-represented party states the following:

[XX] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

Dated:  June 6, 2022                    /s/ Michael G. Yoder

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: June 6, 2022                          /s/ Michael G. Yoder