nIN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NETLIST, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:22-cv-293-JRG |
| vs. | ) | |
| | ) | JURY TRIAL DEMANDED |
| SAMSUNG ELECTRONICS CO, LTD; | ) | (Lead Case) |
| SAMSUNG ELECTRONICS AMERICA, | ) | |
| INC.; SAMSUNG SEMICONDUCTOR | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| NETLIST, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:22-cv-294-JRG |
| vs. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MICRON TECHNOLOGY, INC.; MICRON | ) | |
| SEMICONDUCTOR PRODUCTS, INC.; | ) | ███████████ |
| MICRON TECHNOLOGY TEXAS LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF NETLIST, INC.'S MOTION TO (1) DISMISS MICRON
DEFENDANTS' COUNTERCLAIMS OR IN THE ALTERNATIVE
SEVER AND STAY AND (2) STRIKE MICRON DEFENDANTS'
AFFIRMATIVE DEFENSE OF PATENT MISUSE**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ....................................................................................................2

III.    MICRON'S DEFENSE AND COUNTERCLAIM SHOULD BE STRICKEN ...............4

IV.    MICRON HAS FAILED TO ALLEGE AN ANTITRUST CLAIM ..................................6

        A.    Micron Fails To Allege A Restraint Of Trade ................................................6

              1.    ███████████████████████████████
                    ███████ .....................................................................7

              2.    Even Under Micron's Misreading, t███████████████
                    ████ ..........................................................................10

              3.    Alleged FRAND Breaches Cannot Constitute An Antitrust
                    Violation .....................................................................12

        B.    Micron Has Failed To Allege Antitrust Injury .............................................13

        C.    Micron Has Failed To Allege A Cognizable Market .....................................16

              1.    Micron's Alleged Technology Market Is Non-Cognizable ...........................17

              2.    Micron's Alleged Product Market Is Non-Cognizable...............................20

        D.    Micron Has Failed To Allege That Netlist Has Market Power ................................21

V.      ALTERNATIVELY, THE COURT SHOULD SEVER AND STAY MICRON'S
        ANTITRUST CLAIMS............................................................................................23

VI.    THE COURT SHOULD STRIKE MICRON'S PATENT MISUSE DEFENSE ............26

        A.    An Unconsummated License is Not Patent Misuse....................................27

        B.    Micron Has Not Alleged Market Power ....................................................27

        C.    Patent Portfolio Licensing Does Not Constitute Patent Misuse...............................28

        D.    A Breach of RAND Obligations Does Not Constitute Patent Misuse.....................30

VII.   CONCLUSION ....................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics Inc.*,
    2022 U.S. Dist. LEXIS 60676 (W.D. Tex. Mar. 31, 2022)
    ................................................................................................................16, 26, 28, 29

*Alfred E. Mann Found. For Sci. Rsch. v. Cochlear Corp.*,
    604 F.3d 1354 (Fed. Cir. 2010)......................................................................11

*Almeda Mall, Inc. v. Houston Lighting & Power Co.*,
    615 F.2d 343 (5th Cir. 1980)............................................................................6

*Am. Med. Ass'n v. United Healthcare Corp.*,
    2007 WL 683974 (S.D.N.Y. Mar. 5, 2007) ............................................. 14, 15

*Apple Inc. v. Motorola Mobility, Inc.*,
    886 F. Supp. 2d 1061 (W.D. Wis. 2012) ........................................................14

*Apple Inc. v. Samsung Elecs. Co.*,
    2012 WL 1672493 (N.D. Cal. May 14, 2012)................................................22

*Apple v. Samsung*,
    2011 WL 4948567 (N.D. Cal. Oct. 18, 2011) ................................................22

*ASM Am., Inc. v. Genus, Inc.*,
    2002 WL 24444 (N.D. Cal. Jan. 9, 2002).......................................................26

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995)..........................................................................8, 9

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007) ...........................................................................30

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993).........................................................................................13

*Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*,
    2004 WL 1427136 (E.D. Pa. June 21, 2004) ..................................................15

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)...........................................................................16, 20, 21

*Brulotte v. Thys Co.*,
    379 U.S. 29 (1964)...........................................................................................10

*Chicago Bd. of Trade v. United States,*
    246 U.S. 231 (1918) ........................................................................................................ 6

*Chip-Mender, Inc. v. Sherwin-Williams Co.,*
    2006 WL 13058 (N.D. Cal. Jan. 3, 2006) ...................................................................... 14

*ChriMar Sys. v. Cisco Sys.,*
    72 F. Supp. 3d 1012 (N.D. Cal. 2014) ........................................................................... 22

*Cont'l Auto. Sys., Inc. v. Avanci, LLC,* 485 F. Supp. 3d 712 (N.D. Tex. 2020),
    *aff'd,* 2022 WL 2205469 (5th Cir. June 21, 2022) ........................................................ 13

*Cranfill v. Scott & Fetzer Co.,*
    773 F. Supp. 943 (E.D. Tex. 1991) ................................................................................ 23

*Cyberonics, Inc. v. Zabara,*
    2013 WL 3713432 (S.D. Tex. July 12, 2013) .................................................................. 4

*Delano Farms Co. v. Cal. Table Grape Comm'n.,*
    655 F.3d 1337 (Fed. Cir. 2011) ..................................................................................... 18

*Eastman Kodak Co. v. Image Tech. Servs.,*
    504 U.S. 451 (1992) ...................................................................................................... 17

*Ferko v. Nat'l Ass'n of Stock Car Racing,*
    2002 WL 34477591 (E.D. Tex. Oct. 4, 2002) ............................................................... 16

*In re Flat Glass Antitrust Litig.,*
    385 F.3d 350 (3d Cir. 2004) .......................................................................................... 11

*FTC v. Qualcomm Inc.,*
    969 F.3d 974 (2020) ...................................................................................................... 13

*Futurevision Cable Sys., Inc. v. Multivision Cable TV Corp.,*
    789 F. Supp. 760 (S.D. Miss. 1992) .............................................................................. 23

*Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech.,*
    2017 WL 750700 (D. Del. Feb. 27, 2017) ..................................................................... 27

*Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech,*
    2018 WL 11426956 (D. Del. Feb. 28, 2018) ................................................................. 20

*Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.,* 2017 WL 750700 (D. Del.
    Feb. 27, 2017), *adopted,* 2017 WL 1055958
    (D. Del. Mar. 20, 2017) ................................................................................... 13, 19, 29, 30

*U.S. ex rel. Graves v. ITT Educ. Servs., Inc.,*
    284 F. Supp. 2d 487 (S.D. Tex. 2003), aff'd, 111 F. App'x 296 (5th Cir. 2004) ............... 7

*Huawei Techs. v. Samsung Elecs.*,
  340 F. Supp. 3d 934 (N.D. Cal. 2018)...................................................................14

*Illinois Tool Works Inc. v. Independent Ink*,
  547 U.S. 28, 42 (2006) ............................................................................................22

*Impax Lab'ys, Inc. v. Fed. Trade Comm'n*,
  994 F.3d 484 (5th Cir. 2021).....................................................................................14

*In re Innotron Diagnostics*,
  800 F.2d 1077 (Fed. Cir. 1986).......................................................................24, 25, 26

*Intel Corp. v. Fortress Inv. Grp. LLC*,
  2020 U.S. Dist. LEXIS 158831 (N.D. Cal. July 7, 2020)......................................19

*Intel Corp. v. Fortress Inv. Grp. LLC*,
  511 F. Supp. 3d 1006 (N.D. Cal. 2021)....................................................................19

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) .................................................................................20

*Kjessler v. Zaappaaz, Inc.*,
  2019 WL 3017132 (S.D. Tex. Apr. 24, 2019)..........................................................15

*Little Rock Cardiology Clinic, P.A. v. Baptist Health*,
  573 F. Supp. 2d 1125 (E.D. Ark. 2008), *aff'd*, 591 F.3d 591 (8th Cir. 2009) ...................19

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*,
  751 F.3d 368 (5th Cir. 2014).............................................................................6, 14

*McGinley v. Luv n' care, Ltd.*, 2023 WL 3733896
   (W.D. La. May 30, 2023)........................................................................................5

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008).........................................................................................16

*No Spill LLC v. Scepter Canada, Inc.*,
  2022 WL 1078435 (D. Kan. Apr. 6, 2022) .......................................................8, 9, 10, 22

*Ocean State Physicians Health Plan, Inc. v.
Blue Cross & Blue Shield of Rhode Island*, 883 F.2d 1101 (1st Cir. 1989)............................8, 9

*On Track Innovations Ltd. v. T-Mobile USA, Inc.*,
  106 F. Supp. 3d 369 (S.D.N.Y. 2015)......................................................................27

*Orion Elec. Co., Ltd. v. Funai Elec. Co., Ltd.*,
  2002 WL 377541 (S.D.N.Y. Mar. 11, 2002) ....................................................21, 22

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.,*
    555 U.S. 438, 129 S.Ct. 1109, 172 L.Ed.2d 836 (2009)......................................................12

*Panoceanis Mar., Inc., v. M/V Devall,*
    2013 WL 264616 (E.D. La. Jan. 30, 2013) ................................................................5, 6

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.,*
    9 F.4th 247, 252 (5th Cir. 2021) ..........................................................................................7

*PSKS, Inc. v. Leegin Creative Leather Prod., Inc.,*
    615 F.3d 412 (5th Cir. 2010)..............................................................................17, 20, 21

*Rambus Inc. v. FTC,*
    522 F.3d 456 (D.C. Cir. 2008)............................................................................................23

*Retractable Techs., Inc. v. Becton Dickinson & Co., No.,*
    2008 WL 11518664 (E.D. Tex. Jan. 18, 2008) ...............................................................24

*In re Rolls Royce Corp.,*
    775 F.3d 671(5th Cir. 2014)...............................................................................................24

*Saint Lawrence Commc'ns v. Motorola Mobility LLC,*
    2018 WL 915125 (E. D. Tex. Feb. 15, 2018) ............................................................ 29, 30

*Sanofi-Synthealbo v. Apotex Inc.,*
    2006 WL 3103321 (S.D.N.Y. Nov. 2, 2006) ...................................................................25

*Schlotzky's, Ltd. v. Sterling Purchasing & Nat. Distrib. Co.,*
    520 F.3d 393 (5th Cir. 2008)..............................................................................................29

*Smith v. EMC Corp.,*
    393 F.3d 590 (5th Cir. 2004)................................................................................................5

*Soverain Software LLC v. Amazon.com,*
    356 F. Supp. 2d 660 (E.D. Tex.2005) ..............................................................................24

*Tech Pharma. Servs., LLC v. Alixa Rx LLC,*
    2017 WL 2911773 (E.D. Tex. Jan. 19, 2017) ....................................................................5

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
    551 U.S. 308 (2007).................................................................................................................7

*Texas Instruments v. Hyundai Elecs.,*
    49 F. Supp. 2d 893 (E.D. Tex. 1999) .................................................................................30

*Tinnus Enterprises, LLC v. Telebrands Corp.,*
    2017 WL 11630433 (E.D. Tex. July 11, 2017) ..................................................................5

*U.S. Philips Corp. v. Int'l Trade Comm'n,*
    424 F.3d 1179 (Fed. Cir. 2005) ............................................................. 11, 28, 29

*Unitherm Food Sys. v. Swift-Eckrich, Inc.,*
    375 F.3d 1341 (Fed. Cir. 2004),
     *rev'd in part on other grounds*, 546 U.S. 394 (2006) ............................... 18

*USM Corp. v. SPS Techs.,* Inc.,
    694 F.2d 505 (7th Cir. 1982) ....................................................................... 13

*Valley Liquors, Inc. v. Renfield Importers, Ltd.,*
    822 F.2d 656 (7th Cir. 1987) ....................................................................... 25

*Virginia Panel Corp.  v. MAC Panel Co.,*
    133 F.3d 860 (Fed. Cir. 1997) ..................................................................... 27

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,*
    382 U.S. 172 (1965) ..................................................................................... 16

*Wampler v. Southwestern Bell Telephone Co.,*
    597 F.3d 741 (5th Cir. 2010) ....................................................................... 16

*Westinghouse Air Brake Techs. Corp. v. Siemens Mobility, Inc.,*
    330 F.R.D. 143, 148 (D. Del. 2019) ........................................................... 25

*Westlake Servs., LLC v. Credit Acceptance Corp.,*
    2015 WL 9948723 (C.D. Cal. Dec. 7, 2015) ............................................. 19

*Zenith Radio v. Hazeltine Research,*
    395 U.S. 100 (1969) ..................................................................................... 30

**Statutes**

15 U.S.C. § 1 ........................................................................................................ *passim*

35 U.S.C. § 271(d) .................................................................................................... 11

**Other Authorities**

Phillip E. Areeda et al., Antitrust Law ¶ 565a (3d ed. 2007) ................................. 19

5A Wright & Miller, Federal Practice and Procedure § 1363 ................................... 7

**Rules**

Fed. R. Civ. P. 12(f) ................................................................................................ 26

Fed. R. Civ. P. 15 ...................................................................................................... 5

Fed. R. Civ. P. 15(a) .................................................................................................. 5

Fed. R. Civ. P. 21 ................................................................................................................24

Fed. R. Civ. P. 42(b) ...........................................................................................................24

## I.   <u>INTRODUCTION</u>

Netlist, Inc. ("Netlist") moves to dismiss Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC's (collectively "Micron") counterclaim for alleged violations of Section 1 of the Sherman Act and to strike Micron's affirmative defense for patent misuse as plead in its Answer and Affirmative Defenses to Netlist's Second Amended Complaint And Counterclaims (the "Answer" and "Counterclaim," respectively). Dkt. 122. Aside from being procedurally infirm, Micron's new antitrust claim and patent misuse defense are facially deficient. Though Micron couches its allegations in antitrust buzzwords such as "price fixing," "tying," and "refusal deal," its allegations attack perfectly legal and commercially common licensing terms and practices. Netlist's motion should be granted for the following reasons.

First, Micron's new counterclaim and affirmative defense are procedurally improper and must be stricken. Where a defendant seeks to add new claims or defenses that do not merely respond an amended complaint, leave is required. Here, Netlist's Second Amended Complaint ("SAC") contained a few narrow additions addressing Micron's indirect infringement and willfulness. Micron's new counterclaim and affirmative defense are not responsive to these narrow amendments. But Micron has not sought leave to amend, nor would leave be warranted given that Micron's new counterclaim and affirmative defense are untimely and would unnecessarily inject complicated antitrust issues into this case just as fact discovery is set to close.

Second, Micron's antitrust counterclaim fails as a matter of law. ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████   A patent confers a lawful monopoly, and a patent owner has wide latitude to license its patents on terms of its choosing.

This is just one among many core failings of Micron's antitrust counterclaim. As explained further below, Micron has failed to sufficiently allege any of the elements of Section 1 claim, including antitrust injury, a cognizable market, or that Netlist has market power. Moreover, even if Micron's antitrust claim was viable, which it is not, then the Court should sever and stay this claim until the patent trial is complete as is standard practice.

Finally, Micron's patent misuse defense also fails as a matter of law and should be stricken. Micron's contention that Netlist's license with SK hynix somehow improperly expands its patent monopoly is predicated on the same deliberate misreading that forms the basis of its antitrust counterclaim. Even setting that aside, its patent misuse defense fails for a host of other reasons. For example, Micron alleges that Netlist has ████████████████████████████████████████, but this is not unlawful, nor does Micron ever allege that Netlist actually owns any standard essential patents. Regardless, Netlist has never entered into a license with Micron, and unconsummated offers cannot constitute patent misuse.

For these reasons and reasons further explained below, Netlist's motion should be granted.

## II.     BACKGROUND

This case concerns Micron's infringement of three of Netlist's patents that generally relate to memory modules. Dkt. 101 ¶¶ 2, 17. Netlist's original complaint was filed on August 1, 2022. Dkt. 1. On July 20, 2023, Netlist filed its SAC. Dkt. 101. The SAC added three paragraphs relating to Mircon's indirect infringement of the one of the patents in suit, U.S. Patent Nos. 7,619,912 (the "'912 patent"),

and made revisions to allegations of Micron's knowledge of certain patents. SAC ¶¶ 40-42, 56, 69. Netlist previously disclosed these indirect infringement contentions to Micron in December 2022 and filed its SAC prior to the deadline to amend (Dkt. 110 at 5). Ex. B at 3-4 ("Netlist further contends that Micron indirectly infringes the Patents-in-Suit by inducing infringement by others, such as Micron's customers and end users, in the United States.").

On August 11, 2023, Micron filed its Answer and Counterclaim. Dkt. 122. The Answer and Counterclaim was not limited to responding to the limited and narrow additions to the SAC. Instead, without seeking leave, Micron added a new counterclaim for alleged violations of Section 1 of the Sherman Act and an entirely new patent misuse defense. Dkt. 122. Both were allegedly predicated on a license agreement between Netlist and SK hynix (the "SK hynix License"). Dkt. 122 at 32-35. Netlist produced the SK hynix License to Micron in February of 2023. Sheasby Decl. ¶ 2.

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████



## III.    MICRON'S DEFENSE AND COUNTERCLAIM SHOULD BE STRICKEN

As an initial matter, the Court should strike Micron's antitrust counterclaim and affirmative defense of patent misuse because Micron did not seek leave to amend. "[M]ost courts," including in the Fifth Circuit, "require leave to raise new allegations and defenses that go beyond responding to the new matters raised in the amended complaint." *Cyberonics, Inc. v. Zabara*, 2013 WL 3713432, at *2 (S.D. Tex. July 12, 2013) (collecting cases); *see also Tinnus Enterprises, LLC v. Telebrands Corp.*, 2017 WL 11630433, at *2 (E.D. Tex. July 11, 2017) ("[A]mended counterclaims are not permissible as a matter

of right where plaintiffs' amended complaint did not add any new claims nor did it expand the scope

or theory of the case."). Here, Micron's Answer and Counterclaim clearly go beyond the new matters

raised in Netlist's SAC.

Netlist's SAC, which was filed July 20, 2023, added only three paragraphs regarding Micron's

indirect infringement of the '912 patent and made revisions to allegations of Micron's knowledge of

certain patents. SAC ¶¶ 40-42, 56, 69. This "narrow amendment of the FAC, which asserted specific

infringement allegations regarding the [technologies] already at issue in this case, does not change

[Netlist's] claims or expand the theory of [its] case." *McGinley v. Luv n' care, Ltd.*, 2023 WL 3733896, at

*2-*3 (W.D. La. May 30, 2023) (quoting *Panoceanis Mar., Inc., v. M/V Devall*, 2013 WL 264616, *3 (E.D.

La. Jan. 30, 2013)). Micron's entirely new Sherman Act counterclaim along with a new affirmative

defense of patent misuse have no relation to either of these amendments. Instead, this new defense

and counterclaim relate to a license between Netlist and a third party, SK hynix.

Because Micron did not seek leave before filing its Amended Answer and Counterclaim, it

should be stricken for this reason alone. *Tech Pharma. Servs., LLC v. Alixa Rx LLC*,  2017 WL 2911773,

at *2 (E.D. Tex. Jan. 19, 2017) ("The Court, in determining that Defendants' amended counterclaims

require leave to file, must strike the counterclaims to enforce Rule 15."). But even if Micron had

requested leave as was required, leave would not have been warranted. First, Micron's request is

untimely. "Although Rule 15(a) does not impose a time limit 'for permissive amendment, 'at some

point, time delay on the part of a plaintiff can be procedurally fatal.'" *Smith v. EMC Corp.*, 393 F.3d

590, 595 (5th Cir. 2004). Netlist produced the SK hynix License to Micron in this action on February

21, 2023, Sheasby Decl., ¶ 3, nearly six months before Micron first asserted its antitrust counterclaim

and patent misuse affirmative defense. Thus, Micron "easily could have asserted its counterclaim . . .

or sought leave to amend, long before this patently late date." *Panoceanis*, 2013 WL 264616, at *4.

Second, as explained further below in Section V, Micron's antitrust counterclaim, if permitted to

proceed, will inject a host of new and complex factual and legal questions that have nothing to do with Netlist's infringement case. Adjudicating these issues will be expensive, time consuming, and likely to cause jury confusion if the patent case and the counterclaim are tried together. Section V, *infra*. Thus, if allowed at all, Micron's counterclaim belongs in a separate action.

## IV.   <u>MICRON HAS FAILED TO ALLEGE AN ANTITRUST CLAIM</u>

Micron's Counterclaim alleges that Netlist has violated Section 1 of the Sherman Act which prohibits any "combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. As discussed above, the lynchpin of this claim is ███████████████████████. Micron's claim is facially deficient for at least four independent reasons. Micron fails to plausibly allege: (A) ██████ ████████████████████████; (B) that Micron suffered an antitrust injury; (C) the existence of a cognizable antitrust market; or (D) that Netlist has market power in any alleged market. Anyone of these failings warrants dismissal.

### A.   **Micron Fails To Allege A Restraint Of Trade**

To state a claim under Section 1 of the Sherman Act, a complaint "must allege facts showing that the [alleged unlawful conspiracy] unreasonably restrained trade" in the relevant market. *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 375 (5th Cir. 2014). As the Supreme Court has made clear, not all agreements to restrain trade violate antitrust laws. This is because "[e]very agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence." *Almeda Mall, Inc. v. Houston Lighting & Power Co.*, 615 F.2d 343, 351 n.12 (5th Cir. 1980) (quoting *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918)). Thus, "[t]he true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Id.*

Here, Micron fails to allege that ████████████████████████. First, as noted above, Micron's allegations are based on a clear misreading that clause, which does not restrict Netlist's

ability to negotiate licensing terms with Micron. Second, even if it did, ██████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████ a FRAND violation does not constitute an antitrust violation.

**1.**   ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████

Because Micron's Counterclaim relies on the SK hynix License—indeed it is the entire lynchpin of Micron's antitrust theory—it is thereby incorporated by reference, and this Court can and must consider its contents on a motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety . . . in particular, documents incorporated into the complaint by reference."); *Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, Ltd., 9 F.4th 247, 252 n.2 (5th Cir. 2021) (considering "audit report" that was "referenced" in an amended complaint in deciding dismissal). The Court need not accept Micron's allegations where they are directly contradicted by the language of the SK hynix agreement itself. *U.S. ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 493 (S.D. Tex. 2003), *aff'd*, 111 F. App'x 296 (5th Cir. 2004) ("The court will not accept as true allegations that are contradicted . . . by exhibits attached to or incorporated in the pleading.") (quoting 5A Wright & Miller, Federal Practice and Procedure § 1363).

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████



This is not anticompetitive or an unreasonable restraint on trade. Most-favored-nation clauses "are standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995). They do not constitute "price fixing." *Id.* On the contrary, courts have held that such standard agreements further competition rather than harm it. *Id; see also Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island,* 883 F.2d 1101, 1110 (1st Cir. 1989) (""[A] policy of insisting on a supplier's lowest price—assuming that the price is not 'predatory' or below the supplier's incremental cost—tends to further competition on the merits and, as a matter of law, is not exclusionary.'"); *No Spill LLC v. Scepter Canada, Inc.*, 2022 WL 1078435, at *10 (D. Kan. Apr. 6, 2022) ("Most-favored-nation clauses" in a patent license "generally foster competition rather than hinder it") (granting motion to dismiss).

As the First Circuit explained in *Ocean State Physicians*, "it would seem silly to argue that a policy to pay the same amount for the same service is anticompetitive, even on the part of one who has market power. This, it would seem, is what competition should be all about." 883 F.2d at 1116.

███████████████ as plead here is no different than a standard most favored-nation-clause between a

supplier and its customer. As alleged, it simply ensures that SK hynix's alleged competitors will not gain an advantage by obtaining more favorable licensing terms. This is procompetitive. *Blue Cross & Blue Shield United*, 65 F.3d at 1415; *Ocean State Physicians Health Plan,* 883 F.2d at 1110; *No Spill*, 2022 WL 1078435, at *10.

Contrary to Micron's allegations, ███████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
   ██████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████ "collusively require[] that any license provided to competitors Micron and Samsung be priced based on all of Netlist's patents." Counterclaim ¶ 50. ██████████████████
████████████████████████████
   ████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

███████████████████████████████  Micron's Counterclaim fails for this reason alone.

### 2. Even Under Micron's Misreading, ███████████████████

███████████████████████████████████████████████

███████████████████████████████  this still would not constitute an antitrust

violation.

***No Price Fixing Conspiracy.*** First, there is nothing anticompetitive about Netlist attempting

to obtain the same or even a higher royalty rate from Micron or Samsung in comparison to the rate it

obtained from SK hynix. A patent "empowers the owner to exact royalties as high as he can negotiate."

*Brulotte v. Thys Co.*, 379 U.S. 29, 33 (1964). Thus, in *No Spill*, the district court dismissed an antitrust

claim alleging that a patent license was anticompetitive because it contained an "irrationally high"

royalty rate coupled with a "most-favored-nation" clause. 2022 WL 1078435, at *10. Citing *Brulotte*,

the Court concluded that this did not "plausibly allege the license agreement was a restraint of trade."

*Id.* Moreover, ███████████████████████████████████████████████

███████████████████████████████  this would still not constitute a price fixing

agreement. That occurs "where competitors at the same market level agree to fix or control the prices

they will charge for their respective goods or services." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350,

356 (3d Cir. 2004). In the licensing context, SK hynix is Netlist's *customer*, not its competitor, and there

is no allegation in the Counterclaim that SK hynix has agreed to license its own patents at a specific rate.

*No unlawful tying.* ███████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████ A patent owner has a statutory right to "condition[] the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product." 35 U.S.C. § 271(d). As the Federal Circuit held in *U.S. Philips Corp. v. Int'l Trade Comm'n*, a "package license is thus not anticompetitive in the way that a compelled purchase of a tied product would be." 424 F.3d 1179, 1189-90 (Fed. Cir. 2005) (finding that there was "no evidence that a portion of the royalty was attributable to the [nonessential] patents" and, thus, no basis to support the conclusion that "a hypothetical licensing fee would have been lower if Philips had offered to license the patents on an individual basis or in smaller packages."). As discussed below in Section VI, tying can sometimes constitute patent misuse where "the patent owner has market power in the relevant market for the patent." 35 U.S.C. § 271(d). But as explained further below, Micron has not adequately alleged that Netlist has market power in any market for standard essential patents. Section IV.D, *infra*. In particular, Micron never alleges that Netlist actually owns any standard essential patents, which would be a necessary perquisite to Netlist exploiting any power it has in relation to such patents.

*No unlawful refusal to deal.* Finally, █████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████ Indeed, Netlist could have granted Sk hynix an *exclusive* license that would have prevented Netlist from licensing the patents to Micron at all. *Alfred E. Mann Found. For Sci. Rsch. v. Cochlear Corp.*, 604 F.3d 1354, 1359 (Fed. Cir. 2010) ("[A] patent owner may grant an exclusive license to his patents . . . ."). Thus, a non-exclusive

license that simply limits the terms on which Netlist licenses to others would not be anticompetitive (even if anything like that happened here).

### 3. Alleged FRAND Breaches Cannot Constitute An Antitrust Violation

Finally, Micron alleges that the ███████████ "Netlist's representations and obligations to JEDEC" because it "constrains [Netlist's] ability to provide a license on reasonable terms," Counterclaim. ¶¶ 47. As explained above, ███████████████████████ this would not constitute an antitrust violation as a matter of law.

As an initial matter, Micron's theory makes no sense ████████████████████████ ████████████████████████████████ this would just mean that Micron would get the same deal SK hynix got. Such a license would hardly be unreasonable or discriminatory since it would put all licensees on the exact same footing. Answer ¶ 54 (Under JEDEC "[a] license will be offered, to applicants desiring to utilize the license for the purpose of implementing the JEDEC Standard under reasonable terms and conditions that are free of any unfair discrimination.") (quoting JEDEC Policy).

Regardless, ████████████████████████████████████████ ████████████████████████████████████ As one court in this circuit has explained, in an order that was later adopted by the Fifth Circuit on appeal:

> **It is not anticompetitive for an SEP holder to violate its FRAND obligations**. A lawful monopolist's "charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." [citing *Trinko*, 540 U.S. at 407; *see also Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447-48, 129 S.Ct. 1109, 172 L.Ed.2d 836 (2009) ("Simply possessing monopoly power and charging monopoly prices does not violate § 2."). A patent owner may use price discrimination to maximize the patent's value without violating antitrust law. *USM Corp. v. SPS Techs.*, Inc., 694 F.2d 505, 512 (7th Cir. 1982). **An SEP holder may choose to contractually limit its right to license the SEP through a FRAND obligation, but a violation of this contractual obligation is not an antitrust violation**.

*Cont'l Auto. Sys., Inc. v. Avanci, LLC*, 485 F. Supp. 3d 712, 734 (N.D. Tex. 2020) (emphasis added), *and aff'd*, 2022 WL 2205469 (5th Cir. June 21, 2022) ("Having reviewed the district court's detailed order,

and considered the oral arguments and briefs filed by the parties and amicus curiae, we AFFIRM the judgment of the district court that Continental failed to state claims under Sections 1 and 2 of the Sherman Act.").

Other courts have reached this claim conclusion. In *FTC v. Qualcomm Inc.*, the Ninth Circuit explained that an alleged breach of a FRAND commitment "does not amount to anticompetitive conduct." 969 F.3d 974, 1005 (2020). Rather, any remedy for such a breach "lies in contract and patent law." *Id.*; *see also id.* at 997 ("[I]t would be a mistake to use 'the hammer of antitrust law . . . to resolve FRAND disputes when more precise scalpels of contract and patent law are effective.'"); *Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*, 2017 WL 750700, at *6 (D. Del. Feb. 27, 2017) (patent transferee's alleged failure to offer FRAND is not an antitrust violation; granting dismissal), *adopted*, 2017 WL 1055958 (D. Del. Mar. 20, 2017).

Thus, Micron's alleged FRAND violations should be addressed if at all at the damages phase as part of the reasonable royalty analysis. They cannot form the basis of a Section 1 claim.

### B.    Micron Has Failed To Allege Antitrust Injury

Micron's Counterclaim should also be dismissed because it fails to show that it has suffered any antitrust injury. "It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors. . . . Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224-25 (1993). Rather, "to survive a motion to dismiss," Micron's counterclaims must allege facts showing that Netlist's agreement with SK hynix "injures *competition* in the market." *Marucci Sports*, 751 F.3d at 373-76 (emphasis added). Such injury includes "competitors dropping out of the market, significant price changes, or diminution in the quality of [products at issue]." *Id.* In contrast, where "the only plausible injury [plaintiff] asserts is its own," its claim fails at the pleading stage because "[o]nly injuries to the market are cognizable." *Id.* at 376.

Micron has failed to allege any harm to competition here. The only actual injury that Micron claims it has suffered are supposed "substantial damages defending infringement litigations and has lost good will as a result of Netlist's claims that patents asserted against Micron are standard-essential." Counterclaim ¶ 54. But at most this constitutes an injury to Micron only. Courts have rejected the contention that injuries stemming from litigation standing alone can constitute antitrust injury. *See, e.g., Chip-Mender, Inc. v. Sherwin-Williams Co.*, 2006 WL 13058, at *5-6 (N.D. Cal. Jan. 3, 2006) ("[A] claim of injury in the form of attorneys' fees in defending against a patent infringement suit is not an injury to 'competition' . . . but is rather a purely individual economic injury to [the plaintiff] that has no effect on competition in the relevant market" ) (granting dismissal); *Am. Med. Ass'n v. United Healthcare Corp.*, 2007 WL 683974, at *5 (S.D.N.Y. Mar. 5, 2007) ("[I]t cannot be said that the litigation costs incurred by Counterclaim Plaintiffs are injuries that antitrust laws were intended to prevent or that have had an adverse effect on competition as a whole."); *Apple Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1076 (W.D. Wis. 2012) (attorney fees and costs incurred in response to patent litigation do not constitute antitrust injury); *Huawei Techs. v. Samsung Elecs.*, 340 F. Supp. 3d 934, 956 (N.D. Cal. 2018) ("The only 'injury' to Samsung disclosed in Dr. Hausman's Report is Samsung's litigation costs, which Dr. Hausman conceded were 'harms to Samsung,' not 'harms to consumers.'") (granting dismissal).

Mircon has not linked the litigation expenses or supposed loss of good will it has incurred to any broader market harm such as an increase in prices, exclusion or competitors, reduction of output, or decrease in product quality. *Marucci Sports*, 751 F.3d at 373-76; *see also Impax Lab'ys, Inc. v. Fed. Trade Comm'n*, 994 F.3d 484, 493 (5th Cir. 2021) (anticompetitive harms consists of "increased prices, decreased output, or lower quality goods."). Micron claims that the money it has spent defending itself against Netlist's infringement suits would have been invested in "research and development and improving its sales of memory products ███████████████████████" Counterclaim ¶

- 14 -

54. But even assuming this is true, it also merely constitutes an injury to Micron, as "[t]here is no allegation that the adverse effect is experienced by anyone" else. *Am. Med. Ass'n*, 2007 WL 683974, at *5.

In sum, the mere fact that Micron may have lost money that it could have spent on research and development, even if true, does not constitute an injury to *competition*. Regardless, Micron does not even allege that the quality or output of its own products have gone down, or that it has had to raise prices, or that there is any technology it has not been able to sell or develop because it has been sued by Netlist. *Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*, 2004 WL 1427136, at *7 (E.D. Pa. June 21, 2004) ("While the Amended Counterclaim alleges that RenalTech's payment of defense costs in this litigation flows from Plaintiffs' allegedly anticompetitive conduct, there is no allegation that said payment had any effect on competition, on the price, quantity or quality of RenalTech's products, or prevented RenalTech from pursuing its entry into the market for its polymeric resin.").

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████ First, Micron has not alleged that it has ever paid any price (let alone a supracompetitive one) to license Netlist's patents. Nor does Micron allege that it ever has any intention of licensing Netlist's patents in the future. Micron does not have standing to seek relief based on an alleged injury it has not suffered. *See, e.g., Kjessler v. Zaappaaz, Inc.*, 2019 WL 3017132, at *5, *8 (S.D. Tex. Apr. 24, 2019) (dismissing price-fixing claim, where "[p]laintiffs acknowledge[d] that none of them bought [the allegedly price-fixed product]," and, consequently, none "suffered a personal injury"); *see also In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 15 (1st Cir. 2008) (plaintiff who failed to allege any "intention to buy or lease another new vehicle within such a time frame as could be deemed imminent" had no standing to bring antitrust claim). Second, Micron pleads no facts showing that Netlist has charged anyone (let alone Micron) supracompetitive rates. *Ferko v. Nat'l Ass'n of Stock Car Racing*, 2002 WL

34477591, at *6 (E.D. Tex. Oct. 4, 2002) ("[A]plaintiff must plead and prove facts showing that competition has been injured"). Indeed, the only license rate Micron identifies is the one that was paid by SK hynix, Netlist's alleged co-conspirator. And even if Micron's distorted reading of ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮, which it is not, this would just mean that all other consumers would have to pay the same rate that Samsung paid.

In sum, because Micron has not suffered any antitrust injury, its counterclaim must be dismissed.

### C.      Micron Has Failed To Allege A Cognizable Market

Micron's Section 1 claim also fails because Micron has failed to allege a cognizable market. "[D]etermining the relevant market" is the first step in determining the viability of an alleged Section 1 claim. *Wampler v. Southwestern Bell Telephone Co.*, 597 F.3d 741, 744 (5th Cir. 2010). This is because "[w]ithout a definition of [the] market there is no way to measure [a defendant's] ability to lessen or destroy competition." *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics Inc.*, 2022 U.S. Dist. LEXIS 60676, at *12 (W.D. Tex. Mar. 31, 2022) (granting dismissal) (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177(1965)).

The "outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Cross-elasticity of demand is "the extent to which consumers will change their consumption of one product in response to a price change in another." *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 469 (1992). To survive, a complaint must plead facts demonstrating what the boundaries of the alleged market are. Overly "broad and vague" definitions that apply to wide swaths of products or technologies are not sufficient absent some explanation as to how these products and technologies are substitutes for one another. *PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) (affirming dismissal).

Here, Micron alleges two markets, neither of which is cognizable. Micron's first alleged market consists of patents that read on "standard-compliant DRAM chips and memory modules." Counterclaim ¶ 30. But Micron's counterclaim contains no explanation of how the various technologies that would fall under this vague and amorphous category could plausibly be substitutes. On the contrary, Micron expressly alleges that these technologies are **_not_** substitutes because they are compatible with different types of computers and servers and have different speeds and characteristics.

Micron's second alleged market fairs no better. This market consists of the "memory product markets corresponding to, and **_broader than_**, the licensing markets for particular DRAM technologies." Counterclaim ¶ 34 (emphasis added). Micron's Counterclaim does not even identify the products that would be included in this even vaguer and more amorphous market let alone allege that consumers would treat such products as interchangeable.

### 1.      Micron's Alleged Technology Market Is Non-Cognizable

The first alleged market "consists of a technology market for the licensing of technology used to manufacture standard-compliant DRAM chips and memory modules, which comprises licensing submarkets specific not only to DRAM designs (e.g., DDR5, DDR4, and DDR3) but also to memory module architectures incorporating such DRAMs (e.g., LRDIMMs, RDIMMs, UDIMMs, and SODIMMs)." Counterclaim ¶ 30. Micron's Counterclaim does not even attempt to explain how the various generations of DRAM modules and types of DRAMS modules that are included in this market (the "Technology Market") could be economic substitutes.

As an initial matter, the mere fact that the USPTO has issued patents on a certain technology does not mean that technology constitutes a "market" for antitrust purposes, nor does the fact that patents relate to the same general technology mean that they are all in the same market. *See Delano Farms Co. v. Cal. Table Grape Comm'n.*, 655 F.3d 1337, 1352 (Fed. Cir. 2011) ("[T]he aspects of an

invention that may have led the PTO to issue a patent are not per se coterminous with the features of the patented product that may lead consumers to select that product over other similar ones.") (affirming dismissal of antitrust claim). Rather, a plaintiff must allege facts showing that these technologies are "*economic* substitut[es]" for one another, i.e., "potential customers of the patented [technology] faced with a price increase would shift" to the other technologies in the alleged market. *Unitherm Food Sys. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1364 (Fed. Cir. 2004) ("Mangum did not explain the relationship between technological substitution and economic substitution.") (emphasis added), *rev'd in part on other grounds*, 546 U.S. 394 (2006).

Micron's Counterclaim contains no such alleged facts. On the contrary, Micron alleges that these technologies are ***not*** substitutable:

> DRAM product markets are further segmented by generations and module configurations because different DRAM products are interoperable with different types of computers and servers. Different types of DRAM memory module products are manufactured with different form factors to be compatible with servers (e.g., LRDIMM or Load Reduced Dual Inline Memory Module and RDIMM or Registered Dual Inline Memory Module); with desktop computers (UDIMM or Unbuffered Dual Inline Memory Module); and with laptops and mini-PCs (SODIMM or Small Outline Dual Inline Memory Module). DRAM products are also manufactured across different generations that have different speeds and characteristics (DDR2, DDR3, DDR4, DDR5). Often, a device such as a computer or a server is compatible with a particular set or subset of DRAM generations and/or DRAM memory module form factors. For example, a computer that is compatible with a DDR3 UDIMM memory module may not be compatible with a DDR5 LRDIMM memory module.

Counterclaim ¶ 38.

If these allegations are true, than it is not remotely plausible that the "technology used to manufacture" these disparate technologies are reasonably interchangeable from a consumer perspective. Micron cannot allege a plausible market simply by lumping various distinct technologies together because they relate to the same general field. *Intel Corp. v. Fortress Inv. Grp. LLC*, 511 F. Supp. 3d 1006, 1024 (N.D. Cal. 2021) (market not cognizable where it covered "a general technical field"); *see also Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1144 (E.D. Ark. 2008),

*aff'd*, 591 F.3d 591 (8th Cir. 2009) ("It should be clear that a relevant market consists only of goods that are reasonably close substitutes for one another.") (quoting Phillip E. Areeda et al., Antitrust Law ¶ 565a (3d ed. 2007)) (granting dismissal); *Westlake Servs., LLC v. Credit Acceptance Corp.*, 2015 WL 9948723, at *5 (C.D. Cal. Dec. 7, 2015) (granting dismissal because alleged markets "include[d] products that cannot plausibly be considered substitutes").

Moreover, Micron's alleged market is based on "standard-compliant DRAM chips and memory modules," but never identifies (1) which specific standards are at issue, (2) which patents read on these standards, or (3) even whether Netlist actually owns any standard essential patents in this field. Instead, Micron's market definition appears to implicate numerous different standards. Micron cites the JEDEC Memory Module Design File Registrations, Counterclaim ¶ 30, which note "[t]he JEDEC JC-45 Committee for Memory Modules is responsible for the development, simulation and verification of numerous memory module standards, including various DIMM types such as Unbuffered DIMMs, Registered DIMMs, Buffered DIMMs, Low-Profile DIMMs and SODIMMs."[1]

This is yet another reason why Micron's alleged market is non-cognizable. *Intel Corp. v. Fortress Inv. Grp. LLC*, 2020 U.S. Dist. LEXIS 158831, at *35 (N.D. Cal. July 7, 2020) (granting dismissal of SEP markets where complaint did "not even identified any specific SEPs at issue"). In *Godo Kaisha*, the district court held that a similar attempt to lump different standards within the same market was insufficient: "TCT improperly aggregates all three telecommunication standards together with no explanation of how devices complying with one of the identified standards would be in the same market (or interchangeable) as devices complying with another identified standard, or a combination thereof. Nor does TCT allege that the relevant market is congruent with the patents-in-suit." *Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech,* 2018 WL 11426956, at *5 (D. Del. Feb. 28, 2018). The same is

---

[1] JEDEC Memory Module Design File Registrations (https://www.jedec.org/category/technology-focus-area/memory-module-design-file-registrations).

true here. Micron has "improperly aggregated" all DRAM standards together and it provides no explanation for how the "relevant market" is "congruent" with the numerous patents at issue. *Id.*

Finally, Micron's vague reference to "submarkets" within the broader market for technology used to manufacture "standard-compliant DRAM chips and memory modules," does not save its complaint. Counterclaim ¶ 30. *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1338 (11th Cir. 2010) (Plaintiff's "skimpy allegations of the relevant submarket do not" satisfy pleading burden). First, Submarkets "must exist within broader economic markets," meaning a submarket is not cognizable if it is not part of a cognizable dominant market. *PSKS*, 615 F.3d at 418. *Id.* at 416 (affirming dismissal where plaintiff "had failed to plead a unique submarket for Brighton goods, because it had failed to first plead a 'tenable dominant market.'"). Thus, Micron's alleged submarkets necessarily fail because its alleged dominant market—i.e., patents that read on "standard compliant DRAM memory modules"—is not cognizable for all of the reasons explained above. Second, "the requirements for pleading a submarket are no different from those for pleading a relevant broader market." *Id.* at 418. In other words Micron must allege facts demonstrating that the patents in these submarkets are substitutes. But Micron's Counterclaim does not even identify what these specific submarkets are let explain how they exhibit the "practical indicia" of an economically distinct submarket. *Brown Shoe*, 370 U.S. at 325 (The indicia of a submarket includes "[i]ndustry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.").

## 2.    Micron's Alleged Product Market Is Non-Cognizable

Micron's second alleged market is even vaguer and more amorphous than its first. This market supposedly consists of "memory product markets corresponding to, and **broader than**, the licensing markets for particular DRAM technologies (e.g., DDR5, DDR4, and DDR3) and DRAM memory module configurations (e.g., LRDIMMs, RDIMMs, UDIMMs, and SODIMMs)." Counterclaim ¶ 34

(emphasis added). Because this alleged market (the "Product Market") is even broader than the fatally deficient technology market described above, it fails for all of the same reasons. Indeed, Micron itself alleges that it "manufactures different types of memory products that **are not reasonably interchangeable and constitute distinct product markets**." Counterclaim ¶ 36(emphasis added); see also *id.* at ¶ 49. Thus, Micron has not alleged the "outer boundaries" of this market, and its claim must fail. *Brown Shoe Co.,* 370 U.S. at 325.

### D.      Micron Has Failed To Allege That Netlist Has Market Power

To state a Section 1 claim, not only must Micron allege a cognizable market, but also that Netlist has "power over such a market." *PSKS, Inc.,* 615 F.3d at 418 & n.5. Even accepting Micron's allegations as true, it has not sufficiently alleged that Netlist as power over alleged the Technology and Product markets discussed above. This independently warrants dismissal. *Id.*

As discussed above, Micron's alleged Technology Market "consists of technology used to manufacture standard-compliant DRAM chips and memory modules." Counterclaim ¶ 30. According to Micron, "[w]hen technology is locked into a standard through this process, owners of standard-essential patents have market power to exclude companies from practicing the standard." *Id.* ¶ 31. This allegation fails for two reasons.

First, Micron never alleges that Netlist actually owns any standard-essential patents. ████

████████████████████████████████████████████████████████████

That cannot establish market power. A patent owners "claims about the scope of the patents . . . are not legally relevant," *Orion Elec. Co., Ltd. v. Funai Elec. Co., Ltd.,* 2002 WL 377541, at *6 (S.D.N.Y. Mar. 11, 2002). "[A]ny claim of market power must depend upon the patents themselves, not upon the statements of the patentee." *Id.* Thus, courts have held a patent holder cannot have power over a market involving standard essential patents absent an allegation that the patent holder actually owns such patents. *See, e.g., Apple v. Samsung,* 2011 WL 4948567, *4 n.6 (N.D. Cal. Oct. 18, 2011) ("If, as

Apple alleges, some Samsung patents are not essential to the standard, it will likely be difficult for Apple to establish that Samsung's conduct has antitrust implications") (dismissing antitrust claims); *see also No Spill*, 2022 WL 1078435, at *7 (allegation that "[d]efendants believe that practicing the patents will be required under a forthcoming… standard" insufficient). But Micron has made no such allegations here.

Second, even setting this aside, the possession of a standard-essential patent by itself does not give rise to market power in the antitrust sense. The Supreme Court has made clear that "Congress did not intend the mere existence of a patent to constitute the requisite 'market power.'" *Illinois Tool Works Inc. v. Independent Ink*, 547 U.S. 28, 42 (2006). For example, courts have rejected the contention that a failure to disclose patents during the standard setting process gives rise to market power even when those patents read on the standard that is ultimately selected. *Apple*, 2011 U.S. Dist. LEXIS 120416, at *16 ("Courts have been more reluctant to find antitrust violations based on the theory that a failure to disclose intellectual property rights in a declared essential patent created monopoly power for a member of the SSO."). Rather, to adequately plead a market power the plaintiff must allege (1) that there were alternative technologies under consideration by the standard setting organization prior to adoption of the standard and (2) allege that the standard setting organization would have adopted one of these alternatives absent a defendant's alleged failure to disclose relevant intellectual property or false promise to license such technology on FRAND terms. *See, e.g.*, *ChriMar Sys. v. Cisco Sys.*, 72 F. Supp. 3d 1012, 1019 (N.D. Cal. 2014) (requiring plaintiff to allege "that the SSO would have adopted an alternative standard had it known of the patent holder's intellectual property rights.") (internal quotation marks omitted); *Apple Inc. v. Samsung Elecs. Co.*, 2012 WL 1672493, at *6 (N.D. Cal. May 14, 2012) (plaintiff must allege "alternative technologies were excluded through the standardization process" based on a false promise). Absent such exclusion, the patent holder's "market power" (if any) would flow only from the lawful power conferred by the patent laws. *See Rambus Inc. v. FTC*, 522

F.3d 456, 466-67 (D.C. Cir. 2008).

Here, Micron does not even identify the supposed standards at issue let alone allege that JEDEC would have adopted different standards but for alleged misconduct by Netlist. Absent such allegations, however, any power that Netlist has from possessing JEDEC standard-essential patents stems from the lawful monopoly conferred by the patent itself, not any alleged anticompetitive conduct. Moreover, as explained above, Netlist's alleged failure to comply with its FRAND obligations following the selection of standard cannot constitute an antitrust violation. Section IV.A.3, *supra*.

Finally, Micron has not adequately alleged that Netlist has market power in the alleged "memory product markets" (even assuming that market is cognizable). Its Counterclaim says nothing about what Netlist's alleged share of this broad amorphous market is. *Futurevision Cable Sys., Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 769 (S.D. Miss. 1992) ("Futurevision's complaint fails to allege a specific figure representing the percentage of market share held by ESPN or The Learning Channel in the market which supplies cable programming.") (granting dismissal). In fact, Micron alleges that "Micron, Samsung, and SK hynix are all major manufacturers of flash memory products, accounting for more than 60 percent of flash memory chip sales worldwide," Counterclaim ¶ 43, implying that Netlist's share is, at least according to Micron, relatively small or even non-existent. Counterclaim ¶ 43. Micron thus cannot plausibly allege that Netlist has market power in this alleged market. *See Cranfill v. Scott & Fetzer Co.*, 773 F. Supp. 943, 949 (E.D. Tex. 1991) (granting dismissal for failure to plead market power where defendant's alleged "share of the vacuum cleaner business (however the market is defined) is quite small.").

V.     **ALTERNATIVELY, THE COURT SHOULD SEVER AND STAY MICRON'S ANTITRUST CLAIMS**

Alternatively, if the Court does not dismiss Micron's Counterclaim, it should sever this claim and stay it until the patent case is tried. Federal Rule of Civil Procedure 21 permits a court to "sever any claim against a party," Fed. R. Civ. P. 21, and Rule 42(b) permits the court to "order a separate

trial of any" "counterclaim," Fed. R. Civ. P. 42(b). This Court also "has the inherent power to control its own docket, including the power to stay proceedings." *Soverain Software LLC v. Amazon.com*, 356 F. Supp. 2d 660, 662 (E.D. Tex.2005).

As the Federal Circuit has recognized, it is "standard practice" to "separate[] for trial patent issues and those raised in an antitrust counterclaim." *In re Innotron Diagnostics*, 800 F.2d 1077, 1084 (Fed. Cir. 1986). Courts thus routinely sever and stay antitrust counterclaims so that the patent case can be tried first. *See, e.g., Retractable Techs., Inc. v. Becton Dickinson & Co., No.*, 2008 WL 11518664, at *2 (E.D. Tex. Jan. 18, 2008) ("[T]he Court determines that severing the non-patent claims will promote judicial economy, streamline the issues presented to the jury, and avoid prejudice to either party."); *Polycom, Inc. v. Codian, Ltd.*, 2007 WL 7658922, at *2 (E.D. Tex. Apr. 23, 2007) ("[B]ifurcating antitrust counterclaims from patent infringement claims is well recognized as a useful case management tool.").

This case should be no exception. Courts consider the following factors when deciding whether to sever counterclaims: (1) "whether the claims arose out of the same transaction or occurrence," (2) "whether the claims present common questions of law or fact," (3) "whether different witnesses and documentary proof are required," (4) "whether settlement or judicial economy would be promoted," and (5) "whether prejudice would be averted by severance." *In re Rolls Royce Corp.*, 775 F.3d 671, 675 n.6 (5th Cir. 2014). Each one of these factors favors severance here.

As to the first factor, Micron's Counterclaim does not arise under the "same transaction or occurrence" as Netlist's patent claims. Netlist's claims arise from Micron's infringement of the patents-in-suit whereas Micron's Counterclaim allegedly arises from Netlist's license with SK hynix, who is not even a party to this suit. *Sanofi-Synthealbo v. Apotex Inc.*, 2006 WL 3103321, at *4 (S.D.N.Y. Nov. 2, 2006) (severing antitrust claims because they arose out of "commercial activity that is distinct from the underlying patent dispute."); *see also Westinghouse Air Brake Techs. Corp. v. Siemens Mobility, Inc.*, 330 F.R.D. 143, 148 (D. Del. 2019) ("Because the antitrust litigation arises from [plaintiff's] conduct, and

the patent litigation arises from [defendant's] conduct, the two sets of claims could not arise from the same transaction or occurrence.") (cleaned up).

The second and third factors thus weigh in favor of severance as well. Adjudicating Micron's Counterclaim will require the Court or a jury to address a host of complex issues that having nothing to do with whether Micron has infringed the patents-in-suit including, e.g., (1) whether the SK hynix License constitutes a restraint on trade; (2) whether the pro-competitive benefits of that agreement outweigh this constraint under the rule of reason analysis; (3) what is the relevant antitrust market; and (4) whether Netlist has power within that market just to name a few. Each of these will require different witnesses and documentary proof from Netlist's infringement claims.

The fourth factor, "judicial economy," also favors severance. *In re Rolls Royce Corp.*, 775 F.3d at 675 n.6. Antitrust cases are notoriously complex and expensive to litigate. *See, e.g., Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659, n.4 (7th Cir. 1987) ("[A]ntitrust trials often encompass a great deal of expensive and time consuming discovery and trial work."). Thus, adjudicating patent claims first is almost always more efficient because this may limit or eliminate the need to address "complex, time-consuming, costly, and potentially moot antitrust issues." *See, e.g., In re Innotron Diagnostics*, 800 F.2d at 1084. Such is the case here. For example, Micron has ███████████ ████████████████████████████████████████████████████████████████████████████ ████ One of the questions the jury in the patent case may be asked to address is what constitutes a reasonable royalty rate for the patents in suit, which will then become preclusive and "law of the case" in any subsequent antitrust suit. *In re Innotron Diagnostics*, 800 F.2d at 1085. Moreover, trying the patent and antitrust claims together is not even practically feasible. The close of fact discovery is just two months away, and trial is scheduled for April of next year. Dkt. 110 at 1, 4;  *In re Innotron Diagnostics*, 800 F.2d at 1085 ("Expedition is served because the patent issues on the present schedule will be ready for trial more than a year before the antitrust issues can be made ready.").

Finally, trying the antitrust case and patent cases together will substantially prejudice Netlist. Doing so would almost certainly lead to undue delay of the patent case given the complexities involved. *ASM Am., Inc. v. Genus, Inc.*, 2002 WL 24444, at *6–7 (N.D. Cal. Jan. 9, 2002) ("[P]roceeding on the antitrust claims simultaneously with the patent claims may well delay resolution of the case by increasing its complexity exponentially . . . ."). It is also "very likely to confuse and burden a jury that will already be confronted with a fairly complex patent infringement case." *Polycom, Inc.*, 2007 WL 7658922, at *3. In contrast, Micron will not suffer any prejudice if its Counterclaim is severed and stayed. Micron does not allege that Netlist has somehow prevented it from selling its products in any market. On the contrary, the Counterclaim alleges that Micron accounts for a substantial "percent of flash memory chip sales worldwide." Counterclaim ¶ 43. The only alleged "injury" that Micron claims it has suffered are its litigation costs, and, *id.* ¶ 54, as explained above, severing and staying Micron's Counterclaim will likely decrease litigation costs.

In sum, if the Court permits Micron's antitrust Counterclaim to proceed, there is no reason to depart from the standard practice of severing and staying this claim until the patent claims are resolved. Indeed, if anything, this case is the paradigmatic example of when such an approach is warranted.

## VI.    THE COURT SHOULD STRIKE MICRON'S PATENT MISUSE DEFENSE

Micron's Nineteenth Affirmative Defense of patent misuse is "insufficient" as a matter of law and should be stricken pursuant to Rule 12(f). Fed. R. Civ. P. 12(f); *see also Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982), *cert. denied*, 459 U.S. 1105 (1983). This affirmative defense is predicated on the same blatant misreading of the SK hynix License, Affirmative Defense ¶ 59, and thus fails for all the same reasons as explained in Section III.A. Even setting that aside, however, Micron's allegations fail to show patent misuse as a matter of law.

The crux of Micron's patent misuse defense is that Netlist has offered to license its patents as a portfolio. ████████████████████████████████████████

███████████████████████████████████████████████ ” and

"tying of patent rights Netlist has asserted to be essential to those it has not accused Micron of practicing." Answer ¶ 59. But even if true, these allegations do not constitute patent misuse for multiple reasons. First, there is no allegation that Micron and Netlist have entered into a license agreement, which is necessary perquisite for patent misuse. Second, requiring a licensee to acquire rights to additional patents as a condition for entering into a license is not patent misuse unless the patentee owner has market power. But as discussed above, Micron has not adequately alleged that Netlist has market power here. Third, even assuming Netlist did have market power, it is not patent misuse for a patent owner to license its patents as a portfolio only (even when the portfolio contains both essential and non-essential patents). On the contrary, this approach is common and commercially more efficient. Finally, to the extent that Micron's affirmative defense is based on Netlist's alleged breach of FRAND obligations, such alleged breaches do not constitute patent misuse.

## A. An Unconsummated License is Not Patent Misuse

Micron's patent misuse defense fails at the outset since there is no allegation that Micron and Netlist have entered into a patent license. As numerous courts have held, an ***unconsummated*** offer to license cannot constitute patent misuse. *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 404 (S.D.N.Y. 2015) ("Many courts have concluded that mere offers cannot constitute patent misuse unless they are ultimately consummated.") (collecting cases); *see also Virginia Panel*, 133 F.3d at 871 (unconsummated offer could not constitute *per se* tying or patent misuse); *Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech.*, 2017 WL 750700, at *8 (D. Del. Feb. 27, 2017) (rejecting patent misuse counterclaim "premised on an offer to license which has not been consummated"). Micron's patent misuse defense should be stricken for this reason alone.

## B. Micron Has Not Alleged Market Power

Micron's patent misuse defense also fails because Micron has not adequately alleged market

power. "To establish the defense of patent misuse, the accused infringer must show that the patentee has power in the market for the tying product." *Philips Corp.*, 424 F.3d at 1086. Thus, "conditioning the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product," is not patent misuse unless, in view of the circumstances, the patent owner "has market power for the patent or patented product on which the license or sale is conditioned." *Id.* Here, Micron alleges that "Netlist has [] leveraged market power created as a result of the standard-setting process and the patents it has asserted to be essential." Answer ¶ 59. As explained above, these allegations fail to establish that Netlist has market power especially given that Micron never alleges that Netlist actually possesses any standard essential patents (as opposed to just declared standard essential patents). Section IV.D *supra.* In addition, Micron has not sufficiently alleged that Netlist has market power because it not identified any cognizable market in the first place. Section III.C *supra.*

### C.      Patent Portfolio Licensing Does Not Constitute Patent Misuse

Even if Micron had alleged market power, requiring that a licensee take a license to the patent owners full portfolio does not constitute patent misuse. The Federal Circuit has explained that portfolio license arrangements do not raise the same anticompetitive concerns as would be raised by patent-to-product tying arrangements because "a package licensing agreement that includes both essential and nonessential patents does not impose any requirement on the licensee." *Philips Corp.,* 424 F.3d at 1190. Such an arrangement "might mean that the customer will choose not to license the alternative technology offered by the patentee's competition, but it does not compel the customer to use the patentee's technology." *Id.* "The package license is thus not anticompetitive in the way that a compelled purchase of a tied product would be." *Id.*

Indeed, "package licensing 'reduces transaction costs by eliminating the need for multiple contracts and reducing licensors' administrative and monitoring costs,'" and "has the procompetitive

effect of 'reducing the degree of uncertainty associated with investment decisions' because it 'provides the parties a way of ensuring that a single licensing fee will cover all the patents needed to practice a particular technology.'" *U.S. Philips Corp. v. Princo Corp.*, 173 Fed. App'x 832, 834 (Fed. Cir. 2006) (quoting *Philips*, 424 F.3d at 1192-93). Accordingly, district courts, including this Court, have rejected patent misuse arguments based on alleged package licensing of patents. *See, e.g., Saint Lawrence Commc'ns v. Motorola Mobility LLC,* 2018 WL 915125, at *9 (E. D. Tex. Feb. 15, 2018) (patentee licensing portfolio only on a worldwide basis was not misuse for improper tying); *Godo Kaisha*, 2017 WL 750700, at *8 (recommending dismissal of patent misuse counterclaim that was based on allegation that patentee had refused to separately license three asserted patents rather than entire patent portfolio).

The same analysis should apply here. There is no allegation that Netlist has engaged in patent-to-product tying. For example, Micron does not contend that Netlist has offered anyone (let alone Micron) a license that would require the purchase of a Netlist product much less that Netlist has forced Micron into "a compelled purchase of a tied product." *Philips*, 424 F.3d at 1190; *see also Honeywell Int'l Inc. v. MEK Chem. Corp.*, 2018 WL 6737514, at *5 (N.D. Tex. July 5, 2018) ("A tying arrangement is 'an agreement by a party to sell one product . . . but only on the condition that the buyer also **purchases a different (or tied) product**, or at least agrees that he will not purchase that product from any other supplier.'") (quoting *Schlotzky's, Ltd. v. Sterling Purchasing & Nat. Distrib. Co.*, 520 F.3d 393, 405 (5th Cir. 2008)) (emphasis added).

Instead, Micron alleges that the SK hynix License requires that royalties be "based on all of Micron's memory product revenue across distinct product markets, rather than being limited to those alleged to infringe." Affirmative Defenses ¶ 59. But this is not patent misuse. As the Supreme Court has recognized, "[i]t could easily be . . . that the licensee as well as the patentee would find it more convenient and efficient from several standpoints to base royalties on total sales than to face the burden of figuring royalties based on actual use." *Zenith Radio v. Hazeltine Research*, 395 U.S. 100, 138

(1969). This is because it is often "impossible to determine whether a specific product is 'covered by' a patent without litigation," which would defeat the very purpose of entering into a license in the first place. *See Texas Instruments v. Hyundai Elecs.*, 49 F. Supp. 2d 893, 901 (E.D. Tex. 1999).

To the extent Micron is attempting to allege that this somehow constitutes patent-to-product tying, this fails because Micron never alleges that the SK hynix License (nor any other Netlist license) requires that the licensee purchase Netlist's products. Regardless, the SK hynix license does not in any way limit the terms that Netlist can offer to Micron as explained above.

### D.     A Breach of FRAND Obligations Does Not Constitute Patent Misuse

Third, an alleged breach of FRAND obligations does not on its own amount to patent misuse. *See* Answer ¶ 59. As this Court has observed, "a breach of FRAND is not determinative of patent misuse," particularly because "the Federal Circuit has cautioned against a broad application of the patent misuse doctrine." *Saint Lawrence Commc'ns*, 2018 WL 915125, at *7; *see also Godo Kaisha,* 2017 WL 750700*,* at *8 (dismissing patent misuse claim based on FRAND allegations because defendant did "not allege that [plaintiff's] portfolio licensing restricts the use of the patents-in-suit in a specific way that falls outside the broad scope of the patent grant."). This is particularly true where, as here, there is no allegation that the patent holder (Netlist) made an "intentionally false promise to license essential proprietary technology on FRAND terms," or that a standards organization (JEDEC) "reli[ed] on that promise when including the technology in a standard." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007).

### VII.    <u>CONCLUSION</u>

For the reasons stated above, Netlists' motion should be granted.

Dated: September 19, 2023

Respectfully submitted,

/s/ *Jason G. Sheasby*
_____

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Jason G. Sheasby (*pro hac vice*)
jsheasby@irell.com
Annita Zhong, Ph.D. (*pro hac vice*)
hzhong@irell.com
Thomas C. Werner (*pro hac vice*)
twerner@irell.com
Yanan Zhao (*pro hac vice*)
yzhao@irell.com
Michael W. Tezyan (*pro hac vice*)
mtezyan@irell.com

**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199

***Attorneys for Plaintiff Netlist, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 19, 2023, a copy of the foregoing was served to all counsel of record via email.

<u>/s/ Jason Sheasby</u><br>
Jason G. Sheasby

## <u>CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL</u>

I hereby certify that the foregoing document and exhibits attached hereto are authorized to be filed under seal pursuant to the Protective Order entered in this Case

<u>/s/ Jason Sheasby</u><br>
Jason G. Sheasby