1                   IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF TEXAS
2                        MARSHALL DIVISION

3   NETLIST, INC.,                   (  CAUSE NO. 2:22-CV-293-JRG
                                      )
4           Plaintiff,               (
                                      )
5   vs.                              (
                                      )
6   SAMSUNG ELECTRONICS CO., LTD., (
    et al.,                          )  MARSHALL, TEXAS
7                                    (  SEPTEMBER 26, 2023
            Defendants.              )  8:30 A.M.
8   _____

9

10

11

12  _____

13                        MARKMAN HEARING

14

                 BEFORE THE HONORABLE RODNEY GILSTRAP
15               UNITED STATES CHIEF DISTRICT JUDGE

16  _____

17

18

19

20

21

22               SHAWN McROBERTS, RMR, CRR
                   100 E. HOUSTON STREET
23              MARSHALL, TEXAS  75670
                     (903) 923-8546
24         shawn_mcroberts@txed.uscourts.gov

25

<pre>
  1                    A P P E A R A N C E S

  2        FOR NETLIST:          IRELL & MANELLA, LLP -
                                 LOS ANGELES
  3                              1800 AVENUE OF THE STARS
                                 SUITE 900
  4                              LOS ANGELES, CA 90067-4276
                                 (310) 203-7096
  5                              BY:  MR. JASON SHEASBY

  6                              McKOOL SMITH, P.C. - MARSHALL
                                 104 E. HOUSTON ST., SUITE 300
  7                              MARSHALL, TEXAS  75670
                                 (903) 923-9000
  8                              BY:  MS. JENNIFER TRUELOVE

  9        FOR SAMSUNG:          FISH & RICHARDSON, PC -
                                 WASHINGTON DC
 10                              1000 MAINE AVE. SW, SUITE 1000
                                 WASHINGTON, D.C.  20024
 11                              (202) 783-5070
                                 BY:  MR. MICHAEL McKEON
 12                                   MR. BRIAN LIVEDALEN
                                      MR. CHRISTOPHER DRYER
 13
                                 FISH & RICHARDSON, PC -
 14                              SAN DIEGO
                                 12860 EL CAMINO REAL, STE. 400
 15                              SAN DIEGO, CA 92130
                                 (858) 678-5070
 16                              BY:  MR. FRANK ALBERT

 17                              GILLAM & SMITH, LLP
                                 102 N. COLLEGE, SUITE 800
 18                              TYLER, TEXAS  75702
                                 (903) 934-8450
 19                              BY:  MR. TRAVIS UNDERWOOD

 20        FOR MICRON:           WINSTON & STRAWN, LLP -
                                 REDWOOD CITY
 21                              255 SHORELINE DRIVE, STE. 520
                                 REDWOOD CITY, CA 94065
 22                              (650) 858-6443
                                 BY:  MR. MICHAEL RUECKHEIM
 23
                                 WARD, SMITH & HILL, PLLC
 24                              1507 BILL OWENS PARKWAY
                                 LONGVIEW, TEXAS  75604
 25                              (903) 757-6400
                                 BY:  MR. CHAD EVERINGHAM
</pre>



1          OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
2                                100 E. HOUSTON STREET
                                 MARSHALL, TEXAS  75670
3                                (903) 923-8546
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          THE COURT:  Be seated, please.

2      All right.  This is the time set for claim construction

3  in the case of Netlist, Inc., versus Samsung Electronics, et

4  al.  This is Civil Case No. 2:22-CV-293.

5      The Court will call for announcements at this time.

6      What says the Plaintiff Netlist?

7          MS. TRUELOVE:  Good afternoon, Your Honor.  Jennifer

8  Truelove here for the Plaintiff in this case.  Joining me

9  today and presenting argument is Mr. Jason Sheasby.  We also

10  have some client representatives out in the audience, Mr.

11  Tobin Hobbs and Jayson Sohi.  And we are ready to go, Your

12  Honor.

13          THE COURT:  All right.  Thank you, counsel.

14      What says the Defendants?

15          MR. UNDERWOOD:  Good afternoon, Your Honor.  Travis

16  Underwood on behalf of the Samsung Defendants.  With me this

17  afternoon are Mike McKeon, Frank Albert, Brian Livedalen,

18  Christopher Dryer.  And in the gallery we're also pleased to

19  have two client representatives with us, Young Chun and

20  Sunghun Lee.  And Samsung is ready to proceed, Your Honor.

21          THE COURT:  All right.  Thank you.

22          MR. EVERINGHAM:  Good afternoon, Your Honor.  May it

23  please the Court.  Chad Everingham and Mike Rueckheim are here

24  for the Micron Defendants.  And we are also pleased to be

25  joined by our client representative Becky Carrizosa.  And we

1    are ready to proceed.

2              THE COURT:  Thank you, Mr. Everingham.

3        All right.  That should be all the announcements.  Let's

4    turn to the disputed claim language that's set for

5    construction today.

6        Counsel, we've got a lot of ground to cover in the time

7    allocated.  I understand there may be an agreement that at

8    least one of these terms should be taken up on the papers only

9    and not subject to oral argument today.  Is that correct, or

10   am I mistaken?

11             MR. SHEASBY:  Your Honor, Mr. Rueckheim, who is

12   arguing 'circuitry' on behalf of both parties, indicated that

13   he was prepared to submit on the record.  Given the number of

14   terms, I agreed to that as well, subject to the Court's

15   approval, of course.

16             THE COURT:  Is that correct, Mr. Rueckheim?

17             MR. RUECKHEIM:  That's correct, Your Honor.

18             THE COURT:  All right.  Then we'll reserve

19   'circuitry' for resolution on the briefing and papers.

20       Let's start with 'memory module comprising' from the '912

21   Patent, with similar language from the '417 and the '215.  Let

22   me hear argument.

23       Let's begin with the Plaintiff on this one.

24             MR. SHEASBY:  May it please the Court.

25       If I could have the slides.

1          There are two issues that I think are threshold issues.

2     The first is there was some procedural argument that the claim

3     construction positions are unripe because of the evolving

4     nature of the dispute.  And to put it in precise context,

5     there is a part of that argument that is incorrect and a part

6     of it that is correct.  So there is a fundamental dispute

7     about whether 'rank' can encompass one memory device, and that

8     has been live since the parties first began negotiating the

9     claim terms.

10          There are two other aspects of the discussion of 'rank'

11     that became apparent.  There was a live dispute as we reviewed

12     the interrogatory responses and contentions and other matters

13     that the Defendants have set forth.  Those two other disputes

14     are whether 'rank' has to be a defined set of devices or it

15     can change on the module, and also whether 'rank' needs to

16     operate with all chips in the module.  It is, in fact, correct

17     that those two issues are embedded issues that Defendants'

18     claim construction does not seek to engage, but it is quite

19     clear that there is a dispute of claim construction as to

20     those two issues as well.  And so we think discretion is the

21     better part of valor in this situation and we should deal with

22     it upfront.

23               THE COURT:  So does that mean that in addition to

24     whether the term 'rank' can be one or must be more than one,

25     there is a live dispute, in your view, counsel, as to whether

1   the rank of devices corresponds to a fixed bit width.  Is that

2   still an issue?

3              MR. SHEASBY:  It still is an issue, as is the issue

4   of whether you need to read every device in the rank.

5              THE COURT:  Okay.  Whether or not a partial read is

6   permitted.

7              MR. SHEASBY:  Correct, Your Honor.

8              THE COURT:  All right.  Let me hear your argument on

9   these issues.

10             MR. SHEASBY:  Your Honor, 'rank' and 'DDR devices'

11  are terms that appear in either -- 'rank' appears in all the

12  claims and 'DDR devices' appears in the '912 claims in

13  addition to 'rank'.  And those are not terms that have some

14  imaginary abstract reading meaning; those are terms that are

15  actually created by JEDEC themselves.  And so we know that the

16  patents-in-suit are read in the context of JEDEC standards

17  because the '912 Patent makes that clear.  This is on slide 6.

18  And we know --

19             THE COURT:  So are you telling me the plain and

20  ordinary meaning of 'rank' doesn't apply; that there's some

21  special lexicography that comes out of JEDEC.

22             MR. SHEASBY:  I would say the plain and ordinary

23  meaning of 'rank' is JEDEC; in other words, that in the

24  context of a memory module, the term was created by JEDEC.

25  And the evidence of that is pretty substantial.

1          So if we look at slide 7, the term 'rank' was created by

2     JEDEC, the memory industry standards group.  This is what

3     Micron has said publicly.  And, of course, JEDEC began

4     dividing the term 'rank' and using that term from DDR1

5     forward.  So it was already well-established by that point.

6          THE COURT:  So let me ask you this, counsel.  Given

7     the prominence of JEDEC in this situation, are we, in fact,

8     dealing with patents that are standard essential, or are these

9     patents somehow not standard essential, notwithstanding the

10    influence of JEDEC?

11         MR. SHEASBY:  So what I would say is the following:

12    Is that these patents are built on top of -- if we go to slide

13    13, these patents are built on a baseline of JEDEC

14    specifications, and then certain departures are made from

15    JEDEC specifications in order to advance the field.  So when

16    they --

17         THE COURT:  When they're built on that platform of

18    JEDEC, do they take on the obligations of FRAND and other

19    things that are applicable to standard essential patents, or

20    does somehow the deviation from that once they've built on the

21    platform, does that somehow insulate them from the obligations

22    of fair, reasonable, and non-discriminatory?

23         MR. SHEASBY:  Yeah.  So these patents are a

24    different species than the patents last time.  For at least

25    the '912 Patent, my understanding is the '912 Patent, the

1    ultimate contentions, and an expert will have to do this, is

2    that it's actually essential; in other words, that it doesn't

3    depart -- it was subsequently adopted by JEDEC.  And so this

4    would be a species of a patent that is not just built on;

5    it's -- so at the time it was created, JEDEC had not yet

6    standardized it.  It was forward-looking as to what was going

7    to actually be the case at DDR4.  This patent reads on DDR4

8    and DDR3, but it was created long before that.  But my

9    understanding is that for DDR4, the '912 Patent is -- the

10   experts are likely to find that it's actually essential; that

11   it was fully adopted by JEDEC.

12              THE COURT:  All right.

13              MR. SHEASBY:  But the --

14              THE COURT:  Let's get back to 'rank'.

15              MR. SHEASBY:  Sure.  So the -- so Doctor Stone I

16   think addressed this for the purposes of claim construction.

17   The patents are supposed to comply with JEDEC standards.  And

18   there's different levels of JEDEC standards.  The JEDEC

19   standards that these are compliant with are those relating to

20   'DDR' and 'rank'.  And the specification--and Micron makes

21   this clear--that in the context of JEDEC and in the context of

22   DDR devices and memory modules, a rank is multiple DRAM

23   components.  And that exists for a very specific reason.

24       If we go to slide 11.

25       The width of a JEDEC device, the DDR chip, the width of a

1   rank in DDR is either 64 or 72 bits, and it's been that way

2   since the beginning of the JEDEC standardization of the term

3   'rank' and of the term 'DDR'.  And that has necessarily

4   required more than one chip at all points in time.  And so

5   when you're talking about a DDR memory chip, which the '912

6   recites, when you're talking about 'rank', which the '912 and

7   the other patents cite of necessity, you're talking about more

8   than one chip.  It's scientifically impossible for you to have

9   one chip that's the bit width of JEDEC DDR, which is a term

10  that only exists in the context of JEDEC.

11      The testimony of Harold Stone, this is on--I was on slide

12  9 previously; this is on slide 12 now--in which Doctor Stone

13  makes clear again that in the past and present there has

14  always been a requirement for more than one chip in a rank for

15  DDR devices.  And, of course, Micron's corporate

16  representative makes clear as well that there's always been

17  more than one chip required for a rank in DDR devices.

18      So 'rank' and 'DDR devices' don't have a plain and

19  ordinary meaning in the sense that you would go to a

20  dictionary to look them up.  They were terms that were created

21  by JEDEC, and in the context of JEDEC they have a plain and

22  ordinary meaning, and that context is a rank is more than one

23  DDR device.

24      So although I'm showing what may seem like extrinsic

25  evidence, it's actually, in my mind, not extrinsic evidence

1    because the terms -- the patents actually use these sort of

2    coin terms for JEDEC of 'DDR' and 'rank multiplication'.  This

3    is slide 14 where I'm showing the testimony of Mr. Holbrook.

4        I don't think there is a substantial attempt by either of

5    the Defendants to engage this issue in their briefing;

6    instead, they sort of suggest that the Court ignore it because

7    they say that the specification contemplates a rank with only

8    one device.  I would respectfully submit that the other

9    intrinsic record, in addition to incorporation by reference of

10   the JEDEC standards, does not support that.

11       So if you look at the specification--I'm on slide

12   15--there is a repeated contemplation of the ranks having

13   multiple devices.  If you go to slide 16, you look at Figure

14   1A, and if you look at every figure in the specification, the

15   rank is always described as having more than one device.

16       They have I think two arguments based on the intrinsic

17   record as to why they think a 'rank' can have just one device.

18   The first one relates to Table 1.  This is on slide 17.  Table

19   1 is referring to, if you look in the specification at 7:56

20   through 59, 'rank of memory devices' -- 'ranks of memory

21   devices' plural, so it contemplates that there are multiple

22   memory devices in each rank.

23       I'm on slide 18.  This is I think their argument that, in

24   my mind, I was I think the most unclear from the briefing on

25   both sides.  So they talk about this Logic State 4 as being an

1   example in which there would only be one device in each rank.

2   And what they argue is because it said in Logic State 4 the

3   command signal, e.g., 'read', is sent to only one memory

4   device or the other memory device, and they imagine that

5   that's a scenario in which the command signal is sent to only

6   one rank or the other rank.  In other words, there's two ranks

7   that are -- there is two ranks available for the signal to be

8   sent to, and one is -- only one is chosen.

9        But if you look at the specification at 8:26 through 62,

10  you will see that that Logic State 4, there's only one rank

11  available.  So what the specification that they point to is

12  actually describing is an instance in which there's one rank

13  available, there's two chips within the rank, and read signal

14  is sent to only one of those two chips.  The confusion is that

15  they imagine that State 4 is a state when two ranks are

16  available, when, in fact, State 4, if you read the context, is

17  an instance in which only one rank is available.

18            THE COURT:  Let me ask you this, Mr. Sheasby.

19  There's some mention in the briefing about Netlist having

20  characterized 'rank' as being something with one device when

21  it appealed an IPR decision, with the implication being

22  there's either some kind of disclaimer or estoppel or

23  something there.  What's your view on that issue?

24            MR. SHEASBY:  Yeah.  I found that confusing.  I

25  think it's actually just the exact opposite.  And this is just

1    a situation where I think there needs to be a careful reading

2    of the opinions by the Central Reexamination Unit and then the

3    Patent Trial and Appeal Board.  This is on slides 19 and 20 in

4    my deck.

5        On slide 19 -- 18, the -- we actually argued that the

6    Amidi reference was not invalidating because in Amidi it only

7    sent a signal to one device; whereas, in our system, our claim

8    system, a rank required a plurality of devices, and it would

9    not have been obvious based on Amidi, which sent a signal to

10   only one device, to send a signal to only one device in which

11   there are a plurality of devices in a rank.

12       And so, in fact, we argued just the opposite.  We didn't

13   argue that 'rank' could only have one device; we argued that

14   Amidi was not anticipating because there were -- they -- it

15   did not contemplate a plurality of devices in the rank; it was

16   only one device could theoretically exist, and the signal was

17   sent to that one device.  Our patent has multiple devices in

18   the rank, but there's a capability of sending it to only one

19   device.

20           THE COURT:  So are you suggesting that the

21   Defendants misrepresented --

22           MR. SHEASBY:  I don't think it's the

23   misrepresentation.  I think it's just a confusion in

24   understanding the context.  I think what Defendants thought

25   when they read this quickly was that this was talking about

1    Amidi having plurality of memory devices.  That's not actually

2    -- it's just the context they got wrong.  It's not Amidi

3    having a plurality of memory devices, it's Amidi not having

4    a plurality of memory devices; whereas, the claims require

5    plurality.

6         And this is slide 20 as well in which requester has not

7    provided a reasonable explanation as to why one skilled in the

8    art would transmit a command signal to only one DDR memory

9    device at the time when there is a plurality of memory devices

10   in a rank.  That's saying that Amidi, sending one signal to

11   one device, did not render obvious sending one signal to

12   multiple devices in a rank.

13        So I attribute no ill-will whatsoever, but I do think,

14   with all due respect, there was just a confusion and a

15   misinterpretation of the IPR.

16        Your Honor, with your permission I'll move on to some of

17   their other arguments --

18             THE COURT:  That's fine.

19             MR. SHEASBY:  -- in the intrinsic record.  And I

20   want to focus on -- I don't think it does anyone any good to

21   sort of not recognize that there are distinction.

22        The '912 Patent describes both 'DDR devices' and requires

23   both DDR devices as well as 'ranks'.  And in our mind that's

24   the apogee of the warrant that 'rank' should be multiple

25   devices as required in and contemplated by JEDEC.

1        I certainly understand that the other two patents are not

2   limited to 'DDR memory devices', and that the basis for

3   interpreting 'rank' as requiring more than one device would in

4   that context be just the specification and the understanding

5   of the word 'rank'.  But I think even those -- in those other

6   patents, there is robust amount of evidence that a rank does

7   not contemplate one device.

8        I think their best argument in the intrinsic record is

9   '215 Patent, claim 1.  And what they say, and the PTAB noted

10  this as well, it's -- by the way, the '215 is a completely

11  different specification than the '912, and I'm not clear how

12  this would be relevant to what's in the '912.  But what it

13  says is it talks about -- in some of the dependent -- some of

14  the later limitations it selects out one first memory

15  integrated device and one second memory integrated device a

16  and a first rank and a second rank.  And I think that the

17  board on first blush, as well as my brothers, imagined that

18  that means that a rank only has one device.  But this is a

19  situation in which the first and the second rank are -- first

20  memory device and second memory device are being identified

21  because there must be one device in each of those ranks that

22  does something specific, and that is one device in each of

23  those ranks must have connected to it a buffer that buffers it

24  along.  And this is on slide 25.

25       So I think in terms of the '215 Patent, claim 1, it's not

1    stating there's only one memory integrated circuit in the

2    rank, it's stating that there has to be at least one memory

3    integrated circuit that has the features that are listed

4    below, which is a state that they are connected to a buffer.

5        I think that the other arguments that the Defendants make

6    is they focus on claim 55 of the '912 Patent in which they say

7    that each rank of a first number of ranks comprises a

8    plurality of DRAM chip packages having a total bit width equal

9    to the sum bit width of the DDR chip packages of the rank.

10   This is slide 27.  And they say, Well, this claim 55 requires

11   a plurality of ranks and, therefore, claim 1, which it depends

12   on, does not require a plurality of devices in a rank.  And I

13   think this is, once again, just -- it's a good faith argument,

14   but I don't think it actually engages the issue.

15       The issue with claim 55 is not that there is multiple

16   devices in the rank; the issue is that all the devices in the

17   rank add up to a specific number of bits, a bit width length,

18   and SO that has nothing to do with whether claim 1 requires

19   THE -- whether claim 1 requires multiple devices in a rank.

20       The '912 Patent, claim 15, they also argue that the --

21   somehow the language in the claim itself contemplates one

22   device in each of a rank.  I think that that is -- I think

23   it's hard to read that when you parse it correctly.  So

24   basically what they say is that if a memory devices was

25   plural, it would -- in each rank, it would make this language

1    up here redundant, the language in the red underlining

2    redundant.  But what it's doing is claim 19 is -- claim -- the

3    claims of the '912 Patent are doing two things.  First, they

4    are defining the type of memory devices--it's got to be DDR

5    memory devices; second, it's saying that there are a number of

6    those devices in each of a number of ranks, defining the

7    physical ranks; and then there are a number of each of those

8    devices in logical ranks defining each of the logical ranks.

9        So I think reading into this contemplation that an

10   individual memory device -- that a rank can only have one

11   memory device because if -- because of some argument that if

12   it would -- if it required more -- the language I circled was

13   redundant I think is a bridge too far because that language

14   exists not to identify the number of memory devices, but

15   identifies exist to define their nature.

16       And then I think the last argument they make is they

17   point to Figure 6A and they say that 6A contemplates two

18   separate ranks with separate devices.  This is I think, is,

19   once again, just a good faith confusion.  There are two

20   separate embodiments -- two separate concepts of strategies

21   that are described in the specification.  There is a set in

22   which you actually combine two physical chips together to

23   mimic the behavior of one chip, and there is a design in which

24   you have two separate ranks which are logically mimicking the

25   design of one rank.  In Figure 6A and the specification

1    associated with that is not about ranks.  It makes no

2    reference to rank whatsoever.  It talks about how to combine

3    two physical chips to make them logically look like one chip,

4    which is one of the embodiments, not the claimed embodiment.

5         Your Honor, that's the sum of my argument on the multiple

6    rank issue.  Would you like me to turn to the other two

7    issues, or would you like me to --

8              THE COURT:  I want you to do that, but before you

9    do, I want to ask you for your response to the offer of

10   extrinsic evidence from the Defendants from Bruce Jacob where

11   he defines "a rank of memory is a bank of one or more DRAM

12   devices."  Why is he wrong when he says 'one or more' from

13   this memory system cache DRAM disk publication from 2007?  Why

14   is that wrong?

15             MR. SHEASBY:  So if you read the context of that,

16   it's talking about an old system in which a rank is a bank of

17   one or more DRAM devices.  And because of that ambiguity in

18   the sense that a DRAM -- a bank could be on an individual chip

19   and an individual chip could have two separate ranks and each

20   of those ranks there could be only one array of memory, what

21   the -- it actually goes on to say it's "To lessen the

22   confusion associated with overloading the nomenclature, the

23   word 'rank' is now used to denote a set of DRAM devices."

24        So what he's talking about, there was an old usage before

25   JEDEC standardization in which 'bank' and 'rank' were used

1    interchangeably, and it created confusion because on a chip --

2    an individual chip, a bank may only have one array or one set

3    of devices on it.  What he's saying is that now a rank is used

4    exclusively to note a set of DRAM devices, which is multiple

5    DRAM devices.

6        So in terms of Jacobs, I'm not running away from Jacobs,

7    the Jacobs actually proves the point.  There was an archaic

8    sort of conflation of 'bank' and 'rank' that has -- that was

9    sort of a pre-JEDEC design.  That conflation has now

10   disappeared with the JEDEC creation of the term -- formalized

11   term 'rank' in the context of DDR devices, with the record

12   'rank' is now used to note a set of DRAM devices.  The 'now'

13   is speaking about the context of when the '912 Patent was

14   issued.

15       And then, of course, if you go on -- I was on slide 22.

16   I was complaining that on slide 23, now -- is that when they

17   talk about this context of 'rank' now means multiple DRAM

18   devices is, again, presented on slide 23.

19       So the Jacobs point and -- is in my mind just another

20   situation in which you just need to read a little more closely

21   than I think was done historically.  There was an old

22   definition of 'bank' and 'rank' that conflated them.  There

23   was a new definition of 'rank' that made it multiple DRAM

24   devices.  That was -- in terms of the contemporaneousness of

25   the text, this language about the new -- the 'now', the 'now'

1    is the time of the '912 Patent.

2         THE COURT:  Several times you've argued that the

3    term 'rank' was a creation of JEDEC.  Put me in the Garden of

4    Eden.  Show me the point of creation where JEDEC creates

5    'rank' as a term.  Where did it happen?  How did it happen?

6         MR. SHEASBY:  DDR1.  So at the time of -- when DDR1

7    was standardized, the bit width that would be used in modules

8    was set at 64 or 72.  And when that bit width was set at 64

9    and 72, the JEDEC made clear that JEDEC defined the term

10   'rank' as meaning multiple devices because it was

11   theoretically impossible to create a device at 64 or 72 bits

12   on its own, so the only way you could do it was by having

13   multiple devices.

14       So it's -- Harold Stone talks about it in the DDR and

15   DDR2 standards.  This is on slide 11.  The widths were defined

16   as 64 and 72, and at that point that defined rank ineluctively

17   is meaning more than one device because there was no single

18   device that could have a width of 64 or 72, and, of course,

19   Mr. Holbrook testifies to the same as well.

20       So once --

21         THE COURT:  Do we have a document generated by JEDEC

22   that says, Henceforth, we are using the word 'rank' to mean

23   more than one device?  Do we have something that precise, or

24   is it just an evolution over the usage through DDR that we get

25   to the position you've taken?

```
 1              MR. SHEASBY:  So it's -- so it actually -- so the

 2    most precise thing in the record is slide 7.  This is Micron's

 3    testimony that Micron said -- reported that JEDEC created the

 4    term 'rank' and that that term required there to be multiple

 5    DRAM devices.  But in terms of the most specific things in the

 6    record, at DDR1, the bit width was set at 64 for a rank and a

 7    module, and that was -- that's required and standardized, and

 8    that will be undisputed by Defendants.  And at that point it

 9    was ineluctable that a rank would require more than one

10    because the -- there is no such thing as a chip that has more

11    than 64.

12         I can actually show you the specifications.  They are in

13    the record, Your Honor.  If you give me one moment I will find

14    them.

15         Slide 32, Ms. Truelove.

16         I'm on slide 32.  This is the JEDEC DDR standard, which

17    is Exhibit 7 and Exhibit 8 in our brief, Your Honor.  This is

18    for DDR1 and DDR2, and they both define the bit width as 64

19    and define the number of chips that would be in their rank, it

20    would be either 4, 8, or 6 based on the size of the chips that

21    are allowed under JEDEC.

22              THE COURT:  4, 8 or 16?

23              MR. SHEASBY:  4, 8, or 16, Your Honor.  Excuse me.

24              THE COURT:  Let's move on to the fixed bit width and

25    the partial read issues.
```

1          MR. SHEASBY:  Yes, Your Honor.

2      On the fixed bit width issue --

3      If you go to slide 37 -- 36, Ms. Truelove.

4      Sure.  It's our contention that the memory -- that a rank

5  is not some arbitrary logical structure that's created.  The

6  idea of ranks on the device are that they're physical

7  structures with defined physical contractual metes and bounds.

8  You see that on slide 36 from the specification at -- from the

9  claim itself.  And you see that in -- for example, in '912 it

10  talks about the memory devices being arranged in a first

11  number of banks.  'Arranged' is a physical act.  It's not

12  something where the rank can change arbitrarily over time.

13      Slide 40 speaks about the fact that --

14      I'm sorry.  Slide --

15      All the claims themselves make clear that a rank is a

16  physical construct.  It's not something that logically changes

17  based on some software or something.  And you know that from

18  the plain language of the claim which talks about the devices

19  being arranged in a first number of ranks.

20      As to being able to send data from only a subset of

21  devices in a rank, it is clear that you must have a capability

22  to use every device in the rank, but I think any argument that

23  every device in the rank must be used turns the specification

24  on the head.

25      If you look at column -- slide 40, this is '912, 8:44

1    through 60 and 7:56 through 59, the whole point of this design

2    is only to address a single memory device that would be in a

3    rank.  So this is State 4.  State 4, one rank is turned on.

4    And although there are multiple devices in that rank, you're

5    sending it to only one or the other device in the rank.  So it

6    would be -- do violence to the entire purpose of the

7    specification if you required every chip in the rank to be

8    addressable.

9        And I think that that is supported by Doctor Wolfe, who's

10   one of Samsung's experts who testified that it's still a rank

11   if you do a partial read from it.  In other words, one of the

12   tactics in the patent is there to be partial reads.  That's

13   what 8:44 through 60 speaks about.

14       Oh, and there's one other issue that they talk about.

15   There is a portion of the specification in which it talks

16   about 32-bit width modules and 32-byte DRAM devices, and they

17   say, Well, if you combine 32 and 32 together, it would be one

18   chip and one sort of set of bit width, but that's not defining

19   rank; that is just defining a theoretical option.  If you

20   didn't speak about ranks, if you didn't speak about DDR

21   devices, you could create a crazy 32-bit -- 32-byte DRAM

22   device and use it in a 32-bit width module, but that would not

23   be a rank -- a JEDEC rank, and it would not be a DDR device,

24   because DDR device does not standardize 32 bits.

25       Thank you, Your Honor.

1          THE COURT:  All right.  Let me hear from Defendants

2   in response.

3          MR. McKEON:  Good afternoon, Your Honor.  Mike

4   McKeon for Samsung.

5          THE COURT:  Good afternoon, Mr. McKeon.

6          MR. McKEON:  Nice to see you again.  And lots to

7   respond to there, so let me get -- just get right to it, if I

8   can.

9          THE COURT:  I expect this term to take most of the

10  time.

11         MR. McKEON:  This is a hotly --

12         THE COURT:  Things should move quicker after this.

13         MR. McKEON:  That is right, Your Honor.  This is the

14  one that's -- I think the parties are focusing on for this

15  proceeding.

16      So I think a little context here, Your Honor.  I mean,

17  we're actually in a situation where we have the Plaintiff

18  patent owner coming in and trying to lard this term up with a

19  bunch of limitations to narrow the term, you know, including

20  this issue of whether it covers one or more or that it has to

21  be two or more.  But what's going on here is we're at the

22  Patent Office, as Your Honor knows, and the Patent Office has

23  rejected this argument that the claim is limited to two or

24  more three different times.

25         And let me just show you the timeline here.  We filed an

1   IPR on the '912 before the lawsuit in this case was even

2   filed.  We filed that IPR in July of '22.  The lawsuit was

3   filed in August.  And then we had an institution decision on

4   the '912.  And, frankly, there was some politics going on in

5   the Patent Office.  It was withdrawn from institution, and the

6   director had to look at it again because of an issue regarding

7   Google and whether Google was actually a party in interest.

8   That issue has been resolved, and it was instituted again, the

9   '912.  Then the '215 and '417 were all instituted and they're

10  all pending right now in the Patent Office.

11      So we have a situation where the proceeding in the Patent

12  Office is going on in parallel, and the reason is because

13  these things were filed so early.  We're actually -- in the

14  Patent Office they looked at this 'one or more' and rejected

15  it three times.

16      And these other issues that are being presented here in

17  the *Markman* hearing about these other limitations, they're

18  trying to get this Court to -- well, pit this Court against

19  the Patent Office.  I mean, that's what this proceeding is all

20  about with this term.  It's an effort to narrow based on prior

21  art.

22      Really, as far as we can tell, Your Honor, I'm not sure

23  there are any infringement issues here or anything in this

24  Court that's going to be relevant in terms of the claim

25  constructions.  It's really an issue of prior art and the

1    Patent Office.

2         THE COURT:  So are you suggesting that this Court

3    should just defer to the PTAB for purposes of claim

4    construction?

5         MR. McKEON:  Well, what I would suggest, Your Honor,

6    frankly -- and, you know, as you know, we have a pending

7    motion to stay pending IPRs, and three out of the four

8    patents--the '608 Patent was just added--three out of the four

9    are pending in IPR.

10         THE COURT:  And the standard for claim construction

11    at the Board is not the standard for claim construction under

12    *Phillips* at the court, is it not?

13         MR. McKEON:  No, it absolutely is, Your Honor.

14         THE COURT:  Identical?

15         MR. McKEON:  Identical.  *Phillips* governs -- in the

16    early days after 2011, in the early days they had this

17    broad --

18         THE COURT:  I understand that.  But even after that

19    was changed, are you saying it's on all fours with --

20         MR. McKEON:  All fours in *Phillips*.  *Phillips*

21    controls the Patent Office now; absolutely, Your Honor.

22      And remember, Your Honor, another thing to keep in mind

23    here on this is, of course the prosecution history is always

24    relevant, Your Honor.  So we're literally creating prosecution

25    history right now in the Patent Office.  I'm going to show you

1    some of it actually.  So we're creating that.  And, of course,

2    that guides your -- that's intrinsic record and that's going

3    to guide your evaluation.  And the point is we're pitting that

4    against this process.  And it's an unusual case because we're

5    so far along in the Patent Office, so that's why I think it's

6    a little more unusual.  You don't see that a lot.

7            THE COURT:  Well, I don't intend to argue your

8    motion to stay.

9            MR. McKEON:  And I'm not trying to do that, Your

10   Honor; I just want to give context here about why we have a

11   situation where the Plaintiff is coming in trying to narrow

12   this claim, and Samsung's been consistent all along here.  And

13   so let me just dive into that, Your Honor.

14           THE COURT:  Please do.

15           MR. McKEON:  And I'm not going to spend the time on

16   -- you know, there was a procedural, we think, process, you

17   know, with all respect, failure in the sense that we saw in

18   the initial constructions a proposal by Netlist that really

19   kind of matched what Samsung was proposing and -- in terms of

20   they have a set of DRAM devices.  They didn't have one or

21   more, but it was a 'set' which, of course, a definition is one

22   or more, 'acting together' was in their initial proposal, and

23   'in response to command signals'.  The only dispute we had

24   initially was this fixed bit width, and that was the initial

25   position they took here, the Patent Office stuff moving

1    forward, and that's why today we have a different proposal

2    from them, which is these issues that Mr. Sheasby just argued.

3        So that's sort of background here, Your Honor.  And I'm

4    going to deal with the -- whether Your Honor accepts that as a

5    procedural flaw, you know, I'm going to argue all the issues

6    and you're going to have that before you, but I think there is

7    a procedural issue there.

8        Let's get to rank, Your Honor.

9        What I show here on the slide are the institution

10    decisions for '912 and '215.  And again, this is part of the

11    prosecution history.  And these are only the institution

12    decisions so it's not final, but it's pretty compelling.

13        With respect to this 'rank' issue, "Patent owner does not

14    agree with petitioner that a rank includes a single memory

15    device, but does not otherwise dispute petitioner's rank

16    construction," which, of course, is the construction that

17    we're talking about here in this courtroom.  So there in the

18    Patent Office they didn't dispute it.  The fight was 'one or

19    more'.  And that was the issue that was presented to the

20    Patent Office, and they in every single instance agreed with

21    Samsung.

22        And Your Honor, they agreed with Samsung based on the

23    intrinsic record that was presented.  That was really sort of

24    their analysis.  I'm going to go through that in detail.  But

25    what Mr. Sheasby has done here, he's turned everything upside

1    on its head.  In fact, as far as I recall, he started his

2    presentation with all this extrinsic evidence, and that's not

3    where we start normally; we start with the intrinsic record.

4    So he's trying to say that JEDEC governs here, and whatever's

5    in JEDEC you should construe the patent that way.  Well, Your

6    Honor, I'm going to demonstrate to you that would be

7    inconsistent with the intrinsic record, if you are going to

8    say, Oh, JEDEC -- whatever happened in JEDEC, that's what

9    happens in these patents.  And I'm going to walk you through

10   that now.

11        First and foremost, Your Honor, '215 Patent -- and

12   Mr. Sheasby addressed this, but I think it's just worth

13   highlighting.  The claim in that patent actually claims at

14   least one first memory integrated circuit in the first rank.

15   So, in other words, we have a patent in this case, Mr. Sheasby

16   wants you to say it requires two or more, but we have a claim

17   that requires at least one.  So a construction with 'two or

18   more' would be in direct conflict with the actual claim

19   language.  So that can't be right.  That argument can't be

20   right.

21        And remember, these patents are all related.  The '912,

22   Your Honor, is the earliest, and they all go back to two

23   patents.  And the numbers I believe are -- '386 I believe is

24   one of them, and there's a 4 something, Your Honor, but it's

25   in the record.  They are the great-grandparents.  They all

1    flow from that.  And the case law tells you that this 'rank'

2    term should be construed consistently.

3         So I have a '215 Patent claim that the Court cannot

4    construe 'two or more' because it would be in the -- it would

5    be in conflict with the language of the claim where it says

6    'at least one'.  So we know that's not right for '215, and we

7    think you should construe them all together.  'Rank' shouldn't

8    mean one thing for '215, something else for the other patents.

9         And the argument that Mr. Sheasby made, you know, he's

10   focusing on the language 'DDR' that's in the '912 claim.  And

11   DDR is double data rate.  Your Honor, this is a Samsung

12   invention--double data rate.  The fact that double data rate,

13   that DDR appears in a claim and it's discussed in the patent

14   specification doesn't link this somehow to JEDEC; not at all.

15   Double data rate -- you can have different embodiments and

16   implement a double data rate system, and I'm going to show you

17   the excerpt in a minute here from the --

18             THE COURT:  So is it your view that we're dealing

19   with standard essential patents here or not?

20             MR. McKEON:  Well, your Honor, the million dollar

21   question we get.  Right?  And just like the last case, Your

22   Honor, where we couldn't even utter the words 'JEDEC', as you

23   remember, in the last trial, because, you know, Your Honor

24   said, Hey, listen, this is off limits, no one saying it's

25   standard essential.  And now, of course, Mr. Sheasby comes

1    into court and he's hanging his hook on JEDEC.  And I guess he

2    does a concession here in open court that '912 is standard

3    essential.

4        You know, we believe there's no infringement in these

5    patents, Your Honor, and, of course, we believe the patents

6    are invalid and they're on -- the patents are on life support

7    in the Patent Office, Your Honor.  I mean, these patents are

8    on life support.  So we think they're invalid, but we --

9            THE COURT:  Do you speak for the Patent Office?

10            MR. McKEON:  Well, I mean, I look at the record,

11    Your Honor.  You know, I look at the record.  And, you know,

12    institution was done on all three patents, and it's not final

13    for sure and things can change, certainly, but, you know,

14    that's the context of what we -- where we're debating this.

15        So I think the standard essentiality question, Your

16    Honor, of course, is still -- I think the jury's still out on

17    that, so-to-speak.  I know -- I take Mr. Sheasby at his word

18    that '912 is standard essential, but what we know for the

19    purposes --

20            THE COURT:  We're going to get to the bottom of that

21    issue long before we see a jury in this case.

22            MR. McKEON:  Yeah.  Your Honor, I imagine that we

23    would, just like in the last trial, you know.  But what role

24    JEDEC plays, Your Honor, is obviously going to be dependent on

25    what happens here today, because Mr. Sheasby's telling you to

1    hook these things around JEDEC, and that's what he's saying,

2    and we don't think that's right.  We think that's all

3    extrinsic evidence, has no place in this claim construction

4    process.

5                THE COURT:  Let's talk about extrinsic evidence for

6    a minute.

7         Part of the extrinsic evidence that you cite in your

8    briefing is this work by Bruce Jacob, and the quoted section

9    of it about 'rank' says "a rank of memory is a bank of one or

10   more DRAM devices that operate in lockstep in response to a

11   given command."

12               MR. McKEON:  Yes.

13               THE COURT:  How does one device operate in lockstep?

14   You have to have two devices to operate in lockstep with each

15   other.

16               MR. McKEON:  That's true, Your Honor.  And the

17   reason --

18               THE COURT:  So can you clarify what this means?

19               MR. McKEON:  Yeah.  First of all, what I'll say is

20   that on this article -- on this book, Mr. Sheasby was saying

21   -- well, he came -- he started the argument with 'rank' was

22   invented by JEDEC; then he comes in and he says, Well, Jacob

23   is dealing with an old system about 'rank'.  So I'm not sure

24   where we stand on who invented what here.  But what I can tell

25   you here is that in terms of Jacob--and this is a book that

1    both parties point to--he's very clear on this, that it can

2    have one device.  And this is extrinsic evidence for sure, but

3    if you have two or more -- if you have two or more, then, of

4    course, you're going to have a lockstep situation where

5    they're all going to act together.

6            THE COURT:  Well, this doesn't say, If it's two or

7    more, it operates in lockstep; it says "one or more devices

8    that operate in lockstep," and I don't know how one device

9    operates in lockstep.

10           MR. McKEON:  I mean, Your Honor --

11           THE COURT:  It takes two to tango.

12           MR. McKEON:  Yeah.  I mean, what -- just heading

13   back to the patent a bit, I mean, one of the things the patent

14   achieved or attempts to achieve is you have a memory -- you're

15   communicating with a memory controller and you want to

16   communicate with more than two ranks.  So the goal of the

17   patent was to have logic circuit that -- where the memory

18   control would only see two ranks, not four ranks.  And that

19   goal is achieved, that very goal is achieved even if you just

20   have one memory device in a rank, because you're still -- you

21   can expand the number of ranks.  So it's very consistent with

22   the patent that you have one.

23       And let me show you this, Your Honor, because I think

24   this, frankly, is compelling.  Mr. Sheasby addressed it, but

25   I'd like to walk you through it because --

1                THE COURT:  I'll be glad to hear your version.

2                MR. McKEON:  Yeah.  This here, Your Honor, is

3     telling.  And what are we showing here?  Mr. Sheasby says,

4     Oh, this is all JEDEC.  JEDEC doesn't make 32 -- JEDEC -- the

5     JEDEC standard doesn't deal with 32-bit wide memory devices.

6     It's 64 or 72, as Mr. Sheasby said.  But look what we have

7     here in the very disclosure of the patent.  We have memory

8     modules that have 32 bits--that's the width.  And then we're

9     going to have memory devices, and the memory devices in the

10    rank can be 32 bits.  So what does that mean?  Well, that

11    means you have the module is 32 bits, my rank will be 32 bits,

12    and if I have a 32-bit memory device, what does that mean?

13    That means I only need one.

14         And this is the disclosure in the patent, the intrinsic

15    record specifically dealing with the idea that you can mix and

16    match this to have a 32, 32; I'm going to have one chip, I

17    don't need anymore.  And as Mr. Sheasby said, that's not

18    JEDEC.  That's not JEDEC at all.

19         So the patent contemplates non-compliant/JEDEC compliant

20    devices.  And this is -- right here on slide 21 makes that

21    compelling.  It says 4 bytes, which is 32 bits.  It's very

22    explicit with 32 bits.  That can be built -- you can build a

23    device within the meaning of this patent and have -- by the

24    very specification have one device.  And I think that's a

25    compelling point, Your Honor.

1         I do want to mention this claim 55, if I can, because I

2    think that's another claim where -- the '215 Patent we already

3    showed you the language; it says at least one.  But here on

4    claim 55, we have "each rank of the first number of ranks

5    comprises a plurality of DDR DRAM chips."  So, in other words,

6    it's a -- this is a -- claim 55 is a limiting claim dependent

7    on claim 1 where they -- they're explicit about plurality.

8         And again, you know, claim differentiation, why are we

9    limiting that if the broader claim already covers plurality,

10   and that -- and I think that's another persuasive point, Your

11   Honor, to keep in mind.

12        Let's talk about Table 1.  Mr. Sheasby spent some time on

13   that.  And we definitely have a different view of Table 1 than

14   he does.  And maybe it's misunderstanding on both sides.  I

15   don't -- you know, I don't think so.  But we view Table 1,

16   Your Honor--and the Patent Office actually explicitly

17   considered this--but Table 1 is a description of how you're

18   going to issue commands to these ranks and you're going to do

19   a selected rank.  And what it says here, if you look at the

20   '912 language, and it's in both sets, the language, "A command

21   signal"--which is in this case a read--"is sent to only one

22   memory device or the other memory device."  And if you look at

23   the signals in Table 1, it only selects -- it will select a

24   memory device, and it only -- it doesn't give you any signal

25   that's going to select a memory chip within the rank.  So the

1    Table 1 only talks about selecting a rank, not a chip within

2    the rank.

3         So what does that mean?  That disclosure there doesn't

4    -- isn't talking about selecting the individual chip.  And the

5    language "a memory device or the other memory device," it's

6    talking about two different ranks.

7         And I'm going to show you here, this is the analysis the

8    Patent Office gave, because this argument was made at the

9    Patent Office.  In these -- the proceedings in the Patent

10   Office with the pending IPRs this is what they said.  "Rather,

11   the passage quoted above indicates an embodiment in which each

12   rank has one memory device."  That's how the Patent Office

13   viewed Table 1.  Very consistent with what we've been saying

14   in our briefing is what the Patent Office says.

15        And so there's no confusion, Your Honor, from my point of

16   view from our side on this.  I think it's very clear we're

17   very consistent with the Patent Office who instituted this and

18   came to the conclusion that one is right there in Table 1;

19   it's one chip per rank.

20        And Your Honor, let me address this figure here that

21   Mr. Sheasby addressed.  Mr. Sheasby tried to, you know, argue

22   that it should be set aside because it doesn't deal with the

23   word 'rank'.  Well, true, the word 'rank' isn't in this

24   disclosure here with respect to 6A, but, of course, the patent

25   is riddled with 'rank' and the whole invention surrounds the

1    idea of organizing here with ranks.

2        And if you look at what we show here and what's described

3    in the -- in slide 25, you have -- the data lines here are in

4    the -- I guess it's pink.  These are the data lines.  And

5    they're all connected to the same pin.  And what the

6    description tells you is that you have memory devices A and B.

7    So the debate here is, is that one rank or two ranks.

8        Mr. Sheasby says it's not relevant to 'rank' at all.  But

9    this is actually showing two different ranks with one chip in

10   each rank, and the reason we know that is because it's

11   connected to the same pin.  So if I was going to have a read

12   operation where these are of the same rank, I would get this,

13   which is a collision.  It can't be possible or these

14   pins -- this pin connects these two memories.  These have to

15   be separate ranks, which is consistent with everything we're

16   saying, consistent with the Patent Office's view on figure --

17   on Table 1 that we have these two different chips.  It's

18   explicitly disclosed.

19       Now he -- Mr. Sheasby is absolutely right, Your Honor.

20   If you look at the figures, there is multiple chips in the

21   rank.  I mean, we don't dispute that, and that -- there's a

22   lot of embodiments where they have that.  Our point is there's

23   embodiments and description that show you one.  And there's

24   embodiments that say you're not JEDEC, you have nothing to do

25   with JEDEC, which I just went through.

1      And that's the issue is, is claim -- should you narrow

2   the claim, as Mr. Sheasby wants you to, to only apply to two

3   or more, because that's a narrowing -- he's inviting you to

4   narrow the claim.  And we think in light of the intrinsic

5   record, Your Honor, you shouldn't do that.

6      There's some prior art, Your Honor, that's cited --

7           THE COURT:  So this is all really about validity.

8           MR. McKEON:  All about validity.

9           THE COURT:  When a defendant wants it to be broad

10  and not narrowed, it's about validity --

11          MR. McKEON:  Right, Your Honor.

12          THE COURT:  -- and when the plaintiff wants it

13  narrowed, it's about validity.

14          MR. McKEON:  Your Honor, you've done this enough

15  where I think you know how that works.

16          THE COURT:  Okay.

17          MR. McKEON:  And the question is who's got the

18  goods.

19          THE COURT:  That's what we're here to find out.

20          MR. McKEON:  That's what we're here to find out.

21      And, you know, we think, Your Honor -- you know, our

22  focus really, Your Honor, we're trying to focus on the

23  intrinsic record, you know, because I think in this case it

24  is quite compelling.  And again, this slide 27 is more

25  evidence.  This is in the citations in the '215 Patent showing

1    you one memory device per rank.

2         Now, let me address this.  Mr. Sheasby dealt with it.

3    Again, this is a -- some terminology, Your Honor.  Google has

4    a case with the '912 Patent that's at issue, and there was a

5    re-examination, an *inter partes* re-examination.  And sometimes

6    people say IPR, but technically that's not really an IPR; it's

7    an *inter partes* re-examination.  There is a different process

8    where you can amend the claims and all that.  This stuff I'm

9    showing you now is from that Google re-exam.  It's not from

10   the IPR or the *inter partes* review that's happening now.

11        So the Amidi reference that Mr. Sheasby referenced, that

12   was all part of this Google re-exam.  And what happened there

13   is -- in fact, again, I have to take issue with what

14   Mr. Sheasby said, which is Amidi has two or more chips, not

15   one.  It has two or more.  And what the Patent Office is

16   saying here is that there was no disclosure in Amidi -- claim

17   16 requires you to pick only one of the two.  And the Patent

18   Office -- like Amidi has two or more, and there is no

19   disclosure of only picking one; therefore, we're going to

20   allow the claim.  That was the issue.  And the language you

21   see here is language where it says, "when there is a plurality

22   of memory devices in the rank."  So they said you have --

23   there's nothing in Amidi that says only one DDR memory at a

24   time when there is a plurality of memory devices in the rank.

25   And the point here is, their view of the claim at the time was

1    that you could have multiple because why would they -- I mean,

2    in terms of how they analyzed Amidi, because Amidi had the

3    two.  So they said that when there is a plurality of memory

4    devices in the rank --

5              THE COURT:  They being?

6              MR. McKEON:  The Patent Office.  The Patent Office.

7    There is -- why would you need to specify when?  Why would you

8    even make that statement if the patent claim is limited to a

9    situation where you had to have two or more?  What they were

10   saying was it had to be -- you know, when you have that

11   situation, then you've got to have disclosure that you're only

12   selecting one.

13       And so this history from that Google *inter partes*

14   re-exam, Your Honor, I think helps our side and really

15   undermines the argument that somehow that this supports the

16   two or more.  I just think that, Your Honor, they are simply

17   misreading Amidi because, again, in our view, it has two or

18   more chips.

19             THE COURT:  Why don't you give me your view on the

20   fixed bit width issue and the partial read issue.

21             MR. McKEON:  Okay.  Let me -- just one quick thing

22   about the JEDEC standards, Your Honor, if I may.

23       So JEDEC, you know -- as you know, Mr. Sheasby cites the

24   JEDEC a lot, but this is all -- you know, I just want to make

25   it clear that our view this is all the intrinsic record, and,

1    you know, there's nothing in here that compels a construction

2    of this patent.  And I think that's an important point to keep

3    in mind.

4        But let me jump, if I can, Your Honor -- oh, yeah.

5    That's slide 33, Exhibit 14 and 15 we were talking about.  The

6    '523 Patent is an unrelated IPR, and the JEDEC proposal cited

7    on slide 15.  And slide 16 actually goes into the disclosures,

8    and you can see here that the disclosure of 'rank' here is a

9    set of memory devices, which is consistent with what we're

10   saying, and a collection of SDRAMs, which is consistent with

11   what we are saying, a collection of one or more.

12           THE COURT:  So you're saying the word 'set' must

13   mean more than one.

14           MR. McKEON:  I think that most people would say

15   that, Your Honor, 'set' is -- could be one.  In a

16   mathematician point of view, 'set' can be one or more.  Our

17   construction, as you know, Your Honor, we put in 'set', you

18   know, one or more, to be very explicit on it.  That way we

19   don't have any problems down the road about what we're talking

20   about.

21       Your Honor, let me jump to your other issues real quick,

22   but can I comment on Doctor Stone?

23       A lot of testimony from Doctor Stone.  Doctor Stone was a

24   Micron expert witness that presented a declaration in the

25   Micron IPRs.  And Mr. Sheasby deposed him.  He gave no --

1   nothing in the declaration about 'rank'.  There was -- he gave

2   no opinions on that.  And like a third of the deposition was,

3   you know -- our friend Mr. Sheasby is very, you know, good to

4   get to the issues that are important to him.  A third of the

5   deposition was on 'rank'.  It wasn't something that he gave an

6   opinion on.  So that's the context of the testimony you see.

7        And if you read the other parts of the testimony here,

8   you know, he believed -- this is what he says.  "I believe

9   that many definitions, in fact, competing and inconsistent

10  definitions exist for 'banks' and 'ranks'."  So that was his

11  view at the time of the definition -- at the time of the

12  deposition about these competing definitions.  Of course, the

13  one that we're concerned about, of course, is the one that

14  applies to this patent.

15       And he repeats this, Your Honor.  "I have not been asked

16  to opine on 'rank' or 'bank' or the meaning of 'rank' in this

17  patent, so I would have to review the materials and determine

18  what they mean by 'rank'."

19       So Doctor Stone, Your Honor, I think you can discount

20  what's been said about -- you know what Mr. Sheasby quotes

21  on Doctor Stone's deposition.  He wasn't there for that, he

22  never gave an opinion on that, and he even admitted that, I

23  got to look at this and think about it.

24       All right.  So let me get to fixed bit width, Your Honor.

25  This is actually I think pretty straightforward.

1      There is nothing in the patents that describe the bit
2  width as fixed.  It's just -- you don't find that.  It's just
3  -- you know, they have generally -- generally have a bit
4  width, but there's nothing in there limiting it to something
5  that's fixed.
6      This applies also to the extrinsic record, including the
7  Jacobs book.  Nothing in there -- and the JEDEC materials that
8  Mr. Sheasby cites.  Nothing in there about this being fixed.
9  Nothing in the JEDEC materials about that, that -- the word
10  'fixed'.
11      And we do see actually a disclosure in the '912 Patent,
12  "the number of memory devices of a memory module can be
13  increased by increasing the number of memory devices per
14  rank."  So this idea that we can expand, it's not fixed, it
15  can be increased, again, that's right -- this is slide 40, and
16  that's right in the disclosure.  It's not fixed.  You can
17  expand that.
18      So we think there's a problem with that just on the --
19  looking at the intrinsic record, and even extrinsic record
20  that Mr. Sheasby relies on there's nothing in there about it
21  being fixed.
22      So let me now address, Your Honor, the other arguments,
23  the pre-determined argument.
24      I think, you know, part of our problem with that, Your
25  Honor, is we don't know what -- when it says -- when

 1    Mr. Sheasby says 'pre-determined', we're not sure what he

 2    means by that.  Is it, you know, before I ship the module; is

 3    it before I put it in the computer; before I issue a command;

 4    before I issue a re-command--pre-determined when?  And so,

 5    again, this is another word.

 6         And I can tell you, Your Honor, the 'fixed' issue, the

 7    'pre-determined' issue, just like the 'one or more' issue, is

 8    all about the prior art.  That's what's going on here.

 9         And again, we don't think that there is intrinsic to

10    support for 'pre-determined'.  And we do also think there's

11    a problem just of how -- what does it mean in the context of

12    the -- of this patent.

13         And as we cite here also, Your Honor, on slide 44, you

14    know, their reply brief.  And again, you know, they don't shed

15    light on -- in any of their materials here what do they mean

16    by this 'pre-determined' and when the determination is made.

17    So really we're interjecting not only something that's not

18    supported by the claim language or the intrinsic record, or

19    the extrinsic record for that matter, but we just think it's

20    ambiguous; you know, pre-determined when.  And that's going to

21    be a problem later on if the Court goes down that road.  And

22    again, no mention in the JEDEC -- this idea of being --

23              THE COURT:  What's your view on whether a rank of

24    devices can allow a partial read?

25              MR. McKEON:  Partial read.  So, Your Honor, we think

1    this -- that that limitation certainly is not required in the

2    patents.  Again, no -- nothing saying partial read or

3    something less than a full read.  You know, we do cite this

4    lockstep concept.  We cited that in our briefing.  And Your

5    Honor already pointed that out that these devices we're

6    talking about having these ranks, memories, are operating in

7    lockstep, and then standards, of course, as well; you know, in

8    the standards we have --

9            THE COURT:  Can you explain to me how one device can

10   operate in lockstep?

11           MR. McKEON:  Well, that was a question you asked

12   earlier, Your Honor, and I think in that language -- you know,

13   with that language, there's sort of -- it's broader in the

14   sense of it will cover a two or more situation, because

15   lockstep you need two.  Right?  But, on the other hand, Jacob

16   was very clear that if you have one device, you know, in that

17   sense, Your Honor, it's in lockstep with itself.  Right?

18   It's -- you know, it's --

19           THE COURT:  That's my point.  How can you in

20   lockstep with yourself?

21           MR. McKEON:  Well, in a design where you have the

22   one--right?--which Jacob says that's known in the art, having

23   one --

24           THE COURT:  But Jacobs doesn't say 'rank of memory

25   is a bank of one or more DRAM devices that when you have two

1    or more can operate in lockstep'; he says 'that operate in

2    lockstep'.

3                MR. McKEON:  Yeah.  And Your Honor, we recognize

4    that tension there, and, you know, again, I think Jacobs is

5    extrinsic evidence, and I think --

6                THE COURT:  I understand he's extrinsic evidence,

7    but as you pointed out, but both sides rely on it.

8                MR. McKEON:  Both sides do, and we concede that.  We

9    obviously like the statement about the one or more, and -- but

10   there is some tension there with the lockstep.  We concede

11   that, Your Honor.  But I think, you know, it's a textbook and

12   it's really just sort of talking generally about these

13   systems.  And I think, you know, that's a situation where

14   there would be two or more, because otherwise it wouldn't

15   make -- it wouldn't be quite clear.

16       Then, finally, Your Honor, if I can, the DDR -- as I

17   understand, there's -- Mr. Sheasby wants to -- we understood

18   from the briefing at least--and I wasn't clear from today's

19   argument, and maybe we can get some clarity--but the DDR

20   memory device is -- is the intention to lock sort of the DDR

21   memory -- the DDR references to the time of the invention, the

22   2005 time period?  Because as I understand the argument, if

23   we're supposed to look back to the time of the invention and

24   we're going to look at DDR and look at the JEDEC specs in

25   particular, well, then we have a problem, Your Honor, because,

1    of course, the infringement case is accusing -- they're not

2    accusing DDR1 -- we're not going back to -- all the way back

3    to there.  And in an infringement case, particularly in the

4    '912 is dealing with DDR4.  So that spec wasn't around.

5         So when we lock it in, okay, are we going -- if Your

6    Honor locks it into the DDR spec on the JEDEC, are we going to

7    lock it into 2005, and then does that mean that DDR4 is not

8    covered because we've locked it in?

9         So there is some -- and I don't know the answer.

10   Mr. Sheasby hopefully can clarify that, because that's -- if

11   you take his presentation to its logical conclusion, I think

12   that's where you end up.  And in that case we can, I think,

13   all go home because then there's no infringement in this case

14   because all the accusations are focusing on the later

15   standard.

16        So that's one problem we have with it, overriding

17   problem, but also in addition to the other things that I

18   mentioned earlier about how -- you know, double data rate

19   memory is a term of art and it's not -- there's no necessarily

20   linking it to that particular JEDEC spec or JEDEC in general.

21   And I think -- you know, Samsung invented it.

22        All right.  With that, Your Honor, unless you have any

23   questions on anything, I will turn the podium.

24             THE COURT:  All right.

25             MR. McKEON:  Thank you.

1              THE COURT:  Thank you, Mr. McKeon.

2         Mr. Sheasby we've spent an hour on this first term and we

3    have three hours for the entire process.  Let's see if we can

4    button this up and move on.

5              MR. SHEASBY:  I'll do it very rapidly.

6         One, Mr. McKeon is both correct and incorrect--in other

7    words, that the *Phillips* standard does apply in the PTAB, but

8    where he's incorrect, and I think -- is that the PTAB issues

9    what it calls a preliminary claim construction, which is

10   actually not binding and can change.  In addition, the PTAB is

11   not governed by *02 Micro*, and the PTAB is not required to

12   construe a term; it can just say the construction is

13   irrelevant to my analysis.

14        And so to say *Phillips* governs in both, it's actually

15   not accurate to say you -- Your Honor applies the same

16   standard.  Your Honor is held to a much higher standard by the

17   Federal Circuit based on *02 Micro* than the PTAB is, just to

18   correct what Mr. McKeon said.

19        The second point is we should go to the intrinsic

20   evidence, and I agree with that.  So this is the intrinsic

21   evidence.  This is the only portion of the specification for

22   the '912 Patent that they said contemplates a rank with one

23   device on it.  And what it talks about in Table 1 is it talks

24   about a tool for selecting ranks.

25        So these are the command signals that select ranks.  And

1    this is in column 7, lines 55.  And they talk about that Logic

2    State 4.  That Logic State 4 selects a given rank.  Then after

3    the Logic State 4 selects a different rank, then there is

4    another set of command signals that can go in.  If you read

5    the specification, you'll see that there's also discussion of

6    chip select signals.  And so a chip select signal will then go

7    in and specify a particular memory device within the rank.

8         So we are absolutely fine being bound by what's in the

9    specification.  Every example of the specification is a rank

10   with multiple devices in the '912 Patent.

11        As to the '215 Patent, the claim is an entirely different

12   claim, and this would not govern the '912 Patent.  But what

13   Mr. McKeon did is he split up the definition of what must be

14   on the device, a first and second rank with multiple devices,

15   from the idea of selecting one device in each of those ranks

16   to perform a buffer -- so that it is attached to a buffer.

17        So I don't think that the language in the '215 Patent

18   claim has any control over the '912 Patent, and if it did, I

19   don't even think it would support what's in the '215 Patent.

20   This is obviously a very important issue for Netlist.

21        I should just add, as to the Jacob text, you know, the

22   Jacobs text -- and this is I think one of the dangers of the

23   extrinsic evidence.  The Jacob text talks about historically

24   one device being in lockstep, and you have to ask yourself the

25   question how can one device be in lockstep.

```
 1        If I could have the slides.  And actually let's take

 2   those down.  I'll just speak.

 3        It talks about -- this is slide 23.  It talks about

 4   an old -- 22.  It talks about an old use of 'rank' which

 5   meshed it with 'bank', but then talks about 'lockstep', but

 6   then it talks about the current definition of 'rank', which is

 7   a set of DRAM devices.  And I didn't hear anything from my

 8   brother disputing that in terms of the vintage of Jacob, the

 9   '912 Patent is a time of the current understanding of 'rank'

10   not the --

11             THE COURT:  Let me ask you this, Mr. Sheasby.  Give

12   me your take on Mr. McKeon's argument about Figure 6A in the

13   '912 and his argument that implementing your position creates

14   some kind of a collision I believe is the word he used.

15   Respond to that briefly for me.

16             MR. SHEASBY:  Yes, Your Honor.  I think I can

17   respond to it in two words.

18        Figure 6A is an embodiment of linking together two

19   devices, not linking together two ranks.

20             THE COURT:  All right.  Anything further?

21             MR. SHEASBY:  No, Your Honor.

22             THE COURT:  Okay.

23        All right.  Let's move on, counsel and cover the

24   remaining of these terms.  Also, just for clarity in the

25   record, I want to clarify something.  I called -- at the
```

1    beginning of today's claim construction process, I called the

2    Netlist/Samsung case; I did not call the Netlist/Micron case,

3    2:22-CV-294.  Obviously this is a claim construction process

4    that applies in both cases, and Mr. Everingham was kind enough

5    to announce for Micron even though I didn't ask for a specific

6    announcement.  But I want the record to be clear that the

7    process we're involved in now is relating to both cases for

8    purposes of claim construction, and that's my oversight for

9    not being clear when we started.

10        Okay.  Let's go on to 'signal' and 'row'.  And address

11    'signal' from the '912 Patent, please.

12        And Defendants have offered a specific construction;

13    Plaintiff has argued for plain and ordinary meaning.  Let me

14    hear Defendants with regard to their specific construction

15    first and then I'll hear from Plaintiff.

16            MR. McKEON:  Thank you, Your Honor.  Mike McKeon

17    again.  And let me direct you to the slides.

18        So yes, Your Honor, it's plain and ordinary meaning from

19    Netlist, but if you look at the briefing, what we're -- what's

20    going on here is there's a bunch of things going on in the

21    plain and ordinary meaning that we don't think is appropriate.

22        And what we've done -- what Samsung has done, Your Honor,

23    is we've adopted -- for the construction of 'signal', we've

24    adopted the definition that's been Netlist's definition for

25    years and years and years before this case, and I'm going to

1    walk you through that.

2        We've adjusted slightly the row/column address signal

3    because, of course, we want to account for the row and column

4    address language.  It's a particular type of signal.  So the

5    broad definition of 'signal', 'varying electrical impulse that

6    conveys information from one point to the another', row/column

7    address signal is a particular type of signal, and so the

8    information there--we're just being explicit in the

9    definition--is an address of either a row or a column memory

10   location, but otherwise conceptually --

11           THE COURT:  Isn't this being framed for the Court on

12   the basis of some disclaimer?

13           MR. McKEON:  Let me walk through that.

14           THE COURT:  Okay.

15           MR. McKEON:  Okay?  And this is, again, a timeline.

16   And when you we look back in 2009, Your Honor, what happened

17   was there is a *Google/Netlist* case, and it was regarding the

18   '386 Patent, which is the -- was one of the grandparents to

19   all the patents at issue here, other than the '608.  And the

20   word 'signal' was a disputed term.  And the court construed

21   the 'signal' term the way we're construing it here.  That was

22   the court's conclusion in the Northern District of California.

23       Netlist -- in 2010 Netlist--and this is slide 54--agreed

24   to that construction in the *Netlist/Google* case.  This is

25   2010.  And then also Netlist in 2010 -- October 2010 submitted

1    that agreed construction, submitted to the Patent Office in an

2    IDS.

3         So there's three things that Netlist has done sort of to

4    firm up what it believes the word 'signal' should mean to one

5    of ordinary skill in the art, and now it's changing its view

6    on that.  And let me just walk through some of the basic facts

7    here, Your Honor.

8         This is the -- the construction as you see here on the

9    slide here, this is what the court held.  And this is back in

10   2009.  And this is exactly how we're construing it.  So we're

11   very consistent with what the court held.  And then if you go

12   here on slide 56, this is the agreed-upon construction that

13   Netlist agreed on in the *Google* case.  And again, this was in

14   2010.  And again, Netlist at this point agreed that this

15   construction for the '912 Patent should apply.  'Signal', 'a

16   varying signal impulse that conveys information from one point

17   to another'.

18        Then Netlist took -- later took that construction, again

19   in the '912 IDS, and submitted it to the Patent Office with

20   that construction in it.  And this was part of that

21   re-examination proceeding I mentioned earlier.

22        Now, this case, Your Honor, we think controls the outcome

23   here.  This is the *Golden Bridge* case we cited in our brief.

24   They didn't respond to it in their reply brief, so there's no

25   response from them on this.  And really the facts are just

1   like we have here--they submitted a construction to the Patent

2   Office in an IDS, and the Federal Circuit says, Well, you're

3   stuck with that; that's the construction.  And, you know, they

4   -- Golden Bridge, of course, said they never notified the PTO

5   they had wanted a different meaning, so this is binding on

6   them.  And we think that result applies here, Your Honor.

7   It's the construction they had since 2009, and now what

8   they're saying is what we have here on the slide 59.

9           THE COURT:  Let me ask you this.  Language to which

10  Netlist previously agreed, as I see the circumstances, did not

11  resolve a dispute as to whether 'signal' could be packetized.

12  And if it related to a different dispute, why is it disclaimer

13  here?

14          MR. McKEON:  Well, Your Honor, why are we going down

15  the road where we're -- again, this is prior art.  Okay?  This

16  is all about prior art.  We have two things--packetize and

17  dedicated lines.  All of the sudden now here we are in this

18  court and now we're dealing with packetized and dedicated

19  lines, which is something that wasn't even part of the

20  construction earlier.

21      Now, I view that as being inconsistent.  You know, now

22  all of the sudden we're trying to have a new definition.  They

23  say plain and ordinary, Your Honor.  That's not their goal

24  here.  Plain and ordinary is for Your Honor to say that the

25  claim requires dedicated lines and that the signal can't be

1    packetized.  That's what their goal is here, if you look at

2    the briefing.  So they say plain and ordinary, but what's

3    going on under that is an attack on the prior art, and that's

4    why they want to have those two limitations, and we don't

5    think -- we think it's inconsistent with what's happened prior

6    to today in the Ninth Circuit and in the Patent Office, and we

7    think it's inconsistent with their intrinsic record.  And this

8    is --

9            THE COURT:  Well, I mean, my point is you're going

10   back in time and saying this is the position they took and

11   they took this position again here and we took this position

12   again here but now they're taking a new position, and my

13   question is, if those earlier positions were addressing an

14   issue in dispute that's not in dispute here, then how are they

15   somehow bound or have disclaimed the ability to take that

16   different position with regard to a new dispute that wasn't an

17   issue when they took their original position?  That's what I'm

18   trying to figure out.

19           MR. McKEON:  Well, I mean, I would just characterize

20   it a little differently, Your Honor.  The dispute they're

21   having is in the Patent Office, and they're trying to use this

22   Court to influence what happens in the Patent Office.  That's

23   really the dispute that's going on here.  And I think the word

24   'signal' is -- is the word 'signal' changing definitions?

25   It's a very explicit technical point, and all of the sudden

```
1    we're going to change the definition that --

2            THE COURT:  Well, I don't want to -- you know, the

3    Court doesn't want to put its head in the sand about what may

4    or may not be going on in the Patent Office but, by the same

5    token, when Congress created the American Invents Act, they

6    consciously created a parallel process.  That doesn't mean

7    that the district court controls the PTAB or the PTAB controls

8    the district court.  They're in parallel.  So I've got my path

9    that I've got to go down, and the PTAB's got their path

10   they've got to go down, and perhaps we're looking at some of

11   the same or similar issues, but what's going on in the Patent

12   Office shouldn't be, at least in my view, the driver for how

13   the Court discharges its obligation to construe the claim

14   language pursuant to the proper standard.

15           MR. McKEON:  Your Honor, I don't dispute that.

16           THE COURT:  I mean, I don't want to ignore any

17   practical realities here, but the governing process here is

18   not about this is the strategy they're pursuing in the PTAB

19   and that's what ought to force you to go down this different

20   path in the district court.  I don't think that's the right

21   way to approach it.

22           MR. McKEON:  I'm not suggesting that, Your Honor.

23   I know Your Honor has very specific views on this, and my only

24   point there is when we're building this intrinsic record,

25   because it is part of the intrinsic record in the Patent
```

1    Office, we can't be blind to it; you know, we have to pay

2    attention to it.  And also, Your Honor --

3              THE COURT:  I'm not saying be blind to it, but I'm

4    saying not be controlled by it.

5              MR. McKEON:  Right.  And -- but I would also say,

6    Your Honor, I mean, remember, part of the AIA was, you know,

7    we wanted to add some efficiency to the process.  You know,

8    that was part of it, and --

9              THE COURT:  How's that worked out for you?

10             MR. McKEON:  Well, Your Honor, we all have different

11   views on that.  But now we're having these two processes, and

12   at a minimum it's not efficient, you know, and I think that's

13   one of our viewpoints.

14       But Your Honor, let me just direct you to this slide 59,

15   because I think this is very compelling and goes to the point

16   you're making on what they said before.

17       In the prior case, Google made the argument -- this is

18   Google's argument, this is their brief, and they say, "Google

19   seeks to improperly limit the scope of 'signal' to information

20   presented on one or more pins of a device dedicated to that

21   specific information."  So this sounds familiar, Your Honor.

22   This is the argument they're making here in this court.  They

23   want you to adopt this idea that it's dedicated.  And they

24   said to the Northern District of California that this argument

25   is wrong and you shouldn't adopt it, and now they're here in

1    this court telling you to adopt it.  You know, and this is the

2    point is the signal is a signal.

3         And one thing they can't do, you know, is have a direct

4    statement in the Northern District of California and then

5    later in this court have something completely the opposite.  I

6    mean, that can't be right as a technical matter.  And that's

7    why I bring up the Patent Office, because I just want to give

8    you an insight of what's on here and that's why these

9    arguments are being made, even if they're directly

10   inconsistent.

11        And then just a point on the actual substance of the

12   argument, Your Honor.  Of course there's a difference between

13   electrical connections, you know, physical connections, and

14   the signal that travels over the connection, and the

15   specifications in '912, you know, is clear on that difference.

16   And we have cites here on slide 61--you know, we have a

17   connection, and then, of course, we have a set of control

18   signals that are going over the connection.

19        We do cite some dictionaries, Your Honor, on slide 62.

20   That's in the briefing.

21        Let me deal with packetized.  So the packetized argument,

22   this is what they say in their reply brief, and I was very

23   cures about this.  It says, "Packetized information transfer

24   is not an electrical impulse, a high or low which translates

25   into a 1 or 0, but is, instead, a group of 1s or 0s linked

1    together."  So what it's saying is 'packetized' is a group

2    linked together.

3          Well, first of all, we have the disclosure here where we

4    have a signal line, so we have a signal going over the line,

5    so where it repeatedly discusses data signals.  But more to

6    the direct point, Your Honor, we have in Figure 4A -- this is

7    slide 65.  What we've shown here is a group, a group of 1s and

8    0s all together.  This is Figure 4A of the patent, the '912

9    Patent.  And Mr. -- the -- Netlist says in their briefing

10   that, Well, wait a minute; if it's a group of 1 or 0s, that's

11   a packet.  Well, that means they're excluding Figure 4A.  If

12   you adopt this construction that it -- you know, it can't be a

13   packet, then you're reading out 4A, which shows by their own

14   definition a group of 1s and 0s.  So we think that's another

15   inconsistency in their argument, Your Honor.

16         And finally, Your Honor, just on the -- I address this

17   briefly, but on the address of either a row or column on

18   memory locations, there wasn't a lot of dispute I don't think

19   on that in the briefing in terms of what type of information.

20   It's all about what a signal is.  That's really what the

21   debate is.  I don't think there's much debate on this.

22         With that, Your Honor, unless you have any questions,

23   I'll turn over.

24              THE COURT:  Nothing further.  Thank you.

25         Let me hear from Netlist, please.

1          MR. SHEASBY:  Your Honor, there will be presented in

2    this case system art that involves the use of packetized

3    transfer of data, just as there is written prior art in the

4    PTAB that involves the transfer of packetized written data.

5    So the issue is live for validity but it's validity that's

6    going to happen in this court, not just validity that's going

7    to happen at the PTAB because they're going to present the

8    mirror image system art before Your Honor.

9          I can do this relatively quickly.  So the -- historically

10   there was never a debate about whether packetized information

11   was a signal or not.  That wasn't live in the issue that was

12   before in the Northern District of California in *Google*.

13   There is now a live debate as to whether packetized

14   information constitutes a signal.

15         And Madam Courtroom Deputy, if I can have the elmo.

16         We know that the issues are not the same because this is

17   the language that was proposed in Google of 'varying

18   electrical impulse that conveys information from one point to

19   another'.  That was the Google proposal.  You will notice that

20   that is not the proposal of either Micron or Netlist, and

21   there's a reason for that.  It's because they want to say

22   we've disclaimed something and then alter it to make it more

23   possible for them to argue that packetized information

24   constitutes a signal.

25         A -- packetized information --

1        If we go back now.

2        Packetized information and a signal are different things.

3    The courtroom -- the --

4        May I approach counsel's bench, Your Honor?

5            THE COURT:  You may.

6            MR. SHEASBY:  Thank you, Your Honor.

7        Counsel's table.

8        The issue is -- and this is the embedded issue.  So

9    there's -- sometimes people say plain and ordinary meaning

10   because they want to avoid a debate.  Plaintiffs do that too

11   often and it's not, I think, appropriate.  This is not a

12   situation in which we want to avoid debate; we want to engage

13   forthrightly with a debate, which is we don't think they

14   should be able to argue that 'packet' equals a 'signal'.  And

15   going from 'packet' to the Northern District of California

16   construction and then changing the Northern District of

17   California construction to some arbitrary additional language

18   that they've added in is all in the stead of one thing, of

19   saying a signal is a same as an encoded data of packet.

20   Mr. Holbrook, who's their corporate representative, testifies

21   that it is not.

22       The evidence that a signal is not an encoded packet of

23   data comes directly from Figure 4A and Figure 4B that my

24   brother showed, and I'll explain why.  D0, D1, D2, D3, those

25   are defined in the specification as signals.  Each of them is

 1    a separate signal.  That's the whole point.  They're trying to

 2    say that altogether is a signal.  That's not a signal in the

 3    specification.  Mr. Holbrook on slide 49 makes clear that the

 4    signal is different from a packet.  And all they're doing

 5    through this claim construction is nudging, nudging, nudging

 6    closer to this argument that a signal is a same as a packet.

 7    That's a packet altogether when it's encoded, but we -- each

 8    of those is defined separately as a signal, Your Honor.

 9    That's all I need to say.

10              THE COURT:  All right.

11              MR. McKEON:  Your Honor, may I make one quick point?

12              THE COURT:  You may.

13              MR. McKEON:  I just want to clarify.  The definition

14    of 'signal' that we propose in this case is exactly the same

15    definition that Netlist agreed to previously.  There's no

16    distinction.  The only difference we had was 'row/column

17    address signal', which is a different term.  We took the

18    definition of 'signal' that Netlist agreed to and added the

19    row and column memory locations, but that's the only thing

20    that's different.  Thank you.

21              THE COURT:  All right.

22              MR. McKEON:  Thank you, Your Honor.

23              THE COURT:  Let's move on to the 'logic element

24    generates' from the '912 Patent.  And Plaintiff proposes plain

25    and ordinary meaning and then there are a set of discreet

1    definitions proposed by Defendants.

2         Let me hear from Plaintiff on this first.

3              MR. SHEASBY:  Slide 53, Ms. Truelove.

4              THE COURT:  Tell me why the Defendants are wrong

5    here.

6              MR. SHEASBY:  Sure.  So the whole game is replacing

7    the phrase 'received by' with 'used', and so it's just a pure

8    exercise in claim redrafting.  The basis for that exercise in

9    claim redrafting is the CRU proceeding as well as the PTAB and

10   the Federal Circuit affirmance of the validity of the '912

11   Patent.  And what we talked about in that context was that

12   Amidi, which was the prior art reference, did not send all --

13   did not -- not all four signals were received by Amidi.  This

14   was on slide 55.  And because of that, we distinguished that

15   our system was different because we responded to the receipt

16   of all four signals.

17        We did not use the word 'use' to apply to all four

18   signals on page 55 -- page 56.  There is a reference to 'use'.

19   There are two references to use in our appellate brief.  One

20   is not requiring use of all four signals and one is requiring

21   just a basis -- a reference to the specification, not for the

22   claims.

23        So there clearly was an attempt to disclaim -- to sort of

24   claim around prior art, and that happened by saying 'in

25   response to all of these four signals' and specifically

1    listing all the four signals.  That's the claim language

2    itself.  The redrafting of response to use is just an attempt

3    to create additional ambiguity, because then once we get to

4    'use', there is going to be debate about what does it mean to

5    use all four signals.

6        So, for example, in the specification -- if you go to

7    slide 54, it describes receiving all four signals, including a

8    bank address signal, a row address signal, a column address

9    signal, et cetera.  But in some situations it may not send all

10   of those four signals onto the memory device.

11       So this is, once again, trying to -- it's trying to avoid

12   a subsequent debate which, is what we're going to have in

13   front of the jury, is about what 'use' means.  And the claims

14   say in response to the argument in front of the Central

15   Reexamination Unit and the federal -- and the PTAB was about

16   the fact that our claims say 'in response to'.  There are two

17   references to 'use', but neither of those references relate to

18   all four of the signals that are recited in the claims nor to

19   the claims themselves.

20       And so I think going from 'in received to' -- 'in

21   response to' to 'use' is just claim redrafting.

22       Thank you, Your Honor.

23           THE COURT:  But didn't Netlist amend these claims

24   during re-exam to require that the logic element generates

25   specified output signals in response to all four enumerated

1    signals?

2         MR. SHEASBY:  Absolutely.  And we are bound by that

3    and we live with that.  The problem is the embedded dispute is

4    that what they want to do is convert -- and this is -- on

5    slide 53, the issue is they want to convert 'in response

6    to' -- 'receive and act in response to' to 'used'.  They're

7    trying to redraft the claim language.

8         We are bound -- so let me give you an example.  That

9    claim language was added.  There's no equivalence available on

10   that claim language--right?--except if you go through the

11   steps that would a avoid -- you know, there's certain

12   circumstances.  But there is -- there was prosecution

13   disclaimer based on the amendment of the claim by adding that

14   limitation.  There's no doubt about that.  But that doesn't

15   mean you get to go from the language in the claim and re-alter

16   it to use the word 'use' because of two passing references to

17   'use' in the Federal Circuit briefing, which is what they're

18   trying to do.

19        THE COURT:  All right.  Let me hear from Defendants,

20   please.

21        MR. DRYER:  Thank you, Your Honor.

22        THE COURT:  Good afternoon, Mr. Dryer.

23      Please proceed.

24        MR. DRYER:  With all due respect to my friend on

25   the other side, I think it's really Netlist that's trying to

1    redraft this claim and not Defendants.  As you can see here on

2    slide 67, the proposed construction does not use the word

3    'use', which my friend was so concerned about.  It uses 'in

4    response to'.  What Netlist wants to say, though, is you

5    don't actually have to use the signals in any way; you can

6    just receive them; you don't have to use them as long as you

7    receive them.  So they're trying to replace 'response' with

8    'receive'.

9        I think, respectfully, you can't generate output signals

10   based on all four input signals without using all four input

11   signals.  So to that extent there is a disagreement about

12   'use'.  But that's not what the construction that we've

13   proposed says.  The focus of our construction is clarifying

14   that all four of the signals need to be used even though some

15   of the claims, not all of them, but some of them recite at

16   least in part.  And that 'at least in part' could create an

17   ambiguity that the jury, without a construction, might think

18   'in part' means--I can use three of them but not the other one

19   or can respond to three of them but not the other one.  That

20   can't be right, and we know that from the disclaimer, which I

21   think Mr. Sheasby agreed occurred during the re-examination.

22       The amendment itself, of course, uses the conjunctive

23   'and' to group these signals together.  So that alone -- I

24   think the plain reading of that would be that all four have to

25   be responded to or used.

1          Then Netlist, you know, distinguished the prior art on

2    that very basis.  And then they doubled down on it on an

3    appeal to the Federal Circuit saying that it has to respond to

4    all four enumerated signals.  In fact, they even characterized

5    themselves as having made a disclaimer when they went up to

6    the Federal Circuit.

7          Here you can see the amendment on slide 69.  I think,

8    again, the language kind of speaks for itself.  Here's -- on

9    slide 70 and 71 you have the argument that they made, and I

10   think it's very important here, the key point is they say that

11   Amidi CPLD 604 never receives bank address signals, that's one

12   of the four enumerated signals; therefore, the control signals

13   can't be generated based on bank address signals.  So it's

14   talking about generating the signals based on all four inputs.

15   And because Amidi was missing one of those four inputs, it

16   wasn't generating its output signals based on all four.

17         On the Federal Circuit, again, they reiterated this point

18   very strongly.  They said they unequivocally disclaimed any

19   broader meaning.  And, you know, as concerned as they are over

20   the meaning of 'use' now, they didn't have any problem

21   understanding what it meant in their own Federal Circuit brief

22   because they used the word 'use' multiple times.  And

23   respectfully, I think, if you actually read the context in

24   which they used the word 'use', it's not as narrow as they

25   claim in their reply brief.

1    With respect to page 28 of Exhibit Q, here, yes, it's

2    true that they only mention using two of the signals here, but

3    if we're construing 'response', if that's what we're doing, if

4    'response' means you have to use those two, then there's no

5    reason it would mean only those two; it would be all four,

6    because that's what -- the claim language is consistent for

7    all four.

8    And then with respect to Doctor Sechen's declaration that

9    they referred to on page 34 of their appeal brief, this is

10   where Doctor Sechen was offering an opinion, the specification

11   provided a written description to support this new limitation.

12   And in doing that, he said the specification teaches using all

13   four.  So if you need to use all four to have a written

14   description, then that must be what you're trying to add.

15   And, finally, they point out that there is embodiments

16   where certain of these signals aren't used.  We haven't

17   disputed that.  But when you narrow your claims in

18   re-examination, it's only natural that you're going to be

19   narrowing them in a way that excludes some of the disclosed

20   embodiments, and that's what the Federal Circuit recognized in

21   the *Plastipak* case.  And so the fact that, you know, applying

22   this disclaimer might exclude certain embodiments is not

23   controlling here.

24   Unless Your Honor has any questions.

25         THE COURT:  No.  I think I understand your

1    arguments.

2              MR. DRYER:  Thank you.

3              THE COURT:  Anything further, Mr. Sheasby.

4              MR. SHEASBY:  No, Your Honor.  Because of time, I'll

5    move on.

6              THE COURT:  All right.  Let's move 'a memory module

7    connectable' 'a memory module operable' from the '912 and '608

8         The issue here seems to be whether the preamble is or is

9    not limiting.

10        I'll hear from Netlist first.

11             MR. SHEASBY:  May it please the Court.  I can do

12   this claim by claim.

13        So the first dispute relates to the '912 Patent.  It

14   refers to 'a memory module connectable to a computer system'.

15   'A computer system' provides antecedent basis to the reference

16   to input signals received from the computer system.  And so if

17   you didn't have a memory module connectable to a computer

18   system, the idea of the computer system sending signals that

19   are received by the memory module would lack antecedent basis

20   and, therefore, be indefinite.  That's slide 62, claims 15 of

21   the '912 Patent.

22        Slide 63 is claim 1 of the '608 Patent.  It refers to 'a

23   memory module operable to communicate with a memory module via

24   a memory bus', and that memory bus has certain signal lines,

25   and that -- a memory bus and a set of control address signal

1    lines, the indefinite article provides antecedent basis for

2    the reference to the memory bus and the set of control address

3    signals in the claim itself.

4        So, once again, the preamble is limiting because it

5    provides antecedent basis for the source of those memory bus

6    and control address signals.

7        Thank you, Your Honor.

8        THE COURT:  Let me ask you this before you sit down.

9    The Defendants in their briefing argue that what led the Court

10    to find the preamble's limiting in *Samsung* 1, we'll call it,

11    are not present here.  Do you agree with that or disagree with

12    that?

13        MR. SHEASBY:  No.  Actually I think the -- it was a

14    closer case in *Samsung* 1.  In *Samsung* 1 there was one -- there

15    are two reasons why the preamble is limiting.  One, if it

16    provides antecedent basis, or two, if it gives life and

17    meaning to the claim as a whole.  Judge Payne found that the

18    preamble was limiting in the *Samsung* 1 case based on the

19    life-and-meaning analysis.  You don't even have to get to the

20    life-and-meaning analysis.  This is black letter law that

21    antecedent basis requires the preamble to be limiting.

22        THE COURT:  All right.  Well, I'm not sure that

23    there was an answer to my question in there or not.  I take it

24    you're telling me that this is a different situation --

25        MR. SHEASBY:  This is a different situation, yeah.

1    I don't think you can read Judge Payne's decision and say that

2    leads me one way or the other.  In other words, Judge Payne

3    thought a memory module was important because otherwise the

4    limitations could read on random things put in graphics

5    processing units or computers themselves, and on that basis

6    he felt the specification required him to find 'memory module'

7    limiting.  All that exists here, but that's sort of the tail

8    wagging the dog.  The dog here is the antecedent basis, which

9    the Federal Circuit requires.

10    I'm sorry for not being fully responsive the first time,

11    Your Honor.

12    THE COURT:  All right.  Thank you.

13    Let me hear from Defendants.

14    What's your position, Mr. Dryer?

15    MR. DRYER:  First I'd like to start with a small

16    procedural point, Your Honor.  The antecedent basis argument

17    that my friend on the other side just made actually doesn't

18    even appear in their opening brief.  Their opening brief

19    relied exclusively on the life-and-meaning prong of the

20    analysis, and it was only in their reply that they brought up

21    these two antecedent basis arguments.  So I think the Court

22    would be well within its discretion to disregard them.

23    On the merits, the life-and-meaning, I think they haven't

24    made the showing in this case.  First of all, they haven't

25    shown that the factors that led Judge Payne to find in

1    *Samsung* 1 that the preamble was limiting, they haven't shown

2    that to be the case here and they haven't shown why the -- you

3    know, they haven't explained, for instance, how these claims

4    could hypothetically read on a graphics processor or some

5    other type of component, which was the concern that led Judge

6    Payne to rule the way he did.

7        And on the merits of the antecedent basis issue, I think

8    it's really -- it's redundant if you read, say, 'a computer

9    system' in the '912 Patent as limiting in the preamble because

10   the body of the claim requires a computer system to be

11   providing signals.

12       So I think if you are just going to take 'computer

13   system' and say that part of the preamble is limiting because

14   it provides antecedent basis, then it would not be changing

15   the scope of the claim in any way.  It's kind of a non-issue

16   really.  It's a redundancy.  And the same is true for the

17   antecedent basis argument they make for the '608 Patent.

18            THE COURT:  All right.

19            MR. DRYER:  But in either case the law is clear,

20   even if one piece of the preamble needs to be construed as

21   limiting, it doesn't convert the entire rest of the preamble

22   to limit it.

23       Unless you have questions.

24            THE COURT:  No, sir.  Thank you.

25       Okay.  Let's move onto the data buffer terms.

1          And let me hear from the Defendants first.

2          Again, Plaintiffs are proposing plain and ordinary

3     meaning, but Defendants have discreet constructions they've

4     offered up.

5               DR. ALBERT:  Thank you, Your Honor.  Frank Albert

6     for Samsung.

7          May I proceed?

8               THE COURT:  Yes, you may, Mr. Albert.  Doctor

9     Albert, I should say.

10               DR. ALBERT:  Thank you, Your Honor.

11          Your Honor, the dispute here regarding the what we call

12     the buffer control terms is a dispute that was before this

13     Court in *Netlist 1*, and the question is whether these terms --

14     these are very long, very complicated, but these terms as a

15     whole require there to be a so-called fork in the road.  And

16     here what we're talking about is not the inside of the buffer,

17     but whether there is a signal input and that data goes to one

18     of two outputs.

19               THE COURT:  In other words, when data is being

20     transmitted to one device, does that automatically mean that

21     the other devices are somehow electronically isolated.

22               DR. ALBERT:  That's the exact dispute, Your Honor.

23               THE COURT:  Yeah.  So tell me why your side of the

24     dispute is the right one.

25               DR. ALBERT:  Thank you, Your Honor.

1       So you may be asking yourself, Your Honor, why we have

2   the same dispute for a different patent in another case.  And

3   if you look at the patents, the '215 and '417, for example,

4   they share an inventor with the '339 that had this dispute in

5   *Netlist* 1.  Both patents -- sets of patents are directed to

6   buffers.  They're both from around the same general time from

7   the same company.  Kind of makes sense that the shared

8   inventor had a similar solution to a similar problem.

9       And in *Netlist* 1 the Court dealt with the same issue

10  and it found that when describing a problem to be solved, the

11  patent emphasized reducing load at the outputs of the memory

12  devices.  And in addition, the Court went on to say that the

13  sole embodiment describing path selection during a write

14  operation disables one path within the buffers and the other

15  path is enabled.  We have a very similar situation here with

16  these patents, the '215 and '417.

17      So starting with the --

18          THE COURT:  Isn't your position, at the end of the

19  day, really based on some theory of disclaimer?  I mean, you

20  don't really call it that in your briefing, but isn't that

21  really what this is?

22          DR. ALBERT:  That is certainly one aspect of why

23  this Court should hold for the fork in the road.  It starts

24  with the claims, it goes to the specification, we talk about

25  the problem to be solved, and the solution.  This is the

1    solution.  This is the only solution that is described.  And

2    then that's why during the appellate procedure for the

3    prosecution history they described a key aspect of this

4    invention was essentially to have this fork in the road.  They

5    called it selective enabling.  And I'll get to that in a bit.

6        So; I wouldn't necessarily only rely on disclaimer, but

7    that is certainly a part of it.  That is certainly something

8    that pushes it along.  But if you look at the totality of the

9    evidence, Your Honor, we think each step along the way shows

10   that there's a fork in the road, starting with the claims,

11   going to the specification, then going to the disclaimer.  And

12   we do cite specific disclaimer law in our opposition brief.

13           THE COURT:  Are the claims at issue here clearly

14   directed to load isolation?

15           DR. ALBERT:  We think they are, Your Honor.  So if

16   you go to, for example, claim 2--sorry--'215, claim 1,

17   Netlist, as you've seen from *Netlist* 1, they are, you know --

18   they're kind of masters at creating these very long claims.

19   Some of these claims go on for a page, a whole column, column

20   and a half.  Some of these limitations are full paragraphs.

21   Here is one such example.  And here what we're talking about

22   is it's this logic coupled with the buffer and it's for

23   providing control signals to the buffer to enable

24   communication.

25        And what is it actually doing?  If you read the claim,

1    you've got a first set of logic signals that enable the

2    communication to one device and then another set of signals

3    that enable the communication to that other device.  And it's

4    that combination, as recited in the claims themselves, of

5    enabling one and then enabling the other, these different

6    devices, is what creates that fork in the road.

7         And here we have a very similar approach for claim 21 of

8    the '215.  It's that creating, that enabling of that first

9    device, and then with something different doing that enabling

10   of that second device.

11        A little bit different -- excuse me.  I skipped to a

12   slide for the '417.  It's very similar language.  And here

13   it's instead of the, you know, 'enabling', it's 'circuitry

14   being configured to transfer the bursts'.  And here it's in

15   the one of the plurality of N-bit wide ranks.  And so it's

16   actually talking about taking the multiple ranks and only

17   triggering the bursts of the data from one.

18        And so how is that actually described and how does this

19   come about from the specification?  The specification talks

20   about this problem of too much load.  When you take a system

21   -- prior art systems where you have one, two, three, four

22   devices, and you wanted to make a device -- a module with more

23   devices, more memory, what that is going to do is it's going

24   to stack up that load; it's going to increase the load on the

25   system.  And what they say here in the background of the

1    invention is that things like that are things that reduce the

2    capabilities, that reduce your design.  And so this -- these

3    challenges are preventing you from creating these modules with

4    more capacity.

5    And then it describes in the patent this conventional

6    memory module.  And here we have Figure 2 of the '215 and '417

7    Patents, and what I've circled here in red is the memory

8    devices 30a and 30b.  And you see the output of each memory

9    device goes to a common line.  And what they're saying is that

10    when you electrically couple the memory controller computer

11    system, the load of both memory devices is exposed to the

12    computer system.  So without some intervention, as you

13    increase the number of devices, you increase the load.

14    And then the patent, the very first thing it says in the

15    detailed description about how to solve that problem was load

16    isolation.  And here what the patent describes is the

17    selective isolation of one or more of the loads.  So you take

18    the module that has now too much load for the system and you

19    disable some of the devices.  That is the fork of the road.

20    You disable some of the devices to reduce the load.  So here

21    on the right, "The load isolation advantage allows the memory

22    module to present a reduced load."  And how does it do that?

23    I've got it underlined--"selectively switching between the two

24    ranks of memory devices."

25    And then it goes on in that very same section, using

1    this feature allows you -- it says may -- it allows certain

2    embodiments in which the loads of the memory module may

3    otherwise limit the number of ranks.  So by having this

4    switching, this solution, it allows you to have, according to

5    Netlist in this patent, more memory.  This was the solution

6    that was directed at the identified problem that provides that

7    enabling of one memory device in the claims and then the

8    enabling of the other memory device.

9         THE COURT:  Where is this actually called out in the

10   claim language?  For example, take claim 1 of the '215.  Where

11   is the claim language that supports this fork in the road

12   concept?

13        DR. ALBERT:  So we say that it's in the entire

14   language where it talks about providing the first control

15   signals to the buffer to enable -- first enable communication

16   of the first data burst.  Right?  So you have one signal that

17   enables the first data burst between the first memory

18   integrated circuit and the memory controller.  That's the

19   first set of devices where the switch is turned on.

20        And then you go on in claim 1 and it talks about where

21   the logic is further configured to respond to the second

22   memory command by providing a second control signal to the

23   buffer to enable communications of the second data burst

24   between the second integrated circuit and the memory

25   controller.  That's when the switch to the other memory

1    devices are turned on.

2         Thank you for that question, Your Honor.  We looked to

3    this claim language and we had a similar question.  We read

4    the specification and we asked ourselves how did this claim

5    match up with the specification.  And if you look at it as a

6    whole and enabling one and enabling the other, that's how it

7    matches up with the specification.

8              THE COURT:  And that's how you get to the fork in

9    the road.

10             DR. ALBERT:  That's how you get to the fork in the

11   road based on the plain language of the claims.

12             THE COURT:  Over.

13             DR. ALBERT:  However, the specification, again,

14   talks again about the load isolation as being the solution to

15   the identified problem.  And then if you go to the figures,

16   each figure that talks about presenting this data, routing the

17   data through this buffer, which is required in the claims,

18   every embodiment that talks about routing that data through a

19   buffer, sometimes called a switch, but a buffer or switch,

20   it's doing so with this fork in the road.

21        So here is a description of Figure 4A, and what I've

22   highlighted here is the fork in the road.  The blue is the

23   input line to the switches and the red is the output line out

24   of those switches.  And so you have the two inputs and the one

25   output, you have that fork, and that's exactly what the

1    specification describes for this figure.  It talks about

2    selectively allowing one of the first DQ data signals lines

3    from the DQ data signal line 102a compared to 102b.  So it's

4    talking about that selectively allowing that data to go

5    through.

6        And so what I've shown here on slide 89, Your Honor, is

7    those two different paths, the two different tines of the

8    fork, if you will, where you can receive data from the devices

9    32a on the left are received data from the devices 32b shown

10    on the right.

11        If look to the other figures of the patent, Your Honor,

12    it's consistent.  There's some -- there is a dispute about

13    whether there is an embodiment that does describe something

14    that's not a fork in the road--I'll get to that later--but if

15    you go to the figures of the patent, each of them that talk

16    about the data going through the buffer, talks about this load

17    isolation solution of having that fork in the road.  Here I've

18    got 3a on the left, 5a in the middle, 8c on the right; they

19    all have that two tines on the left, one tine of the fork on

20    the right.

21        Now, one other aspect of these claims, Your Honor, is not

22    just the switches or the buffer, but it's how those switches

23    are controlled.  That's -- if you go back to the claim

24    language, it talks about control signals that control that

25    buffer.  There's only one place in the actual body of the

1   specification that talks about those signals, and what it's

2   doing there -- what those signals are doing is enabling and

3   controlling that fork in the road.  So here I've got the two

4   examples on the left, the actual quotes, and the Figure 5a

5   that it's describing on the right, and yellow on the right is

6   the highlighting for those signals.

7       So we got the switches in green on the right and we got

8   the logic elements up at the top, and then the signals are the

9   signals that enable and control that selective isolation by

10  those switches.  It's the only description in the body of the

11  patent regarding that control.

12      Now, getting to your disclaimer question, Your Honor, you

13  asked whether it really is an issue of disclaimer.  Again, we

14  think from the plain language of the claims as well as the

15  description and, you know, how the patent distinguished the

16  conventional systems in the patent itself, disclaimer is not

17  necessary, but if the Court decides to go there, into

18  disclaimer, disclaimer absolutely carries us forward and

19  limits this invention to only a fork in the road; the

20  selective isolation, if you will.

21      So here I have on slide 95 is Netlist's description in

22  the appeal brief for a related patent.  And, you know, I'd

23  like to address front, Your Honor, in the opening brief

24  Netlist had kind of a buried statement that, you know, none of

25  our evidence of other proceedings is even relevant because

1    there is different claim language.  And in our responsive

2    brief we put in case law that says exactly why this is

3    relevant.

4         If you have a disclaimer or -- you're not just talking

5    about particular claim language of a parent, but if you're

6    talking about the invention generally, then that prosecution

7    history applies through that entire chain even if you have

8    different claim language.  So we put that in multiple cases in

9    the brief, in our response, and in the reply brief we didn't

10   see a response to that; we didn't see a response why that was

11   wrong.

12        So going back to that disclaimer, let's see the actual

13   merits of how it affects the case.  So here we have Netlist's

14   description of that same figure that I presented earlier.

15   Netlist described that that figure can selectively

16   electrically couple each pair of data lines--same description

17   as I presented earlier.

18        And what did Netlist say to the Federal Circuit?  Netlist

19   said that the configurability to selectively electrically

20   couple a device data line to a common data line was a key

21   contribution of the inventions; not a key contribution of some

22   specific claim language, but a key contribution of the

23   inventions.

24        Now, Netlist is saying that, no, there is no requirements

25   of selectively electrically coupling in this -- these

1    particular claims, but what they said to the Federal Circuit

2    for a related patent was that that exact requirement was a key

3    contribution of the invention.  And they went on to say, When

4    a switch or other mechanism is used to selectively

5    electrically couple the data lines, such as Figure 3A--I

6    showed that earlier--the electrical load of the memory devices

7    can be disconnected from the computer switch.

8           THE COURT:  So when they say that to the PTAB in a

9    proceeding with a different, although albeit related patent,

10   that somehow rises to the level of disclaimer even though that

11   language is not in these claims.

12          DR. ALBERT:  Exactly, Your Honor.

13          THE COURT:  Is that your view?

14          DOCTOR ALBERT:  That's not just our view, Your

15   Honor; that's the Federal Circuit's view.  We cited three

16   cases in our responsive brief.  Netlist did not respond to

17   those three cases.

18          THE COURT:  All right.  What else, Doctor Albert?

19          DR. ALBERT:  There is -- that -- we're not just

20   dialing with an isolated statement to the Federal Circuit.

21   Again, this is not statements that we're relying on to the

22   PTAB; it's statements to the Federal Circuit in the appeal

23   from that PTAB proceeding.

24      And they go on to say, "Solving the problem of increasing

25   load due to additional memory devices was essential to

1    overcoming the shortcomings of the prior art memory modules."

2    And remember, the solution that this patent described for the

3    load isolation problem was the fork in the road.

4        Then it goes -- then Netlist went on to say, "The

5    inventor solved these problems by designing logic and circuit

6    elements to perform memory density multiplication and to

7    selectively electrically couple and load isolate individual or

8    groups of memory devices, thus avoiding the increased

9    electrical load of the memory devices."  Again, they're

10    talking about that fork in the road.

11        THE COURT:  All right.  What else?  I'm happy to

12    hear it if you've got something else, but we do need to move

13    on.

14        DR. ALBERT:  Sure.

15        Netlist also pointed to this Figure 8 and Figure 8B from

16    the patent claiming that there's some sort of embodiment that

17    envisions not having this fork in the road.  We got to start

18    with the claims, Your Honor, and the claims require that data

19    burst going through the buffer.  And if you look at Figure 8A

20    and 8B, the data is just hard-wired, like the conventional

21    system, hard-wired to the output.  There is no switch, there

22    is no buffer that that data is going for.  So 8A and 8B just

23    don't apply to these claims.

24        Then, finally, Your Honor--it's my last slide, I

25    believe--the -- with regards to Figure 8A and 8B, the claims

1    also require that the control signals to the buffer, if you

2    look at the description of Figure 8A and 8B, there's no

3    description of that control signal; you have to go back to

4    Figure 5, which I showed the fork in the road.

5        One last point, Your Honor, Netlist points to a --

6    the -- some language in the abstract for support for the

7    -- for an alleged broader meaning.  We don't think it really

8    supports them because it doesn't say anything that negates the

9    rest of the patent.  However, one thing that was actually very

10   surprising to us that they're relying on the abstract, because

11   the abstract to this invention was added in 2017.  They're

12   claiming in their infringement contentions that the priority

13   date is 2004.  So if the invention is to be interpreted as of

14   the date of the invention, say it's 2004, then the abstract

15   can't change that meaning.  And if it can change the meaning,

16   we've got a problem, because if 2017 is now their allegation

17   of what the priority date is, which is in conflict with their

18   infringement contentions, then they're accusing the prior art

19   of infringement in this case and this case should be over.

20       Thank you, Your Honor.

21           THE COURT:  All right.  Let me hear from Netlist,

22   please.

23           MR. SHEASBY:  Your Honor, I'm having a technical

24   difficulty.

25           THE COURT:  That's fine.  Take a moment to see if

1    you can work it out.

2        Let's go off the record while he does that.

3                    (Pause in proceedings.)

4        THE COURT:  We're back on the record.

5        Go ahead, Mr. Sheasby.

6        MR. SHEASBY:  Thank you for your indulgence, Your

7    Honor.

8        I think there's a lot of what Doctor Albert said that is

9    right, but I think that he -- his ship sort of crashes on two

10   shoals.  The first is that there is a concept in the Federal

11   Circuit where -- in which -- Your Honor, I need to make one

12   more brief adjustment.

13       THE COURT:  That's fine.

14       MR. SHEASBY:  The -- if I could have slide 79,

15   Ms. Truelove.  Thank you.

16       There is a concept in which a disclaimer in a parent can

17   apply to a child, and the -- and it doesn't necessarily turn

18   on any one particular claim term, but it turns on the claim

19   itself that was the subject of disclaimer in relationship to

20   the claims that are at issue in this case.  And where the

21   disclaimer argument fails is it's not an accident that they

22   didn't show you the claims from that unrelated -- or that

23   parent application and explained why those claims are the same

24   or substantially the same or related, not just based on one

25   word but even conceptually the same as the patents in this

1    case.

2        There is a load isolation embodiment in the

3    specification--I'm on slide 80--and we actually have patents

4    that have been issued on that load isolation concept.  This is

5    the '774 Patent.  The '215 Patent and the '417 Patent don't

6    recite load isolation.  They also don't recite the drive

7    concept that is in the '339 Patent that was the subject of

8    the -- Judge Payne's ruling on the '339 Patent.  And the

9    concept that the -- there is no language in the claims that

10   references the isolation.  There's no language in the claims

11   that talks about selectively switching.  The language in the

12   claims talks about the fact that there needs to be an

13   independent path for both -- for buffers to -- for control

14   signals to two separate ranks.  It doesn't say that they are

15   isolated or selectively turned off.

16       I should also point out, the issue is the presence of a

17   switch that cuts off one and cuts off the other.  And the

18   argument, which was a new argument made for the first time

19   that there's no buffering on the DQ line, box 40 is the

20   buffer, and you'll see that in Figure 8a the DQA, which is the

21   data line, goes through the buffer, so it's buffered but it

22   doesn't have the switches that are necessary to create the

23   selective isolation.

24       So Figure 8A is an example of both a data line that's

25   buffered and also a data -- and also a data line that doesn't

1    have a switch that isolates each one of them separately.

2        So I think that Doctor Albert has, respectfully,

3    misinterpreted claim 8A, and I think he falls on a basic

4    fact that 'isolate selectively' or those concepts are not in

5    the specification -- are not in the claims.  The claims are

6    directed to a different portion of the specification.

7            THE COURT:  You mean Figure 8A, not claim 8A.

8            MR. SHEASBY:  Figure 8A, excuse me.  And I think

9    the claims are directed to a different portion than the

10   selection isolation portion of the specification.

11       Thank you, Your Honor.

12           THE COURT:  Okay.  All right.  Let's move onto the

13   'logic' term, which I understand is contested by Micron only

14   and not Samsung.  Micron's position is that this is subject to

15   § 112, ¶ 6 and is indefinite; plaintiff's position is that

16   it's not § 112, ¶ 6 and should be given its plain and ordinary

17   meaning.

18       Let me hear from Micron first on this.

19           MR. RUECKHEIM:  If we can have -- Your Honor, Mike

20   Rueckheim on behalf of Micron, and I will try to make this

21   very quick.

22           THE COURT:  Please proceed.  Obviously we don't have

23   'means for' here, so we don't have the magic language to open

24   the door to § 112, ¶ 6.

25           MR. RUECKHEIM:  We do not.  What we have is the word

1    'logic', which the Federal Circuit has recently found in the

2    *Engenera* case to be a means-plus-function term.  We had the

3    'configured to' that's shown on the slide in green.  And

4    'configured to' has been found in many cases, *MTD Products*

5    identified in our briefing, to be one of these transition

6    terms like 'means for'.  And then we have in blue the function

7    language from the top of the screen is the '215 Patent, the

8    bottom is the '415.

9        And so the *Engenera* case says that it may be 'circuity',

10   it may be 'logic', and *Engenera* dealt with the term 'logic'

11   'logic to modify'.  Maybe there's some structure there, but

12   you have to have sufficient structure for the actual functions

13   identified or known to one of skill in the art in the context.

14   And so what we did was we asked our expert, the only expert

15   who opined on this issue, is there sufficient structure here,

16   and he said no.  He said the logic here can relate to any kind

17   of hardware, software, or what have you.

18       What Netlist points to in its opposition brief or in its

19   responsive brief is that there are statements in the claims

20   that recites the logic is coupled to a buffer or the logic is

21   coupled to a printed circuit board.  *MTD Products* looked at

22   this 'coupling' type language, *Engenera* cited in the brief as

23   well looked at this 'coupled to' type language and found it

24   was not sufficient unless you can identify some type of

25   structure for the inputs and outputs that would inform one of

1       skill what the logic is referring to here.

2           I think this case is a unique case for the term 'logic'.

3       I have the entirety of claim 1 of the '415 Patent--it's

4       long--on the screen, and you'll notice that it has two words

5       in it--'logic' and 'circuitry'.  And we're resting on the

6       briefing for 'circuitry', but I do think it's interesting that

7       we have these two words in here that are presumed under the

8       law to have different meanings and Netlist has not indicated

9       at all what it believes these meanings are.  Micron believes

10      both of these terms are indefinite.

11          Once you find -- that the Court finds this term is

12      means-plus-function, we asked our expert to look at the

13      specification and see if there's any structure to support that

14      it's tied to -- that it's clearly tied to the function here;

15      the expert said no.

16          Netlist in its briefing did a string cite of a number of

17      different pages in the specification.  This is from their

18      reply brief on the slide.  They point to in the bottom of the

19      screen this logic -- there is some disclosure in the spec of a

20      logic element that's configured to receive control signals.

21      But what the Court needs to do is see if there's structure

22      that's tied to the function of the claims.  That's all the

23      blue language on the slide.  It has to receive these control

24      signals--that's the '215 Patent; it has to respond by

25      producing different control signals.  The '415 involves

1    control signals, address signals, and it also discusses it

2    being further configurable to help put data buffer signals,

3    and there's been absolutely no showing of anything in the

4    specification that meets this language.

5         Unless there's any questions.

6              THE COURT:  No, sir.  Thank you.

7         Let me hear from the Plaintiff in response.

8              MR. SHEASBY:  I think my brother -- this is Jason

9    Sheasby for Plaintiffs.

10        I think my brother pointed out there was a Federal

11   Circuit case that talks about 'logic'.  That case is a

12   situation in which the claims could read on software.  These

13   claims are not software claims; these claims are about memory

14   modules with physical structures.  Those physical structures,

15   logic, have input and output.  On slide 67 and 68, those input

16   and output are expressly described.  And the concept of logic

17   is not a concept that could be anything other than hardware in

18   the specification.

19        On slide 72, '215 Patent, column 6:36 through 48, the

20   logic element is expressly described as a circuitry, a

21   physical circuitry.  This is the circuitry that is described

22   as performing the functions in the claims themselves.

23        Doctor Stone seems to have had a change of heart between

24   his declaration and his specification -- and his deposition.

25   In his deposition, the first thing he admits is that the term

1    'logic' is a structure of circuits, and this is in his

2    discussion of -- you can't see it from this passage, but this

3    is from his discussion of the logic issue.

4        And when we asked him --

5            THE COURT:  I don't see the word 'logic' there

6    anywhere.

7            MR. SHEASBY:  I know.  It's not there.  I haven't

8    captured the same thing, so you're not going be able to rely

9    on that without more context, Your Honor.

10        This is Doctor Stone talking about logic, and that logic

11    is -- has gates, and they're sometimes referred to as

12    transistors, and those transistors have specific structure.

13    This is on slide 75.  He was asked that logic includes

14    circuitry with state and circuitry without state.  His answer

15    was yes.  He said those are actual structures that you can go

16    to a textbook and look up.  In other words, he's able to look

17    at circuitry and determine whether that circuitry is logic,

18    which is what the claim requires.  This is on slide 77.  One

19    again, he can look at logic and determine what that structure

20    requires.

21        And so what we have is a couple of points.  There may be

22    some patents in which logic could theoretically be software or

23    something else and there could be nonce, but in this patent

24    logic is circuitry.  Logic circuitry is a physical structure

25    that Doctor Stone admits he can go and find and determine

1    whether something is or is not logic circuitry.  That defeats

2    the indefiniteness claim because he can actually look at a

3    circuitry and say is this or is this not logic, as defined by

4    the claims.  And, of course, the specification provides

5    detailed descriptions of structures that can be used to

6    perform the exact functions on 78.

7        So putting aside the fact that I captured the wrong

8    portion of the Doctor Stone's declaration in my slide, I think

9    it's very clear from his deposition testimony that logic is

10   structure, he can go and define that structure, look at it and

11   determine whether that structure satisfies the definition of

12   logic.  And in these claims, the input and the output are both

13   defined as to what the logic does, which moves them outside of

14   that Federal Circuit case.

15       Thank you, Your Honor.

16           THE COURT:  I hear your argument on structure,

17   structure, structure, but what about the issue of whether this

18   is or is not subject to § 112, ¶ 6?  If it is, then we get to

19   whether or not there is structure to determine whether it's

20   definite or not, but you never did really tell me whether you

21   believe this is or isn't § 112, ¶ 6.

22           MR. SHEASBY:  It's not § 112, ¶ 6, and the reason

23   being in this context 'logic' is not a nonce term; 'logic' is

24   a circuit.  And Doctor Stone admitted that 'logic' is a

25   circuit.  That circuit can be looked at and defined and

1    determined if it satisfies the definition of 'logic'.  And in

2    this case 'logic' is defined as having a particular input and

3    producing a particular output, so it's describing a very

4    particular type of logic circuitry, Your Honor.

5                THE COURT:  All right.

6                MR. SHEASBY:  Thank you, Your Honor.

7                THE COURT:  Thank you, Mr. Sheasby.

8         Anything else, Mr. Rueckheim, before we move on?

9                MR. RUECKHEIM:  Quickly, Your Honor.

10        I just wanted to point out, Mr. Sheasby pointed to a

11   couple of statements in the specification regarding 'logic'.

12   He didn't argue that these statements, the PLD, or what have

13   you, are in any way limiting to the claim.  He didn't argue

14   that these PLD and the other sections he pointed to with

15   respect to 'logic' were somehow enabled to do the functions at

16   all or described to do the functions that are recited in the

17   claim.  He didn't point out the fact that there's other

18   references to 'logic' like logic translation equations being

19   programmed into various components as well in the

20   specification.

21        I'll just also throw in that Doctor Stone did not have a

22   change of heart.  Doctor Stone was not asked whether he

23   believed the circuit in the context of the claim means the

24   same thing as 'logic', which would be against the presumption

25   that these two claim terms used in the same claim had

1    different meanings.  He was asked generally about logic with

2    gates, he was asked logic about computer logic.  Mr. Sheasby

3    showed a picture of a question about a series of circuits.  He

4    wasn't asked about the context of this patent.

5         The Federal Circuit said in general, outside the context

6    of any specific patent, this term can be means-plus-function.

7    In the context of this patent, it is a means-plus-function

8    term because there is no specifying term in front of 'logic',

9    there is no description in the specification that would limit

10   the functions being referred to any structure.

11        Thank you, Your Honor.

12            THE COURT:  All right.  Thank you.

13        All right.  Per the parties' agreement, I'll take the

14   term 'circuitry' under advisement and rule on the briefing

15   there without oral argument.

16        We're going to move onto the remainder of the terms,

17   although I want to remind counsel that if we run out of time

18   before we hear -- the Court hears argument on some of these

19   remaining terms, I will also simply determine what the proper

20   claim construction should be based on the briefing.

21        All right.  Let's move on to 'at least one of the circuit

22   components' from the '215 Patent.  This, again, is a dispute

23   between Plaintiff and Micron only.  Micron says it's

24   indefinite; plaintiff says plain and ordinary meaning.  And I

25   think the dispute is probably whether or not there is or isn't

1    a lack of antecedent basis.

2        But let me hear Micron's argument first.

3            MR. RUECKHEIM:  Thank you, Your Honor.

4        Your Honor, I have one slide for you.  Claim 14 is

5    potentially the antecedent basis.  The term that we're dealing

6    with is in claim 15.  Claim 14 recites a buffer that includes

7    circuit components.  Claim 15 has the language that's the

8    problem, the 'at least one of the circuit components'.  And so

9    there is no antecedent basis.

10       Netlist argues that the Court can construe this term, can

11   fix this term.  The problem is there's no support one way or

12   the other as to what this term means.  Is it reciting that

13   there is one circuit component that does both the functions in

14   claim 15, provide the first path in response to one signal and

15   provide a second path in response to the second control

16   signals, or is it saying that all the circuit components that

17   are recited in claim 14 are configured to do these two

18   functions, or both.  We don't know.  We think the term's

19   indefinite.

20       Thank you, Your Honor.

21           THE COURT:  All right.  Let me hear from Plaintiff,

22   please.

23           MR. SHEASBY:  If I can have slide 100, Ms. Truelove.

24           THE COURT:  Now, if he just had one slide, you only

25   get one slide.

1          MR. SHEASBY:  Your Honor, I will just use one slide.

2          THE COURT:  All right.

3          MR. SHEASBY:  So I think what my brother is

4    confusing is that a claim is breadth versus indefiniteness.

5    So the only question for indefiniteness is whether there is

6    antecedent basis for these circuit components, and there is

7    antecedent basis because the claim before it refers to circuit

8    components.  Everything else he said about, We don't know if

9    it can be one or both, the breadth of the claims doesn't make

10   it indefinite; the only indefiniteness argument is that is

11   there antecedent basis for the circuit components.  There is.

12   It's the components that are within the buffer.  So we know

13   what circuits to look at to examine where the claim

14   limitations are met.

15        All this other stuff that he's talking about goes to the

16   question of proof of infringement, not whether you don't know

17   what circuit to look at.  We know what circuit to look at it.

18   It's the circuits in the buffer.

19        Thank you, Your Honor.

20        THE COURT:  All right.  Anything further from

21   Micron?

22          MR. RUECKHEIM:  Nothing further, Your Honor.

23          THE COURT:  Okay.

24        Let's go on to 'burst of data strobe signals' from the

25   '215 as well.  Similar situation--Micron, the opposing party

1   to Plaintiff, is arguing indefinite; plaintiff's saying plain

2   and ordinary meaning.

3        Let me hear from Micron.

4        MR. RUECKHEIM:  Thank you, Your Honor.

5        Your Honor, the term is 'burst of data strobe signals'.

6   The claim recites a first burst of data strobe signals, second

7   burst of data strobe signals, and then a buffer that's

8   configured to prevent the first burst and second burst of

9   signals from colliding with each other.

10       And we asked our expert Doctor Stone, the only expert who

11  opined in this case, what this term means, and he said, Well,

12  it depends; it can mean a couple of different distinct things.

13  One, it can be a set of consecutively transmitted strobe

14  signals from at least two different memory devices.  It can

15  also mean a set of consecutively transmitted strobe signals

16  from one single memory device.  And we asked him, Well, what

17  does it mean in this patent, and he says, Well, it doesn't

18  say.  So the claim says something that can be read in two

19  different ways.  The patent doesn't say which way you should

20  read it.

21       Netlist in it's briefing said -- well, they agreed with

22  us.  That should be the end of the story--they agreed this

23  term has two different meanings--but Netlist says the Court

24  should interpret the term to encompass both.  The problem with

25  that is that there's two distinct plausible meanings here, and

1    Netlist is saying you should construe them as accompanying

2    both, but what you need to do is look at the specification.

3    What does the specifications say?  One way or the other or

4    combined?  The specification says nothing.

5         This is the sole reference on the screen as to burst of

6    data strobe signals.  It doesn't say one way or the other

7    whether these signals should be combined, whether it should be

8    coming from one device or two.  And the differences here

9    matter.  It matters for the infringement analysis.  It matters

10   for invalidity analysis.  The configurations -- the structural

11   configurations of what's being accused are significantly

12   different.

13        THE COURT:  Why do we need to know where this burst

14   of data signals comes from?  Why do we need to know?

15        MR. RUECKHEIM:  It depends -- well, it's not even

16   just the where, Your Honor; it is what is a burst of data

17   strobe signals.  Is it something that's -- I get Your Honor's

18   point where is it coming from.  Is it something coming from

19   one rank and something coming from two, and we're trying to

20   show that on this screen on the slide.  If you look at the

21   pink lines as your data strobe signals, at the first you see

22   the uncombined data strobe signals coming from each device,

23   and so basically what they're accusing, they would say the

24   claims encompass a device that only prevents collisions from

25   these pink lines.

1        If you take the second, the combined approach, you now

2   have two different memory devices being combined on here and

3   the strobe signal from both, and so you'd have to accuse

4   functionality where these strobe signals from two different

5   devices, or more, are now -- you prevent those from collision.

6        And so, Your Honor, just to wrap up, we think the case

7   law here supports us; actually the *Sandoz* case.  When you have

8   different plausible meanings that yield a different result,

9   which we've shown here, the claim can be indefinite.  The

10  other side pointed to this case *Nervo* that dealt with this --

11  they dealt with this issue to the extent they said the

12  different opinions as to what the term 'configured to' means,

13  one of the different opinions was not plausible and so they

14  rejected that out of hand and they said, We're not going to

15  take multiple distinctions, because in every case you could

16  have non-plausible interpretations of what a claim term means.

17  So we think *Nervo* is completely distinguishable and not

18  relevant here.

19        Thank you, Your Honor.

20             THE COURT:  All right.  Thank you.

21        Let me hear from Plaintiff.

22             MR. SHEASBY:  Jason Sheasby for the Plaintiff, Your

23  Honor.

24        Two things.  I was chagrined to have had a title on my

25  slide about Doctor Stone's declaration and then had put in the

1    wrong portion of his declaration.  For the record, the

2    appropriate portion of his declaration where he discusses that

3    'logic' refers to a field effect transistor is Exhibit 5,

4    paragraphs 38 through 39, and I apologize for the imprecision

5    on the slide, Your Honor.

6              THE COURT:  All right.

7              MR. SHEASBY:  Moving on to the issue of data strobe

8    burst and its indefiniteness, this is slide 107.  Doctor Stone

9    in his deposition was able to identify whether something was a

10   data strobe by looking at a figure and analyzing it.  And the

11   fact that there would be different types of data strobes, data

12   strobes that are combined versus data strobes that are not

13   combined--this is on slide 108--doesn't make it indefinite; it

14   means that the claims cover both non-combined data strobes and

15   combined data strobes.

16        Thank you, Your Honor.

17             THE COURT:  All right.  Let's go on to 'operable in

18   a computer system to communicate data', again from the '215

19   and also from '417 Patent.  Both Defendants are opposed to

20   Plaintiff here, and Defendants have offered a precise

21   construction; plaintiff has proposed plain and ordinary

22   meaning.

23        Let me start with the Defendants, and let me ask for an

24   explanation of your proposed construction 'configured in a

25   computer system to communicate data'.

1    And I'll be honest, I'm not real sure what the dispute

2    between the parties is here, so you might clarify that for me.

3              MR. LIVEDALEN:  Can we please adjust the --

4              MR. McKEON:  We're getting the slides, Your Honor.

5    Just a moment, please.

6              MR. LIVEDALEN:  We'll just go with the slide deck.

7    Sorry about that, Your Honor.

8              THE COURT:  If you want to put one of your printed

9    slides on the elmo as opposed to using the computer screen,

10   that's fine.

11             MR. LIVEDALEN:  That would be great.  Thank you,

12   Your Honor.

13        Brian Livedalen for Defendant Samsung.  Good afternoon,

14   Your Honor.

15             THE COURT:  Please proceed.

16        What is the real dispute here between the parties?

17             MR. LIVEDALEN:  Sure.  So turning to slide 114 -- if

18   you just bear with me.  So the dispute here, Your Honor, is

19   whether this term requires mere capability, including after

20   modification, or whether it requires structure that presently

21   is configured to perform the recited function.  And so, Your

22   Honor, if you go to our next slide 115 --

23             THE COURT:  But the structure must be presently

24   configured to perform the recited function.  Correct?

25             MR. LIVEDALEN:  That's correct, Your Honor.  And the

1    issue is, Your Honor, if we actually skip to the next slide to

2    keep this brief, this exact same issue came up in Your Honor's

3    ruling in the *TQ Delta v. CommScope* case, and there was a

4    latent ambiguity as to this exact same term, and we read Your

5    Honor's decision, and in that decision there is a

6    clarification that 'operable to' requires actual configuration

7    to perform that function, and it's not broad enough to include

8    mere capability, including capability that could be modified.

9         We did not think that this would be a term that was

10   disputed.  We offered it as part of the claim construction

11   process, and for whatever reason Netlist has yet to agree to

12   this term.

13        If we go to the next slide, in their reply brief they

14   said, What's the big deal; there's no issue here.  There was a

15   dispute in the *TQ Delta v. CommScope* case.  That dispute is

16   not present here.  And if that's the case, then Netlist should

17   agree to Defendants' proposed construction.  We've not heard

18   any reason why they resist the construction other than them

19   calling it vague and nebulous.  But as Your Honor found in the

20   *TQ Delta v. CommScope* case, the construction here resolved the

21   exact latent ambiguity that exists in this case.  So we ask

22   for clarity now so the parties aren't fighting about this

23   ambiguity later.

24             THE COURT:  All right.

25             MR. LIVEDALEN:  Thank you, Your Honor.

1        THE COURT:  Thank you.

2        MR. SHEASBY:  Ms. Truelove, could I have slide 113,

3   please?

4        THE COURT:  So Mr. Sheasby, is there a dispute here?

5        MR. SHEASBY:  I think there is.

6    So the claims use the phrase 'operable', they don't use

7   the phrase 'configured to', and so Federal Circuit precedent

8   would require you to respect that separate language.  I think,

9   although I'm not so sure -- I'm not completely sure what's

10   going on here, I think what's going on here is that in many

11   cases these memory modules have to be provisioned by the user

12   with sort of added information to their registers for them to

13   perform certain functions.  Certain registers must be switched

14   on or off.  And so my guess is the reason for this is that

15   they're going to say that because there are registers that

16   allow you to turn on and off certain features, they're not

17   configured to -- the memory module is not configured by

18   Samsung to do something or Micron to do something, even though

19   it would be operable to do that if you set the particular

20   register.  And so my guess is that's what's going on here.

21    I read the *TQ Delta* case.  It was for actually preparing

22   for a completely different litigation.  And the *TQ Delta* case

23   cites a number of Federal Circuit opinions, and those Federal

24   Circuit opinions deal with situations in which people had to

25   argue that you had to break the device or use it in a way that

1    it was not designed to be used for, and they were arguing that

2    satisfied the definition of 'configured' or 'capable'.

3        We're not talking about breaking a device here or

4    physically altering it.  My sensitivity is -- my guess is that

5    there are registers that are -- that can be turned on and off

6    in the memory module.  They're going to argue that means it's

7    not configured.  We're going to argue it still means

8    'operable'.  And so --

9            THE COURT:  Have you had that discussion with the

10   other side as to whether your supposition is correct or

11   incorrect?

12           MR. SHEASBY:  They have not been -- I have not spoke

13   to them directly and said, Is this what you're planning on

14   doing.  But based on how I know these devices work, I'm at the

15   80 to 90 percent confidence level that this is about that

16   registers within the device can be changed to use -- to

17   operate in different modes, and they're going to argue that's

18   not configured.

19       And so I -- for right now I would like to keep it as

20   plain and ordinary meaning.  At some point it may come up that

21   additional construction is necessary or there's an issue to be

22   joined.  But in abstract, because of this changing in word --

23   this change in language, I don't think -- I don't -- it's hard

24   for me to agree with it in abstract for that exact reason.

25           THE COURT:  All right.

1    MR. SHEASBY:  Clearly we can't break the device or

2    we can't claim that if someone were to etch off a circuit it's

3    still operable to do something, but if they're just setting a

4    register in the device, I think that's for the jury, not for

5    the Court.

6        Thank you, Your Honor.

7        THE COURT:  Well, let me ask Defense counsel, since

8    you two don't want to seem to talk to each other directly, let

9    me ask you, is what he's afraid of what you're going to say?

10   Is that going to be your position?

11       MR. LIVEDALEN:  Your Honor, the Federal Circuit

12   precedent is clear if there's functionality that --

13       THE COURT:  I wasn't asking about Federal Circuit

14   precedent.  I was asking -- Plaintiff's counsel laid out what

15   he is concerned Defendants' position will be at trial with

16   regard to the word 'operable', and I want to know if that is a

17   legitimate concern, or if you're telling me, No, we're not

18   going to say that we're not going to do that, then maybe we

19   don't have a problem here.  If you're going to tell me, Yes,

20   we are, and his supposition is right, then maybe we do.  So

21   I'm trying to get to the bottom of it.  So answer the question

22   and don't tell me what about Federal Circuit precedent says.

23       MR. LIVEDALEN:  Yes, Your Honor.

24       So to the extent that there is functionality that simply

25   needs to be turned on, we're not going to argue that that's

1    not operable or not configured to per Defendants'

2    construction.

3        The issue in the *TQ Delta* case, which is the exact same

4    issue here, is that the Plaintiff identified functionality in

5    standards and alleged hypothetically that these devices could

6    exist based on what's in the standard.  In this case, Netlist

7    is relying on, once again in its infringement contentions,

8    technology and things that exist in the standard, not the

9    actual device.

10        THE COURT:  So you're not going to say because

11   there's a register here that needs to be turned on and it's

12   not turned on, that it's not operable.

13        MR. LIVEDALEN:  That's right, Your Honor; the point

14   being is that Netlist can't simply point to a standard and say

15   the standard says that it can work with sub-devices;

16   therefore, it satisfies all the limitations.  The burden on

17   infringement is for Netlist to show that the actual accused

18   products are configured in the way that the claims require,

19   and that's our position.

20        THE COURT:  Of course, practicing the standard

21   relates back to whether or not we're talking about standard

22   essential patents.  We've already had a discussion about that

23   today.  It hasn't been definitive, but as I said, we will get

24   to the bottom of that issue before we get this case before a

25   jury.

```
 1              MR. LIVEDALEN:  Yes, Your Honor.  We appreciate
 2    that.
 3              THE COURT:  All right.  Thank you, counsel.
 4              MR. LIVEDALEN:  Thank you, Your Honor.
 5              THE COURT:  Let's go to 'data buffer control
 6    signals' out of the '417 Patent.
 7         Let me hear from the Plaintiff first.  Why is plain and
 8    ordinary meaning proper here in light or in lieu of the
 9    'selectively electrically coupled language' in the Defendants'
10    proposed construction?
11              MR. SHEASBY:  Your Honor, this is the same --
12              THE COURT:  We're back to the fork in the road.
13              MR. SHEASBY:  This is back to the fork in the road,
14    so it's the same issue as before, Your Honor.
15              THE COURT:  Okay.
16              MR. SHEASBY:  I should also flag, although the --
17    definitively I think it's unlikely that -- unlike the '912, I
18    can disclose to the Court I think it's unlikely that the -- we
19    were just talking about the '417.  For full disclosure, I
20    think it's unlikely the '417 will be put forward as standard
21    essential as opposed to infringed based on the technology,
22    just for -- so the Court's aware of that.
23              THE COURT:  All right.  What's Defendants' position?
24              DR. ALBERT:  Thank you, Your Honor.  Frank Albert
25    for Samsung.
```

1          THE COURT:  Go ahead, Doctor Albert.

2          DR. ALBERT:  There is substantial overlap with the

3     fork in the road arguments from the 'buffer' terms that I

4     argued earlier, and so I will try to limit my argument to what

5     is not overlapping, for time --

6          THE COURT:  Okay.  That would be appreciated.

7          DR. ALBERT:  This issue we have with 'buffer control

8     signals', Your Honor, is that term didn't appear in the

9     original specification.  The -- that term only actually was

10    added to the abstract summary of the invention in and around

11    2019, very late.  But if you look to the description of the

12    specification that actually corresponds to what they say is

13    their priority date, it's these two quotes here on the right.

14    This is the only description that you can even begin to say

15    corresponds to these control signals.  It doesn't actually

16    call them 'buffer control signals', 'data buffer control

17    signals'; it just calls them 'control signals for the buffer'.

18         This is that Figure 5 that I showed earlier where the --

19    where you had that 'logic' element at the top of the figure

20    and that -- those control signals that would go down in yellow

21    to the switches, and that is what was used for that selective

22    electrical coupling.  That is the only description in the

23    patent of these control signals.  And so our offer here, Your

24    Honor, is that it should be construed with that disclosure in

25    mind.

1        But further to that, Your Honor, we have the disclaimer.

2   And again, we cited this disclaimer with regard to this term.

3   Netlist did not respond to it.  Now, what we have here is for

4   these terms, for the similar patent, Netlist said that the

5   selective electrical coupling was a key contribution of the

6   invention--not particular claim language, not a specific

7   aspect of the invention, but the key contribution of the

8   invention.  And the clear black letter law from the Federal

9   Circuit is when you make that kind of broad disclaimer, it

10  applies to the later patents.

11       Now, there was a contention with regards to the 'buffer'

12  terms that, Well, maybe the claim language didn't exactly line

13  up.  If you look at our briefing, Your Honor, you'll see that

14  what the claim language at issue there was it was the question

15  of how you enable, how you couple the memory devices to the

16  data line.  That was the issue in the claim language in the

17  previous patent that was at issue in that Federal Circuit

18  case, and that's the same exact issue here.  And so for that

19  case, they said the key contribution of the invention was the

20  selective isolation that the -- this concept of selective

21  isolation was essential to overcoming the shortcomings of the

22  prior art modules.  That was the module that didn't use the

23  buffer to switch between one device or the other.  And so here

24  we have this disclaimer in that previous case that went

25  unrebutted in Netlist's reply.

1      Thank you, Your Honor.

2           THE COURT:  All right.  Anything further from

3 Plaintiff, Mr. Sheasby?

4           MR. SHEASBY:  Your Honor, I will just be repeating

5 what I said previously.

6           THE COURT:  All right.  We don't need that.

7      All right.  We've got two more terms in dispute.  I think

8 there's merit in hearing argument on the two of them at the

9 same time 'overall CAS latency' and 'wherein data transfers

10 through the circuitry are registered for an amount of time

11 delay'.  These are both opposed -- or the issue is between

12 Plaintiff and Micron only, not Samsung.

13      So let me hear argument from Netlist first, and then I'll

14 hear argument from Micron.

15           MR. SHEASBY:  Your Honor, the issue here is that

16 the -- does 'CAS latency' only relate to read CAS latency or

17 does it relate to both read and write CAS latency.

18           THE COURT:  I understand that.

19           MR. SHEASBY:  If it relates to both read and write,

20 there is no indefiniteness, and I would say that there is

21 substantial reason to believe that the language contemplates

22 both read and write CAS latency.

23      The most trenchant example of this--I'm on slide 130--is

24 that the claims contemplate both a read or write memory

25 commands, and so the claims that discuss CAS latency are

1   claims that encompass both read and write memory commands.

2   That's the case for the '417 Patent on slide 130.  It's also

3   the case for the '215 Patent on slide 131, because it says

4   'receive or output', and so that would be both the read and

5   write command as opposed to just a read and write command.

6        Slide 132, the specification also makes clear that the

7   design encompasses both read and write in dealing with

8   latencies in the context of bode read and write.  And Doctor

9   Stone was shown the passage on CAS latency from the

10  specification and he agreed that it could relate to both read

11  and write transfers.

12       There is this odd sort of situation of which the

13  Defendants are endorsing the use of the JEDEC specification

14  to inform baseline terms in the claims.  I'm not going to run

15  away from that.  I've asked you to do that as well, and so it

16  is fair, just as I've asked you to look at the JEDEC

17  specifications to define 'bit width' and the size of memory

18  devices.  I think it is fair to look at the JEDEC

19  specification on 'CAS latency' as well.  And what's clear is

20  that 'CAS latency', as used in the JEDEC specification,

21  encompasses both read and write latency.  That's discussed at

22  slide 136.  So I'm --

23            THE COURT:  If that's all true, then why is your

24  offering here simply plain and ordinary meaning?  Why don't

25  you propose something that specifically defines what you're

1    now arguing to me?

2              MR. SHEASBY:  You know, it's a fair criticism.  We

3    thought the claims say read or write in the claims.  The body

4    of the claims, in the previous limitations say read or write,

5    and so we just think it's transparent that since it says read

6    or write at the beginning of the claim and then afterwards it

7    talks about data transfers that have a CAS latency, and a

8    transfer would mean a read or write, there's no skulduggery

9    involved.

10      We have no problem making clear that the data transfers

11    include both read or write and the CAS latency is read or

12    write.  There was no desire at all to run away from that, Your

13    Honor.

14              THE COURT:  All right.  Anything further on either

15    of these two terms?

16              MR. SHEASBY:  No, that's it for me.  Thank you, Your

17    Honor.

18              THE COURT:  Let me hear a response from Micron,

19    please.

20              MR. RUECKHEIM:  Your Honor, Mike Rueckheim again.

21              THE COURT:  Please proceed.

22              MR. RUECKHEIM:  There is no dispute that the claims

23    recite -- I think it's the memory module that can send or

24    receive read and write commands.  That has nothing to do with

25    the claim language at present here.

1        Counsel said something to the effect that JEDEC uses read

2   and write CAS latency.  That's false.  The documents that were

3   just shown to the Court talk about read latency, talked about

4   write latency, and it talked about CAS latency.  That's the

5   claim language here--'CAS latency'.

6        And with respect to this claim language, Your Honor is

7   exactly right.  This -- the claim language on the screen, this

8   is I think the toughest technology-wise most complex as far as

9   for the jury to understand, and just grammatically.  It says

10  the memory module has an overall CAS latency.  It says the

11  actual operation CAS latency of memory integrated

12  circuits--two different things.

13       We need a construction here, and so what we did is we

14  asked our expert, What does this term mean.  We looked at the

15  JEDEC spec--what does this term mean, and when you're talking

16  about overall CAS latency of a module, you're talking about

17  the delay between when a read command is executed on the -- by

18  the module and when the module -- you think of a card with

19  memory devices on it.  The computer sends it a read command;

20  boom, it gets it, that's your start time.  You get your memory

21  devices on there, they're going to go get the data, shoot it

22  back out the card to the computer.  That's the end time.

23  That's your delay.

24       When you go to the actual operational CAS latency, you're

25  now talking about the integrated circuits.  That's what the

1    claim says.  It's not talking about the module anymore.  And

2    so it's when the integrated circuits on your module receive

3    your command and then execute that command and get the data

4    from the memory and then shoot it back.  That's the main

5    distinction here.

6        And so why did we look at JEDEC?  Why did we talk to the

7    expert?  The specification is silent.  There's no description.

8    This is a complex term.  The jury needs a construction here.

9    And so we looked at extrinsic evidence, we looked at expert

10   analysis, because the specification tells us nothing.

11       This slide is just really just talking about why JEDEC is

12   relevant.  The slide from JEDEC is on the screen.  It

13   discusses read latency in terms of the CAS latency plus one,

14   the register that's on the DIMM.  The top section there from

15   JEDEC, it talks about a read latency is the day between when

16   the module gets the read command and the availability of the

17   first piece of data on the output.

18       So we're not trying to say 'CAS latency' excludes write

19   commands at all.  It's not.  It's a different term.  But it's

20   defined whet the module actually receives something for

21   overall of the module and then sends that data back out, and

22   it's defined separately when you're talking about the

23   integrated circuits.

24       Why that's important is because the claim language does a

25   comparison of the overall CAS latency.  It says it has to be

1    greater--this is talking about the registered data

2    transfers--adds this delay such that the overall CAS latency

3    of the module is greater than that of the operational CAS

4    latency.  Here it's the memory devices, but it means the

5    memory integrated circuits on the module.  And so that leads

6    to the problem.

7         So we're not trying to exclude -- 'CAS latency' is a

8    stand-alone term.  It's used all the time with respect to read

9    and write commands.  It's just the delay for read command when

10   the module gets the command and then sends it back out.  Write

11   command is defined -- write latency--I'm sorry--not the write

12   CAS latency.  That's not a term.  Write latency is defined as

13   a sub-pact of that.

14        But the problem becomes is that the language the Court

15   pointed to, is that the claim says you have data transfers

16   through the circuitry that are transferred -- that are

17   registered--I'm sorry--for an amount of time such as this

18   relationship happens.  The overall module latency is greater

19   than the device latency.

20        So the problem with that is under Micron's view, really

21   'CAS latency' is only referring to when you have a read

22   command come in and then a delay until the data gets kicked

23   back out, and -- but the claim says it write commands, too.

24   And so if a write command is being registered through, there's

25   no way a write command could ever be registered through a

1    module such that it affects the read.  They just -- they're

2    two independent -- apples and oranges, Your Honor.

3         And then we get to Netlist's proposal.  And this is why

4    -- despite the indefiniteness argument, this is why we need a

5    construction for this term, because Netlist in another

6    proceeding said this term means the delay between when a

7    command is sampled on the memory module and when the first

8    piece of data is available at the pins.  So they said that in

9    a separate proceeding, but in this proceeding they said, No,

10   that was a separate proceeding; we're not taking that position

11   here.

12        So if they think we're wrong, tell us why, and the jury's

13   going to have to do an analysis here and they don't know what

14   these terms mean.  I think it's highly unlikely -- I don't

15   want to talk bad about the potential jury here, but I think

16   it's very complex terminology.  And even under Netlist's view,

17   the delay for a write command coming in and when the write

18   data is available at the module pins is zero.  The write data

19   and command come in at the exact same time, and there's no way

20   the rest of the claim makes sense.  When the overall CAS

21   latency is zero, that can't be greater than anything else, no

22   matter how long you register.

23             THE COURT:  All right.

24             MR. RUECKHEIM:  Thank you, Your Honor.

25             THE COURT:  Anything further from Plaintiff?

1          MR. SHEASBY:  I would just be repeating myself, Your

2    Honor.

3          THE COURT:  All right.  Well, those appear to be all

4    the terms scheduled for claim construction today, counsel.  I

5    appreciate your time and your argument.  Except for the one

6    term that the parties agreed for the Court to decide on the

7    briefing, I've heard your arguments and will consider those

8    further in light of the briefing.  And I'll do my best to get

9    you a written claim construction order as soon as practical.

10   I can't give you an exact date on that, but I will get to it

11   as quickly as can.

12       As I say, I appreciate your argument today.  That

13   completes the presentation regarding claim construction in

14   both the Samsung and the Micron cases, as cited in the record.

15   You're excused.

16       And the Court stands in recess.  Thank you.

17                         (End of hearing.)

1    I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts              09/30/2023

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25