# Exhibit 2

█████████████████████████

```
 1        UNITED STATES COURT OF APPEALS, NINTH CIRCUIT
 2
 3   NETLIST INC.,
     a Delaware corporation,
 4
             Plaintiff-Appellee,
 5
     vs.                                    Case No.:  22-55209
 6
     SAMSUNG ELECTRONICS CO., LTD.,
 7   a Korean corporation,
 8        Defendant-Appellant.
 9
10
11
12
13         TRANSCRIPT OF AUDIO-RECORDED ORAL ARGUMENT
14     Before:  M. SMITH and DESAI, Circuit Judges, and AMON,
15                       District Judge
16                       June 8, 2023
17                         1:36 p.m.
18
19
20
21
22   Transcribed By:
     TERRI NESTORE
23   CSR No. 5614, RPR, CRR
24
25   Job No. 6169798

                                                        Page 1
```

**Page 6**

1  to be your position that it's ambiguous and that it should
2  be a jury trial on the meaning of it or do you say it
3  clearly states your position and it should be read to
4  apply only to the JDP?
5      MR. YODER: Yes, Your Honor.
6      Our position is that it is unambiguous, when the
7  contract is read as a whole and when the apparent purpose
8  of the contract is considered and the structure of the
9  contract is considered along with the text.
10     JUSTICE DESAI: So is it your position that
11 Samsung never had any supply obligation under the
12 agreement, based on the language I think that you cite
13 that says 6.2 imposed a supply obligation if the joint
14 development product ever, quote, became commercialized?
15     MR. YODER: Well, let me just finish answering
16 the first question, though, and that is, but in the
17 alternative there is no question but that this agreement
18 is reasonably susceptible to both proffered
19 interpretations; whether the scope is limited to the joint
20 development project or unlimited as Netlist contends.
21     JUSTICE AMON: But then what happens if we
22 determine it's ambiguous?
23     Does it go back for a jury trial?
24     MR. YODER: Well, it's a good question and as
25 Your Honor probably knows, courts handle that issue quite

**Page 7**

1  differently, in terms of whether the issue just is
2  presented to the jury as to whether there's a breach and
3  then there's argument, whether the court gives fact
4  questions to the jury to answer as to the disputed
5  evidence.
6      JUSTICE AMON: Does the damages verdict continue
7  to remain or do they have to redo damages in light of
8  that?
9      MR. YODER: I think it would depend on the nature
10 of the issue that would be remanded.
11     I think that under a certain scenario the damages
12 wouldn't change but under a different scenario it would,
13 depending upon the verdict. I think that would have to be
14 hashed out with the district court.
15     JUSTICE AMON: I'm sorry, you probably want to
16 answer that.
17     MR. YODER: I apologize. So the point is this:
18 There was an obligation under 6.2. We don't deny that.
19 There was an obligation to supply the memory chips in
20 connection with the joint development project.
21     There was an obligation to supply it during the
22 development stage so they had access to those chips and if
23 the project were successful and the NVDIMM-P product were
24 commercialized, there would be an obligation to supply
25 those memory chips to Netlist, in order for Netlist to

**Page 8**

1  sell the product.
2      JUSTICE AMON: But on the first point that you
3  make, are you asking us to insert language after the word
4  "products" that says in connection with the JDP?
5      I mean that language is nowhere in 6.2.
6      There's no language that ties it to the JDP, and
7  there are other provisions in the contract that stand
8  alone, separate and apart, from the JDP.
9      So how would we resolve this, you know, what you
10 claim to be an ambiguity or maybe you say it's clear in
11 the other direction, without the specific language that I
12 think you need in that section that ties it to the JDP.
13     MR. YODER: Well, there is no language in 6.1
14 either that says NVDIMM-P controller in connection with
15 the joint development project.
16     There's other provisions in the contract that
17 clearly relate to the joint development project, that
18 don't also say in connection with the joint development
19 project. That's why you have to look at the structure of
20 the agreement in order to interpret specific language.
21     For example, in Section 3.1, there's an
22 $8 million NRE fee that's paid. It's clearly for the
23 joint development project, but it doesn't say it's
24 specifically for the joint development project.
25     JUSTICE SMITH: Counsel, let's argue window,

**Page 9**

1  okay?
2      MR. YODER: Sure.
3      JUSTICE SMITH: Let's say that I, after looking
4  at the contract as a whole, that I conclude that
5  Section 6.2 is ambiguous. Now, that's contrary to what
6  both parties say, but I do say it, that's it, that's
7  arguendo that's what it is.
8      What do you do with that? If it's ambiguous, how
9  does that affect your case?
10     MR. YODER: Well, if it's ambiguous, then under
11 New York law you have to look to the extrinsic evidence to
12 determine what the parties' intent was, and the parties'
13 intent is the controlling issue there.
14     And in this case, the most compelling extrinsic
15 evidence is the MOU, the memorandum of understanding of
16 the parties, which followed the exchange of two term
17 sheets, which made clear that the memory chips were to be
18 raw material as part of the joint development project.
19     And Netlist's CEO, Mr. Hong, admitted in his
20 deposition that under those term sheets, the raw materials
21 were for the NVDIMM-P product.
22     JUSTICE SMITH: You're making the point you have
23 to go outside the contract.
24     MR. YODER: Right.
25     JUSTICE SMITH: So you have to go back for a

### Page 14

 1  MR. YODER: Yeah, and so but that also goes to
 2 materiality. One, it goes to whether there's a breach; it
 3 also goes to whether it's material.
 4  Did Netlist really believe it was material when
 5 they sat on it for five years and didn't declare a breach?
 6  And when finally the higher Korean tax authority
 7 overruled the lower Korean tax authority, was there a
 8 breach when the lower Korean tax authority agreed with
 9 Samsung? It's nonsense. It can't be.
10  But when the higher authority decides there's a
11 refund, with interest, there's nothing to cure; but yet
12 under the district court's interpretation, Samsung's out
13 of luck. Never could have cured, never given a chance to
14 cure, but there's this strict liability based upon what is
15 determined five years later.
16  So not a breach, but also that should have gone
17 to the jury on materiality.
18  JUSTICE SMITH: Well, I gather from Samsung's
19 perspective, if there's ambiguity and if Section 6.2 is
20 interpreted the way you think it should, considering the
21 totality of the circumstances, the tax gets reversed as
22 well because there's no ambiguity there, it's not strict
23 liability and the declaratory relief gets overturned
24 because the others didn't happen. Is that correct?
25  MR. YODER: Right. That's our position,

### Page 15

 1 Your Honor. But even if the court doesn't agree that that
 2 should be the outcome, there needs to be a remand and a
 3 trial on these issues for sure.
 4  And that's true as to materiality on 6.2 as well,
 5 and where I was going with that, when you go through the
 6 briefing on the issue of materiality, Netlist's argument
 7 was really, it was material because the supply obligation
 8 was a primary consideration for getting these licenses.
 9  Well, number one, if you look at the JDLA and you
10 look at the recitals, the recitals are very clear -- and
11 parties put recitals in agreements to make sure language
12 isn't tortured down the road by lawyers and courts, right?
13  Here's what our purpose is, interpret this
14 agreement consistent with our purpose.
15  And when you look at the recitals, what does it
16 say about the licenses?
17  Whereas in connection with their collaboration
18 hereunder, the parties wish to grant to each other a
19 cross-license under each party's patents.
20  The licenses are being given in connection with
21 the collaboration. That's the joint development project.
22  And Netlist got a whole bunch of consideration in
23 addition to this supply obligation.
24  If there were an unlimited supply obligation, it
25 would be called out in some fashion.

### Page 16

 1  JUSTICE SMITH: Do you want to save -- I thought
 2 you said you want to say five minutes.
 3  It's up to you entirely, of course.
 4  MR. YODER: No, and I am watching the clock,
 5 Your Honor, because I got a sense we need to do that.
 6  But the thing I would say, though, just on the
 7 materiality, is that when you look at the record before
 8 Judge Scarsi on the 6.2 issue in materiality, Netlist's
 9 argument was that the supply obligation was the primary
10 benefit that it received, and Judge Scarsi agreed with
11 that. He said this was integral, this was a key
12 component, and he made a factual finding based upon
13 essentially a post hoc declaration by Netlist's CEO, and
14 he disregarded all the other evidence in the record as to
15 whether this was the primary benefit.
16  JUSTICE AMON: So it wasn't an undisputed fact?
17  MR. YODER: Pardon?
18  JUSTICE AMON: It wasn't an undisputed fact,
19 then? In other words, the fact.
20  MR. YODER: It was disputed. It was disputed.
21  JUSTICE AMON: The fact was disputed?
22  MR. YODER: Very much disputed, yeah, whether --
23  JUSTICE DESAI: He shouldn't have resolved it
24 against you because it was disputed?
25  MR. YODER: Yeah, absolutely not. I mean, even

### Page 17

 1 just on his -- and he erred as a matter of law too,
 2 because instead of applying the multifactor test of
 3 materiality, he just picked out this one issue.
 4  And even on that issue, there was a conflict in
 5 the facts in the record.
 6  JUSTICE AMON: Can I just ask you one further
 7 question? You said that you did supply these memory
 8 components in connection with the JDP, what was being
 9 developed?
10  MR. YODER: Yes, Your Honor.
11  JUSTICE AMON: Why was there a need to do that?
12  MR. YODER: To create the product.
13  JUSTICE AMON: So there was some --
14  MR. YODER: To try to --
15  JUSTICE AMON: And did you also, during that
16 time -- is the record clear that you submitted memory
17 components for Netlist's other uses?
18  MR. YODER: Yes, there was, but that was true
19 before, during and after, and it was done subject to
20 purchase orders and acknowledgements that didn't reference
21 the JDLA. So the parties' practice continued the same way
22 during the JDLA as before, and our position is that
23 doesn't really prove anything.
24  You really have to get into the extrinsic
25 evidence to decide why are they doing that?

```
 1  component parts was because there was a JDP, right?
 2       MR. YODER:  Correct.  Correct.
 3       But the purchase of the components for resale,
 4  the purchase of the NAND and the DRAM to sell to third
 5  parties was outside of the joint development agreement.
 6       The SEC filings that Netlist made where they say
 7  we have no long-term supply agreement shows that; the fact
 8  that Netlist kept coming back to Samsung saying, give us a
 9  unlimited supply agreement, shows that.  All of that shows
10  that.
11       The thing I would say on materiality real quickly
12  is that the evidence was before the court, and if the
13  evidence showed that the parties did not intend a
14  supply -- an unlimited supply obligation to be the primary
15  consideration for these licenses, then even more so it
16  wasn't material, it wasn't a material breach.
17       And all of that evidence was before the district
18  judge.  If you look at his ruling that he made in
19  connection with the summary judgment decision, he said
20  that -- and bear with me, I know I'm a little bit over.
21       It's the last point that I'll make.
22       Netlist, in its reply, acknowledges that there's
23  a fact issue on materiality.
24       Netlist said that if Samsung was suggesting that
25  there's a fact issue on materiality, there isn't.  Look at
                                                    Page 38
```

```
 1  this extrinsic evidence.
 2       The district court looked at extrinsic evidence
 3  on materiality.  It relied on Mr. Hong's self-serving
 4  declaration.  It ignored all the other evidence in the
 5  record about the three-year delay in claiming a breach,
 6  about the statements that were made to the SEC -- all of
 7  which, we submit, show that this wasn't material.
 8       Final point is that if there is to be a remand,
 9  we would ask the court to consider allowing Samsung to
10  raise its affirmative defenses; that those weren't
11  required to be raised as part of the summary judgment, and
12  I would just point the court to --
13       JUSTICE AMON:  Isn't that too little, too late?
14       I mean, you should have raised those in
15  connection with summary judgment and you didn't do it.
16       MR. YODER:  May I answer that question?
17       JUSTICE SMITH:  Yes.
18       MR. YODER:  Okay.  And I'll be brief.
19       No.  If you look at -- the best thing to look at,
20  Your Honor, is the district court's order on summary
21  judgment.  There was a lot of confusion about what the
22  motion was.
23       The notice of motion said the merits of our
24  claims.  I don't know what that is.  Their points and
25  authorities talk about the four elements in New York, one
                                                    Page 39
```

```
 1  of which is damages; the others are contract, Netlist
 2  performance, Samsung's breach.
 3       But what the district court did when he said,
 4  here's my ruling on summary judgment, it was as to three
 5  elements.  It wasn't as to liability as a whole, it was
 6  existence of contract, performance of contract, and
 7  Samsung's breach of the supply provision.  That's 1ER41.
 8       And in response to a summary judgment motion that
 9  identifies three elements and says we want summary
10  judgment on those, I don't believe that Rule 56 requires a
11  defendant to put in affirmative defenses.
12       JUSTICE SMITH:  Okay.
13       MR. YODER:  Thank you so much.
14       JUSTICE SMITH:  Any other questions by my
15  colleagues?  Thanks to counsel.
16       MR. YODER:  Thank you.
17       JUSTICE SMITH:  This is an interesting case.  We
18  appreciate the preparation on your argument.
19       The case just argued is submitted, and I'm
20  pleased to say that the court is adjourned for the week.
21       THE BAILIFF:  All rise.
22       Court for this session stands adjourned.
23       (End of recording.)
24
25
                                                    Page 40
```

```
 1              C E R T I F I C A T E
 2
 3
 4       I, TERRI NESTORE, Certified Shorthand Reporter/
 5  Transcriptionist, do hereby certify that I was authorized
 6  to transcribe the foregoing recorded proceeding, and that
 7  the transcript is a true and accurate transcription of my
 8  shorthand notes, to the best of my ability, taken while
 9  listening to the provided recording.
10
11       I further certify that I am not of counsel or
12  attorney for either or any of the parties to said
13  proceedings, nor in any way interested in the events of
14  this cause, and that I am not related to any of the
15  parties thereto.
16
17
18  Dated this 22nd day of October, 2023.
19
20
21           [Signature: Terri Nestore]
            TERRI NESTORE, CSR 5614, RPR, CRR
22
23
24
25
                                                    Page 41
```