# Exhibit 3

[redacted]

| | | |
|---|---|---|
| 1 | | |
| 2 | JASON C. LO, SBN 219030 | JASON SHEASBY, SBN 205455 |
| 3 | jlo@gibsondunn.com | jsheasby@irell.com |
|   | MATTHEW BENJAMIN (*pro hac vice*) | IRELL & MANELLA LLP |
| 4 | mbenjamin@gibsondunn.com | 1800 Ave. of the Stars |
|   | RAYMOND A. LAMAGNA, SBN 244821 | Los Angeles, CA 90067 |
| 5 | rlamagna@gibsondunn.com | Telephone: 310.203.7096 |
|   | GIBSON, DUNN & CRUTCHER LLP | Facsimile: 310.203.7199 |
| 6 | 333 South Grand Avenue | |
|   | Los Angeles, CA 90071-3197 | |
| 7 | Telephone: 213.229.7000 | |
| 8 | Facsimile: 213.229.7520 | |
| 9 | Attorneys for Plaintiff Netlist Inc. | |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| NETLIST INC., a Delaware corporation, | CASE NO. 8:20-cv-993-MCS (ADS) |
| Plaintiff, | **NETLIST INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation, | |
| Defendant. | |

- ii -

NETLIST INC.'S REPLY BRIEF IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

Samsung's brief in opposition to Netlist's motion for partial summary judgment is nearly identical in substance—and often identical in wording—to the opening brief Samsung filed in support of its cross-motion two weeks earlier. Although Samsung has tweaked some of its language and rearranged its arguments, Samsung recycles the vast majority of its latest brief nearly verbatim from its earlier filing. *Compare*, *e.g.*, Opp. § II(A)(5),[1] *and* Dkt. 150 § II(B)(1)(h) (making the same estoppel argument). Netlist has already explained why those arguments fail. *See* Dkt. 171. Because Samsung opted to largely repeat its earlier cross-motion, Samsung's opposition brief does not engage meaningfully with Netlist's arguments or evidence in support of summary judgment. Samsung does not contest that (1) the JDLA was an enforceable contract, (2) Netlist need not prove damages in order to obtain partial summary judgment, and (3) Netlist properly followed the JDLA's termination provisions. *See* Br. §§ IV(A), (D) & (F). And as to the remaining elements of Netlist's claim—Netlist's performance, Samsung's breach, and the materiality thereof—none of the points raised for the first time in Samsung's opposition brief provide any basis to deny Netlist's motion.

## ARGUMENT

### I. Samsung Breached the JDLA.

#### A. Samsung breached its supply obligation.

Samsung makes no effort to identify any error in Netlist's reading of Section 6.2. In plain English, it says that "Samsung **will supply** NAND and DRAM products to Netlist **on Netlist's request** at a competitive price." Nowhere does Section 6.2 limit

---

[1] Citations to Opp." refer to Samsung's opposition brief, Dkt. 168; citations to "Br." refer to Netlist's moving brief, Dkt. 142-1; citations to "SUF" refer to Netlist's Statement of Undisputed Facts, Samsung's response thereto, and the evidence cited in each, Dkt. 168-1; and citations to "AMF" refer to Samsung's Statement of Additional Material Facts and the evidence cited therein, Dkt. 168-2. Unless otherwise noted, all emphases are added, and all quotation marks and alterations are omitted. All defined terms have the same definitions as in Netlist's moving brief.

Netlist's requests in any way—including by cabining Samsung's supply obligation to only the NAND and DRAM necessary for the parties' joint development efforts. Under New York law, the omission of such limitations must be honored. *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 992 N.Y.S.2d 687, 695 (2014) ("if parties to a contract omit terms . . . the inescapable conclusion is that the parties intended the omission"); *In re Ore Cargo, Inc.*, 544 F.2d 80, 82 (2d Cir. 1976) ("Applying the maxim, *expressio unius est exclusio alterius*, the failure . . . to include a . . . specific reference . . . precludes our divining or implying such a [term] on the basis of the general language of the agreement."). Because "on its face" Section 6.2 "is reasonably susceptible of only one meaning," no such limits may now be read into that unambiguous provision. *Goldman Sachs Grp., Inc. v. Almah LLC*, 924 N.Y.S.2d 87, 90 (App. Div. 2011).

Unable to confront the JDLA's straightforward language, Samsung's opposition leapfrogs past the contract fully executed by both parties and proceeds straight to extrinsic evidence, including preliminary and superseded negotiation history. According to Samsung, "the **only** way to interpret the supply provision in Section 6.2 is to look at the MOU." Opp. 8; *see also id.* (referring to negotiation history as "the **only** relevant data points for interpreting Section 6.2."). No legal authority is cited for that remarkable assertion because none exists. As New York's highest court has explained, "extrinsic and parol evidence is **not admissible** to create ambiguity" and "**may not be considered**" in the interpretation of a contract that "is complete and clear and unambiguous upon its face." *S. Road Assocs., LLC v. Int'l Bus. Mach. Corp.*, 4 N.Y.3d 272, 278 (2005). Having failed to identify any ambiguity in Section 6.2, Samsung's argument fails as a matter of law.[2]

To the extent that the Court nevertheless does look to extrinsic evidence (which

---

[2] Samsung's focus on extrinsic evidence is also inconsistent with its admission that Section 6.2 is "unambiguous." *See, e.g.*, Opp. 8

it should not), Samsung offers no explanation of its internal communications making clear that (1) the ***actual language of Section 6.2***—as opposed to the MOU—imposed on Samsung "an obligation to supply NAND/DRAM" because "[p]ursuant to the agreement, supply for NAND and DRAM products is necessary if there is a request from Netlist," SUF ¶¶ 38-39; (2) Samsung nevertheless arbitrarily capped the amount of product it would sell to Netlist and on occasion provided "zero allocation . . . to support Netlist," *id.* ¶¶ 82, 85-88, 93, 96, 99, 106, 109-10;[3] (3) these limitations were in response to instructions from Samsung executives "to manage the sales to dwindle down" and to "minimize sales to Netlist," *id.* ¶ 76, 110; and (4) Samsung did not similarly limit its sales to other customers, *id.* ¶ 105. Furthermore, any suggestion that such caps were necessary in light of limited product availability is nonsensical. Samsung did not limit the volume of any specific product that it would sell to Netlist, and there is no evidence that its monetary caps were tied to the amount available of any given product at any given time. Placing an arbitrary dollar-value cap on Netlist's total purchases of all Samsung products—regardless of the products in question or their availability—is simply not consistent with attempts to manage inventory of scarce products.

Because it has no defense to those undisputed facts, Samsung instead asks the Court to ignore them by asserting that all of "the post-JDLA Samsung emails are irrelevant." Opp. 8; *see also id.* at 22 (same). There is no legitimate basis for doing so. Samsung's evidentiary argument relies on *Faulkner v. National Geographic Society* for the proposition that "*post hoc* interpretations" of the JDLA by employees who did not "participate[ ] in drafting or negotiating" the contract "say nothing about [Samsung's] views at the time the contract[ ] was entered." 452 F. Supp. 2d 369, 379

---

[3] Samsung quibbles that at times "Netlist's allocation cap was $1 million per month," rather than $500,000. SUF ¶ 85. That is hardly a defense, as even a slightly larger arbitrary cap would still violate Section 6.2's mandatory supply obligation. In any event, the record evidence is clear that a $500,000 cap was frequently imposed.

(S.D.N.Y. 2006) (quoted at Opp. 8, 22). That argument fails on several levels.

***First***, Samsung's assertion fails on its own terms. Samsung contends that these emails are "irrelevant" because they were written by employees "who did not directly negotiate the . . . JDLA." Opp. 8, 22. But Samsung ***expressly and repeatedly admits*** that Ho-jung Kim was "personally involved with negotiating [the] JDLA" on behalf of Samsung. SUF ¶¶ 15, 20, 35, 60. Thus his January 2018 admission that "[p]ursuant to the agreement, supply for NAND and DRAM products ***is necessary*** if there is a request from Netlist" remains admissible under Samsung's reading of *Faulkner*. *Id.* ¶ 38. Evidence demonstrating that Netlist was uniquely singled out by Samsung, which improperly limited the amount of product Netlist could purchase, also remains admissible because it reflects neither "legal conclusions" nor "expressions of [either] party's postcontractual subjective understanding" of Section 6.2. *Faulkner*, 452 F. Supp. 2d at 379. Rather, it proves Samsung's bad-faith breach.

***Second***, the Court should not follow Samsung's description of *Faulkner* because the case simply does not stand for the proposition for which it is cited by Samsung. In light of its own reliance on extrinsic evidence, Samsung attempts to distinguish between statements by those who "directly negotiate[d] the MOU and JDLA"—which Samsung suggests are admissible—and statements by those "without foundational knowledge of the actual negotiations"—which Samsung suggests are not. Opp. 8, 22. But *Faulkner* draws no such distinction. Rather, it held that ***all*** subsequent interpretations of the contract at issue were "inadmissible," including the deposition testimony of an executive who "authored the [relevant] policies in the contracts at issue." 452 F.2d at 378-79. To the extent that *Faulkner* is good law (it is not, as discussed below), it would bar Samsung's reliance on all post-2015 statements by Netlist and Netlist witnesses as to their understanding of the MOU and JDLA, regardless of whether or not the declarants were involved in the negotiation process.

***Third***, *Faulkner* is an outlier that misapplied the very New York authority it

- 4 -

cites. The court in *Faulkner* held that a ***plaintiff*** could not rely on evidence of the ***defendant's*** after-the-fact understanding of the parties' contract. But to support this holding *Faulkner* relied on case law addressing parties' attempts to introduce evidence of ***their own*** subjective understanding of their contracts.[4] *Faulkner* thus misapplied the doctrine of "uncommunicated subjective intent," which "seeks to prevent a party from concealing its understanding of the contract from a counterparty, only to reveal that understanding later or to invent a *post hoc* rationalization in aid of a litigation position." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co.*, 957 F. Supp. 2d 316, 341 (S.D.N.Y. 2013), *rev'd on other grounds*, 773 F.3d 110 (2d Cir. 2014). That doctrine has no bearing here because Netlist seeks to introduce evidence of **Samsung's "contemporaneous understanding"** of Section 6.2 in order **to show that the parties' mutual interpretation was "harmonious."** *Id.* at 341 n.24. That is perfectly permissible. *Id.* (collecting cases). Moreover, even evidence of a party's own "uncommunicated subjective intent" is "not per se inadmissible" under New York law and "has some probative value" in interpreting ambiguous contracts. *GE Funding Cap. Mkt. Servs., Inc. v. Neb. Inv. Fin. Auth.*, 2017 WL 2880555, at *4 (S.D.N.Y. July 6, 2017) (collecting cases), *aff'd*, 767 F. App'x 110 (2d Cir. 2019); *see also Chesapeake Energy*, 957 F. Supp. 2d at 342 (same).

Nor does the authority cited by *Faulkner* support the notion that parties' interpretation of their own contract constitutes inadmissible legal conclusions.[5] And

---

[4] *See Faulkner*, 452 F. Supp. 2d at 379 n.51 (citing *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 208 n.10 (2d Cir. 2005) (finding contract unambiguous and discussing in *dicta* parties' post-contract exchange of letters); and *Ingersoll Milling Mach. Co. v. M/V Bodena*, 619 F. Supp. 493, 506 (S.D.N.Y. 1985) (defendant "sought to justify [its] interpretation" by introducing "the subjective views of [defendant's] officials, never communicated to [plaintiff] until this litigation")).

[5] *See Faulkner*, 452 F. Supp. 2d at 379 n.50 (citing *Ward v. Nat'l Geo. Soc.*, 208 F. Supp. 2d 429, 439 (S.D.N.Y. 2002) (witness's understanding of contract "admissible to establish that he acted in a manner consistent with it")); and *Evans v. Port Auth. of N.Y. & N.J.*, 192 F. Supp. 2d 247, 262 (S.D.N.Y. 2002) ("only admissible evidence

other courts applying New York law have expressly found that a party's "post hoc interpretations of [its own] agreement[ ]" ***is admissible*** "as extrinsic evidence of [that party's] post-execution course of conduct." *GE Funding*, 2017 WL 2880555, at *5.

In sum, *Faulkner* simply provides no basis for refusing to consider the extrinsic evidence cited by Netlist. And it certainly does not support barring ***only*** Netlist's extrinsic evidence while taking Samsung's extrinsic evidence into consideration.

### B. Samsung breached by withholding $1.32 million and failing to "reasonably cooperate" with Netlist

The JDLA allowed Samsung to withhold from its $8 million payment to Netlist only taxes "required" by Korean law. Samsung therefore has no answer to the Korean Tax Tribunal's ruling that Netlist's non-recurring engineering fee—on which Samsung purported to withhold taxes—was not a taxable patent royalty payment. Samsung's only responses are non sequiturs: that it (1) initially prevailed before a lower taxing authority,[6] (2) "was not a party to Netlist's appeal," and (3) "did not make 'arguments' in th[o]se proceedings." SUF ¶ 53. None of these points rebuts the Tax Tribunal's unequivocal ruling; the latter two points are not even accurate. Indeed, elsewhere Samsung concedes that the Tax Tribunal "eventually sided with Netlist." Opp. 9, 29. Beginning in 2015 Netlist pleaded with Samsung to remit the $1.3 million that Samsung wrongfully withheld. Five years later, the Tax Tribunal's ruling confirmed that Samsung had never been "required" by Korean law to withhold any of the money owed to Netlist under the JDLA as taxes on patent royalties. That Samsung

---

may be considered in passing on motions for summary judgment")).

[6] Samsung also argues that this overturned decision "evidenc[es] the reasonableness of Samsung's view" regarding its withholding. Opp. 10, 29. But Section 3.2 only allows Samsung to withhold taxes "***required***" by applicable law. ***Reasonableness*** is beside the point. Regardless, Samsung no longer dispute that the $8 million owed to Netlist under the JDLA was a non-recurring engineering fee. SUF ¶¶ 27, 46-47, 52-53; AMF ¶ 23. That admission confirms that Samsung's earlier claims to the contrary in order to justify its withholding were not reasonable.

did so anyway conclusively demonstrates that it breached the JDLA. SUF ¶ 46. Samsung's assertion that there is "no evidence [it] was not required to withhold taxes," Opp. n.10, is rote denialism that fails to engage with the Tax Tribunal's decision and does not satisfy Samsung's burden. *See* Fed. R. Civ. P. 56(c)(1)(B) ("A party asserting that a fact . . . is genuinely disputed must . . . show[ ] that the materials cited do not establish the absence . . . of a genuine dispute").

In addition, Samsung claims that it reasonably cooperated with Netlist's refund efforts because its submission to the Korean taxing authorities "was essential for Netlist to obtain a refund." Opp. 10; *see also id.* at 29 ("Netlist could not have received a refund . . . without Samsung's written submission"). But the evidence cited ***by Samsung*** indisputably shows that Samsung misrepresented the plain words of the JDLA, and persisted in doing so despite Netlist pointing out this error. Among other things, Netlist's CFO informed Samsung that Netlist could not "provide written consent for Samsung to submit [its] letter" to the Korean government because Samsung' draft submission was "factually incorrect." Dkt. 150-5 at 49. Afterwards, Netlist's consultants from PricewaterhouseCoopers requested that Samsung inform the Korean government "that the $8 million is [a non-recurring engineering] payment not a license fee," and requested that Samsung delete its representation "relat[ing] to $8 million being paid in consideration for the use of all Netlist' patents." *Id.* at 48. Samsung's persistence in arguing to the Korean government that the payment was for a taxable patent royalty only underscores Samsung's bad faith. *See* SUF ¶ 52.

## II. Samsung's Breaches Were Material.

In connection with its judicial estoppel argument, Samsung asserts that the JDLA provides Netlist with other consideration in addition to Section 6.2's mandatory supply obligation. Opp. 27. But Netlist has never argued otherwise. Instead, it has asserted only that Section 6.2 constituted "the most important right that Netlist obtained in the JDLA." Br. 1; *see also id.* at 2, 22 (Samsung's "mandatory supply

obligation" provided Netlist's "primary benefit" and "primary purpose in entering into the contract"). Samsung has not explained why the existence of additional consideration relieves it of liability for breaching its agreement to provide the primary consideration for which Netlist bargained

To the extent that Samsung means to suggest that its breach of Section 6.2 was not material, it provides no evidence as to the value of the additional consideration nor how it might reduce the importance of Samsung's mandatory supply obligation. In truth, the other consideration was not worth much. Samsung first points to the $8 million fee, but it did not even cover Netlist's actual expenses on the joint development effort and Samsung improperly withheld $1.3 million of that amount in any event. SUF ¶¶ 29, 46. Second, Samsung's loan (which is not governed by the JDLA) required repayment with interest. AMF ¶ 23. Third, there is no evidence Netlist ever sought a license to Samsung's patents or viewed them as useful. And while Netlist did value its "partnership with Samsung," Opp. 27, the mandatory supply obligation breached by Samsung was the critical component of that partnership, SUF ¶¶ 15-17.

Samsung seeks to downplay the importance of the mandatory supply obligation by insinuating that (1) Section 6.2 was an afterthought because Netlist supposedly "wanted Samsung's assurance" of memory chip supply only "if the [parties'] joint development proved successful and demand took off," and (2) Netlist never "asked" for "a broader supply contract" during the JDLA's negotiation. Opp. 12-13. Neither characterization is accurate. The first claim is false, as the testimony cited by Samsung in support of that proposition says no such thing. *See* AMF ¶ 17. And as to the second, it is undisputed that Netlist first asked for more than $85 million for a time-limited license to its patents. SUF ¶ 12. After that initial proposal and further discussion between the parties, Samsung offered a "counter-proposal," including "supply[ing]" NAND and DRAM "on terms to be negotiated." *Id.* ¶ 13. Ultimately, the parties

agreed to the mandatory supply obligation embodied in Section 6.2. That mandatory supply obligation is neither limited nor an afterthought. Rather, it provided a way for Samsung to obtain a perpetual patent license worth far in excess of $85 million without paying cash. *See id.* ¶ 15. Indeed, in pitching its counter-proposal Samsung framed its commitment to supply Netlist with NAND and DRAM as "enabl[ing] Netlist to expand it's [*sic*] business" and helping achieve Netlist's "vision." *Id.* ¶ 14.

Lastly, Samsung says that its breaches of Section 3 "could not possibly [be] material" because "Netlist suffered no injury from Samsung's withholding" and would have incurred the same costs in seeking a refund even if Samsung had cooperated in Netlist's efforts to do so. Opp. 29-30. First, that is irrelevant to the instant motion because Netlist has not moved for summary judgment with respect to damages, which it intends to prove at trial. Br. § IV(D). Second, it is factually incorrect that the refund—which took years of effort and expenses to obtain— remedied all harm to Netlist. SUF ¶ 54; Dkt. 171-22 § IX. And third, Samsung's argument baselessly proceeds from the premise that Samsung's withholding was not also a breach of the contract. Without Samsung's predicate improper withholding, there would have been no need for Netlist to incur ***any*** costs in seeking a refund.

## III. Netlist Has Not Abandoned Any Arguments.

Samsung does not argue the JDLA as a whole is unenforceable but it nevertheless contests the enforceability of Section 6.2. In doing so, it erroneously claims that Netlist "abandoned" arguments as to whether Section 6.2 is akin to a requirements or options contract. Opp. 22 & n.6. Not so. "To prevail on a breach of contract claim under New York law," Netlist bears the burden of proving that there was "a contract." *Aquino v. Alexander Cap., L.P.*, 2021 WL 3185533, at *14 (S.D.N.Y. July 27, 2021). But that is undisputed. Samsung cites no authority for the proposition that Netlist was required to offer a specific theory as to the enforceability of a particular provision in that contract. In any event, Netlist raised these same

purportedly "abandoned" arguments in opposing Samsung's cross-motion. Samsung's attempt to relitigate these arguments is improper in light of the Court having already resolved them in Netlist's favor when it denied Samsung's motion for judgment on the pleadings. *See* Dkt. 120.

Without any further explanation, Samsung claims that Netlist has somehow "misconstrue[d] Samsung's argument" concerning the enforceability of Section 6.2 "as one premised on a lack of consideration." Opp. 24 n.8. Netlist understands that to be among Samsung's arguments because Samsung has expressly argued that Section 6.2 fails due to the absence of an exclusivity provision, *see, e.g.*, Dkt. 150 § II(B)(2)(b), and because it pleaded lack of consideration as an affirmative defense, Dkt. 27 at 5. But as made clear in Netlist's opening brief, the JDLA provided Samsung with a wide variety of consideration. Dkt. 145 at 13. For this reason alone, Samsung's affirmative defense of "lack of consideration" fails. Dkt. 27 at 5. And the absence of other consideration is the doctrinal basis for Samsung's exclusivity argument. Exclusivity is "thought to be essential" for U.C.C. requirements contracts only because no other consideration is necessarily given to the seller. 3 Williston on Contracts § 7:12 (4th ed.). For such narrow contracts, the buyer's promise "not to buy except from a particular seller, constitute[s] . . . sufficient consideration" even if the buyer does not actually buy anything. *Id.* That analysis has no relevance here because the JDLA provided Samsung with other meaningful consideration and thus obviates any need for an exclusivity provision. Regardless, as Netlist previously has explained, Samsung has not met its burden in establishing that the JDLA is governed by the U.C.C., and it was nevertheless mutually understood that Netlist would purchase all of its required Samsung products from Samsung. Dkt. 171 at 19.

## CONCLUSION

For the foregoing reasons, Netlist respectfully requests that partial summary judgment be granted on each of its three causes of action.

Dated: September 6, 2021    GIBSON, DUNN & CRUTCHER LLP

By: _____
    Jason C. Lo
    333 South Grand Avenue
    Los Angeles, CA 90071
    213.229.7000
    jlo@gibsondunn.com

    Attorneys for Plaintiff Netlist Inc.