# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| NETLIST, INC., <br><br> Plaintiff, <br><br> vs. <br><br> SAMSUNG ELECTRONICS CO, LTD; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SEMICONDUCTOR INC., <br><br> Defendants. | Case No. 2:22-cv-293-JRG <br><br> JURY TRIAL DEMANDED <br> (Lead Case) <br><br> ▬▬▬▬▬▬▬▬ |
| NETLIST, INC., <br><br> Plaintiff, <br><br> vs. <br><br> MICRON TECHNOLOGY, INC.; MICRON SEMICONDUCTOR PRODUCTS, INC.; MICRON TECHNOLOGY TEXAS LLC, <br><br> Defendants. | Case No. 2:22-cv-294-JRG <br><br> JURY TRIAL DEMANDED |

**PLAINTIFF NETLIST, INC.'S MOTION FOR SUMMARY JUDGMENT ON SAMSUNG'S LICENSE DEFENSE**

**TABLE OF CONTENTS**

                                                        **Page**

I. STATEMENT OF ISSUES TO BE DECIDED BY THE COURT ....................................... 2

II. STATEMENT OF UNDISPUTED FACTS ..................................................................... 3

III. ARGUMENT .................................................................................................................... 9

        A. Samsung Is Estopped From Arguing The JDLA Covers The Accused Products ................................................................................................................ 9

        B. There Is No Genuine Dispute That Netlist Properly Terminated The JDLA ......... 11

                1. Samsung's Interpretation Violates New York Law .......................................... 11

                2. The Extrinsic Evidence Exclusively Favors Netlist's Interpretation............ 13

                3. There Is No Genuine Dispute That Samsung's Breach Was Material ............................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahrens v. Perot Sys.*,
   205 F.3d 831 (5th Cir. 2000) .................................................................................................. 10

*Compagnie Financiere v. Merrill Lynch*,
   232 F.3d 153 (2d Cir. 2000) ...............................................................................................13, 14

*Gulf Ins. v. Transatlantic Reinsurance*,
   886 N.Y.S.2d 133 (2009) ........................................................................................................ 14

*Hall v. GE Plastic*,
   327 F.3d 391 (5th Cir. 2003) ...............................................................................................9, 10

*Last Time Beverage v. F & V Distrib.*
   173 N.Y.S.3d 543 (2012) ...................................................................................................12, 13

*Netlist Inc. v. Samsung Elecs. Co.*,
   2023 WL 6820683 (9th Cir. Oct. 17, 2023) ................................................................... 2, 10, 11

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ...................................................................................................................9

*New Windsor v. Meyers*,
   442 F.3d 101 (2d Cir. 2006) .................................................................................................... 15

*Quadrant Structured Prod. v. Veritin*,
   23 N.Y. 3d 549 (NY 2014) ........................................................................................... 2, 12, 13

*Vermont Teddy Bear v. 538 Madison*,
   1 N.Y.3d 470 (NY 2004) ......................................................................................................... 12

**Rules**

FRCP Rule 37 ................................................................................................................................ 16

Samsung's license defense is predicated on the parties' Joint Development and License Agreement (JDLA) which Netlist terminated on July 15, 2020 for material breach. First, Samsung claims that it was not in material breach of the component supply obligation in the agreement because it only had an obligation to supply components for the NVDIMM-P product that was the subject of the JDLA. Second, Samsung claims that the license grant in the agreement is not limited to the NVDIMM-P product. Samsung must prove both claims to prevail on its JDLA license defense. Fact discovery is now closed making this motion ripe for determination, especially given that Samsung is attempting to use its JDLA license defense to obtain a stay of this case (Dkt. 187) and to vacate the verdict in *Samsung I*. Case No. 2-21-cv-00463 at Dkt. 576.



In the Ninth Circuit, Samsung claimed that, in light of the "Whereas" recital (the "Fourth Recital"), it is proper to limit clauses in the JDLA to joint development and expressly gave Netlist's license grant (Section 8.2) as an example:

> [T]he recitals are very clear -- and parties put recitals in agreements to make sure language isn't tortured down the road by lawyers and courts, right? Here's what our purpose is, interpret this agreement consistent with our purpose. And when you look at the recitals, what does it say about the licenses? Whereas in connection with their collaboration hereunder, the parties wish to grant to each other a cross-license under each party's patents. **The licenses are being given in connection with the collaboration. That's the joint development project**.

Ex. 1 at 15:10-21.[1] This is the exact opposite of what Samsung argues before this Court: "The plain language of the JDLA unambiguously licenses all semiconductor products except Foundry Products and is not limited to the Joint Development Project." *Samsung I*, Dkt. 328 at 2.

---

[1] "Exhibit" references are to the Michael Harbour Declaration. Emphasis (in case/evidence cites) is added and internal citations are omitted. Defined terms are in the Appendix of Defined terms, *supra*.

The Ninth Circuit relied on this specific argument to find the supply obligation ambiguous: "Read as an integrated whole, however, the contract's apparent purpose as derived from its title, structure, and related provisions make § 6.2 reasonably susceptible of more than one interpretation." *Netlist Inc. v. Samsung Elecs. Co.*, 2023 WL 6820683, at *1 (9th Cir. Oct. 17, 2023). Judge Desai's dissent expressly stated that the majority opinion was relying on the argument made by Samsung relating to recital four. *Id.* *4 ("Finding no support in the terms of the agreement, the majority's decision settles on the recitals as the basis for its finding that § 6.2 is ambiguous.").

Netlist respectfully seeks summary judgment on the JDLA license defense. First, under Fifth Circuit law, Samsung is estopped from arguing that the JDLA's license grant covers the Accused Products. To convince the Ninth Circuit that Samsung's supply obligation was limited to the joint development efforts, Samsung relied on other provisions of the JDLA, **including the license grant**, arguing that they, too, are implicitly limited to joint development. This is flatly inconsistent with Samsung's license defense, which depends on the license being broader than the parties' joint development, given that none of the Accused Products are the joint development product (NVDIMM-P) which never even materialized.

Second, even if Samsung is not estopped as to license scope, its interpretation of Samsung's supply obligation fails as a matter of law, which means the JDLA (the license included) was properly terminated as a matter of law. The highest court in New York, the Court of Appeals, holds that under New York law, even when a contract is "ambiguous," extrinsic evidence cannot be used to insert a limitation that sophisticated parties could have included but did not. *Quadrant Structured Prod. v. Veritin*, 23 N.Y. 3d 549, 560 (NY 2014). That is precisely what Samsung is attempting to do here, i.e., read a "joint development" limitation into Samsung's supply obligation where the parties could have included it but did not.

I.   STATEMENT OF ISSUES TO BE DECIDED BY THE COURT

1. Is Samsung estopped from arguing that the Section 8.2 license grant is not limited joint development products?

2.  Under New York law, is it proper to import a limitation into the Section 6.2 supply clause limiting it to joint development product even when the clause is ambiguous?

## II.   STATEMENT OF UNDISPUTED FACTS

**Product Supply Obligations**

1.  ███████████████████████████████████████████████████████████████████
    ████████████████████████████████████████████ Ex. 2 at -07; Ex. 3 at 15:16-18.

2.  ███████████████████████████████████████████████████████████████████
    ███████████████████████████████████████████████████████████████████
    ██████████ Ex. 4. Samsung told Netlist that ██████████████████████
    ███████████████████████████████████████████████████████████████████
    ███████████████████████████████████████████████████████ *Id.*

3.  ███████████████████████████████████████████████████████████████████
    ███████████████████████████████████████████████████████████████████
    █████████████████████ Ex. 5 at NL049012. ██████████████████████████
    █████████████████████████████████ Ex. 6 (JDLA) § 6.1. █████████████
    ███████████████████████████████████████████████████████████████████
    ███████████████████████████████████████████████████████████████████
    ████████████████████████████ Ex. 7. ███████████████████████████████
    ███████████████████████████████████████████████████████████████████
    ██████████ Ex. 8.

4.  The parties executed the JDLA on November 12, 2015. Section 6.1 states ██████
    ███████████████████████████████████████████████████████████████████
    ███████████████████████████████████████████████████████████████████
    ███████████████████████████████████████████████████████████████████

- 3 -

████████ *Id.* § 6.2. Netlist thus has ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

5. From the execution of the JDLA until around the second quarter of 2017, ████████

████████████████████████████████████ Ex. 9 (Hong Dep.) at 120:20-121:16. To put this in

perspective ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████. Ex. 10

(Samsung invoices). But after the JDLA, ████████████████████████████████████████

████████████████████████████████████. Ex. 11 at 46.

6. Samsung also ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████ Ex. 12.

7. Samsung's internal summaries of the supply clause in June 2016 do not contain any statement that it

████████████████████████████████████ Ex. 13 (noting as the only limit on the supply clause was

████████████████████████████████████████████████████████████████████████████

████████████████████████████ In fact, ██████████████████████████████████████

████████████ Ex. 14, ██████████████████████████████████████████████████████

████████████████████████████████████████████████ *Id.*

8. Samsung ████████████████████████████████████████████████████████

████████████████████████████████████████████████ *See, e.g.*, Harbour Decl. ¶ 41.

9. Netlist's 2016 10-K notified investors that "our JDLA with Samsung contractually commits Samsung to supply NAND flash and DRAM products to us upon our request at competitive prices." Ex. 15 at 8. Netlist's 2018 10-K contained a risk disclosure that Netlist's business could be harmed if Samsung "fail[ed] to comply with the terms of the JDLA regarding the supply of these products." Ex. 16 at 19.

10. Samsung's corporate representative, Joseph Calandra, testified that Samsung's supply obligation in

the JDLA ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



Ex. 17 (Calandra Dep.) at 21:3-23.

11.     This testimony is the exact opposite of what Samsung told the Ninth Circuit, where it argued that the supply clause was entirely unique and unprecedented in Samsung's history. Ex 18 at 34-35 ("No ordinary businessperson in Samsung's position would agree to supply an unquantified amount of DRAM and NAND to a single customer on 'request at a competitive price.'").

12.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮ Ex. 19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ By January of 2018, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮ Ex. 20. On February 19, 2018, Paik Ki Hong (of Netlist) sent an email to Samsung stating that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ " *Id.* at 1. ▮▮▮▮▮▮▮

▮▮. Ex. 21.

13.     On January 18, 2018, Ho-Jung Kim (whom Samsung identified in its interrogatories as a JDLA

negotiator), Ex. 22 at 5, ███████████████████████

████████████████████████████████████

Ex. 23.

14.  In the Central District, Samsung's counsel admitted that, "*if 6.2 is construed as Netlist is saying, that would have been the most important part of this contract by far. It would have outweighed anything else in the contract.*" Ex. 24 at 17:22-25.

15.  Samsung's sales person responsible for the Netlist relationship informed Samsung's executives that ████████████████████████████████████████

████████ Ex. 19 (May 24, 2017 email from Steven Metz) ████████████

████████████████████████████████ *see also* Ex. 25 (Metz Dep.) at 91:13-92:24, 93:22-94:17, 103:1-24.

16.  The documentary records indicate JS Choi, the head of sales at Samsung, ████████

████████████████████████████. Ex. 26 ████████████████

████████████; Ex. 27 SEC116009 ████████████████ JS Choi was ████

██████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

Ex. 28.

17.  Samsung unilaterally refused to provide any discovery in this case on its JDLA defense in light of its motion to stay. Dkt. 193, Dkt. 225. This included a refusal to make JS Choi available for deposition in this proceeding. Dkt. 224 at 1. Netlist has moved to preclude Samsung from introducing evidence relating to the

JDLA based on Samsung's refusal to produce discovery on this topic. Dkt. 225.

18. After the instruction from JS Choi, Samsung sales personal discussed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 29. Samsung also used ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 30.

19. At the same time Netlist's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ex. 31 (Knuth Dep.) at 160:11-161:15.

20. The Samsung engineer who worked with Netlist on the JDLA confirmed ▮▮▮▮▮▮▮▮▮ drop in supply by Samsung to Netlist, Ex. 32 (Indong Kim Dep.) at 96:13-17, which he described as "unethical." *Id*. at 70:7-15.

21. On May 27, 2020 and again on June 12, 2020, Netlist served a notice of material breach. Exs. 33, 34. Samsung did not provide any written explanation claiming that it was not obligated to supply or that it was unable to supply despite best efforts. Netlist terminated the JDLA on July 15, 2020. Ex. 35.

**Joint Development Product**

22. The JDLA defines the Developed Product (to arise from the Joint Development Project, which was

also a defined term) as NVDIMM-P. Ex. 6 § 1. None of the Accused Products (DDR4 LRDIMMs and RDIMMs) are NVDIMM-P because Samsung admitted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 32 (Indong Kim Dep.) at 108:8-11.

**License Grant**

23. Neither Section 6.2 "Supply by Samsung" nor Section 8.2 "License to Samsung" contain an express reference to the Joint Development Project or the Developed Product.

24. Samsung argued to the Ninth Circuit that various provisions of the JDLA that do not expressly reference the Joint Development Project or product are nonetheless limited to joint development. For example, Samsung argued that "there's an $8 million NRE fee that's paid. It's clearly for the joint development project, but it doesn't say it's specifically for the joint development project." Ex. 1 at 8:16-24. This is the exact opposite of Samsung position before this Court in support of its JDLA defense. *Samsung I*, Dkt. 566 at 57 ("Netlist perpetually licensed 87 patents to Samsung, including the asserted patents, in an agreement where Samsung paid $8 million.").

25. Samsung claimed before the Ninth Circuit that the license grant was also limited to the joint development project:

> [T]he recitals are very clear -- and parties put recitals in agreements to make sure language isn't tortured down the road by lawyers and courts, right? Here's what our purpose is, interpret this agreement consistent with our purpose. And when you look at the recitals, what does it say about the licenses? Whereas in connection with their collaboration hereunder, the parties wish to grant to each other a cross-license under each party's patents**. The licenses are being given in connection with the collaboration. That's the joint development project**.

Ex. 1 at 15:10-21.

This is the exact opposite of what Samsung argues before this Court: "The plain language of the JDLA unambiguously licenses all semiconductor products except Foundry Products and is not limited to the Joint Development Project." *Samsung I*, Dkt. 328 at 2.

26. Ho-Jung Kim, whom Samsung identified in interrogatories as a negotiator of the JDLA,

testified, consistent with the Ninth Circuit argument, that the license grants were limited to what was necessary to develop NVDIMM-P: ▮▮▮▮▮

▮▮▮▮▮ Ex. 36 (Ho-Jung Kim Dep.) at 22:11-17.

## III.   ARGUMENT

### A.   Samsung Is Estopped From Arguing The JDLA Covers The Accused Products

Samsung's license defense claims that the JDLA provided a broad license grant to all of Netlist's patents for any purpose, not just for the Joint Development Project/NVDIMM-P. Samsung, however, successfully secured a partial reversal in the Ninth Circuit by arguing the opposite. This estops Samsung from taking the contrary position now. The doctrine of judicial estoppel "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *Hall v. GE Plastic*, 327 F.3d 391, 396 (5th Cir. 2003). "Statements made in a previous suit by an attorney before the court can be imputed to a party and subject to judicial estoppel." *Id.* (citing *New Hampshire v. Maine*, 532 U.S. 742, 753 (2001)). The Fifth Circuit applies a two-pronged test: "the position of the party to be estopped is clearly inconsistent with the previous one; and that party must have convinced the court to accept that previous position." *Id.* Here, both prongs are met.

Samsung's position that the JDLA's license grant covers the Accused Products is "clearly inconsistent" with what Samsung argued to the Ninth Circuit. This is established by comparing Samsung's own words before this Court and the Ninth Circuit. The premise of Samsung's appeal was that clauses in the JDLA that make no mention of the parties' joint development project or product, such as the supply clause, should nonetheless be read as implicitly limited to the joint development project or product.

First, Samsung argued that the JDLA's $8 million NRE fee that Samsung paid to Netlist was not a license fee, but instead payment for the joint development project:

> There's other provisions in the contract that clearly relate to the joint development project, that don't also say in connection with the joint development project. That's why you have to

> look at the structure of the agreement in order to interpret specific language. For example, in Section 3.1, there's an $8 million NRE [non-recurring engineering] fee that's paid. **It's clearly for the joint development project, but it doesn't say it's specifically for the joint development projec**t.

Ex. 1 at 8:16-24; *see Hall*, 327 F.3d at 396 (estoppel applies to "statements made at oral argument"). This is the opposite of what Samsung argued to this Court in *Samsung I*, when it repeatedly asserted that the $8 million payment was compensation for a broad license grant (not the joint development project). *See, e.g.*, *Samsung I*, Dkt. 566 at 57 ("Netlist perpetually licensed 87 patents . . . where Samsung paid $8 million.").

Second, Samsung argued to the Ninth Circuit that the license was similarly tied to the parties' joint development project even though the license also makes no mention of joint development. Specifically, Samsung relied on the JDLA's fourth recital:

> And when you look at the recitals, what does it say about the licenses? Whereas in connection with their collaboration hereunder, the parties wish to grant to each other a cross-license under each party's patents. **The licenses are being given in connection with the collaboration. That's the joint development projec**t.

Ex. 1 at 15:15-21. This, however, directly contradicts Samsung's license defense in this case. First, before this Court, Samsung argued that "[t]he plain language of the JDLA unambiguously licenses all semiconductor products except Foundry Products and is not limited to the Joint Development Project." *Samsung I*, Dkt. 328 at 2. Second, Samsung has admitted that none of the Accused Products are NVDIMM-P. *See* SUF 22.

Samsung's argument succeeded. In an unpublished 2-1 decision, the Ninth Circuit upheld multiple rulings of the Central District, but reversed the grant of summary judgment on the supply clause. The majority conceded that "[s]tanding alone, the plain language of § 6.2 favors Netlist's interpretation: that Samsung must fulfill all NAND and DRAM orders by Netlist for whatever purpose." *Netlist*, 2023 WL 6820683, at *1. But it nevertheless found § 6.2 ambiguous. *Id*. In reaching this conclusion, the Ninth Circuit clearly relied on Samsung's argument regarding the fourth recital. *See Ahrens v. Perot Sys.*, 205 F.3d 831, 836 (5th Cir . 2000) (When a prior court "necessarily accepted, and relied on" a party's position in making a determination, then the prior-success requirement is satisfied). Right after Samsung's counsel emphasized that "[t]he licenses are

- 10 -

being given in connection with the collaboration," the very first question posed to Netlist's counsel by the Presiding Judge who joined the majority opinion was: "But it is, if you will, interpreted by the rest of the contract including, for example, the recital that [Samsung's counsel] just gave, and when you look at that in its totality, now it's pretty ambiguous to me. Why am I wrong?" Ex. 1 at 18:23-19:2. The majority then concluded that the supply clause was ambiguous based on the "contract's apparent purpose as derived from its title, structure, and related provisions," *Netlist*, 2023 WL 6820683, at *1, and the dissenting Judge confirmed that the majority's reasoning was predicated on the very recital that Samsung's counsel had emphasized at oral argument: "Finding no support in the terms of the agreement, the majority's decision settles on the recitals as the basis for its finding that § 6.2 is ambiguous." *Id.* at *4.[2]

### B. There Is No Genuine Dispute That Netlist Properly Terminated The JDLA

Even if Samsung is not estopped from arguing that the JDLA's license grant covers the Accused Products, there is no genuine dispute of material fact that Netlist properly terminated the JDLA in June of 2020 based on Samsung's material breach of the supply provision. The Ninth Circuit's reversal in the Central District Action was narrow. It held only that the supply provision was ambiguous and left the question of "whether the extrinsic evidence 'creates a genuine issue of material fact' as to the provision's meaning" still to be resolved. *Netlist*, 2023 WL 6820683, at *2. Here, even when considering the extrinsic evidence, it is beyond reasonable dispute that the supply clause required Samsung to provide Netlist with NAND and DRAM products for any purpose on request, and Samsung materially breached this provision.

#### 1. Samsung's Interpretation Violates New York Law

Under New York law (which governs the JDLA), even if a contract is ambiguous, judgment as a matter of law is proper if the non-moving party's interpretation conflicts with established canons of contract

---

[2] As noted above, Samsung witness, Ho-Jung Kim, whom Samsung identified in interrogatories as a negotiator of the JDLA, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SUF 26. Samsung took this position because it was seeking to limit rights clauses in the agreement that did not make reference to joint development.

interpretation. *See, e.g., Last Time Beverage v. F & V Distrib.* 173 N.Y.S.3d 543, 552 (2012) ("[T]o the extent that [the contract provision in question] may be ambiguous, the Supreme Court properly resorted to the canons of construction. . . ."). According to New York's highest court (the Court of Appeals), where sophisticated parties are involved, "[e]ven where there is ambiguity, if the parties to a contract omit terms—particularly terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission." *Quadrant*, 23 N.Y. 3d at 560; *Vermont Teddy Bear v. 538 Madison*, 1 N.Y.3d 470, 475 (NY 2004) (where sophisticated parties involved: "courts should be **extremely reluctant** to interpret the agreement as impliedly stating something which the parties have neglected to specifically include.").

Samsung's attempt to read a joint development project/product limitation into the JDLA's supply clause violates this canon of construction. As noted above, while Netlist's supply obligation under § 6.1 is expressly limited to the Developed Product (NVDIMM-P), the parties chose **not** to include any such limitation for Samsung's supply obligation under § 6.2:

> **Section 6.  SUPPLY OF COMPONENTS**
>
> 6.1   Supply by Netlist. Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer.
>
> 6.2   Supply by Samsung. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (*i.e.*, among customers purchasing similar volumes of similar products).

If the parties had wanted to limit § 6.2 to the joint development project or product, there were multiple ways that they could have done so. "Joint Development Project" (or "JDP"), "NVDIMM-P Product," and "Developed Product" are all defined terms under the JDLA that the parties employed when they saw fit. *See, e.g.*, Ex. 6 § 4.2 (Solely- and Jointly-Owned Patents); § 5.1 (Standardization); § 5.2 (Right of First Refusal); § 5.3 (Productization); § 5.4 (Sole Collaboration IPR License); § 16.3 (Compliance with Laws). Other provisions are expressly limited to the parties' "development work," including all of Section 2, which governs "Collaborative Development Work" and Section 3, which governs "Development Costs." Section 6.2, however, makes no mention of "Developed Product," "Joint Development Project," "JDP," "NVDIMM-P Project," or "development work." Under *Quadrant*, this omission **must** be regarded as intentional regardless of ambiguity. 23 N.Y. 3d at 560; *W. & S. Life Ins. v. U.S.*

*Bank*, 173 N.Y.S.3d 543, 551-52 (2022) ("[E]ven if there were an ambiguity. . . omission of terms that are readily found in other, similar contracts was intentional.").

In addition to being internally inconsistent with Samsung's proffered interpretation of the license grant, Samsung's interpretation of the supply clause has been woefully inconsistent. Initially, Samsung claimed that Section 6.2 did not require it to supply any products at all. Rather, according to Samsung at the time, Section 6.2 was simply "a Pricing Term With No Supply Obligation." Ex. 37 at 15. After that argument failed, Samsung changed course and argued that Section 6.2 was a supply obligation after all, but "Samsung's supply obligations would only arise if and to the extent the NVDIMM-P product was commercialized but this never occurred." Ex. 38 #21. Then, once that argument also failed, Samsung changed course yet again in the Ninth Circuit on appeal. This time, Samsung admitted that it had a supply obligation, and that had in fact arisen, but that it only covered the joint development project. Ex. 18 at 29 ("Sections 6.1 and 6.2 are, in other words, complementary to each other—they each set forth the components that the other party agreed to supply for the NVDIMM-P joint development project.").

### 2. The Extrinsic Evidence Exclusively Favors Netlist's Interpretation

Even setting *Quadrant* aside, summary judgment for Netlist is still proper. A "[c]ourt may resolve the ambiguity in the contractual language as a matter of law . . . if the extrinsic evidence is so-one sided that no reasonable factfinder could decide contrary to one party's interpretation." *Compagnie Financiere v. Merrill Lynch*, 232 F.3d 153, 159 (2d Cir. 2000). ■■■ *See* SUF 1. ■■■

■■■ *Id.* ■■■

■■■

■■■ *Id.*

Further, ███████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███ *See* SUF 3. Ultimately, Netlist's supply obligations were limited to NVDIMM-P controllers only, whereas Samsung's supply obligations were for NAND and DRAM **products**, without any limitation to NVDIMM-P or joint development.

The parties' subsequent course of performance after the JDLA was signed also contradicts Samsung's interpretation. *Gulf Ins. v. Transatlantic Reinsurance*, 886 N.Y.S.2d 133, 143 (2009) ("[T]he parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.'"). In the two years prior to signing the JDLA, █████████████████

█████████████████████████████████████████████

███████████████ SUF 5. In comparison, after the execution of the JDLA, ███████████████

█████████████████████████████████████████████

███ *Id.* Samsung also █████████████████████████████████████

█████████████████████████████████████████ SUF 6. This confirmation makes no sense under Samsung's proffered interpretation, which is that its supply obligation was only for joint development, not Netlist's resale to its own customers. While Samsung argued to the Ninth Circuit that "[n]o ordinary businessperson in Samsung's position would agree to supply an unquantified amount of DRAM and NAND to a single customer on request at a competitive price," Ex. 18 at 34-35. Samsung's corporate representative here affirmed this is consistent with its other agreements. *See* SUF 10.

Samsung's internal communications also indicate that, █████████████████████

█████████████████████████████████████████ On January 18, 2018, Ho-Jung Kim (whom Samsung has identified in its interrogatories as a negotiator of the JDLA) specifically flagged

- 14 -

*See* Ex. 23; *see also* SUF 13. Notably this email was sent *after* Samsung asserts that the joint development project was "abandoned" at "some point before 2017." Ex. 39 at 24. Thus, it could not have been referring to an obligation to supply Netlist solely for the joint development project or product.

### 3. There Is No Genuine Dispute That Samsung's Breach Was Material

Finally, there is no genuine dispute that Samsung's breach was material. Under New York law, a breach is material if it "go[es] to the root of the agreement between the parties." *New Windsor v. Meyers*, 442 F.3d 101, 117 (2d Cir. 2006). In the Central District, Samsung's counsel admitted that, "***if 6.2 is construed as Netlist is saying, that would have been the most important part of this contract by far. It would have outweighed anything else in the contract***." SUF 14. If that does not meet the root of the agreement standard, it is hard to imagine what would. Moreover, Samsung's internal communications demonstrate that Samsung knew its breach of the JDLA would significantly harm Netlist. *See* SUF 15.

On the record before it, the Ninth Circuit found a material fact issue existed as to whether Samsung's breach was "material." But after the Ninth Circuit oral argument, two important events occurred. First, Samsung's corporate representative Mr. Calandra was deposed in this case. He quickly admitted that Samsung's basis for an absence of material breach, that "no ordinary businessperson in Samsung's position would agree to supply an unquantified amount of DRAM and NAND" was lawyer fiction.

SUF 10. And Second, Samsung has improperly refused to provide any discovery regarding the JDLA in this proceeding. SUF 17. Thus, as explained in Netlist's pending Motion to Preclude (Dkt. 225), Samsung should be barred from introducing any testimony in support of its license defense under FRCP Rule 37. This would include any explanation for why its behavior was excusable, or done for a reason other than to harm Netlist.

| | |
|---|---|
| Dated: December 12, 2023 | Respectfully submitted, |
| | */s/ Michael D. Harbour* |
| | Samuel F. Baxter |
| | Texas State Bar No. 01938000 |
| | sbaxter@mckoolsmith.com |
| | Jennifer L. Truelove |
| | Texas State Bar No. 24012906 |
| | jtruelove@mckoolsmith.com |
| | **MCKOOL SMITH, P.C.** |
| | 104 East Houston Street Suite 300 |
| | Marshall, TX 75670 |
| | Telephone: (903) 923-9000 |
| | Facsimile: (903) 923-9099 |
| | |
| | Jason G. Sheasby (*pro hac vice*) |
| | jsheasby@irell.com |
| | H. Annita Zhong (*pro hac vice*) |
| | hzhong@irell.com |
| | Andrew J. Strabone (*pro hac vice*) |
| | astrabone@irell.com |
| | Thomas C. Werner (*pro hac vice*) |
| | twerner@irell.com |
| | Yanan Zhao (*pro hac vice*) |
| | yzhao@irell.com |
| | Michael W. Tezyan (*pro hac vice*) |
| | mtezyan@irell.com |
| | Michael Harbour (*pro hac vice*) |
| | mharbour@irell.com |
| | |
| | **IRELL & MANELLA LLP** |
| | 1800 Avenue of the Stars, Suite 900 |
| | Los Angeles, CA 90067 |
| | Tel. (310) 277-1010 |
| | Fax (310) 203-7199 |
| | |
| | Philip Warrick |
| | New York Bar No. 4471413 |
| | pwarrick@irell.com |
| | |
| | **IRELL & MANELLA LLP** |
| | 750 17th Street NW, Suite 850 |
| | Washington, DC 20006 |
| | Tel. (310) 777-6512 |
| | Fax (310) 317-7252 |

***Attorneys for Plaintiff Netlist, Inc.***

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I hereby certify that the foregoing document and exhibits attached hereto are authorized to be filed under seal pursuant to the Protective Order entered in this Case.

*/s/ Michael D. Harbour*
Michael D. Harbour

## CERTIFICATE OF SERVICE

I hereby certify that, on December 12, 2023, a copy of the foregoing was served to all counsel of record via email.

*/s/ Michael D. Harbour*
Michael D. Harbour
