# Exhibit 1

Filed Under Seal

```
 1        UNITED STATES COURT OF APPEALS, NINTH CIRCUIT
 2
 3   NETLIST INC.,
     a Delaware corporation,
 4
            Plaintiff-Appellee,
 5
     vs.                                    Case No.:  22-55209
 6
     SAMSUNG ELECTRONICS CO., LTD.,
 7   a Korean corporation,
 8          Defendant-Appellant.
 9
10
11
12
13         TRANSCRIPT OF AUDIO-RECORDED ORAL ARGUMENT
14     Before:  M. SMITH and DESAI, Circuit Judges, and AMON,
15                         District Judge
16                         June 8, 2023
17                          1:36 p.m.
18
19
20
21
22   Transcribed By:
     TERRI NESTORE
23   CSR No. 5614, RPR, CRR
24
25   Job No. 6169798

                                                         Page 1
```

**Page 6**

1 to be your position that it's ambiguous and that it should
2 be a jury trial on the meaning of it or do you say it
3 clearly states your position and it should be read to
4 apply only to the JDP?
5     MR. YODER: Yes, Your Honor.
6     Our position is that it is unambiguous, when the
7 contract is read as a whole and when the apparent purpose
8 of the contract is considered and the structure of the
9 contract is considered along with the text.
10    JUSTICE DESAI: So is it your position that
11 Samsung never had any supply obligation under the
12 agreement, based on the language I think that you cite
13 that says 6.2 imposed a supply obligation if the joint
14 development product ever, quote, became commercialized?
15    MR. YODER: Well, let me just finish answering
16 the first question, though, and that is, but in the
17 alternative there is no question but that this agreement
18 is reasonably susceptible to both proffered
19 interpretations; whether the scope is limited to the joint
20 development project or unlimited as Netlist contends.
21    JUSTICE AMON: But then what happens if we
22 determine it's ambiguous?
23    Does it go back for a jury trial?
24    MR. YODER: Well, it's a good question and as
25 Your Honor probably knows, courts handle that issue quite

**Page 7**

1 differently, in terms of whether the issue just is
2 presented to the jury as to whether there's a breach and
3 then there's argument, whether the court gives fact
4 questions to the jury to answer as to the disputed
5 evidence.
6     JUSTICE AMON: Does the damages verdict continue
7 to remain or do they have to redo damages in light of
8 that?
9     MR. YODER: I think it would depend on the nature
10 of the issue that would be remanded.
11    I think that under a certain scenario the damages
12 wouldn't change but under a different scenario it would,
13 depending upon the verdict. I think that would have to be
14 hashed out with the district court.
15    JUSTICE AMON: I'm sorry, you probably want to
16 answer that.
17    MR. YODER: I apologize. So the point is this:
18 There was an obligation under 6.2. We don't deny that.
19 There was an obligation to supply the memory chips in
20 connection with the joint development project.
21    There was an obligation to supply it during the
22 development stage so they had access to those chips and if
23 the project were successful and the NVDIMM-P product were
24 commercialized, there would be an obligation to supply
25 those memory chips to Netlist, in order for Netlist to

**Page 8**

1 sell the product.
2     JUSTICE AMON: But on the first point that you
3 make, are you asking us to insert language after the word
4 "products" that says in connection with the JDP?
5     I mean that language is nowhere in 6.2.
6     There's no language that ties it to the JDP, and
7 there are other provisions in the contract that stand
8 alone, separate and apart, from the JDP.
9     So how would we resolve this, you know, what you
10 claim to be an ambiguity or maybe you say it's clear in
11 the other direction, without the specific language that I
12 think you need in that section that ties it to the JDP.
13    MR. YODER: Well, there is no language in 6.1
14 either that says NVDIMM-P controller in connection with
15 the joint development project.
16    There's other provisions in the contract that
17 clearly relate to the joint development project, that
18 don't also say in connection with the joint development
19 project. That's why you have to look at the structure of
20 the agreement in order to interpret specific language.
21    For example, in Section 3.1, there's an
22 $8 million NRE fee that's paid. It's clearly for the
23 joint development project, but it doesn't say it's
24 specifically for the joint development project.
25    JUSTICE SMITH: Counsel, let's argue window,

**Page 9**

1 okay?
2     MR. YODER: Sure.
3     JUSTICE SMITH: Let's say that I, after looking
4 at the contract as a whole, that I conclude that
5 Section 6.2 is ambiguous. Now, that's contrary to what
6 both parties say, but I do say it, that's it, that's
7 arguendo that's what it is.
8     What do you do with that? If it's ambiguous, how
9 does that affect your case?
10    MR. YODER: Well, if it's ambiguous, then under
11 New York law you have to look to the extrinsic evidence to
12 determine what the parties' intent was, and the parties'
13 intent is the controlling issue there.
14    And in this case, the most compelling extrinsic
15 evidence is the MOU, the memorandum of understanding of
16 the parties, which followed the exchange of two term
17 sheets, which made clear that the memory chips were to be
18 raw material as part of the joint development project.
19    And Netlist's CEO, Mr. Hong, admitted in his
20 deposition that under those term sheets, the raw materials
21 were for the NVDIMM-P product.
22    JUSTICE SMITH: You're making the point you have
23 to go outside the contract.
24    MR. YODER: Right.
25    JUSTICE SMITH: So you have to go back for a

3 (Pages 6 - 9)

Page 14

1  MR. YODER: Yeah, and so but that also goes to
2  materiality. One, it goes to whether there's a breach; it
3  also goes to whether it's material.
4      Did Netlist really believe it was material when
5  they sat on it for five years and didn't declare a breach?
6      And when finally the higher Korean tax authority
7  overruled the lower Korean tax authority, was there a
8  breach when the lower Korean tax authority agreed with
9  Samsung? It's nonsense. It can't be.
10     But when the higher authority decides there's a
11 refund, with interest, there's nothing to cure; but yet
12 under the district court's interpretation, Samsung's out
13 of luck. Never could have cured, never given a chance to
14 cure, but there's this strict liability based upon what is
15 determined five years later.
16     So not a breach, but also that should have gone
17 to the jury on materiality.
18     JUSTICE SMITH: Well, I gather from Samsung's
19 perspective, if there's ambiguity and if Section 6.2 is
20 interpreted the way you think it should, considering the
21 totality of the circumstances, the tax gets reversed as
22 well because there's no ambiguity there, it's not strict
23 liability and the declaratory relief gets overturned
24 because the others didn't happen. Is that correct?
25     MR. YODER: Right. That's our position,

Page 15

1  Your Honor. But even if the court doesn't agree that that
2  should be the outcome, there needs to be a remand and a
3  trial on these issues for sure.
4      And that's true as to materiality on 6.2 as well,
5  and where I was going with that, when you go through the
6  briefing on the issue of materiality, Netlist's argument
7  was really, it was material because the supply obligation
8  was a primary consideration for getting these licenses.
9      Well, number one, if you look at the JDLA and you
10 look at the recitals, the recitals are very clear -- and
11 parties put recitals in agreements to make sure language
12 isn't tortured down the road by lawyers and courts, right?
13     Here's what our purpose is, interpret this
14 agreement consistent with our purpose.
15     And when you look at the recitals, what does it
16 say about the licenses?
17     Whereas in connection with their collaboration
18 hereunder, the parties wish to grant to each other a
19 cross-license under each party's patents.
20     The licenses are being given in connection with
21 the collaboration. That's the joint development project.
22     And Netlist got a whole bunch of consideration in
23 addition to this supply obligation.
24     If there were an unlimited supply obligation, it
25 would be called out in some fashion.

Page 16

1  JUSTICE SMITH: Do you want to save -- I thought
2  you said you want to say five minutes.
3      It's up to you entirely, of course.
4      MR. YODER: No, and I am watching the clock,
5  Your Honor, because I got a sense we need to do that.
6      But the thing I would say, though, just on the
7  materiality, is that when you look at the record before
8  Judge Scarsi on the 6.2 issue in materiality, Netlist's
9  argument was that the supply obligation was the primary
10 benefit that it received, and Judge Scarsi agreed with
11 that. He said this was integral, this was a key
12 component, and he made a factual finding based upon
13 essentially a post hoc declaration by Netlist's CEO, and
14 he disregarded all the other evidence in the record as to
15 whether this was the primary benefit.
16     JUSTICE AMON: So it wasn't an undisputed fact?
17     MR. YODER: Pardon?
18     JUSTICE AMON: It wasn't an undisputed fact,
19 then? In other words, the fact.
20     MR. YODER: It was disputed. It was disputed.
21     JUSTICE AMON: The fact was disputed?
22     MR. YODER: Very much disputed, yeah, whether --
23     JUSTICE DESAI: He shouldn't have resolved it
24 against you because it was disputed?
25     MR. YODER: Yeah, absolutely not. I mean, even

Page 17

1  just on his -- and he erred as a matter of law too,
2  because instead of applying the multifactor test of
3  materiality, he just picked out this one issue.
4      And even on that issue, there was a conflict in
5  the facts in the record.
6      JUSTICE AMON: Can I just ask you one further
7  question? You said that you did supply these memory
8  components in connection with the JDP, what was being
9  developed?
10     MR. YODER: Yes, Your Honor.
11     JUSTICE AMON: Why was there a need to do that?
12     MR. YODER: To create the product.
13     JUSTICE AMON: So there was some --
14     MR. YODER: To try to --
15     JUSTICE AMON: And did you also, during that
16 time -- is the record clear that you submitted memory
17 components for Netlist's other uses?
18     MR. YODER: Yes, there was, but that was true
19 before, during and after, and it was done subject to
20 purchase orders and acknowledgements that didn't reference
21 the JDLA. So the parties' practice continued the same way
22 during the JDLA as before, and our position is that
23 doesn't really prove anything.
24     You really have to get into the extrinsic
25 evidence to decide why are they doing that?

**Page 18**

1  Is it because of this unlimited supply obligation
2  or is it because that's the way the parties had been doing
3  this for years and years?
4  So with that, let me reserve the rest.
5  JUSTICE SMITH: Reserve your time.
6  MR. YODER: Thank you very much.
7  JUSTICE SMITH: Very welcome. All right.
8  Mr. Ashley.
9  MR. ASHLEY: Almost good afternoon, Your Honors.
10  JUSTICE SMITH: Pretty close.
11  MR. ASHLEY: May it please the court, Matt Ashley
12  for Netlist.
13  This case begins and ends with the plain language
14  of the JDLA and New York's settled contract interpretation
15  principles. You're correct, you don't look outside of
16  this contract to determine whether there is ambiguity.
17  And I want to focus first on the key contractual
18  provision in the case, which is Section 6.2.
19  Section 6.2 reads, and I'll quote it to you:
20  Samsung will supply NAND and DRAM products to Netlist, on
21  Netlist request, at a competitive price. That is
22  succinct, clear and unambiguous language.
23  JUSTICE SMITH: But it is, if you will,
24  interpreted by the rest of the contract including, for
25  example, the recital that Mr. Yoder just gave, and when

**Page 19**

1  you look at that in its totality, now it's pretty
2  ambiguous to me. Why am I wrong?
3  MR. ASHLEY: You're wrong in part because he read
4  you the wrong recital.
5  JUSTICE SMITH: Ah. Let's hear the right one.
6  MR. ASHLEY: He didn't read the first recital of
7  the contract, which says: Whereas Samsung develops and
8  manufactures, among other things, memory components and
9  memory modules, and Netlist develops and manufactures
10  memory components and memory modules.
11  So it's speaking to the products that these
12  companies produce, and that ties into the supply
13  obligation later that for Netlist, is expressly limited in
14  Section 6.1 to NVDIMM-P controllers, and that for Samsung
15  is not limited to either NVDIMM-P controllers or their
16  current position, the joint development project.
17  JUSTICE AMON: You friend on the other side said
18  that there was a relationship with respect to the sale of
19  these NAND and DRAM products before this agreement. It's
20  my understanding that there was no agreement, there was no
21  contract that obligated Samsung to sell these parts to
22  Netlist, and in fact it was pretty ad hoc and requests
23  would be made and not fulfilled, or backlogged, and in
24  fact part of this agreement was to ensure that when those
25  parts were ordered, they would in fact be supplied at the

**Page 20**

1  competitive prices that Samsung was selling them for; is
2  that correct.
3  MR. ASHLEY: That's absolutely correct.
4  And then one of your questions to Counsel was you
5  referenced, Your Honor, the term "JDP."
6  That's a point I wanted to make.
7  They stress, both in their moving and in their
8  reply brief, sort of the linchpin of their argument about
9  creating an ambiguity is to say, well, Section 6.2 is part
10  of Section 6, which is supply of components, and that's
11  why I was tying you to that first "whereas" clause; they
12  say you should interpret "components" to be components for
13  the JDP. Well, it doesn't say supply of components for
14  the JDP.
15  JUSTICE AMON: But isn't the controller in the
16  first part a JDP controller? I mean that is used just for
17  this particular development; is that correct?
18  MR. ASHLEY: In Section 6.1.
19  JUSTICE AMON: In Section 6.1.
20  MR. ASHLEY: Yes.
21  JUSTICE AMON: That controller is limited to this
22  project, correct? It's not something else?
23  MR. ASHLEY: It's limited to -- it's limited to
24  NVDIMM-P, which is supposed to be the jointly developed
25  product.

**Page 21**

1  JUSTICE AMON: That's the jointly developed
2  product.
3  MR. ASHLEY: Correct.
4  JUSTICE AMON: So under heading of Supply of
5  Components, the first is clearly for the JDP project. Why
6  wouldn't you reasonably read the second clause as also
7  relying or involving that development project?
8  MR. ASHLEY: For two reasons; it's not there and
9  they could have put it there; second, even the reference
10  to the NVDIMM-P is not to the joint development project,
11  it's to that product that's supposed to come out of it.
12  So you have to --
13  JUSTICE AMON: I thought you just told me
14  Section 6.1 was specifically directed to the project.
15  MR. ASHLEY: It's directed to NVDIMM-P, which is
16  the product that's supposed to come out of the project.
17  There are defined terms in this agreement for the
18  project, which is the joint development project, or JDP;
19  there's the joint -- the developed product, which is the
20  NVDIMM-P product; and those defined terms are used
21  throughout this agreement when the provisions intend to
22  limit themselves to, for instance, NVDIMM-P or the joint
23  development project.
24  And I'll give you an example. Your Honor asked
25  whether or not Samsung's position was whether or not they