# Exhibit 39
Filed Under Seal

Ekwan E. Rhow - State Bar No. 174604
  erhow@birdmarella.com
Marc E. Masters - State Bar No. 208375
  mmasters@birdmarella.com
David I. Hurwitz - State Bar No. 174632
  dhurwitz@birdmarella.com
Kate S. Shin - State Bar No. 279867
  kshin@birdmarella.com
Christopher J. Lee - State Bar No. 322140
  clee@birdmarella.com
Jong-min Choi - State Bar No. 329474
  jmchoi@birdmarella.com
Joyce J. Choi - State Bar No. 256165
  jchoi@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant
Samsung Electronics Co., Ltd.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETLIST INC., a Delaware corporation, | CASE NO. 8:20-cv-00993-MCS-ADS |
| Plaintiff, | **DEFENDANT SAMSUNG ELECTRONICS CO., LTD'S OPPOSITION TO PLAINTIFF NETLIST'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| vs. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,, | |
| Defendant. | [Filed Concurrently with:<br>(1) Defendant's Statement of Genuine Disputes of Material Facts;<br>(2) Defendant's Separate Statement of Additional Material Facts;<br>(3) Defendant's Evidentiary Objections;<br>(4) [Proposed] Order;<br>(5) Declaration of Hyeoksang Yoo and<br>(6) Declaration of Christopher J. Lee |
| | Date: September 20, 2021<br>Time: 9:00 a.m.<br>Crtrm.: 7C |
| | Assigned to Hon. Mark C. Scarsi<br>Courtroom 7C |

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ........................................................... 2

TABLE OF AUTHORITIES .......................................................... 3

I.    INTRODUCTION ............................................................ 7

II.    ARGUMENT ................................................................. 10

    A.    Netlist Is Not Entitled To Partial Summary Judgment On Its First Cause Of Action For Breach Of Contract ............................... 10

        1.    Section 6.2 Is Limited To The Supply And Pricing Of Components For The Joint Development Project ...................... 11

            a.    The Parties' Negotiating History Shows Section 6.2 Is Limited To The NVDIMM-P Joint Development ............ 11

            b.    The Structure And Express Terms Of The JDLA Prove Section 6.2 Is Limited To Joint Development ......... 15

            c.    Netlist's Admissions Demonstrate Section 6.2 Is Limited To Joint Development ............................ 17

            d.    The Parties' Long Standing Course Of Conduct Reveals Section 6.2 Is Limited To Joint Development ....... 19

            e.    Netlist's Contrary Evidence Is Out Of Context, Irrelevant, And Inadmissible ............................. 22

        2.    Section 6.2 Is Too Indefinite To Be A Valid Supply Contract ...... 22

            a.    The Phrase "At Netlist's Request" Is Not A Definite Quantity Term .................................. 23

        3.    Section 6.2 Was Overridden By Netlist's Purchase Orders .......... 24

        4.    Netlist Failed To Perform Its Obligations Under The JDLA ....... 24

        5.    Netlist Is Estopped From Arguing Its Misinterpretation Of Section 6.2 Is Supported By Expansive Patent Licenses ............. 25

            a.    Netlist Ignores Other Consideration It Received For The Patent Licenses ................................. 27

    B.    Netlist Is Not Entitled To Partial Summary Judgment On Its Second Cause Of Action For Breach Of Contract ...................... 28

        1.    Samsung Reasonably Deducted Withholding Taxes From Payment To Netlist ................................... 28

DEFENDANT'S OPPOSITION TO NETLIST'S MOTION FOR PARTIAL SUMMARY JUDGMENT

2.      Samsung Reasonably Cooperated With Netlist's Successful Efforts To Obtain A Refund Plus Interest ................................... 29

C.    Netlist Is Not Entitled To Partial Summary Judgment On Its Third Cause Of Action For Declaratory Relief .................................... 30

1.      Netlist Waived Any Right To Terminate The JDLA ................... 30

III.     CONCLUSION ................................................. 31

DEFENDANT'S OPPOSITION TO NETLIST'S MOTION FOR PARTIAL SUMMARY JUDGMENT

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Federal Cases**

*Bird v. Computer Technology, Inc.*,
    364 F. Supp. 1336 (S.D.N.Y.1973) ................................................................... 12

*Caitlin Specialty Ins. Co. v. QA3 Fin. Corp.*,
    36 F. Supp. 3d 336 (S.D.N.Y. 2014) ........................................................... 11, 12

*Churchill v. Winter Chevrolet*,
    No. C-04-0489 JCS, 2005 WL 281170 (N.D. Cal. Feb. 4, 2005) ...................... 26

*Dun & Bradstreet Corp. v. Harpercollins Publishers, Inc.*,
    872 F. Supp. 103 (S.D.N.Y. 1995) ................................................................... 30

*Faulkner v. National Geographic Society*,
    452 F. Supp. 2d 369 (S.D.N.Y. 2006) .......................................................... 8, 22

*GT Beverage Co. LLC v. Coca Cola Co.*,
    No. SACV1000209JVSRNBX, 2010 WL 11595832 (C.D. Cal. Aug.
    2, 2010) ............................................................................................................ 26

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778 (9th Cir. 2001) ........................................................................... 26

*Indep. Energy Corp. v. Trigen Energy Corp.*,
    944 F. Supp. 1184 (S.D.N.Y. 1996) ................................................................. 24

*JA Apparel Corp. v. Abboud*,
    568 F.3d 390 (2d Cir. 2009) ............................................................................ 11

*Johnson v. Oregon*,
    141 F.3d 1361 (9th Cir. 1998) ......................................................................... 26

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ........................................................................................ 26

*Miller v. Metro Life Ins. Co.*,
    979 F.3d 118 (2d Cir. 2020) ............................................................................ 31

*Rapture Shipping, Ltd. v. Allround Fuel Trading B.V.*,
 350 F. Supp. 2d 369 (S.D.N.Y. 2004) ........................................................ 26

*Rissetto v. Plumbers & Steamfitters Local 343*,
 94 F.3d 597 (9th Cir. 1996) .................................................................... 26

*Septembertide Publ'g, B.V. v. Stein & Day, Inc.*,
 884 F.2d 675 (2d Cir. 1989) ................................................................... 30

*Stalis v. Sugar Creek Stores, Inc.*
 295 A.D.2d 939, 940 (2002) ................................................................... 31

**State Cases**

*Ashwood Capital, Inv. v. OTG Mgmt., Inc.*,
 99 A.D.3d 1 (2012) .............................................................................. 24

*Cty. of Jefferson v. Onondaga Dev., LLC*,
 59 N.Y.S.3d 203 (2017) ........................................................................ 24

*Fed. Ins. Co. v. Americas Ins. Co.*,
 258 A.D.2d 39 (1999) ........................................................................... 19

*Greenfield v. Philles Recs., Inc.*,
 98 N.Y.2d 562 (2002) ........................................................................... 15

*Lee v. Wright*,
 108 A.D.2d 678 (1985) .......................................................................... 30

*Mar-Jon Mach. & Tool Co. v. Eastman Kodak Co.*,
 534 N.Y.S.2d 47 (1988) ........................................................................ 23

*Rudman v. Cowles Commc'ns, Inc.*,
 30 N.Y.2d 1 (1972) .............................................................................. 11

*Slamow v. Del Col*,
 79 N.Y.2d 1016 (1992) .......................................................................... 15

*Studley v. Nat'l Fuel Gas Supply Corp.*,
 107 A.D.2d 122 (1985) .......................................................................... 20

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
 1 N.Y.3d 470 (2004) ............................................................................. 23

1

*Webster's Red Seal Publications, Inc. v. Gilberton World-Wide Publications, Inc.*,
    67 A.D.2d 339 (1979).........................................................................................20

*Westmoreland Coal Co. v. Entech, Inc.*,
    100 N.Y.2d 352 (2003).......................................................................................15

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S OPPOSITION TO NETLIST'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# I.    INTRODUCTION

To support its Motion for Partial Summary Judgment ("MPSJ"), Netlist focuses this Court's attention on e-mails written by Samsung employees, even those who had no involvement in the negotiation of the Joint Development and License Agreement ("JDLA"). These e-mails are taken out of context and describe the JDLA *after-the-fact* and *without foundation.* The e-mails and admissions that should matter are the ones Netlist omits – namely, those from *Netlist's lead negotiators* (CEO Chuck Hong, a/k/a C.K. Hong, and in-house counsel and Vice President of Intellectual Property & Licensing Noel Whitley) *during* the negotiations of both the JDLA and the earlier Memorandum of Understanding ("MOU") that culminated in the JDLA. These admissions by Netlist are undisputed and prove the following three dispositive facts:

(1)    As Chuck Hong admitted at deposition, the MOU – the only other document both parties actually negotiated and signed – was designed to cover all critical points of the JDLA, and included supply terms tied *exclusively* to the future NVDIMM-P product that was to be jointly developed. *See* Samsung's Separate Statement of Additional Material Facts ("AMF") 10, 12. And, as Chuck Hong further admitted at deposition, the supply terms would be activated only if and to the extent the future NVDIMM-P product was ever "commercialized." *Id.*

(2)    The JDLA's supply provisions necessarily conformed to the MOU, as Noel Whitley indicated in an undisputed e-mail in which he excluded all provisions that "conflict with MOU," writing: "Samsung states that nothing in this agreement will 'require Samsung to supply any products to Netlist.' Netlist removed this qualification and returned the language to reflect what was agreed to in the MOU." AMF 15.

(3)    No commercialization of an NVDIMM-P product ever occurred. AMF 29. Thus, based on Netlist's own interpretation of the JDLA, the supply terms in Section 6 never kicked in.

These admissions and facts are fatal to Netlist's MPSJ on its first breach of contact claim, and in fact support an order granting Samsung's summary judgment

motion. Based on the above evidence from Netlist's own witnesses and writings, the only way to interpret the supply provision in Section 6.2 is to look at the MOU, the obligations of which are limited to the NVDIMM-P product (and only if commercialized). Section 6.2 was not meant to obligate Samsung to supply Netlist with its requirements unconnected to the joint collaboration concerning NVDIMM-P.

Chuck Hong's deposition testimony, Noel Whitley's e-mail, and the MOU are not isolated pieces of evidence. They are buttressed by the proposals and term sheets *Netlist* prepared leading up to the MOU. Chuck Hong repeatedly testified those proposals either omitted supply obligations or, to the extent they contained any supply obligations, such terms were again limited to the future NVDIMM-P product that was to be developed. AMF 4-9. These admissions are also in harmony with the plain and unambiguous language of Section 6.2, as well as the title, overall structure, and other specific provisions of the JDLA, which focus solely on NVDIMM-P joint development and patent licensing rather than independent supply obligations Netlist now alleges. And they are also consistent with other admissions Netlist made in public filings, a press release, and representations by its management to its board. AMF 31-34.

What this undisputed evidence means is Netlist's evidence has no bearing on the JDLA, including: (1) pre-MOU e-mails by Samsung introduced by Netlist to the extent such e-mails contradict the MOU; and (2) post-JDLA e-mails by Samsung introduced by Netlist to the extent such e-mails contradict the MOU and JDLA. Additionally, the post-JDLA Samsung e-mails are irrelevant to the extent they were written by Samsung employees who did not directly negotiate the MOU and JDLA, and constitute after-the-fact observations about the JDLA without foundational knowledge of the actual negotiations – which are the only relevant data points for interpreting Section 6.2. *Faulkner v. National Geographic Society*, 452 F. Supp. 2d 369, 372-73, 379 (S.D.N.Y. 2006) ("the statements by [Defendant's] agents and employees say nothing about [Defendant's] views at the time the contracts were entered. The statements, then, are nothing more than *post hoc* interpretations . . . [by] employees who . . . are not even

alleged to have participated in drafting or negotiating plaintiff's contracts.").

Even apart from the above dispositive evidence from its lead negotiators, Netlist's MPSJ on its first breach of contract claim still fails, and Samsung is entitled to summary judgment, for several independent reasons. *First*, Section 6.2 lacks a definite or ascertainable quantity term. Netlist has posited several theories as to how Section 6.2 might constitute a broad supply agreement, but none of them provide a sufficiently definite quantity term that could make Section 6.2 an enforceable supply contract. *Second*, the historical practice between the parties of submitting and accepting purchase orders – which continued after the JDLA was executed – overrode any purported supply obligation in Section 6.2. *Third*, Netlist failed to perform its obligations under the JDLA by abandoning a core part of the joint development project – the creation of a new NVDIMM-P *standard. See* Samsung's Statement of Genuine Disputes of Material Facts ("GMF") 91. The JDLA requires a written amendment signed by the parties for any such change, AMF 68, but there is no evidence that an amendment was executed.

Netlist tries to bolster its misinterpretation of Section 6.2 by alleging it provided broad patent licenses for a unlimited supply obligation. But Netlist is judicially estopped from making such argument based on the contrary position it took before the Korean National Tax Service ("Korean NTS") – *i.e.*, that the patent licenses are narrow – in successfully arguing it was entitled to a tax refund with interest. Moreover, Netlist ignores other consideration it received for the patent licenses.

Netlist's MPSJ also fails as to its second breach of contract claim alleging Samsung violated the JDLA by withholding taxes on the $8 million payment. It is undisputed that, after consulting with its own tax professionals, Netlist voluntarily submitted a tax form to Samsung a week before executing the JDLA in which Netlist indicated the $8 million was a *royalty* payment and authorized the very 16.5% tax withholding that Netlist now complains about. AMF 58-61. That Netlist concurred with Samsung demonstrates Samsung's reasonableness in withholding taxes. And, before the Korean NTS eventually sided with Netlist, a lower Korean tax tribunal ruled

against Netlist and found the $8 million was taxable, further evidencing the reasonableness of Samsung's view at the time of the tax withholding. GMF 52.

Nor can Netlist obtain partial summary judgment on its second breach of contract claim to the extent it alleges Samsung violated the JDLA by failing to reasonably cooperate with Netlist in obtaining a refund with interest. Here, too, Samsung is the party entitled to summary judgment. There is no dispute Samsung provided Netlist with drafts of what it eventually submitted to the Korean NTS for Netlist's review and comment. GMF 48. There is no dispute Netlist's accountants admitted Samsung's written submission to the Korean NTS was essential for Netlist to obtain a refund. *Id.* And there is no dispute Netlist's accountants thanked Samsung for its cooperation. *Id.* What Netlist complains about is Samsung's refusal to adopt Netlist's after-the-fact view that the $8 million was not a royalty. Samsung's contrary belief was held in good faith, was consistent with Samsung's articulated position throughout the MOU and JDLA negotiations, and was consistent with Netlist's initial view in its signed tax form acknowledging the $8 million was a royalty. AMF 58-63.

Because Netlist's first two claims collapse under the weight of the undisputed evidence, its third claim for declaratory relief premised on these two claims also fails. Moreover, by waiting years to bring its claims, Netlist waived them and any right to terminate the JDLA. In sum, Netlist's MPSJ is undermined by Netlist's own admissions and undisputed conduct – the very same admissions and conduct that support Samsung's motion for summary judgment.

## II.   ARGUMENT

### A.   Netlist Is Not Entitled To Partial Summary Judgment On Its First Cause Of Action For Breach Of Contract

Netlist's first cause of action alleges Samsung breached an obligation to supply NAND and DRAM at Netlist's request. Netlist is not entitled to summary judgment on this claim for five independent reasons: (1) the obligation in Section 6.2 is limited to the NVDIMM-P joint development project; (2) Section 6.2 does not contain a definite or

1  ascertainable quantity term necessary to create an enforceable obligation; (3) the

2  submission and acceptance of purchase orders irrespective of the JDLA override any

3  purportedly broad obligation in Section 6.2; (4) Netlist cannot present undisputed

4  evidence showing it performed its obligations under the JDLA; and (5) Netlist is

5  judicially estopped from arguing its patent licenses to Samsung support its

6  misinterpretation of Section 6.2.

### 1. Section 6.2 Is Limited To The Supply And Pricing Of Components For The Joint Development Project

Undisputed evidence concerning (a) the parties' negotiating history leading to
the MOU and the JDLA, (b) the structure and express terms of the JDLA, (c) Netlist's
admissions about the JDLA, and (d) the parties' course of conduct, prove Samsung's
promise in Section 6.2 was limited to the supply and pricing of NAND and DRAM
products for the NVDIMM-P joint development project. Section 6.2 does not create a
long-term supply contract for Netlist's needs outside the joint development project.

### a. The Parties' Negotiating History Shows Section 6.2 Is Limited To The NVDIMM-P Joint Development

The contractual language and overall structure of the JDLA are unambiguous.
However, to the extent the Court finds otherwise, "extrinsic evidence as to the parties'
intent may properly be considered." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d
Cir. 2009). Such evidence includes the contracting parties' negotiations. *Rudman v.
Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 11 (1972) ("the court may and should look to the
prior negotiations to determine what was intended.").[1]

---

[1] Netlist argues, to the extent ambiguities remain after considering extrinsic evidence,
those must be resolved in favor of Netlist as the purported non-drafting party. Dkt.
145 at 17:23-18:4. But *contra proferentem* is inapplicable here because (1) the extrinsic
evidence resolves any ambiguities in favor of Samsung and (2) Samsung and Netlist,
both sophisticated parties with equal bargaining power, negotiated Section 6.2 through
several rounds of mutual drafting. *Caitlin Specialty Ins. Co. v. QA3 Fin. Corp.*, 36 F. Supp.
3d 336, 342 (S.D.N.Y. 2014), *aff'd sub nom. Catlin Specialty Ins. Co. v. QA3 Fin. Corp.*, 629
F. App'x 127 (2d Cir. 2015). Also, even if the Court finds the JDLA ambiguous,

---

11

Uncontroverted extrinsic evidence from the negotiations of Section 6.2 through drafts of the term sheet, the MOU, and the JDLA evince the parties' intent that Samsung agreed only to supply the necessary raw materials for the NVDIMM-P joint development project. *Bird v. Computer Technology, Inc.*, 364 F. Supp. 1336, 1343 (S.D.N.Y.1973) ("the Court may look to prior negotiations to determine what was intended."). There is no evidence Netlist asked Samsung during these negotiations to commit to a broader supply contract covering Netlist's needs outside the joint development project, and no evidence Samsung ever agreed to any such term.

In early 2015, Netlist approached Samsung to discuss a strategic partnership involving, among other things, joint development of a product based on a new standard called NVDIMM-P and the licensing of Netlist's patents. AMF 1. The NVDIMM-P-related product would be a "game changer" according to Chuck Hong and, based on presentation materials, was designed to take market share in a $15 billion industry. AMF 2. Netlist also raised licensing, which was a subtle threat of a potential claim for infringement of Netlist's LRDIMM patents and was designed to convince Samsung to agree to the joint development project. AMF 3.

Chuck Hong testified Netlist's first proposal to Samsung in April 2015 focused on the cash consideration and did not mention a long-term supply agreement. AMF 4. When Netlist sent Samsung the first draft of the term sheet on April 21, 2015, Netlist proposed, as part of the "Joint development and marketing" for the "Technology Collaboration," that Samsung supply "Flash" (which means NAND) and "DRAM" for the NVDIMM-P-related product. AMF 5.

When the parties moved into negotiation of a term sheet, Netlist drafted a section entitled "Technology Collaboration" and proposed a subsection entitled "Raw Materials: Samsung will supply NAND, DRAM on mutually agreed terms." AMF 6.

---

considers all extrinsic evidence, and applies *contra proferentem* as a "last resort" (*id.* at 341), the ambiguity should be construed against Netlist, not Samsung, because Netlist drafted the final version of Section 6.2 (*see* Netlist's SUF 19-22).

1  Chuck Hong testified *the supply obligation Netlist is alleging in this litigation was not contained*
2  *therein.* Instead, he conceded the supply section applied only to NVDIMM-P if and
3  when commercialized: "Q. And so those were raw materials that were provided in
4  connection with commercialization of the dash P product; correct? A. That's correct."
5  AMF 7. In subsequent drafts of the term sheet, Netlist continued to express this clear
6  understanding that these obligations would only arise if and to the extent the
7  NVDIMM-P product was ever commercialized—which never occurred. AMF 8-9.

8       Chuck Hong further testified his intent during the negotiations was to get
9  Samsung's commitment to supply NAND and DRAM for the NVDIMM-P product so
10  Netlist would have sufficient supply if and when it was able to commercialize the
11  technology. AMF 10. According to Chuck Hong, NVDIMM-P was "industry
12  changing" technology, a significant business opportunity, and Netlist was going to
13  invest more than $10M in engineering costs. AMF 11. He testified Netlist wanted
14  Samsung's assurance it would supply NAND and DRAM to support "game-changing"
15  NVDIMM-P sales if the joint development proved successful and demand took off.
16  AMF 7, 10, 11, 12, 17. That is why Netlist put the "raw material" language in the term
17  sheet under Technology Collaboration and Productization for the NVDIMM-P
18  initiative. AMF 6-10. And, after exchanging more drafts, the parties signed the MOU
19  intended to reflect all important deal terms. AMF 12. Section 6 of the MOU states:

20       6. Most Favored Nation (MFN): Netlist will provide Samsung any
21       NVDIMM-P* controller at a price lower than the price Netlist provides
22       to any other buyer. Either party may produce NVDIMM-P controller
23       using its own technology and has no obligation to buy from the other
24       party. *Raw Materials: Samsung will provide competitive pricing (i.e. among customers*
25       *purchasing the same products and similar volumes) for the supply of Samsung NAND*
26       *and DRAM products. Id.* (emphasis added.)

27       As to the MOU, Chuck Hong again admitted this language limited Samsung's
28  supply obligation exclusively to the NVDIMM-P joint development, and this obligation

1 would arise only if and to the extent the NVDIMM-P product "ever became

2 commercialized." AMF 12. Thus, according to Chuck Hong's repeated testimony and

3 the undisputed terms of the MOU, the parties expressly agreed the MOU did not

4 contain the supply obligation that Netlist is alleging in this lawsuit years later.

5      Netlist cannot now evade the MOU because, during the negotiation of the

6 JDLA, Noel Whitley made clear the MOU was the sole basis for what became Section

7 6.2 of the JDLA. On October 8, 2015, when the parties began drafting the JDLA from

8 the MOU, Samsung proposed the following language to Netlist:

9      6.2 Supply by Samsung. Samsung will supply NAND and DRAM to

10      Netlist on Netlist's request at a competitive price similar to the customers

11      purchasing similar volumes of similar products. For the avoidance of

12      doubt, any of the provisions under this Agreement will not be deemed to

13      require Netlist to purchase any products from Samsung or to require

14      Samsung to supply any products to Netlist. AMF 13.

15      On October 14, 2015, Netlist replied to Samsung, forwarding an email from

16 Noel Whitley with his comments. AMF 14-15. As to the new Section 6.2, Whitley

17 wrote in all bold this proposed language "**Conflicts with MOU**" and "Samsung states

18 that nothing in this agreement will 'require Samsung to supply any products to Netlist.'

19 Netlist removed this qualification and returned the language to reflect what was agreed

20 to in the MOU." AMF 15. Samsung agreed to this change. *Id.*

21      The MOU's intent is clear from Netlist's witnesses and writings. Under the

22 MOU, the supply of NAND and DRAM was limited to the NVDIMM-P joint

23 development project. AMF 12. That intent was carried forward into Section 6.2, which

24 refers to the supply of components for the NVDIMM-P product. Indeed, when

25 Samsung asked to add language stating it was not required to supply NAND and

26 DRAM, Netlist refused and demanded they revert to the MOU – namely, the supply of

27 raw materials for the joint development of the NVDIMM-P product. AMF 16.

28      Yet another Netlist executive, CFO Gail Sasaki, made this intent clear when she

14

characterized the MOU during the negotiation of the JDLA, telling Samsung: "Both sides understood from the outset that this was a strategic deal, not a financial one. *The value that would be transferred and created resided in the patents and the technology.*" (Emphasis added.) AMF 18. If a supply agreement was the key consideration for Netlist in the deal (as Netlist now claims years later), Gail Sasaki surely would have mentioned it. That she did not clearly shows Netlist understood the deal did not include an agreement to supply anything beyond what was necessary for the joint development project (and only to the extent NVDIMM-P was commercialized).[2]

### b. The Structure And Express Terms Of The JDLA Prove Section 6.2 Is Limited To Joint Development

Under New York law, which governs pursuant to the choice of law provision in the JDLA, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992). "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002). Moreover, Section 6.2 must be construed in light of the JDLA as a whole. *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) ("The meaning of a writing may be distorted where undue force is given to single words or phrases"). Taken as a whole, the JDLA clearly is an agreement for NVDIMM-P joint development and patent cross-licensing – as its title, structure, and terms show.

On November 12, 2015, Samsung and Netlist entered into the JDLA. AMF 19. The structure and terms of the JDLA reflect the express purpose of the contract, which as the recitals in the preamble indicate, is for the parties "to work together to jointly develop an interface and associated technologies for certain memory modules and promote such interface to standards-setting organizations," and grant each other

---

[2]   It is not disputed Netlist got the chips it needed for its initial development work and the NVDIMM-P product was never commercialized. AMF 28, 29. Thus, Samsung's obligation to supply DRAM and NAND was never triggered.

DEFENDANT'S OPPOSITION TO NETLIST'S MOTION FOR PARTIAL SUMMARY JUDGMENT

licenses for one another's intellectual property. AMF 20, 22. The JDLA defines the "Developed Product" to be a "NVDIMM-P Product developed by the Parties hereunder pursuant the Statement of Work that meets the Product Specifications." AMF 21. The JDLA also includes a release of threatened claims. AMF 22.

The JDLA states Netlist is to receive $8 million for non-recurring engineering on the NVDIMM-P development work, and concurrently with the JDLA, Samsung provided an additional $15 million convertible loan at 2% interest that allowed Netlist to pay off existing debt with less favorable financial terms.[3] AMF 23. In addition to its receipt of cash and financing from Samsung, Netlist would generate significant profits and obtain valuable market share if the parties were able to develop this "game changing" standard for NVDIMM-P and produce a commercially feasible product under this new standard. AMF 24.

The JDLA seeks to implement these objectives, including terms for the collaborative NVDIMM-P development work, development milestones and a Statement of Work (Section 2, Appendices A and B); development costs (Section 3); IPR ownership (Section 4); schedule for standardization and productization (Section 5); supply of components for the joint development work (Section 6); a mutual release of claims (Section 7); and licensing of intellectual property (Section 8). AMF 25.

In particular, Section 6 of the JDLA, entitled "Supply of Components," includes mutual promises regarding the supply and pricing of components in connection with the NVDIMM-P joint development project. AMF 26. Section 6.1 states: "Supply by Netlist. Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer." *Id.* As the NVDIMM-P product did not exist, Netlist was not required to supply anything yet.

Section 6.2 is the parallel NVDIMM-P-related provision and, if interpreted consistently with the remainder of Section 6 and the JDLA as a whole, was focused on

---

[3]  Netlist was having cash flow issues, which explains its overall approach. AMF 70.

providing supply for the NVDIMM-P product to be developed. It states: "Supply by Samsung. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (i.e., among customers purchasing similar volumes of similar products)." AMF 26. As Netlist's 30(b)(6) witness on the JDLA's negotiations Chuck Hong testified, this obligation would arise only if and to the extent the NVDIMM-P product was commercialized. AMF 27. This reading also makes sense in the larger context of the joint development whereby Netlist had expertise with the NVDIMM-P product's controller while Samsung had the NAND and DRAM supply necessary for the NVDIMM-P product. *See* AMF 26.

Viewing the JDLA as a whole, Section 6.2 is limited to the supply and pricing of NAND and DRAM components Netlist requested for the NVDIMM-P joint development. Section 6.2 has nothing to do with Netlist's requests for product for resale, which was covered by the parties' *prior* course of conduct (below) that continued *after* the JDLA was executed and even *after* the JDLA purportedly was terminated. Netlist's contrary interpretation is inconsistent with the uncontroverted material facts.

### c. Netlist's Admissions Demonstrate Section 6.2 Is Limited To Joint Development

It is undisputed Netlist repeatedly admitted in different forums the JDLA is not a supply contract that extends to Netlist's needs outside the joint development. While the exact language has changed over the years, Netlist repeatedly and consistently has disclosed the risks associated with not having a long-term supply contract for DRAM and NAND in its annual reports before 2015. AMF 33. Crucially, in its first 10-K *after* the JDLA was executed, Netlist continued to state Netlist had "no long-term supply contracts" for these products. AMF 32.[4] This is no mere boilerplate disclosure of risk.

---

[4] Netlist's 2015 10-K states: "Our ability to fulfill customer orders or produce qualification samples is dependent on a sufficient supply of field programmable gate arrays ("FPGAs"), DRAM ICs and NAND flash, which are essential components of our memory subsystems. There are a relatively small number of suppliers of FPGAs, DRAM ICs and NAND flash, and we purchase from only a subset of these suppliers.

Netlist said it had no long-term supply contracts for DRAM and NAND *in the very same section it described its contract with and purchases from Samsung. Id.* By contrast, in 2021, when Netlist entered into an actual supply contract with SK Hynix, it disclosed that supply contract "entitles Netlist to purchase up to $600,000,000 of SK Hynix memory products during the term . . ." AMF 30.

Moreover, Netlist management's presentation of the JDLA to its board of directors in November 2015 confirms the management's view that the JDLA is *not* a supply agreement. Chuck Hong's presentation to the board, prepared by Gail Sasaki, describes the technology collaboration and the cross-licensing of patents. AMF 31. No mention is made of the JDLA being a supply agreement for Netlist's existing DRAM and NAND requirements, a purported supply agreement Chuck Hong now declares to be "crucial" and "critical." *Id.*; *see* Dkt. 89-21 at ¶¶ 4, 5 (C.K. Hong 7/26/21 Decl.). This clearly would have been material to the board had there been such a contract.

While Netlist disclaimed in its 10-K disclosures that the JDLA was a long-term supply agreement, Netlist proclaimed in its press release the JDLA was in fact a "strategic alliance" and "long term partnership" focused on development of a "new class of NVDIMM-P." AMF 34. Notably, no mention is made that Netlist had been given a supply agreement for all of its existing NAND and DRAM requirements. *Id.*

Netlist's public filings, board materials, and press release are consistent with its statements to Samsung in the period before any dispute arose. Netlist's understanding that the JDLA is not a supply agreement for Netlist's resale business and unrelated products is also evidenced by Netlist's continued efforts to obtain a supply agreement in the years following the JDLA, long *before* it sought to terminate the JDLA. In February 2017, Netlist met with Samsung to request a "New Partner Type" that would require Samsung to provide "Product Allocation support for Netlist" and an "Official-Distributor Partnership Agreement." AMF 35. Netlist understood the JDLA did not

---

*We have no long-term FPGA, DRAM or NAND flash supply contracts.*" AMF 32 (emphasis added.) All subsequent Netlist's 10-Ks attest to the same. AMF 33.

guarantee it the product allocation or supply it wanted; otherwise, it would not have proposed a new business relationship 18 months after execution of the JDLA – *before* there was any dispute under the JDLA. Indeed, when Netlist made this ask, Samsung told Netlist the JDLA was not an avenue to support Netlist's other business. *Id.*

In sum, Netlist's SEC filings, characterization of the JDLA to its own board and in a press release, and subsequent requests to Samsung show Netlist did not believe the JDLA was a supply contract in the manner it now alleges years later. This compelling evidence is uncontroverted and should estop Netlist from arguing otherwise here.

### d. The Parties' Long Standing Course Of Conduct Reveals Section 6.2 Is Limited To Joint Development

Extrinsic evidence of the parties' course of performance under a contract may also be admissible to demonstrate the parties' intent. *Fed. Ins. Co. v. Americas Ins. Co.,* 258 A.D.2d 39, 44 (1999) ("the parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties.").

Netlist has been a customer of Samsung since at least 2001, purchasing over $200 million of NAND and DRAM products. AMF 36. Both before and after the JDLA, Samsung has been a significant and continuous supplier of NAND and DRAM to Netlist, as reflected in Netlist's annual reports. AMF 37. In addition to purchasing from Samsung, Netlist also purchased NAND and DRAM from SK Hynix and Micron, as well as from sellers who bought from the manufacturers for resale. AMF 38.

The DRAM and NAND industry functions like other commodity industries, such as crude oil. It has three primary suppliers – Samsung, SK Hynix and Micron. Dkt. 89-21 at ¶ 6. The amount of NAND and DRAM product the market can supply is limited and demand for products often exceeds available supply. AMF 39. Accordingly, Netlist, like other customers, would provide Samsung with advance forecasts of the amount of product it wished to purchase, and Samsung would then inform Netlist how much product it could allocate and make available to Netlist to purchase. AMF 40. Following these discussions regarding allocations and availability, Netlist issued

DEFENDANT'S OPPOSITION TO NETLIST'S MOTION FOR PARTIAL SUMMARY JUDGMENT

purchase orders for specific amounts of product that Samsung had approved. AMF 41. In turn, Samsung accepted and fulfilled some of the purchase orders, put some on backlog, and rejected others, just as it did with other customers. AMF 42. The practice of forecasts, purchase orders, allocations, and backlogs are "industry norms" according to Chuck Hong and continued after the JDLA was executed. AMF 39, 43.

The parties' performance in the pre-litigation period, particularly in the first two years following the JDLA, shows neither party intended Section 6.2 to create an obligation for Samsung to supply all of Netlist's requests for Samsung's NAND and DRAM products. *Webster's Red Seal Publications, Inc. v. Gilberton World-Wide Publications, Inc.*, 67 A.D.2d 339, 341 (1979) (actual performance is the "most persuasive evidence of the agreed intention of the parties").

For Netlist's needs outside the JDLA, Samsung continued to supply Netlist with NAND and DRAM in the same manner as it had done before the JDLA. AMF 44. Samsung's sales to Netlist have continued from 2001 to the present day, according to the same course of dealing that existed before the JDLA, after the JDLA, and that continues to this day even after Netlist purported to terminate the JDLA and filed this lawsuit. AMF 45. This consistent course of dealing before and after the JDLA provides strong evidence Netlist understood the JDLA did not guarantee it access to all of the Samsung product it requested, but only the product Samsung actually agreed to sell based on the parties' historical course of dealing. AMF 46; *Studley v. Nat'l Fuel Gas Supply Corp.*, 107 A.D.2d 122, 128 (1985) (following "the established rule that the practical construction put upon a contract by the parties in performing under it is of great importance in determining its meaning").

Based on their prior course of dealing and industry norms, Netlist and Samsung operated using advance forecasts, supply inquiries, purchase orders, limited allocations, and backlogs. AMF 44-48. Prior to 2015, Samsung often could not supply Netlist's requested amount or any amounts. GMF 71. And this practice continued after the JDLA. *Id.* For example, on April 6, 2016, less than six months after the JDLA,

20

1  Raymond Jiang of Netlist wrote to Neal Knuth of SSI in hopes of buying more
2  NAND: "I know it's insane but want to see try our luck...I know it's not something
3  easy or possible, but want to give it try. Please let me know if any of these can be
4  found." *Id.* (NL039163-64). Knuth responded the next day: "No bid." *Id.* To provide
5  just one more example of many, on December 14, 2016, Jiang asked Knuth: "How
6  possible is it for you to get us 2100pcs of this DDR … DRAM?" Knuth replied:
7  "Straight from SEC: we cannot support. Securing any additional stock and Product
8  Allocation is not possible." *Id.* (NL024952).

9       That Samsung could not fulfill all of Netlist's orders was not a breach of the
10  JDLA. As both Chuck Hong and Paik Ki Hong (Netlist's Vice President of Worldwide
11  Operations) admitted as Netlist's 30(b)(6) witnesses and in their prior declarations,
12  *Samsung's performance was satisfactory in 2015, 2016 and into 2017.* GMF 71; *see also* Dkt. 84-
13  18 at ¶ 4 (P.K. Hong 7/20/21 Decl.). But *in those same years*, the order history and their
14  testimony establishes *Samsung regularly did not fulfill orders.* AMF 42, 43; GMF 71. Chuck
15  Hong admitted this was "reality" and that allocations in the fixed supply DRAM and
16  NAND industry were "industry norms." GMF 114 (Chuck Hong Deposition
17  testimony at 121:24-123:5, 152:15-24). Given the industry involves a commoditized
18  product with limited supply, Netlist understood it could not get all chips it requested.[5]

19       What this evidence further shows is Netlist never believed the JDLA contained a
20  supply component for anything beyond the NVDIMM-P joint development project,
21  which never resulted in a commercialized product. Netlist's course of conduct with

22

---

23  [5]   What Netlist and Chuck Hong are complaining about is the allocation to Netlist
24  changed after Hong's close friend, YH Jun, who was President of Samsung's memory
     division, moved to a separate company in 2017. AMF 71. at 119:6-120:7. Up until that
25  point, Chuck Hong had been able to use this relationship to "push through" certain
     orders and obtain red-carpet treatment. *Id.* Such treatment ended in 2017 when his
26  friend moved. *Id.* Thereafter, Samsung continued to supply chips but not with the same
27  level of attention Netlist had previously enjoyed. AMF 44. That is not a breach of
     contract. The JDLA and the purchase orders – and not Chuck Hong's personal
28  friendships – govern the parties' obligations.

Samsung was established for the 15 years prior to the JDLA and continued even after Netlist purported to terminate the JDLA in 2020. AMF 45. Indeed, Samsung continues to supply chips to Netlist to the present day based on this same protocol. *Id.* The end result is Netlist purchased a substantial amount of NAND and DRAM from Samsung in each quarter from November 2015 to the present, although the amounts varied over time. AMF 49. Accordingly, Netlist has no evidence of breach of Section 6.2.

### e. Netlist's Contrary Evidence Is Out Of Context, Irrelevant, And Inadmissible

As set forth above, evidence proffered by Netlist is taken out of context, irrelevant, and inadmissible, including: (1) pre-MOU e-mails by Samsung introduced by Netlist to the extent such e-mails contradict the MOU; and (2) post-JDLA e-mails by Samsung introduced by Netlist to the extent such e-mails contradict the MOU and JDLA. The post-JDLA Samsung e-mails are also irrelevant to the extent they were written by Samsung employees who did not directly negotiate the MOU and JDLA, and constitute after-the-fact observations about the JDLA without foundational knowledge of the actual negotiations. *Faulkner*, 452 F. Supp. 2d at 372-73, 379. Given space limitations, Netlist's specific evidence is addressed in Samsung's GMF.

### 2. Section 6.2 Is Too Indefinite To Be A Valid Supply Contract

The extrinsic evidence and express contractual terms (above) show Section 6.2 is limited to the supply of DRAM and NAND for the NVDIMM-P joint development project. Even were the Court to disagree, Netlist's MPSJ on its first breach of contract claim fails because Section 6.2 lacks a definite or ascertainable quantity term. Netlist has posited several novel theories over the course of this litigation as to how Section 6.2 could be sufficiently definite (either as (1) a contract to supply at request; (2) a requirements contract; or (3) an options contract), so as to give Netlist a one-sided contractual right to purchase any quantity of its choosing between zero and Samsung's entire worldwide inventory. But Netlist has abandoned the second and third theories and, in any event, none of the three proffered theories provide a sufficiently definite

quantity term that could make Section 6.2 an enforceable supply contract.[6]

### a. The Phrase "At Netlist's Request" Is Not A Definite Quantity Term

The phrase "at Netlist's request" in Section 6.2 is too indefinite to state a valid quantity term. The phrase neither states a definite quantity nor provides a fixed means to determine a volume of product. *Mar-Jon Mach. & Tool Co. v. Eastman Kodak Co.*, 534 N.Y.S.2d 47, 48 (1988) (contract of sale must be definite as to the quantity of the goods sold, or provide fixed means by which the quantities can be determined).[7] Rather, Netlist's theory is it can request any quantity it wants, subject only to the implied covenant of good faith and fair dealing that would prohibit Netlist from requesting products beyond what it could possibly need for its resale business and its own products outside the joint development. But even as cabined by the implied covenant, there is no enforceable contract, as there was no meeting of the minds as to a definite or otherwise ascertainable quantity of product that Samsung would supply.

Nor is there any basis for the Court to imply a missing quantity term where none exists. *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) ("courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include"). That is especially true where, as here, the parties are sophisticated companies that could be expected to have

---

[6] Netlist argued the JDLA is a requirements or option contract in its opposition to Samsung's motion for judgment on the pleadings (*see* Dkt. 89), but Netlist abandons these two theories in its MPSJ. Dkt. 145. Thus, Samsung does not address them herein. In the event Netlist tries to revive either or both theories in its reply brief, which would be improper and objectionable, Samsung refers the Court to its Motion for Summary Judgment in which it explains why neither theory has merit. Dkt. 150 at pp. 26-29.

[7] Contrary to an argument Netlist made in the past, this is not an issue Samsung must raise as an affirmative defense under the Statute of Frauds, but rather an element of Netlist's breach of contract claim – namely to prove the existence of a valid enforceable contract. There is no evidence of any agreement (oral or written) as to quantity.

negotiated a quantity term had they chosen to do so. *Ashwood Capital, Inv. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 7 (2012). Moreover, there is no objective method for the Court to imply a quantity term here.[8]

### 3.	Section 6.2 Was Overridden By Netlist's Purchase Orders

The parties' submission and acceptance of purchase orders both before and after the JDLA's execution provides another basis to deny Netlist's MPSJ on its first breach of contract claim. By their very terms, Netlist's purchase orders indicate they constitute new "offers" and supersede any prior agreements or discussions with Samsung, such as forecasts and informal e-mail or oral requests to purchase product. AMF 50. Thus, Netlist cannot argue Samsung was obligated to supply any product beyond the amount reflected in Netlist's purchase orders, regardless of any earlier requests. *Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1195 (S.D.N.Y. 1996) ("Prior agreements and negotiations are deemed to merge and be subsumed in a later written agreement.").

### 4.	Netlist Failed To Perform Its Obligations Under The JDLA

Netlist is not entitled to summary judgment on its first breach of contract claim, *nor on any of its other claims*, because Netlist did not perform its obligations under the JDLA, and thus cannot prevail on its breach of contract claim. *Cty. of Jefferson v. Onondaga Dev., LLC*, 59 N.Y.S.3d 203, 206 (2017) ("[O]ne of the essential elements of a cause of action for breach of contract is the performance of its obligations by the party asserting the cause of action for breach[.]").

Samsung engineer Indong Kim testified Netlist abandoned the NVDIMM-P *standardization* project that was a core component of the joint development work under the JDLA at some point before 2017. GMF 91. There was no written amendment authorizing Netlist to do so. And Chuck Hong testified that, in 2017, Netlist went its

---

[8]	Netlist misconstrues Samsung's argument as one premised on a lack of consideration. Dkt. 145 at 13:7-25 (citing *Guzman v. Ramos*, 139 N.Y.S. 3d 648 (App. Div. 2021)). But that is not Samsung's argument and *Guzman* is therefore inapposite.

1  "separate ways" from Samsung and, instead of continuing work under the NVDIMM-

2  P protocol, used the foundational development work and moved to a different product

3  without Samsung. *Id.*

4       Netlist also failed to perform its obligations under the JDLA by cancelling

5  purchase orders. Chuck Hong testified it would be a breach of the JDLA if a purchase

6  order was cancelled. AMF 54. While Netlist contends Samsung cancelled orders

7  improperly, Netlist was forced to admit during deposition it too cancelled such orders,

8  as it did with the eMMC purchase orders in the second half of 2017. *Id.* The evidence

9  establishes the eMMC orders at issue were a significant request by Netlist as Samsung

10 did not normally sell eMMC to customers like Netlist. AMF 51-52. Samsung allocated a

11 substantial amount of eMMC product to Netlist for 2017, much of which had

12 previously been allocated to another customer. AMF 53. After prices for eMMC

13 dropped unexpectedly in the second half of 2017, Netlist cancelled half of its eMMC

14 order. AMF 54. If Netlist contends the failure to fulfill all purchase orders is a breach

15 of the JDLA, Netlist's own cancellation of any purchase orders must also be one.

16 Having failed to perform under its own interpretation of the JDLA, Netlist cannot

17 prevail on its claims for breach of contract and declaratory judgment.

18      **5.**     **Netlist Is Estopped From Arguing Its Misinterpretation Of Section 6.2 Is Supported By Expansive Patent Licenses**

19

20      Netlist asserts it "provided Samsung a fully-paid license to Netlist's broad patent

21 portfolio" "in exchange [for] receiving an invaluable mandatory supply obligation."

22 Dkt. 145 at 1:13-14, 4:18-20. Thus, according to Netlist, Samsung agreed to supply

23 outside the joint development project in exchange for a broad license to all Netlist

24 patents. But this argument is directly contrary to Netlist's assertion to the Korean NTS

25 that the license granted in the JDLA was not broad but limited solely to the joint

26 development project – an assertion the Korean NTS relied on in ruling for Netlist.

27 AMF 55-56. Thus, Netlist should be estopped from making that argument in this case.

28      Under the equitable doctrine of judicial estoppel, a litigant is barred from

1   obtaining an advantage by asserting a position in a case, and then later seeking to obtain

2   an advantage by taking a clearly inconsistent position. *Rissetto v. Plumbers & Steamfitters*

3   *Local 343*, 94 F.3d 597, 600–01 (9th Cir. 1996); *Hamilton v. State Farm Fire & Cas. Co.*,

4   270 F.3d 778, 782 (9th Cir. 2001)(doctrine provides for the orderly administration of

5   justice and dignity of proceedings).

6       The doctrine of judicial estoppel applies to statements made in prior

7   administrative proceedings. *Rissetto*, 94 F.3d at 604, 605; *Churchill v. Winter Chevrolet*, No.

8   C-04-0489 JCS, 2005 WL 281170, at *8 (N.D. Cal. Feb. 4, 2005). The doctrine also

9   applies to foreign proceedings. *GT Beverage Co. LLC v. Coca Cola Co.*, No.

10  SACV1000209JVSRNBX, 2010 WL 11595832, at *5 (C.D. Cal. Aug. 2, 2010)

11  (discussing favorable authority on application to foreign proceedings); *Rapture Shipping,*

12  *Ltd. v. Allround Fuel Trading B.V.*, 350 F. Supp. 2d 369, 374 (S.D.N.Y. 2004) (plaintiff

13  estopped based on statements made in a Dutch Court).

14      "Federal law governs the application of judicial estoppel in federal courts."

15  *Johnson v. Oregon*, 141 F.3d 1361, 1364 (9th Cir. 1998). Courts generally consider three

16  factors when deciding whether to apply the doctrine. *New Hampshire v. Maine*, 532 U.S.

17  742, 743 (2001). First, courts determine whether "a party's later position [is] clearly

18  inconsistent with its earlier position." *Id.* Second, courts consider whether a litigant

19  successfully persuaded a court to accept one position, so that subsequent judicial

20  acceptance of an incompatible position "would create the perception that either the

21  first or the second court was misled." *Id.* Finally, courts take into account "whether the

22  party seeking to assert an inconsistent position would derive an unfair advantage or

23  impose an unfair detriment on the opposing party if not estopped." *Id.*

24      Here, the inconsistency in Netlist's position is clear. Netlist asserts its grant of

25  broad patent licenses provides sufficient consideration for a "mandatory" long-term

26  supply obligation beyond the joint development project. But Netlist argued in its

27  Korean tax appeal that "the granting of cross licenses under the [JDLA] is limited to

28  the joint research and development, and hence in cases where Samsung Electronics

DEFENDANT'S OPPOSITION TO NETLIST'S MOTION FOR PARTIAL SUMMARY JUDGMENT

uses intellectual property rights of [Netlist] in the course of its own research and development, it does not constitute something that can be subject to the [JDLA]." AMF 55. Second, the Korean NTS relied on Netlist's position the patent license was limited in making its ruling. AMF 56. And third, Samsung would be prejudiced by Netlist's assertion of inconsistent positions here. On the one hand, Netlist is trying to use the Korean NTS decision to show Samsung's withholding was improper. At the same time, to prevail on its first breach of contract claim, Netlist asserts its broad patent licensing provided consideration for a "mandatory" long-term supply agreement beyond the joint development project. Netlist should be estopped from asserting a position here that is inconsistent with its position in the Korean NTS.[9]

### a. Netlist Ignores Other Consideration It Received For The Patent Licenses

Even assuming Netlist were not judicially estopped from arguing the patent licenses are broader than the joint development project, Samsung provided significant consideration in exchange for such licenses, including: (i) an $8 million cash payment; (ii) a $15 million convertible note Netlist fails to acknowledge in its papers even though it is referenced on the first page of the JDLA, Netlist used the $15 million to escape a bad debt, and the note offered the potential that Samsung would take an equity stake in Netlist, AMF 67; (iii) licenses to Samsung's patents, AMF 68; and (iv) a partnership with Samsung that significantly bolstered Netlist's reputation in the industry, provided invaluable marketing opportunities, and provided Netlist an opportunity to become a products-company in a rich $15 billion market through joint development of a "game changing" NVDIMM-P product. AMF 24. There was no need for Samsung to also provide a "mandatory" supply obligation for product outside the joint development, as Netlist asserts.

---

[9]  Samsung has consistently taken the position the main purpose of the JDLA was patent licensing, which is why Samsung deducted withholding tax as a royalty. SUF 63. While Samsung agrees the licenses are broad, Netlist should not be allowed to argue one thing to its advantage in the Korean NTS and the direct opposite here.

### B. Netlist Is Not Entitled To Partial Summary Judgment On Its Second Cause Of Action For Breach Of Contract

#### 1. Samsung Reasonably Deducted Withholding Taxes From Payment To Netlist

Netlist's second claim for breach of contract alleges Samsung improperly deducted withholding taxes under Section 3.2 of the JDLA. But the JDLA provides Samsung may deduct applicable withholding taxes from payments due to Netlist, and that is what Samsung did. Section 3.1 sets forth Netlist's $8 million "NRE fee." AMF 23. Section 3.2 acknowledges Samsung may be required to deduct withholding taxes from this payment: "To the extent that any withholding taxes are required by applicable law for the payment set forth in this Agreement, *Samsung may deduct any applicable withholding taxes due or payable under the laws of Korea . . . .*" AMF 57.

On November 5, 2015, a week before the JDLA was signed, Samsung sent Netlist a tax form for Netlist to apply for a reduced tax rate as a foreign corporation. AMF 58. The form indicated the tax rate on royalties pursuant to a treaty with the U.S. was 16.5%. AMF 60. Gail Sasaki reviewed the form, signed it, and returned it to Samsung after having consulted with tax professionals of Netlist's choosing. AMF 60. As Netlist's CFO, Gail Sasaki had the authority to approve and sign the form, and consulted with a tax expert to ensure it was appropriate. AMF 61.

Immediately after the JDLA was signed, Samsung made the contractually required cash payment to Netlist of $8 million, less 16.5% deducted for withholding taxes, and paid the withheld amount to the tax authority. GMF 46. Samsung did so because it viewed the $8 million as consideration for Netlist's grant of patent licenses, and Korean law requires withholding of payments on such royalties.[10] AMF 62. This had been Samsung's stated position throughout the negotiations with Netlist. *Id.*

---

[10] The Court correctly characterized Netlist's theory as alleging "the NRE fee was not properly taxable," even if the withholding was lawful. (Dkt. 120 at 6.) There is no evidence Samsung was not required to withhold taxes, even if ultimately refunded.

Further evidencing the reasonableness of Samsung's view, before the Korean NTS eventually sided with Netlist, a lower Korean tax tribunal had ruled against Netlist and found the $8 million was taxable.[11] GMF 53.

### 2. Samsung Reasonably Cooperated With Netlist's Successful Efforts To Obtain A Refund Plus Interest

Netlist's second claim for breach of contract also alleges Samsung failed to reasonably cooperate with Netlist's successful efforts to obtain a refund plus interest, as required under Section 3.2. But Samsung did in fact cooperate. What Samsung refused to do was provide inaccurate information that runs counter to the tax form Netlist itself had signed just months prior to the withholding. Samsung had numerous communications with Netlist and PWC, Netlist's tax consultant, shared drafts of what Samsung proposed to submit to the tax authorities, and even asked Netlist and PWC to propose language they wanted. GMF 48. PWC even thanked Samsung for its cooperation and acknowledged Netlist could not have received a refund plus interest without Samsung's written submission to the Korean NTS. *Id.* What Netlist wanted was for Samsung to further Netlist's economic interests and deny the $8 million was a royalty. AMF 63. But Samsung had no contractual duty to provide inaccurate information to the Korean NTS.

Netlist suffered no injury from Samsung's withholding and alleged failure to cooperate. Netlist won its tax appeal, and received a full refund plus interest. GMF 54. While Netlist did pay consultants to obtain that result, there is no evidence Netlist would not have had to pay the same consultants' fees to obtain a refund even if Samsung had provided the kind of "cooperation" Netlist wanted.

---

[11]   Netlist asserts Samsung is precluded by collateral estoppel and res judicata from challenging the substance of the Korean NTS's ruling. Dkt. 145 at 18:17-19:16 (citations omitted). But, under the cases cited by Netlist, collateral estoppel and res judicata do not apply here because Samsung was not a *party* to the tax proceedings and simply provided information as requested by the Korean NTS. Moreover, Samsung is not quibbling with the substance of the Korean NTS's ultimate ruling. Rather, Samsung argues it acted reasonably in withholding taxes for the reasons above.

### C. Netlist Is Not Entitled To Partial Summary Judgment On Its Third Cause Of Action For Declaratory Relief

Netlist seeks a declaration the JDLA be terminated based on the two alleged breaches, but the undisputed facts show there was no supply obligation as alleged by Netlist and therefore no material breach of the JDLA. Netlist also received a full refund with interest, so the tax withholding claim could not possibly constitute a *material* breach. *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989) (for a breach to be material, it must "go to the root of the agreement between the parties."). Netlist thus is not entitled to partial summary judgment on it third claim.

#### 1. Netlist Waived Any Right To Terminate The JDLA

Moreover, Netlist long ago waived any right to terminate the contract based on its claims.[12] *Dun & Bradstreet Corp. v. Harpercollins Publishers, Inc.*, 872 F. Supp. 103, 110 (S.D.N.Y. 1995) (termination on the basis of material breaches "must be sought promptly" or it is deemed waived). Netlist executives internally discussed whether to provide notice of breach over the tax withholding dispute in March 4, 2016, but decided not to send a breach notice because it wanted to reap the benefits of its business relationship with Samsung. AMF 64. And as to the supply claim, Netlist asserts that "starting as early as the second quarter of 2017, Samsung began to refuse and/or cancel orders from Netlist. AMF 65. Yet Netlist waited to provide notice of alleged breach until May 27, 2020, more than *four years* after it first considered doing so. AMF 66. Not coincidentally, the $15 million note is due December 31, 2021. AMF 67.

While the JDLA includes a "no waiver" clause, even broad "no waiver" clauses may themselves be waived if circumstances warrant, as they do here. *Lee v. Wright*, 108 A.D.2d 678, 680, 485 N.Y.S.2d 543, 544 (1985) ("Contrary to its conclusion that the non-waiver clause in the lease precluded any finding of waiver, it has long been the rule

---

[12]  The Court's ruling on the MJOP addressed the election of remedies defense but not the separate defense of waiver. *See* Dkt. 120 at 7.

1  that parties may waive a "no-waiver" clause."). Netlist intentionally delayed suing for

2  years, all the while benefiting from its business relationship with Samsung.

3          Netlist cannot have it both ways. Either the alleged breaches were not material

4  and there is no right to terminate, or, if there were a material breach, then Netlist

5  waived its claim by acquiescing in the alleged breaches since early 2016 (as to the tax

6  withholding claim) and the first half of 2017 (as to the supply claim). Whether based on

7  waiver (or other concepts such as laches or election of remedies), that is far too long

8  for Netlist to have sat on its rights before trying to terminate the contract.[13]

9          So why did Netlist file its complaint after years of supposedly repeated non-

10  performance? The answer is simple: by terminating the JDLA and the cross-licenses

11  contained therein, Netlist can set up a patent infringement claim, which as its 10-K

12  discloses, is part of its long-standing business plan to monetize its intellectual property

13  through litigation. Such strategic maneuvering, however, cannot replace the clear terms

14  of the JDLA and sidestep the undisputed evidence that has been uncovered.

15  **III.  CONCLUSION**

16          For all these reasons, Samsung respectfully requests the Court deny Netlist's

17  MPSJ in its entirety.

18

19  DATED:  August 30, 2021          Bird, Marella, Boxer, Wolpert, Nessim,
                                     Drooks, Lincenberg & Rhow, P.C.
20

21                                   By:  _____

22                                          Ekwan E. Rhow
                                       Attorneys for Defendant Samsung
23                                     Electronics Co., Ltd.

24

25  [13]     Netlist is incorrect that Samsung's "continued failure to pay . . . or to cooperate"
       (Dkt. 145 at 20 n. 4) are a continuing wrong to this day; at most, Netlist feels the
26  "continuing effects of earlier … conduct," which the continuing wrong doctrine does
       not cover. *Miller v. Metro Life Ins. Co.*, 979 F.3d 118, 122 (2d Cir. 2020). Netlist's reliance
27  on *Stalis v. Sugar Creek Stores, Inc.* is misplaced because there, the defendant had a duty
       of continuing performance throughout the contract's term. 295 A.D.2d 939, 940
28  (2002). That is not the case here: Samsung's performance began and ended at the
       withholding in 2015 and with its submissions to the Korean tax authority in 2019.