# Exhibit O

**Case Nos. 22-55209 (L), 22-55247**

*In the*

# United States Court of Appeals
*for the*
# Ninth Circuit

---

NETLIST INC.,
a Delaware corporation,
*Plaintiff-Appellee,*

v.

SAMSUNG ELECTRONICS CO., LTD.,
a Korean corporation,
*Defendant-Appellant.*

---

*Appeal from the United States District Court for the Central District of California (Santa Ana),
Case No. 8:20-cv-00993-MCS-ADS · Honorable Mark C. Scarsi, District Judge*

## FIRST BRIEF ON CROSS-APPEAL
[APPELLANT'S OPENING BRIEF]

| | |
|---|---|
| ANTON METLITSKY | MICHAEL G. YODER |
| EPHRAIM MCDOWELL | MARC F. FEINSTEIN |
| O'MELVENY & MYERS, LLP | O'MELVENY & MYERS, LLP |
| Times Square Tower | 400 South Hope Street, 18th Floor |
| 7 Times Square | Los Angeles, CA 90071 |
| New York, NY 10036 | Telephone: (213) 430-6000 |
| Telephone: (212) 326-2000 | myoder@omm.com |
| ametlitsky@omm.com | mfeinstein@omm.com |
| emcdowell@omm.com | |

*Attorneys for Appellant Samsung Electronics Co., Ltd.*

 COUNSEL PRESS · (213) 680-2300    PRINTED ON RECYCLED PAPER 

*Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007). Where a contract is "ambiguous," however, "[e]xtrinsic evidence of the parties' intent may be considered." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002).

Here, the JDLA unambiguously provides that section 6.2's supply obligation is limited to the parties' NVDIMM-P joint-development project. But at minimum, the contract is ambiguous, and the undisputed extrinsic evidence overwhelmingly supports Samsung's reading. Because Netlist does not argue that Samsung failed to supply NVDIMM-P-related memory components, judgment for Samsung is required on this claim.

> 1. *Section 6.2 Unambiguously Requires Samsung To Fulfill DRAM And NAND Orders Only For The NVDIMM-P Joint-Development Project*

a. To determine whether a contract is unambiguous, New York courts must discern "the intention of the parties [as] gathered from the four corners of the instrument." *Beal*, 8 N.Y.3d at 324. Three interpretive principles are especially salient here.

*First,* courts must read the document "as a whole, and every part will be interpreted with reference to the whole." *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003).

*Second*, courts must discern from the contractual language and structure "the apparent purpose of the parties," and then construe the

-24-

"[w]ords in [the] contract … to achieve th[at] apparent purpose." *Hooper Assocs., Ltd. v. AGS Comps., Inc.*, 74 N.Y.2d 487, 491 (1989); *see Beal*, 8 N.Y.3d at 324-25.

*Third*, courts disfavor constructions that produce "commercially unreasonable" results that the parties likely did not intend. *Cole v. Macklowe*, 99 A.D.3d 595, 596 (N.Y. App. Div. 2012); *see Uribe v. Merchants Bank of N.Y.*, 91 N.Y.2d 336, 340 (1998) (the "reasonable expectation and purpose of the ordinary business[person] when making an ordinary business contract serve as the guideposts").

b. Under these principles, Samsung's section 6.2 supply obligation is unambiguously tied to the NVDIMM-P product that the parties were jointly developing.

When the JDLA is read "as a whole," *Westmoreland Coal*, 100 N.Y.2d at 358, it is clear that the parties' "apparent purpose," *Hooper Assocs.*, 74 N.Y.2d at 491, was to jointly develop a new NVDIMM-P product. The contract's title is "Joint Development and License Agreement," and its preamble states that "the Parties intend to work together to jointly develop an interface and associated technologies for certain memory modules." 4-ER-709. The contract defines the "joint development project" to mean "the collaborative efforts by the Parties to develop" the "NVDIMM-P Product." 4-

-25-

ER-711, § 1. The contract outlines the parties' multi-phase plans to develop the NVDIMM-P product. 4-ER-712-713, § 2. And the parties agreed that once the product was developed, they would "work together to bring a Developed Product to market." 4-ER-714, § 5.3. In short, the JDLA's core purpose is to establish terms under which the parties would jointly develop and bring to market a new NVDIMM-P product.

Section 6 must be interpreted "to achieve [this] apparent purpose of the parties," *Hooper Assocs.*, 74 N.Y.2d at 491, and "with reference to the whole" JDLA, *Westmoreland Coal, Inc.*, 100 N.Y.2d at 358. Section 6 is entitled "Supply of **Components**," 4-ER-714-715, § 6 (emphasis added)—so naturally, the referenced "components" are those necessary to jointly develop the NVDIMM-P product, not products promised in unlimited quantities to be used for any purpose. Section 6.1 states that "Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer." 4-ER-714, § 6.1. Correspondingly, section 6.2 provides that "Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (*i.e.*, among customers purchasing similar volumes of similar products)." 4-ER-714-715, § 6.2. Each provision requires one party to supply the other with applicable components for NVDIMM-P products. *See infra* at 28-29.

-26-

This construction follows naturally from the "reasonable expectation and purpose of the ordinary business[person] when making an ordinary business contract." *Uribe*, 91 N.Y.2d at 341. When agreeing to a contract principally addressing joint development of a particular product, an ordinary businessperson would understand that their obligation to supply "components" is tethered to that particular product. They would not understand their obligation to be an unlimited promise to supply all products the counterparty might need for any reason, including for reselling to third parties in a supply-constrained memory market. Such a reading runs afoul of the "well settled principle that a contract should not be interpreted to produce ... commercially unreasonable" results. *Cole*, 99 A.D.3d at 596.

c. The district court nevertheless held that section 6.2 "unambiguously creates a mandatory obligation on Samsung to supply" unlimited NAND and DRAM on request, even when unrelated to the NVDIMM-P joint-development project. 1-ER-34; *see* 1-ER-33-35. That conclusion flowed from three independent legal errors.

First, the court failed to read section 6.2's language in the context of the JDLA as a whole. Section 6.2 is not a "straightforward," 1-ER-33, term for the supply of goods generally that just happened to be placed into a joint development agreement, but rather is a term for the "supply of components"

-27-

(to quote section 6's title) that are necessary for the particular product to be jointly developed by the parties. New York courts recognize that sometimes the words of a single provision (here, section 6.2) "might seem to admit of a larger sense," but in fact "should be restrained to the particular occasion and to the particular object"—here, the joint-development project—"which the parties had in view." *Hooper Assocs.*, 74 N.Y.2d at 491. The district court failed to heed this admonition.

Second, the court drew an inappropriate negative inference from section 6.1. *See* 1-ER-35. Because section 6.1 specifically references NVDIMM-P and section 6.2 does not, the court reasoned, section 6.2 must reach *all* NAND and DRAM, whether or not related to NVDIMM-P. *Id.* But the "force of any negative implication … depends on context," *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013), and the contractual context here precludes the court's conclusion. Netlist promised to provide controllers for NVDIMM-P products, not any generic controller. Section 6.1 refers to an "NVDIMM-P controller" because that is what Netlist agreed to supply. The products that section 6.2 required Samsung to supply, in contrast, are generic types of memory that can be used for many computing purposes, not just the NVDIMM-P product. For example, the JDLA defines "NVDIMM-P Product" to mean a "memory module" that "combines a smaller density of

-28-

fast memory like DRAM with a higher density of slower memory like NAND", 4-ER-711, § 1—NAND and DRAM are described generically as components of the NVDIMM-P product.  Section 6.2 thus accurately describes exactly what Samsung was required to supply for the NVDIMM-P project—namely, generic NAND and DRAM, full stop.  Sections 6.1 and 6.2 are, in other words, complementary to each other—they each set forth the components that the other party agreed to supply for the NVDIMM-P joint-development project.

Third, the court reasoned that because JDLA sections 7 and 8—which grant mutual release of patent-infringement claims and cross-licensing of patents—do not "pertain specifically to the NVDIMM-P project," section 6.2 may be read in the same manner. 1-ER-34-35.  This reading misunderstands the contract's structure.  As the JDLA's title shows, the agreement addresses two distinct items: (1) "joint development" of the NVDIMM-P product and (2) "licens[ing]" of the parties' patents.  4-ER-709.  Sections 7 and 8 speak to the patent licenses.  It therefore makes sense that Sections 7 and 8 do not speak in NVDIMM-P-specific terms.  *See, e.g.,* 4-ER-711, § 1 (defining "Netlist's Licensed Patents" to mean "*any and all* Patents owned or controlled by Netlist or any of its Subsidiaries" (emphasis added)); *id.* (defining Samsung's "Licensed Products" to mean "*all* semiconductor

products manufactured or have manufactured by or for Samsung or its Subsidiaries" (emphasis added)).

Section 6, by contrast, sets out obligations for effectuating the joint development project. For one thing, the section is labeled "Supply of *Components*," which naturally relates to the new technology the parties were developing rather than to patent licensing. That is confirmed by section 6.1, under which "Netlist will provide Samsung any NVDIMM-P controller," 4-ER-714, § 6.1—an NVDIMM-P component. It would be anomalous if section 6 covered only NVDIMM-P components in its first subpart, but included non-NVDIMM-P products in its second subpart. And indeed, NAND and DRAM—the focus of section 6.2—are two of the main components of NVDIMM-P. *See supra* at 28. So while it is true that sections 7 and 8 do not "pertain specifically to the NVDIMM-P project," 1-ER-34-35, that says nothing about section 6.2's scope. When read in context, section 6.2 unambiguously imposes an obligation on Samsung to supply NAND and DRAM only for the parties' joint-development project.

  2.  *At Minimum, Section 6.2 Is Ambiguous, And The Extrinsic Evidence Compels Samsung's Interpretation*

At the very least, the contract is "reasonably susceptible" of Samsung's construction. *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 572 (1986). When faced with an ambiguous contract, "the courts of New York will examine the

record as a whole in an effort to interpret the agreement so as to effectuate the intent of the parties." *Bank of N.Y. v. Amoco Oil Co.*, 35 F.3d 643, 661 (2d Cir. 1994); *see Greenfield*, 98 N.Y.2d at 569. Here, the undisputed extrinsic evidence shows that Samsung's section 6.2 supply obligation is limited to components for NVDIMM-P products.

The parties' contractual negotiations are revealing. *See, e.g., 67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248-49 (1975) ("evidence of conversations, negotiations and agreements made prior to or contemporaneous with the execution of a [contract] … is generally admissible to explain ambiguities therein"). An early Netlist proposal included a section called "Technology Collaboration," under which "Samsung [would] supply NAND [and] DRAM" as "Raw Materials" for that Technology Collaboration on "mutually agreed terms." 2-ER-276 (¶ 24). Netlist's CEO testified that "Technology Collaboration" referenced the "NVDIMM-P technology," 3-ER-376, and "Raw Materials" referenced "the components themselves," i.e., "DRAM" and "NAND," 3-ER-377. Another Netlist proposal included a section called "Phase 2: Technology Productization," under which the parties would "work together to bring an NVDIMM-P product to market," and Samsung would "supply NAND and DRAM" as "Raw Materials" for that product on "mutually agreed terms." 2-

ER-276-277 (¶ 27); *see also* 3-ER-379 (Netlist's CEO testifying that "Raw Materials" referenced DRAM and NAND "provided in connection with the commercialization of the dash P product [the NVDIMM-P product].").

Importantly, section 6 of the MOU stated that as "Raw Materials," "Samsung will provide competitive pricing (i.e. among customers purchasing the same products and similar volumes) for the supply of Samsung NAND and DRAM products." 2-ER-278-279 (¶ 32). Reflecting the earlier proposals, Netlist's CEO testified that Samsung's supply obligation under this section applied to "[t]he dash P product"—i.e., the NVDIMM-P product—"if it ever … became commercialized" (which never occurred). 3-ER-380. There is no plausible basis to construe the JDLA as departing so drastically from the MOU on which the JDLA was explicitly based.

Moreover, if the JDLA had granted Netlist an unlimited supply of NAND and DRAM, Netlist presumably would have announced this momentous fact to the market and its shareholders in SEC filings—such a supply guarantee would have been a significant accomplishment in an industry plagued by unstable supply. *See supra* at 11-12. Yet Netlist's audited annual 10-K reports to its shareholders and the SEC following the JDLA—which Netlist's lawyers surely examined in detail—described the JDLA's joint-development and licensing provisions without mentioning any

-32-

long-term supply commitment with Samsung, 4-ER-627, and instead stated (for the five years following the JDLA) that Netlist had "*no long-term … supply contracts*" for DRAM and NAND, 4-ER-606 (emphasis added); 2-ER-282-283 (¶¶ 43-44). If section 6.2 actually established an unlimited supply obligation, that sort of audited statement to shareholders and the SEC would be inexplicable. Moreover, when Netlist actually *did* enter into a long-term supply contract with another supplier (SK Hynix) in 2021, it reported the contract to the SEC immediately. 5-ER-902 ("The Supply Agreement entitles Netlist to purchase up to $600,000,000 of SK Hynix memory products during the term of the Supply Agreement.").

The parties' "post-contract course of performance"—"which is highly probative of their state of mind at the time the contract was signed," *China Privatization Fund (Del.) v. Galaxy Entm't Grp. Ltd.*, 187 A.D.3d 596, 597 (N.Y. App. Div. 2020)—confirms the point. From 2015 into 2017, while the parties' joint-development project proceeded on one track, their normal business transactions—which started before the JDLA and continued after it—proceeded on another: Netlist would request NAND and DRAM from Samsung through purchase orders stating that they represented "the entire agreement between [the] parties with respect to the subject matter"; and Samsung would fulfill some orders but not others. *See* 2-ER-283-285 (¶¶ 46-

53); *supra* at 11. For instance, in April 2016, Netlist wrote to Samsung in hopes of buying more NAND: "I know it's insane but want to … try our luck." 3-ER-447 (¶ 71). And when Samsung did not provide Netlist with the amount of NAND and DRAM it wanted, Netlist sought a larger "monthly allocation." 2-ER-119-120 (¶ 104). Netlist does not dispute that Samsung complied with its supply obligations during this period. *See* 2-ER-214 (¶ 48); 2-ER-112 (¶ 71). Yet this course of conduct would make no sense if the JDLA had already secured Netlist the right to buy all the NAND and DRAM it wanted.

Nor would Netlist's February 2017 request for a "New Partner Type" relationship and an "Official-Distributor Partnership Agreement" that would require Samsung to provide additional NAND and DRAM "Product Allocation support for Netlist." 2-ER-283 (¶ 45); 2-ER-212 (¶ 45). Netlist would not have needed to make this request for additional supply of NAND and DRAM products if the JDLA *already* guaranteed unlimited supply outside of the joint-development project.

Finally, because the JDLA was "negotiated by counsel for sophisticated commercial parties," the Court should interpret any "ambiguous language to realize the reasonable expectations of the ordinary businessperson." *Bank of N.Y.*, 35 F.3d at 662. No ordinary businessperson in Samsung's position would agree to supply an unquantified amount of DRAM and NAND to a

-34-

single customer on "request at a competitive price." 4-ER-714-715, § 6.2. Samsung is one of the world's leading suppliers in a memory industry that experiences endemic supply shortages, *see supra* at 5, 12, so an unlimited supply commitment to one customer would seriously jeopardize Samsung's sales to its many *other* customers. Assuming such a commitment is especially unreasonable where (as here) Netlist's own supply obligation is narrowly tailored to the NVDIMM-P context, which would make Samsung's supply obligation bizarrely and unfairly asymmetrical.[2]

* * *

The only plausible reading of section 6.2 is that Samsung's supply obligation was tied to the NVDIMM-P joint-development project. Netlist does not claim that Samsung failed to supply sufficient NAND and DRAM for the NVDIMM-P project. *See* ECF 192 at 14. Samsung is thus entitled to judgment on Netlist's first claim.

---

[2] For the reasons given, if the Court finds section 6.2 ambiguous, it should reverse the district court's judgment on the ground that the undisputed extrinsic evidence compels Samsung's interpretation. If the Court finds, however, that the extrinsic evidence is disputed, it should remand for a trial on section 6.2's scope.

Yet Netlist chose not to terminate the contract until 2020. This is exactly what the election-of-remedies doctrine precludes. *See ESPN, Inc. v. Off. of Comm'r of Baseball*, 76 F. Supp. 2d 383, 391-92 (S.D.N.Y. 1999) (allowing nonbreaching party to "terminate the contract based on breaches that occurred almost two years ago would violate important principles of contract law"). And the JDLA's no-waiver provision does not excuse Netlist's failure to seek termination. *See id.* at 390 (a "standard 'no-waiver' provision does not immunize or excuse parties from the requirements and consequences of election"). Thus, Samsung should have been allowed to raise this defense.

## CONCLUSION

For the foregoing reasons, the judgment below should be reversed.

Respectfully Submitted,

Dated: June 6, 2022

By: /s/ Michael G. Yoder

Anton Metlitsky
Ephraim McDowell
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

Michael G. Yoder
Marc Feinstein
O'Melveny & Myers LLP
400 South Hope Street
18th Floor
Los Angeles, CA 90071

-65-

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**  22-55209 (L), 22-55247

 I am the attorney or self-represented party.

 **This brief contains 13,995 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

 I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[XX] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

 [ ] it is a joint brief submitted by separately represented parties;

 [ ] a party or parties are filing a single brief in response to multiple briefs; or

 [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


Dated:  June 6, 2022                                  /s/ Michael G. Yoder

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s)**  22-55209 (L), 22-55247

The undersigned attorney or self-represented party states the following:

[XX]  I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

Dated:  June 6, 2022                                    /s/ Michael G. Yoder

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:  June 6, 2022                                                  /s/ Michael G. Yoder