# Corrected Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

NETLIST, INC.,                    (  CAUSE NO. 2:21-CV-463-JRG
                                  )
          Plaintiff,              (
                                  )
vs.                               (
                                  )
SAMSUNG ELECTRONICS CO., LTD.,    (
et al.,                           )  MARSHALL, TEXAS
                                  (  APRIL 14, 2023
          Defendants.             )  9:00 A.M.
_____


VOLUME 1


_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury
_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

```
 1                         A P P E A R A N C E S

 2         FOR THE PLAINTIFF:      IRELL & MANELLA, LLP -
                                   LOS ANGELES
 3                                 1800 AVENUE OF THE STARS
                                   SUITE 900
 4                                 LOS ANGELES, CA 90067-4276
                                   (310) 203-7096
 5                                 BY:  MR. JASON SHEASBY
                                        MS. LISA GLASSER
 6
                                   McKOOL SMITH, P.C. - MARSHALL
 7                                 104 E. HOUSTON ST., SUITE 300
                                   MARSHALL, TEXAS  75670
 8                                 (903) 923-9000
                                   BY:  MR. SAM BAXTER
 9                                      MS. JENNIFER TRUELOVE
                                        MR. KEVIN BURGESS
10
           FOR THE DEFENDANTS:     FISH & RICHARDSON, PC -
11                                 WASHINGTON DC
                                   1000 MAINE AVE. SW, SUITE 1000
12                                 WASHINGTON, D.C.  20024
                                   (202) 783-5070
13                                 BY:  MR. RUFFIN CORDELL
                                        MR. MICHAEL McKEON
14
                                   GILLAM & SMITH, LLP
15                                 303 SOUTH WASHINGTON AVENUE
                                   MARSHALL, TEXAS  75670
16                                 (903) 934-8450
                                   BY:  MS. MELISSA SMITH
17
           OFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
18                                 100 E. HOUSTON STREET
                                   MARSHALL, TEXAS  75670
19                                 (903) 923-8546

20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| SCOTT MILTON | |
| Direct By MR.SHEASBY ........................................... | 189 |
| Cross By MR. McKEON ........................................... | 230 |

1          THE COURT:  Thank you.  Be seated, please.

2      Good morning, ladies and gentlemen.  Thank you for being

3  here.

4      My name is Rodney Gilstrap, and I am the chief United

5  States district judge for the U.S. District Court for the

6  Eastern District of Texas.  I have lived in Marshall since

7  1981.  I practiced law in and around this community for 30

8  years before I was appointed to the bench here in 2011.

9      They say that confession is good for the soul so I'll

10  start with a confession.  I was not born in Texas, but I got

11  here as quick as I could.  I came to Texas at the ripe old age

12  of 18 to enroll as a freshman at Baylor University in Waco.  I

13  finished my undergraduate degree there, and then I attended

14  and graduated from Baylor law school.

15      I am married.  My wife and I had two grown children.  We

16  lost one about six months ago.  We have several wonderful

17  grandchildren.  My wife owns and operates a retail floral

18  business here in Marshall, and she's done that for more than

19  the last 15 years.

20      Now, I tell you all those things about myself because in

21  a few minutes I'm going to ask each of you to give me the same

22  type information about yourselves, and I think you're entitled

23  to know as much about me as I'm about to find out from each of

24  you-all.

25      We are about to engage in the selection of a jury in a

1    DDR4 and DDR5, it was March and May of 2021.

2    Q.   And just to level-set on that, you were here in Court,

3    Mr. Kennedy, when Judge Gilstrap explained to the jury that it

4    had been determined that Samsung no longer had a license after

5    July of 2020.  Is that where that date is coming from?

6    A.   Yes, that's correct.

7    Q.   Now, is there a set of factors that courts have laid out

8    to aid experts like yourself in performing this analysis?

9    A.   Yes.  They're called the *Georgia-Pacific* factors, named

10   after a well-known patent case years ago, and it outlines 15

11   factors that experts need to consider to determine damages.

12   Q.   What are the first three factors that you focused on for

13   your work?

14   A.   So 1 and 2 relate to any licensing history that the

15   parties might have that might be relevant to the hypothetical

16   negotiation.

17        And factor No. 5 is something where we have to consider

18   the commercial relationship between the licensor and licensee

19   at the time of this hypothetical negotiation.

20   Q.   Mr. Kennedy, when you reviewed all of the facts and

21   documents in the case, what did you find to be the most

22   significant facts regarding the parties' licensing history and

23   their relationship?

24   A.   Well, Netlist has never licensed its patents outside of a

25   strategic agreement, and that's really important because in

1    the hypothetical negotiation there is no strategic agreement.

2    Samsung needs a license to the patents, and they are not

3    giving anything in return for that except royalties.

4    Q.    And could you go on and describe what other additional

5    significant facts you found?

6    A.    So the JDLA included a cross license, and that means that

7    Netlist got a license to all of Samsung's patents, and they

8    also got this highly valuable supply agreement.

9    Q.    And -- I'm sorry.  Go on, Mr. Kennedy.

10   A.    Sure.  And one other factor that I considered was the

11   fact that Samsung entered into a license in a very similar

12   situation as this situation, and it involved memory patents

13   and they agreed to pay up to $1.1 billion plus give a cross

14   license to Rambus to their patents.

15   Q.    So at a high level, what was the impact of these on how

16   you're thinking about the parties approaching a hypothetical

17   negotiation?

18   A.    So these are all important factors that place upward

19   adjustment on the royalty rate, significant upward adjustment.

20   Q.    So let's turn to each of them in turn.  You mentioned

21   that Netlist never previously has licensed or never in the

22   real world has licensed its patents outside of a strategic

23   relationship.  What was significant to you in particular about

24   the JDLA relationship?

25   A.    So this is some deposition testimony from Samsung's

1    president of memory, and he was told to look into any

2    feasibility of a technological collaboration with Netlist.

3    And that's significant because Samsung is the largest memory

4    company in the world, and they're coming to Netlist for help

5    to this technology.  So that would definitely have a

6    significant upward adjustment to the royalty rate at the

7    hypothetical negotiation.  Samsung really needs Netlist

8    technology.

9    Q.   Now, did you see evidence that Samsung was aware that

10   Netlist had important patents?

11   A.   Yes, I did.

12   Q.   Now, I know the jury has seen these a number of times.

13   Are these some of the examples on the screen here of the

14   evidence that Samsung was aware of the Netlist patents and

15   pending applications?

16   A.   Yes.

17   Q.   Now, you mentioned that the JDLA included, I think you

18   used the phrase, a highly valuable supply obligation.  Is that

19   right?

20   A.   Yes.

21   Q.   And were you able to review the records of the parties to

22   understand the quantities of supply that were exchanged when

23   the JDLA was first put in place?

24   A.   Yes, I was.

25   Q.   And what is the particular example that we're looking at

```
 1   on the screen?
 2   A.   This is an email from Netlist to Samsung.  And after the
 3   JDLA was entered into, about a year later, they were
 4   requesting $15 million for a quarter, and that was in June of
 5   2017.
 6   Q.   So we're talking about greater than a 60 million pace at
 7   that point in time at about a year after the agreement was
 8   implemented?
 9   A.   Yes.
10   Q.   Now, again, the Court instructed the jury that the JDLA
11   terminated back in 2020.  What did Netlist do at that point?
12   A.   So they went to find another source of supply and entered
13   into another strategic agreement with SK hynix.
14   Q.   And is this the second time you were referring to earlier
15   that Netlist agreed to license its patent portfolio?
16   A.   Yes.
17   Q.   What were the key terms of those hynix agreements that
18   were executed together?
19   A.   So based on my review, the most important aspect of the
20   agreement was that Netlist was able to replace the supply
21   commitment that they no longer had with a $600 million supply
22   commitment from SK hynix for a five-year period of time.
23        And SK hynix also paid Netlist $40 million, and there was
24   a cross license to Netlist and SK hynix's patents.
25   Q.   Now, based on your analysis, was the value of the supply
```

1   A.   Yes.

2   Q.   All right.  Now, both parties would know a lot about each

3   other at this negotiation.  Right?

4   A.   Yes.

5   Q.   And one of the things they would know is any other

6   agreements that might be relevant out there.  Right?

7   A.   Yes.

8   Q.   Now, before we get into that, I'd like to just frame up

9   kind of what we're talking about.  Well, let's do those

10  agreements right now.  I'm sorry.

11       Netlist has licensed the patents in this case in two

12  agreements.  Correct?

13  A.   As part of two agreements, yes.

14  Q.   That would be the JDLA that they -- the agreement they

15  had with Samsung.  Right?

16  A.   Yes.

17  Q.   And the agreement they had with SK hynix.  Correct?

18  A.   Yes.

19  Q.   And in both of those agreements, Netlist licensed every

20  patent that they owned.  Right?

21  A.   Yes.

22  Q.   And in the JDLA at the time, it was about 87 patents.  Is

23  that right?

24  A.   That sounds about right.

25  Q.   And the terms of the JDLA required Samsung to pay Netlist

1       $8 million.  Right?

2       A.    Yes.

3       Q.    And there's also the SK hynix agreement.  You're familiar

4       with that one.  Right?

5       A.    Yes.

6       Q.    JDLA was done in 2015.  Is that right?

7       A.    Yes.

8       Q.    And SK hynix, that agreement was done in 2021.  Right?

9       A.    Yes.

10      Q.    And the SK hynix agreement licensed all of Netlist's

11      patents to SK hynix.  Right?

12      A.    Yes.  That was part of the agreement.

13      Q.    And in 2021, that was about 120 patents.  Right?

14      A.    Yes.

15      Q.    Okay.  And Samsung and SK hynix are competitors.  I think

16      you testified about that.  Right?

17      A.    Yes.

18      Q.    They both sell DDR4 products.  Right?

19      A.    Yes.

20      Q.    Both Samsung and hynix sell DDR5 products.  Right?

21      A.    Yes.

22      Q.    SK hynix and Samsung sell HBM products.  Right?

23      A.    Correct.

24      Q.    Those are all the products that are at issue in this

25      case.  Right?

1    A.    Yes.

2    Q.    Okay.  So let me -- before we get into the nitty-gritty,

3    let me see if I can frame this up.  And let's start with the

4    damages that you have opined about in this case.  So let's

5    call this Mr. Kennedy.

6              MR. CORDELL:  Your Honor, may I move this forward?

7              THE COURT:  You may.  Move it up near the elmo.

8              MR. CORDELL:  Thank you.

9         Can you hear me all right?

10             THE COURT:  Mr. Kennedy, can you hear him?

11             THE WITNESS:  Yes, sir.

12   Q.    (BY MR. CORDELL)  Now, there are three different classes

13   of products.  Let me make sure I get all this right.  We have

14   DDR4, we have DDR5, and we have HBM.  Is that right?

15   A.    Yes.

16   Q.    I apologize about my handwriting again.

17        And the years of the damages that you have talked about

18   in this case are a little bit different for each of the

19   products.  Right?

20   A.    Yes.

21   Q.    So for DDR4, when does the damages start on DDR4?

22   A.    That's at the termination of the JDLA, which was July, I

23   believe, of 2020.

24   Q.    Would you believe that it was in December of 2021?

25   A.    Yes.

```
 1              MS. GLASSER:  Actually, can we have a sidebar, Your
 2    Honor?
 3              THE COURT:  Approach the bench.
 4              (The following was had outside the hearing of the
 5              jury.)
 6              MS. GLASSER:  My concern is that he is correct that
 7    the number he -- he said the wrong date, but he mixed up
 8    something.  But now he just threw out a completely different
 9    date that has to do with a separate period of damages that is
10    not when the hypothetical negotiation is taking place.  So I
11    guess I'm not sure where he's going with --
12              THE COURT:  If we're talking about the JDLA, I've
13    told the jury that it was no longer effective in July of 2022.
14              MR. CORDELL:  We're not, Your Honor.
15              THE COURT:  '21.
16              MR. CORDELL:  '21.  2020.
17              MS. GLASSER:  If it was the issue date of the
18    patent, then I would be okay with it if that's what it is, but
19    --
20              MR. CORDELL:  No.  No.
21              THE COURT:  Let's start over.  What's the problem?
22              MS. GLASSER:  It sounds like he's introducing
23    something having to do with a different damages period or a
24    different hypothetical negotiation date than what is actually
25    at issue.  But I could be wrong.  Maybe he can reassure me
```

1   where he's going with it.  But that wasn't the hypothetical

2   negotiation date or the JDLA date, and so it seemed to me like

3   it might be going in a wrong direction.

4           THE COURT:  All right.  Can you respond to that, Mr.

5   Cordell?

6           MR. CORDELL:  Yes, Your Honor.  First of all, this

7   witness should know.  You can see him over there looking it up

8   right now.

9       The damages period he opined about is the damages period

10  he opined about.  The correct damages period begins at

11  December of 2021 when the complaint was filed.  Your Honor

12  ruled on that at the pretrial.  For these two patents, it's

13  December of 2021.

14      For HBM, it began in May when they filed the amended

15  complaint.  So I'm entitled to get from him what his opinion

16  is about when the damages started.  I'll refresh him if he

17  can't remember, but he should remember.  It has nothing to do

18  with the hypothetical negotiation --

19          MS. GLASSER:  Do you intend to talk about how he

20  calculates that number for the revenue?  Is that --

21          THE COURT:  All right.  Just -- just stop.  There's

22  not an objection up here.  We're not here to have a

23  conversation.  Let's go forward.  Okay?

24          MR. CORDELL:  Thank you, Your Honor.

25          MS. GLASSER:  Thank you.

```
 1              (The following was had in the presence and hearing

 2         of the jury.)

 3    Q.    (BY MR. CORDELL)  All right, Mr. Kennedy.  Do you

 4    remember the question?

 5    A.    Yes, I believe so.

 6    Q.    When do your damages period begin for DDR4?

 7    A.    When the JDLA was terminated.

 8    Q.    Okay.  So are you sure about that, sir?

 9    A.    I can check in my report to make sure.

10    Q.    Why don't you check?  Because I think it's December of

11    2021, not July of 2020.  And that's about a year and a half

12    difference.

13    A.    To save time, do you want to direct me to it, or do you

14    wish for me to look for it?

15    Q.    Well --

16    A.    I'm happy to do either.

17    Q.    So let me show you -- I mean, well, let me just ask you

18    quick.  Do you remember the damages period for any of the

19    three classes of products that you put your opinion in on?

20    A.    Yes.

21    Q.    Okay.  Well, what -- what are the others?

22    A.    The DDR5 is -- it's March of 2021, and HBM is May of

23    2021.

24    Q.    No.  Let me see if I can find your chart.  Okay.  Let's

25    try it with this.
```

```
1          And it matters when the damages period is.  Right, Mr.
2     Kennedy.
3     A.   Yes, yes.
4     Q.   Right.  You don't want to pay for your hunting lease for
5     years you're not going to be there.  Right?
6     A.   That's correct, yes.
7     Q.   You've been called to Africa, it would be silly for you
8     to pay for a lease when you're not there.  Right?
9     A.   Yes, that's correct.
10    Q.   So if you see here your exhibit for B to C, which is
11    DDR4 --
12    A.   Yes.
13    Q.   -- after December 2021 going forward.  Right?
14    A.   Yes, that's correct.
15    Q.   Not July 2020.  Right?
16    A.   That's correct.
17    Q.   It's not March of 2021.  Right?
18    A.   Yes, that's correct.
19    Q.   So for DDR4, the damages begin when we have to start
20    paying you at 12/21.  Right?
21    A.   That's correct.
22    Q.   And that runs through the present day.  Fair?
23    A.   Yes.
24    Q.   That's through the present.  What about DDR5?  What does
25    your chart say about when damages began then for DDR5?
```

```
 1   A.   In -- at December 20th, 2021, forward.

 2   Q.   Okay.  So 12/21, and that again to the present.  Right?

 3   A.   Yes.

 4   Q.   All right.  And when did the damages begin for HBM.

 5   A.   So from May 3rd, 2022 forward.

 6   Q.   All right.  So 5/22 to the present.  Right?

 7   A.   Yes.

 8   Q.   So we've had about, oh, call it 14 months for DDR4 and

 9   DDR5?  Is that right?

10   A.   That's correct, yes.

11   Q.   And then we have about, oh, just shy of a year, maybe 11

12   months, for HBM.

13   A.   Yes, that's correct.

14   Q.   All right.  Now, can we kind of come up with a round

15   number just so I can use one time period?  So 7, 18, and 11,

16   you know, call it 16 months?  Does that sound about right?

17   A.   Sure.

18   Q.   Okay.  So is there another number you prefer?

19   A.   No.  That's fine for --

20   Q.   All right.  So 16 months?

21   A.   -- this purpose.

22   Q.   All right.  So that's what you say is the capture period

23   for damages in this case.  Right?

24   A.   Yes.  That's the damages period.  The hypothetical

25   negotiations were the other dates.  But I think we -- the
```

 1   Court has instructed which date to use for damages, and that

 2   is correct.

 3   Q.    And that's important.  Right?  Because we didn't -- we

 4   didn't lease the land until these dates.  Right?

 5   A.    That's right.

 6   Q.    Okay.  So we're going to -- you're only going to give an

 7   opinion that Samsung owes money for those dates.  Right?

 8   A.    That's correct.

 9   Q.    Okay.  Now, let's take that, that's -- and you say

10   that's -- I'm sorry, $440.2 million.  Right?

11   A.    Yes.

12   Q.    And you accountants write million as two Ms.  Is that

13   right?

14   A.    That's right.

15   Q.    Why do you do that?

16   A.    I'm not sure.  It's been that way since I've been in

17   college, since I was in college.

18   Q.    Million still only has one M in it.  Right?

19   A.    I know it.  But if you put one M, people understand that

20   as a thousand, so -- I didn't come up with it.

21   Q.    All right.  Now, I'd like you to do something for the

22   jury and do a comparison.  Would that be okay?

23   A.    Sure.

24   Q.    All right.  So let's see.  Let's start with your number.

25   Okay?  I'm just going to put a big K here as that's your

```
 1   number.  And your number is $404.2 million.  Isn't that right?

 2   A.   Correct.

 3   Q.   And that was for 16 months.  You want to round that up so

 4   I can call it a year-and-a-half, 18 months, 1.5 years?

 5   A.   Okay.

 6   Q.   1.5 years.  All right.  That's your opinion.  Right, sir?

 7   A.   Yes.

 8   Q.   Okay.  Now, the JDLA, that's another agreement in this

 9   case.  Right?

10   A.   Yes.

11   Q.   And that was -- the total money in that case that was

12   paid was $8 million.  Right?

13   A.   The total cash -- the cash, yes.

14   Q.   The cash--$8 million.  Right?

15   A.   Yes.

16   Q.   Okay.  And how long was the JDLA in force?

17   A.   How long was it supposed to be in force or over time

18   or --

19   Q.   Just in fact, it was five years, wasn't it?  It was from

20   2015 --

21   A.   Yes, until it was terminated.

22   Q.   -- until 2020.  That was about five years.  Right?

23   A.   Yes.

24   Q.   And then we have the hynix agreement.  You talked about

25   that one.  Right?
```

```
 1    A.    Yes.

 2    Q.    And that was $40 million.  Right?

 3    A.    Yes.

 4    Q.    And how many years has that been in force?

 5    A.    Five years.

 6    Q.    Five years?  Well, it started in 2021.  Right?

 7    A.    Oh, it was for a five-year period.

 8    Q.    It started in 2021.

 9    A.    Yeah.

10    Q.    But there was a funny thing in the hynix agreement.  It

11    had a release in it.  Tell us what a release is.

12    A.    When you release somebody from an obligation, I guess.

13    It's a legal term, but that would be a way to think about it.

14    Q.    That meant that it kind of took care of some past years.

15    Right?

16    A.    Yes.

17    Q.    So there are a few years maybe before 2021 that were

18    swept in there, but we can start at 2021.  Is that all right?

19    A.    Sure.

20    Q.    Okay.  So 2021 to 2026.  Isn't that right?

21    A.    Yes.

22    Q.    So that's another five years.  And then we have Rambus.

23    Talked a lot about that one.  Do you remember that?

24    A.    Yes.

25    Q.    And how much did you say was attached to Rambus?
```

1    A.    I'm sorry?  What was your question?

2    Q.    How much did you say that was paid for the Rambus

3    license?

4    A.    Well, it was up to $1.1 billion.  I don't know what

5    the -- how much had actually been paid at that point in time.

6    Q.    You gave us two numbers.  You said it's between 690 and

7    1.1 billion.  Right?

8    A.    That's correct.  That's what the agreement called for

9    potentially over time when they agreed to it.

10    Q.    So 690 to 1.1 billion.  Right?

11    A.    Yes.

12    Q.    And how many years was that Rambus agreement?  How many

13    years did that lease go on for?

14    A.    I believe it was the -- well, I'm -- I'm not certain.

15    The license agreement itself would have been for the life of

16    the patents.

17    Q.    Okay.  So that could be 20 years?

18    A.    For some patents, yes.

19    Q.    It could be more than 20 for others?  So the short answer

20    is, you don't know how long the Rambus license is going to go

21    on for.  Right?

22    A.    Yes.  There's no -- as the patents expire, coverage would

23    expire or benefits would expire.

24    Q.    Well, we know that it was signed in 2010.  Right?

25    A.    Correct.

1   Q.  And it's going -- it's at least in force now.  That's

2   been 13 years.  Right?

3   A.  Yes.

4   Q.  And it's going to go on for an indeterminate number of

5   years into the future.  Right?

6   A.  Yes.

7   Q.  So it's at least 13.  I'm going to put present.  And

8   that's -- I'm going to write 13-plus.  Right?

9   A.  Okay.

10  Q.  So what we've got and the evidence that this jury is

11  going to be presented with is we have your analysis that $404

12  million should be paid for a lease of 1.5 years.  Right?

13  A.  Yes.

14  Q.  The JDLA was an $8 million cash payment for a five-year

15  lease.  Right?

16  A.  Yeah.  I wouldn't agree with that characterization that

17  the 8 million paid for the five-year --

18  Q.  That was the cash.  Right, Mr. Kennedy?

19  A.  That was the cash, yes.

20  Q.  Hynix, the cash was 40 million for a five-year lease.

21  Right?

22  A.  That was part of the payment -- part of the

23  consideration, yes, 40 million.

24  Q.  And Rambus you said is somewhere between 690 and 1.1

25  billion, but that's for a 13-year lease and counting.  Right?

1    A.    Yes.

2    Q.    Okay.  But there's another aspect to this.  How many

3    patents are in your -- your lease?

4    A.    Five.

5    Q.    Five.  So I don't know.  I'm out of room.  Five patents.

6    How many patents with the JDLA?

7    A.    Well, the cross license, so it would have been --

8    Q.    Well, let me rephrase it then.  How many patents did

9    Samsung give Netlist money to license Netlist patents?

10    A.    I'm sorry.  Ask that question again, please?

11    Q.    How many patents -- Netlist patents did Samsung license

12    in the JDLA?

13    A.    They received coverage on the portfolio.

14    Q.    And was that 87 patents?

15    A.    Approximately, yes.  I believe that's correct.

16    Q.    87 patents.  For hynix, how many patents -- how many

17    Netlist patents did hynix receive rights to?

18    A.    The portfolio.

19    Q.    Was that about 120 patents at the time?

20    A.    Yes.

21    Q.    All right.  And for Rambus, how many patents did Samsung

22    receive rights to under the Rambus license?

23    A.    I believe Rambus had -- I'm not sure of the exact number.

24    Q.    Something like more than 2,000?

25    A.    That -- yes, I believe so.

1    Q.    So when we're out there shopping for leases, what is

2    supposed to happen in the hypothetical negotiation is we look

3    at what other landowners in the area are charging for their

4    acreage.  Right?

5    A.    For leases?  Yes, sure.  Well, depending on the

6    difference in the land.  Some land is better hunting than

7    others.

8    Q.    Some people think they got the best in the whole world

9    and some don't.  But basically if you're in the same county,

10   you're probably going to pay about the same for a lease.

11   Right?

12   A.    Yeah.  With the hunting lease, I couldn't say.  It would

13   depend on whether it was swamp or timber or combination or

14   crops.

15   Q.    Well, one thing we know is that for your lease, your

16   five-patent lease for only 1.5 years, it was only 404 million.

17   Right?

18   A.    Yes.

19   Q.    For the JDLA lease, it was $8 million for five years for

20   87 patents.  Right?

21   A.    Yes.  Again, the qualification of your identifying the

22   engineering payment, not the other aspects of the agreement.

23   Q.    Okay.  But the cash payment made under the JDLA was $8

24   million.  Right, sir?

25   A.    Cash, yes.

1    As to the issue of the starting date for damages for the

2    '054 Patent, the Court grants JMOL that the damages period for

3    the '054 Patent will not be prior to January the 25th, 2022.

4    With regard to the issue of foundry products, Plaintiff's

5    counsel is correct that where claims and defenses are

6    typically abandoned or jettisoned in advance of the trial, the

7    Court's practice is not to rule on those substantively, but in

8    this case the foundry products issue was litigated throughout

9    the pretrial process.  At the conclusion of the pretrial

10   process, it was made clear to the Court that the parties

11   intended it to be a part of the trial on the merits before the

12   jury.  It's that reason that the Court invited both sides to

13   submit suggested instructions for it to consider in its

14   preliminary jury instructions regarding the JDLA, its

15   termination date, and the issue of foundry products as being

16   excluded from the license provisions of the JDLA.

17   With regard to the foundry products issue under the JDLA,

18   notwithstanding what happened after the jury was impaneled and

19   the evidence began, this was a live issue that had not been

20   abandoned or narrowed through the impaneling of the jury and

21   the beginning of the trial.  Therefore, I am going to rule on

22   the foundry products issue and I'm going to grant JMOL that

23   there is no infringement prior to the July 15th, 2021, date

24   with the termination of the JDLA with regard to foundry

25   products or anything else prior to that time.  July 15th,

1    MR. SHEASBY:  May it please this Honorable Court.

2    Good morning, ladies and gentlemen of this jury.  I want

3    to thank you again for your service.  I am acutely aware that

4    it is a financial and personal sacrifice to do what you have

5    done, but I hope that you can understand how incredibly

6    important, incredibly important, this case is to Netlist.

7    Netlist was founded in 2000 in Orange County, and the

8    goal and vision of Netlist was to create American innovation

9    in the memory module space.  And today there are 120 employees

10   who are dedicated to that goal.

11   Samsung Electronics, you heard from Samsung's corporate

12   representative, is the largest memory company in the world.

13   He spoke about $19 billion in research and development they

14   spend each year.  He spoke about 12,000 patents they hold.

15   And yet they came to Netlist, a small company in Orange County

16   in California and asked for a technical collaboration.

17   And they did this, and it was candidly admitted under

18   oath, because they wanted to access our patents and because

19   they wanted our skill in joint development.

20   The reason why they wanted to access our patents is that,

21   although Samsung is innovative in many, many spaces, as it

22   relates to these particular products, the innovation was

23   created by Netlist.

24   These are not my words; these are the admissions of

25   Samsung's corporate representatives.  For DDR4, for DDR5, for

 1    HBM, not a single Samsung patent covers the products at issue

 2    here.  And the reason for that is because the patents that are

 3    used in these products are Netlist patents.

 4        And as the Court said, Samsung no longer has a license,

 5    no longer has a right to use the patents in this case, and

 6    it's in this forum, a federal court, that the consequences of

 7    its actions will be determined.

 8        The first issue you'll be asked to decide is

 9    infringement.  Infringement is an issue on which Netlist bears

10    the burden, and it's preponderance of the evidence.  And what

11    that means is that if one pebble, just one pebble more weighs

12    in favor of Netlist, you're required by law to find that

13    Samsung infringes.  That's what preponderance of the evidence

14    means.

15        The first family of patents is the '918 and the '054

16    Patents, and Doctor Mangione-Smith spoke about those.

17        Doctor Mangione-Smith, could you please stand and be

18    acknowledged?  Thank you very much, sir.

19        The products that accuse the '918 and '054 Patents are

20    called the DDR5 products with on-module power management.

21        I am putting in the corners of each of the exhibits the

22    exhibit numbers.  You can ask for exhibit numbers in your

23    deliberations.  And so if someone has a question or you have a

24    question, you'll be able to respond to them and say, we can

25    look at this exhibit.

1   MR. SHEASBY:  Can I have slide 1.132, please?

2   Counsel for Defendants asked where the invention story

3   was, that Netlist is nothing, that these are faked patents

4   created by patent attorneys.

5   The invention story is in Samsung's own documents.  In

6   2019, 1756, a unique proprietary know-how that they wanted to

7   access.  Two years before they launched their infringing DDR5,

8   they came to us and asked us how to design DDR5 on-module

9   power management.  This is PX 586.  They conceded that we're

10  the company that created the LRDIMM technology.  Where is the

11  invention story?  The invention story is admitted in Samsung's

12  own documents.

13  We're here for one reason and one reason only, and it's

14  admitted in the last line of 1756, because Samsung refuses to

15  and will not pay for its use and infringement of these

16  patents.

17  Patents are not pathetic.  Mr. Milton is not a liar.

18  What was created here was coveted by Samsung.

19  Let's go to 1.7.

20  We are here because Samsung is violating the law.  They

21  spoke about flying 7,000 miles or 6,000 miles.  He flew 6,000

22  miles to tell us that they needed access to our patents and to

23  not say one explanation for why they don't infringe.  It

24  doesn't matter what country you are from; in this country, you

25  follow the law.