# Exhibit 2

Trials@uspto.gov
571-272-7822
Paper 54
Date: May 8, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

SAMSUNG ELECTRONICS CO., LTD.,
Petitioner,

v.

NETLIST, INC.,
Patent Owner.

———————

IPR2022-00062
Patent 9,858,218 B1

———————

Before JON M. JURGOVAN, SHEILA F. McSHANE, and
KARA L. SZPONDOWSKI, *Administrative Patent Judges.*

JURGOVAN, *Administrative Patent Judge.*

DECISION
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00062
Patent 9,858,218 B1

# I.    INTRODUCTION

## A. Background and Summary

Samsung Electronics Co., Ltd. ("Petitioner") filed a Petition (Paper 1, "Pet.") for *inter partes* review of claims 1–22 ("Challenged Claims") of U.S. Patent 9,858,218 B1 (Ex. 1001, "the '218 patent"). Paper 1 ("Pet."). Netlist, Inc. ("Patent Owner") filed a Preliminary Response (Paper 7, "Prelim. Resp.") to the Petition. With our authorization (Paper 8), Petitioner filed a Preliminary Reply to the Preliminary Response (Paper 11, "Prelim. Reply") and Patent Owner filed a Preliminary Sur-Reply (Paper 12, "Prelim. Sur-Reply"). We instituted *inter partes* review under 35 U.S.C. § 314(a). Paper 14 ("Inst. Dec.").

During the trial, Patent Owner filed a Response (Paper 31, "Resp."), Petitioner filed a Reply (Paper 35), and Patent Owner filed a Sur-Reply (Paper 37). Petitioner and Patent Owner requested oral argument (Papers 38 and 39). A hearing was conducted on February 15, 2023. Paper 53 ("Tr.").

Petitioner and Patent Owner objected to evidence (Paper 32, 36) and filed Motions to Exclude (Papers 45, 46). The parties filed Oppositions to the respective Motions to Exclude (Papers 47, 48), and further filed Replies (Papers 49, 50) to the respective Oppositions. As discussed below, we dismiss-in-part and deny-in-part Patent Owner's Motion to Exclude, and dismiss Petitioner's Motion to Exclude.

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. Having reviewed the complete trial record, we determine that Petitioner has shown, by a preponderance of the evidence, that the Challenged Claims are unpatentable.

IPR2022-00062
Patent 9,858,218 B1

B.    *Real Parties in Interest*

Petitioner identifies Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc. as the real parties in interest. Pet. 1. Patent Owner identifies itself as the sole real party in interest. Paper 4, 1.

C.    *Related Matters*

The parties advise that the '218 patent is related to *Samsung Electronics Co., Ltd., et al. v. Netlist, Inc.*, IPR2022-00063; *Samsung Electronics Co., Ltd., et al. v. Netlist, Inc.*, IPR2022-00064; and *Samsung Electronics Co., Ltd. v. Netlist, Inc.*, Case No. 1:21-cv-01453 (D. Del.) ("the parallel litigation"). Pet. 1; Paper 4, 3.

The parties advise that the '218 patent is related to the following legal proceedings, which are no longer pending: (1) *Netlist v. SK hynix Inc.*, Case No. 6:20-cv-000194-ADA (W.D. Tex.); (2) *Samsung Electronics Co., Ltd. v. Netlist, Inc.*, IPR2020-01042; (3) *SK hynix Inc., et al. v. Netlist, Inc.*, IPR2020-01044; (4) *Netlist, Inc. v. SK hynix Inc., et al.*, Case No. 8:17-cv-01030 (C.D. Ca.); (5) *In the Matter of Certain Memory Modules and Components Thereof, and Products Containing Same*, Inv. No. 337-TA-1089 (International Trade Commission); (6) *SK hynix Inc., et al v Netlist, Inc.*, IPR2018-00303; (7) *Netlist, Inc. v. SK hynix Inc., et al.*, Case No. 8:16-cv-01605 (C.D. Ca.); (8) *In the Matter of Certain Memory Modules and Components Thereof, and Products Containing Same*, Inv. No. 337-TA-1023 (International Trade Commission); and (9) *SK hynix Inc., et al. v. Netlist, Inc.*, IPR2017-00548. Pet. 3–4; Paper 4, 3–4.

D.    *The '218 Patent (Ex. 1001)*

The '218 patent is titled "Memory Module and Methods for Handshaking With a Memory Controller" and is generally directed to

IPR2022-00062
Patent 9,858,218 B1

"systems and methods for handshaking with a memory module during or upon completion of initialization." Ex. 1001, code (54), 1:19–21.

The '218 patent explains that memory subsystems, "such as memory modules are generally involved in the initialization procedure for computer systems." *Id.* at 1:25–27. For example, "the system memory controller may request that the memory subsystem perform one or more requested tasks during system initialization." *Id.* at 1:32–34. However, the '218 patent states that there is no existing method of handshaking between the system memory controller and the memory module during initialization. *Id.* at 2:59–62. As a result, the system memory controller "does not monitor the error-out signal from the memory [module]" and therefore, "perform[s] blind execution." *Id.* at 2:62–65. According to the '218 patent, this has not been a serious issue because the system memory controller "generally has complete control over the initialization procedure." *Id.* at 2:65–3:3. However, one configuration of LR-DIMM (Load Reduced Dual In-line Memory Module) has the system memory controller "handing over one or more parts of the initialization operation sequence to the memory subsystem." *Id.* at 3:3–6. In such configuration, the system memory controller may insert a waiting period of predetermined length during which it is idle while the memory controller undergoes initialization. *Id.* at 3:11–14. However, this approach has shortcomings in that the time for the memory controller to complete the task may vary and may be longer or shorter than the predetermined period of time that the system memory controller is idle. *Id.* at 3:14–37.

The '218 patent describes two methods of handshaking between a system memory controller and a memory module: notifying and polling. *Id.*

4

IPR2022-00062
Patent 9,858,218 B1

at 3:38–39. In polling, the system memory controller "reads a status register in the memory subsystem controller to find out if the memory subsystem controller has completed the required or requested operation." *Id.* at 3:39–42. The '218 patent explains that polling is "generally inefficient because the system memory controller does not know exactly when the memory subsystem will have completed the required or requested operation." *Id.* at 3:44–48. Therefore, the notifying method, where the memory controller sends a signal to the system memory controller when it completes the required or requested operation, is described by the '218 patent as advantageous because it allows the system memory controller to execute one or more independent commands while it waits for the notification signal from the memory controller. *Id.* at 3:59–67.

The '218 patent describes embodiments establishing a handshake mechanism between the system memory controller and the memory module based upon notification signaling. *Id.* at 4:1–3. For example, Figure 3, depicted below, "shows a host computer system including example first and second memory modules configured to perform handshaking with a memory controller of the host system." *Id.* at 2:37–39.

IPR2022-00062
Patent 9,858,218 B1



Figure 3

Figure 3, above, depicts host computer system 16, including memory modules 10 and 26, memory controller 14, controller circuit 18, notification circuit 20, and output 12. *Id.* at 11:11–37. "[M]emory module 10 is configured to operate in at least two modes comprising an initialization mode during which the memory module 10 executes at least one initialization sequence, and an operational mode." *Id.* at 4:25–28.

The "at least one initialization sequence may comprise one or more training sequences." *Id.* at 5:64–66. "The operational mode is the normal mode of the memory module 10." *Id.* at 6:41–42. In operational mode, "the system memory controller 14 may cause the memory module 10 to perform standard operations such as memory read/write, pre-charge, refresh, etc., while in operational mode." *Id.* at 6:46–49. Controller circuit 18 "may receive and process address and command signals (e.g., read, write commands) from the system memory controller 14 and transmit appropriate address and commands to the memory elements in response." *Id.* at

6

IPR2022-00062
Patent 9,858,218 B1

5:40–44. Notification circuit 20 is "configured to drive the at least one output 12 while the memory module 10 is in the initialization mode to provide at least one notification signal to the memory controller 14 indicating at least one status of the at least one initialization sequence." *Id.* at 4:32–37.

As shown in Figure 3, "the at least one first output 12 is operatively coupled to an error-out pin of the memory module 10, and a multiplexor 42 drives the transistor 36 with either of a task_in_progress signal 44 or an error signal 46 (e.g., parity error signal)." *Id.* at 11:16–20. "[F]or example, the multiplexor 42 may be configured to drive the transistor 36 with the task_in_progress signal 44 when the memory module 10 is in the initialization mode or is executing the at least one initialization sequence, and with the error signal 46 when the memory module 10 is in the operational mode." *Id.* at 11:21–26. The '218 patent explains that "the memory module 10 can be advantageously configured to both perform the standard (e.g., JEDEC-specified) error reporting functionality via the error-out pin during the operational mode and provide the status notification functionality during the system initialization mode." *Id.* at 11:26–31.

E.    *Illustrative Claim*

Among challenged claims 1–22, claims 1, 9, and 15 are independent. Independent claim 1, reproduced below with brackets noting Petitioner's identifiers, is illustrative of the claimed subject matter.

1.    [1.a] A memory module operable with a memory controller of a host system, comprising:

[1.b] a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections

IPR2022-00062
Patent 9,858,218 B1

including first edge connections, second edge connections, and an error edge connection in addition to the first edge connections and the second edge connections;

[1.c] dynamic random access memory elements on the printed circuit board;

[1.d] a module controller on the printed circuit board and coupled to the dynamic random access memory elements, the module controller having an open drain output coupled to the error edge connection; and

[1.e] wherein the memory module is operable in at least a first mode and a second mode, wherein the memory module in the first mode is configured to be trained with one or more training sequences;

[1.f] wherein the memory module in the second mode is configured to perform one or more memory read or write operations not associated with the one or more training sequences by communicating data signals via the first edge connections in response to address and command signals received via the second edge connections;

[1.g] wherein the module controller is configured to receive via the second edge connections the address and command signals associated with the one or more memory read or write operations and to control the dynamic random access memory elements in accordance with the address and command signals, and

[1.h] wherein the module controller is further configured to output via the open drain output and the error edge connection a signal indicating a parity error having occurred while the memory module is in the second mode;

[1.i] wherein the module controller is further configured to drive a notification signal associated with the one or more training sequences to the error edge connection via the open drain output while the memory module is in the first mode.

IPR2022-00062
Patent 9,858,218 B1

Ex. 1001, 14:38–15:10.

### F. Evidence

Petitioner relies on the following evidence:[1]

| References | | Date | Exhibit |
|---|---|---|---|
| Hazelzet[2] | U.S. Patent Pub. No. 2008/0098277 A1 | April 24, 2008 | 1014 |
| JEDEC[3] | JEDEC COMMITTEE LETTER BALLOT, LRDIMM DDR3 Memory Initialization Chapter Proposal | November 2009[4] | 1015 |
| Buchmann[5] | U.S. Patent No. 8,139,430 B2 | Issued March 20, 2012 Filed July 1, 2008 | 1016 |
| Kim | U.S. Patent No. 8,359,521 B2 | Issued January 22, 2013 Filed January 22, 2008 | 1017 |

---

[1] The '218 patent issued from Application 15/088,115, filed April 1, 2016, which is a continuation of Application 13/942,721, filed July 16, 2013, now U.S. Patent No. 9,311,116 B1, which is a continuation of Application 12/815,339, filed June 14, 2010, now U.S. Patent No. 8,489,837 B1. Ex. 1001, codes (21, 22). The '218 patent also claims priority to Provisional Application 61/186,799, filed June 12, 2009. *Id.* at codes (60, 63).

[2] Petitioner contends Hazelzet is prior art under §§ 102(a), (b) and (e). Pet. 24.

[3] Petitioner contends JEDEC is prior art under § 102(a). Pet. 29.

[4] Petitioner contends JEDEC was distributed in November 2009. Patent Owner disputes that JEDEC was distributed. Because we decide the case on other grounds, we do not address whether JEDEC was distributed in November 2009.

[5] Petitioner contends Buchmann is prior art under § 102(e). Pet. 30.

IPR2022-00062
Patent 9,858,218 B1

In addition, Petitioner relies on the Declaration of Dr. Donald Alpert (Ex. 1003) and other evidence. Patent Owner relies on the Declaration of Robert J. Murphy (Ex. 2027) and other evidence. The depositions for these experts have been entered into the record. Exs. 2023 (Alpert), 1077 (Murphy).

G. *Prior Art and Asserted Grounds*

Petitioner asserts that claims 1–22 are unpatentable on the following Grounds (Pet. 4):

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–22 | 103(a)[6] | Hazelzet, JEDEC |
| 1–22 | 103(a) | Hazelzet, Buchmann |
| 3–6, 10–12, 17–20 | 103(a) | Hazelzet, JEDEC or Buchmann, Kim |

## II.  DISCUSSION

### A.  Principles of Law

In an *inter partes* review, a petitioner bears the burden of persuasion to prove "unpatentability by a preponderance of the evidence." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (quoting 35 U.S.C. § 316(e)); *see* 37 C.F.R. § 42.1(d) (2022).

---

[6] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103. Although the parties dispute whether the '218 patent is entitled to claim priority to the provisional application (*see, e.g.*, footnote 1; Pet. 5–10; PO Response 12–25), there is no dispute that the '218 patent's priority claim extends to Application 12/815,339, filed June 14, 2010. Ex. 1001, code (63). Because the filing date of this application is before the effective date of the applicable AIA amendment, we refer to the pre-AIA version of 35 U.S.C. § 103.

IPR2022-00062
Patent 9,858,218 B1

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

B.  *Level of Ordinary Skill in the Art*

Petitioner asserts a person of ordinary skill in the art "would have had a [B]achelor's degree in computer engineering, or a related field, and several years of additional experience working with computer memory systems. She would have been familiar with computer memory systems and basic CPU architecture documented in the literature, including standards, and generally available in commercial systems, including how computer components access a computer's memory, the role of a memory controller, the basic operation of memory modules and devices, and the techniques used to couple memory devices to the other components of the computer system." Pet. 10 (citing Ex. 1003 ¶ 56). Patent Owner does not dispute Petitioner's proposed level of skill in the art. *See* Resp. 5.

We find Petitioner's proposal is consistent with the level of ordinary skill in the art reflected by the '218 patent and the prior art of record, and,

IPR2022-00062
Patent 9,858,218 B1

therefore, adopt Petitioner's proposed level of ordinary skill in the art in this Decision. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

  C.  *Claim Construction*

  We construe each claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent," the same standard used to construe the claim in a civil action. 37 C.F.R. § 42.100(b).

  The words used in patent claims are interpreted in light of the intrinsic evidence of record, including the written description, drawings, and prosecution history. *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). Absent express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning. *Id.* at 1325. There is a heavy presumption that a patent claim carries its ordinary and customary meaning. *Id.*

  Petitioner proposes the following constructions:

IPR2022-00062
Patent 9,858,218 B1

| Claim Term | Proposed Construction |
|---|---|
| memory read and write operations | operations used to communicate data between the memory module and the memory controller in response to commands from the memory controller |
| training sequence | a set of operations occurring in a particular order and used for training |
| notification signal associated with the [one or more training sequences] / "information related to the [one or more training sequences]" / "open-drain signals related to the [one or more training sequences]" | unscheduled signal/information/open-drain signals provided without polling that indicate the status of the one or more training sequences |

Pet. 20–24.  Petitioner presents several arguments and support in favor of its proposed constructions.  *Id.*  Petitioner also argues that the term "mode" does not require construction.  *Id.* at 21–22.  Patent Owner agrees that "mode" does not require construction, but disagrees with Petitioner's other proposed constructions, which "deviate from the plain and ordinary meaning."  Resp. 3–5.

We find that Petitioner's proposals improperly alter the language of the respective claims to change their meaning, and also lack support in the intrinsic evidence of record.  Petitioner's proposal concerning "memory read and write operations" states that the data is communicated between the memory module and the memory controller in response to commands from the memory controller.  Pet. 20–21.  But claim 1 recites that the data signals are communicated "in response to *address and command signals*."

IPR2022-00062
Patent 9,858,218 B1

Ex. 1001, 14:60–61.  As Patent Owner argues, Petitioner's proposal seeks to change the claim language by making the data communication responsive to command signals alone, and not to both address and command signals, as claimed.  Resp. 4; Ex. 2027 ¶ 26.  We cannot construe claims to read an express limitation or element out of the claims.  *TDM America, LLC v. U.S.*, 85 Fed. Cl. 774, 778 (2009).  We decline to adopt Petitioner's proposed construction.

Petitioner's proposal for "training sequence" improperly introduces the concept of "a set of operations occurring in a *particular order*," which narrows the meaning considerably, and is not supported by the specification or file history.  *See* Exs. 1001–1002.  To the contrary, this proposal conflicts with the '218 patent, which states "in any method or process disclosed herein, the acts or operations making up the method/process may be performed *in any suitable sequence* and *are not necessarily limited to any particular disclosed sequence*."  Ex. 1001, 14:23–27.  We decline to rewrite the claims as Petitioner proposes.

Petitioner's proposal for "notification signal" introduces the concepts of "unscheduled" (mentioned nowhere in the '218 patent or file history) and "without polling."  The '218 patent identifies "polling" and "notifying" as different ways of "handshaking" between the Memory Controller Hub (MCH) or system memory controller, and the memory subsystem controller.  Ex. 1001, 2:54–58, 3:38–58.  "Notifying" is described as "advantageous" in the '218 patent, and use of the term "notification signal" in the claims implies "notifying" as described in the '218 patent.  *Id.* at 2:59–61.  However, the term "unscheduled" in Petitioner's proposal is unsupported by the intrinsic evidence so we decline to adopt Petitioner's proposal.

14

IPR2022-00062
Patent 9,858,218 B1

Neither party avers that the outcome of this case turns on Petitioner's proposed constructions, and we agree.  We decline to adopt Petitioner's proposals, and instead give the claim terms their plain and ordinary meanings.

D.     Ground 1: Obviousness Over the Combination of Hazelzet and JEDEC

Petitioner contends that claims 1–22 would have been obvious over the combination of Hazelzet and JEDEC.  Pet. 44–71.  Petitioner and Patent Owner dispute whether JEDEC constitutes a prior art "printed publication" under 35 U.S.C. § 311(b).  Pet. 25–29; Resp. 7–12; Reply 2–8; Sur-Reply 1–9.  Since we find that other grounds demonstrate unpatentability of all challenged claims, we find it unnecessary to address this issue or ground in this Final Written Decision in order to resolve the dispute between the parties.

E.     Ground 2: Obviousness Over the Combination of Hazelzet and Buchmann

Petitioner contends that claims 1–22 of the '218 patent are unpatentable as obvious over the combination of Hazelzet and Buchmann. Pet. 42–67.  We address Hazelzet and Buchmann and their combination in the following section and conclude that Petitioner has shown claims 1–22 unpatentable for the reasons that follow.

1.     Hazelzet (Ex. 1014)

Hazelzet was published on April 24, 2008 and is titled "High Density High Reliability  Memory Module With Power Gating and a Fault Tolerant Address and Command Bus."  Ex. 1014, codes (43), (54).  Petitioner asserts that Hazelzet is prior art under 35 U.S.C. §§ 102(a), (b), and (e).  Pet. 24.

IPR2022-00062
Patent 9,858,218 B1

Hazelzet is generally directed to a high density, high reliability memory controller/interface. Ex. 1014 ¶ 7. Figure 2, reproduced below, is a block diagram of the enhanced server memory arrangement:



FIG. 2

Ex. 1014 ¶ 25.

Figure 2 depicts dual inline memory module ("DIMM") 20 with a "novel ECC/Parity Buffer chip 21" coupled to memory interface chip 18, which is coupled to memory controller or processor 19. *Id.* ¶ 38. Hazelzet describes that "DIMMs are printed circuit cards designed to carry a plurality of DRAMs 22 thereon and the DRAM output pins . . . are connected via the printed circuit to selected connectors 23 along the edge of both the back and front sides of the card." *Id.* ¶ 39. Figure 2 shows "the memory interface chip 18 sends and receives data from the DIMMs via the data line 15 and sends address and commands via line 16." *Id.* ¶ 38. "The memory interface chip 18 then sends and receives data, via line 15, to the memory devices, or

16

IPR2022-00062
Patent 9,858,218 B1

DRAMs 22 and sends address and command information to the register chip 21 via add/cmd line 16 and check bits for error correction purposes to the ECC/Parity register chip 21 via line 25." *Id.*

Hazelzet further describes that the DIMM has "added error correction code logic (ECC) incorporated therein for correcting single bit errors while permitting continuous memory operation independent of the existence of these errors." *Id.* ¶ 64. Hazelzet also discloses "[a] parity operating mode . . . to permit the system to interrogate the device to determine the error condition." *Id.* In this way, Hazelzet describes two modes: "ECC Mode (/ECC Mode low)" and "parity mode (/ECC Mode high)." *Id.* ¶¶ 69–70; *see also* Ex. 1014, Fig. 8. In addition, Hazelzet describes error reporting circuitry, where "[t]wo open-drain outputs are available to permit multiple modules to share a common signal line for reporting an error that occurred during a valid command (/CS=low) cycle (consistent with the re-driven signals)." *Id.* ¶ 72. "/Error (CE) indicates that a correctable error occurred and was corrected by the ECC logic, /Error (UE) indicates that an uncorrectable error occurred and depending on the mode selected is an uncorrectable ECC error or a parity error." *Id.*

### 2. *Buchmann (Ex. 1016)*

Buchmann was filed on July 1, 2008, issued on March 20, 2012, and is titled "Power-On Initialization and Test for a Cascade Interconnect Memory System." Ex. 1016, codes (22), (45), (54). Petitioner asserts that Buchmann is prior art under 35 U.S.C. § 102(e). Pet. 30.

Buchmann is generally directed to "[a] memory buffer, memory system and method for power-on initialization and test for a cascade interconnect memory system." Ex. 1016, code (57). Buchmann describes

17

IPR2022-00062
Patent 9,858,218 B1

that "the memory buffer includes logic for executing a power-on and initialization training sequence initiated by the memory controller." *Id.* Buchmann discloses that it "is operable in a static bit communication (SBC) mode and a high-speed mode." *Id.* at 1:43–55.

Buchmann describes several training sequences, including training sequence TS0, which "is used to perform upstream (US) and downstream (DS) clock detection and repair (if necessary)." *Id.* at 5:51–53. During this training sequence, the memory module outputs various commands, including TS_done, which "indicates the local and all cascaded MBs are done with TS0." *Id.* at 6:1–20, Table 1. Buchmann also similarly describes other training sequences, TS2 and TS3. *Id.* at 7:15–8:45.

### 3.    *Motivation to Combine Hazelzet and Buchmann*

Petitioner, with supporting testimony from Dr. Alpert, argues there is sufficient motivation to combine Hazelzet with Buchmann. Pet. 32–42 (citing Ex. 1003). Generally, Petitioner contends that "Hazelzet's memory modules would be modified to add the functionality of buffering the data signals similar to that in the DDR3 LRDIMM of the time and an initialization mode ("first mode/operation") into which each module could be switched and which includes training sequences whose completion is reported by the memory buffer using a status signal output over an open drain output (i.e., UE 121) of Hazelzet." Pet. 32 (citing Ex. 1003 ¶ 143).

Petitioner contends that, in the combination of Hazelzet and Buchmann, the training sequences would be like those described as TS0 and TS3 in Buchmann. Pet. 32 (citing Ex. 1016, 5:51–7:2, 8:24–9:18, Figs. 4, 6). According to Petitioner, the drain output signals would be TS0_done and TS3_ack or TS3_done. *Id.* at 32–33. Petitioner notes that Buchmann does

18

IPR2022-00062
Patent 9,858,218 B1

not disclose the memory controller communicating any data with the module or performing operations to read or write to the memory devices during either of the TS0 or TS3 sequences.  Pet. 33 (citing Ex. 1003 ¶ 145).

Petitioner contends that Hazelzet's ECC/Parity register would be modified to implement the training as part of an additional mode to run, for example, at initialization to switch among modes when appropriate, and to use the UE 121 open drain output of Hazelzet to communicate the new notification signals.  Pet. 33 (citing Ex. 1014 ¶ 123; Ex. 1016, 3:49–60). According to Petitioner, "Hazelzet already uses the UE 121 open drain output for two different signals in two different modes," and so, Petitioner reasons, "the ECC/Parity register necessarily includes circuitry for selecting which signal to drive on the UE 121 output depending upon the mode of the module." *Id.*  Petitioner contends "[i]t was well within the level of ordinary skill to modify such circuitry such that it instead selected among three different signals, depending upon the mode/operation." *Id.*  Petitioner contends a person of ordinary skill in the art "could have made that modification without undue experimentation and with a reasonable expectation of success." *Id.* (citing Ex. 1003 ¶ 146).

Petitioner contends that the combination of Hazelzet and Buchmann "would employ known open drain signaling circuitry, which necessarily included a field effect transistor having its source coupled to ground and its drain as the output." *Id.* (citing Ex. 1017, Figs. 4, 5).  According to Petitioner, a person of ordinary skill in the art "would have known that in order to use open drain signaling to indicate training completion among multiple modules, the open drain output would have to be configured such that the transistor output is driven low (ground) while training is still

19

IPR2022-00062
Patent 9,858,218 B1

occurring," and "driven high upon completion." *Id.* at 33–34. Petitioner contends that "[t]his is because, with an open drain configuration shared by multiple modules, any module can individually drive the output low, but it takes the collective action of all connected modules to drive the output high." *Id.* at 34. Petitioner contends that a person of ordinary skill in the art would "understand that to drive the output low (which would be a low impedance state), the gate of the transistor must be high, causing the transistor to conduct and connect the drain to ground." *Id.* Conversely, Petitioner contends, "to drive the output high (which would be a high impedance state), the gate of the transistor must be low, turning the transistor off." *Id.* (citing Ex. 1014 ¶ 99; Ex. 1017, 5:65–6:18, Figs. 4–5; Ex. 1003 ¶ 147).

Petitioner argues that the prior art relied on in the Petition is analogous to the '218 patent both because it is in the same field of endeavor ("memory module design, including error detection and correction, initialization, training and the use of pins/paths for multiple purposes during different operations/modes") and reasonably pertinent to the same problems ("increasing memory module capacity, performance, and/or reliability by sharing an output pin/path to perform multiple functions during multiple operations/modes, including initialization/training"). *Id.* at 34–35.

Petitioner argues that the combinations are "merely an arrangement of old elements with each performing the same function it had been known to perform and yielding no more than what one would expect from such an arrangement." *Id.* at 35. Petitioner contends the combinations "would have been well within the level of ordinary skill in the art" and "would not have resulted in any unpredictable results." *Id.* This is a recognized reason to

IPR2022-00062
Patent 9,858,218 B1

combine under *KSR*, 550 U.S. at 417 (citing *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273 (1976)).

Petitioner also provides arguments for why a person of ordinary skill in the art would be motivated to add training for the data buffers and other components of a memory module, to add training as a separate mode, and to use the same output for the added training mode.  Pet. 35–42 (citing Ex. 1003).  Petitioner argues that a person of ordinary skill in the art would be motivated to add training to Hazelzet "because it was known that training improved memory module reliability."  Pet. 35–36 (citing Ex. 1014 ¶¶ 1–4, 7, 42, 44, 123; Ex. 1017, 12:36–53; Ex. 1025, 15–18; Ex. 1027, 1:35–2:12; Ex. 1003 ¶ 151).  In addition, Petitioner argues that LR-DIMMs and their initialization were known in the art, and provided increased performance and capacity by adding the LR-DIMM's data buffering functionality to Hazelzet's RDIMM.  Pet. 36–37 (citing Ex. 1008, 22; Ex. 1003 ¶ 152).

Petitioner also notes that Buchmann discloses "a training phase that allows more flexibility and improved control data exchange during start-up" to establish "reliable communication" on the bus.  *Id.* at 38 (citing Ex. 1016, 3:64–67, 14:28–35, 14:5–8).  Hence, Petitioner contends that combining Buchmann's training with Hazelzet improves reliability.  *Id.*  Petitioner further contends that one of ordinary skill in the art would have been motivated to add the functionality of buffering the data signals and corresponding training to Hazelzet's RDIMM because it was a known, reliable technique which improved performance and enabled higher capacity.  *Id.* (citing Ex. 1003 ¶¶ 154–156, 158).  Petitioner contends the combination of Hazelzet and Buchmann was well within the level of skill in the art at the time and provided no more than expected at the time, a DIMM

IPR2022-00062
Patent 9,858,218 B1

with a buffer to buffer data, address and command signals, and efficient training of that buffer during initialization to ensure optimal read and write performance during normal read and write performance during normal operation. *Id.* (citing Ex. 1003 ¶ 158).

Petitioner argues that a person of ordinary skill in the art would be motivated to add training in a separate mode from normal operation "because it was known that training before normal operation was necessary to minimize errors" in read and write operations. *Id.* at 39–40 (citing Ex. 1016, 12:60–13:41; Ex. 1025, 15–18; Ex. 1022 ¶¶ 32, 52, 88–89, Fig. 4; Ex. 1056, 18, 22, 25–26, 42–44; Ex. 1057, code (57), 2:13–34, 2:60–3:3, 9:11–10:44, Fig. 5; Ex. 1003 ¶¶ 159–161). Petitioner notes that Buchmanns's invention is an "initialization training sequence" that is completed at "power-on," which would suggest to a person of ordinary skill in the art that training before normal operation is important. *Id.* at 39 (citing Ex. 1003 ¶ 159). Since Hazelzet also initializes upon power-on, Petitioner contends that Buchmann's training complements Hazelzet's initialization. *Id.* at 39 (citing Ex. 1014 ¶ 123; Ex. 1025, 15–18; Ex. 1027, 1:61–2:19, 6:24–25, 10:24–45). Petitioner contends that after updating Hazelzet's buffers to buffer both address and data signals, a person of ordinary skill in the art would have been motivated to combine the references such that training in an initialization mode occurred separate from normal operating modes/operations. *Id.* (citing Ex. 1003 ¶ 160).

Petitioner further argues that it would have been obvious to communicate training status in an initialization mode using the same open drain output already used in other modes/operations. Pet. 40 (citing Ex. 1003 ¶¶ 162–164). Petitioner contends that Hazelzet uses the same open

22

IPR2022-00062
Patent 9,858,218 B1

drain output to indicate an "uncorrectable error" in ECC mode and parity
error in parity mode. Pet. 40–41 (citing Ex. 1014, ¶¶ 44, 49, 59, 64, 69, 72,
109, Figs. 4B, 7A; Ex. 1003 ¶ 164). Petitioner contends that this disclosure
would have motivated a person of ordinary skill in the art to use the same
output in the added training mode because the parity and ECC modes would
not be using the open drain output while the training operation was running
during initialization. *Id.* at 41 (citing Ex. 1003 ¶ 165).

Petitioner further notes that multiple use of a pin was known, and
would have been considered an efficient use of the limited number of output
pins on integrated circuits. *Id.* Petitioner points to Kim as an example of
use of an open-drain output on a memory module during multiple modes.
*Id.* (citing Ex. 1017, 1:16–22, 5:49–57, 6:8–16). According to Petitioner,
Kim discloses, in addition to sharing ECC and parity on the error output pin,
that "[i]n alternate exemplary embodiments, other functions also share the
error feedback pin." *Id.* (citing Ex. 1017, 6:16–18; Ex. 1003 ¶ 166).
Petitioner contends that these disclosures would have motivated a person of
ordinary skill in the art to use Hazelzet's UE 121 open-drain output to notify
the memory controller that training was in progress or done. *Id.* (citing
Ex. 1003 ¶ 167).

Dr. Alpert testifies that a person of ordinary skill in the art would have
been motivated to arrange the modified Hazelzet to communicate signals
indicating training completion only when all memory modules have
completed that training, in order to ensure that the entire memory system had
been trained before proceeding to normal operation. *Id.* at 42. As Dr. Alpert
explains, this would permit training to be completed in an orderly and
systematic manner, limiting the complexity of the control circuitry needed to

23

IPR2022-00062
Patent 9,858,218 B1

implement the training, while using a known, efficient way to do so. *Id.*
(citing Ex. 1014 ¶¶ 18, 109; Ex. 1017, Fig. 4, 5:65–6:12; Ex. 1043, 7:30–51;
Ex. 1003 ¶ 168).

Petitioner contends that a person of ordinary skill in the art would
have been further motivated to modify Hazelzet as described because
Hazelzet's memory system includes multiple memory modules in need of
training. *Id.* (citing Ex. 1014 ¶¶ 18, 109; Ex. 1017, Fig. 4, 5:65–6:12;
Ex. 1043, 7:30–51). Petitioner contends the combinations analyzed here
would allow any module in the system to pull the open drain pin to "low"
while still executing its training sequence, regardless of whether the other
modules in the system have completed training and were no longer pulling
that pin low, thereby delaying normal operations until the system is
completely ready. *Id.* (citing Ex. 1003 ¶ 169).

Patent Owner contends a person of ordinary skill in the art would not
have combined Hazelzet with Buchmann to arrive at the '218 patent's claims
for several reasons. Resp. 27–58. Patent Owner contends that there was no
motivation to redesign Hazelzet's memory module by adding Buchmann's
memory buffer to buffer data signals. *Id.* at 28, 31–41. Patent Owner argues
that one of ordinary skill in the art could not combine Buchmann's training
because Hazelzet's memory modules have no buffering and thus are not
compatible with that training. *Id.* at 31–32 (Ex. 2002, 68:19–79:24,
81:18–83:5; Ex. 2027 ¶¶ 79–84).

Patent Owner's argument considers Hazelzet *in isolation* and does not
properly consider what one of ordinary skill in the art would have
understood from the *combination* of Hazelzet and Buchmann. "Non-
obviousness cannot be established by attacking references individually

24

IPR2022-00062
Patent 9,858,218 B1

where the rejection is based upon the teachings of a combination of references.*" *In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981)).  Hazelzet teaches a memory module with multiple modes that buffers address and command signals.  Ex. 1014 ¶¶ 16, 35.  Buchmann teaches a LR-DIMM memory buffer for buffering *data* as well as address and command signals.  Ex. 1016, 4:14–19, 29:25–47, Figs. 1, 2.  Buchmann's memory buffer uses training to improve its reliability.  Ex. 1016, 3:64–67, 14:28–35, 14:5–8.  Considered together, Hazelzet and Buchmann teach to add data buffering and training to Hazelzet's memory module.

Patent Owner argues that Petitioner's grounds require redesign of Hazelzet's memory modules to add Buchmann's memory buffers to buffer data signals, i.e., to change Hazelzet's RDIMM to an LR-DIMM. Resp. 32–34; Sur-Reply 17–20.  Patent Owner contends that Petitioner's argument for changing Hazelzet for "increased performance and capacity" is conclusory.  Resp. 32.  Patent Owner further contends the motivation to combine comes from a reference that is not part of the proposed grounds and is not prior art to the '218 patent (Ex. 1036).  *Id.* at 33 (citing *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1336 (Fed. Cir. 2020)).  Patent Owner further contends the industry debated tradeoffs between LR-DIMMs and RDIMMs, and found RDIMMs less expensive with higher performance compared with LR-DIMMs.  Pet. 34 (citing Ex. 2017, 3; Ex. 2027 ¶¶ 88–92).

Patent Owner's arguments do not undermine Petitioner's showing of a motivation to combine Hazelzet and Buchmann.  Petitioner has shown sufficiently that UDIMM, RDIMM, FBDIMM, and LR-DIMM modules

25

IPR2022-00062
Patent 9,858,218 B1

were known alternatives with known tradeoffs at the time of the '218 patent.
Reply 16–20 (citing Ex. 1077, 61:5–10; 98:11–20); Sur-Reply 17–21.
Under appropriate circumstances, such as the need for increased
performance and memory capacity, it is clear from the record that one of
ordinary skill in the art would have elected to use LR-DIMMs over
RDIMMs. Pet. 37 (citing Ex. 1003 ¶¶ 155–156; Ex. 1028 ¶ 31);
Reply 21–22. As Petitioner contends, load reduction in LR-DIMMs permits
high-speed controllers to drive larger quantities of data and provides for a
higher capacity memory module. Reply 21–22 (citing Ex. 2017, 1, 3;
Ex. 2006, 4–5). Although Patent Owner debates whether an LR-DIMM has
"increased performance" over an RDIMM, Patent Owner does not dispute
that an LR-DIMM has "increased capacity" relative to an RDIMM. Patent
Owner contends that Petitioner's reasons of "increased performance and
capacity" for upgrading Hazelzet's RDIMM to the LRDIMM of Buchmann
are conclusory. Resp. 32–33; Pet. 37. However, Hazelzet explicitly
mentions its objectives as a "high density and enhanced reliability memory
solution at low cost." *See* Ex. 1014 ¶ 7. Patent Owner does not explain why
Hazelzet's enhanced reliability does not serve to increase performance, or
why Hazelzet's higher density does not serve to increase capacity.

Thus, Petitioner's proposed motivation to combine is based on the
teachings of the references and other evidence. And, as noted, Petitioner
does not rely solely on JEDEC (Exhibit 1036) for the motivation to combine
Hazelzet and Buchmann. Accordingly, Patent Owner's arguments do not
undermine Petitioner's motivation to combine.

Patent Owner argues that Hazelzet suggests an alternative to adding
more complex data line buffers to its memory architecture. Resp. 35 (citing

26

IPR2022-00062
Patent 9,858,218 B1

Ex. 1014 ¶ 14; Ex. 2027 ¶¶ 93–110, 119–123); *see also* Sur-Reply 21–22.
Patent Owner argues that a person of ordinary skill in the art would have
understood that implementing such a feature would not necessarily have
been desired nor the right choice in designing a memory system. Resp. 35
(citing Ex. 2027 ¶¶ 98–105). For instance, Patent Owner contends that
memory modules that buffered data signals had several disadvantages, such
as increased complexity, power consumption, and increased costs. *Id.*
(citing Ex. 1027, 2:12–19). Patent Owner further contends that training
sequences may require bi-directional data and corresponding circuitry which
would increase device complexity and cost, and may worsen signal
transmission characteristics and therefore reliability. *Id.* (citing Ex. 2027
¶ 99).

      Patent Owner's argument that adding data line buffers to a memory
architecture may not be the right choice in designing a memory system in
some cases does not negate Petitioner's contention that, in other cases, it
would be the most advantageous option considering such factors as
performance, complexity, power consumption, and cost. As noted,
Petitioner's combination basically uses Hazelzet's RDIMM as a foundation
and adds Buchmann's LR-DIMM data buffering and training to create a
modified LR-DIMM memory module. Petitioner submitted persuasive
evidence that LR-DIMMs are desirable for higher speed and capacity.
Pet. 35, 37 (citing Ex. 1036, 5; Ex. 1003 ¶¶ 155–156, 158); Reply 21–23
(citing Ex. 2017, 1, 3; Ex. 2006, 4, 5).

      With regard to bi-directional data exchange, Patent Owner contends
that it *would* be required by Petitioner's combination, but the evidence is
much less certain, stating "this training sequence *may* require bi-directional

IPR2022-00062
Patent 9,858,218 B1

data exchange" and "*may* require a disadvantageous addition of circuitry" which "*may* worsen signal transmission characteristics." Resp. 35, 42 (citing Ex. 1027, 2:12–19); Sur-Reply 21–22. This falls short of stating that bi-directional data exchange or addition of circuitry is *required* in Petitioner's proposed combination, or that such added circuitry *would* worsen signal transmission. And Patent Owner does not contend that RDIMM is *always* more advantageous than LR-DIMM.

Patent Owner further argues that "Hazelzet teaches that its solution strikes a balance between performance, capacity, reliability, and cost for low or midrange systems, which a person of ordinary skill in the art would have understood likely precludes memory modules that buffered data signals." Resp. 35–36 (citing Ex. 1014 ¶¶ 1–6; Ex. 2027 ¶¶ 106–110). Patent Owner contends that a person of ordinary skill in the art would have understood that Hazelzet's memory system accomplished those goals without requiring additional, more complex hardware, and counsels against doing so. *Id.* at 36 (citing Ex. 2027 ¶ 108). We do not discern any disclosure in the cited parts of Hazelzet that precludes buffering of data signals, or the addition of components such as a data buffer. Consequently, we do not agree with Patent Owner's arguments.

Patent Owner further argues that Hazelzet teaches away from more complex memory modules that buffered data signals by "eliminating the need to produce or procure two types of buffer devices or to redesign existing memory modules." *Id.* at 36–37 (citing Ex. 1014 ¶ 14; Ex. 2027 ¶ 109). Patent Owner contends that a person of ordinary skill in the art would be led in a direction divergent from adding more costly and complex memory components that buffer data signals, contrary to Hazelzet's intended

28

IPR2022-00062
Patent 9,858,218 B1

purpose to use "reduced-function memory assemblies" for the "low or midrange markets." *Id.* at 37 (citing *In re Gurley*, 27 F.2d 551, 553 (Fed. Cir. 1994)). Patent Owner argues that Petitioner's conclusory motivation is driven only by increased performance and capacity, and fails to consider Hazelzet's disclosure as a whole, which balances trade-offs between reliability, performance, capacity, and cost. *Id.*

We agree with Petitioner that Hazelzet does not "criticize, discredit, or otherwise discourage" memory modules with data buffers. Reply 22; *see Galderma Laboratories, L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013) (a prior art reference does not teach away if it does not criticize, discredit, or otherwise discourage investigation into the invention claimed). Moreover, Hazelzet states that its memory module is "capable of meeting the *desired* density, performance and reliability requirements." Ex. 1014 ¶ 7 (emphasis added). Hazelzet thus provides the designer freedom to select density, performance, and reliability according to the designer's requirements, which may encompass increased performance and capacity, and may involve the addition of components.

Patent Owner further argues that the Petition failed to demonstrate how the proposed combination could have been done. Resp. 37–38. Patent Owner argues that Petitioner makes a conclusory contention that "such an upgraded LRDIMM would have worked even in Hazelzet's RDIMM platforms (with appropriate BIOS changes)." *Id.* at 37–38. Patent Owner contends that the document that Petitioner cites as supportive of its contention states that "the controller must have the capability to do address mirroring." *Id.* at 38. Patent Owner contends that Hazelzet does not have a controller with the capability to do address mirroring. *Id.* (citing Ex. 2027

IPR2022-00062
Patent 9,858,218 B1

¶ 101). Patent Owner further contends that Petitioner does not address the problems associated with LR-DIMMs in the contemporaneous art (such as complication of memory configuration, mismatch of signals between host and memory interface, and reduced timing margins), or address how a person of ordinary skill in the art would implement LR-DIMMs in Hazelzet. *Id.* (citing Ex. 2007, 1:37–61; Ex. 2008, 2:12–30; Ex. 2009 ¶ 3; Ex. 2010, 4:8-61; Ex. 2027 ¶¶ 102–106). Patent Owner contends each of these problems is associated with the resulting performance and reliability of LR-DIMMs, and associated read and write functionality in normal operation. *Id.* According to Patent Owner, modifying Hazelzet to implement an LR-DIMM would introduce many problems when performing the read and write operations required by the claims. *Id.* (citing Ex. 2027 ¶¶ 104–105).

Although Patent Owner indicates several alleged problems with LR-DIMMs, LR-DIMMs were known alternatives for RDIMMs like Hazelzet. Reply 22; *see also* Ex. 2007, Fig. 2; Ex. 1077, 95:9–96:25; Ex. 2023, 294:5–296:4. Petitioner also notes that "address mirroring" was merely an optional technique for LR-DIMMs that was already standardized for UDIMMs. Reply 22 (citing Ex. 1077, 181:8–17, 188:8–11). Patent Owner does not explain why "address mirroring" would be necessary in Petitioner's combination, or why the alleged problems with the LR-DIMMs of Petitioner's combination could not have been overcome by a person of ordinary skill in the art.

Patent Owner also contends that Petitioner's expert previously admitted that his analysis was "not concerned with the physical embodiments and how . . . those structures might be physically modified. . . . I haven't considered what—you know, exactly how those changes

IPR2022-00062
Patent 9,858,218 B1

would be made." Resp. 39 (citing Ex. 2002, 68:19–69:20; Ex. 2027 ¶ 105).
Patent Owner's argument is premised on "physical" or "bodily"
incorporation of the teachings of one reference into the other, which is not
the standard by which obviousness is determined. "[I]t is not necessary that
the inventions of the references be physically combinable to render obvious
the invention under review." *In re Sneed*, 710 F.2d 1544, 1550 Fed. Cir.
1983 (citing *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1013
(Fed. Cir. 1983); *In re Andersen*, 391 F.2d 953, 958 (CCPA 1968)). We find
no error in Petitioner's expert's approach for it is the concepts taught by the
Hazelzet and Buchmann that are being combined in the obviousness
analysis, not necessarily any physical embodiments.

Patent Owner argues that "the conclusory testimony of Petitioners'
expert does not provide an articulated motivation to change Hazelzet's
memory modules to add . . . Buchmann's memory buffers, or demonstrate
that such combination could even be done." Resp. 39 (citing Ex. 2027
¶ 106). Patent Owner contends that conclusory statements do not amount to
substantial evidence. *Id.* (citing *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d
1352, 1358 (Fed. Cir. 2019)).

We do not agree that Petitioner's expert's testimony was conclusory
or failed to explain how the combination would be done. Petitioner's expert
references the '218 patent, Hazelzet, Buchmann, and other evidence as
supporting his testimony and establishing a reasonable expectation of
success. Ex. 1003 ¶¶ 143–169. For example, the Petition specifically
identifies that a problem addressed by the '218 patent, Hazelzet, and
Buchmann is increasing memory module capacity, performance, and/or
reliability by sharing an output pin/path to perform multiple functions during

31

IPR2022-00062
Patent 9,858,218 B1

multiple operations/modes, including initialization/training.   Pet. 35 (citing
Ex. 1001, code (57), 5:66–6:14, 8:4–48; Ex. 1014, code (57), ¶¶ 7, 69–70,
123; Ex. 1016, 1:7–9, 3:49–60, 4:51–5:50, 12:60–13:41, 14:1–63, 20:20–
21:19, 33:45–67; Ex. 1022 ¶¶ 4, 5, 32–33, 52; Ex. 1025, 15–18; Ex. 1027,
1:61–2:19, 6:24–25, 10:24–45; Ex. 1017, 1:16–22, 5:49–57, 6:8–18,
11:20–34, 12:36–53; Ex. 1003 ¶ 148).   The motivation to combine may be
found in the nature of problem to be solved, leading one to look to
references relating to possible solutions to that problem.   *Ruiz v.
A.B. Chance Co.*, 357 F.3d 1270, 1276–77 (Fed. Cir. 2004).

Patent Owner further argues that Buchmann provides no motivation to
combine because "Petitioner points to nothing in Buchmann that would have
motivated a person of ordinary skill in the art to modify Hazelzet's memory
buffer to also buffer the data signals."  Resp. 40.  Patent Owner argues that
both references recognize that, in designing a memory system, various
constraints including power, performance, and costs need to be considered.
*Id.*  Patent Owner contends that Buchmann would have recognized that
adding the functionality of buffering data signals would require various
factors, such as decreased speeds and higher cost.  *Id.* at 41.  Patent Owner
contends that both references considered tradeoffs, but reached two very
different solutions for different purposes.  *Id.*

As noted previously, Hazelzet teaches a memory module "capable of
meeting *desired* density, performance and reliability requirements."
Ex. 1014 ¶ 7.  Similarly, Buchmann teaches that "placing more technology-
specific functionality local to the memory subsystem, such benefits as
improved performance, increased design flexibility/extendibility, etc., may
be obtained, often while making use of unused circuits within the

32

IPR2022-00062
Patent 9,858,218 B1

subsystem." Ex. 1016, 32:30–34. Hence, Hazelzet's and Buchmann's purposes and solutions are aligned with respect to capacity (density, extendibility) and performance, contrary to Patent Owner's argument.

Patent Owner argues that there is no motivation to add a separate training mode in Hazelzet, let alone the specific training of Buchmann. Resp. 41–53; Sur-Reply 21–24. Patent Owner argues that adding training to Hazelzet would have added unnecessary complexity and cost. Resp. 41–43. However, Patent Owner's expert admitted that it was "very well known to one of ordinary skill in the art that there was an initialization mode, and there was a normal mode," for both RDIMMs (like Hazelzet) and LR-DIMMs (with data buffers). Reply 23 (citing Ex. 1077, 110:9–20). Patent Owner's expert further admitted that persons of ordinary skill in the art knew about the need to train memory modules, including LR-DIMMs, in an initialization mode, especially as the speed of the memory devices increases. Reply 23–24 (citing Ex. 1077, 155:7–22 ("training is required to…set the timing optimally so that part can achieve its highest performance and have its best reliability"); Ex. 2027 ¶¶ 95–96. We agree with Petitioner that high-speed operations require training, and that cost and complexity are lesser concerns when high-speed performance is required. *See* Reply 24.

Patent Owner further argues that Hazelzet provides no motivation to combine because it is silent regarding training. Resp. 44–46. Petitioner notes that Hazelzet does not exclude training during initialization, and teaches that its initialization will depend "on the available interface busses, the desired initialization speed, available space, cost/complexity objectives, subsystem interconnect structures, the use of alternate processors . . .etc." Reply 24 (citing Ex. 1014 ¶ 123). We agree with Petitioner that Hazelzet is

IPR2022-00062
Patent 9,858,218 B1

not limited to any specific initialization, and Buchmann discloses training during initialization, with undisputed benefits for the data buffer. Reply 24–25 (citing Ex. 1016, code (57)).

Patent Owner further argues that Hazelzet and Buchmann teach different solutions to different problems. *Id.* at 48–53. Patent Owner argues training per Buchmann and error correction code (ECC) are not the same because training seeks to correct errors prior to transmission whereas ECC corrects errors after transmission. *Id.* at 48. Petitioner agrees that ECC is not a substitute for training, and that training would be required for reliable high-speed operations using data buffers, as discussed above, but, in any event, Patent Owner's argument does not negate Petitioner's motivation to combine. Reply 25.

Patent Owner argues that the Petition relies on hindsight. Resp. 53–58. Patent Owner argues that Petitioner relied on adding training to Hazelzet to "improve reliability" but indicates there would be no reason to implement a memory buffer just to add training to Hazelzet. *Id.* at 53. Petitioner contends that Patent Owner's hindsight argument repeatedly ignores Petitioner's motivation for adding a data buffer to Hazelzet. Reply 16–23, 25. We agree with Petitioner that Patent Owner's arguments do not adequately address Petitioner's reasons to combine. *See* Reply 16–23. Nor does Petitioner change its argument relative to a previous IPR since it was not involved in that IPR. Reply 26; Resp. 55–57. Patent Owner further argues that Petitioner's expert engages in hindsight by looking at the training sequences to see if any satisfy the claim limitations. Resp. 58. We agree with Petitioner that Patent Owner's assertion takes Petitioner's expert's testimony out of context, and that Dr. Alpert first made the

34

IPR2022-00062
Patent 9,858,218 B1

combination from the point of view of a person of ordinary skill in the art,
and then considered whether the combination satisfied the claim language.
Reply 26 (citing Ex. 2023, 221:22–222:8, 227:21–228:11). In any case, any
judgment on obviousness is in a sense "necessarily a reconstruction based
upon hindsight reasoning, but so long as it takes into account only
knowledge which was within the level of ordinary skill at the time the
claimed invention was made and does not include knowledge gleaned only
from applicant's disclosure, such a reconstruction is proper." *In re
McLaughlin*, 443 F.2d 1392, 1395 (C.C.P.A. 1971).

Patent Owner contends that all grounds fail because there is no
teaching, suggestion or motivation to use Hazelzet's UE line to
communicate training signals. Resp. 59–70. Petitioner contends that the
Petition explained the motivation for using Hazelzet's open-drain line for
notifications signals in Grounds 1–3. Reply 26–27 (citing Pet. 40–42). We
agree with Petitioner.

Patent Owner contends that Hazelzet describes using a bus to perform
initialization distinct from the UE line. Sur-Reply 24. Patent Owner
contends that the bus is needed for reporting or responding to operational
subsystem information. *Id.* (citing Ex. 1014 ¶¶ 124–125; Ex. 2027 ¶¶ 166–
171). Petitioner's combination does not exclude use of a bus—it merely
uses the UE line to report training completion. That other information may
be exchanged between the controller and memory module does not negate
Petitioner's combination.

Patent Owner further argues that Buchmann does not implement the
claimed notification signal with an open drain (*id.* at 25), which is an attack
on Buchmann alone without considering its combination with Hazelzet. *See*

IPR2022-00062
Patent 9,858,218 B1

*Merck, supra*. Patent Owner's argument that Hazelzet has other unused pins available during initialization (*id.* at 26) does not negate that Petitioner's motivation stems from using a pin that has a dual purpose, suggesting it would also be useful for a separate training mode. And we do not agree with Patent Owner's argument that Petitioner fails to support its contention that use of open-drain signaling was a known efficient way to indicate that all modules had completed training. Petitioner shows that Hazelzet has multiple modules and that normal operations would be delayed until all modules completed training and were no longer pulling the UE pin low. Pet. 42 (citing Ex. 1003 ¶ 169). And Dr. Alpert relies on evidence in Hazelzet describing use of the open drain UE pin by multiple modules. Ex. 1003 ¶ 169 (citing Ex. 1014 ¶¶ 18, 109). Thus, it is not true his testimony lacked support.

Specifically, Hazelzet uses the same open drain output UE 121 to indicate "uncorrectable error" in ECC mode and parity error in parity mode. Pet. 40–41 (citing Ex. 1014 ¶¶ 44, 49, 59, 64, 69, Figs. 4B, 7A). One would have been motivated to use the same output for the training mode/operation separate from the ECC and parity modes. *Id.* at 40–41 (citing Ex. 1003 ¶ 165). And multiple use of a pin was known. *Id.* at 41 (citing Ex. 1003 ¶ 166; Ex. 1017, 1:16–22, 5:49–57, 6:8–18; Ex. 1022 ¶¶ 4, 5, 32–33, 52; Ex. 1003 ¶ 166). Petitioner contends that these disclosures would have motivated a person of ordinary skill in the art to use Hazelzet's UE 121 open-drain output to notify the memory controller that the training was in progress or done. *Id.* (citing Ex. 1003 ¶ 167). And Dr. Alpert explains that a person of ordinary skill in the art "would have been motivated to arrange the modified Hazelzet to communicate signals indicating training

36

IPR2022-00062
Patent 9,858,218 B1

completion only when all memory modules have completed that training, in order to ensure that the entire memory system had been trained before proceeding to normal operation." *Id.* at 42 (citing Ex. 1003 ¶ 168). Petitioner contends that this "would permit training to be completed in an orderly and systematic manner, limiting the complexity of the control circuitry needed to implement the training, while using a known, efficient way to do so." *Id.* (citing Ex. 1014 ¶¶ 18, 109; Ex. 1017, 5:65–6:12, Fig.4; Ex. 1043, 7:30–51; Ex. 1003 ¶ 168).

Patent Owner contends that Hazelzet "teaches away" from using its open-drain UE line during initialization. Resp. 61–64. Patent Owner, however, has not identified any teaching in Hazelzet that "criticizes, discredits, or otherwise discourages" using the UE line during initialization. *See Galderma Laboratories, supra.* Patent Owner's expert admitted that an open-drain output was a simple, well-known technique for implementing a logical OR function as a way to indicate whether all memory modules had completed their training using an open-drain line not otherwise used during initialization. Reply 27 (citing Ex. 1077, 178:21–179:25; Ex. 1003 ¶¶ 166–169; Pet. 40–42). Patent Owner argues that Hazelzet discloses only error reporting on the open-drain UE line, but ignores its combination with Buchmann which teaches notifying training status. *Id.* Hazelzet's UE line provides notifications in two different modes, thus motivating a person of ordinary skill in the art to use it for the additional function of notifying training completion in an initialization mode when combined with Buchmann. Reply 28 (citing Ex. 1003 ¶¶ 164–167). We agree with Petitioner that one of ordinary skill in the art would have understood the advantages of using an open-drain line like Hazelzet's UE line efficiently for

IPR2022-00062
Patent 9,858,218 B1

the specific task of notifying training completion by all of multiple modules. *Id.* (citing Ex. 1003 ¶¶ 168–169).

Patent Owner argues that Hazelzet discloses using a bus for some initialization tasks. Resp. 62–64. Petitioner contends Hazelzet does not require using the bus, explaining that "[i]nitialization of the memory subsystem may be completed via one or more methods, based on the available interface busses, the desired initialization speed, available space, cost/complexity objectives, subsystem interconnect structures." Reply 28 (citing Ex. 1014 ¶ 123). This statement implies flexibility in how initialization is carried out. We agree with Petitioner that since the UE line was available for training during initialization, it would have been obvious to use the UE line to signal completion of training by a module. *Id.*

Patent Owner further argues that Buchmann does not disclose an open drain for training signals. Resp. 64–68. This is again an attack on the reference individually without considering it in combination with Hazelzet as proposed by Petitioner. *See Galderma Laboratories, supra.* Petitioner combined Hazelzet with Buchmann such that Buchmann's training completion is communicated through Hazelzet's open-drain UE line, providing obvious advantages. Reply 29 (citing Pet. 32–34, 40–42).

Patent Owner argues that Buchmann's UE line is not open-drain and is not used for training, and that instead a 6-bit bus carries training. Resp. 64–66. Petitioner explains, however, that Buchmann's UE line is not between the memory modules and the memory controller, but is inside SBC receiver circuity, which would have motivated a person of ordinary skill in the art to use Hazelzet's open-drain UE line between the memory controller

IPR2022-00062
Patent 9,858,218 B1

and multiple modules to indicate in a simple and efficient way that all modules completed training.  Ex. 1003 ¶¶ 162–169.

Petitioner contends that Patent Owner crops Petitioner's expert's testimony to create confusion about Dr. Alpert's testimony.  Reply 29; Resp. 67–68.  Petitioner contends that Dr. Alpert's testimony is consistent that "the memory controller in Hazelzet would be modified to initiate training commands, training sequences like Buchmann does, and that the success or failure of those training sequences would be indicated by a status on the UE signal line that comes back from the module to the memory controller in Hazelzet."  Reply 29 (citing Ex. 2003 at 121:16–22).

Petitioner further argues that in the final written decision for IPR2018-00303, Paper 42 (Ex. 1034), the Board determined similar limitations in another patent of Patent Owner obvious over the combination of Hazelzet and Buchmann.  Reply 30 (citing Ex. 1034, 15, 22).  As we address the merits of this case, we do not reach Petitioner's argument that Patent Owner is collaterally estopped in this proceeding by the final written decision in IPR2018-00303.

Patent Owner argues that a person of ordinary skill in the art would not have implemented a notification signal associated with a training sequence via an open drain output because there are at least two other "straight forward" implementations that the references would have instructed a person of ordinary skill in the art to do.  Resp. 68–70 (citing Ex. 2027 ¶ 179).  According to Patent Owner, one implementation is to use the memory controller, and not a component on the memory module, to conduct the training.  Resp. 69.  Since the memory controller conducts the training, no notification signal is needed to indicate to it when training is

39

IPR2022-00062
Patent 9,858,218 B1

completed.  *Id.*  In the other implementation, Patent Owner contends that Hazelzet teaches to use a separate, distinct bus, and not the UE line.  Resp. 70 (citing Ex. 2027 ¶ 181).

That there may be other ways to combine Hazelzet and Buchmann does not negate Petitioner's showing of a motivation to combine in the particular way that Petitioner indicated a person of ordinary skill in the art would have pursued.  On this record, we are persuaded that Petitioner has provided sufficient reasoning to combine Hazelzet with Buchmann.  Pet. 32–42.  More specifically, Petitioner has provided sufficient evidence of motivation to add Buchmann's buffering of data signals to Hazelzet, similar to a DDR3 LRDIMM, because it was a known, reliable technique to improve performance and increase capacity of Hazelzet's memory module.  *Id.* at 32 (citing Ex. 1003 ¶ 143; ), 37 (citing Ex. 1028 ¶ 31; Ex. 1036, 5; Ex. 1003 ¶¶ 155–156), 38 (citing Ex. 1003 ¶¶ 154–156, 158).  Petitioner has also provided the motivation to add Buchmann's training to Hazelzet in order to improve reliability.  *Id.* at 35–36 (citing Ex. 1014 ¶¶ 1–4, 7, 42, 44, 123; Ex. 1017, 12:36–53; Ex. 1025, 15–18; Ex. 1027, 1:35–2:12; Ex. 1003 ¶¶ 151–152, 154).  Petitioner further provides evidence that adding training in an initialization mode before normal operation was necessary to minimize errors and ensure correct read and write operations.  *Id.* at 39 (citing Ex. 1014 ¶ 123; Ex. 1022, ¶¶ 32, 52, 88–89, Fig. 4; Ex. 1025, 15–18;; Ex. 1027, 1:61–2:19, 6:24–25, 10:24–45; Ex. 1056, 18, 22, 25–26, 42–44; Ex. 1057, code (57), 2:13–34, 2:60–3:3, 9:11–10:44, Fig. 5; Ex. 1003 ¶¶ 159–160).  Petitioner further sets forth motivation to communicate training status in an initialization mode using the same open drain output used in other modes/operations.  *Id.* at 40–42 (Ex. 1014, Figs. 4B, 7A, ¶¶ 18, 44, 49, 59,

IPR2022-00062
Patent 9,858,218 B1

64, 69, 72, 109; Ex. 1022 ¶¶ 4–5, 32–33, 52; Ex. 1043, 7:30–51; Ex. 1003 ¶¶ 162–169).

In its Sur-Reply, Patent Owner argues that Hazelzet and Buchmann are not analogous art. Sur-Reply 14–16. This is largely new argument, which is improper in a sur-reply. *See* 37 C.F.R. § 42.23(b); Consolidated Trial Practice Guide "TPG"[7] 73–75. In any case, we do not agree with Patent Owner that Petitioner overstates the field of endeavor as memory module design. Hazelzet and Buchmann repeatedly mention "design" in the context of a memory module and its components. Ex. 1014 ¶¶ 39, 65, 67–68, 83, 90, 105; Ex. 1016, 2:30–51. Patent Owner insists that the problem addressed in Hazelzet is not increasing memory module capacity, performance, and reliability, but the reference is titled "High Density High Reliability Memory Module . . ." that is "capable of meeting desired density, performance and reliability requirements" at "low cost." Ex. 1014, code (54), ¶ 7. But, Buchmann teaches that "[b]y placing more technology-specific functionality local to the memory subsystem, such benefits as improved performance, increased design flexibility/extendibility, etc., may be obtained, often while making use of unused circuits within the subsystem." Ex. 1016, 32:30–34 (*see also* 32:7–30). These overlapping or identical problems and solutions would have drawn the person of ordinary skill in the art to consider Hazelzet and Buchmann together.

In the Sur-Reply, Patent Owner contends that the combinations in the asserted grounds are not a mere arrangement of old elements performing known functions yielding expected results. Sur-Reply 16. Patent Owner

---

[7] The Consolidated Trial Practice Guide "TPG" is available at www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2022-00062
Patent 9,858,218 B1

contends that adding data buffers to Hazelzet's module, adding a new training mode, and using a UE line on Hazelzet's redesigned module to report notifications of the new training mode would require substantial reconstruction and redesign of the elements without expectation of success. *Id.* Although data buffers and training may be "new" in the sense that Hazelzet does not have them, they are not new in the art, as Buchmann shows. *See* Ex. 1016, code (57). And understanding that Hazelzet uses a dual-purpose open drain output to signal different parameters in different modes, adding another training mode and a notification signal for that open drain output would have been straightforward for a person of ordinary skill in the art. *See* Ex. 1014 ¶ 59, Fig. 4B.

Patent Owner argues that there is no motivation to combine data buffers with Hazelzet. Sur-Reply 17. Patent Owner argues that Petitioner goes outside the bounds of Hazelzet and Buchmann by relying on Kim and Exhibits 1036 and 1037 and other evidence for ground 2 (Kim is expressly relied upon as evidence in ground 3 of the Petition (Pet. 4)). As discussed below, there is no need to reach Kim or Exhibits 1036 and 1037 to find the claims unpatentable over the combination of Hazelzet and Buchmann alone.

Patent Owner further argues that Buchmann provides no motivation to add training to a system like Hazelzet's which lacks a data buffer. Sur-Reply 20–24. Patent Owner contends that merely adding training to Hazelzet would not teach, suggest, or motivate a person of ordinary skill in the art to add training in a way that would implement the novel notification signal required by all claims. *Id.* at 20. Further, Patent Owner contends that if one added training, one of ordinary skill in the art would have used Hazelzet's existing architecture with Hazelzet's memory controller. *Id.*

42

IPR2022-00062
Patent 9,858,218 B1

Patent Owner's arguments fail to take into account Buchmann's teachings that "[a]dditional functions that may reside local to the memory subsystem include write and/or read buffers, . . . error detection and/or correction circuitry on one or more busses, . . . , operational and/or status registers, initialization circuitry, self-test circuitry (testing logic and/or memory in the subsystem), performance monitoring and/or control, . . . and other functions that may have previously resided in the processor, memory controller or elsewhere in the memory system." Ex. 1016, 32:7–22. Buchmann further states "[b]y placing more technology-specific functionality local to the memory subsystem, such benefits as improved performance, increased design flexibility/extendibility, etc., may be obtained, often while making use of unused circuits within the subsystem." *Id.* at 32:30–34. In other words, Buchmann identifies the design trend of moving functionality from the system processor or memory controller to the memory module. *See KSR*, 550 U.S. at 418 ("Often, it will be necessary for a court to look to . . . the effects of demands known to the design community . . . to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue").

Patent Owner argues that "Petitioner did not rebut [Patent Owner's] evidence that teaches away from adding complex and costly training to Hazelzet." Sur-Reply 21. But the only "teaching away" argument in the Response relates to adding a notification signal to Hazelzet's UE line. *See* Resp. 60–64. We do not consider new arguments in a Sur-Reply. *See* 37 C.F.R. § 42.23(b); TPG[8] 73–74.

---

[8] http://www.uspto.gov/sites/default/files/documents/tpgnov.pdf.

IPR2022-00062
Patent 9,858,218 B1

In sum, we find that one of ordinary skill in the art would have been motivated to combine Hazelzet and Buchmann for the reasons Petitioner has stated, notwithstanding Patent Owner's arguments to the contrary. We now consider whether each of the limitations of claim 1 are met by the combination of Hazelzet and Buchmann.

4.    *Analysis of Independent Claim 1*

a)    *Limitation 1.a: "A memory module operable with a memory controller of a host system"*

Petitioner asserts that Hazelzet discloses the preamble. Pet. 44. Specifically, Petitioner contends that Hazelzet "discloses dual inline memory modules ('DIMMS') configured to operate with the 'memory controller' of the host system." *Id.* (citing Ex. 1014 ¶¶ 36–39, Figs. 2, 3A–3D; Ex. 1003 ¶ 172). For example, Hazelzet's Figure 2 depicts a DIMM "coupled to the memory interface chip 18 which is in turn coupled to the memory controller or processor 19." Ex. 1014 ¶ 38.

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet teaches the preamble.[9]

b)    *Limitation 1.b: "a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections including first edge connections, second edge connections, and an*

---

[9] Neither party argues whether the preamble limits claim 1. We find that the evidence supports that the prior art teaches the preamble, so we do not address whether the preamble of claim 1 is limiting.

IPR2022-00062
Patent 9,858,218 B1

> *error edge connection in addition to the first edge*
> *connections and the second edge connections"*

Petitioner asserts that Hazelzet discloses this limitation. Pet. 44–48. For example, Petitioner relies in part on Figures 3A–3D, which depict alternative views of the DIMMS, which "are printed circuit cards designed to carry a plurality of DRAMs 22 thereon and the DRAM output pins . . . are connected via the printed circuit to selected connectors 23 along the edge of both the back and front sides of the card." Pet. 44–46 (citing Ex. 1014 ¶ 39; Ex. 1003 ¶¶ 175–176. Petitioner also relies on Figures 9 and 11 and their associated descriptions to disclose the "edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller." Pet. 46–47 (citing Ex. 1014 ¶¶ 39, 97, Figs. 9, 11; Ex. 1003 ¶ 177). In addition, Petitioner relies on Figures 7A–7C to teach a first set of edge connections for communicating data signals between the module and the memory controller (data edge connections including pins 11, 12, 17, 18, 22, 23, 31, 32, 37, 38) and a second set of edge connections for communicating address and control signals from the memory controller (address edge connections including pins 67, 70, 72–75, 82, 205–207, 210–213, 220, 277 and command edge connections including pins 86, 89, 91, 93). *Id.* at 47 (citing Ex. 1014 ¶¶ 15, 35, 38, 41, Figs. 7A–7C; Ex. 1003 ¶ 179). Petitioner also contends that Hazelzet discloses an error edge connection (uncorrectable error pin UE (142) in Figure 7A) coupled to the open drain output of the module controller. *Id.* at 47–48 (citing Ex. 1014, ¶¶ 72, 109, Figs. 4B, 7A; Ex. 1003 ¶ 164).

IPR2022-00062
Patent 9,858,218 B1

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet teaches this limitation.

> c) *Limitation 1.c: "dynamic random access memory elements on the printed circuit board"*

Petitioner asserts that Hazelzet discloses this limitation. Pet. 48. For example, Hazelzet describes that "[t]he DIMM of the present invention is comprised of a printed circuit board having a front side and a back side and a plurality of double data rate (DDR) DRAMs or synchronous dynamic random access memories (SDRAMs) affixed to both the front surface and the back surface." Pet. 48 (citing Ex. 1014 ¶ 15, Figs. 2, 3A–3D; Ex. 1003 ¶ 183).

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet teaches this limitation.

> d) *Limitation 1.d: "a module controller on the printed circuit board and coupled to the dynamic random access memory elements, the module controller having an open drain output coupled to the error edge connection"*

Petitioner asserts that Hazelzet discloses this limitation. Pet. 48. Specifically, Petitioner contends that Hazelzet discloses an "ECC/Parity register ('module controller')," that is on the "'printed circuit board' and coupled to the DRAMs," and "having an output for uncorrectable errors shown in FIG. 4B as '/ERROR (UE) 121' (i.e., UE 121), which is an 'open drain output.'" *Id.* (citing Ex. 1014 ¶¶ 39, 42, 44, 59, 72, Figs. 3A–3D, 4A, 4B) (emphases omitted). Petitioner further contends that "[t]he output UE 121 is 'coupled to the error edge connection' of the module." *Id.* (citing

IPR2022-00062
Patent 9,858,218 B1

Ex. 1014 ¶¶ 59, 72, Figs. 4B, 7A (pin 142); Ex. 1003 ¶¶ 187–190) (emphasis omitted).

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet teaches this limitation.

> e)    *Limitation 1.e: "wherein the memory module is operable in at least a first mode and a second mode, wherein the memory module in the first mode is configured to be trained with one or more training sequences"*

Petitioner asserts that Hazelzet, in combination with Buchmann, discloses this limitation. Pet. 48–49. Specifically, Petitioner asserts Hazelzet discloses that its memory module (DIMM) "is configurable to operate in (1) a 'parity mode,' which is the claimed 'second mode,' and (2) an 'ECC mode.'" *Id.* at 48 (citing Ex. 1014 ¶¶ 64, 69–72, Fig. 8) (emphasis omitted). To disclose the "first mode," Petitioner relies on Buchmann. *Id.* at 48–49. In Buchmann, Petitioner relies on training sequences like those described as TS0 or TS3 to train the data buffers. *Id.* at 30–31 (citing Ex. 1016, 5:51–72, 8:24–9:18, Figs. 4, 6), 48–49 (citing Ex. 1003 ¶ 192).

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet and Buchmann teach this limitation.

> f)    *Limitation 1.f: "wherein the memory module in the second mode is configured to perform one or more memory read or write operations not associated with the one or more training sequences by communicating data signals via the first edge connections in response to*

47

IPR2022-00062
Patent 9,858,218 B1

> *address and command signals received via the second*
> *edge connections"*

Petitioner asserts that Hazelzet, in combination with Buchmann, discloses this limitation.  Pet. 49–52.  Specifically, Petitioner asserts that Hazelzet, in describing Figure 2, discloses "the memory interface chip 18 sends and receives data from the DIMMs via the data line 15 and sends address and commands via line 16." *Id*. at 49 (citing Ex. 1014 ¶ 38, Fig. 2). Hazelzet further states "[t]he memory interface chip 18 then sends and receives data, via line 15, to the memory devices, or DRAMs 22 and sends address and command information to the register chip 21 via add/cmd line 16 and check bits for error correction purposes to the ECC/Parity register chip 21 via line 25." Ex. 1014 ¶ 38.

Dr. Alpert provides testimony as to the disclosure in Hazelzet's Figure 2:  "[Figure 2] shows line 15 coupling the memory controller and the DRAMs, and line 16 coupling the memory controller and the register 21." Ex. 1003 ¶ 195.  Dr. Alpert further testifies that a person of ordinary skill in the art "would also understand from Figure 2 that lines 15 and 16 are coupled to edge connectors for data and address/control, respectively, since those lines coupled the DIMM to the memory controller." *Id.* (citing Ex. 1014 ¶¶ 15, 35, 38, 41, Figs. 2, 7A–7B).  Dr. Alpert further testifies that a person of ordinary skill in the art "would understand that such operations—communicating data with DRAMs while communicating address and command information with the register—to constitute '*memory read or write operations*' because they follow the standard configuration for such operations with a JEDEC . . . compliant device, [Ex. 1014 ¶ 44],

48

IPR2022-00062
Patent 9,858,218 B1

including sending address and control to the register and data to the DRAMs." *Id.* ¶ 196 (citing Ex. 1024, 1, 14, 16).

Petitioner asserts that Hazelzet's "parity mode" is an "'operating mode' . . . in which 'the memory interface chip or controller would generate a single parity bit in conjunction with providing the full address and command field to the module.'" Pet. 50–51 (citing Ex. 1014 ¶¶ 64, 70, 75; Ex. 1003 ¶¶ 198–199) (emphasis omitted). Dr. Alpert testifies that a person of ordinary skill in the art "would understand the phrase 'operating mode' to refer to a mode in which the memory operations are employed to store data in or read data from the DRAMs of the module." Ex. 1003 ¶ 198. Dr. Alpert further testifies that a person of ordinary skill in the art "would understand [the phrase] 'the full address and command field' in this context to refer to the signals sent to a memory module during a read or write operation." *Id.* ¶ 199 (citing Ex. 1024, 1, 14, 16). Petitioner also relies on Figure 8 of Hazelzet to support its contentions that Hazelzet's "address and control signals received by the module over the address/control edge connections are '*configured to perform one or more memory read or write operations*.'" Pet. 51 (citing Ex. 1014, Fig. 8; Ex. 1003 ¶¶ 200–201).

Petitioner further contends that even if Hazelzet "does not sufficiently disclose memory read and write operations in the parity mode, it would have been obvious to include that in" Hazelzet's system because "[t]he use of such operations in an operational mode employing parity checking was known in the prior art." Pet. 51 (citing Ex. 1017, 6:19–34). Petitioner argues that a person of ordinary skill in the art "would have therefore been motivated to modify Hazelzet's 'parity mode' into the claimed 'second mode' involving a read and write operations over the recited edge

49

IPR2022-00062
Patent 9,858,218 B1

connections because to do so would have permitted memory operations using existing and convenient connections disclosed in Hazelzet and because it would have been common sense to do so." *Id.* at 52 (citing Ex. 1024, 14, 16) (emphases omitted); *see also id.* (citing Ex. 1014 ¶ 75; Ex. 1003 ¶ 206).

Petitioner contends that the combination of Hazelzet with Buchmann include "training sequences in a training mode ('first mode') separate from any mode that includes memory read and write operations in response to memory controller commands." Pet. 52 (emphasis omitted). In addition, Petitioner argues that none of the portions of Hazelzet and Buchmann "relied upon for the combinations analyzed disclose training operations occurring during the memory read and write operations in response to memory controller commands, [Ex. 1003 ¶ 210], so their silence additionally satisfies this limitation." *Id.*

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet and Buchmann teach this limitation.

> g)   Limitation 1.g: "wherein the module controller is configured to receive via the second edge connections the address and command signals associated with the one or more memory read or write operations and to control the dynamic random access memory elements in accordance with the address and command signals, and"

Petitioner asserts that Hazelzet discloses this limitation. Pet. 53. Specifically, Petitioner reiterates that, as set forth for limitations 1.b and 1.f, Hazelzet's "module can be placed into a parity mode, which is a mode in which the module is provided, over the edge connections identified for that purpose, address and control signals for performing 'one or more memory

50

IPR2022-00062
Patent 9,858,218 B1

read or write operations.'" Pet. 53 (emphasis omitted) (citing Ex. 1014 ¶¶ 15, 35, 38, 41, 64, 70, Figs. 2, 7A–7C; Ex. 1024, 13–14, 16; Ex. 1003 ¶ 212). Petitioner further contends that Hazelzet "discloses that the printed circuit board has a first set of edge connections for communicating data signals between the DRAM and the system memory controller . . . while the memory module is in the 'parity mode' and in accordance with the received address and control signals." Pet. 53 (citing Ex. 1014 ¶¶ 15, 35, 38, 41, 64, 70, Figs. 2, 7A–7C, 8). Petitioner also reiterates that, as set forth for limitation 1.f, "data communication between the memory module and the memory controller is 'in accordance with the address and command signals.'" *Id.* (emphasis omitted) (citing Ex. 1014 ¶¶ 15, 35, 38, 41, 64, 70, Figs. 2, 7A–7C, 8; Ex. 1024, 13; Ex. 1003 ¶¶ 195–204, 213).

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet teaches this limitation.

> h)    Limitation 1.h: "wherein the module controller is further configured to output via the open drain output and the error edge connection a signal indicating a parity error having occurred while the memory module is in the second mode"

Petitioner asserts that Hazelzet discloses this limitation. Pet. 53–54. Specifically, Petitioner reiterates that, as set forth for limitations 1.b and 1.d, "the error edge connection (pin 142) is coupled to the open drain output (UE 121) of the ECC/Parity register ('*module controller*')." Pet. 54 (citing Ex. 1014 ¶¶ 59, 72, Figs. 4B, 7A (pin 142); Ex. 1003 ¶ 215). Petitioner contends that "[w]hen the memory module is in the parity mode ('second mode'), the 'parity generator/checker circuit 231' generates and sends the

IPR2022-00062
Patent 9,858,218 B1

'parity error signal (PERR)' to the 'error logic circuit' 100 . . . and outputs it to the memory controller through the output line UE 121 . . . which is an open-drain output . . . coupled to the memory controller using pin number 142." *Id.* (emphasis omitted) (citing Ex. 1014 ¶¶ 38, 59, 70, 72, 76, Figs. 4, 5, 7A (pin 142); Ex. 1003 ¶¶ 219–221).

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet teaches this limitation.

> i)    Limitation 1.i: "wherein the module controller is further configured to drive a notification signal associated with the one or more training sequences to the error edge connection via the open drain output while the memory module is in the first mode"

Petitioner asserts that Hazelzet and Buchmann disclose this limitation. Pet. 54–56. Specifically, Petitioner states that Hazelzet's memory module "would be modified to be configurable to enter a training mode and output . . . Buchmann training status signals ('*notification signals*') to the system memory controller via open drain output UE 121." Pet. 54. In Buchmann, Petitioner relies on the signals TS0_done, TS3_ack, or TS3_done. *Id.* at 31 (citing Ex. 1016, Figs. 4, 6, 5:51–72, 8:24–9:18).

Petitioner contends that "Hazelzet's memory system involves sharing the open drain output so that the memory controller can receive notification signals from multiple modules using the open drain output." Pet. 55 (citing Ex. 1014 ¶¶ 18, 72, 109; Ex. 1003 ¶ 225). Petitioner further contends that a person of ordinary skill in the art "would understand that, in this combination, the added training status signals would be at a low logic level . . . over a Hazelzet open drain output (UE 121) until the related operations

IPR2022-00062
Patent 9,858,218 B1

are completed for all modules of the system and the gate signals to the transistors of all the open drain circuits in all the modules are low, at which time the signals would be at a high impedance state, indicating completion." *Id.* (citing Ex. 1017, 5:65–6:12, Fig. 4; Ex. 1001, 9:47–10:50). Petitioner contends "[t]he high and low gate signals to the transistors represent 'driv[ing] a notification signal . . . to the error edge connection via the open drain output while the memory module is in the first mode,' respectively or vice versa." *Id.* at 55–56 (citing Ex. 1003 ¶ 226) (emphases omitted).

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet in combination with Buchmann teaches this limitation.

### j) *Conclusion for Claim 1*

Petitioner has shown by a preponderance of the that one of ordinary skill in the art would have had reasons to combine Hazelzet and Buchmann as proposed in the Petition, with a reasonable expectation of success in arriving at the memory module recited in claim 1. Petitioner has further shown by a preponderance of the evidence that the combination of Hazelzet and Buchmann teaches or at least suggests all limitations of claim 1. Consequently, claim 1 of the '218 patent is unpatentable as obvious over the combination of Hazelzet and Buchmann.

### 5. *Analysis of Independent Claim 9*

Claim 9 is an independent method claim and recites similar limitations to claim 1. *See* Ex. 1001, 15:38–64. Petitioner contends claim 9 is

IPR2022-00062
Patent 9,858,218 B1

unpatentable, relying on similar disclosure in Hazelzet and Buchmann as
with independent claim 1, as follows. Pet. 62–63.

> a)    Limitation 9.a: *"A method performed by a memory
> module operating with a memory controller of the host
> system, . . . the method comprising:"*

Petitioner contends that this preamble is satisfied by the operation of
the combined system analyzed in connection with claim limitation 1.a. Pet.
62. Patent Owner does not dispute this limitation. *See* Resp. We agree with
Petitioner's contention.[10]

> b)    Limitation 9.b: *"the memory module including
> dynamic random access memory elements on a printed
> circuit board,"*

Petitioner contends that this limitation is satisfied for the reasons set
forth for claim limitation 1.c. Pet. 62. Patent Owner does not dispute
Petitioner's contention. We agree with Petitioner's contention.

> c)    Limitation 9.c: *"the printed circuit board having
> edge connections that fit into a corresponding slot of a
> host system, the edge connections including first edge
> connections via which the dynamic random access
> memory devices communicate data with the memory
> controller, second edge connections via which the
> memory module receives address and command signals
> from the memory controller, and an error edge
> connection in addition to the first edge connections and
> the second edge connections,"*

Petitioner contends that this limitation is satisfied for the reasons set
forth for claim limitation 1.b (identifying PCB and edge connections) and

---

[10] Since we agree with Petitioner that the preamble is taught or at least
suggested by the combination of Hazelzet and Buchmann, we do not decide
whether the preamble is limiting.

IPR2022-00062
Patent 9,858,218 B1

limitation 1.f (explaining coupled of edge connections to DRAMs and module controller). Pet. 62. Patent Owner does not dispute Petitioner's contention. We agree with Petitioner's contention.

> d)    Limitation 9.d: "receiving from the memory controller address and command signals associated with one or more memory read or write operations;"

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitation 1.g. Pet. 62. Specifically, Petitioner contends that Hazelzet discloses memory operations that entail the module receiving address and control signals from a system memory controller via the respective address and control edge connections. *Id.* (citing Ex. 1003 ¶ 288). Patent Owner does not dispute Petitioner's contention. We agree with Petitioner's contention.

> e)    Limitation 9.e: "controlling the dynamic random access memory elements in accordance with the address and command signals;"

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitation 1.g. Pet. 62–63. Specifically, Petitioner contends that Hazelzet discloses memory operations that entail the module receiving address and control signals from a system memory controller via the respective address and control edge connections. *Id.* (citing Ex. 1003 ¶ 290). Patent Owner does not dispute Petitioner's contention. We agree with Petitioner's contention.

> f)    Limitation 9.f: "outputting to the memory controller via an open-drain output coupled to the error

IPR2022-00062
Patent 9,858,218 B1

> *edge connection a signal indicating a parity error having occurred in the memory module; and"*

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitation 1.h. Pet. 63. Specifically, Petitioner contends that Hazelzet discloses the module outputting, in the "second mode," a parity error signal via an open drain output (UE 121) for memory read and write operations accessing the module. *Id.* (citing Ex. 1003 ¶ 292). Patent Owner does not dispute Petitioner's contention. We agree with Petitioner's contention.

> g)    *Limitation 9.g: "training with one or more training sequences while the first edge connections are not active, and"*

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitation 1.e (explaining training that occurs) and dependent claim 7 (explaining that "first edge connections are not active" during that training). Pet. 63 (citing Ex. 1003 ¶¶ 211–222, 294, *see also* 271–272, 274–277). Patent Owner does not dispute Petitioner's contention. We agree with Petitioner's contention.

> h)    *Limitation 9.h: "driving a notification signal associated with the one or more training sequences to the memory controller via the open drain output and the error edge connection."*

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitation 1.g. Pet. 63. Petitioner contends that the combination of Hazelzet and Buchmann includes a memory module that performs training sequence operations and output to the system memory controller training notification signals (TS0_done, TS3_ack, TS3_done) via an open drain output (UE 121). *Id.* (citing Ex. 1003 ¶ 296). Patent Owner

IPR2022-00062
Patent 9,858,218 B1

does not dispute Petitioner's contention.  We agree with Petitioner's contention.

### i)    Conclusion for Claim 9

Petitioner has shown by a preponderance of the that one of ordinary skill in the art would have had reasons to combine Hazelzet and Buchmann as proposed in the Petition, with a reasonable expectation of success in arriving at the method recited in claim 9.  Petitioner has further shown by a preponderance of the evidence that the combination of Hazelzet and Buchmann teaches or at least suggests all limitations of claim 9.  Consequently, claim 9 of the '218 patent is unpatentable as obvious over the combination of Hazelzet and Buchmann.

### 6.    Analysis of Independent Claim 15

Claim 15 is an independent method claim and recites similar limitations to claim 1.  *See* Ex. 1001, 16:16–54.  Petitioner contends claim 15 is unpatentable, relying on similar disclosure in Hazelzet and Buchmann as with independent claim 1, as follows.  Pet. 64–67.

### a)    Limitation 15.a: "A memory module operable with a memory controller of a host system, comprising:"

Petitioner contends that the preamble is satisfied for the reasons set forth for claim limitation 1.a.  Pet 64.  Patent Owner does not dispute Petitioner's contention.  *See* Resp.  We agree with Petitioner's contention. [11]

### b)    Limitation 15.b: "a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections including

---

[11] Since we agree with Petitioner that the preamble is taught or at least suggested by the combination of Hazelzet and Buchmann, we do not decide whether the preamble is limiting.

IPR2022-00062
Patent 9,858,218 B1

> *first edge connections via which the memory module receives or outputs data signals, second edge connections via which the memory module receives address and command signals, and an error edge connection in addition to the first edge connections and the second edge connections;"*

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitations 1.b (identifying PCB and edge connections) and limitation 1.f (explaining coupling of edge connections to DRAMs and module controller). Pet 65. Patent Owner does not dispute this limitation. *See* Resp. We agree with Petitioner's contention.

> c)    Limitation 15.c: *"dynamic random access memory elements on the printed circuit board and configurable to communicate data signals with the memory controller via the first edge connections; and"*

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitations 1.c (identifying DRAMs on PCB) and limitation 1.f (explaining coupling of edge connections to DRAMs). Pet 65. Patent Owner does not dispute this limitation. *See* Resp. We agree with Petitioner's contention.

> d)    Limitation 15.d: *"a module controller on the printed circuit board and coupled to the dynamic random access memory elements, the module controller having an open drain output coupled to the error edge connection;"*

Petitioner contends that this limitation is satisfied for the reasons set forth in claim limitation 1.d. Pet. 65. Patent Owner does not dispute this limitation. *See* Resp. We agree with Petitioner's contention.

IPR2022-00062
Patent 9,858,218 B1

> e)    Limitation 15.e: "wherein the memory module is configurable to perform at least a first operation and a second operation;"

Petitioner contends that this limitation is satisfied for the reasons set forth in claim limitation 1.e.i. Pet. 65. Petitioner contends the claimed "first operation" corresponding to the "second mode" in claim 1 and the claimed "second operation" corresponds to the "first mode" of claim 1. *Id.* Patent Owner does not dispute this limitation. *See* Resp. We agree with Petitioner's contention.

> f)    Limitation 15.f: "[15.f.i] wherein the module controller in the first operation is configured to receive via the second edge connections address and command signals associated with one or more memory read or write operations and [15.f.ii] to control the dynamic random access memory elements in accordance with the address and command signals,"

Petitioner contends that limitation 15.f.i is satisfied for the same reasons set forth for claim limitation 1.g. Pet. 65. Specifically, Petitioner contends that Hazelzet discloses memory operations that entail the module receiving address and control signals from a system memory controller via the respective address and control edge connections. *Id.* (citing Ex. 1003 ¶ 320).

Petitioner contends that limitation 15.f.ii is satisfied for the reasons set forth for claim limitation 1.g. Pet. 66. Specifically, Petitioner contends that Hazelzet discloses memory operations that entail the module receiving address and control signals from a system memory controller via the respective address and control edge connections, and in response communicating data between the system memory controller and the module DRAMs via the data edge connections under the control of the module

IPR2022-00062
Patent 9,858,218 B1

controller. *Id.* (citing Ex. 1003 ¶ 322). Patent Owner does not dispute this limitation. *See* Resp. We agree with Petitioner's contentions.

> g)    *Limitation 15.g: "wherein the module controller in the first operation is further configured to output to the memory controller a signal indicating a parity error having occurred in the memory module; and"*

Petitioner contends that this limitation is satisfied for the reasons set forth in claim limitation 1.h. Pet. 66. Petitioner contends that "Hazelzet discloses the module outputting, in the "second mode," corresponding to the "first operation" in this claim, a parity error signal via an open drain output (UE 121) in connection with memory read and write operations accessing the module." *Id.* (citing Ex. 1003 ¶ 324). Patent Owner does not dispute this limitation. *See* Resp. We agree with Petitioner's contention.

> h)    *Limitation 15.h: "wherein the memory module in the second operation is configured to be trained with one or more training sequences while the first edge connections are not active, and"*

Petitioner contends that this limitation is satisfied for the same reasons stated for claim limitation 1.e (explaining training that occurs) and claim 7 (explaining that "first edge connections are not active" during that training). Pet. 66 (citing Ex. 1003 ¶ 326, *see also* ¶¶ 271–272, 274–277 (concerning claim 7)). Patent Owner does not dispute this limitation. *See* Resp. We agree with Petitioner's contention.

> i)    *Limitation 15.i: "wherein the module controller in the second operation is configured to drive a notification signal associated with the one or more training*

IPR2022-00062
Patent 9,858,218 B1

> sequences to the error edge connection via the open
> drain output of the module controller."

Petitioner contends that this limitation is satisfied for the same reasons set forth for claim limitation 1.g. Pet. 66. Petitioner notes that the combination of Hazelzet and Buchmann includes a module that performs training sequence operations and outputs to the system memory controller training notification signals (e.g., TS0_done, TS3_ack, TS3_done, TS3_ack) via an open drain output (UE 121) of the module controller. *Id.* at 66–67 (citing Ex. 1003 ¶ 328). Patent Owner does not dispute this limitation. *See* Resp. We agree with Petitioner's contention.

### j)    Conclusion for Claim 15

Petitioner has shown by a preponderance of the that one of ordinary skill in the art would have had reasons to combine Hazelzet and Buchmann as proposed in the Petition, with a reasonable expectation of success in arriving at the memory module recited in claim 15. Petitioner has further shown by a preponderance of the evidence that the combination of Hazelzet and Buchmann teaches or at least suggests all limitations of claim 15. Consequently, claim 15 of the '218 patent is unpatentable as obvious over the combination of Hazelzet and Buchmann.

### 7.    Claims 2 and 16

Claim 2 depends from claim 1 and recites "wherein the module controller comprises an integrated circuit." Ex. 1001, 15:11–12. Claim 16 depends from claim 15 and recites the same limitation. *Id.* at 16:55–56.

Petitioner contends that Hazelzet's ECC/Parity register ("module controller") "comprises in integrated circuit." Pet. 56. Petitioner contends that Hazelzet explains that the module support devices, including "buffers,"

IPR2022-00062
Patent 9,858,218 B1

"registers," and "PLL's" may be comprised of "multiple separate chips" or
may be "combined onto a single package or even integrated onto a single
device." *Id.* (citing Ex. 1014 ¶¶ 39, 42 115, Figs. 3A–3D; Ex. 1003 ¶¶ 228,
230, 330). Patent Owner does not dispute Petitioner's contentions. We
agree with Petitioner that Hazelzet teaches the limitations of claims 2 and 16
of the '218 patent.

        8.    *Claims 3 and 17*

     Claim 3 depends from claim 1 and recites "wherein the module
controller includes a notification circuit comprising one or more transistors
each having an open drain coupled to the open drain output." Ex. 1001,
15:14–17. Claim 17 depends from claim 15 and recites a similar limitation.
*Id.* at 16:57–60.

     Petitioner contends that, as explained for claim limitation 1.d,
Hazelzet discloses that the ECC/Parity register has an open drain output.
Pet. 56. Petitioner contends that Hazelzet's ECC/Parity register has an
"error correction code circuit ECC segment 21b," which is a "notification
circuit" which outputs signals notifying the system memory controller of
correctable, uncorrectable, and parity errors. *Id.* (citing Ex. 1014 ¶ 44).
Petitioner contends that the "error correction code circuit ECC segment 21b"
(within the ECC/Parity register) includes circuitry for determining whether
the errors occurred, and provides an "open-drain" output for a notification
signal such as UE 121. *Id.* (citing Ex. 1014 ¶¶ 59, 72, Fig. 4B; Ex. 1003
¶ 232). Petitioner contends that a person of ordinary skill in the art would
have understood that an open drain output includes a field effect transistor
having gate, source, and drain, and that an "open drain" output is an output
of "one or more transistors each having an open drain coupled to the open

IPR2022-00062
Patent 9,858,218 B1

drain output" while the source of that transistor is coupled to the ground.  *Id.*
at 57 (citing Ex. 1017 5:65–6:18, Figs. 4–5; Ex. 1020, 1 (Title), 4:28–37; Ex.
1003 ¶¶ 137–142, 233–235).

Patent Owner does not dispute Petitioner's contentions.  *See* Resp.

We agree with Petitioner that the combination of Hazelzet and
Buchmann teaches these limitations.  Hazelzet teaches that the ECC/Parity
register includes an error correction code circuit that notifies the memory
controller of errors, that has "[t]wo open-drain outputs are available to
permit multiple modules to share a common signal line for reporting an
error."  Ex. 1014 ¶¶ 59, 72, 109, Fig. 4B.  This is sufficient to teach the
limitations of claims 3 and 17 of the '218 patent.

9.    *Claims 4 and 18*

Claim 4 depends from claim 3 and recites "wherein the notification
circuit is configured to drive the notification signal by driving a gate of each
of the one or more transistors to a logic high level to provide a low
impedance path between the open drain output to ground."  Ex. 1001,
15:18–22.  Claim 18 depends from claim 17 and recites a similar limitation.
*Id.* at 16:61–65.

Petitioner contends (as explained in § V.D of the Petition) that in the
combination of Hazelzet and Buchmann the open drain output is configured
such that the transistor output is driven low (ground) while training is still
occurring, and driven high upon completion.  Pet. 57.  According to
Petitioner, to drive the output low (ground or "provide a low impedance
path"), the gate of the transistor must be high, causing the transistor to
conduct and connect the drain to ground.  *Id.*  To drive the output high
(which would be a high impedance state), the gate of the transistor must be

IPR2022-00062
Patent 9,858,218 B1

low, turning the transistor off. *Id.* (citing Ex. 1003 ¶¶ 252–253). Petitioner contends that, in the combination of Hazelzet and Buchmann, the ECC/Parity register is configured (for example, by placing it in the training mode) "to drive the notification signal by driving a gate of each of the one or more transistors to a logic high level to provide a low impedance path between the open drain output to ground," and thereby outputting "notification signals." *Id.* (citing Ex. 1003 ¶ 254).

Patent Owner does not dispute Petitioner's contentions. *See* Resp.

We credit Dr. Alpert's testimony concerning what one of ordinary skill in the art would have understood of the structure and operation of an open drain transistor as taught by Hazelzet. *See* Ex. 1003 ¶¶ 252–254. Although Hazelzet does not specifically mention the gate of an open drain transistor being driven high, it does mention the output being driven low which would require the gate to be driven high in light of Dr. Alpert's testimony of what a person of ordinary skill in the art would have understood about the structure and operation of an open drain transistor. We agree with Petitioner that the combination of Hazelzet and Buchmann teaches, or at least suggests, the limitations of claims 4 and 18 of the '218 patent.

### 10.  *Claims 5, 11, and 19*

Claim 5 depends from claim 4 and recites "wherein the notification circuit is configured to drive the parity error signal by driving the gate of each of the one or more transistors to a logic high level to provide a low impedance path between the open drain output to ground." Ex. 1001, 15:23–27. Claim 11 depends from claim 10 and recites a similar limitation.

IPR2022-00062
Patent 9,858,218 B1

*Id.* at 16:4–7.  Claim 19 depends from claim 18, and also is similar.  *Id.* at 16:66–17:3.

Petitioner contends that Hazelzet's "ECC/Parity register has 'open-drain output[s]' capable of using 'parity error signals' (PERR) to output signal UE 121 to the host indicating a parity error."  Pet. 58 (citing Ex. 1014 ¶¶ 59, 70, 72, 76).  When the memory module is in the parity mode ("second mode", the "parity generator/checker circuit 231 (within SEC/DED ECC circuit 90) generates and sends the "parity error signal (PERR)" to the "error logic circuit" 100.  *Id.* (citing Ex. 1014 ¶¶ 59, 70, 72, 76, Figs. 4B–5; Ex. 1003 ¶ 258).  Hazelzet states that in the parity mode, the parity error "will be reported two clock pulses later via the Uncorrectable Error (UE) line (<u>driven low</u> for two clock pulses)."  *Id.* (citing Ex. 1014 ¶¶ 18, 70; Ex. 1003 ¶ 259) (emphasis added).

Petitioner further contends that, as explained for claims 3 and 4, "Hazelzet discloses that its open-drain output is driven 'low' (i.e., to ground) when the driver is enabled (i.e., the gate receives a high voltage), and further explains that the open-drain 'output [is] permitted to return to an un-driven state (high impedance)' when the 'driver [is] disabled.'"  *Id.* (citing Ex. 1014 ¶ 99; Ex. 1003 ¶ 260).

Petitioner thus contends that Hazlezet's "error correction code circuit ECC segment 21b" ("notification circuit") driving the open-drain output UE 121 is configured "to drive the parity error signal by driving the gate of each of the one or more transistors to a logic high level to provide a low impedance path between the open drain output to ground."  *Id.* at 58–59 (citing Ex. 1017, 5:65–6:18, Figs. 4–5; Ex. 1003 ¶¶ 137–142, 261–262, 301, 336).

IPR2022-00062
Patent 9,858,218 B1

Patent Owner does not dispute Petitioner's contentions that claims 5, 11, and 19 are taught or suggested by the combination of Hazelzet and Buchmann. *See* Resp.

Petitioner shows sufficiently that the limitations of claims 5, 11, and 19 are taught or at least suggested by the combination of Hazelzet and Buchmann. Hazelzet teaches that its ECC/Parity buffer includes an error correction code circuit segment 21b that outputs a parity error signal (*id.* ¶ 59) that is driven low to indicate a parity error. Ex. 1014 ¶¶ 59, 70, 72, 76, Figs. 4A–4B. Although Hazelzet does not specifically mention the gate of an open-drain transistor being driven high to provide a low impedance path from drain to ground, Dr. Alpert testifies that a person of ordinary skill in the art would have understood an open-drain transistor to be structured and to operate in this way. Ex. 1003 ¶¶ 258–260. We agree with Petitioner that the limitation of claims 5, 11, and 19 are taught or at least suggested by the combination of Hazelzet and Buchmann.

### 11.    *Claims 6, 12, and 20*

Claim 6 depends from claim 4 and recites "wherein the notification circuit is configured to drive the notification signal using one or more OR logic elements." Ex. 1001, 15:28–30. Claim 12 depends from claim 10, and recites a similar limitation. *Id.* at 16:8–10. Claim 20 depends from claim 18, and recites the same limitation. *Id.* at 17:4–6.

Petitioner contends that Hazelzet's "notification circuit" includes "Error Logic 100" which receives "US [sic] 110" signal and the "PERR 111" signal, and outputs one of these signals to the same "/ERROR (UE)" pin 121 depending on the mode of the memory module. Pet. 59 (citing Ex. 1014 ¶¶ 44, 59, 69–72, Fig. 4B; Ex. 1003 ¶¶ 146, 265–266). Petitioner

IPR2022-00062
Patent 9,858,218 B1

contends that because the Error Logic 100 receives "U[E] 110" signal and the "PERR 111" signal and the training mode notification signals, a person of ordinary skill in the art would have understood that the Error Logic 100 would necessarily include "one or more OR logic elements," such as a three-input OR gate, to determine which signal should be used to drive the transistor. *Id.* at 59. Petitioner contends the circuit thus would be "configured to drive the notification signal using one or more OR logic elements." *Id.* at 59–60 (citing Ex. 1017, 5:65–6:18, Figs. 4–5 (depicting in Fig. 5 OR logic gate used for such purpose); Ex. 1003 ¶¶ 267–268, 303, 338).

Patent Owner does not dispute Petitioner's contentions. *See* Resp.

Although Hazelzet does not specifically mention "one or more OR logic elements," we agree with Petitioner that one of ordinary skill in the art would understand that an OR logic element is implied by Hazelzet's teaching that "[w]hen *either* error line (CE) 109 *or* uncorrectable error line (UE) 110 is low, . . . [t]he error lines 120, 121 will be active . . . in ECC mode or . . . in parity mode. Ex. 1014 ¶ 59, Fig. 4B. We agree with Petitioner that Hazelzet's "either/or" signifies use of an OR logic element. Accordingly, we agree with Petitioner that this limitation of claims 6, 12, and 20 is taught by the combination of Hazelzet and Buchmann.

　　　　12.　　*Claim 7*

Claim 7 depends from claim 1 and recites "wherein the first edge connections are not active when the memory module is in the first mode and configured to be trained with the one or more training sequences." Ex. 1001, 15:31–34.

IPR2022-00062
Patent 9,858,218 B1

Petitioner contends that, in the combination of Hazelzet and Buchmann, "in which only the TS0 training operations are carried out in the training mode ("first mode"), the address/control and data pins (data pins are the "first edge connections") of the module edge connections would not be active during that training because TS0 training involves training of the "clock" itself, and no address/control or data signals are transmitted between the host and the memory module during such training." Pet. 60 (citing Ex. 1016, 5:51–7:2; Ex. 1003 ¶ 274).

Petitioner further contends that "it would have been obvious not to send any data or address/control signals while the clock is being trained because a Skilled Artisan would have been motivated to keep the pin(s) for those signals inactive to conserve power and/or avoid unreliable operating during periods that the clock may be unstable. Pet. 61 (citing Ex. 1003 ¶ 275).

Patent Owner does not dispute Petitioner's contentions. *See* Resp.

We agree with Petitioner that it would not make sense to use the first edge connections to send any data or address/control signals while the clock is being trained. Hence, a person of ordinary skill in the art would have understood that the first edge connection must be inactive while the clock is being trained. Ex. 1003 ¶ 275.

Accordingly, we agree with Petitioner that the combination of Hazelzet and Buchmann teaches or at least suggests the limitation of claim 7 of the '218 patent.

### 13.    *Claims 8, 14, and 22*

Claim 8 depends from claim 1 and recites "wherein the module controller is configured to drive the notification signal to indicate a status of

IPR2022-00062
Patent 9,858,218 B1

the one or more training sequences." Ex. 1001, 15:35–37. Claim 14 depends from claim 9 and recites a similar limitation. *Id.* at 16:14–15. Claim 22 depends from claim 15 and recites the same limitation. *Id.* at 17:10–12.

Petitioner contends, as explained in §V.D of the Petition, that Hazelzet would be modified to be configurable to enter a training mode and output Buchmann training status signals ("notification signals") to the system memory controller via open drain output UE 121. Pet. 61. According to Petitioner, the status signals (TS0_done, TS3_ack, TS3_done) "indicate a status of the one or more training sequences" because each provides status about the related sequences, such as whether it has been completed or whether all memory buffers have returned an acknowledgement. *Id.* Petitioner contends that the combination of Hazelzet and Buchmann teaches "wherein the module controller is configured to drive the notification signal to indicate a status of the one or more training sequences." *Id.* at 61–62 (citing Ex. 1003 ¶¶ 279, 308, 342).

Patent Owner does not dispute Petitioner's contentions that the combination of Hazelzet and Buchmann teaches the limitations of claims 8, 14, and 22 of the '218 patent.

Petitioner has shown sufficiently that the combination of Hazelzet and Buchmann teaches the limitations of claims 8, 14, and 22.

### 14.    *Claim 10*

Claim 10 depends from claim 9 and recites "wherein driving the notification signal comprises driving a gate of each of one or more transistors to a logic high level to provide a low impedance path from the

IPR2022-00062
Patent 9,858,218 B1

open drain output to ground, the one or more transistors each having an open drain coupled to the open drain output." Ex. 1001, 15:65–16:3.

Petitioner contends that the combination of Hazelzet and Buchmann teaches or at least suggests the limitation of claim 10. Pet. 63–64 (citing Ex. 1003 ¶ 298). Patent Owner does not dispute Petitioner's contention. For the reasons stated for claims 3 and 4 (Sections II.E.8 and II.E.9), we agree with Petitioner that the combination of Hazelzet and Buchmann teaches or at least suggests the limitation of claim 10.

### 15.    *Claims 13 and 21*

Claim 13 depends from claim 9 and recites "wherein the memory module is configured to be trained with the one or more training sequences in response to a request by the memory controller." Ex. 1001, 16:11–13. Claim 21 depends from claim 15 and recites a similar limitation. *Id.* at 17:10–12.

Petitioner contends that, in the combination of Hazelzet and Buchmann, "it would have been obvious to train the memory module with one or more training sequences that initiates a response to a request by the memory controller, given that Buchmann explains that '[t]he memory system includes a memory controller that includes logic for initiating … initialization training sequence for the memory system.'" Pet. 64 (citing Ex. 1016, 1:56–59). Petitioner notes that Buchmann further explains that "the memory buffer [in the memory module] includes logic for executing a power-on and initialization training sequence initiated by the memory controller." *Id.* (citing Ex. 1016, 2:39–42, 6:51–7:2, 8:24–29; Ex. 1003 ¶¶ 305, 340).

Patent Owner does not dispute Petitioner's contentions. *See* Resp.

IPR2022-00062
Patent 9,858,218 B1

We agree with Petitioner that the combination of Hazelzet and Buchmann teaches the limitations of claims 13 and 21 of the '218 patent. Ex. 1016, 1:56–59, 2:39–42.

### 16.   Conclusion for Ground 2

Petitioner has shown by a preponderance of the evidence that a person of ordinary skill in the art would have had reason to combine Hazelzet and Buchmann with a reasonable expectation of success in arriving at claims 1–22 of the '218 patent.  Petitioner has further shown that the combination of Hazelzet and Buchmann teaches or at least suggests the limitations of claims 1–22.  Accordingly, Petitioner has shown by a preponderance of the evidence that claims 1–22 would have been obvious over the combination of Hazelzet and Buchmann.

### F.   Ground 3:  Obviousness Over the Combination of Hazelzet, Buchmann, and Kim

Petitioner, alternatively, contends claims 3–6, 10–12, and 17–20 would have been obvious over the combination of Hazelzet, JEDEC or Buchmann, and Kim.  Pet. 67–71.  Given the parties' dispute regarding whether JEDEC is a prior art printed publication, we limit our analysis to the combination of Hazelzet, Buchmann, and Kim.  For the reasons that follow, we are persuaded that the evidence, including Dr. Alpert's testimony, sufficiently supports Petitioner's arguments and, therefore, establishes by a preponderance of the evidence the unpatentability of claims 3–6, 10–12, and 17–20.

### 1.   Kim (Ex. 1017)

Kim was filed on January 22, 2008, issued on January 22, 2013, and is titled "Providing a Memory Device Having a Shared Error Feedback Pin."

71

IPR2022-00062
Patent 9,858,218 B1

Ex. 1017, codes (22), (45), (54).  Kim is generally directed to a memory device having a shared error feedback pin.  Ex. 1017, 1:6–8.  Figure 4, reproduced below, is "a block diagram of a memory module [400] having an error feedback pin that is shared among multiple device[s]."  *Id.* 3:13–16.



FIG. 4

Figure 4 depicts "the error output line from the memory devices are dotted together via open drain drivers to a single error line that is output from the memory module 400."  *Id.* at 6:1–3.

IPR2022-00062
Patent 9,858,218 B1

Figure 5 is reproduced below.



FIG. 5

Figure 5 depicts "a block diagram of a memory device 500 that shares an error feedback pin between data CRC and address parity." *Id.* at 6:13–15.

 2. *Analysis*

 Petitioner contends that Kim teaches an "'open drain output' with an output pin coupled to the drain of a transistor, which includes a gate, a source, and a drain." Pet. 67 (citing Ex. 1017, Fig. 4). Petitioner also contends that Kim discloses "using a logic element (an OR gate) such that multiple error signals could drive the gate of the open-drain transistor." *Id.* at 68 (citing Ex. 1017, 6:13–18, Fig. 5). Petitioner proposes combining Kim's "open drain transistor configuration" with Hazelzet's error logic circuit 100 "such that signals indicating parity mode error, ECC mode error and training status would be provided to a logic gate, such as an OR gate, as in Kim, which would select among them based on the mode of the module, as in Hazelzet." Pet. 68–69 (underlining omitted). Petitioner contends the

IPR2022-00062
Patent 9,858,218 B1

combined circuit "would . . . include the transistor configurations and signaling recited in claims 3–5, 10, and 17–19" and "the OR logic elements as recited in claims 6, 12 and 20." Pet. 70 (citing Ex. 1003 ¶¶ 234, 270).

Petitioner contends that a person of ordinary skill in the art would be motivated to combine Kim with Hazelzet and Buchmann because (1) Kim is assigned to the same company as Hazelzet and contains some of the same disclosures, as well as some additional disclosures; (2) using the output-pin scheme of Kim in the system of Hazelzet would have been "the use of known techniques for their known purposes to achieve predictable results, i.e., using an open-drain output to provide error or status information from multiple components"; (3) "it represented a well-known (and therefore reliable) and simple technique to provide error and/or status information from a number of components and in different modes"; and (4) it would "simplify[] the design of the system and sav[e] pins on the various integrated circuits connected to the bus." *Id.* at 70–71.

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the record, we determine that Petitioner has shown that one of ordinary skill in the art would have had reason to combine Hazelzet, Buchmann, and Kim with a reasonable expectation of success, and that the combination teaches the limitations in claims 3–6, 10–12, 17–20. As Dr. Alpert establishes, Kim's disclosure overlaps substantially with Hazelzet, and discloses additional details regarding use of an open-drain output on a memory module to notify a memory controller of errors during parity and ECC modes, as well as initialization operations to train a memory module and output training status on a shared error feedback pin. Ex. 1003 ¶¶ 166, 168–169. We previously

74

IPR2022-00062
Patent 9,858,218 B1

addressed the reasons for combining Hazelzet and Buchmann. *See* Section
II.E.3. Dr. Alpert further shows that the limitations of claims 3–6, 10–12,
and 17–20 are disclosed by the combination of Hazelzet, Buchmann, and
Kim. Ex. 1003 ¶¶ 171–270, 281–303, 309–328, 331–338. Thus, we
determine that Petitioner has established by a preponderance of the evidence
that claims 3–6, 10–12, 17–20 of the '218 patent are unpatentable as obvious
over the combination of Hazelzet, Buchmann, and Kim.

    G.    *Motions to Exclude*

        1.    *Patent Owner's Motion to Exclude*

    Patent Owner seeks to exclude Exhibits 1015, 1024–1025,
1036–1037, 1039, 1048–1049, 1051, 1056, 1071–1076, and 1080–1081.
Paper 45, 9–14.

    We did not rely on Exhibits 1015, 1037, 1039, 1048, 1049, 1051,
1071–1076 or 1080–1081 in rendering this Final Written Decision.
Consequently, Patent Owner's Motion to Exclude is moot as to these
Exhibits.

    Patent Owner contends that Exhibits 1024–1025, 1036–1037, and
1056 should be excluded because they are not authenticated. FRE 901(a).
Petitioner contends that some of these Exhibits are authenticated by the
declaration of Julie Carlson (Ex. 1050) who was responsible for
"maintenance and publication of JEDEC documents and standards" and a
declaration from "Sung Joo Park, who participated in JEDEC at the relevant
time and has personal knowledge of the documents he authenticates."
Ex. 1055 ¶ 5." Paper 48, 6. Petitioner contends these declarations
authenticate Exhibits 1036 and 1037. We agree. Petitioner contends that
Exhibits 1024–1025 and 1056 "are similar JEDEC documents and contain

IPR2022-00062
Patent 9,858,218 B1

the same indicia of authenticity under FRE 901(b)(4) and 902(7), including similar cover pages, tables of contents, fonts, logos, technical contents, and revision logs." *Id.* We agree and determine that sufficient evidence has been provided to authenticate these Exhibits.

Patent Owner further contends we should exclude Exhibits 1024–1025, 1036–1037, and 1056 because they are inadmissible hearsay under FRE 801 and 802. Paper 45, 12–14. Petitioner contends that the declaration of Julie Carlson establishes that Exhibits 1036–1037 are business records of JEDEC under FRE 803(6) as of the dates shown on the documents. Paper 48, 13. We agree that Exhibits 1036–1037 fall under the business records exception to the hearsay rule.

Comparison of Exhibits 1036 and 1037 to Exhibits 1024, 1025, and 1056 leads us to conclude that these Exhibits also are authenticated business records (standards or committee letter ballots) of JEDEC. They have similar cover pages, tables of contents, fonts, logos, technical contents, and revision logs. Patent Owner has introduced no evidence to suggest that these Exhibits are not what they appear to be.

Consequently, Patent Owner's Motion to Exclude is *dismissed-in-part* as moot as to Exhibits 1015, 1037, 1039, 1048, 1049, 1051, 1071–1076, and 1080–1081, and is *denied-in-part* as to Exhibits 1024–1025, 1036–1037, and 1056.

## 2. *Petitioner's Motion to Exclude*

Petitioner seeks to exclude Exhibit 2017 and paragraphs 20–21 of Exhibit 2026. Paper 46, 1. We *dismiss* Petitioner's Motion to Exclude as moot because the resolution of these issues is not required to reach our Final Written Decision.

IPR2022-00062
Patent 9,858,218 B1

## III.  CONCLUSION

For the foregoing reasons, we determine that Petitioner establishes by a preponderance of the evidence that claims 1–22 of the '218 patent are unpatentable.

## IV.  ORDER

Accordingly, it is:

ORDERED that claims 1–22 of the '218 patent have been shown to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude is *dismissed-in-part* as moot as to Exhibits 1015, 1037, 1039, 1048, 1049, 1051, 1071–1076, and 1080–1081, and is *denied-in-part* as to Exhibits 1024–1025, 1036–1037, and 1056;

FURTHER ORDERED that Petitioner's Motion to Exclude is dismissed; and

IPR2022-00062
Patent 9,858,218 B1

FURTHER ORDERED that any party seeking judicial review must comply with the notice and service requirements of 37 C.F.R. § 90.2. [12]

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not shown Unpatentable |
|---|---|---|---|---|
| 1–22 | 103 [13] | Hazelzet, JEDEC | | |
| 1–22 | 103 | Hazelzet, Buchmann | 1–22 | |
| 3–6, 10–12, 17–20 | 103 | Hazelzet, Buchmann, Kim | 3–6, 10–12, 17–20 | |
| **Overall Outcome** | | | 1–22 | |

---

[12] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).
[13] We do not reach this ground for the reasons discussed in Section II.D.

IPR2022-00062
Patent 9,858,218 B1

FOR PETITIONER:

Eliot D. Williams
Neil P. Sirota
Theodore W. Chandler
Ferenc Pazmandi
Stephanie C. Kato
BAKER BOTTS LLP
eliot.williams@bakerbotts.com
neil.sirota@bakerbotts.com
ted.chandler@bakerbotts.com
ferenc.pazmandi@bakerbotts.com
stephanie.kato@bakerbotts.com


FOR PATENT OWNER:

Sarah Spires
Rex Hwang
SKIERMONT DERBY LLP
sspires@skiermontderby.com
rhwang@skiermontderby.com