# Exhibit 10

Filed Under Seal

Case 2:22-cv-00293-JRG   Document 486-6   Filed 02/06/24   Page 2 of 38 PageID #:
54213
Case 2:21-cv-00463-JRG   Document 426   Filed 04/03/23   Page 1 of 261 PageID #: 32583     1

```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF TEXAS
 2                          MARSHALL DIVISION

 3    NETLIST, INC.,                (  CAUSE NO. 2:21-CV-463-JRG
                                    )
 4             Plaintiff,           (
                                    )
 5    vs.                           (
                                    )
 6    SAMSUNG ELECTRONICS CO., LTD., (
      et al.,                       )  MARSHALL, TEXAS
 7                                  (  MARCH 28, 2023
               Defendants.          )  9:00 A.M.
 8    _____

 9

10                              VOLUME 1

11    _____

12                         PRETRIAL CONFERENCE

13             BEFORE THE HONORABLE RODNEY GILSTRAP
                 UNITED STATES CHIEF DISTRICT JUDGE

14    _____

15

16

17

18

19

20

21

22                   SHAWN McROBERTS, RMR, CRR
                       100 E. HOUSTON STREET
23                   MARSHALL, TEXAS  75670
                         (903) 923-8546
24              shawn_mcroberts@txed.uscourts.gov

25
```

1     Can I have the next slide?

2     But we have definitions in the agreement that tell us

3   what's licensed, and it's Samsung's licensed products which

4   are all semiconductor products manufactured by or for Samsung

5   or its subsidiaries. And the exclusion that we're going to

6   talk about here are foundry products, although Mr. Sheasby

7   didn't spend much time on that. But that is an issue, and

8   I'll touch on that.

9     Next slide, please.

10    Before the California court, Netlist argued that the JDLA

11  was not limited to joint R & D. In the papers, Your Honor may

12  have seen that there was an issue about whether or not we were

13  going to limit -- the parties would limit the scope of the

14  license to the JDLA only. And the JDLA by its terms was not

15  limited -- the license under the JDLA was not so limited to

16  the parties' joint development products.

17    You may recall that under the JDLA, the parties were to

18  cooperate and create new products. And there was an issue

19  that has been bandied back and forth about whether the license

20  was somehow narrowly limited only to the jointly developed

21  products.

22    I don't think that anybody is carrying that issue

23  forward. And Netlist convinced Judge Scarsi that it was not

24  so limited. And that was an issue. It was an issue that was

25  presented to him, and they succeeded. There will be estoppel

1    and issue preclusion consequences for that.

2        Netlist has told the whole world that Samsung was

3    licensed to everything.  So back in 2017, they relied on their

4    license to Samsung as their domestic industry in an ITC case.

5    The Court's familiar with the fact that in an ITC case, the

6    patentee has to prove that they or their licensees are

7    practicing the patents.

8        And what did Netlist do in 2017?  They went to the U.S.

9    International Trade Commission and said, there's Samsung, our

10   licensee, they are practicing these patents; therefore, we

11   checked that box on what we have to prove.

12       We've seen in the parol evidence that in fact Netlist

13   admits the license covered all of their patents and that

14   related to all of Samsung's exposure on LRDIMMs, all of

15   Samsung's memory that's at issue in this case.

16       We have had a little bit of an issue about the Korean Tax

17   Tribunal, and I can cover that in more detail.  But there's

18   one fundamental fact that Netlist leaves out in all of their

19   arguments here, and that is that Samsung was not a party to

20   the Korean Tax Tribunal matter.

21       What happened with the Tax Tribunal is that Samsung was

22   to pay Netlist some money.  Korean law says, whenever you are

23   paying money, you have to withhold taxes if it's for a patent

24   royalty.  There was a dispute before the Korean tax authority

25   where Netlist said, hey, we want that money back.  And they

1   had a case in front of the Korean tax authority.  Samsung

2   wasn't invited.

3       So all of these arguments that somehow Samsung was bound

4   by that or estopped by that fail at the very first instance

5   because Samsung wasn't invited to the party.  They weren't

6   there.  So they can't be estopped; they can't be binding on

7   them.

8            THE COURT:  Let me stop you for a minute, Mr.

9   Cordell.  You made a statement a second ago that nobody is

10  arguing here that the JDLA was limited to the joint

11  development project.  I saw that argument in Plaintiff's

12  briefing over and over.

13      So has that been conceded to your knowledge, or did I

14  misread their briefing, or --

15           MR. CORDELL:  You are correct.

16           THE COURT:  Revisit that statement for me.

17           MR. CORDELL:  Sure.  You are correct that that

18  was -- and I hoped I acknowledged that, that it was in -- it

19  was in the papers at the beginning.  It just didn't --

20           THE COURT:  You don't need to add anything to this,

21  Mr. Sheasby.

22           MR. SHEASBY:  I'm not going to say -- but this is

23  sort of Netlist's confidential information.  I'd like for the

24  courtroom to be sealed because we are a public company.  The

25  terms of it both are material.

```
 1              THE COURT:  Are you talking about the terms of the

 2   JDLA?

 3              MR. SHEASBY:  Yes, Your Honor.  I'm not trying to --

 4              MR. CORDELL:  I'm going to do it at a very high

 5   level.

 6              THE COURT:  I don't think we need to seal the

 7   courtroom at this point.  You can reurge it later.

 8         Go ahead, Counsel.

 9              MR. CORDELL:  My point is that as the briefing was

10   developed, no one seemed to -- to be focused on whether or not

11   these products were the jointly developed products or not.

12   That issue seemed to kind of go by the boards, as it should,

13   because the reality is that JDLA was in no way limited to

14   jointly developed products.

15         Again, I can take you back to the language of the

16   license, and the license --

17              THE COURT:  I've read the JDLA.

18              MR. CORDELL:  Yes.  Thank you.

19              THE COURT:  Several times unfortunately.

20              MR. CORDELL:  I'm going to come back to it yet

21   again.

22         So we do have an issue about the foundry products.  And

23   Mr. Sheasby didn't visit this, but I will and I'll do it in

24   some detail.  But the reality is people in the business know

25   exactly what a foundry product is.
```

1          They know that a foundry product is when a company comes

2    to a foundry, people that have a semiconductor line, and they

3    have a tape in their hands, and they hand it over and they

4    say, can you make this tape into a semiconductor product?

5    They feed the tape into the machine, out come the

6    semiconductor products.

7          It has to be designed by somebody else.  It has to be

8    their information.  It has to be their product.  That's the

9    way the foundry product process works.

10          But, importantly here, and, again, I'll treat this in

11    some detail, the problem that Netlist faces in this case is

12    that they haven't accused any foundry products.  So it's one

13    thing to say that Samsung has a foundry product business.

14    That is true.  Samsung will make products for other companies.

15              But the only way it's relevant in this case is that

16    if Netlist says product X28.48 is accused and it's a foundry

17    product and therefore excluded from the license.  And they

18    just haven't done that.  So we don't have any accusation of a

19    foundry product which makes it very difficult.

20          What we know from the experts is that they say the

21    products that actually are accused were designed by Samsung,

22    not by some third party.  So we have Doctor Brogioli, who is

23    the '060 and '160 HBM patents' expert.  And he affirmatively

24    says that Samsung is the one who is designing and

25    manufacturing these accused products.  It's not incidental.

1    He says it -- says it right out because he wants to show

2    direct infringement, so he's got a reason to make that

3    statement.

4        Slide 16.

5        We have again another statement from him about the design

6    and the -- the purposeful design of the products for the '060

7    and '160 Patents.  It's not incidental.  It's not off the

8    cuff.

9        Doctor Mangione-Smith, who is the expert on the remainder

10   of the patents, the LRDIMM patents, again makes the statement

11   that Samsung is the one who designs these products.  It's not

12   incidental.  It's not off the cuff.

13       We have Samsung employees at slide 18, Mr. Sri (ph) and

14   Mr. Kim, that both say that there are no foundry products

15   here, that the ones that have been accused in this case are

16   Samsung products, which make sense, Your Honor, because these

17   are memory products.  These are kind of commodities.

18       These are the things that Samsung makes and sells widely,

19   and it's -- would be unusual for a company to come to Samsung

20   and say, I want you to make a commodity product based on our

21   design.  That would be -- that would be a fairly unusual

22   thing.  The documents in this case overwhelmingly show that

23   these are Samsung products made according to Samsung's design

24   for Samsung's purposes and they're sold as Samsung products.

25       The evidence that Netlist points to is very, very sparse,

1    Your Honor.  They point to this document that I've got up on

2    slide 20, which is Exhibit 5 to Docket 264, and they say, aha,

3    look, you make foundry products.  Well, yes, the HBM product

4    is a product, but it is not a foundry product.

5        So the chart they point to does have some foundry

6    products.  There are -- there are processors, although I

7    should say that this document was prospective.  This was a

8    business case that could be accomplished.  So it was not

9    something that had been accomplished, but it was something

10   that could be accomplished.

11       But for HBM, because this is a memory product, this is a

12   commodity product; it's just, even in this business case,

13   designated as a Samsung product rather than a foundry product.

14       The one document they point to over and over again is on

15   slide 21, Exhibit 4 from Docket 264.  And they say, aha, look,

16   there's a memory division product, HBM, that's combined with a

17   foundry product.

18       Again, Your Honor, this is a prospective presentation.

19   This is something that could be done rather than something

20   that has been done.  But what they're pointing to are things

21   like an interposer, an additional product that could be added

22   that a customer might want.  But that's a different issue.

23   That doesn't tell us that the HBM was a foundry product.

24       And, critically, they've got to point to something.  They

25   got to point to a product somewhere that they tell us, they

1     stand before you and say, this product, the X28.48 memory

2     product, was a foundry product made for this company according

3     to their specifications.  And they haven't been able to do

4     that.

5          So the termination date.  There really -- it's hard for

6     me to understand how this could still be an issue.  The JDLA

7     itself gives us the mechanism for termination.  Good contract

8     lawyers don't leave the parties to wonder about their

9     relationship as they move through a contract.  Good contract

10    lawyers don't leave to chance whether or not a contract is

11    still in existence or not.

12         And the good contract lawyers that wrote this one

13    provided a specific termination mechanism, one that Judge

14    Scarsi recognized.  He recognized that this was a -- this was

15    not an executory covenant subject to -- you know -- or I

16    can't -- I can't quite dredge up all the words from law

17    school.

18         This was -- this was a -- an existing covenant that could

19    be defeated if you followed the following steps:  You had the

20    right to terminate the agreement by written notice.  And that

21    13.2 termination provision was what Judge Scarsi relied on

22    which binds Netlist, which means that none of this should be

23    an issue in this case, because that's exactly what happened.

24         They sent us a letter on July 15, 2020, and they declared

25    that they were terminating effective immediately, that is, of

1    that date.  On that date, they elected that remedy.  They

2    could have sued and said, for past performance things weren't

3    right.  They could have made claims.  But they elected

4    termination.  Election of remedies is an important part of

5    this case.

6         And they said that we're terminating the agreement as of

7    this date, including the patent license granted to Samsung.

8    They didn't say the patent license that had been previously

9    terminated; they didn't say the patent license that might be

10   injured in some fashion.  They said, we're terminating as of

11   this date, which meant that it was in existence until that

12   date.

13        The JDLA gave us the -- the process and the mechanism for

14   termination.  They followed it, and that's what Judge Scarsi

15   ultimately decided on.

16        In the interrogatory responses in this court in this case

17   just a couple of months ago, Halloween 2022, they put in an

18   interrogatory response saying that the JDLA was terminated on

19   this date, which ended the license granted to Samsung.  The

20   language could not have been clearer.

21        So part of the problem with Netlist's coming up with

22   these new theories as we move through the case is they forget

23   what they've said earlier.  They could not have been clearer

24   about this.

25        They told the California court this, of course, over and

1    over and over again.  At slide 26, I have Exhibit 6 from the

2    complaint in the Central District of California.  They said

3    that the licenses and rights previously granted to Samsung

4    ceased on July 20, 2020.  They had that wrong.  It was July

5    15, but they were close.

6        We know that the arguments they made in getting summary

7    judgment, they absolutely emphasized that the JDLA was in

8    force between November 2015 and its termination in July 2020.

9    And they urged the Court to focus on that because that was the

10   extant period of the contract.

11       Mr. Sheasby told us that, well, it's an executory

12   covenant, and somehow he called it an executory contract.  I

13   think he meant executory covenant.  I'm not sure about that.

14   I'm not sure that -- and this is an argument that they bubbled

15   up in the reply section of the briefing.  I'm not sure that a

16   license is an executory covenant.  I think if we went back to

17   law school and we had a debate about this, that executory

18   covenant is something that requires you to take action, not

19   something that requires you to forebear action.

20       And according to Mr. Sheasby, he says that a license

21   means you are going to be free from suit.  So we have no time

22   machine, we have no ability to go back and have them take an

23   action that they had promised to forebear.  But we can leave

24   that debate aside because the reality is what they told us,

25   what they told Your Honor, what they told the California

1    court, is that the JDLA was in force from November 2015 to

2    July 2020.  And that's what Judge Scarsi found.

3         Judge Scarsi found that, when they sent that letter on

4    July 15, 2020, they terminated it, and he specifically found

5    that Netlist followed the rules that were set forth in clause

6    13.1 of the JDLA.  Their termination comported with the JDLA's

7    termination method.

8         So their appeal--and I don't want to

9    belabor this--repeats that in fact July 15, 2020, was the

10   termination event -- terminating event for the JDLA.  They

11   have got this before the Ninth Circuit.  They also told the

12   Delaware court the same fact.

13        Slide 30 recites Exhibit 10 from Docket 255, that the

14   letter of July 15, 2020, was the termination of the JDLA.

15        And then, finally, Your Honor, in this case, in this

16   complaint, once again they tell us that they terminated the

17   agreement on July 15, 2020.

18        At some point, at some point their statements to Your

19   Honor, to us, to Judge Scarsi, to Delaware, to the Ninth

20   Circuit, at some point those have to have meaning.

21        So with that, Your Honor, I'll turn to the preclusion

22   arguments.  We think issue preclusion does lie here.  We think

23   that Judge Scarsi was presented with this -- this issue.  They

24   could have advocated to him that the agreement had terminated

25   much earlier.

1       Recall that the jury looked at this breach of contract

2   claim in California and awarded zero dollars.  Zero dollars.

3   Judge Scarsi said, well, there was a breach; therefore, I have

4   to enter nominal damages.  They gave them $1.  $1.

5       But they chose.  They chose to ask for termination, they

6   elected their remedies, and whatever damages they thought

7   flowed from that -- that breach, that alleged breach, they

8   were compensated for.

9       And so it's -- it's not accurate to suggest that somehow

10  Judge Scarsi wasn't presented with this issue.  They could

11  have -- they could have made the repudiation argument that

12  they make here, that somehow they were relieved of covenants

13  earlier on and therefore whatever damages flowed from that --

14  that -- that point forward would have happened.  But that's

15  not what they did.  They elected July 15, 2020.

16      The issue was adjudicated, it was fully and fairly

17  litigated, the determination was necessary to judgment, and

18  there was nothing to excuse them.  And so the reality is we

19  have two issues:  We have whether or not it covers the

20  products--that was before Judge Scarsi--and when the license

21  was terminated--that was also before Judge Scarsi.  All four,

22  all four of the issue preclusion elements are present here.

23          THE COURT:  Does it make a difference as to whether

24  it was the identical issue, that that was a declaratory

25  judgment action versus the structure of this action here?

1      MR. CORDELL:  It would for claim preclusion.  Your

2   Honor, remember there are two -- we were taught in law school

3   res judicata, and they kind of stopped right there.  But now

4   we -- we've refined it.  The law has refined it so we have

5   issue preclusion, which is when was the -- when was the

6   contract terminated.  It's a factual question.  It follows the

7   law, it was resolved, and we have a judgment that depended on

8   it.  That's issue preclusion.

9      Claim preclusion would suggest that no matter what claims

10   the defenses could have been brought, they are now -- they are

11   now barred under claim preclusion because the entirety of the

12   transaction should have been barred.  And in that case, it

13   does matter what causes of action were brought.

14      And so claim preclusion we have from the Comer case in

15   the Fifth Circuit that, in fact, if the same claim or cause of

16   action was involved in both actions.  And if you recall from

17   the briefing, Netlist suggested that somehow our defenses were

18   precluded because of this, because of claim preclusion.

19      Now it seems that Mr. Sheasby is arguing against claim

20   preclusion which, frankly, we agree with, except for the scope

21   of the JDLA.  The idea that the JDLA didn't reach these

22   products or somehow wasn't terminated on July 15, 2020, is

23   subject to claim preclusion.  Anything else they could have

24   brought, any other remedy they could have sought, is now

25   forestalled.

1    And then, finally, judicial estoppel, Your Honor.  You

2    can't make these repeated statements to courts all over the

3    country and then come back and take them back.  You just

4    can't.  We certainly can't do that here in Texas.

5        So with that, I'll -- I'll pass the -- pass the podium,

6    Your Honor, unless you have other questions.

7            THE COURT:  I don't, but I do think it would be

8    effective, and perhaps I should have told you both this before

9    we started, but Samsung has moved under Document 196 for

10   summary judgment that the accused products sold before 2015

11   are licensed.

12       I think that's part and parcel of this same issue.  It's

13   the other side of the coin, and I want to hear your arguments

14   on that motion in conjunction with the 201 motion that you've

15   been arguing on.

16           MR. CORDELL:  Well, Your Honor, they're really the

17   same issue.

18           THE COURT:  So as long as you're at the podium, take

19   the affirmative side of your motion.

20           MR. CORDELL:  I will.

21       So we think that they're -- and I won't go back through

22   the whole -- the whole analysis, but the reality is if you

23   recall the language that I took Your Honor through on the JDLA

24   is that the products were licensed.  There's no dispute about,

25   you know, whether the LRDIMM, you know, DDR4 versus DDR5, they

1    never raised any distinction there. Those -- those products

2    are licensed if, in fact, the license was terminated on July

3    15, 2020. I don't think there's a dispute about that.

4       The only dispute is the foundry products. And, again, if

5    they can -- they can point us to a single accused product that

6    is a foundry product, then I'll sit down. But they haven't

7    done that. What their experts say is that all of the accused

8    products were designed by Samsung, for Samsung, sold as

9    Samsung products, which means that they're licensed.

10    So there's really nothing left other than Mr. Sheasby's

11    repudiation argument that somehow earlier there was a

12    termination of the license. But the law doesn't permit

13    We've seen that from issue preclusion, from claim preclusion.

14    But to me the judicial estoppel is the most profound, the

15    fact that they told us in the complaint in this case, in

16    discovery just a couple of months ago, told Judge Scarsi, told

17    the Delaware court, told the ITC, they have -- they have

18    represented over and over again to virtually every judicial

19    body they could find--the Ninth Circuit I left out--that in

20    fact that license persisted until July 15, 2020, and they have

21    to live up to that.

22    So with that, I think summary judgment does follow.

23       THE COURT: All right. Mr. Sheasby, let me hear

24    from you.

25       MR. SHEASBY: Just briefly, Your Honor.

1    May I have my slides, Mr. Huynh?  And if I can have slide

2    43.

3              THE COURT:  And, of course, I want you to address

4    your response to Samsung's motion for summary judgment,

5    Document 196, as a part of this.

6              MR. SHEASBY:  Yes, Your Honor.

7        So I want to start off with just some importance on

8    precision, which is in the interrogatory response.  When they

9    asked us for the first time what is our view of the JDLA, we

10   expressly said that the JDLA was repudiated at the time of

11   substantial non-performance.  That was in our interrogatory

12   response.

13       We also said that the JDLA excluded foundry products, and

14   we also said that they were bound -- Samsung was bound by the

15   decision of the KTT.  So just as a matter of precision, the

16   idea that this is a surprise or that this came out in -- in a

17   reply brief on a motion just has no connection to reality.

18       Mr. Cordell actually showed a portion of this document,

19   but omitted to show the portion--this is our Interrogatory

20   Response No. 16--that made clear our position on all these

21   issues.

22       If I could go back to slide 4, Mr. Huynh.

23       There are really three issues, each of which are disputed

24   questions of fact, two of which are disputed questions of

25   fact, one is an issue of comity, all of which we think require

1    denial of their motion and the grant of our motion.

2         The first is that these language -- this election of

3    remedies language that Mr. Cordell used, there's no time

4    machine that goes back.  That is just not New York law.  The

5    parties agreed to New York law.

6         Under New York law, there are two mechanisms.  There's a

7    contractual mechanism of termination which is exercised in a

8    particular date.  That termination did not just apply to

9    whatever license grant we had given them.  It applied to a

10   host of obligations that both parties had, all of which ended

11   on that date.

12        Under New York law, there's a second issue, which is, at

13   what point in time do you have to -- are you entitled to cease

14   performing on an executory contract.  And the point of time is

15   when there's substantial non-performance.  That is a question

16   of law under New York law, and the idea --

17             THE COURT:  Why is this an executory contract?

18             MR. SHEASBY:  So the Ninth Circuit speaks to that in

19   *In re CFLC*.  So the contract at issue is a contract that

20   requires us to forego bringing a lawsuit and seeking patent

21   damages against them.  And so under settled law -- and the

22   Federal Circuit views that as well.  And so I should say that

23   the executory aspect of it is something that I'm adding.

24   The --

25             THE COURT:  I don't know why the Ninth Circuit

1    ruling here would be enforceable precedent in this court.

2          MR. SHEASBY:  I don't think it is.  So two things.

3    One, the Mega Group and the *Merrill Lynch* case make no

4    reference to executory.  I'm using that as just a handle,

5    which is, our performance is excused at the time of

6    substantial non-performance.  Our performance is not to seek

7    patent damages against them.

8       We have a right to seek patent damages against them for

9    six years before suit that we forewent based on this license

10   agreement.  We did not have to perform that at the time of

11   substantial non-performance.  And so we are entitled to bring

12   a suit for those damages that we otherwise forewent based on

13   the license agreement.

14      So I think executory versus non-executory is probably the

15   wrong question.  It's the *Merrill Lynch* case and the *In re*

16   *Mega* case which both speak about the specific issues.  They

17   don't use the word executory.  So I may have gotten us off on

18   a detour by talking about that.  It's that we have a right to

19   have six years of damages from the time of filing a lawsuit.

20      We committed not to seek damages under the license

21   agreement.  They lost the right to rely on that commitment

22   when there was a substantial non-performance.  The substantial

23   non-performance occurred on a particular date.  From that date

24   forward, we are entitled to seek damages.  That's what the

25   Second Circuit and the Interim Court of Appeals decides.

1          THE COURT:  And your view of the date by which

2     Samsung substantially failed to meet its obligations that you

3     believe gives rise to that damages period in your mind, that

4     is what date?

5          MR. SHEASBY:  This is -- if you go to slide 8.

6          We believe it's on -- in January of 2018, there was a

7     lunch meeting.  And at that lunch meeting, they said, you get

8     zero more, you get nothing from us.  And we told them that was

9     not allowed under the contract, and then we tried to negotiate

10    with them.

11         I should say that's the -- the first issue.

12         The second issue is that we've taken the opinion that

13    they -- taken the position that they had a right to our -- to

14    sort of be relieved from infringement.  I want you to look at

15    this date.  It's January 2018 is when they stopped.  February

16    18th is the date of this email.

17         But if you go to slide 38, the pleadings they're

18    referring to were before the period of time in which they shut

19    off the spigot.  So this is an ITC proceeding from October of

20    2017 when we were still hustling with them to get some

21    performance and some product.  It was before the period of

22    time when they substantially shut off their performance.

23         That's the substantial non-performance issue, which is a

24    question of fact under New York law.

25         The second issue is the foundry issue.  If we go to slide

1    10, foundry products are not licensed if they are based on

2    designs, specifications, or working drawings owned by such

3    third party.  It doesn't say based solely on.  It doesn't say

4    it has to be just a tape they receive.  And we believe that

5    there is substantial evidence in this case that the high

6    bandwidth memory products are foundry products.

7         First off, they describe their high bandwidth memory

8    products as a foundry product in their pleadings -- sorry, in

9    their publications.  They describe that they are using foundry

10   services for each of the major purchasers of the HBM products.

11   AND, Xylex, Microsoft, Amazon, Intel, nVidia are the major

12   purchasers of the HBM products which we contend are foundry

13   products.

14        And I think Mr. Cordell invited me to give an example,

15   one example of a product that is a foundry product, and he

16   would sit down.  This is Exhibit 24 to our opposition at 1, in

17   which they are specifically designing HBM3 products for nVidia

18   and are making the changes that nVidia instructs so they can

19   be custom for nVidia.

20             THE COURT:  Let me ask this question, Mr. Sheasby.

21   And I don't mean to get it out of order with your argument,

22   but there are so many moving parts here, if I don't ask it, I

23   may not remember it.

24        Tell me why, after Netlist concluded in January of 2018

25   that Samsung had materially breached its obligation to perform

1    by refusing what you requested or what Netlist requested, tell

2    me why two years effectively evolved between then and July

3    2020, and what was it that delayed the 2020 action?

4        And are you alleging that somehow Samsung strung you

5    along with promises that they would do better to drag out the

6    time period, or did you reach the conclusion, or Netlist,

7    rather, reach the conclusion that Samsung had materially

8    failed to perform and you just took your own sweet time about

9    doing what you did in 2020?

10       I need some context as to that two-year gap and who's

11   responsible for the expiration of that time.

12              MR. SHEASBY:  Sure, I'm happy to explain it.

13              THE COURT:  I'm sure I may hear a different story

14   from Mr. Cordell, but what's your version of that?

15              MR. SHEASBY:  It was called begging.  So the

16   substantial portion of this company's business -- and, in

17   fact, I can show you the slides if you want me to go to

18   another deck -- when they cut off our royalty stream and

19   it's -- the slide -- it's from Steve Metz to another Samsung

20   employee.  Samsung was effectively a hundred percent of our

21   revenue, was us using Samsung product.  It was existential for

22   our business.

23       There was a joint development relationship relating to

24   substantial product associated with this, and we begged them

25   for years and -- for over a year-and-a-half to do something

1     about this.

2          In addition, what they did was something clever in the

3     sense that there was an internal email in which they decided

4     that they would give us $500,000 of product over a certain

5     period of time.  And the email actually said, LOL, laugh out

6     loud, we're going to give them $500,000 of product.

7          So what they did is they kept giving a little bit of

8     product, allowing us to hope that we would be able to repair

9     this relationship.  The relationship was not reparable.  It

10    became clear there was never going to be a hope of this

11    achieving again.

12         In other words, this is not just a license agreement.

13    This was the future of Netlist.  Right?  This was a JDLA in

14    which there was going to be a joint development of a product

15    design, they had a right of first refusal on our product

16    design, there was going to be exchange of technology.  This

17    was a robust agreement, the license of which was only one part

18    of it.

19         And so I can show you the slides, but that's the short

20    answer.

21              THE COURT:  Short answer, your view is that they

22    strung you along.

23              MR. SHEASBY:  They strung us along.

24              THE COURT:  Okay.

25              MR. SHEASBY:  The short answer is that under New

```
1    York law, stringing along is not a defense.  In other words,

2    from the moment of substantial non-performance under New York

3    law, our obligation ceased.

4              THE COURT:  All right.  What other argument do you

5    have for me?

6              MR. SHEASBY:  And the last issue is -- so we talked

7    about the foundry issue, and Mr. Cordell invited me to show

8    him the evidence.  I've shown him the evidence.

9         The next issue is, what do you do about the Korean Tax

10   Tribunal decision that the license that Samsung received was

11   limited to products that were part of the joint development

12   relationship.  This is only relevant to the HBM products.  The

13   HBM products were the only products for which patents existed

14   before the termination date.

15        If you go to slide 21, this is where the Fifth Circuit

16   instructs you to rely on comity.  Was it rendered by a court

17   of competent jurisdiction?  Was there some type of due

18   process?  Did Samsung have the opportunity to be heard and

19   were procedural formalities followed?  And was there a formal

20   renewal?

21        This is the decision of the Korean Tax Tribunal making

22   clear that the agreement was limited to licenses under the

23   joint development relationship.  HBM was not part of the joint

24   development relationship.

25        Samsung's representation that it was not a party to this
```

1    proceeding or did not have its right to be heard is entirely

2    inconsistent with both the KTT decision, which stated that

3    the -- that they were involved and submitted proceedings.

4         And if you look at Judge Scarsi's decision on the

5    subject--this is Exhibit 22 to our opposition to their motion

6    for summary judgment--Judge Scarsi actually noted that the

7    Korean Tax Tribunal was a venue in which Samsung made, quote,

8    arguments adverse to Netlist's interests.  And Judge Scarsi

9    actually adopted the Korean Tax Tribunal's decision.

10        I suggest that there -- I think -- I've dealt with claim

11   preclusion.  There's no claim preclusion because it's a

12   different claim.  The claim in that case was a declaratory

13   judgment of whether the termination was effective.

14        The issue in this case is a response to their raising the

15   license agreement as a defense.  But if you go to slide 31,

16   the idea that there was judicial estoppel or we told anyone

17   anything different is just factually incorrect, and Judge

18   Scarsi noted that as well.

19        We've always taken a position that the JDLA is limited to

20   the joint development and research.  He just said that was

21   irrelevant to his decision.  It was not relevant to his

22   decision what the scope of the license are.

23        So four issues:  substantial non-performance, foundry

24   products, and whether they're bound by the KTT decision, and

25   then the fourth issue is there's no claim or issue preclusion

1    or judicial estoppel.

2        Thank you, Your Honor.

3            THE COURT:  Do you have anything else on Documents

4    201 or 196?

5            MR. SHEASBY:  Nothing, Your Honor.

6            THE COURT:  All right.  Mr. Cordell, I'll give you

7    the last word on these, and then we'll move on.

8            MR. CORDELL:  Thank you, Your Honor.

9        So let's start with the substantial non-performance

10    issue.

11        Could I have slide 25?  Sorry.

12        So Mr. Sheasby said, Wait a minute, we told them in

13    interrogatory responses that we had other issues.

14        But, Your Honor, they could not have been clearer.  They

15    could not have been clearer.  I put slide 25 back up, which is

16    their response to Interrogatory 16, on July 15, 2020, Netlist

17    sent Samsung a formal written notice terminating the JDLA

18    which ended any license granted to Samsung.

19        Netlist needs to be true to its word.  They can't tell us

20    that early in the case and then later say, well, you know,

21    maybe we really didn't mean that, maybe we thought it was

22    repudiated much earlier, and that the license granted to

23    Samsung somehow expired earlier.

24        Mr. Sheasby, once again, he seems to be retreating from

25    the executory covenant argument, and now shows us New York law

1    suggesting that you might be excused from performance if

2    someone commitments a material breach.  That is an

3    unremarkable proposition.  That's one that we were all taught

4    that can happen, but that has to happen in the motion.  That's

5    an extant excuse.

6        So had they sued us in January of 2018, they could have

7    pled that.  That might make sense.  But you can't go back now

8    and say, well, you know, we could have been relieved of our

9    burdens, we could have abandoned the contract and all of its

10   benefits back in January of 2018, but they didn't.  They

11   waited until July 15, 2020.  But there's more.

12            THE COURT:  What's your version of why the period of

13   time from '18 to '20 transpired?

14            MR. CORDELL:  So my version is that it was Samsung's

15   position that Netlist was abusing the supply part of the

16   contract; that, in fact, the parties had understood that there

17   would be some parts that were provided primarily for this

18   joint development project, but there may have been some

19   others.

20       But beyond that, there was a general memory shortage, and

21   it was Samsung's view that Netlist was taking advantage of

22   that situation; that they were -- they were depriving other

23   Samsung customers of parts so that they could be the resellers

24   and reap some profits because of the memory shortage.  That's

25   our view of what happened.

1      But, importantly, Your Honor, we have to go back to the

2    contract, and the contract provides for this.  Again, good

3    contract lawyers don't allow the parties to drift around at

4    sea while they -- they decide whether there's been a

5    termination or not.  Good contract lawyers will -- will

6    provide for it.

7      So we go back to section 13, term and termination.  And

8    section 13 tells us what happens.  They tell us what you have

9    to do to terminate the contract.  They tell us you got to give

10   written notice.  And, importantly, there's a cure provision.

11   So you got to give 30 days for the other side to cure whatever

12   breach you allege happened.

13     So if in January of 2018 they believed that there was a

14   supply disruption or something that caused a breach of the

15   contract, the contract says Netlist should have sent us a

16   letter saying, hey, we're not getting the parts that we need,

17   you need to give us some more parts, or whatever they felt

18   like the breach was.

19     So the cure provision is there in black and white, and it

20   is only if it is not cured within 30 days may they terminate

21   the agreement or declare a breach.  That's what section 13.2.1

22   says.  But there's more.

23     Then in 13.3, we have effective termination.  And it

24   tells us what happens to the license that we've been here

25   arguing about for the last hour.  What happens to the license

1    is that it terminates as of the effective date of the

2    termination.  There is no contractual right to this prior

3    repudiation.  There is no ability to go back in time and say,

4    well, maybe we're going to pull the license back sometime

5    earlier.

6         They agreed to this in black and white, that the rights

7    granted to the defaulting party -- they say Samsung defaulted.

8    Samsung's rights will cease forthwith as of the effective date

9    of such termination.  Not before, not when they thought there

10   might be a problem, not when they thought, well, maybe we

11   should write them a letter, but as of the effective date of

12   the termination.

13        Judge Scarsi determined the effective date.  They

14   admitted that's the effective date.  This has been an enormous

15   expense of the Court's resources for no purpose.

16        Let me address the foundry issue.  So I did challenge Mr.

17   Sheasby to show us an accused product, not any product but an

18   accused product that qualified as a foundry product.  What did

19   he show us?  Well, he showed us a slide that said that Samsung

20   does, in fact, have a foundry business.  And they do.  They

21   will make parts for other companies when they have time.  That

22   is true.  That doesn't tell us that there are any parts

23   accused in this case that were so made.

24        He then showed us this slide and said, Aha, look, HBM --

25   some of the customers of HBM are listed on this slide.

1       Well, they are, Your Honor.  But the fact is there are

2  several businesses mentioned on this slide.  There is foundry

3  services; that is true.

4       I can zoom in on that.

5       But there's also memory, a completely different business

6  or platform services.  The fact is that Samsung does a lot of

7  things for a lot of companies.  Again, I'm waiting to see an

8  accused product that actually qualifies under the definition

9  of a foundry product.

10      And then his -- his big gun is this slide where he

11 says -- let me get my notes -- he says, Aha, I found one,

12 there we go.  This HBM3 that's provided to nVidia,

13 that's -- there you go.  That's -- you wanted a product, he

14 gave us a product.

15      Well, number one, Your Honor, that's not a product.

16 Okay?  There is no accused product called HBM3.  That's a

17 class of products.  That's like saying, you know, a four-door

18 sedan.  That's not a, you know, Ford, I guess, Taurus would be

19 a four-door sedan.  It's hard for me to think of one.  That

20 would be a product.  This is not a product.  That's a class of

21 products.

22      But, critically, critically, HBM3 was not introduced

23 until 2021 at the earliest.  That whole class of products

24 didn't exist during the effective time period of the license.

25 So not only do they not tell us a product, this class of

1    products can't qualify.  It can't be an accused product

2    because it didn't exist at the time the license was there.

3        So he's got to show us an accused product or he loses the

4    foundry issue.  You can't just rely on their evidence.

5        And, finally, Your Honor, with respect to the Korean tax

6    authority, you have to read this very carefully.  I think Mr.

7    Sheasby may have misspoken because he seemed to suggest that

8    somehow the -- that -- that Samsung was making arguments, that

9    Samsung's arguments were being considered or rejected.  But

10   that's not true.  These were Netlist's arguments.

11       Let me find the right slide that he showed us.  Well, he

12   did show us a slide.  I don't think this is the right one.

13   Yes, actually it is the right one, Your Honor, the top -- the

14   top quote.

15       It talks about Netlist's -- though Samsung referred

16   Netlist to appeal directly to the Korean tax authority, and

17   its arguments before the tax tribunal were adverse to

18   Netlist's interests.  The its there are Netlist's arguments,

19   not Samsung's arguments.  Samsung was not a party to the

20   Korean Tax Tribunal.  The way it works is Samsung withholds

21   the money; they then go to the Korean Tax Tribunal and try to

22   get it back.

23       Samsung gives them some information, but they were never

24   a party to that proceeding and they can't be bound by it even

25   if it had any relevance here.  This is not a 44.1

1    determination, and it has none.

2          So with that, unless there are questions, I will sit

3    down.

4                THE COURT:  All right.  Thank you.

5          Well, I've heard considerable argument on these two

6    competing summary judgment motions, and I felt it was

7    important, given their impact and significance.

8          Considering the briefing and considering the argument

9    that's presented today, I'm going to deny Plaintiff's motion

10   for partial summary judgment.  I don't think it's supported by

11   Rule 56.  I don't think the Court has a basis to grant it.

12         But I'm going to grant Defendants' motion for summary

13   judgment.  I think it's replete in the record time and time

14   again, both from the terms of the JDLA itself and the

15   affirmative statements made by Netlist, that until July 15th,

16   2020, Samsung had a license defense, and after July 15th,

17   2020, Samsung has no license defense.

18         And there just does not seem to me to be any material

19   question of fact with regard to that issue.  And the repeated

20   affirmative statements by Netlist to various listeners and

21   recipients that the license terminated on July 15th, 2020,

22   just seems to me to be beyond any material dispute.

23         And I'm going to grant Defendants' motion for summary

24   judgment, Document 196.

25         Now, we've been in here over an hour-and-a-half.  We're

```
 1    going to take a short recess.  I'm aware that the ruling I've

 2    just given you may impact some of the other motions that are

 3    before the Court.  I want you to meet and confer during the

 4    recess about that, and I'll hear input from you on that when I

 5    return.

 6        Mr. Sheasby, you're on your feet walking to the podium.

 7    I assume you have a question.

 8            MR. SHEASBY:  Yes.  So did you -- did the Court

 9    grant summary judgment that the HBM products are foundry

10    products as well?

11            THE COURT:  No.  I don't think there's any fact

12    issue there, either.

13            MR. SHEASBY:  Okay.  Thank you, Your Honor.

14            THE COURT:  All right.  Meet and confer on where

15    this takes us after this ruling, and I'll hear from you on

16    that when I return.  We'll take a short recess at this time.

17        Court stands in recess.

18                    (Brief recess.)

19            THE COURT:  Be seated, please.

20        Counsel, two things.  Number one, I've been reminded that

21    during my housekeeping instructions to you, I didn't expressly

22    say that you each had 30 minutes total to address the venire

23    panel during jury selection.  That's what you have--30 minutes

24    per side.  Nobody asked any questions about it because I

25    assumed that you already knew that, but I'll just make it
```

1    completely clear that's what my expectation is with regard to

2    voir dire.

3        Secondly, as I've had happen before, Mr. Sheasby got up

4    and asked a question as I was about to get off the bench.  I

5    won't say that I was completely ready for it.  I thought about

6    the question he asked just before I recessed.  I want to

7    clarify the Court's ruling.

8        When I said no to his question, that is correct, and that

9    is what I intended to say--that there are fact issues with

10   respect to whether the HBM products are foundry products,

11   which would determine whether they did or did not fall within

12   the license that existed up until July 15th, 2020.

13       So I'm not granting summary judgment.  There are fact

14   issues at play there.  So that is a live issue for the jury

15   and an issue to be presented during the trial.

16       But to the extent they do fall within the license, the

17   license is in place up until January 15, 2020, under the JDLA,

18   and that's the basis upon which I'm granting Samsung's motion.

19       Both sides have conceded on the record that as of -- both

20   sides have conceded on the record that after July 15th, 2020,

21   there is no license defense and the JDLA was terminated, which

22   terminated the license.  So that's I think a complete review

23   of what I've given you so far.

24       If anybody has any questions about any of those issues,

25   now's the time to ask before we move on.

1          MR. SHEASBY:  Nothing from Plaintiff, Your Honor.

2          THE COURT:  Is that clear to your side, Mr. Cordell?

3          MR. CORDELL:  It is, Your Honor.  But I guess I'm a

4    little curious as to what the Court's expectation is on the

5    HBM issue.  It turns out that that is the -- that is the

6    gravamen of this motion, that the only two patents-in-suit

7    that existed as of the time of the license are the HBM

8    patents.

9          THE COURT:  Well, I can tell you I'm persuaded,

10   based on the evidence that's been presented, that there's no

11   material question of fact that the termination letter executed

12   by Netlist on July the 15th, 2020, effectively terminated your

13   licenses -- Samsung's licenses as of that date.

14      But that does not leave open the look-back argument that

15   Plaintiffs presented that somehow in 2018 when they say

16   Samsung failed to substantially perform, that that somehow

17   suspended, repudiated, or otherwise took away the license

18   protection from the JDLA.

19      So you've got a license -- Samsung's got a license

20   defense up until July 15th, 2020, and you don't have one after

21   July 15th, 2020.  What falls within that license as prescribed

22   by the other terms of the JDLA is a fact question, and I don't

23   find as a matter of summary judgment that the HBM products are

24   foundry products and either would be within or without the

25   license.  That's a fact issue that the jury's going to have to

```
 1    decide.
 2              MR. CORDELL:  Understood, Your Honor.  Thank you.
 3              THE COURT:  Okay.  All right.  Let's move on to
 4    Samsung's motion for summary judgment of non-infringement as
 5    to the '060 and the '160 Patents.  This is Document 197.  Let
 6    me hear from Samsung as the moving party here first.
 7              MR. McKEON:  Good morning, Your Honor.  Mike McKeon
 8    for Samsung.
 9              THE COURT:  Good morning, Mr. McKeon.
10              MR. McKEON:  I previously handed up the slides, and
11    you should have them.  May I proceed?
12              THE COURT:  You may proceed.
13              MR. McKEON:  So, Your Honor, we strongly believe --
14    and we were just talking about the HBM products and the two
15    relevant patents for that.  We strongly believe that based on
16    the undisputed facts we have here, that summary judgment of
17    non-infringement is warranted.
18              THE COURT:  Does strongly believe somehow equates to
19    strenuously object?
20              MR. McKEON:  Well, I guess so, Your Honor.
21              THE COURT:  Okay.
22              MR. McKEON:  But really actually, and before I jump
23    to the slides, I think the procedural history how we got here
24    is actually quite telling.  You know, of course, we had the
25    Markman process before Judge Payne, and you know we argued
```

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.


9     S/Shawn McRoberts          04/02/2023

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER