# EXHIBIT 5

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| NETLIST, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:22-cv-293-JRG |
| vs. | ) | |
| | ) | JURY TRIAL DEMANDED |
| SAMSUNG ELECTRONICS CO, LTD; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SEMICONDUCTOR INC., | ) ) ) ) ) | (Lead Case) |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| NETLIST, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:22-cv-294-JRG |
| vs. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MICRON TECHNOLOGY, INC.; MICRON SEMICONDUCTOR PRODUCTS, INC.; MICRON TECHNOLOGY TEXAS LLC, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF NETLIST, INC.'S FIRST NOTICE OF DEPOSITION OF DEFENDANTS MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., AND MICRON TECHNOLOGY TEXAS LLC PURSUANT TO RULE 30(b)(6)

Please Take Notice that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, and the Local Rules of this Court, Plaintiff Netlist, Inc. ("Netlist") will take the deposition by oral examination of Defendants Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC (collectively "Micron" or "Defendants"). The deposition(s) will commence on November 1, 2023 at 9:00 am PT, or such other date and time as may be agreed by the parties, and will continue from day to day (excluding Saturdays, Sundays, and holidays) until completed. The deposition will take place at 1800 Avenue of the Stars, Suite 900, Los Angeles, CA 90067, or another mutually agreeable location. The deposition(s) will be conducted pursuant

to the Federal Rules of Civil Procedure and will be conducted in the English language before a notary public or other officer authorized to administer oaths.

Notice is further given that Netlist reserves the right to conduct this deposition utilizing the secure web-based deposition option afforded by Veritext Legal Solutions or, in the alternative, video teleconferencing (VTC) services or telephonically to provide remote/virtual access for the parties to participate in the deposition via the internet and/or telephone. If the deposition is conducted via remote video, it will be taken before a court reporter, under oath, and will be recorded stenographically, including potentially via LiveNote or equivalent means, audiographically, and/or videographically.

Also take notice that Netlist reserves the right to record the deposition either by stenographic means by a court reporter certified to record depositions or a digital reporter utilizing state-of-the-art digital recording equipment. Both the court reporter and digital reporter are authorized to administer the oath and serve as the deposition officer in the State of California. Please take note that the deposition officer may also be remote and out of the presence of the deponent via one of the options above for the purposes of providing the oath/affirmation to the deponent and capturing the proceeding.

Netlist further reserves the right to utilize the following: (1) Record the deposition utilizing audio or video technology; (2) Instant visual display such that the reporter's writing of the proceeding will be available to all who are a party to this proceeding to request and receive it in realtime; (3) Exhibit Capture (picture-in-picture) technology in which any exhibit reviewed by the deponent during the deposition can be captured visually; and (4) To conduct this deposition utilizing a paperless exhibit display process called Exhibit Share or a similar paperless virtual display platform. The parties are advised that in lieu of a paper set of exhibits, the exhibits may be

provided and displayed digitally to the deposition officer, deponent, parties and counsel. The exhibits will be compiled by the deposition officer for the purposes of exhibit stamping, and ultimate production of the final certified transcript.

Pursuant to Federal Rule of Civil Procedure 30(b)(6), Micron shall designate one or more of its officers, directors, managing agents, or other persons who are most knowledgeable, and competent to testify on its behalf, as to all matters known or reasonably available to Micron with respect to the topics set forth in Attachment A.  Pursuant to Federal Rule of Civil Procedure 30(b)(6), the person(s) designated should be prepared to testify as to such matters known or reasonably available to Micron.  At least five (5) business days before the date set for the deposition(s), Micron shall identify, by name and position, each person so designated and shall set forth the matters on which that person will testify.

Netlist reserves the right to serve Micron with additional notices pursuant to Rule 30(b)(6) on additional topics as this litigation progresses and as further evidence is produced.


*/s/ Yanan Zhao*
Yanan Zhao

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## ATTACHMENT A

## <u>DEFINITIONS</u>

Unless the context indicates otherwise, for purposes of these discovery requests, the following words and phrases have the meanings given:

1.      "Micron," "Micron Defendants," "Defendant(s)," "You," or "Your" means Micron Technology, Inc., Micron Semiconductor Products, Inc., Micron Technology Texas LLC, and any present or former parent, subsidiary, division, subdivision, affiliated company, licensee, predecessor, or successor of Micron, and any of its or their present or former officers, directors, agents, attorneys, consultants, accountants, employees, representatives, investigators, distributors, salespersons, sales representatives, licensors, licensees, and any other persons acting, or purporting to act for or on its or their behalf or under its or their control, including but not limited to experts or persons consulted concerning any factual matter or matters of opinion relating to any issues involved in the action.

2.      "Netlist" means Netlist, Inc. and all of its affiliates, officers, employees, agents, representatives, contractors, consultants, attorneys, successors, and assigns.

3.      "Patent" means any United States, international, or foreign classes or types of patents, utility models, design patents, applications (including provisional applications), certificates of invention, reissues, divisionals, continuations, continuations-in-part, extensions, renewals, reexaminations and foreign counterparts thereof. The defined term Patent includes all stated categories of intellectual property regardless of whether those rights are presently expired or were ever adjudged invalid.

4.      "Netlist Patents-in-Suit" means and refers to, both individually and collectively, U.S. Patent Nos. 7,619,912 ("the '912 Patent"), 11,093,417 ("the '417 Patent"), 9,858,215 ("the

'215 Patent"), as well as all applications and patents that share a common priority claim.

5.    "Third Party" means any individual, entity, organization, partnership, or corporation that is not a party to this action.

6.    "Prior Art" is used in the same manner in which the term is used in pre-AIA 35 U.S.C. §§ 102 and 103, and includes any patent, printed publication, system, prior knowledge, prior use, prior sale, offer of sale, or other act or event relevant to patentability under 35 U.S.C. §§ 102 or 103, or that You otherwise assert renders any asserted claim invalid.

7.    "Micron Accused DDR4 LRDIMMs" shall include any and all Micron Double Data Rate 4 ("DDR4") load-reduced dual in-line memory modules ("LRDIMMs"), including ones that its customers further customize.

8.    "Micron Accused DDR4 RDIMMs" shall include any and all Micron DDR4 registered dual in-line memory modules ("RDIMMs"), including ones that its customers further customize.

9.    "Micron Accused DDR3 LRDIMMs" shall include any and all Micron Data Rate 3 ("DDR3") LRDIMMs, including ones that its customers further customize.

10.    "Micron Accused DDR3 RDIMMs" shall include any and all Micron DDR3 RDIMMs, including ones that its customers further customize.

11.    "Micron Accused Products" shall include any and all Micron Accused DDR4 LRDIMMs, Micron Accused DDR4 RDIMMs, Micron Accused DDR3 LRDIMMs, and Micron Accused DDR3 RDIMMs, and any other products identified in Netlist's preliminary infringement contentions and subsequent amendments.

12.    "Micron Distributor" shall include any person who Micron authorized to sell any

Micron Accused Products.

13.    "Micron Partner" shall include any customers of Micron's Accused Products and any other third parties involved in the design, development, manufacture, testing, assembly, importation, distribution, sourcing, qualification, sale, or offer to sell Micron Accused Products.

14.    "Micron Supplier" means a natural person or a business entity that supplies any component involved in the Micron Accused Products or assembled Micron Accused Products in whole or in part. For the purposes of this definition, a co-development relationship or a fabrication relationship shall constitute one type of supplier relationship.

15.    "Montage" means Montage, Inc. (d/b/a Montage Technologies, Inc.), Montage Technology, Inc., and any present or former parent, subsidiary, division, subdivision, affiliated company, licensee, predecessor, or successor, and any of its or their present or former officers, directors, agents, attorneys, consultants, accountants, employees, representatives, investigators, distributors, salespersons, sales representatives, licensors, licensees, and any other persons acting, or purporting to act for or on its or their behalf or under its or their control, including but not limited to experts or persons consulted concerning any factual matter or matters of opinion relating to any issues involved in the action.

16.    "Rambus" means Rambus Inc. and any present or former parent, subsidiary, division, subdivision, affiliated company, licensee, predecessor, or successor, and any of its or their present or former officers, directors, agents, attorneys, consultants, accountants, employees, representatives, investigators, distributors, salespersons, sales representatives, licensors, licensees, and any other persons acting, or purporting to act for or on its or their behalf or under its or their control, including but not limited to experts or persons consulted concerning any factual matter or matters of opinion relating to any issues involved in the action.

17.    "Inphi" means Inphi Corporation and any present or former parent, subsidiary, division, subdivision, affiliated company, licensee, predecessor, or successor, and any of its or their present or former officers, directors, agents, attorneys, consultants, accountants, employees, representatives, investigators, distributors, salespersons, sales representatives, licensors, licensees, and any other persons acting, or purporting to act for or on its or their behalf or under its or their control, including but not limited to experts or persons consulted concerning any factual matter or matters of opinion relating to any issues involved in the action.

18.    "IDT" means Integrated Device Technology, Inc. and any present or former parent, subsidiary, division, subdivision, affiliated company, licensee, predecessor, or successor, and any of its or their present or former officers, directors, agents, attorneys, consultants, accountants, employees, representatives, investigators, distributors, salespersons, sales representatives, licensors, licensees, and any other persons acting, or purporting to act for or on its or their behalf or under its or their control, including but not limited to experts or persons consulted concerning any factual matter or matters of opinion relating to any issues involved in the action.

19.    "Microchip" means Microchip Technology, Inc. and any present or former parent, subsidiary, division, subdivision, affiliated company, licensee, predecessor, or successor, and any of its or their present or former officers, directors, agents, attorneys, consultants, accountants, employees, representatives, investigators, distributors, salespersons, sales representatives, licensors, licensees, and any other persons acting, or purporting to act for or on its or their behalf or under its or their control, including but not limited to experts or persons consulted concerning any factual matter or matters of opinion relating to any issues involved in the action.

20.    "STM" means STMicroelectronics N.V. and any present or former parent, subsidiary, division, subdivision, affiliated company, licensee, predecessor, or successor, and any

of its or their present or former officers, directors, agents, attorneys, consultants, accountants, employees, representatives, investigators, distributors, salespersons, sales representatives, licensors, licensees, and any other persons acting, or purporting to act for or on its or their behalf or under its or their control, including but not limited to experts or persons consulted concerning any factual matter or matters of opinion relating to any issues involved in the action.

21.    "Ablic" means Ablic Inc. and any present or former parent including without limitation current parent MinebeaMitsumi, Inc. and former parents Seiko Instruments Inc. and the Seiko Group Corporation, any subsidiary, division, subdivision, affiliated company, licensee, predecessor, or successor, and any of its or their present or former officers, directors, agents, attorneys, consultants, accountants, employees, representatives, investigators, distributors, salespersons, sales representatives, licensors, licensees, and any other persons acting, or purporting to act for or on its or their behalf or under its or their control, including but not limited to experts or persons consulted concerning any factual matter or matters of opinion relating to any issues involved in the action.

22.    "Giantec" means "Giantec Semiconductor Corporation" and any present or former parent, subsidiary, division, subdivision, affiliated company, licensee, predecessor, or successor, and any of its or their present or former officers, directors, agents, attorneys, consultants, accountants, employees, representatives, investigators, distributors, salespersons, sales representatives, licensors, licensees, and any other persons acting, or purporting to act for or on its or their behalf or under its or their control, including but not limited to experts or persons consulted concerning any factual matter or matters of opinion relating to any issues involved in the action.

23.    "Renesas" means Renesas Electronics Corporation and any present or former parent, subsidiary, division, subdivision, affiliated company, licensee, predecessor, or successor,

and any of its or their present or former officers, directors, agents, attorneys, consultants, accountants, employees, representatives, investigators, distributors, salespersons, sales representatives, licensors, licensees, and any other persons acting, or purporting to act for or on its or their behalf or under its or their control, including but not limited to experts or persons consulted concerning any factual matter or matters of opinion relating to any issues involved in the action.

24.    "OnSemi" means ON Semiconductor Corporation and any present or former parent, subsidiary, division, subdivision, affiliated company, licensee, predecessor, or successor, and any of its or their present or former officers, directors, agents, attorneys, consultants, accountants, employees, representatives, investigators, distributors, salespersons, sales representatives, licensors, licensees, and any other persons acting, or purporting to act for or on its or their behalf or under its or their control, including but not limited to experts or persons consulted concerning any factual matter or matters of opinion relating to any issues involved in the action.

25.    "Standard(s)" means any technical standard created, authorized, controlled, and/or developed privately or unilaterally by a corporation, consortium, regulatory body, government, or standards setting organization.

26.    "JEDEC" means the JEDEC Solid State Technology Association.

27.    "Person" refers to any natural individual; any form of business entity including, but not limited to, any corporation, company, firm, general partnership, limited partnership, limited liability company, joint venture, proprietorship, business association, association, foundation, and legal entity; any directors, officers, owners, members, employees, agents, representatives, and attorneys of any of the foregoing; anyone else purporting to act on behalf of any such natural person or business entity; or any government entity, agency, officer, department, or affiliate.

28.    "Specification" means all Documents and Things that discuss, illustrate, define, or

reflect, in whole or in part, any aspect of how something is or should be made, inspected, or tested. Specifications include, for example, layout-design (topography) documents, textual documents, drawings, mask files, circuit diagrams, block diagrams, flow diagrams, product specifications, functional specifications, internal design and development specifications, architectural manuals, user manuals, programmer's guides, manufacturing process specifications, material specifications, assembly specifications, blueprints, and/or illustrations.

29.    "Source Code" means programming language statements that can be compiled, transformed, interpreted, executed, or otherwise processed by software (or further compiled, transformed, interpreted, executed, or otherwise processed by software) into object code. This includes, without limitation, instructions, statements, procedures, subroutines, and programs written in a high-level programming language, design description language, or assembly language, and Specifications (defined above) for the operation of hardware, including, without limitation, code written in languages such as VHDL, register-transfer language (RTL), and verilog, and firmware and technical documentation.

30.    "Data Buffer" means data buffers for use in Micron Accused DDR4 LRDIMMs.

31.    "RCD" means register clock drivers ("RCD") for use in any and all Micron Accused Products.

32.    "SPD" means serial presence detects ("SPDs") for use in any and all Micron Accused Products.

33.    "PDA Features" means all features that allow the programmability of a given memory device on a rank, or less than all memory devices on a rank, through a "per DRAM addressability" ("PDA") feature.

34.    "Rank Multiplication Features" means all features that allow the expansion of

memory capacity of a memory module by using on-module logic to (i) present a memory module with 2n physical ranks of memory devices as a module with n (virtual) ranks to the computer system, and/or (ii) produce more chip select signals than it receives from a host.

35.    "DDR4 LRDIMM Timing Control Features" includes the following: (1) the RCD's receipt of input address and control signals (including input chip select signals) associated with a read or write memory command via the address and control signal lines; (2) the RCD's output of registered address and control signals; (3) the active signal value and non-active signal value of the input chip select signals; (4) receipt and/or output of the read or write burst of N-bit wide data signals in response to the read or write commands, and the sequences of the commands; (5) transfer of the bursts of N-bit wide data signals between the memory bus and the memory devices; (6) the overall CAS latency, operational CAS latency, and the difference between the two; (7) the amount of time delay that the data transfers (through the circuitry) are registered for; (8) isolation of the corresponding load of each memory devices from the memory bus; (9) the number of ranks of the memory devices; (10) report of the overall CAS latency to the memory controller in response to a mode register set command received from the memory controller (e.g., by an SPD device); and (11) the selection of a specific rank to receive or output a data burst.

36.    "Load Isolation Features" means all features that allow a memory module to enable or disable data communication with the memory controller through a buffer (or buffers).

37.    "Patented Features" includes one or more of: (1) PDA Features; (2) Rank Multiplication Features; (3) DDR4 LRDIMM Timing Control Features; and (4) Load Isolation Features.

38.    "Key Technical Information" shall mean information pertaining to each and all of the following: (1) read and write operations in the Micron Accused Products; (2) timing control

operations in the Micron Accused Products; (3) structure and function of data buffers and RCDs in the Micron Accused Products; (4) control of the write and read paths and corresponding tristate buffers and delay circuits in the Micron Accused Products; (5) chip selection signals and mechanisms in the Micron Accused Products; (6) CAS latency in the Micron Accused Products; (7) CAS latency reporting operations in the Micron Accused Products (8) rank multiplication in the Micron Accused Products; (9) load isolation operations in the Micron Accused Products; (10) programmability of a subset of a rank of memory devices or individual memory devices or in the Micron Accused Products.

39.     "Including" and "include" mean including without limitation, whether or not the phrase "without limitation" is explicitly stated.

40.     The words "and" and "or" are terms of inclusion and not of exclusion and are to be construed conjunctively or disjunctively as necessary to bring within the scope of these requests for production any information which might otherwise be construed to be outside their scope.

41.     The term "any" shall mean "any and all" and the term "all" shall mean "any and all."

42.     "Date" means the exact day, month and year if so ascertainable, or if not, the best approximation (including relationship to seasons and other events).

43.     "Document" means any form of communication or representation, in any language fixed in any tangible medium, including every form of recording letters, words, pictures, sounds, or symbols, or combinations thereof by means such as handwriting, printing, photostatting, photographing, magnetic taping or writing, optically burning or encoding, or any other form of storing, compiling, or mechanically or electrically recording data onto any media including paper, film, plastic, magnetic tape, computer disks, compact discs (CDs), digital video discs (DVDs) and

the like. For example, the term "Document" includes without limitation, correspondence, memoranda, notes, diaries, minutes, statistics, letters, telegrams, contracts, reports, studies, checks, statements, tags, labels, invoices, brochures, periodicals, receipts, returns, summaries, pamphlets, books, notebooks, lab notebooks, invention disclosures, prospectuses, interoffice, and intra-office communications, offers, notations of any sort of conversations, working papers, applications, permits, surveys, indices, telephone calls, meetings, printouts, teletypes, telefax, telefax records, invoices, work sheets, graphic or oral representations of any kind (including without limitation, pictures, photographs, charts, microfiche, microfilm, videotape, audiotape, recordings, motion pictures, plans, drawings, surveys), and electronic or mechanical records or representations of any kind (including, without limitation, electronic mail or e-mail, Instant Messages, tapes, cassettes, discs, and recordings).

44.     Every draft, version, revision, or non-identical copy of a "Document," including copies that differ from the original because of hand notation(s), shall be considered a separate "Document," as that term is used herein, but exhibits, appendices and attachments to a "Document" shall be considered part of the "Document" itself.

45.     "Communications" means all written, oral, telephonic, or other inquiries, dialogues, discussions, conversations, interviews, correspondence, consultations, negotiations, agreements, understandings, meetings, letters, notes, advertisements, e-mails and all other Documents evidencing any transmittal of information or verbal or nonverbal interaction between persons and entities.

46.     "Thing" means any tangible item, including without limitation, models, prototypes and samples of any device or apparatus or product.

47.     The terms "relate to," "reflecting," "relating to," "concerning," or any variations

thereof, shall mean relating to, referring to, concerning, mentioning, reflecting, regarding, pertaining to, evidencing, involving, describing, discussing, commenting on, embodying, responding to, supporting, contradicting, constituting (in whole or in part), or between (as in the context of Communications), as the context makes appropriate.

48.    The terms "Identify," "Identification," or "Identity" shall mean:

(1)    In connection with natural persons, their full names, titles and job description, and their present or last known business address and residence (designating which);

(2)    In connection with firms, partnerships, corporations, proprietorships, associations or other entities, their name, and their present or last known addresses of the principal place of business (designating which);

(3)    In connection with Documents, a description of the Document, setting forth its Date, title, format, nature, substance, author or over whose name it issued, addressee, and present custodian thereof, with such reasonable particularity as would be sufficient to permit the Document to be sought by subpoena duces tecum or under the provisions of Rule 34 of the Federal Rules of Civil Procedure;

(4)    In connection with oral statements and Communications: (i) the Date and location where they were made; (ii) the identity of each of the participants and witnesses thereto, and all others present; (iii) the medium of communication; and (iv) their substance.

## TOPICS

## TOPIC NO. 1:

The Identity of the three (3) most knowledgeable Persons for each of the Patented Features in the Micron Accused Products, including PDA Features, Rank Multiplication Features, DDR4 LRDIMM Timing Control Features, and Load Isolation Features, as well as the Identity of the

three (3) most knowledgeable Persons for each Key Technical Information, including their dates of employment, current and previous titles, and qualification.

**TOPIC NO. 2:**

Micron's organizational structure with respect to the Micron Accused Products, including but not limited to the description of any research centers, groups, subdivisions, departments, or persons responsible for the design, development, engineering, testing, manufacture, assembly, distribution, sourcing, qualification, and distribution of the Micron Accused Products and components thereof (such as data buffers and registering clock drivers).

**TOPIC NO. 3:**

The Identity, location, organizational structure, and responsibilities of each Micron person, group, team, business, or functional unit involved with the sales or marketing of the Micron Accused Products.

**TOPIC NO. 4:**

The Identification of all Micron Accused Products, including the meaning of Micron's product codes or part numbers.

**TOPIC NO. 5:**

The design, structure, configuration, operation, functionality, and features of the Micron Accused Products, including explanation of Documents relating to the design, structure, configuration, operation, functionality, and features of the Micron Accused Products produced in this Action.

**TOPIC NO. 6:**

The Identity and location of Documents and Source Code related to Key Technical Information and the Identity of Persons having access to these Documents and Source Code.

**TOPIC NO. 7:**

The Identity and location of Documents and Source Code related to the Patented Features in the Micron Accused Products and the Identity of Persons having access to these Documents and Source Code.

**TOPIC NO. 8:**

The Identity of Documents and Source Code that Micron receives from and/or shares with its Suppliers, Partners, and Distributors as related to the Micron Accused Products.

**TOPIC NO. 9:**

The Identity of Documents and Source Code that Micron has a right to or has requested from its Suppliers, Partners, and Distributors as related to the Micron Accused Products.

**TOPIC NO. 10:**

Micron's policies practices, and procedures for Document management, storage, and preservation, including both paper and electronic Documents.

**TOPIC NO. 11:**

The structure, configuration, implementation, and operation of the Micron Accused DDR4 LRDIMMs, including explanation of Documents relating to the structure, configuration, implementation, and operation of the Micron Accused DDR4 LRDIMMs produced in this Action.

**TOPIC NO. 12:**

The structure, configuration, implementation, and operation of the Micron Accused DDR4 RDIMMs, including explanation of Documents relating to the structure, configuration, implementation, and operation of the Micron Accused DDR4 RDIMMs produced in this Action.

**TOPIC NO. 13:**

The structure, configuration, implementation, and operation of the Micron Accused DDR3 LRDIMMs, including explanation of Documents relating to the structure, configuration, implementation, and operation of the Micron Accused DDR3 LRDIMMs produced in this Action.

**TOPIC NO. 14:**

The structure, configuration, implementation, and operation of the Micron Accused DDR3 RDIMMs, including explanation of Documents relating to the structure, configuration, implementation, and operation of the Micron Accused DDR3 RDIMMs produced in this Action.

**TOPIC NO. 15:**

Key Technical Information for each of the Micron Accused DDR4 LRDIMMs.

**TOPIC NO. 16:**

Key Technical Information for each of the Micron Accused DDR4 RDIMMs.

**TOPIC NO. 17:**

Key Technical Information for each of the Micron Accused DDR3 LRDIMMs.

**TOPIC NO. 18:**

Key Technical Information for each of the Micron Accused DDR3 RDIMMs.

**TOPIC NO. 19:**

The structure, configuration, implementation, and operation of the Micron Accused DDR3 RDIMMs, including explanation of Documents relating to the structure, configuration, implementation, and operation of the Micron Accused DDR3 RDIMMs produced in this Action.

**TOPIC NO. 20:**

The structure, configuration, implementation, and operation of the Micron Accused Products, including without limitation Data Buffers, RCDs, DRAMs, SPDs, delay circuits, and data paths on each of the Micron Accused Infringing Products, including their respective operations during: (1) a read operation; (2) a write operation.

**TOPIC NO. 21:**

The structure, configuration, implementation, and operation of the Micron Accused DDR3 Products, including without limitation Data Buffers, RCDs, DRAMs, SPDs, delay circuits, and data paths on each of the Micron Accused Products in connection with Rank Multiplication Features.

**TOPIC NO. 22:**

The structure, configuration, implementation, and operation of the Micron Accused DDR4 LRDIMMs and DDR4 RDIMMs, including without limitation Data Buffers, RCDs, DRAMs, SPDs, delay circuits, and data paths in connection with PDA Features, including but not limited to explaining, for each Micron Accused DDR4 LRDIMM and DDR4 RDIMM product: (1) all circumstances under which PDA features are employed in these products; and (2) the frequency with which PDA features are used.

**TOPIC NO. 23:**

For each Micron Accused DDR4 LRDIMM and DDR4 RDIMM, an explanation of how SDRAMs are configured to ignore commands from the memory controller when PDA Features are used, including but not limited to describing in complete detail: (1) circuitry on an SDRAM device involved in receiving and/or decoding control/address signals; (2) when an SDRAM device is in PDA mode, whether the circuitry identified in (1) continues to latch or buffer

control/address signals; (3) when an SDRAM device is in PDA mode, whether circuitry identified in (1) continues to decode control/address signals; (4) any other circuitry on an SDRAM involved in PDA mode and how it affects whether a command is ignored by or acted upon by the SDRAM device; (5) any components on LRDIMMs or RDIMMs involved in PDA mode operation; (6) mechanisms involved in PDA mode operation; and (7) the specific conditions under which a command is ignored.

**TOPIC NO. 24:**

The structure, configuration, implementation, and operation of the Micron Accused DDR4 LRDIMMs, including without limitation Data Buffers, RCDs, DRAMs, SPDs, delay circuits, and data paths on each of the Micron Accused DDR4 LRDIMMs in connection with DDR4 LRDIMM Timing Control Features.

**TOPIC NO. 25:**

The structure, configuration, implementation, and operation of the Micron Accused DDR4 LRDIMMs, including without limitation Data Buffers, RCDs, DRAMs, SPDs, delay circuits, and data paths on each of the Micron Accused DDR4 LRDIMMs in connection with Load Isolation Features.

**TOPIC NO. 26:**

All facts relating to the competitive advantages and disadvantages of the Micron Accused Products compared with those of Micron's competitors, including how and why the Micron Accused Products are superior to or more desirable than its competitors' products and any value Micron asserts is attributable to the Micron Accused Products separate from the Patented Features.

**TOPIC NO. 27:**

The technical advantages associated with the use of PDA Features in the Micron

Accused DDR4 LRDIMMs and DDR4 RDIMMs, including but not limited to any performance or efficiency improvements PDA Features bring to both individual DIMMs and to servers populated with DIMMs implementing the PDA Features, and specifically including but not limited to how the ability to program ODT, VREFDQ, or other DRAM parameters individually on a per-DRAM basis affects performance or efficiency, such as impacts on signal integrity, timing margin, power consumption, error rate, or speed.

**TOPIC NO. 28:**

Any evaluation, study, testing, or documentation that Micron has performed, commissioned, is aware of, has access to, or is otherwise in its possession, custody, or control regarding how the ability to program ODT, VREFDQ, or other DRAM parameters individually on a per-DRAM level affects performance or efficiency, including but not limited to signal integrity, timing margin, power consumption, error rate, or speed.

**TOPIC NO. 29:**

The technical advantages associated with the use of DDR4 LRDIMM Timing Control Features in the Micron Accused DDR4 LRDIMMs, including but not limited to any performance or efficiency improvements DDR4 LRDIMM Timing Control Features bring to both individual DIMMs and to servers populated with DIMMs implementing the DDR4 LRDIMM Timing Control Features.

**TOPIC NO. 30:**

The technical advantages associated with the use of Load Isolation Features in the Micron Accused DDR4 LRDIMMs, including but not limited to any performance or efficiency improvements Load Isolation Features bring to both individual DIMMs and to servers populated with DIMMs implementing the Load Isolation Features.

**TOPIC NO. 31:**

The technical advantages associated with the use of Rank Multiplication Features in the Micron Accused DDR3 LRDIMMs and DDR3 RDIMMs, including but not limited to any performance or efficiency improvements Rank Multiplication Features bring to both individual DIMMs and to servers populated with DIMMs implementing the Rank Multiplication Features.

**TOPIC NO. 32:**

Any benefits, financial or otherwise, that Micron receives, directly or indirectly, relating to the Micron Accused Products.

**TOPIC NO. 33:**

Any benefits, financial or otherwise, that Micron receives, directly or indirectly, relating to the Patented Features in the Micron Accused Products.

**TOPIC NO. 34:**

Facts and circumstances related to Micron's decision to adopt the PDA Features in the Micron Accused DDR4 LRDIMMs and DDR4 RDIMMs, including when such features were first included, what alternatives were/are available, why Micron includes these features, the technical or economic benefits of such features, and who was involved in the decision making to include these features.

**TOPIC NO. 35:**

Facts and circumstances related to Micron's decision to adopt the Load Isolation Features in the Micron Accused DDR4 LRDIMMs, including when such features were first included, what alternatives were/are available, why Micron includes these features, the technical or economic benefits of such features, and who was involved in the decision making to include these features.

**TOPIC NO. 36:**

Facts and circumstances related to Micron's decision to adopt the DDR4 LRDIMM Timing Control Features in the Micron Accused DDR4 LRDIMMs, including when such features were first included, what alternatives were/are available, why Micron includes these features, the technical or economic benefits of such features, and who was involved in the decision making to include these features.

**TOPIC NO. 37:**

Facts and circumstances related to Micron's decision to adopt the Rank Multiplication Features in the Micron Accused DDR3 LRDIMMs and DDR3 RDIMMs, including when such features were first included, what alternatives were/are available, why Micron includes these features, the technical or economic benefits of such features, and who was involved in the decision making to include these features.

**TOPIC NO. 38:**

The qualification and sourcing process for the Micron Accused Products, including Documents created during such process.

**TOPIC NO. 39:**

Micron's corporate structure and organization, including any relationship between or among Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC; Micron Partners, Distributors, and Suppliers; any past or present successors, subsidiaries, divisions, parents, or affiliates of the same; and any joint ventures or other legal entities that Micron wholly or partially owns or owned, either directly or indirectly involved in the design, development, manufacture, testing, assembly, importation, distribution, sale, offer to sell of Micron Accused Products.

**TOPIC NO. 40:**

The relationship between Micron and any Micron Suppliers, Partners, Distributors, and other Third Parties involved in the design, development, manufacture, testing, assembly, importation, distribution, sale, or offer to sell the Micron Accused Products, including any related agreements, Micron's rights under the agreements, respective responsibilities, and contacts at Micron Suppliers, Partners, Distributors, and other Third Parties.

**TOPIC NO. 41:**

The numbers and percentages of Micron Accused Products containing components supplied by Third Parties, including information for: (1) the respective numbers and percentages of Micron Accused DDR4 RDIMMs containing RCDs supplied by IDT, Inphi, Montage, Rambus, and/or other Micron Supplier(s); (2) the respective numbers and percentages of Micron Accused DDR4 LRDIMMs containing RCDs supplied by IDT, Inphi, Montage, Rambus, and/or other Micron Supplier(s); (3) the respective numbers and percentages of Micron Accused DDR4 LRDIMMs containing data buffers supplied by IDT, Inphi, Montage, Rambus, and/or other Micron Supplier(s); (4) the respective numbers and percentages of Micron Accused DDR3 RDIMMs containing components Micron Supplier(s); and (5) the respective numbers and percentages of Micron Accused DDR3 LRDIMMs containing components Micron Supplier(s).

**TOPIC NO. 42:**

The differences and similarities of RCDs and Data Buffers supplied by the Third Party vendors used in the Micron Accused Products.

**TOPIC NO. 43:**

The cost of researching, developing, purchasing, testing, and manufacturing each key component of the Micron Accused Products, including without limitation Data Buffers and

RCDs.

**TOPIC NO. 44:**

To the extent Micron contends any non-infringing alternative design exists to the inventions claimed in Netlist's Patents-in-Suit, the Identity of such non-infringing alternative, the Identity of the closest non-infringing alternative, the availability and acceptability of such non-infringement alternative, any factual bases for the Micron's contention that such design is non-infringing, and factual bases for the alleged acceptability and availability.

**TOPIC NO. 45:**

For each Netlist Patent-in-Suit, the Identify of what You contend to be the next-best alternative to the claimed inventions, the cost for implementing such an alternative, the performance difference between the alleged best alternative and the Micron Accused Products, whether such an alternative is covered by any patents, and whether Micron has authority to use each of the patents covering the next-best alternative.

**TOPIC NO. 46:**

The customers of the Micron Accused Products, including their Identities, locations, main Person(s) of contact for sales and qualification, long-term purchase agreements with Micron, purchase orders, price discounts, and sales records.

**TOPIC NO. 47:**

Micron's customer base, market share, and distribution channels for the Micron Accused Products.

**TOPIC NO. 48:**

Micron's actual, proposed, contemplated, planned or prospective pricing policies, strategies, plans, practices, or decisions for the Micron Accused Products.

**TOPIC NO. 49:**

The gross revenues, net revenues, costs, gross profits, and net profits for each Micron Accused Product sold or otherwise provided to customers from six years before the filing of this lawsuit to the present.

**TOPIC NO. 50:**

Contracts, agreements, and memoranda of understandings entered by each Micron Defendant with its customers in connection with the Micron Accused Products, including information related to: (1) the identity of each party involved; (2) location(s) where any contract, pricing, and projected demand were negotiated; (3) location(s) where any contract, pricing, and projected demand were executed; (4) location(s) where requests for proposals or bids are submitted; (5) location(s) where each Micron Accused Product was shipped from; (6) location(s) where each Micron Accused Product was shipped to; (7) location(s) where the title of Micron Accused Products was transferred or other locations where Micron and the purchaser agreed that a transfer takes place; (8) billing addresses; (9) locations where each Micron Accused Product was manufactured, assembled, and tested; (10) locations where the payment was made.

**TOPIC NO. 51:**

Micron's Documents relating to sales, costs, marketing, revenues, profits, expenses, and margins associated with sales of the Micron Accused Products, including without limitation the content of such Documents, sources of data used to generate such Documents, how such Documents and information are created and maintained, and how the information within any such Documents is organized.

**TOPIC NO. 52:**

The facts and circumstances of all sales or offers for sale of the Micron Accused Products,

including but not limited to sales meetings in the United States, sales Communications to or from the United States, customization for the United States market, Communications with an entity whose parent is located in the United States, and any other sales activity occurring at least in part in or directed from or to the United States.

**TOPIC NO. 53:**

The facts and circumstances of all use Micron or its customers make of each Micron Accused Product to the extent known to Micron in the United States, including in servers, data centers, or computers owned, operated, or leased by Micron.

**TOPIC NO. 54:**

All facts and circumstances relating to the cost of researching, developing, testing, marketing, sourcing, sale, shipment, delivery, importation, or exportation by Micron in connection with each of the Micron Accused Products and the components thereof.

**TOPIC NO. 55:**

The date on and circumstances through which Micron began making, using, selling, offering for sale, or otherwise providing to a customer the first unit of each Micron Accused Product.

**TOPIC NO. 56:**

The expected, planned, and forecasted profitability, revenues, and sales of the Micron Accused Products.

**TOPIC NO. 57:**

Micron's past, present, and future assessment of its market share, state of competition, and competitors for the Micron Accused Products.

**TOPIC NO. 58:**

All facts and circumstances relating to any customer demand, request, discussion, interest, and requirements for the Micron Accused Products in connection with the Patented Features.

**TOPIC NO. 59:**

Any customer surveys, market research, or consumer research relating to the Micron Accused Products, including Micron's methods and systems for tracking and recording such information.

**TOPIC NO. 60:**

Micron's marketing, advertising, and promotion of the Micron Accused Products or the Patented Features, including without limitation all advertising or Communications between Micron and its past, current, and prospective customers about the value, advantages and importance of the Micron Accused Products and the Patented Features compared to other products.

**TOPIC NO. 61:**

Any research, analyses, studies, evaluations, opinions, competitive analysis, or any other activity Micron undertook or is undertaking to determine the past, current, or potential marketability, revenues, costs, profits, market share, or customer perceptions of the Micron Accused Products including without limitation Micron's past, current, and future commercialization plans for the Micron Accused Products.

**TOPIC NO. 62:**

The portion of the realizable profit from the sale of the Micron Accused Products that should be credited to the alleged invention of the Netlist Patents-in-Suit as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by Micron.

**TOPIC NO. 63**:

Micron's knowledge regarding all products that You contend should be or should have been marked under the Netlist Patents-in-Suit.

**TOPIC NO. 64**:

Any products that practice or have ever practiced any claim of the Netlist Patents-in-Suit known to You.

**TOPIC NO. 65**:

The Identity of any past or present DDR4 LRDIMM, DDR4 RDIMM, DDR3 LRDIMM, or DDR3 RDIMM that does not practice any asserted claim of the Netlist Patents-in-Suit.

**TOPIC NO. 66**:

All facts relating to the appropriate amount of damages You contend Netlist is entitled to if the Netlist Patents-in-Suit is valid and infringed.

**TOPIC NO. 67**:

Any basis for Micron's contention that Netlist is not entitled to a reasonable royalty in this case and/or basis for Micron's proposed royalty calculation, including facts applicable to each of the *Georgia-Pacific* factors and apportionment.

**TOPIC NO. 68**:

The facts and circumstances relating to the preparation of any cost, revenue, profit, loss, or other financial Documents produced in this Action, including the meaning and interpretation of such financial Documents as well as the accuracy of the information contained therein.

**TOPIC NO. 69**:

For each Micron Accused Product sold worldwide since six years before the filing of this lawsuit, the total number of units manufactured, total number of units sold, gross and net revenue,

costs (including total cost of manufacture, fixed costs, and variable costs), and gross and net profits, on a monthly and quarterly basis dating back to the date each Micron Accused Product was first sold, in each country, and Micron's systems and methods for tracking, recording, and maintaining such information, which should include data on transfer pricing between Micron entities, worldwide data, and an explanation of how Micron attributes revenue from Micron Accused Products to a particular country or region.

**TOPIC NO. 70:**

The facts and circumstances relating to how Micron determines or calculates rebates provided to customers, including but not limited to all reasons for which rebates are offered, how the amount of rebate is determined, who determines the amount of rebate, and how the amount of rebate may vary across customer, product, and time.

**TOPIC NO. 71:**

Micron's formal or informal policies, procedures, guidelines or practices for handling, negotiating, reviewing, editing, executing, or otherwise dealing with agreements relating to Patent rights (including Patent licenses), including what Person(s) at Micron is involved in or responsible for such agreements and the factors Micron considers when negotiating license agreements or attempting to determine the value of patents.

**TOPIC NO. 72:**

Micron agreements, contracts, Patent licenses, or other licenses concerning any intellectual property rights related to the Micron Accused Products.

**TOPIC NO. 73:**

Any consideration Micron has paid or received in connection with any transaction or agreement related to the Micron Accused Product (including purchases, sales agreements, cross

licenses, technology transfer agreements, patent licenses, or litigation settlement agreements).

**TOPIC NO. 74:**

The shipment of Micron Accused Products.

**TOPIC NO. 75:**

Any agreements, contracts, or licenses Micron contends are comparable to a license that Micron would have taken in a hypothetical negotiation in this case, including the facts and circumstances Micron took into account in considering or entering into any offer to license or purchase or any actual license or purchase agreement that Micron contends is reasonably comparable in scope to a license for the use or practice of any of the Netlist Patents-in-Suit.

**TOPIC NO. 76:**

All formal and informal indemnity agreements between Micron and any Third Party that relate in any way to Micron Accused Products, including the terms and circumstances of the agreements and all attempts to enforce the agreements.

**TOPIC NO. 77:**

Any competitive analysis or reverse engineering of any product manufactured, sold, sampled, or distributed by Netlist.

**TOPIC NO. 78:**

Any Patent owned by Micron or any Third Parties that Micron contends covers the Micron Accused Products.

**TOPIC NO. 79:**

Any value of the Micron Accused Products that Micron contends is separate from that recited in the claims of the Netlist Patents-in-Suit.

**TOPIC NO. 80:**

Any Micron's systems for tracking or recording Patent licenses or other Patent-related agreements to which Micron is or was a party, and any royalty payments made subject to those agreements, including but not limited to all lists, databases, or other compilations of such information.

**TOPIC NO. 81:**

To the extent Micron contends any of the Micron Accused Products implements one or more sections of the JEDEC Standards, the specific sections of the JEDEC Standards and the factual basis for such contentions.

**TOPIC NO. 82:**

To the extent Micron contends that any claim of the Netlist Patents-in-Suit is essential to practicing any Standard, all facts and circumstances relating to such contention, including the specific section of any Standard being practiced.

**TOPIC NO. 83:**

To the extent Micron contends that any Netlist Patents-in-Suit are essential to practicing a standard, the basis for Micron's proposed (F)RAND royalty calculation.

**TOPIC NO. 84:**

To the extent Micron contents that any claim of the Netlist Patents-in-Suit is not essential to practicing any Standard, all facts and circumstances relating to such contention.

**TOPIC NO. 85:**

Micron's awareness and/or knowledge of the Netlist Patents-in-Suit and of any patent application or patent relating to any of the Netlist Patents-in-Suit, including but not limited to the date on which Micron first gained such awareness and/or knowledge and the facts and

- 28 -

circumstances relating thereto.

**TOPIC NO. 86:**

The facts and circumstances relating to any actions undertaken by Micron in response to becoming aware of the Netlist Patents-in-Suit, being accused of infringement of Netlist's Patents-in-Suit, and/or the Complaint in this Action.

**TOPIC NO. 87:**

Any evaluations, analyses, or other efforts by Micron to determine if any Micron Accused Product or any other Micron product would infringe the Netlist Patents-in-Suit, including the facts and circumstances of those efforts, the results of those efforts, any opinions of counsel relating to such efforts or patents, and any conclusion as to whether or not Micron needed or should obtain a license to one or more of the Netlist Patents-in-Suit.

**TOPIC NO. 88:**

To the extent Micron contends its accused infringement of Netlist Patents-in-Suit has not been willful, all facts and circumstances relating to the basis for Micron's contention, including the facts and circumstances relating to (1) whether Micron deliberately copied ideas or design, (2) whether Micron investigated the scope of the Patents-in-Suit and formed a good-faith belief that they were invalid or not infringed by Micron products, (3) Micron's behavior as a party to this litigation, (4) Micron's size and financial condition, (5) the closeness of the case, (6) the duration of Micron's conduct alleged by Netlist to be infringing, (7) remedial action by Micron, (8) Micron's motivation for harm, and (9) whether Micron attempted to conceal the conduct alleged by Netlist to be infringing

**TOPIC NO. 89:**

Any effort made by, on behalf of, or at the request of Micron to design around and/or

develop a non-infringing alternative to the Netlist Patents-in-Suit, including the facts and circumstances concerning such efforts, any reason for not implementing or deploying any design around or non-infringing alternative to the Netlist Patents-in-Suit, the existence or feasibility of implementing any such design around or non-infringing alternative, any plans or strategies for designing or developing any such design around or non-infringing alternative, any benefits or disadvantages of any such design around or non-infringing alternative, and the costs, engineering requirements, and/or changes necessary to implement any such design around or non-infringing alternative.

**TOPIC NO. 90:**

The facts and circumstances relating to any policy in effect now or at any point, or any practice by Micron personnel, whereby Micron employees are discouraged or prohibited, or understand themselves to be discouraged or prohibited, from reading patents and/or patent applications filed by other companies.

**TOPIC NO. 91:**

Whether Micron instructs its employees on avoiding infringement of others' intellectual property, and the programs, policies, and steps employed towards such avoidance.

**TOPIC NO. 92:**

The facts and circumstances relating to any opinions of counsel upon which Micron intends to rely on in this Action.

**TOPIC NO. 93:**

The Identification of any Micron Patents that cover the Micron Accused Products.

**TOPIC NO. 94:**

For each Micron Accused Product, the JEDEC specification(s) such Micron Accused

Products practice.

**TOPIC NO. 95:**

For each Micron Accused Product, the JEDEC specification(s) from which such Micron Accused Products deviate.

**TOPIC NO. 96:**

The role played by any Micron employees in JEDEC meetings regarding the sections of the specifications referenced in Netlist's answer and counterclaims, preliminary infringement contentions, or subsequent amendments thereto.

**TOPIC NO. 97:**

Any industry standards or practices relating to the licensing of or royalties for memory module technologies.

**TOPIC NO. 98:**

Any factual bases for Micron's defense that any of Netlist's Patents-in-Suit are subject to an express or implied license or covenant not to sue.

**TOPIC NO. 99:**

Any factual bases for Micron's inequitable conduct, and unclean hands defenses in connection with the '912 Patent.

**TOPIC NO. 100:**

Any factual bases for Micron's prosecution laches defense and prosecution history estoppel defenses.

**TOPIC NO. 101:**

Any factual bases for Micron's position that it has intervening rights with respect to the claims of the '912 patent after reexamination.

**TOPIC NO. 102:**

Any factual bases for Micron's patent marking defense and for Micron's position that any damages are limited by the doctrine of patent exhaustion.

**TOPIC NO. 103:**

Any factual bases for Micron's position that Netlist failed to offer Micron a license on reasonable terms and conditions free of unfair discrimination and that Micron is a willing licensee to Netlist's Patents-in-Suit.

**TOPIC NO. 104:**

Any factual bases for Micron's position that Netlist failed to fulfill alleged obligations to JEDEC including any factual basis for Micron's position that this alleged failure prejudiced Micron.

**TOPIC NO. 105:**

Any factual bases for Micron's laches, estoppel, and waiver defenses.

**TOPIC NO. 106:**

Any factual bases for Micron's lack of standing and absence of damages defenses.

**TOPIC NO. 107:**

Any factual bases for Micron's patent misuse defense.

**TOPIC NO. 108:**

Any factual bases for Micron's 28 U.S.C. § 1498 defense and Micron's contention that infringement, in whole or in part, is attributable to the United States government.

**TOPIC NO. 109:**

For each Micron Accused Product, any factual bases for Micron's position that the Accused

Product does not practice one or more claims of Netlist's Patents-in-Suit.

**TOPIC NO. 110:**

The disclosures of the alleged Prior Art references relied on in Your Invalidity Contentions.

**TOPIC NO. 111:**

Micron's implementation and development of any method, structure, or functions described in the alleged Prior Art references relied on in Your Invalidity Contentions.

**TOPIC NO. 112:**

Facts and circumstances relating to the public availability of each and every alleged Prior Art reference identified in Your Invalidity Contentions.

**TOPIC NO. 113:**

Facts known to Micron regarding the references You contend are Prior Art systems in Your Invalidity Contentions, including the operation, function, date of sale, dated of offer for sale, or date of public use.

**TOPIC NO. 114:**

All fact and circumstances relating to the public accessibility or lack of public accessibility of any JEDEC materials or documents Micron contends are prior art references or otherwise reflect the knowledge of a person having ordinary skill in the art.

**TOPIC NO. 115:**

Communications with Samsung or SK Hynix regarding Netlist.

**TOPIC NO. 116:**

Any factual bases for Micron's affirmative defenses.

**TOPIC NO. 117:**

Authentication, description, and circumstances of the creation of Documents identified in

Micron's interrogatory responses that are produced by Micron.

**TOPIC NO. 118:**

Any factual bases for Micron's counterclaim that Netlist violated Section 1 of the Sherman Act.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 19, 2023, a true and correct copy of the foregoing instrument was served or delivered electronically via email to all counsel of record.

<u>*/s/ Yanan Zhao*</u>
Yanan Zhao