**EXHIBIT 2**

08:03:12

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

MARK C. SCARSI, U.S. DISTRICT JUDGE

```
NETLIST, INC.,                  )
                                )
          Plaintiff,            )
                                )
     vs.                        )
                                )   8:20-CV-993-MCS
SAMSUNG ELECTRONICS CO.,        )
LTD.,                           )
                                )
          Defendant.            )
_____ )
                                )
                                )
```

REPORTER'S TRANSCRIPT OF JURY TRIAL

VOLUME II

Los Angeles, California

Wednesday, May 15, 2024

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
 1    APPEARANCES OF COUNSEL:

 2
      For the Plaintiff:
 3

 4              IRELL & MANELLA LLP
                By:  Jason Sheasby, Attorney at Law
 5                   Michael Harbour, Attorney at Law
                1800 Avenue of the Stars, Suite 900
 6              Los Angeles, California 90067

 7              IRELL & MANELLA LLP
                By:  Lisa Glasser, Attorney at Law
 8                   Matthew Ashley, Attorney at Law
                840 Newport Center Drive, Suite 400
 9              Newport Beach, California 92660

10    For the Defendant:

11              O'MELVENY & MYERS, LLP
                By:  Darin Synder, Attorney at Law
12              Two Embarcadero Center, 28th Floor
                San Francisco, California 94111
13
                O'MELVENY & MYERS, LLP
14              By:  Amy Lucas, Attorney at Law
                1999 Avenue of the Stars, 7th Floor
15              Los Angeles, California 90067

16              O'MELVENY & MYERS, LLP
                By:  Anton Metlitsky, Attorney at Law
17                   Marc Pensabene, Attorney at Law
                Times Square Tower
18              7 Times Square
                New York, New York 10036
19
                O'MELVENY & MYERS, LLP
20              By:  Marc Feinstein, Attorney at Law
                400 South Hope Street, 18th Floor
21              Los Angeles, California 90071

22

23

24

25
```

```
11:43:56   A. That is correct.
11:43:57   Q. At any point in time, anywhere in this contemporaneous
11:44:03   document, did Samsung ever say the supply obligation was
11:44:07   limited to NVDIMM-P for the JDP?
11:44:11   A. No.
11:44:14            MR. SHEASBY:  Pass the witness.
11:44:15            THE COURT:  Any recross?
11:44:16            MR. SNYDER:  Yes, Your Honor, just a couple of
11:44:19   questions.
11:44:19                     RECROSS-EXAMINATION
11:44:21   BY MR. SNYDER:
11:44:21   Q. Mr. Hong, you referred a few moments ago to a product
11:44:24   called EMMC.  Do you recall that?
11:44:27   A. Yes.
11:44:27   Q. EMMC was not used for an NVDIMM-P product, correct?
11:44:35   A. That is incorrect.  It is used for NVDIMM-P product.
11:44:39   Q. EEMMC was not used for the jointly developed product
11:44:44   under the JDLA, correct, sir?
11:44:46   A. That is incorrect.  It is specifically used for the joint
11:44:50   develop product.
11:44:51   Q. Netlist did not -- as I think you testified earlier
11:44:55   today, Netlist did not produce -- Netlist and Samsung never
11:45:01   got to the productization stage of the NVDIMM-P project,
11:45:06   correct, sir?
11:45:06   A. Sir, we had the product that we were showing Samsung.
```

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
 1 14:14:05   be.
 2 14:14:05    Q. Now, you said you had a call with Mr. Knuth where he told
 3 14:14:10   you to come up with your best guess or just give you a name,
 4 14:14:12   right?
 5 14:14:12    A. Yes.
 6 14:14:13    Q. And did you record the substance of that call in notes?
 7 14:14:16    A. Yes, we did.
 8 14:14:17    Q. Could you look at the document in front of you?  This is
 9 14:14:22   Exhibit IX13.
10 14:14:24    A. Yes, I'm looking at it.
11 14:14:25    Q. Are these the notes involving your conversation with
12 14:14:30   Neal?
13 14:14:30    A. Yes, it is.  It's our weekly update call.
14 14:14:35            MR. HARBOUR:  Your Honor, I move to admit this
15 14:14:37   exhibit into evidence.
16 14:14:39            THE COURT:  What's the exhibit number?
17 14:14:40            MR. HARBOUR:  It's IX13.  This is not in the exhibit
18 14:14:45   list, but I'm reintroducing it for purposes of rehabilitating
19 14:14:51   the witness.
20 14:14:51            THE COURT:  What will be the exhibit number be in
21 14:14:53   evidence?  Do you have a number -- do you have a regular
22 14:14:55   exhibit number?
23 14:14:58            MR. HARBOUR:  It will be Exhibit 999.
24 14:15:01            THE COURT:  999.  Okay.
25 14:15:03            Any objection to 999 coming in evidence?
```

```
14:15:06   1              MR. FEINSTEIN:  Your Honor, this wasn't on the
14:15:07   2    exhibit list.  It wasn't disclosed to us.  We object on that
14:15:10   3    ground.
14:15:11   4              THE COURT:  Okay.  Counsel, why wasn't this on the
14:15:13   5    exhibit list?
14:15:14   6              MR. HARBOUR:  Well, this exhibit is being
14:15:15   7    introduced -- it was not an exhibit we were seeking to
14:15:18   8    introduce affirmatively.  I'm bringing it up because they
14:15:22   9    attempted to impeach the witness on his cross-examination,
14:15:24  10    and I would like to introduce this exhibit to rehabilitate
14:15:28  11    the witness.
14:15:28  12              So it was not an exhibit we were intending to bring
14:15:31  13    up in our case in chief, it's just an exhibit that came up
14:15:34  14    because of the line of questioning just introduced.
14:15:36  15              THE COURT:  Let me talk to the lawyers at side bar.
14:15:38  16              (At the bench.)
14:15:48  17              THE COURT:  So counsel is indicating he's bringing
14:15:51  18    this in to rehabilitate the witness.  Do you have a response
14:15:53  19    to that?
14:15:54  20              MR. FEINSTEIN:  This document wasn't on the exhibit
14:15:56  21    list.  And it's -- I'm not even aware it was produced in this
14:16:01  22    litigation.
14:16:01  23              MR. HARBOUR:  I don't believe it was.  And again,
14:16:02  24    the only reason why I'm bringing this up is because they
14:16:05  25    tried to impeach him, and he mentioned these meeting notes.
```

```
14:16:07   1   And I wanted to show that he did not make up these meeting
14:16:10   2   notes.  He has documentary evidence on it.
14:16:12   3            THE COURT:  It wasn't produced then, right?
14:16:13   4            MR. HARBOUR:  It was not produced, no.
14:16:15   5            THE COURT:  Why wouldn't it have been produced?
14:16:16   6            MR. HARBOUR:  I don't know.  I wasn't counsel at the
14:16:18   7   time.  I don't know if it was responsive to a particular
14:16:21   8   request.
14:16:22   9            THE COURT:  I can't see how it would not be
14:16:25  10   responsive to a discovery response.
14:16:28  11            First of all, it doesn't come it because it wasn't
14:16:30  12   produced.
14:16:30  13            And second of all, I've got a concern about why
14:16:32  14   this -- why this wasn't produced.  And so I would ask counsel
14:16:35  15   to go back, dig into that, and let me know tomorrow why this
14:16:42  16   wasn't produced.
14:16:43  17            MR. HARBOUR:  We can do that, Your Honor.  I will
14:16:45  18   say that counsel of record at the time is not counsel --
14:16:47  19            THE COURT:  I don't care who counsel of record was,
14:16:50  20   and anything like that, but I do care if there was documents
14:16:53  21   that you've got in your back pocket that haven't been
14:16:56  22   produced that appear relevant.  That seems to be a pretty big
14:16:59  23   discovery violation to me.  One that might merit sanctions.
14:17:02  24   So I just want you -- before I go that far I want to hear a
14:17:05  25   little bit more about it.
```

| | |
|---|---|
| 1 14:17:06 | But this will not come in. |
| 2 14:17:08 | MR. HARBOUR: Thank you, Your Honor. |
| 3 14:17:09 | (In open court:) |
| 4 14:17:09 | BY MR. HARBOUR: |
| 5 14:17:21 | Q. Mr. Park, you also were asked -- or spoke with opposing |
| 6 14:17:25 | counsel about whether or not Netlist had ever told -- or |
| 7 14:17:30 | whether I think it was ever you personally, had ever told |
| 8 14:17:33 | Samsung that they were in breach of the agreement. And |
| 9 14:17:36 | counsel was very particular about the word choice, used the |
| 10 14:17:40 | very specific word "breach." Do you recall that? |
| 11 14:17:41 | A. Yes, I do. |
| 12 14:17:43 | MR. HARBOUR: Could we pull up Exhibit 152, please? |
| 13 14:17:43 | BY MR. HARBOUR: |
| 14 14:17:55 | Q. This was a document that we looked at earlier, and I |
| 15 14:17:57 | think you even opposing counsel showed you. Do you remember |
| 16 14:18:00 | that? |
| 17 14:18:01 | A. Yes. |
| 18 14:18:06 | Q. And I want you to look at that second paragraph in this |
| 19 14:18:10 | e-mail. This is an e-mail that was written by Paik Ki Hong. |
| 20 14:18:15 | Do you recall that? |
| 21 14:18:15 | A. Yes, I do. |
| 22 14:18:16 | Q. And remind us who Paik Ki Hong was. |
| 23 14:18:18 | A. He was our VP of operations and responsible for |
| 24 14:18:21 | procurement. |
| 25 14:18:22 | Q. And I believe this is the e-mail we discussed that he |

```
14:27:27   1   A. Which terms?  I'm sorry.
14:27:28   2   Q. The ones on the screen, joint development project and
14:27:31   3   developed product.
14:27:31   4   A. Oh, yes.
14:27:32   5   Q. Now, if Section 6.2, Samsung's supply obligation were
14:27:38   6   limited to the JDP or the developed product, would
14:27:42   7   Section 6.2, Samsung's supply obligation have had any value
14:27:49   8   to Netlist?
14:27:49   9   A. No, none whatsoever, because under this provision in
14:27:53  10   Section 2.1, Samsung retained the right to cancel or suspend
14:27:59  11   the joint development at any time and for any reason.
14:28:01  12   Q. Were you involved in reviewing all of the drafts of the
14:28:07  13   agreement that went back and forth between the parties before
14:28:09  14   it was signed?
14:28:10  15   A. Yes, I was.
14:28:11  16   Q. Did any of the drafts of the agreement or any of the
14:28:16  17   preceding documents, either from Samsung or Netlist, ever
14:28:19  18   limit the supply clause to the joint development project or
14:28:22  19   the developed product?
14:28:25  20   A. No, that was never proposed.
14:28:25  21   Q. So let's talk about what led to the final agreement.
14:28:29  22       Prior to Netlist entering into the JDLA, were you
14:28:33  23   involved in any presentations to Samsung regarding Netlist's
14:28:38  24   patents?
14:28:38  25   A. I was.
```

```
14:32:27   1    small company like Netlist.
14:32:29   2              There was some initial -- or some additional back
14:32:33   3    and forth to try to address that concern.  We made at least
14:32:36   4    one proposal in that regard.
14:32:38   5              Ultimately, Samsung said that rather than make sort
14:32:42   6    of a large payment like that, they offered supply and
14:32:46   7    products instead.
14:32:47   8    Q.  I'm going to pull up previously admitted Exhibit 101.
14:32:50   9              Do you recognize this document?
14:32:51  10    A.  I do.
14:32:53  11    Q.  What is it?
14:32:53  12    A.  This was the e-mail communicating that proposal from
14:32:58  13    Samsung to us.
14:32:58  14    Q.  Did you see it at the time that it was sent?
14:33:00  15    A.  I did.
14:33:01  16    Q.  And what is the upshot of this e-mail?
14:33:03  17    A.  The upshot is, as I said, Samsung offered to supply NAND
14:33:08  18    and DRAM, amongst other things.  Samsung said that it would
14:33:13  19    enable Netlist to grow its business, and it also said that it
14:33:17  20    would enable us to envision our -- it would enable our vision
14:33:23  21    of being a products company.
14:33:24  22    Q.  What was Netlist's reaction to Samsung's counter proposal
14:33:28  23    to supply NAND and DRAM on Netlist's request in exchange for
14:33:34  24    a license to its patents?
14:33:35  25    A.  We liked the idea.  I mean, the idea or the commitment to
```

```
1  14:33:39  supply NAND and DRAM could be incredibly valuable to
2  14:33:43  Netlist's business.
3  14:33:44          For example, you know, in times of worldwide
4  14:33:47  shortage, having a committed supply of products could be
5  14:33:51  extremely valuable to the company.  And particularly given
6  14:33:54  our history of trying to get supply from Samsung when they
7  14:33:56  had cut us off in the past and it had damaged our business,
8  14:34:00  having that commitment could be really valuable to us.
9  14:34:03    Q. Now, if Section 6.2, Samsung's supply obligation were
10 14:34:06  limited to only the joint development project or the
11 14:34:10  developed product, how if at all would that relate to the
12 14:34:13  Samsung e-mail we are looking at the screen stating supply
13 14:34:17  obligation would enable Netlist's vision of being a products
14 14:34:19  company?
15 14:34:20    A. I would have rendered this e-mail completely nonsensical,
16 14:34:25  because if it had to have been tied to the joint development,
17 14:34:30  they could have canceled that at any point for any reason and
18 14:34:34  cut off that supply.
19 14:34:35    Q. So you started with the $85 million plus an ongoing
20 14:34:41  royalty on Samsung's sales offer by Netlist and ultimately
21 14:34:45  negotiated the final Section 6.2.  What happened in the
22 14:34:48  middle of all of that?
23 14:34:48    A. Yeah, there was -- we negotiated for about six months.  A
24 14:34:52  lot of the terms changed, pretty typical in a negotiation
25 14:34:58  like this, and particularly when dealing with a large foreign
```

```
15:11:29   1   other than to the extent someone translated them for you,
15:11:32   2   correct?
15:11:32   3     A. Correct.
15:11:37   4           MR. SNYDER:  Now, could we bring up Exhibit 101,
15:11:39   5   please?
15:11:39   6   BY MR. SNYDER:
15:11:41   7     Q. You testified earlier about this e-mail from Mr. Kenny
15:11:46   8   Han.
15:11:48   9           Thank you, Dorian.
15:11:52  10           Do you recall that, sir?
15:11:53  11     A. I do.
15:11:54  12     Q. This is previously admitted.
15:11:56  13     A. I do.
15:11:56  14     Q. And I believe that you pointed to this e-mail as the
15:11:59  15   point at which Samsung proposed that it would include a broad
15:12:04  16   supply agreement in an agreement with Netlist, correct?
15:12:08  17     A. I don't know if this was the very first mention of
15:12:14  18   supply, but, yes, it was a very clear suggestion of supply.
15:12:18  19     Q. Now, you did not discuss with the jury during your
15:12:21  20   testimony the actual term sheet that came with this e-mail,
15:12:24  21   did you, sir?
15:12:25  22     A. I mentioned it in passing.
15:12:28  23           MR. SNYDER:  Could we bring up exhibit -- admitted
15:12:30  24   Exhibit 102?
15:12:30  25   BY MR. SNYDER:
```