# Exhibit A



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| NETLIST, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:22-CV-00293-JRG |
| | § | (Lead Case) |
| SAMSUNG ELECTRONICS CO, LTD, *et al.* | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Netlist, Inc.'s ("Netlist") Motion for Summary Judgment on Defendants Samsung Electronics Co., LTD, Samsung Electronics America, Inc., and Samsung Semiconductor Inc.'s (collectively, "Samsung") License Defense ("Netlist's Summary Judgment Motion"). (Dkt. No. 273.) Having considered Netlist's Summary Judgment Motion and the subsequent briefing, the Court finds that the same should be and hereby is **DENIED**.

Also before the Court is Samsung's Motion for Partial Summary Judgment that all Accused Products are Covered by Netlist's License to Samsung in the Parties' 2015 JDLA ("Samsung's Summary Judgment Motion"). (Dkt. No. 337.) Having considered Samsung's Summary Judgment Motion and the subsequent briefing, the Court finds that the same should be and hereby is **GRANTED**.

## I. BACKGROUND

### A. The JDLA

In 2015, Netlist and Samsung entered into a Joint Development and License Agreement (the "JDLA"). The JDLA has two stated purposes: (1) developing a new NVDIMM-P product, and (2) patent cross-licensing between Netlist and Samsung. (Dkt. No. 273-7.) There are three

sections of the JDLA relevant to this Motion. First, Section 3 includes a payment agreement requiring Samsung to pay Netlist $8 million in non-recurring engineering ("NRE") fees. (*Id.*) Next, Section 6.2 contains a supply agreement obliging Samsung to "supply NAND and DRAM products to Netlist on Netlist's request at competitive price." Finally, Section 8 contains a cross-license of patents between Netlist and Samsung. (*Id.*) The JDLA also authorizes either party to terminate the agreement upon written notice to the other party. (*Id.*) The termination is effective only if one party is in material breach of the JDLA and the breach is not cured within thirty (30) days. (*Id.*)

## B.  The California Action

In 2020, Netlist sued Samsung in the Central District of California (Case No. 8:20-cv-993-MCS) (the "California Action"), alleging that Samsung breached the Payment Agreement (§ 3) and the Supply Agreement (§ 6.2) of the JDLA. Netlist undertook to terminate the JDLA on July 15, 2020, and it sought declaratory judgment from the Central District of California that its termination was proper due to Samsung's alleged breach. On October 14, 2021, the Central District of California granted summary judgment in favor of Netlist, finding (1) that § 6.2 was unambiguous and that Samsung materially breached; (2) that § 3 was unambiguous and that Samsung materially breached; and (3) that Netlist effectively terminated the license agreement on July 15, 2020. After a jury trial, the court entered judgment for Netlist awarding nominal damages and declaring that Netlist properly terminated the JDLA. Samsung appealed the California Action to the Ninth Circuit. (*See Netlist, Inc. v. Samsung Elecs. Co., Inc.*, No. 22-55247 (9th Cir.) (the "Ninth Circuit Appeal")).

## C.  *Samsung I*

On December 20, 2020, Netlist sued Samsung in this Court for infringement of patents not asserted in the above-captioned case, but covering similar technology. (*See Netlist, Inc. v. Samsung Elecs. Co., Inc.*, No. 2:21-cv-463 (E.D. Tex.) ("*Samsung I*")). In *Samsung I,* Netlist asserted that

2

Samsung infringed certain asserted patents by making and selling Samsung's DDR4 LRDIMMs, DDR5 RDIMMs, DDR5LRDIMMs, DDR5 SODIMMs, and DDR5 UDIMMs, (collectively, "DDR4 and DDR5 Products") as well as its HBM2, HBM2E, and HBM3 products (collectively, "HBM Products"). Samsung asserted a license defense, claiming that the accused products were covered by the cross-license in § 8 of the JDLA.

Netlist and Samsung filed cross-motions for summary judgment on Samsung's license defense under the JDLA. (*Samsung I,* Dkt. Nos. 196, 201.) Both motions were filed after the Central District of California granted summary judgment as to Netlist's effective termination of the license agreement on July 15, 2020. Thus, both motions assumed that the JDLA had effectively been terminated at least as of July 15, 2020.

Samsung's introductory paragraph explained the purpose for its motion:

> The parties agree that Netlist granted Samsung a license to the asserted patents as part of a "Joint Development and License Agreement" ("JDLA") before filing this suit. As the Court is aware, there remains a dispute about whether Netlist permissibly terminated that license on July 15, 2020, which is the subject of appeal before the Ninth Circuit. ***But days before the close of fact discovery, Netlist disclosed for the first time its remarkable assertion that, even before the license was terminated, the license did not cover the accused products in this case.*** Instead, ***Netlist asserts the license covers only the never-commercialized NVDIMM-P joint development project.*** . . . By its expressed terms, the license covers "all semiconductor products manufactured or have manufactured by or for Samsung or its Subsidiaries" (except for foundry products) and Netlist has again and again confirmed its long held view that the license grant means what it says— ***it covers all semiconductor products, including the accused products in this case.***

(*Samsung I,* Dkt. No. 196 at 1) (emphasis added). Samsung moved for summary judgment that prior to July 15, 2020, the accused products were covered by the license under JDLA, and therefore Netlist could only claim infringement of the asserted patents for the period after the alleged termination on July 15, 2020. (*Id.*) A threshold issue to Samsung's summary judgment motion was whether the products at issue in *Samsung I* were in fact covered by the license. Accordingly, the

first substantive section in Samsung's summary judgment motion in *Samsung I* was titled "Netlist

Licensed All of the Accused Samsung Products Under the JDLA." (*Id.* at 9.) In this section,

Samsung argued the following:

> Under the plain language of the JDLA, Netlist granted Samsung a patent license for **all of Samsung's semiconductor products, including the memory products at issue in this case**. The only possible exception—for foundry products—is not at issue. See Section V.B., infra. However, Netlist suggested near the close of fact discovery that Samsung's patent license is limited to joint development project. This assertion is wrong as a matter of law, based on the plain language of the JDLA.

(*Id.* at 10) (emphasis added). Samsung argued that the **license agreements** in the JDLA and the

**joint development agreements** in the JDLA were not inextricably intertwined. (*Id.*) Rather,

Samsung argued that some sections—such as § 6 (supply of components)—concern the Joint

Development Project and the NVDIMM-P. (*Id.* at 11.) On the other hand, other sections—such as

§ 8 (cross-licenses)—do not mention or concern the Joint Development Project and the NVDIMM-

P. (*Id.* at 11.) Samsung noted that § 8 purported to license "Samsung Licensed Products"—a broad

term encompassing all Samsung semiconductor problems—rather than using the defined term "the

Developed Product" (i.e., the NVDIMM-P). (*Id.* at 12.)

In response, Netlist did not dispute that the DDR4 and DDR5 Products were covered by

the license prior to the termination of the license on July 15, 2020. Instead, Netlist only argued that

Samsung's HBM products were not covered by the license because they were "Foundry Products,"

or alternatively, the HBM products were not covered by the license because the license grant of

the JDLA encompassed only patents related to the parties' NVDIMM-P joint development project.

(*Samsung I,* Dkt. No. 264 at 1-4, 11-16.)

At the pretrial conference for *Samsung I,* Samsung alluded to the disagreement referenced

in the introductory paragraph of its motion concerning whether the license of the JDLA was limited

to cover only jointly developed products (i.e., the NVDIMM-P products) or whether it could

extend to the products at issue in *Samsung I:*

> And the JDLA by its terms was not limited—the license under the JDLA was not
> so limited to the parties' joint development products. You may recall that under the
> JDLA, the parties were to cooperate and create new products. And there was an
> issue that has been bandied back and forth about whether the license was somehow
> narrowly limited only to the jointly developed products.

(*Samsung I,* Dkt. No. 426 at 26:14-21.) However, Counsel for Samsung indicated that Netlist

seemed to not be carrying that argument forward anymore:

> I don't think that anybody is carrying that issue forward. And Netlist convinced
> Judge Scarsi that it was not so limited. And that was an issue. It was an issue that
> was presented to him, and they succeeded.

(*Id.* at 26:22-25.)

> My point is that as the briefing was developed, no one seemed to—to be focused
> on whether or not these products were the jointly developed products or not. That
> issue seemed to kind of go by the boards, as it should, because the reality is that
> JDLA was in no way limited to jointly developed products. . . . So we do have an
> issue about the foundry products.

(*Id.* at 29:9-14, 22.)

In its response brief to Samsung's summary judgment motion, Netlist took the position that

the license of the JDLA was "limited to only the **patents** protecting the parties' activities in joint

development of NVDIMM-P technologies," but it made no statements regarding the scope of the

**products** covered by the JDLA. (*Samsung I,* Dkt. No. 264 at 14.) That is, Netlist did not specifically

say that the license in § 8 of the JDLA only extended to the NVDIMM-P product, but rather stated

that the license only granted rights to Netlist patents that could protect the parties' activities in the

joint development of NVDIMM-P products. However, at the pretrial conference Netlist stated that

a Korean Tax Tribunal had already heard matters related to the scope of the license in the JDLA

and the Korean Tax Tribunal determined "that the license that Samsung received was limited to

***products*** that were part of the joint development relationship." (*Samsung I,* Dkt. No. 426 at 48:9-12.) However, Netlist qualified that "[t]his is only relevant to the HBM products" since "HBM was not part of the joint development relationship." (*Id.*) Netlist never disputed that the DDR4 and DDR5 products were covered by the license. (*Id.*)

The Court partially granted summary judgment in favor of Samsung. Specifically, the Court found that Samsung had an effective license defense up to the termination on July 15 2020, except as to the HBM products as there were issues of fact concerning whether the HBM products were "Foundry Products." The Court stated:

> I think it's replete in the record time and time again, both from the terms of the JDLA itself and the affirmative statements made by Netlist, that until July 15th, 2020, Samsung had a license defense, and after July 15th, 2020, Samsung has no license defense.

(*Id.* at 56:12-17.)

Upon the parties' request for clarification, the Court explained that the grant of summary judgment to Samsung's license defense did not extend to the HBM products because there was a material question of fact whether the HBM products were "Foundry Products" that the license explicitly excepted from the license:

> [T]here are fact issues with respect to whether the HBM products are foundry products, which would determine whether they did or did not fall within the license that existed up until July 15th, 2020. . . . But to the extent they do fall within the license, the license is in place up until January 15, 2020, under the JDLA, and that's the basis upon which I'm granting Samsung's motion.

(*Id.* at 58:8-18.)

In other words, the Court found that Samsung was undoubtedly licensed under the JDLA as to the DDR4 and DDR5 products.

### D.     The Ninth Circuit Appeal

On October 17, 2023, the Court of Appeals for the Ninth Circuit reversed and remanded the grant of summary judgment in the California Action. (*See* Case No. 22-55247). Specifically, the Ninth Circuit found (1) § 6.2 of the JDLA is ambiguous as a matter of law; (2) § 3 of the JDLA is unambiguous and Samsung ***did not*** breach § 3 as a matter of law; and (3) the Central District of California erred in finding that Netlist properly terminated the JDLA given the fact issues concerning Samsung's alleged breach of § 6.2. (*See* Dkt. No. 187-1 at 2-8.) The case was remanded to the Central District of California to determine in the first instance whether extrinsic parol evidence created a genuine issue of material fact that Samsung breached § 6.2. (*Id.* at 5.)

### E.     *Samsung II*

On August 1, 2022, Netlist filed the above-captioned suit against Samsung, 2:22-cv-293 ("*Samsung II*"). As in *Samsung I,* Samsung raised a license defense under the JDLA. (*See* Dkt. No. 20). The Ninth Circuit issued its opinion remanding the Central District of California's summary judgment grant in the middle of fact discovery in *Samsung II*. Shortly after the Ninth Circuit's remand, Samsung moved to stay this case pending resolution of the California Action. (Dkt. No. 187.) Samsung argued that the Ninth Circuit's remand meant that the JDLA was "in full force and effect." (*Id.*) Netlist opposed. Specifically, Netlist argued that this Court was the only forum that could address all issues between the parties, *i.e.*, . . . (1) [whether] the Accused Products infringe; (2) ***[whether] the Accused Products are covered by the license*** in the Joint Development and License Agreement []; and (3) [whether] Netlist properly terminated the JDLA as a result of Samsung's breach of its mandatory supply obligation." (Dkt. No. 196) (emphasis added).

The Court denied Samsung's Motion to Stay "***as premature***." (Dkt. No. 278) (emphasis added). The Court disagreed that the license agreement was in full force and effect, specifically because that issue was (and still is) "currently pending before the Central District of California."

7

(*Id.*) Accordingly, the Court stated that it "will not make comment further while that issue is squarely before another court." (*Id.*) (citing *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721 (5th Cir. 1985)). The Court found that it may "reasonably defer issues of Netlist's alleged termination of the JDLA to the Central District of California and simultaneously proceed on the other issues in this case, including Netlist's claims for patent infringement." (*Id.*)

Two days before the Court issued the Order denying Samsung's Motion to Stay, Netlist moved for Summary Judgment against Samsung's license defense. Samsung has since moved for Summary Judgment that all of the Accused Products in this case are covered by the license in the JDLA.

### F. Jury Verdict in the California Action

The Central District of California held a jury trial to determine whether or not Samsung had materially breached the JDLA, which would determine whether Netlist's termination of the JDLA on July 15, 2020 was effective. On May 17, 2024, the jury in the California Action returned a verdict in favor of Netlist finding that Samsung had in fact materially breached the JDLA.

## II. LEGAL STANDARD

### A. Summary Judgment

A motion for summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may introduce evidence affirmatively supporting its position, and is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Epps v. NCNB Nat'l Bank*, 838 F. Supp. 296, 298–99 (N.D. Tex. 1993), *aff'd*, 7 F.3d 44 (5th Cir. 1993). Alternatively, the movant can file a so-called "no evidence" motion for summary judgment, meeting its burden by establishing that "there is an absence of evidence to support the non-moving

party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In either the traditional or no-evidence context, "[s]ummary judgment reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1197 (5th Cir. 1986) (footnote omitted).

## B. Judicial Estoppel

The doctrine of judicial estoppel "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *Hall v. GE Plastic*, 327 F.3d 391, 396 (5th Cir. 2003). "Statements made in a previous suit by an attorney before the court can be imputed to a party and subject to judicial estoppel." *Id.* (*citing New Hampshire v. Maine*, 532 U.S. 742, 753 (2001)). The Fifth Circuit applies a two-pronged test: "the position of the party to be estopped is clearly inconsistent with the previous one; and that party must have convinced the court to accept that previous position." *Id.*

## C. Collateral Estoppel

"In a patent case, the law of the regional circuit determines whether [collateral estoppel, or "issue preclusion,"] applies, whereas Federal Circuit precedent governs questions involving substantive issues of patent law." *Papst Licensing GmbH & Co. v. Samsung Elecs. Co.*, 403 F. Supp. 3d 571, 601 (E.D. Tex. 2019) (citation omitted). Under Fifth Circuit law, collateral estoppel requires "(1) the issue in the current litigation is identical to the one in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the determination of the issue in the prior action was necessary to the judgment in that prior action and (4) there are no special circumstances that would render estoppel inappropriate or unfair." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008). The fourth element "applies only to the use of offensive (non-mutual) collateral

estoppel by the plaintiff." *TQ Delta, LLC v. CommScope Holding Co.*, 2023 WL 2145502, at *3 (E.D. Tex. Feb. 21, 2023) (citing *Kariuki v. Tarango*, 709 F.3d 495, 506 (5th Cir. 2013)).

## III. NETLIST'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. No. 273)

According to Netlist, there are two issues before the Court. First, "[i]s Samsung estopped from arguing that the Section 8.2 license grant is not limited [to] joint development products?" Second, "Under New York law, is it proper to import a limitation into the Section 6.2 supply clause limiting it to joint development product even when the clause is ambiguous?" The Court addresses each in turn.

### A. Judicial Estoppel

Netlist argues that Samsung's license defense necessarily fails because the license of the JDLA is limited to jointly developed products (*i.e.*, NVDIMM-Ps) and there is no dispute that the accused products in this case are not NVDIMM-Ps. (Dkt. No. 273 at 9.) In other words, Netlist argues that none of Samsung's products were ever covered by the license—***including the Accused Products in this case and the accused products in Samsung I***. (*Id.*; Dkt. No. 196 at 4.) According to Netlist, no products in existence are licensed because the only product covered is the jointly developed NVDIMM-P Product, which never materialized. Under such an interpretation, Samsung would not be entitled to any license defense—in this case or in *Samsung I*—regardless of whether or not the JDLA was terminated.

To support this claim, Netlist contends that Samsung made statements to the Ninth Circuit on appeal that the JDLA was limited to the jointly developed products (NVDIMM-Ps). (*Id.*) This, Netlist argues, is the exact opposite of what Samsung previously argued before this Court in *Samsung I* when Samsung stated "[t]he plain language of the JDLA unambiguously licenses all semiconductor products except Foundry Products and is not limited to the Joint Development Project." (*Samsung I*, Dkt. 328 at 2.)

10

Netlist argues that Samsung's positions in *Samsung I* and in the above-captioned case are "clearly inconsistent" with what Samsung argued to the Ninth Circuit. (Dkt. No. 273 at 9.) According to Netlist, the premise of Samsung's appeal was that the clauses in the JDLA (such as § 6.2) that make no mention of the parties' joint development project or the NVDIMM-P product are nonetheless implicitly limited to the joint development project or the NVDIMM-P product. (*Id.*) Netlist argues that if § 3 and § 6.2 are limited to the joint development project, then it is inconsistent for Samsung to argue that § 8 is not so limited.

Netlist cites two of Samsung's arguments to the Ninth Circuit that Netlist believes are inconsistent with Samsung's position in this case and its positions in *Samsung I*:

> [T]he recitals are very clear -- and parties put recitals in agreements to make sure language isn't tortured down the road by lawyers and courts, right? Here's what our purpose is, interpret this agreement consistent with our purpose. And when you look at the recitals, what does it say about the licenses? Whereas in connection with their collaboration hereunder, the parties wish to grant to each other a cross-license under each party's patents. The licenses are being given in connection with the collaboration. That's the joint development project.

(Dkt. No. 273-2 at 15:10-21.)

> There's other provisions in the contract that clearly relate to the joint development project, that don't also say in connection with the joint development project. That's why you have to look at the structure of the agreement in order to interpret specific language. For example, in Section 3.1, there's an $8 million NRE [non-recurring engineering] fee that's paid. It's clearly for the joint development project, but it doesn't say it's specifically for the joint development project.

(*Id.* at 8:16-24.)

In response, Samsung argues that it has not taken any inconsistent positions as to the scope of its license under § 8 of the JDLA. Samsung argues that its position is—and always has been—that the JDLA has two goals: (1) a cross-license and (2) a joint development project. (Dkt. No. 283 at 10.) Samsung argues that "[g]iven these two purposes, it is entirely reasonable to expect that

some of the JDLA's provisions, such as the supply obligation of § 6.2, are limited to joint development, where as other provisions (like the licenses) are not." (*Id.*)

The Court finds that judicial estoppel does not preclude Samsung from asserting its license defense. Samsung has not taken a position in this case that is "plainly inconsistent" with a prior position before another court.

The Court disagrees that Samsung argued to the Ninth Circuit that the recitals limit *the JDLA* to the joint development project. Rather, the Court finds that Samsung argued to the Ninth Circuit that the recitals limit *§§ 3 and 6.2 of the JDLA* to the joint development project. The issues before the Court in this case concern the scope of the license provision in § 8, which was not an issue in the California Action or Ninth Circuit Appeal.

Samsung's argument to the Ninth Circuit pertaining to the NRE payment explicitly calls out § 3.1:

> There's other provisions in the contract that clearly relate to the joint development project, that don't also say in connection with the joint development project. That's why you have to look at the structure of the agreement in order to interpret specific language. For example, *in Section 3.1*, there's an $8 million NRE [non-recurring engineering] fee that's paid. It's clearly for the joint development project, but it doesn't say it's specifically for the joint development project.

(Dkt. No. 273-2 at 8:16-24 (emphasis added)). Samsung arguing that § 3.1 is limited to the joint development project is not the "opposite" of arguing that § 8 is not so limited. Samsung has repeatedly taken the position that the JDLA comprises two agreements: (1) the joint development agreement and (2) the license agreement. *See e.g. Samsung I,* Dkt. No. 196 at 11. In *Samsung I,* in the California Action, before the Ninth Circuit, and in this case, Samsung has consistently argued that certain sections—namely, §§ 2, 4, 5, and 6—are limited to the joint development project. *See e.g., Samsung I,* Dkt. No. 196 at 11. On the other hand, Samsung has consistently argued that § 8

12

is not limited to jointly developed NVDIMM-P products, but instead covers all of Samsung's semiconductor products except for the explicitly excluded "Foundry Products." *Id.*

Similarly, Samsung's arguments concerning the recitals of the JDLA in the Ninth Circuit Appeal are not "plainly inconsistent" with its arguments before this Court. Read in context, the alleged "inconsistent statements" do not touch on the scope of § 8 in any way. Rather, Samsung argued that it did not materially breach § 6.2 of the JDLA. Samsung argued to the Ninth Circuit:

> [W]hen you go through the briefing on the issue of materiality, Netlist's argument was really, it was material because the supply obligation was a primary consideration for getting these licenses. Well, number one, if you look at the JDLA and you look at the recitals, the recitals are very clear -- and parties put recitals in agreements to make sure language isn't tortured down the road by lawyers and courts, right? Here's what our purpose is, interpret this agreement consistent with our purpose. And when you look at the recitals, what does it say about the licenses? Whereas in connection with their collaboration hereunder, the parties wish to grant to each other a cross-license under each party's patents. The licenses are being given in connection with the collaboration. That's the joint development project. And Netlist got a whole bunch of consideration in addition to this supply obligation. If there were an unlimited supply obligation, it would be called out in some fashion.
>
> . . . .
>
> But the thing I would say, though, just on the materiality, is that when you look at the record before Judge Scarsi on the 6.2 issue in materiality, Netlist's argument was that the supply obligation was the primary benefit that it received, and Judge Scarsi agreed with that. He said it was integral, this was a key component . . . and he disregarded all the other evidence in the record as to whether this was the primary benefit.

(Dkt. No. 273-2 at 15:5-16:15.) Nowhere in this argument does Samsung make representations about the scope of § 8 of the JDLA or the effect of the recitals on the scope of § 8. Rather, Samsung was countering Netlist's arguments that the supply obligation was the primary benefit/consideration of the JDLA by pointing out that Netlist received both monetary compensation and the benefit of a cross-license as consideration. In other words, Samsung did not contend that the patent licenses in the JDLA were limited by the joint development project, but

that the patent licenses were benefits that Netlist was receiving as a result of entering into the agreement as a whole, such that any alleged violation of the supply agreement was not a material breach. This is not "plainly inconsistent" with any position Samsung has taken in this Court such that judicial estoppel would apply.

The Court finds that Samsung is not estopped from arguing that the JDLA covers the Accused Products in this case.

## B. The Effectiveness of Netlist's Termination of the JDLA

Netlist argues that "[e]ven if Samsung is not estopped from arguing that the JDLA's license grant covers the Accused Products, there is no genuine dispute of material fact that Netlist properly terminated the JDLA in June of 2020." (Dkt. No. 271 at 11.) First, Netlist asks the Court to evaluate extrinsic evidence and determine that "the supply clause [§ 6.2] required Samsung to provide Netlist with NAND and DRAM products for any purpose on request." (*Id.*) Second, Netlist asks this Court to determine that "Samsung materially breached [§ 6.2]." (*Id.*)

Samsung argues that Netlist's Motion for Summary Judgment improperly invites the Court to take up issues that are within the clear jurisdiction of the Central District of California. (Dkt. No. 283 at 7-8.) Specifically, Samsung argues that both issues that Netlist puts before this Court are squarely in front of the Central District of California, which is taking up the issue of breach of § 6.2 and termination of the JDLA in light of the Ninth Circuit's remand. Samsung also points out that Netlist has not "provided any cognizable justification for its refusal to withdraw the [Motion for Summary Judgment] after the Court's stay decision made clear that the Court would not address the JDLA breach and termination issues while they are 'squarely before another court.'" (*Id.*)

This issue is moot. As the Court said in denying Samsung's Motion to Stay, the Court would "defer issues of Netlist's alleged termination of the JDLA to the Central District of California," and this Court would not make any further comment "while that issue is squarely

14

before another court."[1] (Dkt. No. 278.) A jury returned a verdict in favor of Netlist finding that Samsung breached the JDLA. The Court finds, in light of the jury's verdict in the California Action, that Samsung breached the JDLA and that Netlist effectively terminated the JDLA on July 15, 2020.

## IV.    SAMSUNG'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. No. 337)

Samsung moves for summary judgment that all of the accused products in this case are covered by the license in the JDLA. Specifically, Samsung argues that ***Netlist***—not Samsung—is estopped from relitigating the scope of § 8 of the JDLA based on the same issues being decided in *Samsung I*. Further, Samsung argues that even if Samsung is not judicially estopped, the Court should nonetheless construe the license in the JDLA as covering the accused products. The Court addresses each argument in turn.

### A.    Collateral Estoppel

Samsung argues that Netlist—not Samsung—is the party who is precluded from arguing the scope of the license of the JDLA. (Dkt. No. 315 at 4; Dkt. No. 337 at 8.) Specifically, Samsung argues that the scope of § 8 of the JDLA was an issue that was already fully litigated in *Samsung I*, and thus it argues that Netlist is barred by the doctrine of collateral estoppel from relitigating the issue. (Dkt. No. 283 at 8-12.) In *Samsung I*, Samsung argued that § 8 of the JDLA covered the accused DDR4 and DDR5 products, which were not jointly developed products (NVDIMM-Ps). (*Id.*) Samsung argues that it "opposed Netlist's improperly narrow interpretation of JDLA § 8, and presented extensive explanation of how both the structure of the contract and Netlist's own statements confirm that JDLA § 8's license extends to all (non-'foundry') Samsung semiconductor

---

[1] The Court acknowledges that Netlist could not have referenced this statement in its original motion as that motion was filed two days prior to the Court's ruling. However, the Court is very surprised that after giving clear guidance that it "will not make comment further" on the issue of breach of the JDLA, Netlist would not only continue pressing into this issue in its reply brief, but would use a majority of its pages to do so without a single mention or acknowledgement of the Court's statement. (*See* Dkt. No. 331.)

products, including memory products." (Dkt. No. 283 at 9.) Further, Samsung points out that some of the accused products in *Samsung I*—certain DDR4 LRDIMMs—are also accused of infringing in this case.

Netlist argues that Samsung's collateral estoppel argument fails for several reasons. First, Netlist argues this Court did not decide the scope of § 8 of the JDLA on summary judgment in *Samsung I*. (Dkt. No. 331 at 2; Dkt. No. 451 at 9.) Rather, Netlist contends, this Court concluded that there was a dispute of material fact as to the license scope. (*Id.*) Second, Netlist argues that the question of what was licensed before the termination was ultimately irrelevant in *Samsung I* because the Court also held as a matter of law that there was a pre-suit marking requirement under *Arctic Cat*, but no pre-suit notice as to the patents issued before the termination. (*Id.*) As such, Netlist argues, the Court did not have the occasion to reach the license scope issue there. Finally, Netlist argues that "partial summary judgment orders under Rule 56(d) are not preclusive," because it remains within the plenary power of the court to revise or set aside" such decisions based on subsequent events. (Dkt. No. 331 at 3; Dkt. No. 451 at 9) (quoting *Avondale Shipyards, Inc. v. Insured Lloyd's*, 786 F.2d 1265, 1271 (5th Cir. 1986).

The Court agrees with Samsung that collateral estoppel bars Netlist from litigating the scope of § 8 of the JDLA. All three relevant prongs of the Fifth Circuit's issue preclusion test are met in this case. In determining the present issue of collateral estoppel, the Court looks to whether "(1) the issue in the current litigation is identical to the one in the prior action; (2) the issue was fully and vigorously litigated in the prior action; [and] (3) the determination of the issue in the prior action was necessary to the judgment in that prior action[.]" *Taylor*, 553 U.S. at 891.

### a)   Identical Issue

The same issue before this Court—the scope of products covered under § 8 of the JDLA—was litigated in *Samsung I*. In this case, Netlist contends that the Accused Products are not covered

16

by the license in the JDLA because—according to its interpretation—the only products covered by the license are NVDIMM-P Products. (*Samsung I,* Dkt. No. 196.) Samsung, on the other hand, interprets § 8 to cover all Samsung semiconductor products. This is identical to the first issue presented in Samsung's summary judgment motion in *Samsung I,* which asked the Court to resolve the following issue:

> Is the scope of Samsung's license under the JDLA limited to products of the joint development project (*i.e.*, Developed Products[2], in the language of the JDLA) or does it encompass all Samsung semiconductor products, except foundry products (*i.e.*, Samsung's Licensed Products[3], in the language of the JDLA)?

(*Samsung I,* Dkt. No. 196 at 2.) The first argument of Samsung's Motion for Summary Judgment on its License Defense in *Samsung I* was that § 8 of the JDLA licensed **all accused products**, including the non-jointly developed DDR4 and DDR5 products. (*Samsung I,* Dkt. No. 196 at 10.) Further, Samsung called out in its opening brief and at oral argument that Netlist had been contending throughout the case that the license grant was limited to NVDIMM-P products. (*See e.g., id.* at 1.) Samsung explicitly argued that "the license under the JDLA was not so limited to the parties' joint development products." (*Samsung I,* Dkt. No. 426 at 26:25-26.)

The Court determined that Samsung's DDR4 and DDR5 products in *Samsung I* were covered by the license in the JDLA. The presence of an identical issue is plainly seen in Netlist's argument to have this prior ruling in *Samsung I* undone. Netlist asks the Court determine that both the accused products in this case **and those in Samsung I** are not covered by the JDLA:

> The JDLA defines the Joint Development Product as NVDIMM-P. . . . The Accused Products in this case (DDR4 LRDIMMs and RDIMMs) **and in Samsung I** (DDR4 LRDIMMs, DDR5 SoDIMMs, UDIMMs, RDIMMs, and HBMs) **are not licensed** because none of them are NVDIMM-P.

---

[2] The JDLA defines "Developed Products" as "an NVDIMM-P Product developed by the Parties hereunder pursuant the Statement of Work that meets the Product Specifications." (Dkt. No. 337-10.)
[3] The JDLA defines "Samsung Licensed Products" as "all semiconductor products manufactured or have manufactured by or for Samsung or its Subsidiaries, but excluding Foundry Products (

(Dkt. No. 196 at 4.) The scope of § 8—specifically, whether § 8 covers only jointly developed products or all of Samsung's semiconductor products—is at issue in this case and was at issue in *Samsung I*. Accordingly, the first prong of collateral estoppel is satisfied.

### b) Fully and Finally Litigated

This issue was fully and finally litigated in *Samsung I*. Samsung put two issues before the Court in *Samsung I:*

> 1. Is the scope of Samsung's license under the JDLA limited to products of the joint development project (*i.e.*, Developed Products, in the language of the JDLA) or does it encompass all Samsung semiconductor products, except foundry products (*i.e.*, Samsung's Licensed Products, in the language of the JDLA)?

> 2. Do all the accused products in this case meet the JDLA's definition of Samsung's Licensed Products and therefore all accused products sold before July 15, 2020 are licensed?

(*Samsung I,* Dkt. No. 196 at 2.) As explained above, Issue No. 1 above, *i.e.*, the scope of § 8, is the same issue that Netlist asks for the Court to determine in this case. The Court affirmatively decided this issue when it granted summary judgment that the DDR4 and DDR5 products—which are not NVDIMM-Ps—were covered by the license in the JDLA prior to its termination.

Whether or not Samsung could assert a valid license defense in *Samsung I* hinged on this issue. The accused products in *Samsung I,* as in this case, qualified as Samsung Licensed Products, but not Developed Products (or NVDIMM-Ps). If the license was limited to NVDIMM-P products, as Netlist contends here, then the accused products in *Samsung I* were not covered by the license under the JDLA. However, the Court determined that Samsung's DDR4 and DDR5 products were covered under the licensed prior to its termination. For the Court to agree with Samsung in this case, it must first undo its ruling in *Samsung I*. (*See* Dkt. No. 196 at 4.)

In its opening brief on its motion for summary judgment in *Samsung I,* Samsung stated that it put this issue before the Court because Netlist had taken the position that § 8 of the JDLA was

limited to the NVDIMM-P products. (*Samsung I,* Dkt. No. 196 at 1.) However, at the pretrial conference hearing, Counsel for Samsung indicated that Netlist seemed to be dropping its arguments that the license was limited to NVDIMM-Ps. (*Samsung I,* Dkt. No. 426 at 26:17-23.) Samsung also reaffirmed its position that "the license under the JDLA was not so limited to the parties' joint development products." (*Id.* at 26:15-16.)

Rather than rebutting Samsung's arguments the DDR4 and DDR5 products were covered by the license, Netlist shifted the focus of the argument to two separate issues not raised in Samsung's motion for summary judgment: (1) that the license was in fact terminated prior to July 15, 2020 and (2) that HBM products were "Foundry Products," the explicit exception to the license grant. Netlist argued that "the license granted under the JDLA Section 8 is necessarily limited to the development of only [jointly developed] products," but it qualified that this argument was "only relevant to the HBM products." (*Samsung I,* Dkt. No. 264 at 14; Dkt. No. 426 at 48:12.) According to Netlist, "the agreement was limited to licenses under the joint development relationship. HBM was not part of the joint development relationship." (*Id.* at 26:22-24.) However, Netlist seemingly abandoned all argument that the DDR4 and DDR5 accused products— undoubtedly not NVDIMM-Ps—were not covered by the license.

The Court agreed with Netlist that "there are fact issues with respect to whether the HBM products are foundry products." (*Id.* at 58:9-10.) With that one exception, the Court granted the motion for summary judgment, determining that Samsung had a license defense for the DDR4 and DDR5 products (and further that Samsung had a license defense for the HBM products if they were later determined to not be foundry products). (*Id.* at 56-58.) Implicit in that finding is the determination of Samsung Issue No. 1 in Samsung's favor. In other words, the Court found the JDLA "encompass[es] all Samsung semiconductor products, except foundry products (*i.e.*,

Samsung's Licensed Products, in the language of the JDLA)[.]" (*See Samsung I,* Dkt. No. 196 at 2.) If the opposite were true—if "the scope of Samsung's license under the JDLA [was] limited to products of the joint development project (*i.e.*, Developed Products, in the language of the JDLA)" as Netlist now contends is the case—then the Court could not have granted summary judgment in Samsung's favor because the products in *Samsung I* would not have been covered by the license. (*Id.*)

Netlist's arguments against the finality of the Court's determination miss the mark. First, Netlist argues that this Court "concluded there was a dispute of material fact" "[a]s to license scope." (Dkt. No. 331 at 2.) This is incorrect. The Court determined that there were "fact issues with respect to whether the HBM products are foundry products," but the Court explicitly stated that to the extent HBM products were not foundry products, *i.e.*, "to the extent they do fall within the license, the license is in place up until January 15, 2020, under the JDLA." (*Samsung I,* Dkt. No. 426 at 58:9-18.) There was no dispute of material fact concerning license scope. The issue over the scope of the license grant was decided in Samsung's favor. The Court determined that, with the exception of foundry products, the JDLA license covers all Samsung semiconductor products, meaning "that until July 15, 2020, Samsung had a license defense." (*See id.* at 56:8-17.) The remaining issue pertained only to whether the HBM products were "Foundry Products" or "Samsung Licensed Products." Further, that issue was ultimately decided against Netlist at the Rule 50(a) stage of the case. (*Samsung I,* Dkt. No. 495 at 1266:17-25.)

Second, Netlist relies on *Avondale Shipyards, Inc. v. Insured Lloyd's* for the proposition that "partial summary judgment orders under Rule 56(d) are not preclusive." (Dkt. No. 331 at 3) (citing 786 F.2d at 1271). The Fifth Circuit in *Avondale Shipyards* found that an interlocutory partial summary judgment grant was not final for the purposes of collateral estoppel. 786 F.2d at

1271. The Fifth Circuit has explained that "if a decision is not appealable under 28 U.S.C. § 1291, it is probably not final for collateral estoppel purposes." *Hacienda Recs., L.P. v. Ramos*, 718 F. App'x 223 (5th Cir. 2018). According to the Fifth Circuit, the summary judgment grant in *Avondale Shipyards* was not final because "[n]ot only [wa]s such an order not appealable," but it remained "within the plenary power of the district court to revise or set aside in its sound discretion without any necessity to meet the requirements of Fed. R. Civ. P. 60(b)." *See* 786 F.2d at 1269.

This case is distinguishable from *Avondale Shipyards*. First, Netlist fails to account for the fact that it is not merely the Court's summary judgment grant that applies the preclusive effect. At trial in *Samsung I,* the Court granted Samsung's motion for judgment as a matter of law under Rule 50(a) that the HBM products were covered by the license. Further, the Court instructed the jury at the end of the trial in *Samsung I* that the JDLA was in effect and barred damages prior to July 15, 2020:

> After the JDLA had been in effect between Netlist and Samsung for some period of time, a dispute developed between them concerning the JDLA and what it required. This dispute has already been addressed by another court, and that court has determined that Samsung no longer had a license to Netlist's patents, including the patents asserted in this case, as of the termination of the JDLA, which occurred on July the 15th, 2020. In other words, Samsung was licensed to Netlist's patents under the JDLA until July the 15th, 2020.

(*Samsung I,* Dkt. No. 469 at 1298:21-1299:4.) The jury found that Samsung infringed the asserted patents in *Samsung I* and assessed damages in the amount of $303,150,00.00. (*Samsung I,* Dkt. No. 480.) The Court entered a Final Judgment on August 11, 2023. (*Samsung I,* Dkt. No. 551.) Samsung's license defense affected the damages finding in the jury verdict and Final Judgment. Unlike *Avondale Shipyards* which settled before a final judgment could be entered, the Court entered a final judgment in *Samsung I*—which is appealable under 28 U.S.C. § 1291. The issue was fully and finally litigated.

21

### c)      Necessary to the Judgment

Netlist argues that the determination of the scope of § 8 of the JDLA was not necessary to the judgment in *Samsung I* because the issue was ultimately irrelevant after the Court held as a matter of law that there was a pre-suit marking requirement under *Arctic Cat*, but no pre-suit notice as to the only patents that issued prior to the termination (the '060 and '160 Patents). (Dkt. No. 331 at 2.) Netlist contends that the Court did not have any occasion to reach the license scope issue, but Netlist argues that if the Court had, any such determination would have been rendered moot by the Court's determination that Netlist could not seek pre-suit damages regardless of license scope. (*Id.*)

Samsung argues that the absence of pre-suit damages in *Samsung I* does not affect preclusion. (Dkt. No. 378 at 3.) Specifically, Samsung contends that its belief that it was licensed was a critical aspect in its defense against willfulness in *Samsung I*. (*Id.*) Samsung points to this Court's explanation in *Samsung I* that "up to the termination of the JDLA . . . , Samsung was licensed" and "during the period of licensure, Samsung really can't infringe . . . , and if they can't infringe, they can't willfully infringe." (Dkt. No. 378-2 at 153:5-7, 154:25-155:3, 168:16-24.)

The Court agrees with Samsung. In *Samsung I,* the Court ruled that Samsung was entitled to a license defense as a matter of law. That determination was essential to determination of damages regardless of what other alternative grounds there were for negating pre-suit damages. Both stood as independent grounds for limiting the damages in *Samsung I*. However, the fact that Samsung was licensed under the JDLA was relevant to other determinations in the jury verdict and the Court's Final Judgment including the determination of willfulness.

"Issue preclusion or collateral estoppel prevents a party from litigating an issue it previously 'litigated and lost' in another action." *Hacienda*, 718 F. App'x at 228 (quoting *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 327 (1979)). The doctrine of collateral estoppel

"prevent[s] repetitious litigation of what is essentially the same dispute." Restatement (Second) of Judgments § 27, cmt. c. (1982). Such is the case here. Samsung and Netlist litigated the issue of license scope in *Samsung I,* and Netlist lost. It now seeks to re-litigate the issue in light of the Ninth Circuit Appeal. However, the Ninth Circuit Appeal did not concern § 8 and does not disrupt this Court's findings on the scope of § 8. The Court finds that Samsung is barred by collateral estoppel from relitigating the scope of § 8 of the JDLA.

## B. Interpretation of the JDLA

Even if collateral estoppel does not apply (and even if Samsung is judicially estopped from presenting arguments about the scope of the JDLA), the construction of an unambiguous contract is a matter of law for the Court. *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007).[4]

Samsung argues that § 8 of the JDLA unambiguously extends to Samsung's semiconductor products and is not limited to jointly developed NVDIMM-P. (Dkt. No. 337 at 9.) Specifically, Samsung notes that § 8.2 containing the license from Netlist to Samsung contains no reference to the joint development project and no hint that the license is limited to the jointly developed NVDIMM-P product. (*Id.*)

Netlist argues that § 8 of the JDLA is ambiguous. (Dkt. No. 451 at 9.) Specifically, Netlist notes that Samsung successfully argued that § 6.2 of the JDLA is ambiguous to the Ninth Circuit because the supply agreement could be reasonably interpreted as being limited to the joint development project, notwithstanding that § 6.2 does not contain a word about the joint development project or the NVDIMM-P Product. (*Id.*) Netlist notes that the Ninth Circuit found, that § 6.2 was ambiguous in light of the fourth recital of the JDLA: "WHEREAS, in connection with their collaboration hereunder, the Parties wish to grant to each other a cross license under

---

[4] The JDLA states that it "shall be construed under and governed by the state laws of the State of New York without reference to its conflicts of law principles." (Dkt. No. 337-10.)

each Party's patents." (*Id.*) Netlist argues that if the fourth recital renders § 6.2 ambiguous, then the same holds true for the license grant. (*Id.*) Netlist argues that summary judgment is inappropriate in light of this ambiguity.

The Court finds that the license grant in § 8 unambiguously covers all Samsung semiconductor products—including the products in this case—not only the jointly developed NVDIMM-P Product.

First, Samsung is incorrect that the Ninth Circuit's finding of ambiguity in § 6.2 necessitates a finding of ambiguity in § 8.2. Section § 6.2 states, "Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price." (Dkt. No. 337-10 at 6.) The issue before the Ninth Circuit was whether that supply obligation was limited to Netlist and Samsung's joint development project or whether it was in reference to their business relationship as a whole. (Dkt. No. 187-1 at 2.) In other words, the issue was whether Samsung was required to continue supplying NAND and DRAM products to Netlist after their joint development project ended. That is a different issue than the issue currently before the Court. The issue currently before this Court is what products are covered by the license from Netlist to Samsung in § 8.2. The JDLA explicitly identifies what products are covered and by what patents.

Section 8.2 of the JDLA covers the license from Netlist to Samsung. It says:

> Netlist, on its own behalf and on behalf of its Subsidiaries, hereby grants, and shall grant, to Samsung and its Subsidiaries a perpetual (subject to Section 13.3), paid-up, worldwide, non-exclusive, non-transferable, non-sublicensable license under **Netlist's Licensed Patents** to make and have made (subject to Section 8.4) **Samsung's Licensed Products**, and to use, sell, offer for sale, import and otherwise transfer or dispose of such products.

(Dkt. No. 337-10 at 8) (emphasis added).

Section § 8.2 grants a license to "Netlist's Licensed Patents" for Samsung to make and have made "Samsung's Licensed Products." (*Id.*) These terms are defined by the contract. The JDLA defines "Netlist's Licensed Patents" as follows:

> **"Netlist's Licensed Patents"** means any and all Patents owned or controlled by Netlist or any of its Subsidiaries having an effective first filing date on or prior to the end of Capture Period.

(*Id.* at 3.) There is no dispute that the Asserted Patents in this case qualify as "Netlist's Licensed Patents" under the JDLA. The JDLA defines "Samsung's Licensed Products" as follows:

> **"Samsung's Licensed Products"** means *all* semiconductor products manufactured or have manufactured by or for Samsung or its Subsidiaries, but excluding Foundry Products (other than as set forth in Section 8.3).

(*Id.*) (emphasis added). There is no dispute that the Accused Products in this case are semiconductor products manufactured by "Samsung or its Subsidiaries" and that they are not "Foundry Products."

There is no room for any other reasonable interpretation of the scope of the products covered by § 8. It unambiguously covers "*all* semiconductor products manufactured or have manufacture by or for Samsung or its Subsidiaries, but excluding Foundry Products." (*Id.*)

Netlist would have § 8.2 read, "to make and have made (subject to Section 8.4) NVDIMM-P Products," but this is not what the agreement says. If the parties had desired the license grant to be limited to NVDIMM-P Products, there is a separate defined term that they could have used. The JDLA defines "Developed Product" as follows:

> **"Developed Product"** means an NVDIMM-P Product developed by the Parties hereunder pursuant to the Statement of Work that meets the Product Specifications.

(*Id.* at 2.) However, § 8.2 granted Samsung a license to make or have made "Samsung Licensed Products," not "Developed Products." Samsung had a license to Netlist's patents, including the Asserted Patents in this case, to make or have made "*all* semiconductor products manufactured or

25

have manufactured by or for Samsung or its Subsidiaries, but excluding Foundry Products." By a plain reading of the text, § 8.2 of the JDLA granting a license from Netlist to Samsung does not limit the license grant to covering only NVDIMM-P products.[5]

Samsung is incorrect that the fourth recital creates ambiguity in § 8.2, as the Ninth Circuit found with § 6.2. To assess contract ambiguity, the Court considers "the intention of the parties . . . [as] gathered from the four corners of the instrument." *Beal Sav. Bank*, 865 N.E.2d at 1213. Section 8 sets forth the parties' intention for the license to cover "Samsung Licensed Products," (*i.e.*, *all* Samsung semiconductor products except "Foundry Products").

The fourth recital does not call into doubt the parties intent for the license to cover "Samsung Licensed Products." For § 6.2, the supply obligation did not say one way or the other whether the obligation was subject to the joint development project. The Ninth Circuit found that this silence opened up § 6.2 to different reasonable interpretations as to whether the obligation was tethered to the joint development project. Section 8, on the other hand, is not silent as to what products are covered by the license. It explicitly states that "Samsung Licensed Products" are covered. Even when reading the JDLA in light of the fourth recital (understanding that the licenses are being given "in connection with [the parties'] collaboration") it defies logic to interpret the license as being limited to only covering the NVDIMM-P Product (*i.e.*, the "Developed Product") when that is a defined term in the JDLA and the license grant explicitly calls out a separate, broader term for explaining which products are covered by the license: "Samsung Licensed Products."

---

[5] Interpretation of § 8 is not before the Central District of California. This Court's deference to the Central District of California for interpretation of the JDLA does not pertain to interpretation of sections of the JDLA, including § 8, that are not squarely before that court. This Court's interpretation of § 8 in *Samsung I,* and the Court's affirmance of that interpretation here, is proper and does not risk intrusion into the Central District of California's decisional process.

The language of § 8.2 is clear and unambiguous. Samsung has an effective license to the Asserted Patents in this case under the JDLA up to July 15, 2020.[6] That license covers "*all* semiconductor products manufactured or have manufactured by or for Samsung or its Subsidiaries, but excluding Foundry Products (other than as set forth in Section 8.3)." The Accused Products in this case fall into that category. Accordingly, as the Court determined in *Samsung I,* the Accused Products were licensed up to July 15, 2020 when Netlist terminated the JDLA.

## V.    CONCLUSION

.      For the reasons stated herein, Netlist's Summary Judgment Motion (Dkt. No. 273) should be and hereby is **DENIED**. Samsung's Summary Judgment Motion (Dkt. No. 337) should be and hereby is **GRANTED**.

The parties are directed to jointly prepare a redacted version of this Order for public viewing and to file the same on the Court's docket as an attachment to a Notice of Redaction within five (5) business days of this Order.

**So ORDERED and SIGNED this 12th day of July, 2024.**

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

---

[6] Whether the JDLA was in fact terminated on July 15, 2020 depends on whether or not Samsung breached the JDLA. That issue was decided by a jury in the California Action. Since the jury in the California Action determined that Samsung materially breached the JDLA, Netlist's termination was effective July 15, 2020.