EXHIBIT 2

1  DARIN SNYDER (SB 136003)
2  dsnyder@omm.com
   O'MELVENY & MYERS LLP
3  Two Embarcadero Center, 28th Floor
   San Francisco, California  94111-3823
4  Telephone:  (415) 984-8700
5  Facsimile:   (415) 984-8701

6  MARC F. FEINSTEIN (SB 158901)
7  mfeinstein@omm.com
   AMY R. LUCAS (SB 264034)
8  alucas@omm.com
9  O'MELVENY & MYERS LLP
   400 South Hope Street, 18th Floor
10 Los Angeles, California 90071
   Telephone:  (213) 430-6000
11 Facsimile:   (213) 430-6400
12

MARC J. PENSABENE (*pro hac vice*)
mpensabene@omm.com
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
Suite 1700
New York, New York  10019
Telephone:   (212) 326-2000
Facsimile:   (212) 326-2061

13 Attorneys for Defendant
14 Samsung Electronics Co., Ltd.

15        **UNITED STATES DISTRICT COURT**
         **CENTRAL DISTRICT OF CALIFORNIA**
16

| | |
|---|---|
| 17 NETLIST INC. a Delaware corporation, | CASE NO. 8:20-cv-00993-MCS-ADS |
| 18             Plaintiff, | **DEFENDANT SAMSUNG'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW** |
| 19       vs. | **PURSUANT TO FED. R. CIV. P. 50(B)** |
| 20 SAMSUNG ELECTRONICS CO., LTD., a Korean corporation, | **OR, IN THE ALTERNATIVE, NEW TRIAL PURSUANT TO FED. R. CIV. P. 59; MEMORANDUM OF POINTS AND** |
| 21             Defendant. | **AUTHORITIES IN SUPPORT THEREOF** |
| 22 | |
| 23 | [[Proposed] Order and Declaration of Amy R. Lucas Filed Concurrently Herewith] |
| 24 | |
| 25 | Date:  August 26, 2024 |
| 26 | Time:  9:00 am |
| 27 | Location:  Courtroom 7C |
|   | Judge:   Hon. Mark C. Scarsi |

28              **PUBLIC VERSION - REDACTED**

                              i

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 26, 2024, at 9:00 am, in Courtroom 7C of the above-captioned court, located at 350 W. 1st Street, Los Angeles, California 90012, Defendant Samsung Electronics Co., Ltd. ("Samsung") will, and hereby does, move the Court, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, to enter judgment as a matter of law in favor of Samsung and against Plaintiff Netlist Inc. ("Netlist"). In the alternative, Samsung will, and hereby does, move the Court, pursuant to Rules 50(b)(2) and 59 of the Federal Rules of Civil Procedure, for a new trial.

Samsung's motion for judgment as a matter of law is made on the grounds that no reasonable juror could have concluded that the parties intended Netlist's construction of Section 6.2 of the Joint Development and License Agreement ("JDLA") when they entered into the contract. That conclusion follows from the overwhelming evidence supporting Samsung's construction, including the negotiation history, Netlist's contemporaneous statements, the course of conduct of the parties, and the commercial reasonableness of the proposed constructions. These grounds were raised in Samsung's oral motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a).

Samsung's motion for new trial is made on the grounds that the jury's verdict was contrary to the clear weight of the evidence, the Court made a number of related prejudicial instructional errors that improperly permitted the jury to find for Netlist based on the language of Section 6.2 in isolation, and at least one of the empaneled jurors made serious false representations during *voir dire*.

This motion is based on this Notice of Motion, the attached memorandum of points and authorities, the Declaration of Amy R. Lucas filed concurrently herewith, the pleadings, records, and files in this case, and such other matters that may be raised at the hearing.

Pursuant to Local Rule 7-3 and the instructions of the Court, this motion is

SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL

made following conference of counsel, including on May 28, 2024 and in subsequent communications.

DATED: June 21, 2024                 O'MELVENY & MYERS LLP

                                     By:  ___/s/ Marc J. Pensabene___
                                          Marc J. Pensabene
                                          Attorneys for Defendant Samsung
                                          Electronics Co., Ltd.

SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................... 1

II. BACKGROUND ........................................................................................ 3

III. ARGUMENT ............................................................................................. 4

    A. Samsung Is Entitled to JMOL Because No Reasonable Juror Could Have Concluded that the Parties Intended Netlist's Construction When They Entered the JDLA. ......................................... 4

        1. The Evidence Overwhelmingly Supports Samsung's Construction ..................................................................................... 4

        2. Netlist's Purported Evidence Was Insufficient to Support the Jury's Verdict .................................................................... 11

    B. At a Minimum, a New Trial Is Required ............................................ 18

        1. Clear Weight of the Evidence .................................................... 18

        2. Instructional Errors ..................................................................... 19

        3. Juror False Representations During *Voir Dire* ........................... 19

IV. CONCLUSION ........................................................................................ 23

# TABLE OF AUTHORITIES

**Cases**

*67 Wall St. Co. v. Franklin Nat'l Bank*,
    37 N.Y.2d 245 (N.Y. 1975) ........................................................................ 5

*A.J. Temple Marble & Tile, Inc. v. Long Island Rail Rd.*,
    256 A.D.2d 527 (N.Y. App. Div. 1998) .................................................... 14

*Catlin Speciality Ins. Co. v. QA3 Fin. Corp.*,
    36 F. Supp. 3d 336 (S.D.N.Y. 2014) ........................................................ 12

*Cont'l Cas. Co. v. Rapid-Am. Corp.*,
    80 N.Y.2d 640 (1993) ............................................................................... 16

*Doherty v. State Farm Gen. Ins. Co.*,
    2022 WL 2230123 (C.D. Cal. Jan. 11, 2022) ............................................ 18

*Dupree v. Younger*,
    598 U.S. 729 (2023) .................................................................................... 4

*Dyer v. Calderon*,
    151 F.3d 970 (9th Cir. 1998) ............................................................... 20, 22

*EEOC v. Go Daddy Software, Inc.*,
    581 F.3d 951 (9th Cir. 2009) ...................................................................... 4

*Evans v. Famous Music Corp.*,
    1 N.Y.3d 452 (2004) ................................................................................... 4

*Ezrasons, Inc. v. Travelers Indem. Co.*,
    89 F.4th 388 (2d Cir. 2023) ...................................................................... 14

*Faulkner v. Nat'l Geographic Soc'y*,
    452 F. Supp. 2d 369 (S.D.N.Y. 2006) ...................................................... 17

*Fed. Ins. Co. v. Ams. Ins. Co.*,
    258 A.D.2d 39 (N.Y. App. Div. 1999) ........................................................ 8

*Frost v. BNSF Ry. Co.*,
    914 F.3d 1189 (9th Cir. 2019) .................................................................. 19

*Goldman v. White Plains Ctr. for Nursing Care, LLC*,
    11 N.Y.3d 173 (2008) ............................................................................... 13

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Green v. White*,
232 F.3d 671 (9th Cir. 2000) .................................................................... 20

*Johnson v. McCullough*,
306 S.W.3d 551 (Mo. 2010) ..................................................................... 20

*Kramer v. Greene*,
142 A.D.3d 438 (N.Y. App. Div. 2016) ...................................................... 4

*Landes Constr. Co. v. Royal Bank of Can.*,
833 F.2d 1365 (9th Cir. 1987) .................................................................. 18

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*,
424 F.3d 195 (2d Cir. 2005) ..................................................................... 17

*Marin v. Const. Realty, LLC*,
28 N.Y.3d 666 (2017) ............................................................................... 13

*Matter of MPM Silicones, L.L.C.*,
874 F.3d 787 (2d Cir. 2017) ..................................................................... 10

*Murphy v. City of Long Beach*,
914 F.2d 183 (9th Cir. 1990) ............................................................. 18, 19

*Murray Walter, Inc. v. Sarkisian Bros., Inc.*,
183 A.D.2d 140 (N.Y. App. Div. 1992) ............................................... 16, 17

*Netlist Inc. v. Samsung Elecs. Co., Ltd.*,
2023 WL 6820683 (9th Cir. Oct. 17, 2023) .................................... *passim*

*Perl v. K-Mart Corp.*,
493 So. 2d 542 (Fla. Dist. Ct. App. 1986) ................................................ 20

*Robinson v. Transworld Sys., Inc.*,
876 F. Supp. 385 (N.D.N.Y. 1995) ........................................................... 14

*Schron v. Troutman Sanders LLP*,
20 N.Y.3d 430 (2013) ............................................................................... 13

*SCS Commc'ns, Inc. v. Herrick Co.*,
360 F.3d 329 (2d Cir. 2004) ....................................................................... 7

*Snapp v. United Transp. Union*,
889 F.3d 1088 (9th Cir. 2018) .................................................................. 15

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Sutton v. E. River Sav. Bank*,
 55 N.Y.2d 550 (1982) ........................................................................... 14

*Tomhannock, LLC v. Roustabout Res., LLC*,
 33 N.Y.3d 1080 (2019) ........................................................................ 13

*United States v. Eubanks*,
 591 F.2d 513 (9th Cir. 1979) ............................................................... 20

*United States v. Gonzalez*,
 214 F.3d 1109 (9th Cir. 2000) ............................................................. 20

*United States v. Perkins*,
 748 F.2d 1519 (11th Cir. 1984) ........................................................... 20

*White v. Ford Motor Co.*,
 312 F.3d 998 (9th Cir. 2002) ............................................................... 19

**Rules**

Fed. R. Civ. P. 50(b)(2) ............................................................................ 18

Fed. R. Civ. P. 59(a)(1)(A) ....................................................................... 18

SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The Court should enter judgment as a matter of law ("JMOL") in favor of Samsung because the extrinsic evidence presented at trial could lead a rational juror to only one conclusion:  the parties intended Section 6.2 of the Joint Development and License Agreement ("JDLA") to be a supply obligation limited to the parties' NVDIMM-P joint-development project.  The question under New York law is what the parties intended *when they entered the contract*.  And the evidence on that question was overwhelming and one-sided in Samsung's favor.  The negotiation history, term sheets, and Memorandum of Understanding ("MOU") made unmistakably clear that Samsung's obligation was to supply "raw materials" for the joint-development project, just as Netlist's CEO, Chuck Hong, admitted in his capacity as Netlist's corporate representative.  That history—by far the best evidence of the parties' intent at the time of the contract—unequivocally demonstrates Samsung's construction of Section 6.2 is correct and alone requires judgment for Samsung.

The rest of the extrinsic evidence confirmed that point.  When Netlist sought the approval of its Board, and when Netlist and Samsung announced the JDLA in a press release, they mentioned all the key elements in the MOU and JDLA, but did not mention any general supply obligation.  Such an omission would be inconceivable if, as Netlist posits, one of the primary rights granted to Netlist was an immensely valuable general supply right.  Indeed, Netlist's SEC Form 10-K filed after the JDLA *expressly acknowledged the lack of any general supply agreement*.

The post-signing conduct of the parties is likewise inconsistent with Netlist having an unlimited supply right.  Samsung told Netlist multiple times that the JDLA conferred no such right.  In fact, after the JDLA was signed, Netlist requested a supply contract, something that would have been unnecessary if the JDLA were

construed as Netlist argues.  And ample record evidence shows that Netlist's interpretation would be commercially unreasonable, both because it would give Netlist absolute front-of-the-line status, and because the JDLA omitted key features typical of general supply contracts.  Indeed, there was evidence that such an unlimited general supply right never existed at Samsung, and there was no evidence such an agreement ever existed in the industry.

In contrast, Netlist proffered no evidence that, ***at the time of contracting***, the parties intended Section 6.2 to be an unlimited general supply obligation.  Instead, Netlist relied heavily on its witnesses' bald, self-serving and litigation-inspired assertions of what the contract meant, in contradiction of Netlist's Rule 30(b)(6) testimony, as well as out-of-context, long after-the-fact Samsung emails that Netlist contorted into supposed "admissions."  No reasonable juror could find that any of that "evidence" overcame the overwhelming evidence supporting Samsung's interpretation.

Further, Netlist repeatedly argued (including in opening and closing) that the plain language of Section 6.2 alone resolved the case.  But that argument is directly contrary to the Ninth Circuit's holding that the contract language alone ***does not*** resolve the parties' intent because Section 6.2, read in light of the contract as a whole, "is ambiguous as a matter of law" and could support either party's reading.  Thus, as a matter of law, the language of JDLA itself—let alone the language of Section 6.2 alone—cannot support the jury's verdict.  And yet, because of instructional errors, it is very likely that the jury found for Netlist based entirely on the language of Section 6.2 in isolation.

Even if the Court disagrees, at a minimum a new trial is required, for several independent reasons.  First, even if the trial record was ***sufficient*** to support the jury's verdict, the verdict was certainly contrary to the clear weight of the evidence.  Second, instructional errors substantially prejudiced Samsung by allowing the jury

SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL

to improperly find for Netlist based on the language of Section 6.2 alone. And third, Samsung's investigation has uncovered at least one juror's serious lack of candor during *voir dire*, raising a presumption of bias that requires a new trial.[1]

Samsung thus respectfully requests that the Court enter JMOL for Samsung or, in the alternative, vacate the jury's verdict and order a new trial.

## II. BACKGROUND

In this case, the parties advanced two competing interpretations of Section 6.2. Netlist's view was that Section 6.2 required Samsung to "fulfill all NAND and DRAM orders by Netlist for whatever purpose." *Netlist Inc. v. Samsung Elecs. Co., Ltd.*, 2023 WL 6820683, at *1 (9th Cir. Oct. 17, 2023); *see also* Dkt. 553 at 31 (Instruction No. 28) ("Netlist claims that … Samsung agreed to supply NAND and DRAM products to Netlist without limitation to the parties' NVDIMM-P joint development project …."). Samsung, on the other hand, contended that Section 6.2 required it to supply NAND and DRAM products only for the parties' NVDIMM-P joint-development project. *See, e.g.*, Dkt. 553 at 31 (Instruction No. 28) ("Samsung claims that … Samsung agreed to supply NAND and DRAM products to Netlist for the parties' NVDIMM-P joint development project ….").

Following this Court's initial grant of partial summary judgment to Netlist, the Ninth Circuit reversed, rejected Netlist's *expressio unius* argument, and held that Section 6.2 is "ambiguous as a matter of law," *i.e.*, "is ambiguous as to whether Samsung's supply obligation is limited to the now-failed joint development project … or applies more broadly to the parties' overall business relationship." *Netlist Inc.*, 2023 WL 6820683, at *1-2. The case was then remanded for this Court to

---

[1] Samsung is also concurrently moving for an evidentiary hearing on Netlist's discovery abuses, the outcome of which may result in Samsung seeking a new trial or relief from judgment.

SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL

1  consider whether the extrinsic evidence created a genuine issue of material fact.  *Id.*
2  On remand, this Court held that the extrinsic evidence was disputed, Dkt. 390 at 9,
3  and tasked the jury with deciding which of the two meanings the parties intended,
4  Dkt. 553 at 31 (Instruction No. 28); Dkt. 556 (Verdict Form).

## III.   ARGUMENT

### A.   Samsung Is Entitled to JMOL Because No Reasonable Juror Could Have Concluded that the Parties Intended Netlist's Construction When They Entered the JDLA.

9  Judgment as a matter of law under Rule 50(b) is proper where no "reasonable
10  jury" could have reached the conclusion the jury in fact reached, or, in other words,
11  where the verdict is not supported by "substantial evidence."  *E.E.O.C. v. Go Daddy*
12  *Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).  "This standard largely 'mirrors'
13  the summary-judgment standard," but "in light of the trial record rather than the
14  discovery record."  *Dupree v. Younger*, 598 U.S. 729, 731-32 (2023).

15  When interpreting a contract under New York law, the ultimate question is
16  the "intention of the parties at the time they entered into the contract."  *Evans v.*
17  *Famous Music Corp.*, 1 N.Y.3d 452, 458 (2004).  Netlist bore the burden of proving
18  the parties' intent at the time of contracting by a preponderance of the evidence.  *See*
19  *Kramer v. Greene*, 142 A.D.3d 438, 440 (N.Y. App. Div. 2016).  Netlist failed to
20  satisfy that burden.

#### 1.   The Evidence Overwhelmingly Supports Samsung's Construction

23  All of the evidence at trial demonstrated that, at the time of contracting, the
24  parties intended Samsung's supply obligation under Section 6.2 to be limited to the
25  parties' NVDIMM-P joint-development project.  Because no reasonable juror could

26
27
28

4

1  conclude otherwise, Samsung is entitled to JMOL as to Netlist's first (breach of

2  contract) and third (declaratory judgment) claims for relief.[2]

3       ***Negotiation history.***  Under New York law, where a contract is ambiguous,

4  the relevant extrinsic evidence includes "conversations, negotiations and agreements

5  made prior to or contemporaneous with the execution" of a contract to ascertain the

6  "intent of the parties" at the time of contracting, *67 Wall St. Co. v. Franklin Nat'l*

7  *Bank*, 37 N.Y.2d 245, 248-49 (N.Y. 1975).  Here, the negotiation history

8  definitively shows the parties intended Samsung's construction when they entered

9  the JDLA.

10       For example, in June 2015, Netlist drafted two term sheets that provided

11  Samsung would supply NAND and DRAM only as "Raw Materials" for the parties'

12  "Technology Collaboration" or "Technology Productization."  Ex. 51

13  [JX1129A.0001-02][3] (6/9/15 term sheet); Ex. 52 [JX1037A.0002] (6/23/15 term

14  sheet).  And Netlist's Chuck Hong conceded that the reference to "raw materials" in

15  those term sheets "means components necessary for the NVDIMM-P product."  Ex.

16  48 at 357:4-7 (first term sheet); *see also* Ex. 53 at 102:4-7 (second term sheet).

17       Later, in September 2015, the parties executed the MOU, "memorializ[ing]"

18  the terms "the parties agreed on."  Ex. 48 at 364:5-10 (Chuck Hong).  "Section II"

19  of the MOU, titled "Technology Standardization and Productization," memorialized

20  the agreement with respect to the joint development project, including work to

21  "standardize an NVDIMM-P* specification" and "bring an NVDIMM-P* product to

22  market."  Ex. 54 [JX1111B.0001-02].

23

---

24  [2] The Ninth Circuit already held Samsung is entitled to judgment on Netlist's second

25  claim (breach of JDLA Section 3).

26  [3] Unless otherwise noted, all "Ex." citations refer to exhibits attached to the

27  concurrently filed Declaration of Amy R. Lucas ("Lucas Decl.").

28

SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL

Significantly, Section II of the MOU also contained a paragraph describing the parties' obligations to supply components for their NVDIMM-P collaboration. That paragraph first set forth Netlist's obligation to supply Samsung with NVDIMM-P controllers.  *Id.*  It then stated: "***Raw Materials***: Samsung will provide competitive pricing (i.e. among customers purchasing the same products and similar volumes) for the supply of Samsung NAND and DRAM."  *Id.* (emphasis added). The inclusion of Samsung's supply obligation in the section devoted to the joint-development project and the use of the term "Raw Materials" make clear that it was intended to be limited to that project.  Not surprisingly, Netlist's CEO and Rule 30(b)(6) corporate representative regarding the JDLA negotiations and communications, Chuck Hong, expressly admitted that use of "Raw Materials" in the MOU "was in reference to the [jointly developed NVDIMM-P] product."  Ex. 48 at 370:17-21; *see* Ex. 76 at 5 (30(b)(6) topics); Ex. 75 (Netlist's designations).

The undisputed evidence also showed that the parties intended the JDLA— including Section 6.2—to adhere to the MOU.  As Netlist's VP of IP & Licensing and lead JDLA negotiator, Noel Whitley, testified, the goal in finalizing the JDLA was to "document the parties' intent in the [MOU]."  Ex. 48 at 508:5-6, 536:20-22. Because there is no possible dispute that ***both*** Netlist's ***and*** Samsung's supply obligations in the MOU were limited to the NVDIMM-P joint-development project, it follows that the parties intended the same limitation in the JDLA.  *See also* Ex. 49 at 697:24-698:15 (in finalizing the JDLA, Netlist never proposed "changing the supply agreement to [cover] NAND and DRAM products for anything other than the jointly developed product").

In light of this evidence, no reasonable juror could conclude that the parties' intent at the time they entered the JDLA was to create a supply obligation that was "limitless," Ex. 55 at 262:9-14 (Sasaki), or "for whatever purpose," *Netlist Inc.*, 2023 WL 6820683, at *1, as Netlist contends.  That alone requires JMOL for

1   Samsung.  *Cf. SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004)

2   (summary judgment appropriate where "the extrinsic evidence is so one-sided that

3   no reasonable factfinder could decide contrary to one party's interpretation").

4          ***Netlist's Contemporaneous Statements.***  Similarly, the internal and external

5   statements Netlist made contemporaneously with the JDLA's signing are

6   incompatible with Netlist's interpretation of Section 6.2.  Chuck Hong testified that

7   the "primary right" Netlist received under the JDLA was "the supply guarantee from

8   Samsung of the NAND and DRAM products at our request," Ex. 47 at 198:10-14,

9   and that the purported supply right "could be incredibly valuable to Netlist's

10  business" "in times of worldwide shortage," Ex. 48 at 517:22-518:8.

11         But if Netlist had truly obtained an immensely valuable, limitless supply

12  obligation, Netlist would have showcased that, for example, to its Board of

13  Directors when outlining the deal to secure Board approval, and to the public in the

14  parties' joint press release issued after closing.  Yet neither Netlist's Board

15  presentation nor the press release included any mention of an unlimited supply.

16  Both documents highlighted the same key points: the NVDIMM-P joint-

17  development project, the $8 million payment, the $15 million loan, and the patent

18  cross-licensing.  *See* Ex. 56 [JX1147.0001] (11/6/15 draft Board agenda); Ex. 48 at

19  384:6-385:18 (concerning Board agenda); Ex. 57 [JX1355] (11/19/15 press release);

20  Ex. 48 at 387:6-10, 388:12-390:1 (concerning press release).  Neither so much as

21  alluded to any general supply obligation.

22         Indeed, the first SEC 10-K filed by Netlist after signing the JDLA was even

23  more explicit.  In that March 4, 2016 filing, Netlist announced the JDLA and

24  highlighted the NVDIMM-P joint-development project and cross-license, but made

25  no mention of an unlimited general supply obligation.  Ex. 58 [JX0481.4].  To the

26  contrary, while the 10-K paraphrased the language of Section 6.2 (*id.* at JX0481.7),

27

28

SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL

*it expressly acknowledged the lack of any general supply agreement: "We have no long-term FPGA, DRAM or NAND flash supply contracts."* *Id.* at JX0481.14.

No reasonable juror could conclude that the parties intended a monumentally valuable general supply obligation at the time they entered the JDLA when Netlist's own contemporaneous statements about it made no mention of such an obligation and expressly noted the opposite.

***Course of Conduct.*** Courts interpreting ambiguous contracts may also look to the parties' course of conduct—"the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy." *Fed. Ins. Co. v. Ams. Ins. Co.*, 258 A.D.2d 39, 44 (N.Y. App. Div. 1999). Unsurprisingly, the evidence shows that the parties proceeded for years after executing the JDLA as if it ***did not*** impose on Samsung an unlimited, general obligation to supply NAND and DRAM to Netlist.

Following execution of the JDLA, while the parties' joint-development project proceeded on one track, their normal NAND and DRAM business transactions—which started many years before the JDLA and continued well after, *see* Ex. 80 [JX1193]; Ex. 48 at 400:6-401:22 (discussing Netlist's pre-JDLA purchase history with Samsung)—proceeded on another, independent track. And it is undisputed that the NAND and DRAM purchases followed the same protocol throughout. Just as prior to the JDLA, Netlist would submit forecasts, Samsung would provide an allocation, Netlist would submit purchase orders, and Samsung would fulfill some but not all of Netlist's requests. Ex. 59 at 29:7-11, 37:9-14, 37:18-22, 45:2-6, 45:8-10, 47:24-48:4 (P. Hong); *see also* Ex. 49 at 624:16-625:24, 627:8-18 (Knuth describing protocol before and after JDLA).

The undisputed evidence also shows that Samsung communicated to Netlist several times that the JDLA was not the sort of general supply contract that Netlist now posits, and ***Netlist did not object, but instead asked for a supply agreement***.

SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL

1   For example, in 2016, Netlist asked Samsung to sign a letter stating that Netlist was
2   "authorized to purchase Samsung's full line of products" "as part of [the JDLA]."
3   Ex. 79 [JX1056.0001] (cover email); Ex. 60 [JX1056A.0001] (Netlist's draft letter);
4   Ex. 48 at 491:18-21, 492:10-494:21 (Devon Park testimony about draft letter).
5   Samsung refused to sign Netlist's draft because Netlist's ability to purchase
6   products from Samsung was unrelated to the JDLA. *See* Ex. 61 [JX1482A] (signed
7   letter omitting the JDLA); Ex. 48 at 497:22-499:9 (Devon Park testimony about
8   final letter).

9        Similarly, in February 2017, Netlist requested that Samsung provide "Better
10  product support and allocation" via either a "Vendor Managed Inventory"
11  agreement or an "Official Distributor-Partner Agreement"—both of which are types
12  of actual supply agreements. Ex. 62 [JX519A.0006, 26]; Ex. 49 at 644:18-645:22
13  (Knuth). Netlist would not have needed better "allocation" or a new supply
14  agreement if it already had a "limitless" supply via the JDLA. In fact, at that
15  February 2017 meeting in Korea, Samsung informed Netlist that the JDLA was
16  "clearly focused on Technology, and is not an avenue to support Netlist with
17  standard products." Ex. 62 [JX519A.0006]. Netlist never objected or disagreed.
18  Ex. 49 at 645:23-646:8 (Knuth).[4]

19       None of this makes sense under Netlist's proffered interpretation of
20  Section 6.2. But it makes perfect sense under the parties' actual understanding of
21  Section 6.2 at the time of contracting, *i.e.*, as being limited to the NVDIMM-P joint-
22  development project.

23

24

25  _____
    [4] As explained in Samsung's concurrent motion for evidentiary hearing, Netlist
26  withheld from discovery documents that corroborate the above and support
27  Samsung's construction.

28

SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL

***Commercial Reasonableness.*** In determining the meaning of an ambiguous contract, courts may also look to evidence of "what would be commercially reasonable." *Matter of MPM Silicones, L.L.C.*, 874 F.3d 787, 796-97 (2d Cir. 2017). Here, the record is clear that a limitless supply obligation of the sort that Netlist posits would be well beyond the bounds of commercial reasonableness.

The record is replete with evidence that there are frequent shortages in the NAND and DRAM market, including in 2017, when Netlist claims Samsung breached Section 6.2. *See, e.g.*, Ex. 48 at 405:7-11. Yet, Netlist contends that Section 6.2 imposed a "limitless" supply obligation on Samsung, Ex. 55 at 262:9-14 (Sasaki), and that Samsung was required to sell every chip Netlist requested, "no matter how much it affects other customers," Ex. 59 at 283:23-284:1, 284:3-7 (P. Hong).

Unsurprisingly, the undisputed testimony from both Netlist and Samsung makes clear that neither company had ever entered into a supply agreement that gave one customer priority over all others, as Netlist contends Section 6.2 did. *See, e.g.*, Ex. 49 at 644:10-13 (Knuth testifying an unlimited supply agreement is "unheard of"); *id.* at 754:3-8 (Metz); *id.* at 690:8-12 (Ji); Ex. 55 at 273:18-21, 274:2-5 (Sasaki testifying that Netlist did not have limitless NAND and DRAM supply agreements with any other suppliers).

Moreover, the actual supply agreements of both Netlist and Samsung contain basic features absent from the JDLA, including typically the word "supply" in the title and/or recitals, a volume provision, and specific provisions for product forecasting. *See* Ex. 48 at 378:6-13, 379:24-382:9 (Chuck Hong discussing Ex. 1486); Ex. 49 at 745:8-746:24 (Metz discussing Ex. 64 [JX1197]), 748:13-749:4 (discussing Ex. 65 [JX1198]), 749:20-750:9 (discussing Ex. 66 [JX1199]), 750:21-751:9 (discussing Ex. 67 [JX1196]). Netlist did not—and could not—offer an example of any agreement that omitted all these features and simply relied on a

single sentence in a contract about something else to impose an unbounded supply obligation.  In light of this undisputed evidence of how commercially reasonable supply agreements are structured, no reasonable juror could have concluded that the single, bare-bones sentence (buried in a "Supply of *Components*" section of the Joint Development and Licensing Agreement) was intended to create an extraordinary limitless supply obligation.

2. **Netlist's Purported Evidence Was Insufficient to Support the Jury's Verdict**

In sharp contrast to the overwhelming evidence supporting Samsung's construction, Netlist relied almost exclusively on evidence with little to no probative value under controlling law and the Ninth Circuit's ruling.  Stripped of that irrelevant "evidence," the trial record contains nothing that supports Netlist's construction, let alone rebuts the overwhelming evidence supporting Samsung's construction.

*Language of Section 6.2.*  From opening to closing, Netlist's counsel relied heavily and repeatedly on the plain language of Section 6.2 in isolation, arguing that the provision "means exactly what it says."  *See, e.g.*, Ex. 50 at 818:3-9 ("the jury may look at this contract and say, it means exactly what it says"); Ex. 49 at 794:19-21 (similar).  Indeed, in summation, Netlist's counsel showed the jury the language of Section 6.2 and framed the question as whether the jury should "write into the agreement that the supply obligation is *limited to … [the] NVDIMM-P joint development project*," Ex. 50 at 838:24-839:2—with the emphasized words shown as handwritten inserts in the contract.  Lucas Decl. ¶ 73.

But the Ninth Circuit's decision foreclosed exactly the conclusion Netlist's counsel asked the jury to draw.  That opinion found Section 6.2 "*is ambiguous as a matter of law*," explaining that "*[s]tanding alone*, the plain language of § 6.2 favors Netlist's interpretation."  *Netlist Inc.*, 2023 WL 6820683, at *2.  But, Section 6.2

SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL

*does not* stand alone, and when "[r]ead as an integrated whole … the contract's apparent purpose as derived from its title, structure, and related provisions make § 6.2 reasonably susceptible of more than one interpretation." *Id.* at *1 (citation omitted).  In other words, it would be legally improper to find for Netlist based on Section 6.2's language alone.

The problem presented by Netlist's arguments would have been solved by a jury charge warning the jury away from the "plain language" analysis Netlist's counsel pressed.  But the Court's instructions failed to do so, instead affirmatively (and erroneously) inviting the jury to do just that.  This is reflected in at least two legally erroneous aspects of the instructions: (i) charging that the "best evidence" of the parties' intent was the language in the agreement, without even explaining the agreement should be considered as a whole; and (ii) further instructing that the jury was permitted, **but not required**, to (*i.e.*, "may") rely on extrinsic evidence in determining the parties' intent, and failing to even identify the types of extrinsic evidence relevant to such an analysis.  *See* Ex. 50 at 816:2-822:22.

<u>*Written contract as "best evidence" of the parties' intent*</u>.  This aspect of the Court's charge was legally erroneous because the written contract is, by definition, **not** the "best evidence" of parties' intent if the contract is "ambiguous as a matter of law," as the Ninth Circuit held here.  *Netlist Inc.*, 2023 WL 6820683, at *1-2.  Under New York law, "[w]hen a court has determined that a contract is ambiguous, it has determined that the 'best evidence' of the parties' intent—the parties' words as memorialized in the agreement—**failed to indicate the parties' intent**," *Catlin Speciality Ins. Co. v. QA3 Fin. Corp.*, 36 F. Supp. 3d 336, 341-42 (S.D.N.Y. 2014) (emphasis added), which means that the factfinder **must** look beyond the written words to determine the parties' intent.  That is why, after concluding that the JDLA was "reasonably susceptible of more than one interpretation," *Netlist Inc.*, 2023 WL 6820683, at *1 (quotation omitted), the Ninth Circuit remanded solely for this Court

to consider the ***extrinsic evidence***. *Id.* at *2. The Ninth Circuit's principal holding was that the intrinsic evidence—*i.e.*, the "written contract"—did not resolve the parties' intent, which means that the written contract ***was not*** the best evidence of the parties' intent.

The Court explained that it would give the "best evidence" instruction "because it's in the pattern instruction." Ex. 50 at 822:17-18. But that language appears not in the pattern instruction—there is no New York pattern instruction about ambiguous contracts—but in the lengthy caselaw appendix to the pattern instruction. *See* N.Y. Pattern Jury Instr.—Civil 4:1 (Contracts—Elements). Moreover, every case cited in the appendix for the "best evidence" proposition involves construction of an ***unambiguous*** contract. *See Tomhannock, LLC v. Roustabout Res., LLC*, 33 N.Y.3d 1080, 1082 (2019) (construing unambiguous contract as matter of law); *Marin v. Const. Realty, LLC*, 28 N.Y.3d 666, 673-74 (2017) (same); *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436-47 (2013) (same); *Goldman v. White Plains Ctr. for Nursing Care, LLC*, 11 N.Y.3d 173, 176-77 (2008) (same).

It is, of course, true that in the run-of-the-mill case where the contract is unambiguous, the written contract represents the "best evidence" of the parties' intent—that is why courts may not consider extrinsic evidence in such cases. But that is obviously not true when the contract is ambiguous—in that case, the written contract does not resolve the question one way or the other. The Court's instruction that nevertheless told the jury the written contract was the "best evidence" of the parties' intent in the context of an ambiguous contract was legally erroneous and allowed—indeed, encouraged—the jury to treat Section 6.2's language as having definitively resolved the question.

The Court's erroneous "best evidence" instruction made it even more important that the jury be instructed to construe Section 6.2, not in isolation, but in

SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL

the context of the JDLA as a whole, as Samsung requested.  Ex. 50 at 821:13-17; *see Netlist Inc.*, 2023 WL 6820683, at *1 ("[I]n determining the parties' intent as to a particular provision, New York courts read 'the entirety of the agreement in the context of the parties' relationship and circumstances,' rather than isolating distinct provisions of the agreement.").  But the instructions failed to tell the jury even that.

<u>*Jury "may" consider extrinsic evidence*</u>.  The Court exacerbated the error by telling the jury that it ***may*** consider extrinsic evidence to determine the parties' intent, when the law is clear that such evidence, if offered, ***must*** be considered in the context of an ambiguous contract.  *See, e.g.*, *Sutton v. E. River Sav. Bank*, 55 N.Y.2d 550, 554 (1982) (jury's role is to "clear up the ambiguity by passing on the credibility of the extrinsic evidence and whatever inferences reasonably could be drawn therefrom"); *Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 399-400 (2d Cir. 2023) ("When a contract is ambiguous, we ***must*** determine whether extrinsic evidence provided by the parties can resolve the ambiguity.") (emphasis added); *A.J. Temple Marble & Tile, Inc. v. Long Island Rail Rd.*, 256 A.D.2d 527, 528 (N.Y. App. Div. 1998) ("Thus, the contract is ambiguous … and the Supreme Court ***must*** rely on extrinsic evidence to discern the intent of the parties.") (emphasis added); *Robinson v. Transworld Sys., Inc.*, 876 F. Supp. 385, 390 (N.D.N.Y. 1995) ("However, if the language is ambiguous, the court ***must*** consider extrinsic evidence.") (emphasis added).  The instruction was also inconsistent with the Ninth Circuit's opinion and mandate, which remanded ***solely*** for the consideration of "the extrinsic evidence."  *Netlist Inc.*, 2023 WL 6820683, at *2. The Court further exacerbated this error by failing to instruct the jury about the types of extrinsic evidence relevant under New York law to guide evaluation of the parties' intent.  Ex. 50 at 820:24-821:3.

Those instructional errors require a new trial.  *See infra* Section III.B.2.  But they are also important to the JMOL analysis because they offer a likely explanation

14

1   for why the jury found for Netlist despite the lack of any relevant extrinsic evidence

2   supporting Netlist's interpretation—the instructions created an overwhelming risk

3   that the jury would follow Netlist's counsel's improper request and find against

4   Samsung based entirely on the language of Section 6.2 in isolation.

5       ***Chuck Hong's Trial Testimony.***  Chuck Hong attempted at trial to contradict

6   his Rule 30(b)(6) deposition admissions that "raw materials" under the MOU and

7   predecessor term sheets was limited to the joint-development project.  *See* Ex. 48 at

8   355:11-16, 363:1-5, 369:19-23.  But Chuck Hong testified as Netlist's Rule 30(b)(6)

9   corporate representative regarding the JDLA negotiations and communications, Ex.

10  76 at 5; Ex. 75, and Netlist is bound by that testimony.  *Snapp v. United Transp.*

11  *Union*, 889 F.3d 1088, 1103 (9th Cir. 2018) (a corporation "cannot present a theory

12  of the facts that differs from that articulated by the designated Rule 30(b)(6)

13  representative").

14        Chuck Hong also relied heavily on a single piece of pre-JDLA evidence of the

15  parties' intent—a May 2015 Samsung term sheet that specified Samsung would

16  supply "NAND, DRAM, and/or NVDIMM-P controllers on terms to be negotiated."

17  Ex. 68 [JX0102.1]; *see also, e.g.*, Ex. 47 at 243:3-244:12 (Chuck Hong testimony

18  about May 2015 term sheet).  Netlist further pointed to an email accompanying that

19  term sheet in which a Samsung employee stated that he hoped the supply would

20  "help enable [Netlist's] vision of being a products company."  Ex. 69 [JX0101.1].

21  But the term sheet merely stated that the parties would later negotiate a supply

22  provision, and the email acknowledged that a supply obligation would help Netlist

23  develop the NVDIMM-P product.  Ex. 49 at 692:15-21.  None of that suggests any

24  intent to create an unlimited general supply obligation as opposed to a supply

25  obligation for the NVDIMM-P collaboration.  And what matters is the parties' intent

26  at the time of contracting—and the record is clear that, from June 2015 until signing,

27  the negotiations, including the later term sheets and MOU, reflected a clear intent to

28

SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL

limit the supply to "raw materials" for the NVDIMM-P joint-development project, consistent with Samsung's construction.

  ***Netlist's Purported Complaints to Samsung.*** Netlist pointed to several instances in which it claims it informed Samsung that Samsung was in breach of Section 6.2 prior to the May 2020 notice letter. *See, e.g.*, Ex. 70 [JX152] (February 2018 email from P. Hong); Ex. 71 [JX119] (June 2017 presentation). But none of those communications actually asserted a contractual right to purchase any quantity of NAND and DRAM. And even if they did, those unilateral communications— ***years after*** the contract was signed—cannot establish that the parties intended a general supply obligation at the time of contracting, particularly because there is no evidence that Samsung ever acquiesced to Netlist's claims. *See Cont'l Cas. Co. v. Rapid-Am. Corp.*, 80 N.Y.2d 640, 651 (1993) ("[T]o show a practical construction … there must have been conduct by the one party expressly or inferentially claiming as of right under the doubtful provision, ***coupled with knowledge thereof and acquiescence therein, express or implied, by the other***." (emphasis added)); *Murray Walter, Inc. v. Sarkisian Bros., Inc.*, 183 A.D.2d 140, 146 (N.Y. App. Div. 1992) (declining to consider communication "well after contract formation").

  ***Post-JDLA Samsung Internal Emails.*** Finally, Netlist pointed to several internal Samsung emails it contended were admissions that Section 6.2 was not limited to the NVDIMM-P joint-development project. *See* Ex. 50 at 836:14-19 (citing Ex. 72 [JX131] and misleadingly telling the jury that this 2018 email represented "what … folks [thought] at the time this agreement was signed" in 2015), 842:2-7 (citing Ex. 73 [JX35], November 2016 email), 869:4-8 (citing Ex. 74 [JX132], February 2018 email chain).

  To start, these one-off, unrelated internal emails are not probative of the parties' intent at the time of contracting because they are temporally removed from that crucial period. *See, e.g., LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*,

424 F.3d 195, 207 n.10 (2d Cir. 2005) ("[I]t is not clear … that the extrinsic evidence on which the court relied … was … relevant to the determination of the parties' intent at the time they entered into the [contract], nearly three years earlier."); *Murray Walter*, 183 A.D.2d at 146 (declining to consider even **external** communication sent "well after contract formation"). Additionally, those "unilateral expression[s] of one party's postcontractual subjective understanding of the terms of [an] agreement" are "not probative as an aid to the interpretation of the contract." *Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 379 (S.D.N.Y. 2006); *Murray Walter*, 183 A.D.2d at 146.

Regardless, none of the emails supports Netlist's construction for other reasons. The first email merely pastes a screenshot of Section 6.2 and states, "Pursuant to the agreement, supply for NAND and DRAM products is necessary if there is a request from Netlist." Ex. 72 [JX131]. But this is just a paraphrase of Section 6.2 and does not address the scope of the supply obligation. As the Ninth Circuit made clear, the language of Section 6.2 alone cannot resolve the question of scope. *See Netlist Inc.*, 2023 WL 6820683, at *2. The same is true of the third email, which merely states that "there is an obligation to supply NAND/DRAM at a competitive price." Ex. 74 [JX0132.1]. Moreover, the second and third emails were sent by Samsung employees who had no basis to know whether the scope of Samsung's supply obligation was broad or limited: Indong Kim, author of the second email, was involved with joint development, not sales, Ex. 49 at 727:16-18, and Netlist introduced no evidence about the responsibilities of Yong Hwangbo, author of the third email. Additionally, the subject of the second email was the letter that Netlist requested in 2016 stating that it was authorized to purchase Samsung's products and, as discussed above, Samsung refused to sign any version of the letter suggesting that the JDLA had anything to do with Netlist's authority to purchase NAND and DRAM from Samsung generally. *See supra* at 8-9. None of

these emails supports Netlist's contention that, at the time of contracting, the parties intended Section 6.2 to require Samsung to supply products to Netlist outside of the joint-development project.

### B. At a Minimum, a New Trial Is Required

At minimum, the Court must vacate the jury's verdict and grant a new trial. Under Rule 59, a new trial is appropriate "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A); *see also* Fed. R. Civ. P. 50(b)(2). It is the "***duty***" of the trial judge to "set aside the verdict … to prevent … a miscarriage of justice." *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (quotations omitted) (emphasis added). A new trial must be granted if: (i) the verdict is against the clear weight of the evidence; (ii) an erroneous jury instruction is given and the error is not harmless; or (iii) a juror was biased. While any one of those grounds would require a new trial, here, all three are present.

#### 1. Clear Weight of the Evidence

The district court must order a new trial if the jury's verdict is "contrary to the clear weight of the evidence." *Murphy*, 914 F.2d at 187; *accord Doherty v. State Farm Gen. Ins. Co.*, 2022 WL 2230123, at *2 (C.D. Cal. Jan. 11, 2022) (Scarsi, J.). Unlike a motion for JMOL, a motion for a new trial requires the Court to "to weigh the evidence as [the Court] saw it." *Murphy*, 914 F.2d at 187. The judge may "assess the credibility of witnesses" and may set aside the verdict even where the verdict is supported by substantial evidence. *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987). The Court should exercise its discretion to grant a new trial on this basis if, "having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* at 1371-72 (quotations omitted).

Here, the jury's verdict on the intended meaning of Section 6.2 is contrary to the clear weight of the evidence for the reasons explained above. *See supra* Section III.A. Even if the evidence does not require judgment for Samsung, it overwhelmingly weighed in Samsung's favor and warrants a new trial.

### 2. **Instructional Errors**

"[E]rroneous jury instructions, as well as the failure to give adequate instructions, are also bases for a new trial." *Murphy*, 914 F.2d at 187. "Jury instructions must … fairly and adequately cover the issues presented, correctly state the law, and not be misleading." *Spencer v. Peters*, 857 F.3d 789, 797 (9th Cir. 2017). A district court must grant a new trial based on erroneous jury instructions unless the error is harmless. *See Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1198 (9th Cir. 2019) (erroneous instruction requires new trial unless non-moving party shows "it is more probable than not that the jury would have reached the same verdict" absent the error).

As explained *supra*, Section III.A.2, the Court's instructions were inconsistent with the Ninth Circuit's decision and New York law in multiple respects, and improperly allowed the jury to rely on the language of Section 6.2 in isolation to find for Netlist. And the error was undoubtedly prejudicial because that is exactly what Netlist asked the jury to do. Netlist's counsel expressly and repeatedly asked the jury to find for Netlist based entirely on the language of Section 6.2 in isolation, *see, e.g*, Ex. 50 at 838:24-839:2, 840:19-23—a result the Court's instructions should have foreclosed but instead invited.

### 3. **Juror False Representations During *Voir Dire***

Finally, a new trial is required because of false representations by jurors during *voir dire* that concealed material facts.

"The presence of a biased juror cannot be harmless; the error ***requires*** a new trial without a showing of actual prejudice." *Dyer v. Calderon*, 151 F.3d 970, 973

19

n.2 (9th Cir. 1998) (en banc) (emphasis added).  A party may obtain a new trial by showing either "***actual* or *implied***" bias on the part of any single juror—that is, "bias in fact or bias conclusively presumed as a matter of law."  *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000) (quotations omitted).  Any "[d]oubts regarding bias must be resolved against the juror."  *Id.* at 1114 (quotations omitted).

Bias is presumed where a juror "lies in order to secure a seat on the jury." *Dyer*, 151 F.3d at 983; *see also Green v. White*, 232 F.3d 671, 677 & n.7 (9th Cir. 2000).  That is so because a juror who "lies materially and repeatedly in response to legitimate inquiries about her background introduces destructive uncertainties into the process," even in the absence of actual bias.  *Dyer*, 151 F.3d at 983.  Such a juror "can be expected to treat her responsibilities as a juror … with … scorn," and "may believe that the witnesses also feel no obligation to tell the truth and decide the case based on her prejudices rather than the testimony."  *Id.*

The presumption of bias is all the more compelling where a juror deliberately conceals her own litigation history or personal connection to legal issues relevant to the trial.  *See, e.g.*, *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979) (new trial required where juror in heroin-related prosecution concealed that he had two sons in prison for heroin-related offenses); *United States v. Perkins*, 748 F.2d 1519, 1522-23 (11th Cir. 1984) (new trial required where juror falsely represented in *voir dire* he had not been involved in prior litigation, because juror's "dishonesty, in and of itself, [was] a strong indication" of bias and juror's "involvement in prior similar litigation" created "additional inference of bias").[5]

---

[5] State courts have reached similar conclusions.  *E.g.*, *Johnson v. McCullough*, 306 S.W.3d 551, 558 (Mo. 2010) (new trial required, and bias and prejudice presumed, where juror intentionally concealed litigation history in *voir dire*); *Perl v. K-Mart Corp.*, 493 So. 2d 542, 543 (Fla. Dist. Ct. App. 1986) (remanding for new trial where juror failed to disclose involvement in previous lawsuits).

SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL

Here, four of the 16 jurors (3, 12, 13, and 16) questioned during *voir dire* (three of the eight empaneled—Jurors 3, 12, and 16) failed to disclose prior litigations, with the failure by one juror—Juror 16—being decidedly serious.  Lucas Decl. ¶¶ 2-41.  Juror 16 did not raise her hand when asked during *voir dire* whether a lawsuit had ever been filed against her, or whether she had ever filed a lawsuit herself.  Ex. 1 at 51:16-21.  Nor did she raise her hand when asked whether she had ever been involved in a contract dispute.  *Id.* at 51:2-15.  Yet investigation has revealed that Juror 16's representations on these questions were false, ███████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████



These are not the sorts of minor lies that *Dyer* explained might be "immaterial to the fairness of [a] trial," like a juror "fail[ing] to mention a magazine he subscribes to" or "exaggerat[ing] the importance of his job." *Dyer*, 151 F.3d at 984.

Juror 16 must have known that disclosing those and the numerous other lawsuits would have materially impacted her chances of serving on the jury. In these circumstances, as in *Dyer*, the Court must infer that she "lied in order to preserve her status as a juror," giving rise to a conclusive presumption of bias. *Id*. at 982.

At a minimum, Juror 16's lies deprived Samsung and the Court of an opportunity to explore her litigation history to uncover any actual or implied bias. A new trial is plainly required.

SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL

## IV.   CONCLUSION

For the foregoing reasons, Samsung respectfully requests that the Court enter JMOL for Samsung pursuant to Rule 50(b) or, in the alternative, vacate the jury's verdict and order a new trial pursuant to Rule 59.

DATED: June 21, 2024          O'MELVENY & MYERS LLP

By:   _/s/ Marc J. Pensabene_
Marc J. Pensabene
Attorneys for Defendant Samsung

# **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Samsung Electronics Co., Ltd., certifies that this brief contains 6,988 words, which complies with the word limit of Local Rule 11-6.1.

DATED:  June 21, 2024        By: */s/ Marc. J. Pensabene*
                                                    Marc J. Pensabene

SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL