# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| NETLIST, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:22-cv-293-JRG |
| | ) | |
| SAMSUNG ELECTRONICS CO, LTD; | ) | JURY TRIAL DEMANDED |
| SAMSUNG ELECTRONICS AMERICA, | ) | |
| INC.; SAMSUNG SEMICONDUCTOR | ) | ████████████████ |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

## NETLIST'S MOTION FOR A PRELIMINARY INJUNCTION AND THEN A SUBSEQUENT PERMANENT INJUNCTION UPON THE RESOLUTION OF ALL POST-TRIAL MOTIONS

## TABLE OF CONTENTS

                                                                                          **Page**

I.     FACTUAL BACKGROUND ..................................................................................... 1

       A.    The Relationship Between Netlist and Samsung ......................................... 1

       B.    The '608 Patent and the Infringing DDR4 LRDIMMs ................................. 4

II.    Legal Standard ............................................................................................................ 5

III.   Netlist's Request for a Preliminary Injunction ........................................................ 6

IV.    Netlist's Request for a Permanent Injunction ......................................................... 6

       A.    Netlist Has Suffered Irreparable Harm ........................................................ 6

             i.     Samsung's Infringement Forced Netlist to Directly Compete
                    with Infringing Products, Resulted in Lost Customers, and
                    Rendered Netlist's Proprietary Products Obsolete ........................... 6

             ii.    Samsung's Infringement Irreparably Harmed Netlist's
                    Reputation .............................................................................................. 8

             iii.   Netlist's Injury is Traceable to Samsung's Infringement of the
                    '608 Patent .............................................................................................. 9

       B.    Monetary Damages Are Inadequate to Compensate for Netlist's
             Injury ......................................................................................................... 10

       C.    The Balance of Hardships Favors an Injunction ..................................... 14

       D.    The Public Interest Would Not Be Disserved by an Injunction .............. 15

V.     Conclusion ................................................................................................................ 15

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acumed LLC v. Stryker Corp.,*
    551 F.3d 1323 (Fed. Cir. 2008) ................................................................................. 13, 14

*Amoco Prod. Co. v. Vill. of Gambell,*
    480 U.S. 531 (1987) ........................................................................................................ 6

*Apple Inc. v. Samsung Elecs. Co. Ltd.,*
    735 F.3d 1352 (Fed. Cir. 2013) ....................................................................... 9, 10, 13, 14

*Apple Inc. v. Samsung Elecs. Co., Ltd.,*
    809 F.3d 633 (Fed. Cir. 2015) ............................................................................. 9, 11, 15

*Celsis In Vitro, Inc. v. CellzDirect, Inc.,*
    664 F.3d 922 (Fed. Cir. 2012) .......................................................................................... 8

*Douglas Dynamics, LLC v. Buyers Prods. Co.,*
    717 F.3d 1336 (Fed. Cir. 2013) ................................................................... 6, 10, 14, 15

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) ............................................................................................... 6, 9, 13

*Edwards Lifesciences AG v. CoreValve, Inc.,*
    699 F.3d 1305 (Fed. Cir. 2012) ................................................................................. 5, 6

*In re Fort Worth Chamber of Com.,*
    100 F.4th 528 (5th Cir. 2024) ....................................................................................... 1

*Genband US LLC v. Metaswitch Networks Corp.,*
    861 F.3d 1378 (Fed. Cir. 2017) ....................................................................................... 9

*i4i Ltd. P'ship v. Microsoft Corp.,*
    598 F.3d 831 (Fed. Cir. 2010) .................................................................... 8, 12, 14, 15

*Metalcraft of Mayville, Inc. v. The Toro Co.,*
    848 F.3d 1358 (Fed. Cir. 2017) ....................................................................................... 6

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.,*
    702 F.3d 1351 (Fed. Cir. 2012) ....................................................................................... 7

*Robert Bosch LLC v. Pylon Mfg. Corp.,*
    659 F.3d 1142 (Fed. Cir. 2011) ..................................................................................... 14

*SiOnyx, LLC v. Hamamatsu Photonics K.K.,*
    2019 WL 3358599 (D. Mass. 2019), *aff'd.,* 981 F.3d 1339 (Fed. Cir. 2020) ......................................12

*SynQor, Inc v. Artesyn Techs., Inc.,*
    2011 WL 238645 (E.D. Tex. Jan. 24, 2011) ..................................................................................7

*Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am.,* Inc.,
    895 F.3d 1304 (Fed. Cir. 2018).........................................................................................................11

*Wirtgen Am., Inc. v. Caterpillar, Inc.,*
    2024 WL 4216057 (D. Del. Sept. 17, 2024) ...............................................................................12

**Statutes**

35 U.S.C. § 283...........................................................................................................................1, 5

Judgment having been entered, Netlist respectfully requests that the Court grant a preliminary injunction under 35 U.S.C. § 283 barring Samsung from continuing to infringe U.S. Pat. No. 10,268,608 (the "'608 patent") by making, using, importing, selling, and/or offering to sell in the United States infringing DDR4 LRDIMMs with speeds of 2400 MT/s and above unless the infringing functionality is permanently disabled. The jury found the asserted claims 1 and 5 of the '608 patent infringed and not invalid. Netlist is moving for **both** a preliminary and permanent injunction. The product found to infringe the patent is a DDR4 LRDIMM. LRDIMMs are used exclusively in servers. Samsung's corporate representative testified at trial that for these products, "[i]n the next two to three years, I would say you will not see it much at all, especially in servers." Trial Tr. 723:19-724:8. The post-trial process on all issues in the case will be lengthy, especially when taking into account appeal time. Samsung delayed this trial by seven months via continuances. Delay in the determination of Netlist's right to an injunction will *de facto* remove the possibility of any injunction. It is for this reason that Netlist seeks a preliminary injunction, which can be immediately appealed. *See In re Fort Worth Chamber of Com.*, 100 F.4th 528, 533 (5th Cir. 2024) ("It's generally understood that a motion for preliminary injunctive relief 'must be granted *promptly* to be effective,' so if a district court does not timely rule on a preliminary-injunction motion, it can effectively deny the motion."). Netlist requests that upon decision on all post-trial motions the Court convert the injunction to permanent.

## I.      FACTUAL BACKGROUND

### A.      The Relationship Between Netlist and Samsung

Netlist has never licensed its intellectual property except as a part of a strategic agreement, specifically one that requires supply of product. Trial Tr. 1096:13-18 (Kindler). The patents in this case, including the '608 patent, are the result of Netlist's pioneering research and development of its proprietary HyperCloud memory modules, the first commercialized LRDIMM. Trial Tr. 209:23-25 (Milton) ("Q. What patent development program -- what development program

resulted in the patents-in-suit? A. That was our HyperCloud development product."). At the time
it was released, HyperCloud was the "highest density, highest performance memory module for
servers." Trial Tr. 202:21-203:1. HyperCloud was qualified by leading server companies of the
day including IBM and HP, earning Netlist a reputation as an innovator. Trial Tr. 231:16-232:7.
Netlist disclosed its HyperCloud design to Samsung in a presentation in May 2012, seeking to
form a partnership for development of its next-generation DDR4 HyperCloud product. PX-12
at 43 (HyperCloud meeting presentation) (Netlist requesting "Long term relationship [that]
extends to DDR4 HCDIMM"), at 27 ("IBM introduces the new Netlist 16GB HyperCloud
DIMM . . ."); Trial Tr. 234:3-6 (Milton) ("Q. What DDR technology was Netlist proposing
Samsung use with the HyperCloud DIMM? A. So we were proposing a partnership for DDR4
doing HyperCloud for DDR4."); *id.* 291:14-19 (HyperVault "was based on an LRDIMM form
factor"). The evidence at trial showed that Netlist's historical customers included Dell, IBM,
Cisco, and HP. PX-30 at 10. ████████████████████████████

████████████████████████████████  ████████████████████

████████████████████████████████████

     In response to Netlist's HyperCloud research, Samsung took two steps. First, it refused
to give Netlist access to DDR4 chips, preventing Netlist from marketing HyperCloud at DDR4.



████████████████████████████████████  Samsung openly admitted it cut off supply to
Netlist before the JDLA:

PX-11 at 1.  Second, Samsung adopted Netlist's patented designs at DDR4.  The adopting of

Netlist's technology at DDR4 destroyed Netlist's ability to market its own products.  *See* Trial Tr.

305:13-23 (Milton) ("Q. And what was the impact of being able to sell HyperCloud at DDR4

based on that? A. Well, DDR4, we -- you know, the whole industry had gone away or had, you

know, adopted our idea, so we weren't able to sell."); 1035:10-15 (Hong) ("Q. And so you

wouldn't consider Samsung a competitor; is that right? A. Samsung becomes a competitor when

they take our high-end technology and water it down into a commodity product.  And when they

do that, it makes it difficult for us to sell our proprietary solutions.").  Netlist markets DDR4

DIMM products that practice the patents-in-suit.  Trial Tr. 203:21-23 (Milton).  And these

products are offered up to speeds of 3200 MT/s.  Trial Tr. 888:13-16 (McAlexander).

In November 2015, Netlist and Samsung entered into a Joint Development and License

Agreement ("JDLA").  The agreement required Samsung to "supply NAND and DRAM

products to Netlist on Netlist's request at competitive price."  JX-51 § 6.2.  Samsung also agreed

to partner with Netlist to develop a new memory product called NVDIMM-P.  JX-51 § 5.1.  In

exchange, Samsung would receive a cross-license to Netlist's patents (including the '608 patent

when it issued) and gain access to Netlist's highly valuable memory module technology along with

Netlist's technical expertise and knowhow.  JX-51 § 5.4.  The immediate impact of the agreement

was "dramatic," and allowed Netlist to grow its sales by a factor of ten.  Trial Tr. 246:15-20.

Samsung was aware of the importance of this supply to Netlist's business and used this

supply commitment as part of the consideration for Netlist entering into the JDLA.  *See* JX-18

(Samsung's VP of Strategic Planning Kenny Han: "we hope the supply of NAND, DRAM, and

NVDIMM-P related chipsets will help enable your vision of being a products company"); Trial

Tr. 632:16-633:3.  Instead of complying with its obligations, however, Samsung breached the

supply commitment and prevented Netlist from realizing its goal of competing in the market at the same level as it had before.  After a number of years, Samsung abruptly changed course and informed Netlist that "Samsung had zero allocation in Q3 to support Netlist and/or the end customers Netlist is currently supporting."  PX-20 at 1; Trial Tr. 705:1-7.  Samsung acknowledged in internal emails that, "[s]ince Samsung is nearly 100% of [Netlist's] support and Revenue this will have a dramatic impact on their financials and future business."  PX-20 at 1.

The evidence shows this is exactly what happened.  Netlist lost "many customers" as a result of not being able to supply products to its existing customers.  Ex. 3 ███████████ ████████████████████████████████████████████████████████████████████████ ██████████; *see also* PX-4 at 1 (Netlist email to Samsung explaining "[t]hese drastic changes [in supply] have impacted our business and impacted our ability to support our customers").  PX-16 at 13 (listing Uber and Riot Games among others as "high-end customers").  When it became clear that Samsung had no intention of honoring its commitments under the JDLA, Netlist sent Samsung a notice of termination of the JDLA in August 2020.  In April 2021, Netlist then entered into a Strategic Supply and License Agreement with SK Hynix that allows it to source and sell DRAM modules from SK Hynix.  The record at trial established that this source of supply "saved us" because "we were able to get product and sell it."  Trial Tr. 260:10-16 (Milton).

Netlist filed this suit in August 2022.  Dkt. 1.  On September 16, 2022 the PTAB declined finally to institute an IPR proceeding on '608 patent filed by Micron.  Ex. 7.  On January 20, 2023, Netlist moved to add the '608 patent to this case.  Dkt. 62.  The jury returned a verdict that Samsung materially breached the contract between the parties by not supplying requested DRAM and NAND memory products and thus Netlist properly terminated the agreement.  Ex. 8.

### B.    The '608 Patent and the Infringing DDR4 LRDIMMs

The '608 patent was read on the application of MDQ/MDQS write delay control words and MDQ read delay control words by the data buffers in Samsung's DDR4 LRDIMMs.  Trial

Tr. 445:21-448:14, discussing JX-27, Tables 72-75; Tables 68-71). The control words in these buffers are supplied via training modes known as MRD and MWD. Trial Tr. 448:15-449:16; JX27 at 35. ██████████████████████████████████████████

██████████████████████   ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████   ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

Samsung claimed throughout trial that DDR4 LRDIMMs are old technology that will be phased out shortly. Trial Tr. 723:19-724:8; 1247:16-19 ("These are very old products . . . ."). Samsung admits that SK Hynix can supply the exact same DDR4 LRDIMM functionality:

> Because hynix and Samsung are kind of the Hertz and Avis of this business. We heard that. They are the biggest competitors out there. But, remember, these products are not really different from one another at all. Remember, these are standard products. . . . So they all have to have the same technology in it. We heard over and over again that, well, Samsung is making use of this technology. Well, ladies, **hynix is making the exact same use. It's the same products. They have to be the same products**. Trial Tr. (Samsung Closing) 1264:18-1265:5.

## II.    LEGAL STANDARD

"A patentee's right to exclude is a fundamental tenet of patent law." *Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012); 35 U.S.C. § 283. To obtain an injunction, Netlist must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).  "Absent adverse equitable considerations, the winner of a judgment of validity and infringement may normally expect to regain the exclusivity that was lost with the infringement."  *Edwards*, 699 F.3d at 1314.

## III.    NETLIST'S REQUEST FOR A PRELIMINARY INJUNCTION

Netlist addresses the preliminary injunction factors below in the context of the permanent injunction analysis.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987).  A preliminary injunction also requires a showing of likelihood of success on the merits.  *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1364 (Fed. Cir. 2017).  Netlist can make that showing here: the jury found claims 1 and 5 of the '608 patent infringed and not invalid (Dkt. 847); and Samsung has dropped its equitable defenses to enforcement of the '608 patent (Dkt. 839).

## IV.    NETLIST'S REQUEST FOR A PERMANENT INJUNCTION

### A.  Netlist Has Suffered Irreparable Harm

Samsung's infringement has irreparably harmed Netlist by forcing it to directly compete with products incorporating its patented features and depriving it of a market for its own products that practice the '608 patent.  Netlist builds its own DDR4 LRDIMM-interface products that practice the patents-in-suit.  DTX-25.6 ("Using an industry standard DDR4 LRDIMM interface, we believe HybriDIMM. . . ."); Trial Tr. 203:21-23 (Milton) (Netlist's DDR4 products practice the patents-in-suit); Trial Tr. 1265:4-5 ("[H]ynix is making the exact same use. It's the same products. They have to be the same products.").

> i.    <u>Samsung's Infringement Forced Netlist to Directly Compete with Infringing Products, Resulted in Lost Customers, and Rendered Netlist's Proprietary Products Obsolete</u>

"Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions."  *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013)).  "Direct competition" between the parties "suggest[s] strongly the

potential for irreparable harm without enforcement of the right to exclude." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012); *SynQor, Inc v. Artesyn Techs., Inc.*, 2011 WL 238645, at *3 (E.D. Tex. Jan. 24, 2011) ("SynQor has demonstrated irreparable injury. SynQor directly competes with Defendants in the market for unregulated and semi-regulated bus converters, and this fact weighs heavily in the Court's analysis.").

The Court observed that "a delay in the proceedings would be prejudicial to Netlist as a competitor to Samsung." Dkt. 782 at 6; *see also* Dkt. 689 at 3-4 (same). The evidence at trial further confirmed that Samsung's conduct caused irreparable harm to Netlist's business. For example, Mr. Milton testified that with respect to HyperCloud, "Samsung was concerned that there might be some competitive issues with their Samsung RDIMM and LRDIMM products." Trial Tr. 234:7-11; ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████; *see also* Trial Tr. (Milton), 305:13-23 (explaining Samsung's actions as a result of Netlist's competition for IBM business was to cut off supply).

Netlist lost several long-term customers as a result of Samsung's infringement. Samsung launched its DDR4 LRDIMMs in 2014. Trial Tr. 734:22-735:1. At the time, Netlist was selling its LRDIMM HyperCloud product and looking to develop a next-generation version for DDR4. Trial Tr. 234:3-6. Netlist's inability to commercialize a proprietary DDR4 LRDIMM product was the direct result of Samsung's infringement:

> Q. And did anything happen after Samsung became aware that Netlist was selling the HyperCloud product to IBM?
> A. Yes, it did.
> Q. What happened?
> A. So my understanding is, is that we stopped getting some supply from Samsung to build that product.
> Q. And what was the impact of being able to sell HyperCloud at DDR4 based on that?
> A. Well, DDR4, we -- you know, ***the whole industry had gone away*** or had, you know, adopted our idea, so we weren't able to sell. Trial Tr. (Milton) 305:13-23.

Netlist's CEO Mr. Hong also testified that Samsung's "watered-down" commodity products

made it difficult for Netlist to sell its proprietary products such as HyperCloud:

> Q. And so you wouldn't consider Samsung a competitor; is that right?
> A. Samsung becomes a competitor when **they take our high-end technology and water it down into a commodity product**. And when they do that, it makes it difficult for us to sell our proprietary solutions. Trial Tr. 1035:10-15.

This evidence also establishes that Samsung's infringement rendered the market for Netlist's LRDIMM products obsolete, further supporting a finding of irreparable harm. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862, (Fed. Cir. 2010) ("In this case, the district court properly considered strong circumstantial evidence that Microsoft's infringement rendered i4i's product obsolete for much of the custom XML market, causing i4i to lose market share and change its business strategy to survive."). As a result of not being able to develop a market for its proprietary DDR4 LRDIMM, Netlist also lost out on sales of NAND and other products that typically accompany sales of DRAM products. *See* Trial Tr. 645:1-3 (convoyed sales result from sale of DRAM products); DTX-25.8 (Netlist Annual Report) ("Our sales activities focus primarily on developing strong relationships at the technical, marketing and executive management levels within existing and prospective customers in our target markets."), -12 ("The vast majority of our net product sales in recent periods have been generated from resales of component products, including SSDs, NAND flash and DRAM products. . . .").

      ii.   <u>Samsung's Infringement Irreparably Harmed Netlist's Reputation</u>

"[D]amage to reputation" constitutes "valid grounds for finding irreparable harm." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). The evidence at trial established Netlist's reputation as an innovator in LRDIMM technology. *See, e.g.*, Trial Tr. 199:15-22 (Milton) (IBM and HP adopted HyperCloud); 915:17-24 (Martinez) (Netlist's customers "view us as a pioneer in this industry and they recognize the contributions that we've made to the ecosystem"). Samsung also acknowledged Netlist's reputation as an innovator in LRDIMM technology. *See, e.g.*, Trial Tr. 613:20-614:2 (Kennedy) (explaining that Samsung admitted Netlist is "well-known

in the industry as a company that created a system for LRDIMM technology"). Samsung also admitted that it entered into the JDLA because of Netlist's position in the field as an innovator in LRDIMM. Trial Tr. 614:3-10 (Kennedy) ("Q. Is there any evidence that Samsung acknowledged the value of Netlist's patents to Samsung specifically? A. Yes. You see here in the next two quotes from their documents that they concluded that the patents related to the memory modules, RDIMMs and LRDIMMs, held by Company N--that was their code word for Netlist-- would be helpful for their development of another product and helpful in resolving the risk of patent claims."); Trial Tr. 319:19-21 (Hyun Ki Ji)  ("Q. So, in your view, was a substantial part of the purpose of the JDLA to obtain access to Netlist's patents? A. Yes, that's correct.").

> ### iii.    Netlist's Injury is Traceable to Samsung's Infringement of the '608 Patent

The first *eBay* factor requires a "causal nexus [that] relates the alleged harm to the alleged infringement." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633, 639 (Fed. Cir. 2015) (*Apple IV*). Proving a causal nexus requires a showing of "some connection between the patented features and the demand for the infringing products." *Genband US LLC v. Metaswitch Networks Corp.*, 861 F.3d 1378, 1383 (Fed. Cir. 2017). *Apple Inc. v. Samsung Elecs. Co. Ltd.*, 735 F.3d 1352 (Fed. Cir. 2013) (*Apple III*) is instructive. There, the Federal Circuit illustrated the causal nexus inquiry with the following example: "if a particular patented laptop battery lasts significantly longer than any other battery on the market, then the replacement of that battery with a non-infringing battery might make a laptop less desirable. In that case, it might be reasonable to conclude that the patented battery is a driver of consumer demand for the laptop." *Id.* at 1364-65.

The record evidence establishes that the infringing timing control is commercially required for LRDIMMs for speeds above 2400 MT/s. The buffer used in the LRDIMMs is "required to support fine adjustment of the phase of individual bit lanes relative to the baseline MDQS for DDR4 data rates above 2400 MT/s. For this purpose the host controller can utilize the per lane MDQS-MDQ read delay control words F[7:4]BC8x through F[7:4]BCBx." JX27.35;

*see also id.* (the buffer "is required to support fine adjustment of the phase of individual bit lanes relative to MDQS for DDR4 data rates above 2400 MT/s. For this purpose the host controller can utilize the per lane MDQ-MDQS write delay control words F[7:4]BCCx through F[7:4]BCFx. F4BCCx."). The use of these specific control words was the proof of infringement at trial. Trial Tr. 445:21-448:14 (discussing JX-27, Tables 72-75; Tables 68-71).

As **Dr.** Mangione-Smith explained at trial, without the '608 patent, Samsung would be unable to sell DDR4 LRDIMMs capable of operating above 2400 MT/s. Trial Tr. 457:10-14. The testimony of Samsung's corporate representative and expert established that speed and density are key drivers of demand for Samsung's customers. *Id.* 737:16-20 (Calandra) ("Q. And these products -- one of the things that customers care quite a bit about when they're purchasing the accused products are two things called density and speed. Correct? A. Yes."); *id.* 884:24-885:2 (McAlexander) ("You've previously testified that speed and density have been a market driver for every DRAM that's been sold since 1972. Correct? A. Yes, I've testified to that.").

**B. Monetary Damages Are Inadequate to Compensate for Netlist's Injury**

Money damages cannot compensate Netlist for the irreparable harm to its business. Generally, "mere damages will not compensate for a[n infringing] competitor's increasing share of the market" in which the patentee "competes." *Douglas Dynamics*, 717 F.3d at 1345.

The Federal Circuit observes that in complex markets in which customers create long term relationships with a company, having to compete for customers against an infringing product causes irreparable harm:

> Sales lost by Apple to Samsung are difficult to quantify due to the "ecosystem effect"
> — that is, the effect the sale of a single product can have on downstream sales of
> accessories, computers, software applications, and future smartphones and tablets. *Id.;*
> *see also* J.A. 10449-50. In addition to the downstream sales to the individual customer,
> Mr. Schiller testified that individual customers have a "network effect," by which they
> advertise Apple's product to their friends, family, and colleagues. J.A. 10449-50. Thus,
> the loss by Apple of a single smartphone or tablet customer may have a far-reaching
> impact on Apple's future revenues. Because of its variable and uncertain nature, this loss
> is very difficult to calculate. *Apple IV*, 809 F.3d at 645.

The evidence establishes that Netlist and Samsung both operate on this basis. DTX-25.6 ("Due to our relationships with memory channel customers, in addition to our own products, we resell certain component products that we purchase for the purpose of resale."), DTX-25.8 ("We primarily market and sell our products and the component products we resell through a direct sales force. . . . Our sales activities focus primarily on developing strong relationships at the technical, marketing and executive management levels within existing and prospective customers in our target markets."). Samsung's internal materials corroborate this synergy, in which sales of DRAM products also enable it to sell other products to the same customers. ███████████ ████████████████████████████████████████ Netlist also offers NAND products. DTX-25.14. This loss of long-term relationships is all the more acute because there are only a small number of potential customers in the industry. DTX-25.7 ("Our target markets are characterized by a limited number of large companies, and consolidation in one or more of our target markets may further increase this concentration. As a result, sales to small numbers of customers have historically represented a substantial portion of our net product sales.").

The fact that Netlist receives a reasonable royalty for infringement is not a barrier to an injunction. The Federal Circuit affirmed this in *Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am.*, Inc., 895 F.3d 1304, 1331 (Fed. Cir. 2018). The jury awarded $73,653.51 as reasonable royalty for patent infringement. *Id.* at 1310. The district court held that the award of a reasonable royalty barred injunction: "The district court denied TAOS's request for an injunction upon finding that, because TAOS had requested a reasonable royalty as compensation for past infringement, a reasonable royalty should be adequate to compensate TAOS for future infringement." *Id.* at 1331. The Federal Circuit vacated the denial of injunction: "A patentee may find a royalty to be the most appropriate remedy for past infringement: it may best measure those harms which are reliably measurable. That does not mean, however, that there do not exist the

kinds of hard-to-measure harms, such as impaired goodwill and competitive position, that can justify injunctions to prevent them before they occur (precisely because they are hard to quantify later)." *Id.*; *see also Wirtgen Am., Inc. v. Caterpillar, Inc.*, 2024 WL 4216057, at \*25-26 (D. Del. Sept. 17, 2024) (granting permanent injunction where jury had awarded a lump sum royalty). Mr. Kennedy explained at trial that his proposed royalty was based on the benefits Samsung gained from the use of the '608 patent, and was not calculated to compensate Netlist for the other non-monetary harms that it suffered as a result of Samsung's infringement. Trial Tr. 628:16-20 ("Q. Do the royalty damages in this case fully compensate Netlist for any harm that's been caused? A. No. . . . This is just dealing with the reasonable royalty that Samsung should pay for the use of the technology."). Samsung's expert did not dispute this conclusion.

Samsung's willful infringement forced Netlist to compete against products that use its proprietary LRDIMM technology, resulted in lost customers, and harmed Netlist's reputation as an innovator. Money damages would be inadequate to compensate Netlist for such losses, which "frequently defy attempts at valuation, particularly when the infringing acts significantly change the relevant market." *i4i*, 598 F.3d at 862; *see also SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 2019 WL 3358599, \*3 (D. Mass. 2019) ("SiOnyx was a small startup, competing against a large foreign manufacturer, and it is impossible to quantify the full extent of the harms, including such things as loss of market share, lost business opportunity, and harm to reputation."), *aff'd.*, 981 F.3d 1339, 1348-50 (Fed. Cir. 2020).

Monetary damages are also inadequate to compensate for the transformative impact of Samsung's infringement on Netlist's business. Samsung's launch of infringing DDR4 LRDIMMs prevented Netlist from developing a next-generation DDR4 HyperCloud product. Trial Tr. 305:13-23 (Milton). As a result, Netlist was forced to go from innovator to reseller, and the vast majority of sales now are from resale. Trial Tr. 1031:3-16. Samsung's corporate representative

admitted this was the period when Samsung launched its DDR4 DIMMs. Trial Tr. 735:2-736:2.

Netlist's prior licensing activity does not prove that money damages would be adequate. Netlist has never entered into a bare patent license. Instead, as Netlist's CEO Mr. Hong testified, the only two licenses Netlist has granted both had significant non-monetary obligations to enable Netlist to solidify its position as a product development company. Trial Tr. 1035:4-7, Samsung's damages expert Ms. Kindler also conceded that Netlist has never licensed its patents outside of a strategic supply context. Trial Tr. 1096:13-18 ("Q. And in the real world, Netlist has never agreed to license its valuable patents outside the context of a deal where it has received not only cash but also supply, joint development, and other consideration. Correct? A. In the real world, the licenses we have do have those other components."). As to the Samsung JDLA, the record at trial established that Samsung had cut-off supply to Netlist before the JDLA. PX-11 at 1█████████

████████████████████████████████████████████████████████

██████████████████████████████. As to the SK Hynix Strategic Supply and License Agreement, the loss of steady supply from Samsung threatened the viability of the company. Trial Tr. 260:10-16 (Milton). Samsung's damages expert conceded the importance of supply to Netlist. Trial Tr. 1096:5-1096:12 ("Q. And, in fact, supply -- it's not just a matter of reselling a product. Having a consistent, affordable, reliable stream of supply is absolutely essential to a company like Netlist that builds its own products and needs components and also engages in years-long process of qualifying products with its customers. Correct? A. I think we heard testimony that supply was important, yes.").

The Federal Circuit reversed the denial of an injunction when the district court focused the fact that Apple had licensed its patents to other handset manufacturers and because the record established that "Samsung is not "off limits" as a licensing partner." *Apple III*, 735 F.3d at 1370.

[T]he district court's focus on Apple's past licensing practices, without exploring any relevant differences from the current situation, hints at a categorical rule that Apple's

willingness to license its patents precludes the issuance of an injunction. "To the extent that the District Court adopted such a categorical rule, ... its analysis cannot be squared with the principles of equity adopted by Congress." *eBay*, 547 U.S. at 393, 126 S.Ct. 1837; see also *Acumed*, 551 F.3d at 1328 ("A plaintiff's past willingness to license its patent is not sufficient per se to establish lack of irreparable harm if a new infringer were licensed."). *Apple III*, 735 F.3d at 1370.

Instead, the Federal Circuit emphasized that what mattered was whether the infringing feature was one of the bases for consumer demand of the Samsung product. *Id.*

### C.  The Balance of Hardships Favors an Injunction

In assessing the balance of hardships, the Court may consider factors such as "the parties' sizes, products, and revenue sources." *i4i*, 598 F.3d at 862. Netlist's LRDIMM technology was one of the cores of its business until Samsung destroyed the market, as even Samsung acknowledges. Trial Tr. 613:20-614:2 (Samsung conceding that Netlist was "well-known in the industry as a company that created a system for LRDIMM technology"). By contrast, Samsung has a broad range of product offerings including TVs, phones, consumer appliances and its foundry business. Trial Tr. 713:2-714:5. Samsung's sales of DDR4 LRDIMM during the notice period amounted to $293.2 million, which is a small fraction of its overall revenue. Trial Tr. 616:11-17; Ex. 5 at 8 (Samsung Financial Statement for 2022 listing $234 billion revenue).

Additionally, "requiring [Netlist] to compete against its own patented invention, with the resultant harms described above, places a substantial hardship on [Netlist]." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011). Samsung's burden of ceasing infringement is comparatively low. Indeed, Samsung insisted throughout trial that it had multiple non-infringing alternatives to the '608 patent that it could deliver to the market without undue cost to its customers. Trial Tr. 850:20-851:2 (McAlexander) (testifying that modules without edge connections are a non-infringing alternative to the '608 patent and is "Very easy to do"). If designing around Netlist's technology is as easy as Samsung claimed, the balance of hardships favors an injunction. *Douglas Dynamics*, 717 F.3d at 1345 ("If indeed Buyers had a noninfringing

-14-

alternative which it could easily deliver to the market, then the balance of hardships would suggest that Buyers should halt infringement and pursue a lawful course of market conduct."); *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1330 (Fed. Cir. 2008) (balance of hardships favored injunction where "Acumed asserts that Stryker has at all times had the option to use its own non-infringing straight nail design . . . and could eliminate any potential hardship on itself by adopting that design").

### D. The Public Interest Would Not Be Disserved by an Injunction

"[T]he touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." *i4i*, 598 F.3d at 863. While competition generally serves the public interest, that is not the case where the defendant is "using a competitor's patented technology." *Douglas Dynamics*, 717 F.3d at 1346. Rather, "the public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions," as Netlist does here. *Apple*, 809 F.3d at 647; Trial Tr. 203:21-23 ("Q. Did Netlist implement these patents in the DDR4 products that it designs and sells? A. Yes, these are in the DDR4 products.").

In the first ten months of 2023, ████████████████████████████████ ████████████████ Ex. 6 ████████████ Samsung emphasized at trial that SK Hynix, whose products Netlist's resells, has effectively the same capacity as Samsung. Trial Tr. 729:5-11 ("So we're both right around, I think this year, around 40 percent."). It was a central element of Samsung's case that its products are interchangeable with SK Hynix. Trial Tr. 1264:18-1265:5 ("Well, ladies, Hynix is making the exact same use. It's the same products. They have to be the same products.").

### V.    **CONCLUSION**

Netlist respectfully requests that its motion for a permanent injunction be granted.

Dated: December 4, 2024

Respectfully submitted,

/s/ Jason Sheasby
_____

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Jason Sheasby (*pro hac vice*)
jsheasby@irell.com
Annita Zhong, PhD (*pro hac vice*)
hzhong@irell.com
Andrew Strabone (*pro hac vice*)
astrabone@irell.com
Michael W. Tezyan (*pro hac vice*)
mtezyan@irell.com
**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199

Rebecca Carson (*pro hac vice*)
rcarson@irell.com
**IRELL & MANELLA LLP**
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660

***Attorneys for Plaintiff Netlist, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that, on December 4, 2024, a copy of the foregoing was served to all counsel of record.

*/s/ Jason Sheasby*
Jason Sheasby

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I hereby certify that the foregoing document and exhibits attached hereto are authorized to be filed under seal pursuant to the Protective Order entered in this Case.

*/s/ Jason Sheasby*
Jason Sheasby

## CERTIFICATE OF CONFERENCE

I hereby certify that, on December 2, 2024, counsel for Netlist informed counsel for Samsung of its intent to file this motion and shared a draft of the proposed order. The parties conferred on the motion and the parties arrived at an impasse. Defendants oppose this motion.

*/s/ Jason Sheasby*
Jason Sheasby