IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

NETLIST, INC., ( CAUSE NO. 2:22-CV-293-JRG
)
Plaintiff, (
)
vs. (
)
SAMSUNG ELECTRONICS CO., LTD., (
et al., ) MARSHALL, TEXAS
( NOVEMBER 14, 2024
Defendants. ) 8:30 A.M.

---

VOLUME 3

---

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICTJUDGE
and a jury

---

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS 75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR THE PLAINTIFF: IRELL & MANELLA, LLP - LOS ANGELES
1800 AVENUE OF THE STARS
SUITE 900
LOS ANGELES, CA 90067-4276
(310) 203-7096
BY: MR. JASON SHEASBY
MS. LISA GLASSER
MR. TONY ROWLES
MR. ANDREW STRABONE

McKOOL SMITH, P.C. - MARSHALL
104 E. HOUSTON ST., SUITE 300
MARSHALL, TEXAS 75670
(903) 923-9000
BY: MS. JENNIFER TRUELOVE

FOR THE DEFENDANTS: FISH & RICHARDSON, PC - WASHINGTON DC
1000 MAINE AVE., SW
SUITE 1000
WASHINGTON, DC 20024
(202) 783-5070
BY: MR. RUFFIN CORDELL
MS. LAUREN DEGNAN
MR. DANIEL TISHMAN

FISH & RICHARDSON, PC - DALLAS
1717 MAIN STREET, SUITE 5000
DALLAS, TEXAS 75201
(214) 292-4084
BY: MR. THOMAS REGER

GILLAM & SMITH, LLP
303 SOUTH WASHINGTON AVENUE
MARSHALL, TEXAS 75670
(903) 934-8450
BY: MS. MELISSA SMITH

OFFICIAL REPORTER: SHAWN M. McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS 75670
(903) 923-8546

# INDEX

**EXAMINATION**



| Witness Name | Page |
|---|---|
| DAVID KENNEDY | |
| Direct By MR. STRABONE | 603 |
| Cross By MR. REGER | 653 |
| Redirect By MR. STRABONE | 704 |
| JOSEPH CALANDRA | |
| Direct By MS. SMITH | 707 |
| Cross By MS. GLASSER | 734 |
| HYUN-KI JI | |
| Direct By MR. CORDELL | 752 |
| Cross By MR. SHEASBY | 766 |
| Redirect By MR. CORDELL | 780 |
| JEFFREY SOLOMON, PH.D. | |
| BY VIDEO DEPOSITION | 784 |
| KEN LEE HYUN, PH.D. | |
| BY VIDEO DEPOSITION | 788 |
| JOE McALEXANDER | |
| Direct By DR. ALBERT | 790 |
| Cross By MR. SHEASBY | 854 |
| Redirect By DR. ALBERT | 891 |

THE COURT: Be seated, please.

08:30 Are the parties prepared to read into the record those
08:30 items from the list of pre-admitted exhibits used during yesterday's portion of the trial?

MS. TRUELOVE: Yes, Your Honor.

THE COURT: Please proceed.

MS. TRUELOVE: Plaintiff Netlist used the following exhibits during yesterday's evidentiary proceeding: JX 7, JX
08:30 8, JX 11, JX 12, JX 14, JX 15, JX 16, JX 23, JX 27, JX 28, JX 30, JX 31, JX 32, JX 33, JX 36, PX 2, PX 3, PX 9, DX 14, DX
08:31 15, DX 19, DX 20, DX 21, DX 22, and DX 24.

THE COURT: Any objections from Defendant?

MS. SMITH: No objections, Your Honor.

THE COURT: Do Defendants have anything else to add?

MS. SMITH: We do, Your Honor. DX 15.

THE COURT: Any objection from Plaintiff?

MS. TRUELOVE: No, Your Honor.

THE COURT: All right. Does that complete the rendition, ladies?

MS. SMITH: Yes, Your Honor.

MS. TRUELOVE: Yes, Your Honor.

THE COURT: All right. Thank you.

08:31 Is there anything I need to hear from the parties on before I bring in the jury and we proceed for the Plaintiff to call Mr. Kennedy?

MS. TRUELOVE: Nothing from Plaintiff, Your Honor.

MR. CORDELL: Nothing from Defendant, Your Honor.

THE COURT: Let's bring in the jury, please, Mr. Barnett.

(Whereupon, the jury entered the courtroom.)

08:33 THE COURT: Good morning, members of the jury. Welcome back. It's good to see you. Please have a seat.

All right. We'll continue with the Plaintiff's case in chief.

08:33 Plaintiff, call your next witness.

MR. STRABONE: Your Honor, Plaintiff Netlist calls Mr. David Kennedy.

THE COURT: All right. Mr. Kennedy, if you'll come forward and be sworn, please, sir.

(Whereupon, the oath was administered by the Clerk.)

THE COURT: Please come around, sir; have a seat on the witness stand.

08:34 All right, counsel. You may proceed with direct examination.

MR. STRABONE: May it please the Court.

DAVID KENNEDY,

having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MR. STRABONE:

Q. Good morning, Mr. Kennedy.

A. Good morning.
Q. Can you please introduce yourself to the jury?
A. Yes. My name is David Kennedy. I'm a senior managing director with J.S. Held.
Q. Where are you from, Mr. Kennedy?
A. Well, from June through October, my wife and I live in a
08:34 little town in western Montana where we raise and train horses. And then before the snow gets too deep, we move down here. We've got a place about 45 minutes north of town where we spend the winter.
Q. Mr. Kennedy, what is your role in this case?
A. I'm here to determine a fair amount that Samsung should pay for the use of the Netlist technology.
Q. Is there a specific term that refers to the payment made for the right to use a patent?
A. Yes. It's called a royalty.
08:35 Q. What is a patent license?
A. Well, it's an agreement that allows you to use someone's patented technology. And I think of it as a hunting lease. You can lease someone's land. You use it; you don't own it. And if you don't pay for the lease, you're trespassing or with patents if you don't pay you're infringing.
Q. Can you please tell us about your professional background?
A. Sure. I graduated from the University of Georgia 1985

08:35 with a degree in accounting. I'm a CPA. I have been since then. And over the last 30 years, I've specialized in patent licensing, patent valuation, and determining the value of patented technology in matters like this.

Q. Have you received any recognition for your work?

A. I have, yes.

Q. What kind of recognition?

08:36 A. A couple of things. A group called Intellectual Asset Management recognizes every year the top IP strategists in the world, and I've been named one of those for the last 13 years, since 2011. And then also they identify and recognize the top 08:36 damages experts in the world, and I've been on that list, too.

Q. Can you give us an example of the types of companies -- excuse me, the types of entities that you've had the privilege of working with?

A. Well, I work for both plaintiffs and defendants, but one of the large defendants or some of the large defendants I've worked for are the Armed Forces. The Navy, Army, and Air 08:37 Force has hired me in the past to determine the value of technology that they're using in national defense. And then I've had to testify about what that royalty should be in court so that they pay what they should pay for use of others' technology.

Q. Do you have any real-world experience negotiating license agreements that makes you uniquely qualified to value the use

of patents?
08:37 A. I do. I've negotiated over 200 license agreements in the real world besides outside of litigation. And I think that helps me do something important here, and that's to put myself in the shoes of both these parties to determine what a fair amount should be that Samsung should pay for the use of Netlist's technology.
Q. What types of companies have you negotiated with?
A. A lot of companies over the years. Some in the general
08:38 computing industry, the semiconductor industry, and the memory space like Intel, Cisco, Broadcom, a lot of companies, a lot of large companies and small companies, too, like Netlist.
Q. Have you negotiated with anyone else in the real world for a patent license?
A. Well, I have also negotiated twice with Samsung on behalf of a company that I was an officer of and then also a company that I was working for as a consultant.
08:38 Q. In addition to hundreds of real-world business negotiations, have you also testified in other patent cases like this one?
A. I have for both plaintiffs and defendants.
Q. Have you performed any investigations for Netlist before?
A. Yes, on three -- three different occasions.
Q. Does your firm get paid for the -- by the hour for the time that you spend on this case?

A. They do. They bill for my time at my standard billing rate.
Q. Does the amount you get paid depend on who wins this case?
08:39 A. No, not at all.
MR. STRABONE: Your Honor, Netlist tenders Mr. David Kennedy as an expert in negotiation of patent agreements and the calculation of patent damages.
THE COURT: Is there objection?
MR. REGER: No objection, Your Honor.
THE COURT: All right. Without objection, the Court will recognize this witness as an expert in those designated fields.
Please continue.
Q. (BY MR. STRABONE) Mr. Kennedy, what materials did you evaluate in the course of performing your damages analysis?
A. Well, it was a tremendous amount of documents. I had
08:39 access to all of the documents that have been produced in this case, tens of thousands, and particularly Samsung's own sales data going back to 2016, very detailed product by product, and we had to go through that and figure out what was sold, when it was sold, how much it was sold for over the years.
Q. And did you do all of this work by yourself?
A. No. I have a team that has specialized experience in
08:40 these types of cases that work with me.

08:40

Q. Can you give an example of that specialized experience?
A. Sure. There's one member of my team, Dr. Andreas Groehn. He will talk about what he did for me later. He's a Ph.D. economist, and he analyzed all of the sales data that was produced to help me determine the value that Samsung realized from the use of the technology.
Q. In assessing damages in this case, what products and what patents did you consider?
A. Well, as we've heard, there's the '912 Patent, and that patent covers both LRDIMMs and RDIMMs. And then there's the '608 Patent that covers LRDIMMs also, and the '417 Patent, which covers LRDIMMs.
MR. STRABONE: May I have the slides, please?

08:41

Q. (BY MR. STRABONE) Is there a United States law that guided your work in this case?
A. Yes. It's the patent statute. It's on the screen here. And I've highlighted one particular part of that statute, and it says that in no event -- that Netlist should be compensated for infringement, and in no event less than a reasonable royalty for the use made of the invention by the infringer.

08:41

So that's what I studied, how much did they actually use it.
Q. How long has Samsung been using Netlist's technology in its DDR4 DIMMs and LRDIMMs?
A. For over a decade.
Q. How is that relevant?

A. Well, we all know technology changes fast, and I think it's relevant that Netlist's technology has been used for over a decade by Samsung and is still very important, still being used.
Q. Did Samsung take steps to acknowledge the value of Netlist's technology?
A. They did. In July -- as you see here on this timeline, in July, July 15th, they signed the JDLA in 2015.
Q. After that agreement ended, what were Samsung's options with respect to the use of Netlist's technology?
08:42 A. So they had two options. They could stop using the technology or face the legal consequences of litigation like this.
MR. STRABONE: Mr. Svenson, can we have JX 51 at page 12?
Q. (BY MR. STRABONE) Why would Samsung have to stop using Netlist's technology?
08:43 A. Well, when the JDLA, as we've heard about, terminated, this term of the JDLA says that if the agreement is terminated, that all licenses and rights to the patents will cease forthwith.
MR. STRABONE: Could we have the slides back, Mr. Svenson? Thank you.
MR. REGER: Excuse me, Your Honor. May we have a sidebar, please?

08:44

THE COURT: Approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT: What's the issue, Mr. Reger?

MR. REGER: Your Honor allowed the slides. We didn't object to the initial questions, but Mr. Kennedy's repeatedly offering the suggestion that we are infringing because of the JDLA.

So, Your Honor, we ask for a jury instruction about that. Your Honor was very clear that the JDLA cannot be used as proof of infringement. Mr. Kennedy has repeatedly talked about how we were using their technology as shown by the JDLA.

MR. STRABONE: He didn't say anything about using the patents in this case. He was making clear there's clearly

08:44

a license agreement in this case, and he was making clear that there's no rights after July 15, 2020. He didn't mention infringement; he didn't mention the patents in this case.

THE COURT: Go ahead. Do you have anything else?

MR. REGER: No, Your Honor. It's in the transcript exactly what Mr. Kennedy said so we ask for a curative instruction.

THE COURT: At this point I don't think a curative instruction is warranted. If it continues down this path, it may be warranted. You can reurge it later if you think it's

08:44

necessary, but I'm going to deny your request for an

instruction at this point.

MR. REGER: Thank you, Your Honor.

MR. STRABONE: Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT: Let's proceed.

MR. STRABONE: Mr. Svenson, back to the slides, please?

Q. (BY MR. STRABONE) Mr. Kennedy, solely for the period after formal notice of Netlist's patents, what was the use made of Netlist's patents?

A. Well, you see here on the screen it was a total of

08:45 37,296,000 units, and that's broken down between LRDIMMs and RDIMMs. LRDIMMs [sic] were 35,244,000, LRDIMMs were 2,052,000 units.

Q. What is the average selling price of Samsung's LRDIMMs?

A. It's about $436.

MR. STRABONE: And, Your Honor, may I approach the paper.

THE COURT: You may use the easel.

08:45 MR. STRABONE: Thank you, Your Honor. May I bring it in line?

THE COURT: Please do.

MR. STRABONE: Thank you.

Q. (BY MR. STRABONE) Mr. Kennedy, did you say 436?

08:46
A. Yes.
Q. Thank you. My Ms got a little tight there. What's the average selling price of Samsung's RDIMMs, Mr. Kennedy?
A. About $146.
Q. Can you read that all right, Mr. Kennedy?
A. Yes.
08:47
Q. Great. What is the reasonable royalty for Samsung's use of Netlist's technology in this case?
A. After all of my calculations, it's $457.81 million, no less than, and we'll go through the details of that.
Q. As part of your analysis, did you analyze the state of the market at the time of the hypothetical negotiation?
08:47
A. Yes, I did.
Q. What did your analysis show?
A. Well, the evidence shows that Samsung -- there's really only three dominant players in the industry: Samsung, hynix or SK hynix, you'll hear them referred to; and Micron. And they control 95 percent of the market.
Q. Why is that important to the determination of a reasonable royalty in this case?
08:48
A. Well, it's a very competitive market. It's a commodity market between these companies, and they all need to be able to offer competitive technology at competitive prices to maintain their market position.
Q. Do SK hynix and Micron sell their own versions of DDR4

08:48 RDIMMs and LRDIMMs?
A. Yes, they do.
Q. Is Samsung incentivized to offer products that are at least as good as Micron's and SK hynix's products?
A. Of course. If they don't, they'll be left behind.
Q. In your analysis, did you see any evidence that Samsung was focused on its market share in the transition to DDR4?
A. Yes, I did.
08:48 MR. STRABONE: Mr. Svenson, can we have PX 6? Could we have page 16?
Q. (BY MR. STRABONE) Mr. Kennedy, what is Samsung saying in this document?
A. So this is an internal Samsung document. It was part of a strategy meeting document from 2014, and they were -- the number one point here was to maintain the market share, lead--they were leading it at the time--with the transition to
08:49 DDR4 from DDR3.
MR. STRABONE: Could we have the slides back, please?
Q. (BY MR. STRABONE) Mr. Kennedy, did Samsung ever acknowledge the value of Netlist's patents?
A. Yes. I've seen in the documents statements from their corporate representative. As shown here on the screen, when
08:49 asked the question what does Samsung know about Netlist, he answered that they had multiple patents in the area of DRAM

and they were well-known in the industry as a company that created a system for LRDIMM technology.

Q. Is there any evidence that Samsung acknowledged the value of Netlist's patents to Samsung specifically?

A. Yes. You see here in the next two quotes from their documents that they concluded that the patents related to the memory modules, RDIMMs and LRDIMMs, held by Company N--that was their code word for Netlist--would be helpful for their development of another product and helpful in resolving the risk of patent claims.

08:50

And he also pointed out -- sorry, the bottom of that slide -- that they understood that Netlist had proprietary know-how, and they contacted Netlist to gain access to that.

08:50

Q. Mr. Kennedy, is there a framework that damages experts such as yourself typically use to evaluate damages?

A. Yes. It's called the hypothetical negotiation.

Q. When does the hypothetical negotiation in this case take place?

A. So for the '912 and the '608 Patent, that's July 2020 when the JDLA was terminated and they no longer had rights to use those patents. For the '417 Patent, it issued about a year later in August of 2021, so the negotiation for that would have taken about at that time. But it's fairly close together.

08:51

And based on the facts and circumstances that I reviewed,

I think they would have just negotiated at the same time for all three patents.
Q. What rules apply to the hypothetical negotiation?
A. Three very important rules, different than the real world. You can't walk away like you can in the real world, you have to reach an agreement. And then also you have access to all the confidential documents of both parties, like we have here. And then, very importantly, the patents are presumed to be valid and infringed in the hypothetical negotiation.
Q. Is there a set of factors that the Court has identified for experts to review?
A. There is. It's called the -- they are called the *Georgia-Pacific* factors. There's 15 of them, and they're shown here on the screen. Sometimes you -- you review all of them to see if they're applicable, but they're not always meaningful or useful in every case. It just depends.
Q. What are the first factors you focused on in your analysis?
A. So I focused on these three here in the middle which dealt with the -- deals with the established profitability and the commercial success of the products and that are covered by the patent, and then also the utility and advantages of the patented property over old modes or devices, and then also the benefits to those who have used the invention, how do they

benefit from using it.
Q. Why were these three factors so important in this case?
A. Well, based on my analysis, Samsung gained a lot of technological benefits and economic benefits from using the technology.
Q. Can you please tell us about those factors with respect to these products? What did you learn about RDIMMs?
A. So Samsung sales just from RDIMMs for -- from August 2022, and that's the legally defined damages period, was $2.78 billion with a profit margin of 60 percent.
Q. And what did you learn about LRDIMMs?
A. Well, sales from July 20th, the date of the hypothetical negotiation, was $839 million. And then sales from June 8th, 2022, which was the date that Netlist sent the official notice to Samsung that they were infringing the '608 and the '417, but that amount is $293.2 million with a profit margin of 61.2 percent.
And then from a technological standpoint and business standpoint, Samsung was -- by using the Netlist technology was able to sell the high-performance, high-speed DIMMs. And they were also able to sell LRDIMMs for the high density servers.
Q. Did you review Samsung's confidential materials to determine the importance of Netlist's patents to Samsung's business?
A. Yes, I did.

Q. Okay. Let's look at one of those documents.

MR. STRABONE: Mr. Svenson, can we have JX 21 at page 10?

Q. (BY MR. STRABONE) What do Samsung's internal documents say about DDR4 benefits?

08:55 A. You see in the middle of the page here, DDR4 is focusing on server applications, DIMMs, and those are the RDIMMs and LRDIMMs, the accused products in this case.

Q. And can you remind us of the role the accused products play in the overall memory functions for servers?

A. Sure. So the DRAM is a chip, and it goes onto the DIMM and is attached to the DIMM. And the DIMM is what's inserted 08:55 into the server that allows customers to use it for their own purposes in those servers. So without the DIMM, the DRAM would be useless.

Q. In your analysis, did you calculate any value associated with the server or the memory controller?

A. No. My analysis focuses just on the benefits provided by the patented technology.

MR. STRABONE: Let's go back to the slides, please, Mr. Svenson.

Q. (BY MR. STRABONE) Let's turn specifically to the '912 08:56 and '608 Patents. What technical benefits do those patents enable?

A. So we heard from Dr. Mangione-Smith that it provides

performance benefits and specifically allows Samsung to sell DIMMs that operate at speeds above 2400 MT/s.

Q. Have you seen evidence regarding the importance of speed to Samsung's business?

A. Yes. There's been a lot of evidence that demonstrates that.

08:57

MR. STRABONE: Can we have JX 19, please?

Q. (BY MR. STRABONE) Mr. Kennedy, how important is speed to Samsung's business?

08:57

A. Well, this is -- JX 19 is from their website, and they are pointing out that the high-performing memory empowers faster powerful solutions, and it delivers -- okay -- top speed with better bandwidth and reliability. And then down at the bottom, it says the DDR4 transfers more data faster than ever before.

08:57

So this is marketing materials from Samsung's website.

MR. STRABONE: And can we have JX 22, page 3?

Q. (BY MR. STRABONE) Did you see any other evidence showing that Samsung believes speed was important for their DDR4 products?

A. Yes. This is a portion of an internal presentation Samsung prepared, and you see the key features. The first one is speed.

08:58

Q. Why does this document use both MT/s, megatransfers per second, and also Mbps, megabits per second?

A. Well, Samsung uses those terms interchangeably. It's megatransfers per second or millions of bytes per second, but they're used interchangeably. You can see that on this they are looking at speed labeled as MT/s, but then under the products they're looking at the speed in terms of Mbps.

08:58 Q. What would have been Samsung's best alternative in a scenario where it could not sell DDR4 DIMMs that operated above 2400 MT/s?

A. So its best alternative would be to try to sell DIMMs that are at speeds of 2400 or less.

Q. Why is it a problem if Samsung just slows the speeds of 08:59 its products a little bit to 2400 or below?

A. Well, speed's important to their customers, and it's also important how you use the DIMMs. If you have a 2133 DIMM speed and you try to put that into a server that's designed to run on 3200 DIMM speed, it basically would -- my understanding 08:59 is it would throttle down the speed of the server to where none of the DIMMs could perform beyond the speed of the slowest DIMM.

Q. Do Micron and SK hynix offer DIMMs with speeds above 2400 MT/s?

A. Yes, they do.

MR. STRABONE: Could we return to the slides, please?

Q. (BY MR. STRABONE) Would Samsung be able to sell its

DIMMs if it had to drop them to 2400 or below?

A. Well, as a practical matter, probably not. If you think about -- I think about horses. If you have a horse that's 25 percent slower than the next one, you're going to have to charge less for it, and -- if someone will buy it at all, or they're going to go somewhere else.

Q. And so what would have been the impact on Samsung's business of not being able to sell speeds above 2400 MT/s?

A. Well, if the customers just decided to get the same product from Micron or SK hynix, Samsung would lose billions of dollars.

Q. How much of an impact would removing the '912 and '608 Patented technologies from the accused products have?

A. I've calculated that here, and it's a range of between 10 and 25 percent would be the change in speed without Netlist's patents.

Q. And how many sales would be at stake here for Samsung?

A. 35,244,000 RDIMMs, 2,052,000 LRDIMMs since -- and then just after June 8th, 2022, the notice letter, it's 651,000 LRDIMMs.

Q. And so in your analysis, did you assume that Samsung would just lose all of these sales?

A. No. I think that's likely. But what I did, to be conservative, is I assumed they would be able to find the same number of buyers to sell all of these products, but at prices

09:01 that were equivalent to the slower speeds, 2400 or below.
Q. So how do investigators like yourself go about putting a dollar value on the relationship between price and speed in a scenario like this?
A. Well, the best way to do it is to look at the actual sales data, what Samsung's customers have paid over time for the products and adjusting for relevant factors like density.
09:02 Q. Is that something you can do using a calculator when you have multiple variables?
A. No. You need specialized software for that.
Q. And did you turn to a colleague with expertise in that type of software?
A. Yes. I mentioned Dr. Groehn earlier. He's a Ph.D. economist, and he analyzes large databases of sales data like this for a living. He is part of my team, and he analyzed the change in speed when -- or the change in price when you change
09:02 the speed based on that sales data.
Q. Is this the first time you've worked with Dr. Groehn to perform a regression analysis?
A. No. I've worked with him five or six other times.
Q. What did Dr. Groehn determine in this case --
A. So as you see here, a decrease in speed of 1 percent has the price decreasing. By August 2016, the earliest sales data
09:03 that we had, it decreases the price by 1.13 percent for RDIMMs and 1.24 percent for LRDIMMs.

09:03 And then in April 2019, the -- you see it's an even larger decline in price as speed's becoming more important. It's 1.75 percent decrease for RDIMMs and 1.71 percent increase [sic] for LRDIMMs.

And then in July 2020, that's the date of the hypothetical negotiation, the decrease is even greater--1.96 percent for RDIMMs and 1.69 percent for LRDIMMs.

Q. And so what was the trend over time?

A. Speed is obviously getting more valuable to the customers based on what they're actually paying.

Q. And which of these numbers did you use to calculate your damages analysis?

09:04 A. So I used the most conservative numbers that -- or from the earliest point in time when the prices and differences for speed were not as much. So that gives Samsung the benefit of using the most conservative of these numbers. If I'd used the numbers in July of 2020, damages would have gone up by -- between the two products by almost 50 percent.

Q. Did you influence Dr. Groehn's analysis in any way?

09:04 A. No. This is what he does. He's a specialist in this, Ph.D. economist, and I didn't tell him how to do his work.

Q. Did you review his analysis after it was completed?

A. I did. I reviewed it, I talked to him, and I'm confident that it was a rigorous analysis as I'm used to from Mr. Groehn.

Q. Have you used data regression such as those performed by Dr. Groehn in real-world negotiations on patent licenses?

MR. REGER: Objection, Your Honor. Outside the scope of the report.

09:05 THE COURT: What's your response, counsel?

MR. STRABONE: He's discussing his experience, which is all throughout his report, Your Honor.

MR. REGER: Your Honor, the word 'regression' never appears in Mr. Kennedy's report.

MR. STRABONE: Your Honor, I can withdraw and move on.

THE COURT: Withdraw the question and move on.

Q. (BY MR. STRABONE) Let's look at an example of how this plays out. What product are we looking at here?

09:05 A. So this is the 128 gigabyte, 3200 speed DDR4 LRDIMM.

Q. And how much does this product sell for with Netlist's '912 and '608 Patented technologies?

A. $635.08.

Q. And how much would Samsung be able to sell it for if it had to reduce the speed by 25 percent to 2400 MT/s and decrease the price based on that decrease in speed?

A. My calculation shows they would be able to sell it for no more than $438.21.

09:06

Q. So how much benefit did Samsung gain from the '912 and '608 patents with respect to this particular example?

A. $196.87.
Q. Is this example on the screen the most expensive DIMM that Samsung sells?
A. No. They sell LRDIMMs and RDIMMs that cost thousands of dollars also.
Q. Did you apply this same calculation on all of Samsung's accused DIMM sales during the damages period?
09:06 A. Yes, I did.
Q. What was the economic benefit Samsung gained from using the '912 and '608 Patents in the accused products during the damages period based on the regression?
A. $1.39 billion.
Q. And is that the minimum benefit Samsung would have gained?
A. Yes, the minimum benefit because, again, I'm assuming they'd get the same number of sales. They wouldn't lose any sales. And that's a big assumption because they're having to 09:07 sell that many slower speed DIMMs, but I'm assuming they could find enough people to buy it.
THE COURT: Mr. Kennedy, you answered the question fully when you said yes. If counsel wants an explanation, he'll ask a question that calls for an explanation. If you would, sir, limit your answers to the questions that are asked. All right?
THE WITNESS: Yes, Your Honor.

THE COURT: Thank you.

Let's continue.

MR. STRABONE: Your Honor, may I approach on a different issue?

THE COURT: You want to approach the bench?

MR. STRABONE: I do want to approach the bench.

THE COURT: All right. Approach the bench, counsel.

09:08 MR. STRABONE: Thank you, Your Honor.

(The following was had outside the hearing of the jury.)

THE COURT: You're going to have to examine with discrete questions, not just throw him a yes or no and he's off to the races explaining how everything works.

MR. STRABONE: Understood, Your Honor.

THE COURT: What's your issue?

MR. STRABONE: There was some discussion yesterday and I believe in opening that regarding Netlist's other patents. I want to ask Mr. Kennedy two questions: are there other patents that cover enabling speeds over 2400 and how 09:08 would that be handled at the hypothetical negotiation in this case.

THE COURT: Patents that are not at issue in this case.

MR. STRABONE: Correct, Your Honor, but have been discussed in this case already.

MR. REGER: Your Honor, there's two issues with that. We were not allowed to explore that with the technical expert.

THE COURT: I'm not going to allow us to get -- if somehow they've gotten in, they probably shouldn't have. But we're not going to focus on anything other than the three patents-in-suit.

MR. STRABONE: Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

09:08 THE COURT: Let's proceed.

Q. (BY MR. STRABONE) Mr. Kennedy, let's move on to the '417 Patent. What is your understanding of the technical benefit associated with the '417 Patent?

A. Well, my understanding was from Dr. Mangione-Smith, and he -- as he testified, it allows more memory per channel or to 09:09 be handled by a channel so that allows DIMMs to operate in a 2DPC or two DIMMs per channel configuration.

Q. Were you able to quantify the economic benefit associated with offering these products with 2DPC versus without?

A. Yes.

Q. And how did you go about doing that?

A. So I looked at if a customer wants two 64 gigabyte LRDIMMs to be used in a 2DPC configuration, and the next best 09:09 alternative is to only use a DIMM in a 1DPC configuration.

Then you'd have to look at the total gigabytes the customer would buy, the two at 64 gigabytes, and replace that with a larger DIMM that operates just one DIMM per channel and that would -- so the total of those two would be 128 gigabytes.

And the difference in price, the customer would be willing to pay more because they don't get what they want, the two DIMMs per channel, but Samsung -- I'm assuming they would still be able to sell the one 128 gigabyte DIMM. So you look at the price difference, and that's $183.70 between the one larger LRDIMM that they would try to sell if they could not sell the two DIMMs per channel and of $544.30.

Q. And did you perform this same calculation for all of the accused products sold during the damages period?

A. I did.

Q. What is the minimum economic benefit Samsung obtained from using the '417 Patent during the damages period?

A. $48.41 million.

MR. STRABONE: Could we have slide 6, Mr. Svenson?

Q. (BY MR. STRABONE) What were the next two *Georgia-Pacific* factors that you focused on?

A. So on the left there, the bottom two on the left, the commercial relationship between the licensor and the licensee and the licensor's established policy of maintaining their patent monopoly whether they license to others or not.

09:12

Q. What are the key facts about Netlist's and Samsung's commercial relationship and licensing history that the hypothetical investigators have in mind in setting the proper royalty for Samsung to pay?
A. So Netlist has never -- they would know that Netlist has never licensed their patents outside of a strategic development agreement or some type of business partnership. And they would know that the last time that Samsung sought access to Netlist's patents, they had to enter into a strategic -- the JDLA which included a lot more value than just paying a license fee.

09:12

Q. What impact do these considerations have on the royalty damages?
A. Well, it would put significant upward pressure on what the number should be.
Q. Do the royalty damages in this case fully compensate Netlist for any harm that's been caused?
A. No. This is just dealing with the no harm to the company. This is just dealing with the reasonable royalty that Samsung should pay for the use of the technology.

09:12

Q. Were you here when we heard deposition testimony from Samsung's president of memory?
A. Yes.
Q. Was there anything notable to you about how Samsung sought access to Netlist's technology?

09:13
A. Yes, I think so. I read or heard his testimony and had read it, and it was notable to me that Samsung, the largest -- one of the largest companies in the memory space, was coming to Netlist, a 100-person small company in Orange County, California, because they wanted to use their technology.

MR. STRABONE: Slide 14, please.

Q. (BY MR. STRABONE) What were the critical terms that Netlist gave to Samsung for the JDLA?

A. So Samsung received a patent license, and they also received the joint development partnership with Netlist to work on a new product.

09:14

Q. What did Samsung provide to Netlist in return?

A. So they gave them what's called a supply agreement. They agreed to supply Netlist with products at -- on demand at competitive prices through 2040. And my analysis shows that that was worth over $2.33 billion to Netlist over that time period. And they also received the joint development partnership with Samsung.

09:14

Q. Why would the right to receive supply on demand be so valuable to Netlist?

A. Well, we've heard in this trial that these products go through periods of extreme shortages, and to be able to have a steady supply is very important to Netlist as a business because they rely on sales of products for the majority of the

09:14

revenues.
Q. Did we hear any testimony from Samsung witnesses about supply shortages?
A. Yes, we did.
Q. What did they say?
A. Well, one thing that I recall is that one of the Samsung witnesses said that they could actually impact prices by cutting production. So if they cut back on production, they 09:15 could actually increase their prices because it's a commodity market and the shortage would actually benefit their pricing structure.

MR. STRABONE: Let's turn to JX 18, please.

THE COURT: Counsel, approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT: This witness is not going to opine to the jury about the effect of other witnesses in this trial 09:15 that he sat here and observed. That's not part of his analysis; that's not part of his report. He's not here to regurgitate his version of what Samsung or other witnesses said.

He needs to be examined within the four corners of his report and not beyond the four corners of his report, which his version of what he's heard sitting in this trial can't be within the four corners of his report.

MR. STRABONE: I understand, Your Honor. He did analyze that testimony.

09:16 THE COURT: He's very good. I've had him in my courtroom many times. He slips in lots of extra stuff. And, you know, your opponent hasn't done much to object to it, but I'm listening to things like consequential damages, damages to the company itself. That's totally out of bounds. But it's already been slipped in and nobody objected.

And I'm not here to police your witness, Mr. Reger, but this guy's going to have to walk the straight and narrow of 09:16 what his report says or we're going to send the jury out and we're going to get to the bottom of it with him.

MR. STRABONE: I understand, Your Honor. Everything he's testified to in his report If Your Honor would prefer, I can pull out the deposition testimony that he's relying on in his report.

THE COURT: Well, he's not going to sit here and comment to the jury about what he's heard over the course of the trial and how he views the testimony that's been presented in the case up to this point, and that's what it sounds like to me he's doing.

MR. STRABONE: Would Your Honor prefer that I show the deposition testimony, he confirm that he analyzed it as 09:17 part of his opinion, and then explain how it affects his opinion?

THE COURT: That would be clearer if you're going to try to do that. If it's prior deposition testimony that he's analyzed in his report, I think that's fine.

MR. STRABONE: Great.

THE COURT: But for him just to be talking about what other Samsung witnesses said, that gives the jury no parameters to know where it came from, what it is, when it was said or any of that.

MR. STRABONE: Understood, Your Honor.

THE COURT: All right. Let's proceed.

MR. STRABONE: Thank you.

MR. REGER: Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

09:18

THE COURT: Let's proceed, counsel.

MR. STRABONE: Could I have JX 18, please.

Q. (BY MR. STRABONE) At the time of the negotiation, did the parties acknowledge the value of the supply obligation to Netlist?

A. Yes, I believe they did based on the documents that I reviewed.

Q. And how did they do that?

09:18

A. You can see this is a Samsung email related to the Netlist term sheet, and it states in the first paragraph that this will enable Netlist to expand its business. And then

09:18

there's also a statement from Samsung that said they hope that the supply of NAND and DRAM and NVDIMM-P related chipsets will enable Netlist's vision of becoming a products company.

MR. STRABONE: Could we have slide 15, please?

Q. (BY MR. STRABONE) And so you mentioned that the projected value of the supply commitments to Netlist was $2.33 billion. How did you arrive at that number?

MR. REGER: Objection, Your Honor. May we approach?

THE COURT: Approach the bench, counsel.

(The following was had outside the hearing of the jury.)

09:19

THE COURT: What's the objection?

MR. REGER: Your Honor, we just want to renew our objection this is not a lost profits case or a contract case. They continue to bring up the value of supply agreement and the alleged --

THE COURT: Slow down, Mr. Reger.

MR. REGER: I'm sorry, Your Honor. And the alleged harm it causes Netlist. This is not a contract case; it's a patent case.

THE COURT: Are you objecting to the demonstrative that was shown? Because if you are, you had a prior opportunity to do that.

MR. REGER: No, Your Honor. I believe we did object to the slides, Your Honor, but I'm reiterating that it's not a

09:19

lost profits case, and the suggestion that they lost sales has nothing to do with the patents.

THE COURT: Let me just say this to Plaintiff's counsel. If there's a further suggestion by the witness, and I'm not -- I'm not implying that you would improperly prompt it, but whether it's prompted or not, if there's a further suggestion by the witness that there are damages to be considered to the company itself or beyond the reasonable royalty calculation, I'm going to instruct the jury to the contrary. Okay?

09:20 MR. STRABONE: Understood, Your Honor.

THE COURT: All right. Let's proceed.

(The following was had in the presence and hearing of the jury.)

THE COURT: All right, counsel. Let's continue, please.

Q. (BY MR. STRABONE) So, Mr. Kennedy, how did you arrive at $2.33 billion?

A. So I looked at the actual results that Netlist realized during Q1 2016 to Q2 2017 and found that they achieved quarterly growth from 21 to 64 percent. And then beyond that, I projected a 20 percent growth rate through 2019 and then a slower growth rate after that through the end of the agreement to try to account for changes in technology.

Q. Why did you perform your analysis through October 15th,

2040?
A. So that was the period of the agreement was going to run through the expiration of the last of the patents, the licensed patents, which was in 2040.
Q. Netlist also entered into an agreement with SK hynix. What were the terms of the combined hynix agreements?
A. So Netlist received 600 million in guaranteed supply at their most favorable pricing for five years, and they also received $40 million in cash on top of that supply agreement.
Q. When Netlist entered into the SK hynix agreement, what was the market's reaction?
A. Well, shortly after the agreement was announced, their market value or capitalization started increasing. And then a few months after that, as their sales started increasing, the market capitalization went up significantly, over a billion dollars.
MR. STRABONE: Could we have slide 6, please?
Q. (BY MR. STRABONE) And so, Mr. Kennedy, what are the next factors that you looked at?
A. So these are -- the first two factors on the left there, the rates received by the patentee and the rates paid by the licensee in other licenses, and does that help establish a royalty at the hypothetical negotiation.
Q. You just walked us through the JDLA and the SK hynix agreement. What did the evidence you studied reveal about

Netlist's licensing strategy?
A. Well, as I mentioned, they -- their strategy is not to license their patents unless they're getting a strategic agreement along with it.
Q. And can you remind us what you mean by a strategic agreement?
A. Well, in both cases they only licensed the patents
09:23 because they were getting a guaranteed supply that was very valuable to them.
MR. STRABONE: Can we return to slide 14, please?
Q. (BY MR. STRABONE) Starting with the JDLA, how do the other components of the agreement affect your ability to compare that agreement with the hypothetical negotiation?
A. Well, you have to consider the supply portion of the
09:23 agreement. That's why Netlist entered into the license agreement. One of the most valuable portions of the agreement was that supply agreement. And so if you're looking at the hypothetical negotiation, you have to consider that was additional value that was given beyond any cash payments that were made.
Q. How do you analyze any monetary payments that were paid?
09:24 A. Well, you have to know that that's just the cash payments, but you have to also add in or consider valuable non-cash elements like the supply agreement and the joint development partnership.

Q. And turning to the SK hynix agreement, how did that strategic agreement factor into your analysis of the hypothetical negotiation?

09:24 A. Well, the same ways as the JDLA, that they only -- they were more interested in the guaranteed supply agreement than a straight-up license agreement like we have to determine here in the hypothetical negotiation. There can't be a supply agreement as the result of the hypothetical negotiation. It has to be a cash payment, so we have to determine what that would be.

Q. How did you -- what is your opinion regarding whether the parties would use either of these agreements to set royalty 09:25 rates in this case?

MR. REGER: Objection, Your Honor. May we approach?

THE COURT: Approach the bench, counsel.

(The following was had outside the hearing of the jury.)

MR. REGER: Your Honor, this is another attempt at suggesting a lost profits analysis. At the end of the day, they're suggesting that they lost sales because Samsung terminated -- the agreement was terminated with Samsung. And if SK hynix replaced that, it's a lost profits case, Your 09:25 Honor. What we should be focusing on is this value of the agreement.

THE COURT: Are you telling me he is testifying

beyond the scope of his report?

MR. REGER: No, Your Honor. I'm saying that it's not --

THE COURT: If he's not testifying beyond the scope of his report, then what you're in essence giving me is a late-breaking *Daubert* argument at the bench and we're not going to circumscribe his report any more than I'm going to let Plaintiff go beyond the scope of his report.

Your objection's overruled.

MR. REGER: Thank you.

MR. STRABONE: Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT: Let's proceed.

09:26 Q. (BY MR. STRABONE) And so, Mr. Kennedy, what is your opinion regarding whether the parties would use either of these agreements, the JDLA or the SK hynix agreement, to set royalty rates in this case?

A. My opinion is they're too different than the -- what we're trying to figure out in the hypothetical negotiation to use as a comparable license, because I believe the supply agreements gave them billions of dollars of -- of additional value. 09:26 And what we're doing in the hypothetical negotiation is trying to determine what the cash payment would be for a license. These have too many other considerations to be

converted to a cash payment.
Q. You mentioned that you had access to other confidential patent licenses that Samsung entered into.
A. Yes.
Q. Did you analyze those agreements?
A. Yes, I did.
Q. What was your conclusion about those agreements?
09:27 A. None of them were comparable to the hypothetical negotiation and should not be used as a benchmark for what should be paid here.
Q. In your review of the evidence in this case, did Samsung identify any economic value associated with any of their licenses?
A. No, they could not. I read the deposition testimony, and we heard it played here of their licensing professional.
MR. STRABONE: Let's turn to slide 6, please.
Q. (BY MR. STRABONE) What's the next factor you'd like to discuss? 09:28
A. So this is the -- the top of the middle column is a factor that's often referred to as convoyed sales. And if there's convoyed sales, which means if you sell a product and 09:28 you're able to sell a lot of other products, you're willing to pay a higher royalty for the licensed product because you know you're going to be able to sell additional products.
Q. Does Samsung engage in convoyed sales?

A. Yes, they tried to.
Q. In what way?
A. Well, we heard that when they sell DRAM products or DDR4 products, they're also selling other types of memory products.
MR. REGER: Objection, Your Honor. Outside the scope of his report.
09:28 THE COURT: What's your response, Plaintiff?
MR. STRABONE: Mr. Kennedy discusses convoyed sales in paragraphs 669 through 671 in his report.
THE COURT: All right. Ladies of the jury, I'm going to have to get into this outside of your presence. I'm going to ask you to retire to the jury room briefly. I'll try to make this as quick as possible.
If you'll simply leave your notebooks in your chairs, don't discuss the case among yourselves, and I'll have you back in here shortly to continue.
09:29 The jury should retire to the jury room.
(Whereupon, the jury left the courtroom.)
09:30 THE COURT: Be seated, please.
All right. Mr. Strabone, give me those references again, please. Is this the opening or the supplemental?
MR. STRABONE: This is the opening report, Your Honor.
THE COURT: Okay.
MR. STRABONE: Paragraph 669. It's on page 180.

And actually 668 is where he starts the discussion of that factor, so the prior page.

THE COURT: Okay. What's the paragraph number?

MR. STRABONE: 668 is where he begins his analysis of factor 6.

THE COURT: This is his expert report of November 21st, 2023?

MR. STRABONE: Correct, Your Honor. If it would help, I could approach with my binder.

THE COURT: Well, since the jury's out of the room, why don't you put the paragraph you're relying on on the overhead so I can see it there.

MR. STRABONE: Okay, Your Honor. On paragraph 668 is where he first begins discussing *Georgia-Pacific* factor 6, convoyed sales.

THE COURT: All right. Leave it there just a second.

MR. STRABONE: Sure. And then I'll flip to the next page when you're ready.

THE COURT: Okay.

MR. STRABONE: Okay? And let's see if we can get the whole thing in here. 669, 670, and 671.

THE COURT: All right.

MR. STRABONE: And I believe he spoke two sentences about convoyed sales, Your Honor, and it was entirely within

those three paragraphs of his report.

MR. REGER: Your Honor, may I be heard, please?

THE COURT: Yes, please, Mr. Reger. Go ahead.

MR. REGER: Thank you, Your Honor.

The question that was asked was generally about convoyed sales which is why I did not object. The issue is Mr. Kennedy was trying to slip in the idea that DDR4 led to convoyed sales. DDR4 is mentioned nowhere in these paragraphs.

More importantly, Mr. Anton Tsui testified that he was talking about HBM. It's in the very first question. HBM was at issue in the first Netlist case, not DDR4. So when Mr. Kennedy started to suggest that there is support in his report for convoyed sales related to DDR4, there's no support there, Your Honor. That's when I jumped up.

09:33

THE COURT: Well, I don't think the question was improper, Mr. Strabone, but I think the witness went beyond the scope of your question and started talking about specific products and selling additional memory products that doesn't really look like it's covered by those paragraphs there.

MR. STRABONE: Understood, Your Honor. He does say -- he does specifically refer to Samsung's DRAM products in paragraph 669. And the document that he refers to here is referring to DDR4.

09:34 THE COURT: Well, the document here is about the size of a large postage stamp or a little bigger. It's not

09:34 quite so simple to see what it relates to.

MR. REGER: Your Honor, just to take it to the next step, he did start talking about how he reviewed testimony that supported his conclusion. Mr. Anton Tsui is talking about HBM which was at issue in the prior case.

MR. STRABONE: It is in an unstricken portion of his report, Your Honor. That's exactly what his report says, he reviewed testimony supporting his analysis.

MR. REGER: Your Honor, I'm not moving to strike the report. I'm moving to strike his answer as going beyond the report.

THE COURT: All right. Here's what I'm going to do. I'm going to strike his answer, but I'll allow Plaintiff's counsel to revisit the topic in a way that stays within the broader, more general provisions of the report. Okay?

MR. STRABONE: Thank you, Your Honor.

09:35 THE COURT: All right. I'll allocate this time to both of the parties. I think it's a close call, but I think the Defendant has the better part of the argument.

Let's bring the jury back in.

(Whereupon, the jury entered the courtroom.)

09:37 THE COURT: Welcome back, members of the jury. Please have a seat. Thank you for your cooperation.

09:37 With regard to the issue that was raised just before the jury left the jury room, convoyed sales, members of the jury,

is where sales of the accused products facilitate or bring about sales of unaccused products.

A simple example might be if a company sells a car that's accused of infringing, the sales of those cars might also bring about sales of an extended warranty or something that's not the car itself and is not accused of infringing, but wouldn't have been sold or bought if the car hadn't been sold.

09:37

The general concept that you've heard about is correct. However, some of the specifics that the witness gave you go beyond what he's covered in his report, and I'm going to instruct you to disregard anything specific beyond that general overview of what convoyed sales are.

I'm going to allow Plaintiff to readdress the issue, but all witnesses are required to stay within the boundaries, the four corners, of their reports. Otherwise, the opposing side doesn't know what to expect. And it works for Plaintiff and it works for Defendant. And in this case it's the Court's view that the witness went beyond the scope of his report, and that's not what the rules allow.

09:38

So that's why I'm telling you disregard Mr. Kennedy's prior answer beyond the general description of what convoyed sales are.

09:38

And, Mr. Strabone, if you want to revisit the topic, you can, or you can move on. But that's where we are.

MR. STRABONE: Thank you, Your Honor.

09:39
09:39
09:40

Q. (BY MR. STRABONE) Mr. Kennedy, does Samsung engage in convoyed sales with respect to DRAM products generally?
A. Yes, it's my understanding they do.
Q. All right. What's the next factor that you looked at with respect to the *Georgia-Pacific* factors?
A. So the -- at the bottom you see the -- it's the extent to which the infringer has made use of the invention and any evidence of the value of the use.
Q. And so is your damages analysis in this case limited to sales that resulted from acts of infringement by Samsung?
A. Yes.
MR. STRABONE: Could we have JX 17, please?
Q. (BY MR. STRABONE) And so, Mr. Kennedy, did you review Samsung's U.S. sales in this case?
A. Yes, I did.
Q. And what evidence did you see that these sales are United States sales subject to the patent infringement statute?
A. This is a list of actual sales and who they were made to, and they're selling -- these are sales from a Samsung -- a U.S. Samsung entity to U.S. customers.
MR. STRABONE: Let's return to the slides, please.
Q. (BY MR. STRABONE) Is that entity -- is that Samsung Semiconductor, Inc., that you're referring to?
A. Yes, SSI.
Q. And what is the last factor we're going to look at today?

09:40

A. So this is the portion of the profit that should be credited to the invention as opposed to non-patented elements like business risks, manufacturing process, and other things.
Q. How did you account for this factor in your analysis?
A. So I used only -- I tried to quantify only the value of Samsung's next best alternative to using the technology. So for the -- and that apportions out any other value, so they're only valuing the benefits enabled by the patent, the speed benefits and the two DPC benefits that I discussed.
Q. Did you see any evidence that Samsung was using its own innovations to help it compete with Micron and SK hynix in the DDR4 market?
A. No, I did not.
Q. In preparing your opinion, did you review testimony from Samsung witnesses discussing this?
A. Yes.
Q. In all of the deposition testimony and other materials that you reviewed for your investigation, did Samsung ever identify any specific patent that it contends is used in the accused DDR4 products?
A. No, it did not.
Q. So of the 160,000 patents we've heard that Samsung has, did they identify a single one that covers DDR4 LRDIMMs or RDIMMs?
A. No.

MR. STRABONE: Slide 18, please.
Q. (BY MR. STRABONE) Let's discuss your ultimate royalty conclusions. Can you break down how much of the benefits provided to Samsung's products are attributable to each of the patents?
A. Yes. For the '912 Patent, the damages start date is July 15th, 2020, for LRDIMMs and August 1st, 2022, for RDIMMs. And the benefits solely attributed to the infringing technology is at least $1.33 billion.
For the '608 Patent, the damages start date is June 8th, 2022, and the damages are at least $57.17 [sic] million.
For the '417 Patent, the damages start date is June 8th, 2022, and the damages are at least $48.41 million.
Q. Are the parties negotiating over a single rate in this case?
A. It could be viewed as a single -- a total amount, but there definitely would be trying to determine the value for the three patents.
Q. So how would Samsung and Netlist approach a negotiation over these three patents?
A. So Samsung, if we're assuming they're licensing the patents at the same time, would expect to get some discount for that including all three patents in a deal. So I'm assuming that the '608 and the '417 damages, which relate to performance and speed and density, would be deducted from the

09:44 '912 damages. But there would be damages and value ascribed to each one of the patents in the negotiation.
Q. Is that the end of your analysis?
A. No. If --
Q. Excuse me. What is your analysis with respect to RDIMMs?
A. So I looked at the benefit solely attributed to infringement, and then I also looked at all the sales data that we had and looked at the prices in 2016 to use the most
09:44 conservative product rate, and that difference takes the -- the benefit down to $864,183,000.
Q. In analyzing the hypothetical negotiation, did you look at what the parties might argue with respect to how much they should retain of the benefits of Netlist's patents?
A. I did.
Q. What's something that Samsung might argue at the hypothetical negotiation?
09:45 A. Well, Samsung, as we've seen, makes about 60 percent on these products, and I believe they would argue to be able to keep that 60 percent margin. And so I've given them credit for that by apportioning down the damages by that 60 percent and only crediting Netlist with 40 percent.
Q. Are there any other arguments you determined Samsung might make at the negotiations?
A. Well, sometimes companies will, and Samsung could, make
09:45 the argument that they contributed to the technology, but I

haven't seen any evidence of that. No patents have been presented.

Q. So what is your conclusion of what Samsung would pay for the sale of its RDIMMs?

A. $345,673,000.

MR. STRABONE: Can we return to slide 4, please?

Q. (BY MR. STRABONE) You just told us about a negotiation over RDIMMs. Would Netlist agree to the same arrangement for LRDIMMs?

09:46 A. No, I don't believe so.

Q. Why not?

A. Well, they recognize, you can see in this middle quote, that -- or the top quote, that it's well-known in the industry that Netlist created a system for LRDIMM technology. So I don't believe there needs to be any economic apportionment beyond determining the true value of the technology.

MR. STRABONE: Slide 3, please.

09:46 Q. (BY MR. STRABONE) What's the final result of -- for the reasonable royalty at the hypothetical negotiation?

A. The total is $457.81 million after those adjustments.

Q. Do you have an opinion on whether the parties would agree to award this amount in the form of a running royalty term payment or a paid-up-for-life lump sum payment? And if so, what's your opinion?

A. I believe they would agree on a running royalty and for a

09:47 couple of reasons. First, a running royalty connects the actual use of the technology, so they only pay a royalty for the products sold, and I think that's a more accurate measure of damages.

A lump sum amount, they would have to project out into the future how much they're going to continue to use the technology, and it can be difficult to predict this

09:47 marketplace, as we've seen. So I think they would agree on a running royalty that is based on their actual sales through trial.

MR. STRABONE: Slide 1, please.

Q. (BY MR. STRABONE) Why does it matter that the royalty reflects Samsung's use?

A. It comes back to the patent damages statute. A royalty for the use made of the invention is what's required.

MR. STRABONE: Slide 20, please.

Q. (BY MR. STRABONE) So in view of all the evidence we've discussed and in view of your own experience, what is your

09:48 final opinion about what the outcome of the hypothetical negotiation would be?

A. The final number for the '912, after accounting for any potential overlap in benefits by deducting out the '608 and the '417 damages, is $355,237,000; for the '608 Patent, it's $54,170,000; and for the '417, it's $48,408,000.

09:48 Q. Thank you, Mr. Kennedy.

MR. STRABONE: Your Honor, I pass the witness.

THE COURT: All right. Cross examination by the Defendant.

MR. STRABONE: Your Honor, may I flip the chart?

THE COURT: Please do.

MR. REGER: Your Honor, may we approach just briefly?

THE COURT: Approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT: What is it, Mr. Reger?

MR. REGER: Your Honor, very early on Mr. Kennedy testified that we will be hearing from Dr. Groehn.

09:49 MR. STRABONE: He did not say that.

MR. REGER: He did. The transcript said he will be telling us about his analysis.

MR. STRABONE: I don't believe he said that.

MR. REGER: It's in the transcript, Your Honor.

MR. STRABONE: I believe he said I will tell.

THE COURT: Well, whatever has been said or not, what is your question?

MR. REGER: The question is, Your Honor, can I briefly explore the fact that Dr. Groehn is not here and we will not be hearing from him? If I understand Your Honor's motion in limine, Mr. Kennedy opened that door.

MR. STRABONE: Your Honor, he did not say that Dr. Groehn will be here. This is a violation of the Court's MIL on empty chair.

MR. REGER: That's why I approached, Your Honor.

09:49 It's not a violation if he opened the door.

MR. STRABONE: He did not say Dr. Groehn will be here.

MR. REGER: He said he will tell us what he thinks.

MR. STRABONE: He did not say that.

MR. REGER: He did.

THE COURT: I'm going to allow you to ask one question.

MR. REGER: Thank you, Your Honor.

THE COURT: And I'm going to tell you what the question is --

MR. REGER: Okay.

THE COURT: -- so you just don't go too far afield.

MR. REGER: Yes, sir.

THE COURT: I'll allow you to ask Mr. Kennedy, is it

09:50 his understanding that Dr. Groehn won't appear at trial.

MR. REGER: Will not appear at trial?

THE COURT: Will not appear at this trial.

MR. REGER: Okay.

THE COURT: He'll answer yes or no, and you'll move on. Okay. Let's proceed.

MR. STRABONE: Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT: Let's proceed with cross examination.

CROSS EXAMINATION

BY MR. REGER:

Q. Good morning, Mr. Kennedy.

A. Good morning, Mr. Reger.

09:50 Q. Nice to see you again, sir.

A. Thank you. Nice to see you.

Q. Mr. Kennedy, how long do you think you testified this morning?

A. Probably an hour or so.

Q. Yeah, an hour, maybe a little more?

A. I believe so.

Q. And you wanted to tell the jury everything that you think is important in your opinions. Right?

A. I responded to all the questions that the attorneys asked me -- the attorney asked me.

Q. Absolutely. You talked for more than an hour, and I did

09:51 not hear you mention the burden of proof once.

A. I don't think I did.

Q. I don't think you did, either, sir. I mean, you've done a lot of these cases. Right?

A. Yes.

Q. And you know the burden of proof is important. Correct?
A. Yes. It's a legal concept, yes, but -- yes, it's important.
Q. Absolutely. In fact, we know Netlist has the burden of proof on infringement. Right?
A. Correct.
Q. On each individual patent. Correct?
A. Correct.
09:51 Q. And, sir, you know that Netlist also has the burden of proof on damages. Right?
A. Correct.
Q. Not Samsung.
A. I'm sorry?
Q. I said, not Samsung.
A. Correct.
Q. Okay. What we do know is Netlist has -- Netlist's lawyers have hired you to value the three patents in this case. Isn't that right?
A. Not -- I wouldn't phrase it that way.
Q. Well, Netlist's lawyers hired you. Right?
A. Yes.
Q. Okay. And you came up with values for the patents. Right?
09:52 A. The damages, correct.
Q. Okay. Well, to come up with the damages of the three

patents in this case, you used a hypothetical negotiation. Correct?
A. Correct.
Q. And the goal of your hypothetical negotiation is to come up with a hypothetical license. Right?
A. Yes.
Q. Now, here the hypothetical license should result in a reasonable royalty. Do you agree with that?
A. Yes.
09:52 Q. Now, you showed the ladies of the jury a slide, and it had a table with two guys sitting at it. Do you remember that?
A. Yes.
Q. One of those guys is meant to represent Netlist. Right?
A. Yes.
Q. Another guy is meant to represent Samsung.
A. Correct.
Q. You picked the date of the hypothetical negotiation. Right?
A. Yes.
Q. Okay. Now, as -- when it comes to this hypothetical negotiation, you'll agree with me that all the cards are on
09:53 the table. Right?
A. Correct.
Q. Absolutely. So you've got Mr. Samsung in your

hypothetical negotiation, you've got Mr. Netlist in your hypothetical negotiation, they have all the cards on the table. Right?
A. Yes.
Q. And to be clear, it's not just all the cards on the table. All the cards are flipped up. Right?
A. Correct.
Q. You can see everything.
A. Yes.
Q. And if I heard you correctly, I think you said you put yourself in the shoes of each of them. Right?
A. Correct.
09:53 Q. Right. So you set up the hypothetical negotiation, you put the cards on the table, you flip them over, and you play the part of Samsung and Netlist. Correct?
A. Correct.
Q. Sir, do you play board games?
A. Sometimes.
Q. Checkers, chess, anything like that?
A. Every now and then.
Q. Have you ever played against yourself?
A. No.
Q. No. That would be a little weird, wouldn't it?
A. I guess.
09:54 Q. Yeah. But we do know in your hypothetical negotiation

you made some assumptions. Right?
A. Yes.
Q. You assume the patents are infringed.
A. I'm required to, yes.
Q. And you assume the patents have some value. Right?
A. Well, I don't know if I would phrase it that way.
Q. So you did not assume that these patents have value.
09:54 A. You don't start with that assumption.
Q. Okay. What we do know is there are assumptions you made for the hypothetical negotiation. Correct?
A. Yes.
Q. Okay. Because in the real world, Samsung disagrees with you. Right?
A. Correct.
Q. I mean, in the real world, Samsung disagrees that it infringes Netlist's patents. Right?
A. Yes.
Q. In fact, that's why we're here today. Isn't that right?
A. Correct.
09:55 Q. And if the jury finds that none of the patents are infringed, then the damages are zero. Correct?
A. Correct.
Q. They can disregard everything you say and write a zero under damages. Isn't that right?
A. Correct, or they never get to the damages issue.

Q. Fair point. Never even get to damages if they find no infringement. Right?
A. Correct.
Q. Now, we know that damages is an issue for the jury to decide. Right?
A. Yes.
Q. And we know that in the real world, Samsung disagrees
09:55 with your damages number. Right?
A. Yes.
Q. In the real world, again that's why we're here. Right?
A. Yes.
Q. Okay. Now, you mentioned the *Georgia-Pacific* factors. You showed that slide a few times, one with all that text. Do you remember that?
A. Yes.
THE COURT: Mr. Reger, could you slow down just a little bit?
MR. REGER: Sorry, Your Honor.
THE COURT: Please do.
MR. REGER: Will do.
THE COURT: Let's continue.
MR. REGER: Thank you, Your Honor.
Q. (BY MR. REGER) Now, these factors guide your hypothetical negotiation. Right, sir?
A. In a way, yes.

09:56
Q. I mean, there's -- you put a bunch of factors on there and you followed those factors. Right?
A. Considered them, yes, as appropriate for this case.
Q. Okay. Now, you agree that the very first *Georgia-Pacific* factor relates to money that's been received by the patent owner. Correct?
A. Yes.
Q. And that's real-world license agreements. Isn't that right?
A. Yes. Correct.
Q. Okay. And, Mr. Kennedy, you agree that real-world license agreements are a valuable source of information. Correct?
09:56
A. They can be, yes.
Q. Absolutely. They can be. In fact, you have relied on real-world license agreements in other hypothetical negotiations before. Correct?
A. Correct.
Q. So I want to talk about Netlist's license. Okay?
A. Okay.
Q. All right. Now, you agree that Netlist has only licensed its patents twice. Correct?
A. Correct.
Q. And you made sure to put these cards on the table. Right?

09:57

A. Sure.
Q. You didn't hide those cards.
A. No.
Q. Okay. So the parties at your hypothetical negotiation would have access to those agreements. Right?
A. Yes.
Q. And because the cards are face up, Samsung would have access to this, for example, Netlist and hynix agreement. Correct?
A. Correct.
Q. Okay. Now, you have one slide on the hynix agreement. Do you recall that?
A. I do.

09:57

Q. Okay. Let's talk about hynix. Hynix is a large memory company. Correct?
A. Correct.
Q. And you agree that hynix is a competitor of Samsung's.
A. Yes.
Q. Their biggest competitor. Right?
A. One of two.
Q. One of two. They're one of the main competitors. Right?
A. Correct.
Q. Now, I believe we heard you, hynix sells DDR4 products. Correct?
A. Yes.

Q. DDR4 LRDIMMs, too.
A. Yes.
Q. DDR4 RDIMMs.
09:58 A. Correct.
Q. Hynix sells DDR4 products at the same speed as Samsung currently. I believe you testified to that. Right?
A. Yes.
Q. And the same capacity. Correct?
A. Yes.
Q. I mean, you were not aware of any differences, any differences between the hynix DDR4 products and the Samsung DDR4 products. Isn't that right?
A. That's correct.
Q. In fact, you did not ask Dr. Mangione-Smith to look at that, did you?
09:58 A. No, I didn't ask him to look at that.
MR. REGER: Your Honor, may I ask Netlist's counsel to pull up one of Mr. Kennedy's slides?
THE COURT: You may.
MR. REGER: Mr. Svenson, could I have Mr. Kennedy's
09:59 4.16, please. I'm sorry. 4.16. Thank you.
Q. (BY MR. REGER) Mr. Kennedy, this is your slide, your only slide, talking about the SK hynix deal. Right?
A. Yes.
Q. Mr. Kennedy, did you intentionally leave something off

this slide?
A. No.
09:59 MR. REGER: Your Honor, may we approach?
THE COURT: Approach the bench.
MR. REGER: Thank you, Your Honor.
(The following was had outside the hearing of the jury.)
MR. REGER: Your Honor --
THE COURT: Where are we going, Mr. Reger?
MR. REGER: Your Honor, yesterday this was their final, final slides Mr. Kennedy approved. It says cross license to SK hynix. Late last night we received an updated version of the slides. This was unobjected to. It's been
10:00 removed. And this is after it's been reviewed by Your Honor. There were no objections to it. They --
MR. STRABONE: I'm not sure what you're requesting.
MR. REGER: Either Mr. Kennedy removed it or the lawyers removed it, but I'd like to ask Mr. Kennedy why it's not there in the slides they sent yesterday as the final slides.
THE COURT: If there's been either a miscommunication or any gamesmanship between the parties with regard to slides, I doubt very seriously Mr. Kennedy's a party to it.
MR. REGER: But, Your Honor, this is his slide that

10:01 he approved.

MR. STRABONE: Your Honor --

THE COURT: If you want to show him a different version of the slide, you can do that.

MR. REGER: Okay.

MR. STRABONE: Your Honor, that would be inappropriate because we didn't use that slide first. They can't use our slides before we use them. We never used that slide. We did send them updated slides. They did not object to them.

MR. REGER: They sent it late last night, Your Honor. This was what they were going to put Mr. Kennedy on the stand for yesterday, and then in the middle of the night

10:01 they changed that slide. I'd like to ask Mr. Kennedy why it's not there.

MR. STRABONE: They can't use prior exchanged slides, Your Honor. We did not use that slide.

THE COURT: This is cross examination. You can treat this as your demonstrative which you don't have to disclose, but you are not going to ask this witness about why something is on one version and not another version, or you can simply ask him doesn't the Netlist agreement -- isn't there a cross license to another party. And you can go into

10:01 the facts of what is or isn't in the agreements.

MR. REGER: Thank you, Your Honor. I can use this

as a demonstrative.

THE COURT: Yes. But you're not going to say this is a different version of theirs. This is your demonstrative.

MR. REGER: Yes, Your Honor.

THE COURT: Okay?

MR. REGER: Thank you, Your Honor.

MR. STRABONE: As long as it's not being ascribed to us in any way, Your Honor, as that would be highly improper.

THE COURT: I think I made that clear. This is his demonstrative. Let's proceed.

MR. REGER: Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

10:02

THE COURT: Let's proceed.

MR. REGER: Thank you, Your Honor.

Q. (BY MR. REGER) So, Mr. Kennedy, this is your slide that you presented to the jury. On the left, we see SK hynix received something. On the right, we see Netlist received something. This is your slide. Right, sir?

A. Correct.

MR. REGER: I'd like to introduce a demonstrative, Your Honor.

Q. (BY MR. REGER) Mr. Kennedy, you will agree with me that as part of the SK hynix deal, Netlist received a cross license to SK hynix's patents. Isn't that right, sir?

10:02

A. They did, yes, sir.
Q. Okay. Thank you.
MR. REGER: Your Honor, at this point I ask that we seal the courtroom. We'll be getting into Netlist confidential information.
THE COURT: Well, my understanding is there is a considerable additional length of this cross examination and there will probably be redirect. It's slightly after 10:00. The ladies of the jury have had a chance to leave the courtroom and come back in, but none of the rest of us have.
So we're going to take a 10-minute recess. When we come back, then I'll entertain your request to seal the courtroom and we'll continue with your cross examination.
MR. REGER: Thank you, Your Honor.
THE COURT: Members of the jury, you can simply leave your notebooks there in the jury box in a vacant chair, follow all my instructions, and we'll be back shortly to continue.
The jury's excused for recess.
(Whereupon, the jury left the courtroom.)
THE COURT: All right. Be seated, counsel.
As we just took up at the bench conference, there apparently is a continuing inability to communicate clearly and accurately with each side in this case by counsel.
We've got allegations by Mr. Reger that there was an

10:04 improper modification of the demonstrative that was used by Mr. Strabone with Mr. Kennedy on the SK hynix license. He's showing me a version of the same slide that has additional information on it that he says Netlist improperly took off overnight and he didn't have a chance to see it.

Netlist is telling me that's not the case and it was furnished to them and they never objected to it.

There shouldn't be this kind of a problem in a trial like 10:05 this with counsel that have the experience and the qualifications that you have.

Now, we've moved on. The other slide's been shown as the Defendants' demonstrative. The fact that there was a cross license in favor of Netlist in the SK hynix agreement is an undisputed fact. It's now been brought out. We have moved on.

But I don't expect to have this kind of problem present itself in the middle of a trial again. This is just 10:05 indicative of the entire conduct of this trial from both sides. And to say that the Court is disappointed is an understatement. You're better than this, both sides. And I see absolutely no reason why there can't be and shouldn't be clear and accurate communication in a timely fashion between both sides.

10:06 And there obviously has been a break-down in that process. I want it restored, don't want to see problems like

I just saw again.

And I'm not going to go any further, I'm not going to impose any kind of penalty, but it's just a very poor reflection on the lawyering in this case that we have that kind of a problem this late in the process. And I'm putting everybody on notice you're going to need to do a better job than you've been doing.

10:06

We're going to take a 10-minute recess, I'm going to try to keep it short, and we'll get back on the record with the witness after that.

Court stands in recess.

(Brief recess.)

THE COURT: Be seated, please.

10:16

Let's bring the jury back in, please.

(Whereupon, the jury entered the courtroom.)

10:17

THE COURT: Please be seated, members of the jury.

10:17

We'll continue with the cross examination of Mr. Kennedy by counsel for the Defendants.

You may continue, Mr. Reger.

MR. REGER: Thank you, Your Honor. At this point we need to seal the courtroom. We're going into Netlist's confidential information.

THE COURT: All right. Based on that request and to protect confidential information, I'll order the courtroom sealed at this time.

Those present who are not subject to the protective order in this case should exit the courtroom and remain outside until it's reopened and unsealed.

10:17 (Courtroom sealed.)

[redacted].

[redacted]

[redacted]

10:18 Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]

[redacted]

[redacted]

[redacted].

Q. [redacted]?

10:19 A. [redacted].

Q. [redacted]

A. [redacted].

Q. [redacted]

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]

10:19 [redacted]

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

10:20 Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

10:20 Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

[redacted].

[redacted].

10:21

[redacted].

[redacted]

10:21 [redacted].

[redacted].

[redacted].

[redacted].

[redacted]

Q. [redacted]?

A. [redacted].

10:22 Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

10:22 Q. [redacted]?

A. [redacted].

Q. [redacted]

[redacted]

Q. [redacted]

10:23 [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]

10:24 [redacted]

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

10:24 Q. [redacted]?

A. [redacted].
Q. [redacted]?
A. [redacted]
Q. [redacted]?
A. [redacted].
10:24 Q. [redacted]?
[redacted].
[redacted]
Q. [redacted]?
A. [redacted].
Q. [redacted]
10:25 [redacted]?
A. [redacted].
Q. [redacted]
[redacted].
[redacted].
[redacted]
Q. [redacted]

[redacted]?

A. [redacted].

Q. [redacted]?

10:26 A. [redacted].

[redacted]

10:26 [redacted]

[redacted].

[redacted].

[redacted].

Q. [redacted]

10:27 [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]

[redacted]?
A. [redacted].
[redacted]
10:27 Q. [redacted]
A. [redacted].
Q. [redacted]?
A. [redacted].
Q. [redacted]?
A. [redacted].
Q. [redacted]?
A. [redacted].
10:27 Q. [redacted]?
A. [redacted].
Q. [redacted]?
A. [redacted].
10:28 Q. [redacted]
A. [redacted].
Q. [redacted]?
A. [redacted].

Q. [redacted]?
A. [redacted].
10:28 Q. [redacted]?
A. [redacted].
Q. [redacted]?
A. [redacted].
Q. [redacted]?
10:29 A. [redacted].
Q. [redacted]?
A. [redacted].
Q. [redacted]?
A. [redacted].
Q. [redacted]?
10:30 A. [redacted].
Q. [redacted]?
A. [redacted].
10:30 [redacted]
10:30 [redacted]

[redacted]

Q. [redacted]?

A. [redacted].

Q. [redacted]?

10:31 A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

10:31 Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

10:32 Q. [redacted]?

A. [redacted].

[redacted]

[redacted]

[redacted]

10:33 Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]

10:33 [redacted]?

A. [redacted].

Q. [redacted]

[redacted]

[redacted]

Q. [redacted]?

A. [redacted].

10:33 Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted].

[redacted]

10:34 (Courtroom unsealed.)

THE COURT: All right. The courtroom is unsealed.

10:34 Continue, counsel, please.

Q. (BY MR. REGER) So I want to stay on that $40 million that hynix paid Netlist. Okay?

A. Okay.

Q. Now, you're a CPA. Isn't that right?
A. Yes.
Q. And that stands for certified public accountant?
A. Correct.
Q. You've been doing accounting for a long time?
A. Yes.
Q. And you were also an auditor. Is that right?
A. Yes.
Q. And you were an accounting consultant for corporations. Correct?
A. Yes.
10:35 Q. You've heard of a form 10-K. Right?
A. Yes, I have.
Q. It's also called an annual report.
A. There's a distinction, but I agree they're connected.
Q. Well, a form 10-K is filed with the U.S. government. Right?
A. Yes.
Q. It's specifically filed with the SEC. Does that sound right?
A. That's correct.
Q. And they're publicly available?
A. Yes.
Q. And investors rely on these 10-Ks or annual reports to make investments. Right?
10:36

A. In part, yes.
Q. And Netlist files these 10-Ks. Right?
A. Correct.
Q. And we know that they filed one in 2022. Right?
A. Yes.
MR. REGER: If I could pull up DTX 25.1, please. If we can zoom in at the top.
10:36 Q. (BY MR. REGER) So this is a filing with the United States Securities & Exchange Commission, the SEC. Right?
A. Yes.
Q. And it covers the fiscal year ended January 1, 2022. Right?
A. Correct.
Q. By Netlist.
A. Correct.
Q. Now, sir, you know that Netlist's CEO actually signed the 10-K. Right?
A. Yes.
Q. And he actually certified that he reviewed the annual report before he signed it. Right?
A. Yes.
10:36 MR. REGER: And if I could have 25.97, please. And let's go to the bottom first, please.
Q. (BY MR. REGER) And it's signed by a Mr. Chun K. Hong, the president, CEO, and sole director of Netlist. Correct?

A. Yes.
Q. Did you ever talk to Mr. Hong for purposes of this case?
A. Yes.
Q. Great. You know that he --
MR. REGER: We can go to the top, please.
10:37 Q. (BY MR. REGER) You know that he certified that this form 10-K does not contain any untrue statement of a material fact. Right?
A. Yes.
Q. He also certified that it does not omit to state a material fact. Right?
A. Yes.
Q. It's important in these filings for Netlist to be accurate. Right?
A. Yes.
Q. And it's important for Netlist to be honest. Right?
A. Correct.
Q. So I'm sure Netlist had lawyers review this annual report. Right?
10:37 A. I would think so.
Q. I'm sure that they had accountants review the annual report. Right?
A. Yes.
Q. Perhaps auditors like you. Right?
A. Correct.

Q. Because details matter in these filings. Right?
A. Yes.
Q. Absolutely. You would not want money to be improperly booked. Right?
A. Correct.
Q. Now, in this 2022 annual report, Netlist actually describes the SK hynix agreement. Correct?
10:38 A. They do.
Q. You've reviewed this before. Right?
A. Yes.
MR. REGER: If I could pull up DTX 25.41, please.
Q. (BY MR. REGER) Tell me how much money Netlist's CEO certified was for the license fee?
10:38 A. $40 million.
Q. Now, we see sales in other places. Right? We see net product sales?
A. Yes.
Q. We see net sales below that. We see gross margins. Right?
A. Yes.
Q. But $40 million is what the Netlist reported to the SEC as a license fee. Right?
A. Correct.
Q. Okay. You understand that Netlist also reported that the $40 million was recognized for licensing of the patents

10:39 pursuant to the SK hynix agreement. Right?
A. Yes.
Q. And, sir, you agree that Netlist has never licensed its patents for more than $40 million. Correct?
A. I would agree that the cash component has not been more than $40 million.
Q. Thank you.
10:39 But it's your understanding -- withdrawn.
It's your opinion that this agreement is not comparable. Isn't that right?
A. Correct.
Q. It's just -- you think it's too hard to unpack this agreement and come up with a patent license rate from this agreement. Isn't that right?
A. I don't know if I would describe it as too hard.
10:40 Q. Well, how about this, sir? Would you say it is not possible to unpack this agreement to determine a per-unit royalty rate for the hypothetical license?
A. I agree with that.
Q. Okay. So in your hypothetical, Samsung would look down at this card showing what its competitor paid in cash for a license fee, and Samsung would say, you know what, I'm not going to play that card. Is that right, sir?
10:40 A. I'm not sure I understand the question.
Q. There's a card that's showing how much Samsung's

competitor paid. Right?
A. Right.
Q. $40 million. Right?
A. In cash. Correct.
Q. And you're saying that Samsung would decide not to play that card at your table. Is that right?
A. I just wouldn't describe it that way, but I think I agree with you that they would not use that as a comparable. Correct.
10:41 Q. But just to go back to the beginning, this is you playing the part of Samsung. Right?
A. Yes.
Q. And when you play the part of Samsung, you look down at this card saying $40 million is what my competitor paid. You, as Mr. Samsung, said, you know what, I'm not going to play that card. Correct?
A. I just don't agree with the way you're phrasing that.
Q. Understood. So let's just -- let's talk about how you did value these patents. Okay, sir?
A. Okay.
10:41 Q. Now, you agree that there's two ways to structure a license payment. Right?
A. At least.
Q. Well, sure. The two you talked about in your direct was a running royalty and a lump sum. Isn't that right?

A. Correct.
Q. Now, a running royalty is a certain dollar amount that Samsung would pay per unit. Is that right?
A. Yes.
Q. And that's the base times the rate. Right?
A. Correct.
Q. And a lump sum is generally considered like a one-time payment. Right?
10:42 A. Yes, for some period of time.
Q. That's right. And that lump-sum payment is one cash payment that covers the entire license period, whatever that is. Right?
A. Yes, whatever that period is.
Q. Now, there's a risk to lump-sum agreements. Right?
A. Yes, there is.
Q. Yeah. You may pay money for technology you don't use. Right?
A. Correct.
10:42 Q. And you may pay money for patents you do not use. Right?
A. That -- yes, that could happen. That is a risk with a lump sum.
Q. With a lump sum there is -- you're paying value for something you may never use. Isn't that right?
A. That's possible, yes.
Q. Sir, in this case you understand -- withdrawn.

In this case you have reviewed a lot of deposition testimony. Right?
A. Yes.
10:43 Q. You reviewed a lot of Samsung deposition testimony as well. Correct?
A. Yes.
Q. Now, that deposition testimony was under oath. Right?
A. Yes.
Q. Yeah. You've also reviewed over a dozen Samsung licenses. Right?
A. Yes.
Q. But I want to get this straight. Based on your review of the Samsung deposition testimony and the Samsung licenses, you agree with me that Samsung prefers a lump sum. Right?
10:43 A. Yes.
Q. I mean, you acknowledge Samsung has a preference for lump sums. Right?
A. It appears that way, yes.
Q. Right. And with all that, Mr. Kennedy, you concluded Samsung would agree at your hypothetical negotiation to pay a running royalty. Is that right?
A. That's correct.
Q. You playing the role of Samsung decided Samsung was going to go with a running royalty?
A. Yes. That's my opinion.

10:44
Q. That's right. That's your opinion, sir.
Now, when it comes to the running royalty, you focused on infringing alternatives. Correct?
A. No, I -- no.
Q. Well, you created a but-for world. Does that sound right?
A. Yes. That might be a way to describe it.
Q. I mean, you created this but-for world for your hypothetical negotiation. Right?
A. Yes.
10:45
Q. And you -- I mean, you're not an expert in any of the technology in this case, are you?
A. That's correct.
Q. And you're not an expert in memory modules?
A. That's correct.
Q. You're not an expert in DDR4. Right?
A. Correct.
Q. You got these alternatives for your but-for world from Dr. Mangione-Smith. Is that right?
A. That's correct.
Q. And if Doctor -- if the jury finds that Dr. Mangione-Smith is wrong about these alternatives, then your damages conclusion is wrong as well. Isn't that right?
A. It would change.
10:45
Q. That's right.

But what you did is you compared the real-world Samsung products against this but-for alternative. Does that sound right?
A. Yes, in effect.
Q. Right. And you determined a price difference between the real world Samsung product and your alternative. Right?
A. That's correct.
Q. And you did that for all three patents. Correct?
A. Yes.
Q. Okay. Let's turn to the '417 Patent. Now, you claim
10:45 that Samsung's customers could not implement 2DPC without the '417 Patent. Isn't that right?
A. That's my understanding from Dr. Mangione-Smith.
Q. That's right. And -- now, sir, you looked at Samsung's sales records. Right?
A. Yes.
Q. Do you know any accused products that are sold in a 2DPC configuration?
A. I don't know the product mix in 2DPC, but --
10:46 Q. I'm sorry, Mr. Kennedy.
Well, let me ask you this. Can you name a single Samsung product that's sold in a 2DPC configuration?
A. I can't. I don't think I -- well, I could explain it, but I can't answer that question.
Q. Fair enough.

10:46

Now, when we're talking about 2DPC, you understand that no -- withdrawn.

Dr. Mangione-Smith never told you that no other company contributed to 2DPC. Right?

A. No, he didn't tell me that.

Q. Other companies in addition to Netlist contributed to 2DPC. Right?

A. Yes.

Q. And part of that, the contribution to 2DPC is through JEDEC. Right?

A. Is what?

Q. Through JEDEC. Isn't that right?

A. Yes.

MR. STRABONE: Objection, Your Honor. Reference to

10:47

JEDEC.

MR. REGER: Your Honor, if I may?

THE COURT: What's your response?

MR. REGER: I can do it in open court or I can approach the bench, Your Honor.

THE COURT: I'm tired of wearing out the carpet up here to the bench. Make your objection on the record --

MR. REGER: Thank you, Your Honor.

THE COURT: -- or your response on the record.

MR. REGER: Mr. Kennedy testified that he's not aware of any Samsung contributions to its own products. They

made those contributions through JEDEC, Your Honor.

MR. STRABONE: That's an improper speaking objection and Your Honor's said that's not an issue in this case.

10:47 THE COURT: All right. The JEDEC organization and the standards that it adopts are not a part of the determination of infringement or validity in this case.

I'm going to sustain the objection.

MR. REGER: Thank you.

Q. (BY MR. REGER) Now, in your hypothetical negotiation, Samsung would ask its -- you're saying Samsung would ask its customers to replace two accused products for one accused product. Does that sound right?

10:48 A. That is the impact of trying to determine the value differential.

Q. Right. But you never talked to a single Samsung customer in this case, did you?

A. No.

Q. And you never conducted any survey of a Samsung customer. Right?

A. Correct.

Q. I'd like to quickly move on to the '912 Patent. The technical benefit you rely on for that is speed. Right?

A. Correct.

10:48 MR. REGER: Could I have JX 22.3, please.

Q. (BY MR. REGER) Now, here was an exhibit you talked about

on direct. Is that right?
A. Yes.
Q. And you were asked the question about megatransfers per second and Mbps. Do you recall that?
A. Yes.
Q. What did you say Mbps stood for?
10:49 A. I believe it's megabytes per second. I'm not a hundred percent sure, but that's my recollection.
Q. Would it surprise you it stands for megabits per second?
A. No, it wouldn't surprise me.
Q. There's a big different between megabytes per second and megabits per second. Isn't that right?
A. I assume so, yes.
Q. Sir, you relied on the ability to operate at speeds above
10:49 2400 megatransfers per second. Right? That's what you're valuing?
A. That is -- that's part of the calculation. Correct.
Q. And you do that for the '912 and the '608 Patent. Right?
A. Yes.
Q. So in your but-for world, what you're suggesting is that Samsung would forcibly slow its products down to 2400. Does that sound right?
A. That is part of the equation. Correct.
Q. Now, for this made-up situation where Samsung is forcibly
10:50 slowing its products down, you looked to Dr. Groehn's

regression to value that forced slow-down. Is that right?
A. Correct.
Q. Mr. Kennedy, is it your understanding that Dr. Groehn will not testify in this case?
A. I don't believe that he will. That's my understanding. I don't know that I -- I've not asked the question of whether
10:50 he will or won't, but my understanding is he probably won't.
Q. Now, when you talked about regression, that is Dr. Groehn's regression, not your regression. Right?
A. That's correct.
Q. And we heard Netlist introduce you as an expert. They did not introduce you as a regression expert. Is that right?
A. That's correct.
Q. So you rely on Dr. Groehn's regression to come up with your numbers. Right?
A. Yes.
Q. It's an important part of your numbers. Correct?
A. Yes.
Q. In fact, would you agree with me that 90 percent of your
10:51 damages are based on Dr. Groehn's regression?
A. I think -- yes, that percentage sounds about right, yes.
Q. Now, sir, you put together a long expert report. Correct?
A. Correct.
Q. 200 pages, single-spaced. Would that surprise you?

A. No, it wouldn't.
Q. And you never mentioned the word 'regression' once in a 200 single-spaced report for 90 percent of your damages. Is that right?
A. That's correct.
10:51
Q. Did you know that you only mentioned Dr. Groehn eight times in the 200 single-spaced report?
A. I didn't -- I have not counted that up so I did not know that.
Q. Well, sir, did you know that if you looked at your resume and all the exhibits, your report's actually like 280 pages long?
THE COURT: Mr. Reger?
MR. REGER: Yes, sir?
THE COURT: Slow down, please. It doesn't do any good if the jury and the court reporter can't follow you. You're awfully fast.
Let's continue.
Q. (BY MR. REGER) If you add everything up, your report is roughly 280 pages long. Does that sound right?
10:52
A. Sure.
Q. And you never mentioned regression once.
A. I don't recall whether I mentioned it once or not. I know that I referred to Dr. Groehn's work, but I don't recall.
Q. Well, you agree with me, sir, that if Dr. Groehn's

numbers are wrong, then your damages numbers for these two patents, the '912 and the '608, are equally wrong. Correct?
A. They would change, yes.
10:52 Q. Exactly. So if Dr. Groehn's numbers went from 1.13 to 0.13, that would have a significant impact on your damages. Right?
A. It could, yes.
Q. And you understand that when you run regression, you can actually come up with a negative relationship. Right? Did you know that?
A. You can, yes.
Q. And so if Dr. Groehn had come up with negative results, it would actually result in a situation where Netlist would be paying Samsung. Right?
10:53
A. I can't imagine that would be the result. It could be that a regression could come to a negative number, though.
Q. Absolutely.
Now, you mentioned you talked to Dr. Groehn twice. Did I hear that right?
A. I talked to him more than twice. I'm not sure --
Q. You mentioned you had two conversations with him for this report. Does that sound right?
10:53 A. At the time of the report, yeah, that sounds right.
Q. Did you know you never mentioned those conversations in your report?

A. I don't know whether I did or not.
Q. Well, if -- have you -- you know Samsung hired a Dr. Ray Perryman to review Dr. Groehn's work?
A. Yes, I do.
Q. Have you analyzed Dr. Perryman's work?
A. No, I haven't. I've -- no, I haven't.
Q. Are you going to defend the regression analysis against Dr. Perryman?
A. I'm not sure I understand your question.
Q. I mean, I didn't hear you mention Dr. Perryman once, did I?
A. No.
Q. Okay. You are aware, though, sir, that Dr. Groehn did not analyze the patents. Right?
A. That's correct.
Q. And you are aware that Dr. Groehn did not look at any prior art. Right?
A. Correct.
Q. I'd like to talk about that supply for a moment. Can we do that?
A. Sure.
Q. Okay. So we're talking about the JDLA supply. Okay?
A. Okay.
Q. Now, when we're talking about supply, what we're talking about is your projection of Samsung's sales to Netlist.

Correct?
A. Yes, basically.
Q. I mean, these are not Samsung products that are custom or customized for Netlist, are they?
A. No, I don't believe so.
Q. Right. They're commodity products. Correct?
A. Correct.
Q. Where Samsung designs the products. Right?
10:55 A. Some of them they could design themselves.
Q. Samsung builds the products. Right?
A. Yes.
Q. Samsung markets the products. Right?
A. They do.
Q. And Samsung sells the products. Right?
A. Yes.
Q. And then Netlist buys those products from Samsung. Right?
A. They do.
Q. And so Samsung gets a profit when it sells these products to Netlist. Right?
A. Yes. I'm assuming they get a profit, yes.
10:56 Q. Sure. And then Netlist resells the products. Right?
A. Yes.
Q. And then Netlist gets a profit based on Samsung's products. Correct?

A. They do get a profit. It's not just based on Samsung's --
Q. Sure. They have other suppliers. Right?
A. Yes.
Q. Okay. Now, for this $2.3 billion number, you were predicting future profits. Correct?
A. Correct.
Q. In fact, I want to make sure I heard you right. You were predicting through 2040?
A. Correct.
10:56 Q. Sir, in your same direct testimony, sir, you -- I think I wrote it down correctly. This market is difficult to predict. Do you remember saying that?
A. Yes.
Q. But you went out 16 years. Does that sound about right?
A. In that analysis, yes.
Q. Right. Cyclical -- I mean, it's a cyclical market, and that means there's a period of shortages. Correct?
A. Yes.
Q. It means there's periods of oversupply. Right?
A. Correct.
10:57 Q. And there's -- there are severe price variations for memory. Right?
A. Yes, significant, severe, I would agree with that. Can be.

10:57
Q. Sir, did you know that Netlist told the public that change -- withdrawn.
MR. REGER: Can I have DTX 25.19, please? There we go.
10:58
Q. (BY MR. REGER) Have you seen this before, sir?
A. I believe so.
Q. You never asked Netlist for a forecast to help you predict through 2040, did you?
A. No. No. I did that independently.
Q. And you did not ask Netlist because Netlist does -- finds
10:58
it very difficult to accurately forecast and plan future business activities. Correct?
A. That's true.
Q. In fact, it's difficult for anyone, according to Netlist, to predict far into the future. Right?
A. Yes.
MR. REGER: Your Honor, may I have one minute?
THE COURT: Take a minute.
(Pause in proceedings.)
10:59
Q. (BY MR. REGER) One last question for you, sir. You understand that DDR4 will be phased out of the market in the next few years. Right?
A. I'm not sure what the timeline is, but I do know that
10:59
there is the next generation that's -- that is going to start being sold, DDR5.

MR. REGER: Thank you, Your Honor. Pass the witness.

THE COURT: Is there redirect?

MR. STRABONE: Yes, Your Honor, and may I approach before?

THE COURT: Approach the bench, counsel.

(The following was had outside the hearing of the jury.)

THE COURT: What is it?

MR. STRABONE: Your Honor, there was a lot of discussion regarding the value of the supply agreement and the fact that the cash consideration of SK hynix was the only portion of the consideration. I request to show these two slides from opening that were already shown.

11:00

THE COURT: Is there objection to showing slides from opening that have already been shown?

MR. REGER: Absolutely, Your Honor.

THE COURT: What's your objection?

MR. REGER: I have no indication those are actually in his report.

MR. STRABONE: They are in his report, and it goes to the question of why was supply so valuable from SK hynix in 2021.

11:00

MR. REGER: Your Honor, that's with respect to the JDLA, not SK hynix.

MR. STRABONE: That's right, the JDLA and Netlist losing support and why SK hynix supply was so valuable to Netlist, and that's throughout --

MR. REGER: That's the lost profit --

THE COURT: Gentlemen, one at a time up here. You're still on the record. We still need it accurately transcribed. And as good as my court reporter is, he can't transcribe accurately when two people are talking at the same time.

To the extent a slide has been used in opening and 11:01 already published before the jury, you can ask this witness if he was here during opening and saw this slide. And if my observations are correct, Mr. Kennedy's been here the whole trial.

MR. STRABONE: That's correct.

THE COURT: And as long as any follow-up questions stay within the scope of his report, I don't have a problem with that. He is limited to the four corners of his report, though.

MR. STRABONE: Okay.

THE COURT: Okay?

MR. REGER: Your Honor, may I ask just to clarify, this is the JDLA, not SK hynix. And they are trying to --

11:01 THE COURT: Well, I assume counsel is going to put it in an accurate context. You're not going to represent that

this relates to the SK hynix agreement when it relates to the JDLA.

MR. STRABONE: The emails say 2017. I'm going to ask him -- I'm going to show him and ask if he was in opening when these were shown, and I'm going to ask him why was supply so valuable to Netlist in 2021 when they entered into the agreement with SK hynix.

I expect the answer will be because they no longer had supply from Samsung.

11:02 MR. REGER: Your Honor, that's four years afterwards. It's four years after these emails. It's after they signed the agreement. It's after they allegedly -- not allegedly. It's after they terminated the JDLA.

MR. STRABONE: He said in his report that supply from SK hynix was incredibly valuable because Netlist was in a bad spot and needed it following the cessation of the JDLA.

MR. REGER: And this is not a lost profits case. It goes directly to the CD count valuation of the JDLA and the breach thereof.

11:02 MR. STRABONE: He does not disagree that it's in his report, Your Honor.

THE COURT: All right, gentlemen. If it's in his report, it's fair game. If it's outside his report, it's objectionable and I expect you to object.

Let's proceed.

MR. STRABONE: Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT: Let's proceed with redirect examination, please.

MR. STRABONE: I may it please the Court.

May I approach counsel's table for a second?

11:03 THE COURT: You may.

MR. STRABONE: May I please have DTX 8? Can you please blow up the title, Mr. Svenson?

REDIRECT EXAMINATION

BY MR. STRABONE:

Q. Mr. Kennedy, counsel asked you a lot of questions about
11:03 the cash portion of the SK hynix agreement. What else did Netlist receive as value as part of the SK hynix agreement?

A. A supply agreement.

MR. STRABONE: May I have the elmo, Madam Court Reporter.

THE COURT: Madam Courtroom Deputy. But it doesn't matter --

MR. STRABONE: Madam Courtroom Deputy. Thank you very much.

Q. (BY MR. STRABONE) Were you in court, Mr. Kennedy, when this was shown during opening?

A. Yes.

11:04
Q. And this is an email from 2017 in which Mr. Metz at Samsung is referring to Samsung no longer having allocation to support Netlist and that this will have a dramatic impact on their financials and future business.
Did you analyze this email as part of your investigation in this case?
A. I did.
Q. And this slide was also shown in opening. Again, 2017
11:04
where -- from Samsung stating that regarding Netlist, it pulled all PAs from Netlist and distributed them to other customers. Do you remember this slide?
A. Yes.
Q. So why was receiving supply so valuable for Netlist at the time of 2021 when it entered into the SK hynix agreement?
A. Well, the JDLA had just terminated, and they were looking
11:05
for a reliable source of supply, so they were -- it was very important for them to be able to replace that supply.
MR. STRABONE: May I have slide 1, please?
Q. (BY MR. STRABONE) Mr. Kennedy, given that the jury cannot award supply or any other consideration, why is it so important to look at the technical benefits of the patents in this case?
11:06
A. Because that's what the statute requires. It looks at the use made of the invention, which can be determined based on analyzing the technical benefits obtained from that use.

Q. The use by Samsung?
A. Yes.
Q. Thank you.

MR. STRABONE: I pass the witness, Your Honor.

THE COURT: Is there additional cross, Mr. Reger?

MR. REGER: There is not, Your Honor.

THE COURT: All right. Then you may step down, Mr. Kennedy.

THE WITNESS: Thank you, Your Honor.

11:06 THE COURT: You're welcome.

Plaintiff, call your next witness.

MR. SHEASBY: Your Honor, Plaintiff Netlist respectfully rests its case in chief.

THE COURT: All right. The Plaintiff has rested its case in chief, so we will transition, members of the jury, to the Defendants' case in chief.

Are the Defendants prepared to call their first witness.

MS. SMITH: We are, Your Honor.

11:06 THE COURT: Please call your first witness.

MS. SMITH: Your Honor and ladies of the jury, Samsung calls Mr. Joseph Calandra.

THE COURT: All right. Mr. Calandra, if you'll come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT: Please come around, sir, have a seat on

the witness stand.

MR. CORDELL: And, Your Honor, just to clarify, our Rule 50 motions are reserved until the end --

THE COURT: As is the usual practice in this court, Mr. Cordell.

11:07 MR. CORDELL: Thank you.

THE COURT: All right, Ms. Smith. You may proceed with direct examination.

MS. SMITH: May it please the Court, counsel.

JOSEPH CALANDRA,

having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MS. SMITH:

Q. Good morning, Mr. Calandra.

A. Good morning, Ms. Smith.

Q. If you would, introduce yourself to the ladies of the jury.

11:07 A. Hi. My name is Joe Calandra. I live in Leander, Texas, with my two daughters, my wife, a big dog; and I am a senior vice president of sales for Samsung.

Q. And you said you lived in Leander, Texas. How long have you lived in Leander?

A. Coming up on five years.

Q. Now, you work at Samsung. What did you do before you took your job at Samsung?

11:08

A. So this has been an interesting journey for me, and the reason why is because I've -- I worked for the other company that's been mentioned a lot, Intel, for 20 years.
Q. Now, my bet is the jurors are mostly familiar with Intel, but remind the ladies of the jury who Intel is.
A. So Intel is one of the largest, if not the largest, semiconductor company in the world, and they make a variety of products, including what's called the CPU, which is the brain of the computer, many will call it.
They've made memory products, which I've sold while I was there, and they also make the memory controller and along with other things like wireless devices, et cetera; so really a lot of pieces and parts that go into the computer.

11:08

THE COURT: Mr. Calandra, pull the microphone a little closer to you, please.
THE WITNESS: Yes, Your Honor.
THE COURT: Thank you.
Go ahead, counsel.
Q. (BY MS. SMITH) So, Mr. Calandra, what was your specific job at Intel for those 20 years?
A. So I had various sales and marketing roles calling on various companies, so I've done, you know, really lots of different things. My last job there, though, working with a company that everyone would know was I was the global account director for HP who makes PCs.

11:09

11:09

11:10

Q. And as the global account director for HP, did that involve selling memory products?
A. It did.
Q. Okay. So it's fair to say you've spent -- is it almost 25-year career selling memory products?
A. A little bit more, yes.
Q. All right. So where did you go to school?
A. I went to Stockton University, and at post-grad I went to Emory University.
Q. Okay. What did you study post-grad?
A. I studied business, Master's in business.
Q. So when exactly did you join Samsung Semiconductor?
A. February of 2020.
Q. Okay. After 20 years at Intel, what caused you to go from Intel and join Samsung?
A. There were two factors. Family was first, so I was looking for the right location for my family. The other thing was the ability to grow my career in new areas, my tech career.
So when Samsung approached me, what was attractive about the role was that it was based in Texas. The other thing that was exciting about the role is that there were very few companies that were as big and had as many products as Intel, but Samsung was one of those companies.
And Samsung was known to be a leader and an innovator.

So it was the right opportunity to call on more customers, working for another great location -- working for another great company in a location that I wanted to live with my family.

Q. And you mentioned a change in location a few times. Where were you based for Intel?

A. So I had two locations. A big portion of my career was in Atlanta, Georgia. I moved to the Bay Area very -- for a couple of years with Intel, and I didn't like California that much, so Texas was attractive.

Q. You fled California for Texas.

A. Yes.

Q. All right. Now, we've heard a little bit over the last couple of days about the Samsung family of companies. What is Samsung Semiconductor or, as we've been calling it, SSI?

A. SSI is a U.S. organization, and -- you know, so SSI is a U.S. semiconductor company headquartered in San Jose, California.

Q. And what's your specific title at SSI?

A. Senior vice president of sales.

Q. So we talked about the types of memory products you sold back at Intel. What type of memory -- what type of products do you sell for SSI?

A. I sell two primary types of products--one that has been discussed here, which is DRAM; and the other is an SSD or NAND

technology.
Q. And what types of companies are you selling those two products to?
A. I sell to the leaders in the industry, so it would be names that I think the jury and everybody in the room would be familiar with, so the OEMs, like HP and IBM and Lenovo and Dell in Austin, as well as what people call cloud companies like Meta and Amazon and Microsoft, you know. So really a variety of companies, including a lot of small companies as well.
Q. And, sir, do you -- you don't do it alone. Correct?
A. No.
Q. Do you have a team?
A. I have a team of 55 that work under me in the organization.
Q. And tell the ladies of the jury a little bit who -- about who those 55 people are that work under you.
A. So 55 people are -- kind of start at what you might call an account director, so a responsible party as the main interface for some of the accounts that I mentioned earlier.
And then, because we deal with a lot of complex products, that -- they have people that work for them, and some of them might be a NAND or an SSD specialist and others would be DRAM specialists. So they would work with the customers on things like pricing. They would work with them on forecasts or how

much they wanted to buy, how much we had available to sell.

And then back up to the account director, they are typically the ones that are involved in the agreements with the customers as well.

Q. Now, sir, you brought some documents to share with the jury this morning?

A. Yes.

MS. SMITH: All right. Mr. Jackson, if we could bring up DDX 2-2, please.

Q. (BY MS. SMITH) What are we seeing here, Mr. --

MS. SMITH: Yeah. That's right. Sorry.

11:13 THE WITNESS: We are seeing --

Q. (BY MS. SMITH) What are we seeing here, Mr. Calandra?

A. We are seeing the products that I was mentioning a few moments ago. So the top line is the DRAM products that I was speaking about, and you have the modules or -- I'm sorry, you have the chips. And then, as we've spoken about in the court, we have the modules, which is the device that holds the chips, if you will. And on the bottom are the SSD products I mentioned earlier, which are, you know, basically memory storage.

Q. Now, before we get into more detail about that, I want to talk a little bit about Samsung as an organization.

11:14 Which three --

MS. SMITH: And if I could see DDX 2-3, please,

Mr. Jackson. Thank you.
Q. (BY MS. SMITH) Which three Samsung entities are named in this lawsuit?
A. So, as I understand it, these are the three entities, and I'll tell you a little bit about them.
So at the top is Samsung Electronics, Limited. That is the Samsung based in South Korea. That is the overarching parent for -- you know, for memory and electronic products.
Q. So when you say 'overarching parent', how is SEC at the top related to your employer, SSI?
A. So they are our corporate parent, if you will. I think that's the way I would explain it.
And then if you look at the bottom, if I may, there are two entities that operate in the United States under electronics. The one on the left is the easiest to explain to the jury because it's the one that's easiest to understand.
So Samsung Electronics America is the organization that you're very familiar with when you go into a Best Buy. So you might go and buy a TV or a phone or a washer or a dryer. So that falls under electronics.
And then if you look to the right, that's Samsung Semiconductor. And Samsung Semiconductor is broken into two pieces. On the first piece is memory and memory products, which we talked about a moment ago, or we talked about quite a bit.

11:15 And then the other half is what's called Samsung Foundry. And what a foundry is a factory where you make someone else's products for them. So they give you the design specification and then you build it for them as, you know, sort of as an OEM for them -- or an ODM for them, I might call it.

Q. And I believe you said previously that SSI's headquartered in California?

A. San Jose, California. That's correct.

Q. Thank you, sir.

Now, Mr. Calandra, we find ourselves in a Texas court today, so I want to talk a little bit about Samsung's offices in Texas.

11:16 MS. SMITH: If we could see DDX 2-4, Mr. Jackson.

Q. (BY MS. SMITH) What do we see here, Mr. Calandra?

A. So we have offices throughout Texas, but I'll cover the main locations.

So if you look at No. 1 and No. 2 on the map, those are two very substantial locations for us. That's where our sales and marketing is headquartered in Texas. But also, more importantly, No. 1 and 2 is where we have two factories.

No. 1 in Austin is our currently operating factory where

11:17 we build products for other customers; and then in Taylor, which have been in the news a lot, that will be our second factory. So those are factories.

When you look in the Texas area, Irving, Coppell, and

Plano, those are various Samsung Electronics entities that do things like the phones and the TVs and telecom and all sorts of those functions. And then in The Woodlands, it's back to memory where we service two very large OEMs that are based in Houston.

11:17 Q. You mentioned the factories No. 1 and 2 in Austin and Taylor. I believe you brought us some photographs of those factories on the next slide?

A. I did.

Q. All right. What are we seeing here?

A. So this is our current operating fab. And to give you an idea of the scale of how big a fab is, it's hard to believe, but, you know, maybe a shopping mall for comparison. And then if you look at the little black specks, those are cars in the parking lot.

11:17 Q. All right. And that's -- you said that's the current fab plant--right?--down in Austin.

A. That's correct.

Q. All right. What do we see on your next slide?

A. So the next slide is an even bigger fab. I believe it's going to be our largest, and it is scheduled for completion going into 2025. It will house, I think, another 2300 manufacturing employees.

Q. Okay. Now, one point of clarification, Mr. Calandra.

11:18 Does Samsung make the products at issue in this case at the

Austin fab that we just saw?
A. No, we don't.
Q. Okay. Now, how long has Samsung had facilities in Texas?
A. So our facility -- so offices go back into at least the '80s, but facilities as large and complex and big as these -- it's been -- I think 1996 was when we opened our first fab.
MS. SMITH: Now, moving on to the next slide, which is DDX 2-7. Thank you, Mr. Jackson.
11:18 Q. (BY MS. SMITH) Does Samsung have facilities in other parts of the U.S.?
A. We do.
Q. Tell us a little bit about those.
A. So I'll go from east to west. If you look at No. 1, that's beautiful New Jersey, and that is where Electronics USA is located, or Electronics America. And that's where, you know, the phones, the TVs, the appliance headquarter is located.
If you look down to No. 2, that is a production facility 11:19 for the appliances--washers, dryers, stoves, those sorts of things.
No. 3 is Samsung Austin Semiconductor, so that's the two factories that we were talking about, or the fabs.
And then when you look at 4 and 5, there is two locations, both are in the Bay Area or San Jose area of California, and we do research and development exclusively --

11:19

or the site is exclusively used for research and development at No. 4. And then the headquarters building for my organization, which I mentioned, is at No. 5--Samsung Semiconductor.
Q. Another point of clarification. Nos. 2, 3, and 4 are not actually involved in -- are not defendants in this lawsuit. Correct?
A. That's my understanding. Correct.
Q. Okay. Now, there is no doubt that the Samsung family of companies is large. Has it always been that way?
A. Not at all, no.
Q. Tell us about that.
A. So Samsung started actually as a grocer selling dried fish, of all things, I think in the, you know, turn of the century, maybe 1920, 1930; a very long time ago.

11:20

Q. So, fair to say, if you worked for Samsung back in the day, you'd be selling fish, not memory?
A. If it was dried fish, I would be selling it but not eating it, yes.
Q. All right. Tell the ladies of the jury how Samsung got into the semiconductor industry.
A. So for those that are familiar with the history of Korea, Korea was a very, very poor country for a long time, and as -- you know, as the Korean conflict concluded, Korea wanted a more prosperous environment for its citizens.

11:20

So Samsung is I think today like hundreds of companies. I don't know the exact number, but even back then in the -- you know, in the 1980s when Samsung entered semiconductors, we saw that it was a great opportunity for economic prosperity.

We approached the Central Korean government and said, 11:21 Hey, we think semiconductors are going to be the next big thing; they're really -- you know, with Apple and everybody, things were just getting started.

And the government was at first against the idea because the capital and the amount of money that you have to invest is very, very high. So at first the government was trying to persuade Samsung not to do it, but because Samsung was already a big part of the Korean economy, eventually they said, Hey, let's -- the Korean government said, Let's partner together to do this thing.

11:21 So the rest is history. Samsung has grown to be, in many cases, the largest in the world, but always in the top handful of semiconductor makers.

Q. Now, Mr. Calandra, if you would slow down just a little bit. Your testimony is actually being recorded here.

A. Certainly. Thank you.

Q. So I appreciate it, sir.

Now, have you enjoyed I guess your start at Samsung, your first five years?

A. I've loved it.
Q. How so?
11:22 A. It was what I expected it to be. Samsung continues to, you know, deliver cutting-edge technologies, so we're always bringing something new and great to the customers. So, yeah, it's just really, really fun to interact with the customers to deliver what they want and to help them to scale their businesses.
Q. Now, you mentioned you left Intel for Samsung because of the innovation going on at Samsung. If somebody said that Samsung was not an innovative company, what would you say?
A. I would disagree.
Q. Why?
11:23 A. Samsung is one of the world's largest patent holders. I think we have 145,000 total patents in the United States, if I recall correctly; maybe more now. That's data that I remember from last year. And I think we have 14,000 memory patents. So those big R&D facilities that we have throughout the United States produce a lot of innovation. And I think our customers would agree, too.
11:23 Q. Well, let's talk about those big R&D facilities.
How much does Samsung invest in research and development annually?
A. $20 billion.
Q. Billion with a B?

A. With a B.
Q. All right. Does Samsung do any of that $20 billion of research and development in the United States?
A. Yes, we do.
Q. Where does that happen?
A. It happens throughout the United States. We have labs in Texas, but primarily where the largest footprint we have for R&D is in No. 4, and specifically for memory is in No. 5. We have five labs in our San Jose facility.
Q. Okay.
MS. SMITH: And if we could go to the next slide, Mr. Jackson, which is DDX 2-8.
Q. (BY MS. SMITH) I think this hits a few of the points you just made.
How many Texas employees does Samsung have?
A. We currently operate with 6600, and then, as I mentioned earlier, we're going to add 2300 when our fab opens in Taylor.
Q. Okay. Taylor's got about 17,000 people. Is that right?
A. That's the size of the town, but it's -- the town size has actually doubled because there's 18,000 construction jobs building it right now.
Q. As a result of the --
A. As a result of the foundry, yeah. So another 18,000 have come to work there.
THE COURT: Let me remind you both, we need people

to speak one at a time.

THE WITNESS: Yes, sir.

THE COURT: Don't speak over each other.

THE WITNESS: Yes, sir.

THE COURT: All right?

Let's continue, please.

MS. SMITH: Understood, Your Honor.

Q. (BY MS. SMITH) All right. Mr. Calandra, we've heard a
11:24 lot about DRAM products. Remind us, what's DRAM do?

A. DRAM is the information that a computer is accessing and in use at the time. So we talked about two products that we make, you know, SSDs which store data, and then DRAM is the data that you're referencing.

So a very simple example on like a PC or cell phone is you've taken a picture -- you're on vacation, you've taken a picture, and you've stored it on your device. When somebody
11:25 says, Hey, where did you go last week, and you pull up the picture to show to them, that's what's in DRAM. DRAM is actually holding the bits or the image at that time. And then when you close the picture, it goes back into memory or back into storage.

MS. SMITH: Okay. Now, if we could see the next slide, DDX 2-9. Thank you, Mr. Jackson.

Q. (BY MS. SMITH) We've spoken a little bit about DDR4 LRDIMM and RDIMM products. What's your familiarity with

those?

11:25 A. I am highly familiar with those parts.

Q. Those are the parts you sell?

A. Every day, yeah.

Q. I believe you've actually brought some demonstratives. Do you have them in your pocket?

A. I have them on the desk right here.

Q. If you could share those with the ladies of the jury, please.

A. Sure. Do I hand them directly or --

THE COURT: No. Stay in your seat.

THE WITNESS: That's what I thought.

MS. SMITH: Your Honor, may he have permission to just kind of hold them up --

THE COURT: Certainly.

MS. SMITH: -- when he speaks?

Thank you, Your Honor.

THE WITNESS: Okay.

Q. (BY MS. SMITH) If you could hold them up and tell us at a high level the difference between RDIMM and LRDIMM.

11:26 A. So these two devices are very closely related to each other or very similar in a number of attributes they have.

Those little black what you might call a chiplet or a DRAM are the majority of what you see on there. We've also talked about registers. So that one in the middle is a

11:26
register. And then the biggest differentiation between these two is across the bottom on the LRDIMM are the buffers that they were talking about throughout this trial. So this is an LRDIMM and this is an RDIMM.
Q. So, Mr. Calandra, why would a Samsung customer choose an LRDIMM over an RDIMM or vice versa?
11:27
A. So they are application-dependent, and it depends on what they want to do with the technologies. But generally what differentiates an LRDIMM from an RDIMM is an LRDIMM is you typically want a bigger memory footprint, so typically will try to put more of them together to create a larger footprint.
Q. What's the significance of that DDR4 name we keep hearing in the courtroom?
11:27
A. So each generation of product has a number so that you know it's the newest generation of product, and in this case DDR4 is the fourth generation of DRAM technology. And what's -- you know, now we're in the DDR5 age. Right? So it's DDR1, 2, 3, 4, and now we're moving into 5.
Q. You say now moving into 5. When does DDR4 phase out?
A. So there's not an exact date, but I believe that manufacture -- so procurement has kind of changed. So at this point in time people are buying more of the new stuff than the old stuff, so we've crossed over with most customers buying DDR5.
11:28
I could look at our forecast and our manufacturing plan,

but I would say you're going to see very little DDR4 in the market in the next --

THE COURT: Mr. Calandra, please slow down.

THE WITNESS: Yes, sir. My apologies.

THE COURT: It's all right. Just take it slow.

THE WITNESS: In the next two to three years, I would say you will not see it much at all, especially in servers.

Q. (BY MS. SMITH) Now, Mr. Calandra, does Samsung develop its own memory products?

A. We do.

Q. How so?

11:28 A. So the development process, there's a lot of steps to it and there's a lot of people involved, so I'll explain it.

It starts first with the customer, because if we build the wrong product or a customer -- a product that the customer doesn't want or it doesn't interoperate with some of the other competitors that were mentioned earlier, it's the wrong product.

So we start with the voice of the customer, and we send what's called a product planner, which is an engineer that is 11:29 there to listen to the customer's needs, what they think the product's going to look like in the next several years, and that gives us an idea of what R&D we should start and where we should focus our R&D.

Soon after the R&D efforts -- I'm sorry. After the product planning efforts and the R&D efforts, we produce what's called a sample or a first article, and we ship it to the customer for them to test it. The customer tests this and gives us feedback on the functionality of the device, does it work as they expected. They also give us feedback on the quality, is the quality what they expected.

After those steps, we do what you might call product specification sheets and -- and user guides, and those sorts of things, so kind of like an owner's manual on an electronics device.

And then we start mass production, which is when -- typically at the mass production stage is where my team gets most heavily involved, and we work with the customer on how many would you like to buy, when would you like to buy them, we agree on what the right price is, and then we start shipping them in volume.

Q. Now, is Netlist involved in Samsung's product development process that you just described?

A. They are not.

Q. Okay. Who manufactures the accused memory products in this case?

A. Samsung does.

Q. Is Netlist at all involved in Samsung's product manufacturing process?

A. No, they are not.
MS. SMITH: If we could go to DDX 2-10.
11:30 Q. (BY MS. SMITH) Mr. Calandra, where are Samsung's memory products manufactured?
A. Memory products are manufactured in South Korea.
Q. And are we seeing a photograph of a fab in South Korea here?
A. You are. You're seeing the inside of the fab, which is -- this is called a clean space. And without too much boring detail, all those machines on the floor are making the chips. And then if you look at the ceiling, all those things 11:31 that look like robots are -- they kind of are robots because they're transporting the chips from step to step in the process.
And then in the middle you'll see somebody with a -- you know, a bunch people. We see one with a little blue suit and white suits behind them. That's call a bunny suit. And earlier in my carrier, I thought it was to protect the people from the chemicals and processes, and then you realize that this is such a sensitive process, that it's actually to protect the chips from the people and impurities in the air.
Q. Now, sir, who builds these factories?
A. We do.
11:31 Q. And how big are they?
A. They are, you know, massive. But for scale, as I

mentioned earlier, they could be bigger than a shopping mall; you know, many football fields inside. They are massive entities. It's takes some time to drive around one; they're that big.
Q. Okay. So stepping into one of these massive facilities, how long does it take to manufacture a single, a single, DDR4 module?
A. The module process is probably four months. There's a -- 11:32 there is a lot of steps in the process and then end user product gets shipped.
Q. And how many individual components make up a single module?
A. Today? Billions. You know, we went from thousands back in the '70s to millions to now billions inside each of these devices.
Q. How often does a customer come to you and say, Mr. Calandra, I want a very specific component of the memory?
A. They don't.
Q. Why not?
11:32 A. As I mentioned earlier, the customers want to have choice. And what I mean by that is, they want to know that if they buy our parts or Micron, which is mentioned earlier, or hynix, they want to know that they all interoperate. So they don't get into the details. What's most interesting -- or most important to them is interoperability and comparability

between the devices.
Q. So has a customer ever come to you and asked about per DRAM addressability or PDA mode?
A. No, a customer has not.
11:33 Q. Has a customer ever asked you about encoded QuadCS functionality?
A. No.
Q. So what does make a product desirable to the customer?
A. So interoperability and compatibility. We're talking about the ability to plug it into a server or a PC and have it work. That's -- that's key.
The other thing is capacity, meaning is it 32 gigabyte or 64 or 128 or some of the numbers that have been thrown around. 11:33 And then the other thing are the commercial attributes like price, availability, et cetera.
Q. Now, is Samsung the only company that makes these DDR4 RDIMM and LRDIMM products?
A. No, we're not.
Q. Okay. Who are Samsung's main competitors in the memory market?
A. Samsung has two main competitors. One is SK hynix and the other is Micron, as I mentioned a moment ago.
Q. And how can you be confident about that?
11:34 A. Because our customers, again wanting choice, will -- you have comparative discussions with us, Hey, I'm looking at a

hynix part and price, what would be your offer, you know, price-wise to compare.

Q. You mentioned SK hynix. What can you tell the ladies of the jury about that company?

A. I would call hynix our most comparable competitor, and the reason why is because they're also based in South Korea. In the United States we have nearly identical market share, and we're the two biggest providers, and of that 95 percent that the top three sort of cover, we split it, and right now Micron takes the difference. Right? So we're both right around, I think this year, around 40 percent.

Q. I assume if you have nearly identical market share, you'd agree that SK hynix is a successful company?

A. Yes, they are.

Q. All right. Now, going back to your role at SSI, what's a day at the office look like for you?

A. So given that my role is what I would call customer driven, so it's really based on the customer's needs, we have some scheduled meetings to talk about things like the customer price requests, contracts, you know, kind of the day-to-day things. But generally my day is driven by a customer. So they'll give us a call and say, Hey, we got an order that we didn't expect and we would like you to see if you can get more than we originally ordered; or, unfortunately, sometimes they call and say, The orders didn't come through and we're going

to greatly reduce our forecast.

And it's just really a matter of what I would call aligning with the customers on their needs; sometimes their concerns in making sure that they're getting what they want so 11:36 they'll continue to buy from us and have, you know, a great relationship with Samsung.

Q. Now, respectfully, sir, you're not an engineer. Correct?

A. I am not.

Q. Okay. How often in that day that you just described for us do you dig into the detailed technology involved in the memory products you sell?

A. Detailed? I don't get involved in detailed discussions.

Q. Okay. As senior vice president of sales, how much of your day do you spend looking at those 145,000 U.S. patents?

11:37 A. Fortunately, none.

Q. Okay. What part of your job involves investigating non-infringement?

A. None.

Q. Okay. What is your understanding of Samsung's position on non-infringement in this case?

A. My understanding is that we do not infringe on any of the asserted claims.

Q. Well, do you have the technical know-how to explain non-infringement to these ladies?

11:37 A. I am not -- I do not have the technical know-how and I --

as I mentioned earlier, I am not the expert.

Q. Well, then how do you know that Samsung doesn't infringe?

MS. GLASSER: I'm going to object, Your Honor. He's a lay witness. He says he doesn't have any background at all on infringement. It's not appropriate for him to be giving a non-infringement opinion to the jury.

MS. SMITH: May I respond?

THE COURT: What's your response?

MS. SMITH: Your Honor, he stated -- he's Samsung's corporate representative at trial, he stated that it's Samsung's position that it does not infringe, and I'm merely asking how he came to that conclusion.

11:37

MS. GLASSER: I think it's inappropriate for him to have said in the first instance that he thinks they didn't infringe. He was pretty explicit at deposition that he did not look into that at all, doesn't have any expertise in that, has no opinion --

THE COURT: All right. That's enough. I'm going to sustain the objection.

He can certainly state his company's position, which he has. By his own admission, he doesn't have the technical knowledge personally to go into the whys behind that opinion. He's perfectly authorized to put forward Samsung's position, but as to why he thinks so, I think that calls for him to go into areas he probably doesn't have the expertise to go into.

11:38

The position of the company's been made clear.

Let's move on.

MS. SMITH: Of course, Your Honor.

Q. (BY MS. SMITH) Mr. Calandra, you just stated that it is Samsung's position that it does not infringe and that these patents are not valid. Who is going to come to this courtroom and explain the technical details of non-infringement and invalidity for Samsung?

A. We are going to bring an independent expert to talk to those claims. His name is Joe McAlexander.

Q. Thank you, sir.

MS. SMITH: Your Honor, I'll pass the witness.

THE COURT: All right. Cross examination by the Plaintiff.

MS. GLASSER: Your Honor, and a brief sidebar before we begin?

THE COURT: All right. Approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT: What is it, Ms. Glasser?

MS. GLASSER: So, Your Honor, I believe the door has been opened through two lines of questioning. One was the question, Is Netlist at all involved in Samsung's product process? The other was his belief of a non-infringement. But I'll focus primarily on that first one.

11:40 I would ask Your Honor's permission to be able to ask the witness if he spoke with any of the Samsung engineers to determine whether they had taken the designs from Netlist.

MS. SMITH: Your Honor, there was no objection --

THE COURT: I don't think the door's been opened to that.

MS. SMITH: Thank you, Your Honor.

MS. GLASSER: And his question -- the question, Is Netlist at all involved, I would like to be able to at least

11:40 go into the fact that he did not investigate whether Netlist was involved in the initial design.

THE COURT: Yeah. He's made it clear he's a salesperson, he's made it clear he doesn't have any technical background, and he doesn't have the ability to investigate infringement or not. There's no need to go any further.

MS. GLASSER: Understood, Your Honor.

THE COURT: All right. Let's go.

MS. SMITH: Thank you.

(The following was has in the presence and hearing of the jury.)

MR. SHEASBY: Your Honor, may I approach briefly to hand out binders?

THE COURT: You may distribute binders.

MR. SHEASBY: Thank you, Your Honor.

11:41 THE COURT: All right, Ms. Glasser. You may proceed

with cross examination.

MS. GLASSER: Could we have the slide deck, please, before we begin?

Godo morning, members of the jury.

CROSS EXAMINATION

BY MS. GLASSER:

Q. And good morning, Mr. Calandra.

A. Good morning, Ms. Glasser.

11:41 Q. Now, as someone who's involved in sales, you have some insight into the relative importance of different types of technologies in the field. Is that fair?

A. Yes.

Q. And were you here in the opening when the lawyer for Samsung made a representation to the jury that the world has moved on -- quote, the world has moved on from Netlist's technology?

11:41 A. I recall -- yes, I believe I heard something like that.

Q. And he said something to the effect of, We don't need the tricks and techniques anymore that Netlist came up with. Do you recall that?

A. I can't agree with the way that that was phrased.

Q. Okay. Now, as the corporate representative for Samsung, even though you've only been at Samsung for a few years, do

11:42 you deny that Samsung launched the DDR4 design at issue by 2014?

A. That's approximately correct.
Q. Samsung, indeed, had launched the DDR4 design at issue by 2014. Correct?
A. I was not here at the time, but what I saw on the charts and what I can recall, yes.
Q. And then in 2015 Samsung signed a document that you have personally seen called the JDLA. Correct?
A. Yes.
11:42 Q. And you understand that in July of 2020, Samsung's license under the JDLA ended. Correct?
A. That's what I've seen, yes.
Q. And is it correct that at that point in time Samsung continued selling exactly the same DDR4 products that it had been selling before termination of the JDLA?
11:43 A. I'm -- so that is perhaps the case. I do not know if the product has been revised or refined since then. If you'd like, I can provide more detail.
Q. Sure. So let's just be very, very clear. You understand that the DDR4 LRDIMM and RDIMM products are what are at issue in this case accused of infringement. Correct?
A. RDIMM and LRDIMM DDR4. That's correct.
Q. And Samsung was selling those when it had the license. Correct?
A. The JDLA. Correct.
11:43 Q. And Samsung continued selling the products after the JDLA

ended. Correct?
A. Correct.
Q. And just to be very, very clear, these DDR4 LRDIMM and RDIMM products remain on sale today. Correct?
A. To some degree, yes.
Q. To some degree. In fact, there was well over a billion dollars sold last year. Correct?
A. I don't -- I saw that there was a chart a few moments ago that were used for the hypothetical damages assessment. I don't -- I didn't see the dates and numbers that came up with that number, so I don't know for sure.

11:44

MS. SMITH: Your Honor, may we approach?
THE COURT: Approach the bench.
(The following was had outside the hearing of the jury.)
THE COURT: What is it, Ms. Smith?
MS. SMITH: Your Honor, there's an order in place that the JDLA license can't imply infringement, and I can't think what else we're doing here with this line of questioning.

11:44

MS. GLASSER: He said that this product is useless anymore, Mr. Cordell said it's old stuff, and I want to show that they've been selling it consistently throughout this entire time period.
THE COURT: You've shown it. You need to move on.

MS. GLASSER: Yes. Understood, Your Honor.

MS. SMITH: Thank you.

(The following was had in the presence and hearing of the jury.)

THE COURT: Let's proceed.

MS. GLASSER: Could we have the elmo?

Q. (BY MS. GLASSER) Actually -- so I guess to cover the final point, we do agree that these DDR4 products remain sold

11:45 in the United States, in the world today. Correct?

MS. SMITH: Your Honor, I object. I believe your guidance --

THE COURT: It's asked and answered. Let's move on.

MS. SMITH: Thank you, Your Honor.

THE COURT: I'll sustain the objection.

MS. SMITH: Thank you.

Q. (BY MS. GLASSER) And these products -- one of the things that customers care quite a bit about when they're purchasing the accused products are two things called density and speed. Correct?

A. Yes.

MS. GLASSER: And let's go ahead and have the elmo,

11:45 if we could.

Q. (BY MS. GLASSER) And we are looking at now an image from the Netlist DDR4 product lineup. Do you see that?

A. Yes, I do.

Q. And I wanted to ask you, the DDR4 products that you sell to your customers, do any of them have speeds higher than the speeds that Netlist is offering to its customers?
11:46
A. Which products?
Q. DDR4. So we can take the RDIMM at the top, for example.
A. I would not know our top speed.
Q. Okay. Let's take a look at some Samsung documents then.
MS. GLASSER: Could we have the slide deck back?
Q. (BY MS. GLASSER) And I'm showing you now -- this is also in your binder if it's easier to take a look at tab 8. This is an excerpt of PX 9.
11:46
Do you recognize this as the Samsung memory DDR4 SDRAM sheet?
A. From what I can see on the document, yes, it says Samsung Electronics in the lower left-hand corner of the document you're calling from, so yes, it seems logical.
Q. And you see here that speed is listed as the very first identified feature along with density for the DDR4. Correct?
MS. SMITH: Objection, Your Honor. She hasn't laid a foundation. I don't believe the witness has ever seen this document, and he's certainly not a technical witness.
11:47
MS. GLASSER: This is the corporate witness identified on marketing, sales, competition, and this is a pre-admitted exhibit in this case.
MS. SMITH: This is not a marketing document; it's a

technical document, Your Honor.

THE COURT: It is technical in nature, it is pre-admitted. You can ask him. If he doesn't know, he's not required to be a technical person to represent the company and has already indicated there will be technical witnesses called on behalf of the Defendants.

So you can use it, Ms. Glasser, but if he doesn't have any personal knowledge of it, he's not required to and can simply say he doesn't know.

MS. GLASSER: Absolutely, Your Honor. We'll keep it at a high level.

THE COURT: Go ahead.

Q. (BY MS. GLASSER) So you see, sir, this type of sheet that goes out to your customers touts the density of the accused products as well as the speed. Correct?

A. It has two density components to it, which I see, as well as a speed component.

11:48 Q. And I think you made a comment earlier that you don't personally have conversations with customers about the PDA feature. Is that right?

A. I have not had one, no.

Q. And you didn't mean to imply that the technical folks aren't interested in PDA, did you?

A. I answered the question that was asked to me.

Q. So let's take a look at this sheet that goes out to the

Samsung customers.

11:48 Do you see here where it is emphasizing the per-DRAM addressability?

MS. SMITH: Your Honor, I apologize for the interruption, but I've been handed a single piece of paper. I don't have these documents.

MS. GLASSER: This is in your binder, PX 9.

MS. SMITH: I don't have a binder.

MR. SHEASBY: It's on counsel table.

MS. SMITH: I apologize. Thank you so much.

MS. GLASSER: Here's another one.

MS. SMITH: I appreciate it. Thank you.

THE COURT: All right. Let's continue. Let

11:49 Ms. Smith get to the page in the binder where you are and then we'll go forward.

And just as a suggestion, given the number of participants in this trial, it's probably better not just to lay the binder on the table, but put it in the hands of the lawyer who's handling the witness.

All right. Let's go forward.

Q. (BY MS. GLASSER) And you do understand that the PDA functionality is touted throughout the technical specifications that go to the Samsung customers. Correct?

A. I don't -- so the answer is no, I don't understand that.

Q. Okay.

11:50 A. I've never seen the document that you've put in front of me.
Q. Do you get involved at all with the technical specifications that go out to the customers?
A. That go out -- can you please rephrase to help me understand what you're saying?
Q. Sure. Do you have any involvement with documents, like the one we're looking at now, where Samsung explains to its customers what the important technical features of the products are?
11:50 A. I do not. I do not build those documents.
Q. And so we can see here in the pre-admitted exhibit that the technical folks who send these documents out to the customers are representing to the customers that the accused DDR4 products have per-DRAM addressability and it causes enhanced signal integrity. Do you see that?
A. I do.
Q. And, in fact, Samsung is touting to its customers that
11:50 this accused functionality allows the DDR4 to be available for considerably longer periods of time without failure. Correct?
MS. SMITH: Objection, Your Honor. She proved up that he has no foundation and no technical understanding, and she's just testifying and reading to the witness.
THE COURT: I'm going to sustain that objection.
Q. (BY MS. GLASSER) Sir, do you know whether or not the

signal integrity that is caused by per-DRAM addressability is important to your customers? Do you know one way or the other?

11:51 A. I do not.

Q. Thank you.

MS. GLASSER: I pass the witness.

THE COURT: Is there redirect?

MS. SMITH: There is not, Your Honor. Thank you.

THE COURT: Then you may step down, Mr. Calandra.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're welcome. If you'll return to the Defendants' counsel table.

Members of the jury, we're going to break for lunch at this juncture. We don't have enough time to get another witness on before we get to the noon hour.

If you will take your notebooks with you to the jury 11:51 room for lunch, follow all my instructions, including not to discuss the case with -- among yourselves, we'll take, as we have been, about 45 or 50 minutes, and we'll be back to continue with the next witness in the Defendants' case in chief.

The jury's excused for lunch.

(Whereupon, the jury left the courtroom.)

11:52 THE COURT: All right, counsel. For your information, as of now we've used 3 hours, 3 minutes, and 20

seconds of designated trial time today. At this moment the Plaintiff has remaining 3 hours and 27 minutes; the Defendant has remaining 6 hours and 48 minutes.

11:52

We stand in recess for lunch.

MR. CORDELL: Your Honor, before we recess, may I have a quick moment?

THE COURT: I guess you will, Mr. Cordell.

MR. CORDELL: I really regret having to do this, Your Honor. It's certainly not anything I relish, but about --

THE COURT: Be seated, please.

MR. CORDELL: -- 20 minutes ago I received an email from opposing counsel attaching 176 demonstrative slides for use with the next witness, Mr. Ji. I have no idea why they feel like that's appropriate. I can't imagine why they would even suggest it, but they gave me 176 slides for a 30-minute cross that they say.

11:53

I am beside -- I just don't have words for this. And I guess we have heard from the Court over --

THE COURT: Who sent the email to you?

MR. CORDELL: It was --

MR. SHEASBY: I sent the email.

THE COURT: You did, Mr. Sheasby?

MR. SHEASBY: Yes.

11:53

THE COURT: Did it have 100-plus slides attached to

it?

MR. SHEASBY: Yeah, but that was an inadvertent send. I'm certainly not going to use 120 slides with Mr. Ji.

MR. CORDELL: It's 176.

MR. SHEASBY: Just let me be very clear. We -- I don't know what Mr. Ji is or is not going to say. There's going to be a very small number of cross examination demonstratives that are used with him. I can't guess which ones are going to be used in advance, and so because this Court has made such an admonition about making sure -- they

11:54 don't even -- they're not even entitled to -- to the cross examination. You don't -- they're not even entitled to my cross examination slides.

THE COURT: Well, just a minute. Under the rules, cross examination slides don't have to be disclosed. I have limited them to a numerical maximum in this case based on reasons I've made very clear in the record.

11:54 So were you expecting to get 20 slides from the Plaintiff to disclose for cross examination?

MR. CORDELL: I expected that they would disclose their cross examination slides the way we did yesterday, and I would -- they would give them to me before he took the stand. I understood that. But what I got instead was 176 slides --

THE COURT: I understand that. You've made that point.

MR. CORDELL: It's clearly an effort to -- I don't want to use this word, but -- but bury whatever it is truly interests them.

But if I can have the elmo just briefly, I'll show you some examples why --

MR. SHEASBY: First off, I don't want my cross
11:55 examination slides published because they were sent inadvertently and they are privileged, so you should not be showing any of them --

THE COURT: All right, gentlemen.

All right. Mr. Sheasby, go to the Plaintiff's counsel table.

Mr. Cordell, go to the Defendants' counsel table.

My question, Mr. Cordell, is, did you have an expectation that cross examination slides would be disclosed to you in advance at all?

MR. CORDELL: I expected that they would provide them to me; not in advance, but when the witness took the stand, I expected to get them. I thought that was our practice.

11:55 And I will just tell you, Your Honor, that as I looked through these, there are half a dozen that are curl-your-hair scandalously outrageous where they specifically take Samsung to task --

MR. SHEASBY: Your Honor, he should not be --

THE COURT: Sit down, Mr. Sheasby. I'll call on you when I want to hear from you.

MR. CORDELL: If these were inadvertently sent to me, that's -- that's news to me because there's been nothing in -- I haven't gotten an email since suggesting that it was.

THE COURT: Just a minute.

Ms. Glasser, I'm trying to listen. We're not going to talk across the room with more than several people talking at once.

MS. GLASSER: Your Honor, I'm so sorry. It's an ethical issue. I don't think he's aware that we've clawed those back. That's all I'm trying to communicate. I really think -- I really doubt he's aware he should not be doing this.

THE COURT: If you have something to add, pass a note to Mr. Sheasby. He's speaking for the Plaintiff on this, Mr. Cordell's speaking for the Defendants on this. I can't have other levels of counsel involved and back-and-forth when I'm trying to listen to somebody else.

Let's get this point clarified. Have they been clawed back or have they not?

MR. CORDELL: I have not seen that, Your Honor, but I've been standing here for a few minutes.

THE COURT: All right. Here's what we're going to do. They are going to be clawed back, whatever they are,

however many there were. And at the time the witness is called, there's going to be a delivery of the actual demonstrative slides that the Plaintiff intends to use on cross examination delivered to Defense counsel--not a hundred that you can pick 20 out of, not 200, but up to 20 -- well, if it's a fact witness and not an expert witness, up to 15 that can be or are intended to be used.

11:57

And if there's anything that's been exchanged heretofore for a witness who hasn't been called yet, then we're wiping the slate clean.

MR. CORDELL: Thank you.

THE COURT: All right? Everybody clear on what I'm saying?

MR. CORDELL: Yes, Your Honor. Thank you.

THE COURT: Mr. Sheasby, you're going to deliver your intended cross examination slides to opposing counsel at the time the witness is called --

11:57

MR. SHEASBY: Yes.

THE COURT: -- the ones you intend to use.

MR. SHEASBY: Yes.

THE COURT: All right.

MR. SHEASBY: And that needs to be parallel, because it hasn't been.

THE COURT: That may be another issue. I'm trying to get this issue straight right now. If you've got a

separate complaint to make, then you need to make your separate complaint.

MR. SHEASBY: Yes. I have two complaints. One's an ethical complaint, is he shouldn't be reading slides that I've withdrawn because it's a violation of the protective order.

And the second issue is this is not -- statements that have been made in this case to you about exchanges of slides are demonstrably false, and I just want the record to show that statements are being made to you --

THE COURT: All right. We're going to recess for lunch. I want you two gentlemen in chambers to see me.

Court stands in recess.

(Lunch recess.)

11:59 THE COURT: Be seated, please.

01:11 Counsel, I am going send you an email shortly. It will have the Court's guidance with regard to the exhibit issues related to Mr. McAlexander. It will also have guidance with regard to the disputed designations on Hobbs, Hong, and Martinez.

With regard to McAlexander, I'm told there is a physical demonstrative that's intended to be used that the Court has not seen. Is it available?

MR. CORDELL: It is, Your Honor.

THE COURT: I have no idea what it is. Can somebody show it to me?

MR. CORDELL: It's an Intel Xeon processor, Your Honor. May I approach?

01:11 THE COURT: You may. And is it intended that its use as a demonstrative will involve opening this box and taking it out?

MR. CORDELL: Yes, Your Honor. It's just an example of the memory controller that we've talked about ubiquitously throughout the trial.

MR. SHEASBY: Your Honor --

THE COURT: Is there objection.

MR. SHEASBY: There is an objection. First, it was 01:12 not disclosed to us in a timely manner. Second, he doesn't discuss it in his report. Third, it has a 403 issue because that is much more than a memory controller; it's an entire CPU. And, fourth, it's outside of the scope of anything that he talked about in his infringement theory. He doesn't have an infringement theory based on the fact that Intel designed the Xeon processor.

So he can show a graphic of it that we've already approved, but to show us a physical demonstrative 35 minutes 01:12 to an hour before he comes on the stand violates these Court's standard practice and it shouldn't be allowed.

THE COURT: What's Samsung's reply?

MR. CORDELL: We did invite inspection of it, Your Honor. I don't know that it was -- it was ever accepted, but

it is merely an example of what we have seen in the graphics over and over and over again in this trial.

MR. SHEASBY: It's not in his report.

MR. CORDELL: Well, it's not referenced as the Xeon -- and I don't remember which model number that is, but
01:13 his report talks about memory controllers and microprocessors over and over and over again. Recall that one graphic that everybody starts with and you have a microprocessor and a memory controller and --

THE COURT: Is it my understanding, Mr. Sheasby, that Plaintiff doesn't object to a graphic of this, but it objects to the physical item?

MR. SHEASBY: That's correct, Your Honor.

THE COURT: Okay. Objection's overruled. This is permitted as a demonstrative. You may approach and get it back.

01:13 MR. CORDELL: Thank you.

THE COURT: All right. Are the parties prepared to go forward with the next Defense witness?

MR. CORDELL: We are, Your Honor.

THE COURT: Let's bring in the jury.

(Whereupon, the jury entered the courtroom.)

01:14 THE COURT: Welcome back from lunch, members of the
01:14 jury. Sorry we are a little late. We had some mechanical issues with some of our electronics, but we're ready to go

now. Please have a seat.

Defendants, call your next witness.

MR. CORDELL: Thank you, Your Honor.

At this time Samsung calls Mr. Hyun-Ki Ji.

THE COURT: All right. Mr. Ji, if you would come forward.

For members of the jury's benefit, this witness is going to testify in Korean with the aid of a certified interpreter who's already been sworn by the Court.

01:15 Ms. Park, if you'll assist the witness as the oath is administered.

(Whereupon, the oath was administered by the Clerk.)

01:15 THE COURT: Please have a seat at the witness stand.

And, Ms. Park, if you will pull the microphone closer to you because it's clear we need to hear the English translation more than we need to hear the original Korean.

01:16

THE INTERPRETER: Yes, Your Honor. Thank you.

THE COURT: All right. Counsel, you may proceed with direct examination.

MR. CORDELL: Your Honor, may I attempt a few questions in English just to get his background out?

MR. SHEASBY: Your Honor, may we approach?

THE COURT: Approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT: What is it, Mr. Sheasby?

MR. SHEASBY: Witnesses are fully translated in Korean or they are done in English. The switching between Korean and English with this witness is not appropriate under the federal rules. They dramatically delayed my time deposing this witness.

THE COURT: I'm not going to allow him to be questioned in English and Korean. He'll -- he will give Korean answers, and they will be translated on everything.

MR. CORDELL: That's fine.

THE COURT: Let's proceed.

(The following was had in the presence and hearing of the jury.)

MR. CORDELL: Ms. Park, I would ask that you translate both ways for us.

THE INTERPRETER: Sure. I will do that. Thank you.

HYUN-KI JI,

having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MR. CORDELL:

01:17 Q. Good afternoon, Mr. Ji. Would you please introduce yourself to the ladies of the jury?

01:18 A. Yes. My name is Hyun-Ki Ji. And I'm married, and I have my wife, and we've been married for 28 years. I have two sons. One is the -- the older son is 26, the younger son is

24, and I have a dog, too. And my sons actually completed serving in the military.

And as for me, I've been with Samsung for the last 30 years.

01:18 Q. You say your sons were in the military. Did you serve in the military?

A. Yes. After my third year in college, actually I

01:18 volunteered to serve in the military. And I served in the U.S. 8th Army 17th Brigade, and I served during this two-year period with the U.S. soldier.

Q. And where -- what military facility were you serving in?

01:19 A. There is a camp base called Camp Humphreys in South Korea. That's where.

Q. And is that a U.S. base?

A. Yes, it's a U.S. base.

Q. And what did you do at Camp Humphreys?

01:20 A. So I served in the supply room and arms room from 1990 to 1992.

Q. Did you go to college?

A. Yes. I graduated from Seoul National University.

Q. And did you get a degree?

A. I did.

Q. In what area?

A. History.

Q. And did you get any further education?

01:20 A. That was 20 years ago. I attended the University of Illinois at Urbana Champagne, and I pursued MBA.
Q. Why did you join Samsung, Mr. Ji?
01:21 A. Even 30 years ago, Samsung was an innovative company in the areas of semiconductors and electronics, so I thought it would be good for me to start my career here at Samsung.
01:21 Q. What is your current job at Samsung?
A. I am an executive vice president, and I also serve as the partner collaboration center lead.
Q. Have you ever been involved in a project in Texas?
01:22 A. After finishing my MBA degree, in my team we actually reviewed the idea as to where we are going to build our second factory, semiconductor factory, and my team thought that it would be better to build out a second plant in Austin because
01:22 that's where we had our factory already.
So the management team actually accepted the idea, and in 2007 I actually -- we became to build this new plant in Austin, Texas.
Q. About how many people does Samsung employ in Texas today?
01:23 A. We have over 6,000 employees working in Texas.
Q. Now, during your 30 years with Samsung, has Samsung collaborated with other companies from time to time?
A. Yes, it has.
Q. Did there come a time when Samsung collaborated with Netlist?

01:24 A. Yes, there did.
Q. Were you personally involved in the collaboration between Samsung and Netlist?
A. Yes. I was involved because I was the strategic planning team lead.
Q. Which party first suggested a collaboration between
01:24 Netlist and Samsung?
A. It was Netlist.
Q. If someone came into this trial and suggested that Samsung was the first to suggest a collaboration with Netlist, would they be right or wrong?
01:25 A. That would not be true.
Q. Did -- in the spring of 2015, did Netlist ask for a meeting with Samsung?
A. That is true that Netlist asked for a meeting with Samsung.
Q. And when was the meeting?
01:25 A. It was April 17th, 2015.
Q. Where did this meeting take place?
A. It was at an office of Samsung in Korea.
Q. Was it any particular set of offices within Samsung?
01:26 A. Yes. It was in a building at Samsung's Hwasung facility. The building was MI-1.

THE INTERPRETER: Interjection. H-W-A-S-U-N-G.

Q. (BY MR. CORDELL) So do you have a clear memory of the

01:26 meeting in 2015 with Netlist?
A. Yes, I do have a clear recollection of that meeting because that was the first negotiation project that I took on
01:26 after I became the strategic planning team lead.
Q. Who was at the meeting from Netlist?
A. There was Mr. Jibum Kim in Korea, and there was also the president of the company, Mr. HyunChil Hong, who was visiting
01:27 Korea from the U.S., and some others.
Q. What language was spoken at the April 2015 meeting?
A. It was obviously in Korean.
Q. Was that -- did all the participants at the meeting speak Korean?
A. Yes, they did.
01:27 Q. If someone came into this trial and suggested that this meeting happened in California, is that right or wrong?
A. That would be wrong.
Q. How long did the meeting last?
A. It was less than an hour.
01:28 Q. Can you recall generally what happened at the meeting?
01:29 A. Yes. Since it was the first meeting, there was some ice-breaking, and Netlist showed us some PowerPoint materials. And also we talked about the forecast as to what is going to happen going forward in the storage market. And, lastly, Netlist said that they were going to send us a written proposal.

01:29 Q. Before this meeting, did you have any idea what this collaboration was going to be about?
A. Not at the time.
Q. Let me show you what we've marked as PX 30. I think there's a copy in your binder, if you'd like, or it's on the
01:30 screen.
Is this the PowerPoint that Netlist brought to the meeting?
A. That's right.
Q. Do you recall whether Netlist went through every page of this or did they just skip through and show you select pages?
A. They showed us some of these pages.
01:30 Q. Let's turn to page 43. Do you see that it mentions the '912 Patent?
A. Yes, I do.
Q. Did Netlist ever mention the '912 Patent during your April 2015 meeting?
01:31 A. Netlist did not mention any individual patents, and I don't remember whether they showed me this slide or presented this slide.
Q. Did Netlist suggest to you that somehow Samsung's
01:31 products infringed Netlist's patents even if they didn't identify any of them specifically?
A. No, they never did.
01:31 Q. Did Netlist or Samsung follow up after the meeting?

A. Netlist sent us their proposal -- a written proposal.
Q. What was the nature of the potential collaboration between Samsung and Netlist?
01:32 A. Technological collaboration as well as cross license between the companies as to the patents that they had.
Q. What was the technical part of that all about?
01:33 A. It was to develop a new NVDIMM product.
Q. Can you tell the jury a little bit about what an NVDIMM product is?
01:33 A. When it comes to an NVDIMM, what you're talking about is there is a board, and on top of the board there is DRAM and NAND flash as well as control IC. So all of them are put onto this board. That's what NVDIMM is.
Q. So it actually has flash memory on it instead of just DRAMs?
A. That's right.
01:34 Q. What are NVDIMMs used for?
A. It can be used for various applications.
Q. Okay. And you also mentioned a cross license. What was that all about?
01:34 A. In cases where we have to jointly develop the technology together, the cross license would mean that each of the companies would have access to other company's patents, so that's -- it's a cross license.
Q. So as a part of this cross license, did Samsung get

01:34 access to Netlist's patents?

01:35 A. That's right. So Samsung gave access to Netlist as to its thousands of patents relating to memory products and vice versa. So Netlist also gave access to Samsung as to its owned patents.

Q. Were you in court for opening statements in this case, Mr. Ji?

01:36 A. I was.

Q. Did you hear my friend Mr. Sheasby say that Samsung made Netlist an offer they could not refuse?

A. I did.

Q. Did Samsung force this collaboration on Netlist somehow?

01:36 A. No, it never did.

Q. Did Samsung ever deal with the supply to Netlist as a way to get them to do this collaboration?

01:37 A. No. Samsung never did threaten or force Netlist using supply as the momentum.

Q. And did -- at the April 2015 meeting, did Netlist even

01:37 say anything about supply?

A. Supply was never discussed in that meeting.

Q. Just to be clear, which party was the one that was pushing for this collaboration?

01:37 A. It was what Netlist suggested.

MR. CORDELL: So let me bring up DTX 23, which is an April 21, 2015 email from Jibum Kim.

Q. (BY MR. CORDELL) Do you recognize this, sir?
A. Yes, I do.
Q. Is this the proposal that Netlist had promised during your April 17 meeting?
01:38 A. Yes, it is.
MR. CORDELL: So if we can go to the second page.
Q. (BY MR. CORDELL) I see at the bottom there is a --
MR. CORDELL: Keep scrolling, please. There we go.
Q. (BY MR. CORDELL) We have a cross-covenant not to sue. What's that all about?
01:39 A. This is relating to that cross license as to the patents.
MR. CORDELL: And if we zoom out, Mr. Jackson, and can you highlight paragraph 2 here? And you can scroll down a little bit more, please. Just give me the whole paragraph, if you will. There we go.
Q. (BY MR. CORDELL) So does this relate to the technology collaboration that Netlist was proposing to Samsung? 01:39
A. Yes, it does.
Q. Does anything in Netlist's proposal even mention supply?
A. Yes, there is.
01:39 Q. And where is that?
A. Yes. It talks about supply of flash and DRAM.
Q. Okay.
MR. SHEASBY: Your Honor, may we approach?
THE COURT: Approach the bench.

(The following was had outside the hearing of the jury.)

MR. SHEASBY: Your Honor, I do object. This is blown wide open the history of the negotiation of the agreement. I've been seriously constrained as to what I could be able to say about their conduct, about what their behavior has been, and I think going to this level of detail about a supply clause and a negotiation before the agreement terminated, I just want to flag that I'm objecting to this as opening the door to the entire JDLA relationship.

MR. CORDELL: Well, I obviously disagree with that, Your Honor. It's -- I'm moving on. I just wanted him to acknowledge that that was a very minor part, but I'll move on.

MR. SHEASBY: Well, I mean --

THE COURT: Just a minute. If during cross examination you believe the door is opened to allow you to pursue something previously you've been restrained from pursuing, then you need to approach at that time and tell me specifically what it is and how you believe the door is opened, and then I'll give you guidance.

MR. SHEASBY: I appreciate that.

THE COURT: And while I have both of you here, please keep your seat, Mr. Sheasby. You are walking around the courtroom passing documents around with a red pen in your teeth like a pirate carrying a dagger in the middle of direct

examination. And you wouldn't like it if Mr. Cordell was doing it while you were at the podium. Unless there's some pressing need, keep your seat. Okay?

MR. SHEASBY: Yes, Your Honor.

THE COURT: All right. Let's proceed.

(The following was had in the presence and hearing of the jury.)

THE COURT: Let's proceed, counsel.

MR. CORDELL: Thank you, Your Honor.

Q. (BY MR. CORDELL) Mr. Ji, did the parties ultimately sign a collaboration agreement?

01:42 A. Yes, they did.

MR. CORDELL: Let me bring up JX 51.

Q. (BY MR. CORDELL) Is this the agreement?

A. Yes, it is.

Q. Now, after this agreement was signed, did you have a role in the relationship between Samsung and Netlist?

01:42 A. Yes. Occasionally Mr. Jibum Kim of Netlist, executive vice president, would reach out to me and provide me with some update as to the Netlist circumstances. And he also made certain requests for Samsung, and I responded to those requests.

Q. And did Netlist ever ask for your help?

A. Yes, it did.

01:43 Q. Okay. Let me show you DDX 113.

MR. CORDELL: Actually, you know what? That's fine. That's fine.

Q. (BY MR. CORDELL) Is this such an instance?

A. Yes, it is.

Q. And can you describe to the jury what this is all about?

01:44 A. This is a document that would confirm that Netlist is one of Samsung's direct customers.

Q. Did they tell you why they wanted this letter?

01:44 A. Yes. What they told me is that -- what he told me was that it was going to be helpful for them to sell their products, Netlist products, in the United States based on this letter.

Q. During this time, did Netlist ever come to you to ask them to help -- for help with their patents?

01:45 MR. SHEASBY: Your Honor, objection. May I approach?

THE COURT: State your objection, counsel.

MR. SHEASBY: I believe he's referring to a violation of a MIL, based on my understanding of the Korean language answer that was given.

MR. CORDELL: I'm at a disadvantage, Your Honor. I don't have any facility in the Korean language.

01:46 THE COURT: Unless there's something more specific or clear, I'm going to overrule that objection. Obviously this witness does not need to be discussing the Court's orders

in limine or any violations of them, but at this point I don't believe I've heard that.

MR. SHEASBY: He's being made -- he's discussing SK hynix, Your Honor, and assistance involving SK hynix that relate specifically to a motion in limine.

THE COURT: All right. My ruling stands. This is overruled. I'll keep an eye out for it in the future. Let's continue.

THE INTERPRETER: May I provide the interpretation, Your Honor?

THE COURT: Restate the question, Mr. Cordell.

Q. (BY MR. CORDELL) Let me be very specific, Mr. Ji. In this time period, did Netlist ever come to you and ask for help with their patents relevant to DDR4?

A. Yes, they did.

Q. I understand that Netlist was trying to deal with a company called hynix. Is that right?

A. That's right.

Q. And did they give you a document that showed patents they thought hynix might be interested in?

A. Yes. They sent me this document with a patent list.

MR. CORDELL: Can I have DDX 3-5?

Q. (BY MR. CORDELL) Is this the patent list you were referring to, Mr. Ji?

A. Yes, it is.

Q. And they tell you that it's a chart of example Netlist patents and the products they cover? Is that right?
A. That's right.
Q. And do you see they list several patents and they say they're relevant to DDR4 LRDIMM and DDR5--I'm sorry--DDR4 RDIMM. Do you see that?
A. Yes, they do.
Q. Do they identify any of the patents in this case on the list they gave you?
A. No.
Q. At the end of the collaboration, Mr. Ji, were the parties able to create this new NVDIMM product?
A. The joint development efforts failed.
Q. At any time during the joint development effort, did anybody from Netlist tell you that they thought Samsung infringed their patents?
A. No, nobody.
Q. Did you ever tell Netlist that you thought they were infringing Samsung patents?
A. I never did.
Q. As part of your job, do you read patents?
A. I don't.
Q. Did you try to read the patents in this case?
A. I did try, but it was hard for me to understand.
Q. Based on your lay understanding, Mr. Ji, do you believe

Samsung infringes the patents in this case?

MR. SHEASBY: Your Honor, I object. This calls for --

THE COURT: Sustained. He's not an expert witness.

MR. CORDELL: Mr. Milton offered us exactly the opposite.

THE COURT: And your corporate representative has given you the Defendants' position. This is not the corporate representative. Sustained.

01:51

MR. CORDELL: Thank you.

Q. (BY MR. CORDELL) Thank you, Mr. Ji.

MR. CORDELL: I pass the witness.

THE COURT: Cross examination?

MR. SHEASBY: Yes.

THE COURT: Proceed when you're ready, Mr. Sheasby.

MR. SHEASBY: Thank you, Your Honor.

01:51

Can I get the opening demonstratives, Mr. Svenson, and in particular -- can I get the opening demonstratives, Mr. Svenson, and in particular slide 32?

CROSS EXAMINATION

BY MR. SHEASBY:

01:52

Q. Now, Mr. Svenson -- Mr. Ji, this is the portions of the JDLA that you showed the jury. Is that correct?

01:53

A. That's right.

Q. And I want to focus in particular on the license

01:53 agreement with license to Samsung. And if I heard your testimony correctly, you testified that at no point in time did Samsung ever state that Netlist was using Samsung's patents. Correct?

01:54 A. Well, for me, I never said that I -- Samsung indicated to Netlist that they were infringing on -- Samsung never told Netlist that it was infringing on Netlist patents.

THE INTERPRETER: Actually, what was the question again?

Q. (BY MR. SHEASBY) Sure. For the ladies and gentlemen of the jury, at any point in time did Samsung tell Netlist it was using any of Samsung's patents?

01:55 A. No, I did not.

Q. But you believe that a substantial part of the purpose of

01:55 the JDLA was to obtain access to Netlist's patents. Correct?

01:56 A. For us to work on this joint development between the companies, there would be occasions where we would need to or might be occasions where we need to use each other's patents, which is a reason why we need a patent license, the cross license, and that was the industry practice. That is the industry practice.

01:56 Q. Sir, in your view, a substantial part of the purpose of the JDLA was to obtain access to Netlist's patents. Correct?

01:57 A. We needed this cross license for us to develop this new product called NVDIMM-P based on the joint efforts.

01:57 Q. Can you turn to your binder of depositions, Mr. Ji? And can you turn to the deposition that has a tab that says 2021/8/21?

THE COURT: Do you mean August 12th, 2021?

01:57 MR. SHEASBY: I do, August 12th, 2021.

Q. (BY MR. SHEASBY) And can you turn to page 20, lines 15 through 17 of that. And just for orientation, those in the

01:58 top right-hand corner.

A. Yes, I saw that.

Q. And, sir, you actually read English. Correct?

A. Yes, I can.

Q. And you speak English. Correct?

A. Yes, I can.

01:58 Q. Okay. And I'd like you to read on page 20, lines 5 through -- 14 through 17.

THE INTERPRETER: 14 through 17, counsel?

MR. SHEASBY: Yes.

01:59 THE INTERPRETER: Do you want him to read to himself?

MR. SHEASBY: Read to himself.

THE WITNESS: I'm done.

01:59 Q. (BY MR. SHEASBY) Did you give that testimony under oath?

A. Yes, I did.

MR. SHEASBY: May I publish, Your Honor?

THE COURT: You need to ask him the question again

and have him answer it.

MR. SHEASBY: Yes, Your Honor.

Q. (BY MR. SHEASBY) It was your view under oath that a substantial part of the purpose of the JDLA was to obtain access to Netlist's patents. Correct?

02:00 A. I did, but it doesn't reflect the full story.

MR. SHEASBY: May I publish now, Your Honor.

THE COURT: You may.

02:00 Q. (BY MR. SHEASBY) Question: "So, in your view, was a substantial part of the purpose of the JDLA to obtain access to Netlist's patents?

"Yes, that's correct."

Did I read your testimony correctly, sir?

A. Yes, you did.

MR. CORDELL: Your Honor, may I invoke optional completeness and have the next seven lines read?

02:01 THE COURT: You can go back to that on redirect under optional completeness, not now.

Let's continue. And while we're stopped, I do want to make one thing clear to the ladies of the jury.

There's been some indication that this witness does read and speak English. We do not know and I do not know to what degree. It is very common for people who are not native English speakers to use an interpreter even if they have some ability in English.

02:01

So I don't want you to draw any negative conclusion from the fact that this witness is testifying with the aid of an interpreter but does have some ability to speak English. All right?

Let's continue.

Q. (BY MR. SHEASBY) Now, not only was it a substantial purpose to obtain access to the patents, but --

MR. SHEASBY: If we go to Milton slide 163.

02:02

Q. (BY MR. SHEASBY) -- your company described Netlist as well-known in the industry as a company that created a system for LRDIMM technology. Do you see that?

MR. CORDELL: Your Honor, I believe this was an excluded exhibit.

THE COURT: Approach the bench, counsel.

(The following was had outside the hearing of the jury.)

02:03

THE COURT: All right. Tell me what we're talking about.

MR. CORDELL: This is the Korean Tax Authority document.

THE COURT: Is that correct?

MR. SHEASBY: Your Honor, this is the exact same demonstrative that was used in Mr. Kennedy's direct without objection.

MR. CORDELL: No. We objected to it.

MR. SHEASBY: And you lost.

THE COURT: One at a time, gentlemen.

MR. CORDELL: The ruling of the Court this morning was that they could ask questions because it was in Mr. Kennedy's report, but that is not for this witness. This is an excluded document. It has an IX on it.

02:03 THE COURT: Does someone have a hard copy of it that I can see?

MR. SHEASBY: Yes, Your Honor.

THE COURT: Get it for me and bring it to me, please.

MR. CORDELL: Your Honor, that's my stuff.

THE COURT: Mr. Sheasby -- counsel, get it from your copies. Don't take anything off opposing counsel's table.

02:04 MR. SHEASBY: I've only given copies to Mr. -- the only copy I had was the copy that I gave to Mr. Cordell. That's why I'm asking to get it from him. I'm sorry.

THE COURT: Mr. Cordell, go work with Mr. Sheasby, find the document, and bring it to me.

02:04 Everybody else take a seat.

MR. CORDELL: So apparently when I was at the podium, Mr. Sheasby left me this pile of documents in my chair, and in it is not the document he's got excerpts on a demonstrative, I think. So that's what I think he's looking for. But I understood the Court wanted an actual copy of the

02:05

document.

THE COURT: Is this what you were displaying?

MR. SHEASBY: It was, and it's identical to what I was showing to Mr. Kennedy. It makes no reference to KTA.

02:05 THE COURT: Just give me a moment to look at it.

MR. CORDELL: It was excluded by the Court under 403.

THE COURT: Excluded by the Court under 403 for what purpose? I mean, the representation's been made that this has already been used with Mr. Kennedy.

MR. CORDELL: It wasn't. It was little excerpts of

02:06 it because Mr. Kennedy had it in his report and experts are entitled to rely on hearsay and non-admissible evidence to support their opinions.

THE COURT: I'm aware of that, counsel.

MR. CORDELL: But that's a different matter than introducing it in front of this jury through a fact witness who I have no idea what he's going to say about this stuff. This is the Korean Tax Authority document is not part of his purview. It's not fair.

THE COURT: What's your intended purpose with this, Mr. Sheasby?

MR. SHEASBY: To establish that his representation to this Court that this was about joint development and cross

02:06 license for joint development is inconsistent with Samsung's

internal records.

And the next slide will say they did it for LRDIMM and RDIMM purposes. I didn't ask him to --

MR. CORDELL: He can ask that question.

THE COURT: We're not here to have a discussion. If you want to say something to me, get my attention and get my approval. It's hard enough to keep the transcript straight here without three people trying to have a conversation all at one time. That's not what this is. It's not a conversation.

02:07

Now, is there another slide in addition to this --

MR. SHEASBY: There's a third slide if you turn the page. It's right there, Your Honor.

THE COURT: Is this witness a participant in any of these conversations?

MR. CORDELL: No.

MR. SHEASBY: He had to have been, Your Honor, since he said he was involved with the joint development relationship with Samsung.

02:07

THE COURT: Well, had to have been is not enough.

MR. CORDELL: I recall that this was something they submitted to the Korean Tax Authority to try to reduce the tax bite --

THE COURT: I understand that. There's no reference to the Korean Tax Authority here. There's no violation of the Court's MIL on other litigation, including the disputes before

02:08 the Korean Tax Authority. But I don't know how this witness has any personal knowledge of this. And he may be an officer of the company, but he is not the corporate representative for purposes of trial.

MR. SHEASBY: This was his division. This was -- he said he was in charge of joint development. This is the report from the joint development division --

MR. CORDELL: This --

THE COURT: These are yours?

MR. CORDELL: I think so, yeah.

THE COURT: Okay. I'm going to exclude these demonstratives.

MR. SHEASBY: Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

MR. SHEASBY: Now, let's go back into PD 1.32.

02:09 Q. (BY MR. SHEASBY) Now, you spoke about the supply obligation in this agreement just briefly. Is that correct?

02:09 A. Yes. I was talking about the supply provision and this supply provision relates to the development of the new product NVDIMM-P.

Q. It says Samsung will supply NAND and DRAM products. Correct?

02:10 A. Yes, it says that.

Q. And in your 30 years of experience at Samsung, Samsung

02:10
has never entered into an agreement that allowed a customer to purchase products with a priority over other customers. Correct?
A. I didn't quite understand the question.
Q. Sure. Based on your 30 years of experience at Samsung, Samsung has never entered into an agreement that allowed a customer to purchase Samsung products with priority over other customers. Correct?
02:11
A. We enter into supply agreements with our customers and the conditions or the terms of the agreements would vary.
Q. Could I have -- if you could turn to the first tab in your deposition binder, and if you can turn to page 690.
02:11
THE INTERPRETER: Interjection. Counsel, did you say pages 690?
MR. SHEASBY: 690.
THE INTERPRETER: Six nine zero.
MR. SHEASBY: It will be in the first tab in the binder.
02:12
Q. (BY MR. SHEASBY) And if you can read page 690, lines 8 through 12.
THE COURT: Read it to yourself.
02:13
And, Ms. Park, to be consistent, why don't you interpret those eight lines for the witness into Korean so he'll understand, and then we'll see what the next question is.
02:13
(The interpreter complies.)

THE COURT: Next question, counsel.

02:14 MR. SHEASBY: I was going to publish, Your Honor, but would you prefer that I ask the question again?

THE COURT: You need to ask the question now that you've refreshed the recollection of the witness.

Q. (BY MR. SHEASBY) Based on your 30 years of experience with Samsung, has Samsung ever entered into an agreement that allowed a customer to purchase Samsung products with priority?

02:15 A. What I said is that there isn't any agreement where Samsung enters into an agreement which would allow this one particular customer having priority over all other customers of Samsung.

Q. And that's the testimony you gave under oath. Is that correct?

A. Yes, it is.

02:15 Q. And you spoke at length about the 2015 minute -- 2015 meeting that you claim to have attended in Korea, but the reality is you were not -- you're not even sure whether you attended that meeting. Correct?

02:16 A. I am.

Q. You don't recall who else attended that meeting. Correct?

A. I do.

Q. And you don't remember what even happened after that meeting. Correct?

02:16 A. I do have a clear recollection.
Q. You have an absolutely vivid clear recollection. Is that your testimony to the ladies and gentlemen of the jury?
A. Yes, it is.
Q. Can you turn to August 12th, 2021 deposition, and if you
02:16 can go to page 28, lines 3 through 24. 28, lines 3 through
02:17 24.
THE WITNESS: I'm done.
MR. SHEASBY: Your Honor, may I publish?
THE COURT: No. You need to ask the question again in light of the witness being refreshed.
Q. (BY MR. SHEASBY) You don't recall for sure whether you attended a meeting with Mr. Kim of Netlist in or around 2015. Correct?
02:19 A. I do.
Q. You don't recall who else attended that meeting with you. Correct?
A. I do.
Q. You don't remember anything that was discussed at that meeting. Correct?
02:19 A. I do.
MR. SHEASBY: Your Honor, may I publish now?
THE COURT: You may.
Q. (BY MR. SHEASBY) Question: Did you attend such a call or meeting with Mr. Kim of Netlist in or around that time?

Answer: I don't recall for sure. However, I think maybe.

Question: If you recall, who else attended that meeting with you?

02:20 Answer: I don't recall.

Question: Do you remember anything about what was actually discussed at that meeting?

Answer: No, I don't remember.

MR. CORDELL: Your Honor, I object. I don't think counsel's reading the transcript correctly.

THE COURT: He's entitled to put what emphasis he wants to on it.

MR. CORDELL: He just skipped words is my objection. 02:20 The phrase was, I don't really recall, and counsel just said, I don't recall.

MR. SHEASBY: Your Honor, I'm speaking about a completely different question.

THE COURT: No. In the second question, the answer is, I don't really recall. I heard you say, I don't recall. But the document is before the ladies of the jury in written form on the screen.

I'm not going to sustain the objection.

Go ahead and finish presenting this, Mr. Sheasby.

MR. SHEASBY: Sure.

THE COURT: Have a seat, Mr. Cordell.

02:21

Q. (BY MR. SHEASBY) Question: "Do you remember anything else about what was discussed at this meeting?"
Answer: "No, I don't remember."
Did I read your testimony accurately, Mr. Ji?
A. You did not.
Q. "Do you remember anything about what was discussed at this meeting?"
Answer: "No, I don't remember."

02:21

Did I read your testimony accurate, Mr. Ji?
A. This set of question and answer you did, but not the prior ones.
Q. The prior one that you're referring to is Question: "If you recall, who else attended the meeting with you?"
Answer: "I don't really recall."
Did I read that question correctly, Mr. Ji?

02:22

A. The first set of question and answer, you did not.
THE COURT: Let's move on, counsel. It's been read; it's been presented visually. Let's move on.
MR. SHEASBY: Sure.
Q. (BY MR. SHEASBY) Did you -- you at the time reported to someone named Jung-Bae Lee. Correct?

02:22

A. Mr. Jung-Bae Lee was senior vice president. He was not my boss at the time.
Q. He was senior to you, though. Correct?

02:23

A. No, we were on the same level. I was a team lead and so

was he.

Q. Okay. Did you ask Mr. Jung-Bae Lee if he had visited Netlist in California?

A. I don't remember asking him that.

MR. SHEASBY: I pass the witness, Your Honor.

02:23 THE COURT: All right. Redirect?

MR. CORDELL: May I proceed, Your Honor?

THE COURT: Please do.

REDIRECT EXAMINATION

BY MR. CORDELL:

Q. Good afternoon again, Mr. Ji. So just to stay with the last topic, do you have a recollection of the meeting on or

02:23 about April 17, 2015 with Netlist?

A. Yes, I do.

MR. CORDELL: And, Your Honor, for completeness purposes, may I read the complete answer he gave that counsel just referred to?

THE COURT: Well, there have been more than one reference to the transcript. Refer me to exactly what you are talking about.

02:24 MR. CORDELL: Yes. Page 28, lines 3 through 6.

MR. SHEASBY: Your Honor, I don't have the transcript. Do you have it handy?

THE COURT: All right. This is the August 12th, 2021 document. Correct?

MR. CORDELL: Yes, Your Honor.

02:24 THE COURT: All right. Just a moment. You're going to read adjacent revisions under the doctrine of optional completeness.

MR. CORDELL: Yes, Your Honor. Just the portion he skipped.

THE COURT: Well, if he had been including it, this wouldn't be under the doctrine of optional completeness. Of course it wasn't read.

Go ahead, counsel.

Q. (BY MR. CORDELL) So, Question: "Did you attend such a call or meeting with Mr. Kim of Netlist in or around this time?"

02:25 Answer: "I don't recall for sure. However, I think I probably did."

Was that your testimony, Mr. Ji?

A. Yes, it was.

Q. And, again, remind the jury why this meeting stood out for you.

02:25 MR. SHEASBY: Your Honor, I object. That is a leading question.

THE COURT: Rephrase the question, Mr. Cordell.

MR. CORDELL: Okay.

Q. (BY MR. CORDELL) Was this meeting memorable to you, Mr. Ji?

02:26 A. Yes, because this was the very first negotiation project that I became charged with after I was promoted to this position of strategic planning team lead, and this was the very first meeting. So I do have a recollection of this meeting.
Q. Was this meeting in the morning or the afternoon?
A. Afternoon.
02:26 Q. Was -- had you met Mr. Hyan Hong before, Hyan K. Hong before?
A. No, I had not.
Q. Did you join them for lunch or did you meet after lunch?
A. It was after lunch, the meeting was.
Q. Mr. Ji, are you absolutely sure that this meeting of
02:27 April 17, 2015 took place in Korea?
A. Yes, I am, because after I became the team lead of
02:27 strategic planning, after the promotion, in the beginning days I didn't make any trip to the U.S.
Q. As to the JDLA, Mr. Ji, what was the purpose of the JDLA?
A. It was to jointly develop the new product NVDIMM.
02:28 Q. Why do companies exchange cross licenses in that context?
A. It is to avoid any patent-related risks that might occur
02:28 going forward in between those companies.
Q. And did the two companies exchange a cross license?
A. Yes, we did.
MR. CORDELL: If I may have the elmo, please. Thank

02:29 02:29 02:30 02:30

you.

Q. (BY MR. CORDELL) Mr. Sheasby showed you this slide. Do you remember that?

A. I do.

Q. And he keyed on paragraph 8.2 of the JDLA. Do you remember that?

A. Yes, I do.

Q. So 8.2 is the second clause in that section. Right?

A. Yes, it is.

MR. CORDELL: Can I have the JDLA, please, JX 51? And can you show us what clause 8.1 is, Mr. Jackson?

Q. (BY MR. CORDELL) Mr. Ji, what was the effect of clause 8.1 of the JDLA?

A. It has to do with Samsung giving a license to Netlist as to Samsung's patents.

Q. About how many memory patents did Samsung have in 2015?

MR. SHEASBY: Objection; foundation.

THE COURT: Overruled. Go ahead and answer.

THE WITNESS: Thousands of patents.

MR. CORDELL: Thank you, Your Honor. Pass the witness.

THE COURT: Is there additional cross?

MR. SHEASBY: There is no additional cross examination.

THE COURT: You may step down, Mr. Ji.

02:31

Am I correct Defendants, you have a series of at least two deposition witnesses to present? Is that correct?

MR. CORDELL: Yes, Your Honor.

THE COURT: Call your first deposition witness.

MR. TISHMAN: Samsung will now play the video testimony of Dr. Jeffrey Solomon. Dr. Solomon is a former engineer at Netlist and inventor on the '912 Patent.

The video runs 3 minutes and 41 seconds for Defendants and 1 minute and 7 seconds for Plaintiff.

02:31

THE COURT: Proceed with this witness by deposition.

JEFFREY SOLOMON, Ph.D.,

BY VIDEO DEPOSITION

02:32

Q. Can you please state your full name for the record?

A. Jeffrey Solomon.

MR. SHEASBY: Your Honor, this is not what we --

THE COURT: Stop the video.

What's your objection, Mr. Sheasby?

MR. SHEASBY: The picture was frozen. I just wanted to make sure the picture would start moving before we actually showed the video.

THE COURT: Have a seat. Let's play this video.

02:32

Q. Can you please state your full name for the record?

A. Jeffrey Solomon.

Q. I guess my question is, you know, after you had sort of started out and at first you were just working on a specific

thing that you were hired for --
A. Right.
Q. -- how did that evolve into a -- into a different way of identifying research areas?
A. Yeah, I -- okay. So I'd say part of it was being aware
02:33 of what projects were there, what -- what -- what was identified by the company mainly through conversations with Jay Bhakta, and then if I -- if I thought of some things, I'd bring them up, like the -- the idea of load-reduction DIMM. I think that was just something that I recognized was a real fruitful area to go into, and Jay agreed.
02:33 I mean, we -- our desks were close by; and I can even remember the moment that we talked about it that -- that it would be something that, over time, would become more important to the industry.
Q. Is Exhibit 4 the '912 Patent that you mentioned earlier?
A. It looks like the front page of Patent '912.
Q. During your work at Netlist, did you ever work on a DIMM that included distributed buffers?
02:34 A. No.
Q. Did you make any inventions related to distributed buffers while at Netlist?
A. Not that I recall.
Q. All right. Do you recognize Exhibit 6?
A. Is that Patent '417?

02:34
Q. Do you see just below your name that this patent was filed on November 25th, 2019?
A. Yes.
Q. Is the abstract of the '417 Patent describing something that you invented with Mr. Bhakta?
A. It doesn't correspond to the specific designs that I did to demonstrate the concepts of the things that I was working on. I -- I never worked on anything -- I -- I didn't work on anything that involved the data buffer.
You know, I mean, I -- I'm not even sure what -- what data buffer means in this context. I never used that in -- in articulating what I was working on.
Q. Okay. In your work at Netlist, did you hear the term 'data buffer' used in the context of anyone else's work?
A. I don't remember.
Q. Have you ever heard of a feature of DDR4 devices called per-DRAM addressability?
A. What kind of addressability?
Q. Per-DRAM addressability.
A. So, Chris, I was introduced to the concept of PDA a few days ago by counsel, and I had never seen that before. So that's -- whatever I know about it, I just encountered that in recent days.
Q. Did you collaborate with Mr. Bhakta on any inventions related to per-DRAM addressability?

A. I did not collaborate with Jay Bhakta on that feature or that operation.
Q. Did you invent anything related to per-DRAM addressability in DDR4?
02:37 A. Not that I know of.
Q. When did you leave Netlist?
A. 2016.
Q. But for clarity, the work you did at Netlist did not involve logic sending control signals to a buffer. Correct?
A. That's correct.
Q. And do you believe Netlist invented LRDIMMs?
A. I do.
02:37 THE COURT: Does that complete this witness by deposition?
MR. TISHMAN: It does, Your Honor.
THE COURT: Call your next deposition witness, please, counsel.
MR. TISHMAN: Samsung will now play the video testimony of Dr. Hyun Lee. Dr. Lee is the former chief technology officer at Netlist, and he's an inventor on the '608 Patent.
This video runs 2 minutes and 7 seconds for Defendants and 9 seconds for Plaintiff.
THE COURT: Proceed with this witness by video
02:38 deposition.

KEN LEE HYUN, Ph.D.,

BY VIDEO DEPOSITION

Q. Can you please state your full name for the record?
A. My name is Ken Lee Hyun.
Q. Dr. Lee, can you describe your educational background for after high school?
A. I obtained my Bachelor's and Master's degree from the University of Michigan. Then I obtained a Ph.D. from Lehigh University in Pennsylvania.
Q. And you -- you joined Netlist around 2007?
A. That is right.
Q. You recall at some point being a CTO at Netlist?
A. Yes.
Q. Did you hold any positions at JEDEC while attending meetings for Netlist?
A. No.
Q. Did you make any technical proposals to JEDEC while attending on behalf of Netlist?
A. To my recollection, no.
Q. And why did you attend JEDEC meetings on behalf of Netlist?
A. As I said earlier, I attended in order to understand which direction the industry was going for, the trend, as CTO.
Q. And were you one of the inventors who came up with the distributed buffer architecture?

A. Yes.
Q. And specifically, Dr. Lee, do you see that you're listed as a member present for the March 5th, 2012, Hong Kong JEDEC meeting?
A. Yes.

02:40 THE COURT: Does that complete this witness by deposition?

MR. CORDELL: Yes, it does, Your Honor.

THE COURT: All right. Members of the jury, the next witness is a live witness who is estimated to be on the witness stand for at least a couple of hours, so we're going to take a recess at this juncture before we start this next witness.

If you will, simply leave your notebooks in your chairs, follow all my instructions, and we'll be back shortly to continue.

The jury's excused for recess.

02:41 (Whereupon, the jury left the courtroom.)

02:41 THE COURT: The Court stands in recess.

(Brief recess.)

02:43 THE COURT: Be seated, please.

03:11 Defendants, are you prepared to call your next witness?

MR. CORDELL: We are, Your Honor.

THE COURT: All right. Let's bring in the jury.

(Whereupon, the jury entered the courtroom.)

03:11 03:12 03:12 03:13

THE COURT: Dr. Albert, you can go to the podium and prepare.

DR. ALBERT: Thank you, Your Honor.

(Whereupon, the jury entered the courtroom.)

THE COURT: Welcome back, ladies. Please have a seat.

Defendants, call your next witness.

DR. ALBERT: Defendants call Mr. McAlexander.

THE COURT: All right. Mr. McAlexander, if you'll come forward and be sworn, please, sir.

(Whereupon, the oath was administered by the Clerk.)

THE COURT: Please come around, sir, have a seat on the witness stand.

All right, counsel. You may proceed with direct examination.

DR. ALBERT: Thank you, Your Honor.

JOE McALEXANDER,

having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY DR. ALBERT:

Q. Can you please introduce yourself to the jury?

A. Yes. My name is Joe McAlexander. I live about 50 miles north of Dallas in Collin County. My wife and I, married for 56 years, have two sons and five grandchildren, and we own and operate an equine therapy ranch, horse ranch to where we work

with families and youth that are challenged.
Q. And what are you here to testify about today?
03:13 A. I'm here to testify about three specific patents that are at issue in this case, and specifically with regard to why Samsung does not infringe those patents and why the patents are invalid.

And I also have a few comments at the end with regard to the benefits of the patents or lack thereof.
Q. Now, can you tell the jury about your experience in the area of computers and memory?
A. Yes. I've been involved in the electronic circuit industry since 1972--a few years. After three years in the military, 1972, I joined Texas Instruments in Houston, Texas, as a design engineer specifically designing DRAMs, which are the subject -- circuits that are subject to this case today.

I also spent about 14 years at TI. It involved all phases of design of integrated circuits. The manufacturing of the integrated circuits were called wafer fabrication. In fact, I managed the entire wafer fabrication facility from a quality and engineering standpoint for two years. I also spent three years in Singapore working with the packaging and the testing.

And in the course of my time, I have actually developed four separate physical and chemical analysis laboratories specifically being able to forensically analyze computer

systems and chips.

03:14 So that's -- right now I'm president of McAlexander Sound, Incorporated, my own registered engineering company, in the Dallas Metroplex area, and I've held that position since 1988.

Q. And do you have any patents in the area of computer systems and memory?

A. Yes. I have. In the U.S. I have 31 patents total, and a number of those are directly associated with integrated

03:15 circuits, including addressing, buffers, sense amplifiers, decoders, encoders, and clocking circuits.

DR. ALBERT: At this time, Your Honor, Samsung would like to offer Mr. McAlexander as an expert in computer systems and memory.

THE COURT: Is there objection?

MR. SHEASBY: No objection, Your Honor.

THE COURT: Without objection, the Court will recognize this witness as an expert in those identified fields.

All right, Dr. Albert. You may continue with your direct examination.

DR. ALBERT: Thank you.

Q. (BY DR. ALBERT) Mr. McAlexander, did you prepare any

03:15 slides to assist your testimony today?

A. Yes, sir, I did.

DR. ALBERT: Mr. Jackson, can we bring up DDX 4-1, please?

Q. (BY DR. ALBERT) Can you describe for the jury what you're showing here on this slide?

A. Yes. This is a -- just a representation of a computer system, and specifically some of the primary components that are located within that system.

I think most of us are familiar with what's shown on the left side. You have a screen that you can look at and display 03:16 what you're writing or reading, a keyboard for the ability to enter in information to the computer, and then this big black box where everything is taking place.

And if you opened up that black box and looked inside of it, there's a lot of components and a lot of wiring. But two of the principal areas that you will see is one is called a memory controller or a microprocessor, and the other is called memory modules.

The memory controller is that which really organizes and is the brains of the entire system, and the memory modules are 03:17 what you use to store information in.

Q. And do you have some samples of those two components to show?

A. Yes, I do.

Q. Can you show the jury what you mean by these two components of the system?

03:17

A. Yes. Well, there are two. I've shown the memory modules in that display. This particular one is called an RDIMM, or registered DIMM, and it has black components. The components that you see on there are dynamic random access memories, and they're located on both sides of the board.

The distinctive difference is in the LRDIMM, the load-reduced DIMM, there are some buffer circuits in addition to the DRAMs that are used to interface to the computer.

And then, lastly, I do also have an example of a Intel processor, and this is the type of component that would fit into the -- into the control aspect in this computer system.

DR. ALBERT: Mr. Jackson, could we bring up DDX 4-2,

03:18

please?

Q. (BY DR. ALBERT) And what are you showing here, Mr. McAlexander?

A. What I'm showing here is a memory controller that is communicating with a memory module. And you will notice that the memory controller is connected to the memory module with some wires labeled in the gold color.

And you also see that at the edge of the memory module

03:18

are some gold pins, and these gold pins that are located here are ones that are used to actually interface between the lines coming in and the memory module itself.

And then you will also notice some blue areas. The blue boxes represent the buffers. This would be similar to this

LRDIMM that I showed earlier.

And then last component, primary component is the DRAM, and the DRAM represents the location where actual data is either stored, which means you write data into it or you read data from it.

And then there are two other components that are also shown in this -- this diagram. One is the RCD, which is the registered clock system, and this kind of orchestrates some of the timing on the circuit, and the last one is the serial protect device, the SPD, which retains some of the characteristics of that particular module.

DR. ALBERT: All right. Can we go to slide 4-3, please?

Q. (BY DR. ALBERT) And what are you showing here, Mr. McAlexander?

A. This is a roadmap of some of the slides that I will be presenting today basically going through the three patents-at-issue in this case. And I will address each of them one at a time, and then at the end I'll also go through some charts to show what I understand to be the potential technical benefits of these patents.

Q. Now, in doing your analysis, what kind of materials did you review?

A. I reviewed a large number of produced documents in this case from both the Plaintiff and the Defendant. I reviewed

documents that included data sheets, which are the specifications that describe the various components that are in this particular matter.

I also listened to quite a bit of deposition testimony.

I also looked at a number of documents that had to do

03:20 with the actual module testing as well as the -- as well as some of the source code that was available to us in this case.

Q. Now, the jury heard from Mr. Mangione-Smith today -- excuse me, Dr. Mangione-Smith the other day. Did you review all of the materials that he offered for this case?

A. Yes. All the materials that Dr. Mangione-Smith relied upon, I reviewed each one of those materials, including the

03:20 reports that he generated in this case.

Q. Now, did you also talk to anyone at Samsung in preparation for your testimony?

A. Yes. I had two conversations with members at Samsung, engineers at Samsung.

Q. Okay. Starting with the first section, what would you like to talk about for the '608 Patent?

A. I'd like to first look at the '608 Patent and specifically discuss why in my analysis Samsung's data buffers

03:21 don't determine the amount of delay as required by the claims.

DR. ALBERT: Can we bring up JX 3-2, please? And zoom in on, yes, the top, please. That's perfect. And can you highlight the title there?

03:21
03:22
03:22

Q. (BY DR. ALBERT) What are you showing the jury here?
A. What I'm showing is on the face page of the '608 Patent in the top right corner is the actual patent number, 10,268,608. Right underneath it, you'll find the date, April 2019 that the patent issued. And then also on the left side is the title, just the generalized title about the patent specifically directing our attention to timing control data paths.
Q. As a general matter, what is this patent directed to?
A. Well, in a general matter, it's directed to data buffer and the way in which you can integrate that into a -- a memory module device and do it in such a way that it yet assists in the transaction of data information from the microcontroller to the DRAMs themselves.
Q. Now, for all of the patents that you're going to talk about today, can you tell the jury a process for reviewing the patents and the description and everything that you found relevant to the patent-at-issue?
A. Well, when I first get the patent itself, such as the '608, I will review the patent, including its face page, the figures that are within the patent. I'll look at the written description that summarizes what the inventor believed to be his invention. And then I will focus most of my attention on the claims at the back of the patent which are the actual invention.

DR. ALBERT: And can we go to JX 3-3? Go to the top left.

03:23

Q. (BY DR. ALBERT) Now, when this '608 Patent talks about technology that would have existed at the time, what is the time frame that this '608 Patent is talking about?

A. That would be the time around July of 2012.

Q. Okay. Now, can you give for the jury a general idea of what timing control is?

03:23

A. Yes. I can give you a general idea. For instance, if I had a family reunion that was going to be here in Marshall, Texas, but I had some family members that lived out in Los Angeles, others lived in Seattle, others lived in Florida, but I wanted to make sure that all the family members got here at the same time or about the same time so we can share a car in order to drive from like Shreveport to Marshall, save some expense. So being able to time that is important.

If I left that up to each one of my family members to time it, it's just not going to happen, but if I think about a host such as American Airlines or Southwest or one of the other airlines, that they can orchestrate and define and determine exactly what flights are going to be done when, then I can go select which ones would be the most pertinent to get the family members here on time. So timing does matter.

03:24

DR. ALBERT: And if we skip ahead to JX 3.35, please, and go to lines 2:26 through 36 and a little bit

03:24

further down, in some conventional memory systems, right there. Can you zoom in the top right there? Perfect. Thank you?

Q. (BY DR. ALBERT) So what is the patent saying about the problem here with conventional memory systems?

03:25

A. What it addresses--this is circa 2012--is that in conventional memory systems, there is a difficulty between the communication between this memory controller and the memory on the module. And so it requires the controllers to have some type of what's called leveling mechanisms. This is where it arbitrates the timing and gets everything arranged in a line.

03:26

That's the problem at that time is that the systems were getting sophisticated so much and the wire links were getting so disparate in terms of their length comparison, that it was becoming very difficult to get this timing controlled.

Q. And what did it say about whether those old memory controllers from the 2002 time frame were sufficient to address that timing issue?

A. Well, at least what the inventor recognized was a belief that the memory controller was not sufficient to be able to make that decision any longer.

03:26

DR. ALBERT: And can we go to JX 3.2 at the abstract, please?

Q. (BY DR. ALBERT) Now, what does the patent offer as an approach to address the prior limitations of those memory

controllers?

03:26 A. What the patent addresses as an approach is rather than leaving the decision process, the determination, up to the memory controller, is that the memory module could take over that control and, in the buffer circuits that exist on the memory module, that it could install a command processing circuit that also, in cooperation with the delay circuit, could actually make that decision at the buffer level.

03:27 So that is really the major emphasis of this patent is to basically take the control away from the memory controller and put it on the memory module in the buffer itself.

DR. ALBERT: And can you go to 3.18?

Q. (BY DR. ALBERT) Now, what is the patent showing here with figure 6 regarding where that determination of the delay time would be?

03:27 A. What this is showing in figure 6 is if we go to look at the circuitry in the buffer itself that's on the memory module, that there would be instantiated a command processing circuit -- that doesn't work. Let's do it this way. You would put in place a command processing circuit, and that command processing circuit would have the necessary circuits, the command circuitry and the delay circuitry, to take control and arbitrate the timing there at the data buffer.

03:28 Q. Okay.

DR. ALBERT: Can we go to JX 3.44 and zoom in on

claim 1, please?

Q. (BY DR. ALBERT) Now, in determining whether Samsung was using the -- any of the '608 ideas, what was the first thing you looked at?

A. The first thing I looked at was the claim itself, and either with a plain and ordinary meaning of the Court's construction made sure that I properly had an understanding of the claim; and then once I had that proper understanding of the claim, then I looked at a comparison of that claim to the accused products.

Q. And does this claim in particular have that requirement that the buffer is the part that determines the delay amount?

A. Yes. It's a very lengthy claim and a lot of words, but embedded in this claim is those specific requirements that the buffer determines that delay.

DR. ALBERT: And let's skip ahead to claim 5, please. 3.44, claim 5.

Q. (BY DR. ALBERT) Now, does claim 5 also have the same requirement for the buffer to determine the amount of delay?

A. Yes. You can see that claim 5 depends from claim 1. It says the memory module of claim 1. So that means claim 5 adds an additional requirement, but all of the requirements that are in claim 1 must also be satisfied.

So as you'll see in the presentation, any finding that I have that the accused products do not infringe claim 1, they

automatically do not infringe claim 5 because it depends from claim 1.

03:30 DR. ALBERT: Mr. Jackson, can you bring up DDX 4-4, please?

Q. (BY DR. ALBERT) And what are you showing here, Mr. McAlexander?

A. What I'm showing here is a comparison of what the claim requires in the Netlist '608 Patent and comparing that to the Samsung products that are accused.

03:30 And so on the left side, I'm showing an example of a particular module that has the data buffers that are shown in blue. And the claim from the Netlist patent requires that the data buffer is the structure that determines the amount of delay; whereas, when I evaluate the Samsung product, it is not the buffer circuit on the module that makes that determination; it is, in fact, the memory controller, in fact, 03:31 similar to the way it was before the patent -- before even 2012.

So they have maintained in Samsung that the memory controller is the one that makes that determination, not the data buffer.

DR. ALBERT: Can we go to DDX 4-5, please?

Q. (BY DR. ALBERT) Now, looking at the top of your slide here, can you explain to the jury the specific language in the '608 Patent claim that requires the delay amount to be

03:31 determined in the buffer?

A. Yes. This section I've drawn at the top here is a particular set of words that are in the claim -- in claim 1 of the '608 Patent. And, specifically, if I look at the words themselves, what it says is that the buffer circuit includes a command processing circuit, and it also has -- and it has a delay circuit, which is shown here. And that is configured to delay a signal through the data path by an amount determined by the command processing circuit.

So here we see the construct within claim 1 that requires that it's the buffer circuit -- in fact, it's a delay circuit and a command circuit within the buffer circuit that is making that decision for determining the amount of delay.

Q. Now, yesterday we heard from Mr. Davey at Renesas. Were you here in court for that?

A. Yes, I was.

03:32 Q. And what did Mr. Davey say about what part determines the amount of delay?

A. He affirmed that it is not the buffer that makes that determination; it's the host that makes that determination.

Q. And to be clear, what is that host?

A. The host would be the microcontroller, memory controller, host controller, that particular device that operates is kind of the brain for the computer system as it controls the data path.

03:33
Q. Now, did you just stop at his word?
A. No.
Q. What did you do to confirm that understanding that it is the memory controller that determines the amount of delay? What kind of documents, materials did you look at?
A. Well, I looked at quite a few documents. But, for instance, this Mr. Davey, his representation is from Renesas. I looked at the Renesas documents for the buffer circuitry, I also looked at Montage, and I also looked at Rambus. All three of these were vendors of these types of products. So I looked at the data sheets that are associated with these products among a number of other documents.
03:33
DR. ALBERT: Mr. Jackson, can you bring up JX 27, please?
Q. (BY DR. ALBERT) And you see up at the top a data buffer and then data sheet on the right. What is that?
03:34
A. This is a data sheet. A data sheet represents what the manufacturer of the product wants the consumer to know and to understand about their product so that they can utilize it properly.
So what is shown here at the top is called a 4DB0232KC2. This is a -- as shown in the left, is a DDR4 data buffer. So this is the type of data buffer that is found on the Samsung-accused products.
03:34
DR. ALBERT: And can we go to JX 27 at 29, please?

And zoom in on training support features. Right there. And can you highlight the first two lines, please?

03:35 Q. (BY DR. ALBERT) Now, up at the left of this highlighting, it references a very long string of letters. What's that referring to?

A. That basically is just the part number associated with the DDR4 buffer.

Q. That's the data buffer that this data sheet is for?

A. Yes, that's correct.

Q. Okay. And then if you go across to the right, it says it

03:35 will depend on the host controller to get timing control registers programmed. What does that mean?

A. Well, the predicate to answering that question occurs just before it. It says that the data buffer that's identified by that part number on the top left, first line, data buffer does not contain the self-sufficient training state machines for calibrating the timing control.

In other words, it does not have the capability to do it.

03:36 It must depend on the host controller to determine that, the timing adjustment, and then to program, which means the host controller makes the decision and then programs, stores, that information down on the buffer so that now the buffer operates in accordance with what the host controller told it to do.

Q. And so does the buffer have any ability then to determine the amount of delay according to this data sheet, this data

buffer data sheet?

03:36 A. No, no. The data buffer cooperates with the host controller to assist the host controller, but the host controller is the only one that can actually make that decision.

Q. Because once the host controller, that memory controller, decides the amount of delay, what happens?

A. When it does decide?

Q. When the memory controller decides the amount of delay to use, what does the memory controller do?

03:37 A. When the memory controller reaches a decision and determines what that delay amount is going to be, it then activates a data path communication from the controller down to the memory module and stores that information. It's called configuration. And it basically configures that information, puts it in a register down on the buffer.

And so from that point forward, the buffer, every time it is activated, is going to transfer data to and from the module 03:37 at -- with the delays that are specified in that register that was determined by the host.

Q. Now, does the buffer have any control of the delay values that the host sets for it?

A. No. Everything else is hard-wired. It's basically -- that's the adjustment comes from the value that's been placed there by the host, and the buffer does not have

03:38 the capability to modify it, change it in any way, delete it, avoid it. It must exactly obey what is programmed there by the host.

DR. ALBERT: Mr. Jackson, can we go to JX 27.35, please? That's perfect. And can you highlight the top line there, DRAM-to-DB read delay?

03:38 Q. (BY DR. ALBERT) What is read delay training mode?

A. The modules do not have the capability to remember, to retain the information. It's a DRAM. So when you power down the system, all of that information is lost.

And so when you turn the system back on, it's like when you push the power-on button on your computer and it turns on, it goes through a start-up phase to power up. And during that phase it goes into what's called a training mode. 03:39

And during the training mode, the host manages that entire training mode and from -- and during that training mode it actually makes that decision and determines what the delay is and then programs that delay down to the buffer.

DR. ALBERT: Now, Mr. Jackson, in the last paragraph there, it says, in this training mode. Can you highlight that first sentence?

Q. (BY DR. ALBERT) Now, we've seen this language before, Mr. McAlexander. It says, "In this training mode, the data buffer uses a data pattern comparator to determine if the read data arriving from the DRAMs after a read command match an 03:39

expected result." Do you see that?
A. Yes, I do.
Q. First off, is that determining a delay value?
A. No, not at all. The data buffer does not have that capability.
Q. Now, does this sentence mention the delay value at all?
03:40 A. No, it does not.
Q. And what is this sentence talking about then?
A. What this sentence is talking about is that when the power up sequence is taking place and it goes through -- it's called the bios, when -- during that start-up phase and the host controller is managing this training phase, it's doing it in such a way that the data buffer is cooperating. So the 03:40 host will transmit data down to the module to get loaded into the DRAM.
And so what the buffer does is compare what was actually stored to what was sent and make sure that there's a match. And so the determination is just making sure that the data was read correctly. And that's all that does.
And this is done through multiple sequences of data where the delay is specifically activated by the host. And then 03:41 once the training process is finished, all of this data that's been collected comes back up to the host and the host determines, okay, where do I select the delay.
DR. ALBERT: At this time, Your Honor, we'd like to

show some third-party confidential information and request to seal the courtroom.

THE COURT: All right. Based on counsel's request and representation and to protect confidential information, I'll order the courtroom sealed.

I'll direct that all persons who are not subject to the protective order in this case exit the courtroom at this time

03:41 and remain outside until it is reopened and unsealed.

(Courtroom sealed.)

[redacted]

03:42 [redacted]

Q. [redacted]?

A. [redacted]

03:42 [redacted]

[redacted]

[redacted].

Q. [redacted]?

A. [redacted].

03:43

Q. [redacted]?

A. [redacted].

03:43

Q. [redacted]?

A. [redacted].

03:44

Q. [redacted]?

A. [redacted].

Q. [redacted]
[redacted]?
A. [redacted]
[redacted].
Q. [redacted]
[redacted]?
A. [redacted].
Q. [redacted]
[redacted]?
A. [redacted].
Q. [redacted]
[redacted]?
A. [redacted].
Q. [redacted]

[redacted]

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

03:47
Q. [redacted]
[redacted]?
A. [redacted].
Q. [redacted]?
A. [redacted].
Q. [redacted]
[redacted]?
A. [redacted]
03:48
[redacted].
[redacted]

(Courtroom unsealed.)

03:49
THE COURT: All right, counsel. You may continue.
DR. ALBERT: Mr. Jackson, can you bring up DDX 103,
03:49
please?
Q. (BY DR. ALBERT) Mr. McAlexander, is this an Intel proposal from early 2012 for the data buffer?
03:49
A. Yes, it is. As I recall, it was like in March of 2012.
Q. Okay. And how does that --
DR. ALBERT: Can we go to the third page, please?

And zoom in on training support features.

MR. SHEASBY: Your Honor, objection; foundation. This is a proposal that was made by Intel to JEDEC. This isn't an analysis of Samsung's products, so I have a relevance objection and I have a foundation objection.

THE COURT: What's your response, Defendants?

DR. ALBERT: This is showing the proposed feature that Intel made that buttresses the document that we just showed and the confidential portion as to how the memory controller actually implements the determining the delay.

MR. SHEASBY: So I then renew my objection. A proposal has nothing to do with what's actually implemented in Samsung products, especially a proposal from a third party.

THE COURT: Is this material that's covered in the expert's report?

DR. ALBERT: Yes, it is, Your Honor.

MR. SHEASBY: But not for this purpose, Your Honor. It's not an outside of the scope objection, Your Honor. It's a relevance objection.

THE COURT: I understand, and as you well know, experts can rely on material that's not otherwise admissible on its own. I'll overrule the objection at this time.

MR. SHEASBY: Thank you.

DR. ALBERT: And, Mr. Jackson, can we highlight the first two sentences again? The first two lines, actually.

Thank you.

Q. (BY DR. ALBERT) And in this Intel proposal from 2012, what does Intel say about whether the data buffers would be able to determine the amount of delay?

03:52

A. What this document says is that for the training support, that the data buffer, the DDR4 data buffer, does not contain self-sufficient training state machines for calibrating its timing control. It instead depends on the host controller.

03:52

Q. And was this proposal made before the '608 family was filed, patent family was filed?

MR. SHEASBY: Your Honor, I object. And can I approach?

THE COURT: Approach the bench, counsel.

(The following was had outside the hearing of the jury.)

MR. SHEASBY: This is a clear violation of a motion in limine. This is withdrawn prior art. The date on which this proposal was made or not made is utterly irrelevant to any issue of infringement in this case. If it was made before, it doesn't matter. If it was made after it doesn't matter because it doesn't matter to infringement. This is a surreptitious validity argument, and it's a clear violation of a MIL.

03:52

THE COURT: What's your response?

DR. ALBERT: We're clearly not asserting for

invalidity, Your Honor. But this was made before the patent, and there's assertions that Samsung copied -- or not copied, but we somehow got ideas from the '608 through various disclosures. This shows that the proposal for the technology that actually made it into the product, the product spec exactly, came out well before the patent was filed.

MR. SHEASBY: First off, I sustained an objection in my opening because of some suggestion of copying, so clearly copying is not in this case. Based on that and, two, it's still being used as prior art. This is just a surreptitious -- this is literally, literally their invalidity argument.

THE COURT: All right. Just a moment. What limine order do you believe this brings to bear?

MR. SHEASBY: Withdrawn defenses, Your Honor.

THE COURT: Do you have something else to add, Dr. Albert?

DR. ALBERT: Yes. This was known to the inventor. He did not disclose it to the Patent Office when the patent was filed. He clearly didn't think this was relevant.

MR. SHEASBY: So now we have an equitable conduct allegation as the basis for the relevance.

THE COURT: I'm going to sustain the objection.

DR. ALBERT: Thank you.

MR. SHEASBY: Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT: All right. Objection sustained. Let's proceed.

Q. (BY DR. ALBERT) So based on your review of all of the documents in this case, the data sheets from all the manufacturers, the source code from the buffer supplier, the documents from the memory controller, are you sure that the determination for the delay amount is in the memory controller as opposed to the buffer?

03:55

A. I'm very certain that the determination of that delay amount is determined by the host and then is programmed to the buffer and the buffer basically obeys and responds to what the host controller tells it.

03:55

DR. ALBERT: Can we bring up DDX 4-3, please?

Q. (BY DR. ALBERT) Moving on to the second item regarding the '608 Patent, what is your conclusion as to invalidity for the '608 claims?

A. My conclusion is that the -- if the patent claim is broad enough to cover still having contribution from the memory controller, then that goes against what the patent claim is all about. So, therefore, it's not valid.

03:56

Q. And did you see quotes in the patent specification actually criticizing using memory controller for this type of thing?

A. Well, there was a number of places that -- in fact, I represented one of them. Basically they found that the memory controller was not sufficient to be able to do that. So the buffer circuit, according to the invention, was to take over that control and make that determination.

In this case in Samsung's products that are accused, it is the controller that's making that determination. So I don't believe the claims are broad enough to cover where the determination is made in the controller.

03:56

MR. SHEASBY: Your Honor, I have an objection.

THE COURT: What's your objection?

MR. SHEASBY: Contingent with the claims read act then they're invalid for why [verbatim] is not an appropriate analysis for written description.

THE COURT: All right. Well, you can address it with the witness on cross examination. Overruled at this point.

Go ahead, Dr. Albert.

03:56

Q. (BY DR. ALBERT) Moving on to the second part of your analysis, what is your conclusion briefly regarding the '912 Patent?

A. There are two areas that I will cover. Briefly, I find that the Samsung-accused products do not practice and therefore are not infringing the '912 Patent claim, and there are two specific reasons that I will address.

03:57 DR. ALBERT: And can we go to JX 2-2, please? And zoom up towards the top half, please. Perfect.
Q. (BY DR. ALBERT) What are you showing here?
A. This is the face page of the '912 Patent. You can see
03:57 the patent number in the upper right corner, 7,619,912, with the issue date of November 2009. Mr. Bhakta on the top left corner is the identified inventor as well as Mr. Solomon, and also you can see the filing date of this patent on line 22 is September of 2007.
Q. And just like the '608 Patent, did this patent result from a family that extended earlier?
A. Yes, it does.
03:58 Q. And what was that date?
A. We can look down further, and I believe it's May of 2004.
Q. Okay. So in your analysis of the teachings of the '912 Patent, what time frame were you considering?
A. 2004.
DR. ALBERT: And can we go to JX -- at the second
03:58 column, please? Earlier, before this. After the figures. 23, please, and zoom in on column 2, lines -- starting with lines 34--during operation.
Q. (BY DR. ALBERT) Now, in the second -- the last two sentences there, what does the patent say about the
03:59 limitations of computer systems in that 2004 time frame?
A. What it says is around 2004, that the memory controller

04:00

that -- that runs this show is limited to two different ranks of memory. And as a result, it says that the memory density that you put in the memory modules is going to be significantly impacted because there's a limitation to one or two ranks from the memory controller.

DR. ALBERT: Can we go to DDX 4-8, please?

Q. (BY DR. ALBERT) And what are you showing the jury here?

A. What I'm showing here is that the '912 Patent recognizes a particular problem, and that is that the microcontroller, which I've highlighted in the purple box at the bottom, when it communicates to the module, it is limited to being able to communicate to one or two ranks at the most. And that was the state at that time.

04:00

Q. So what happens in the old system when a memory controller that can control two ranks tries to put data into a memory module that has two ranks? Does that work?

A. Yes, it works. It is shown here. If the memory module is configured with two ranks and the controller can communicate to two ranks, then clearly it can communicate and control.

04:01

Q. Now, what role does the signals coming from the memory controller have in the system on where the data goes on the memory module?

A. There's a one-to-one correspondence. Here, because there are one or two ranks on the memory module and the memory

04:01 controller can control one or two ranks, then when the memory controller tells the module to place the data that it's sending to it in rank 2, it will sent in rank 2. And so the controller knows exactly where the data is placed. It knows which rank and which memory devices the actual data exists.

Q. Now, in that old system, what would happen if the memory controller had four ranks? Would that work?

A. If the memory controller had --

Q. I'm sorry. Let me withdraw the question.

A. Okay.

Q. In that old system with the old memory controllers, what would happen if the memory module had four ranks?

04:02 A. It would not work because the controller can only talk to two.

DR. ALBERT: And can we go to JX 2.27, please?

Q. (BY DR. ALBERT) And what does the patent offer as an

04:02 approach to get around that old technology in those old memory controllers that were limited to one or two ranks?

A. It recognizes first that the old controllers are limited to two ranks. And so if the memory module is going to be designed to have more ranks and more units and more -- more density, then it has to somehow come up with a way in which it can--I'll use the word trick--trick the memory controller into

04:03 thinking it has only two ranks where there really are more.

And so this is done -- it's called the SPD, the serial

protect device. That contains some characteristics of the memory module. So if the SPD device was on a memory module that had two ranks, it informs the controller, I have two ranks. But here if I have, for instance, four ranks, the memory module will orchestrate and store data in four ranks, but it will still tell the memory controller, I only have two ranks. Basically tricks it.

DR. ALBERT: Can we go to DDX 4-9, please?

Q. (BY DR. ALBERT) And what are you illustrating with this image on 4-9?

A. What I'm illustrating here is for the example where the memory module has more than two ranks, in this case four, it has two ranks on the front side of the board and two ranks on the backside of the board.

And when I use the term rank, I'm really looking at a row of memory, and the Court has given us construction on that. I know Dr. Mangione-Smith has already identified that.

But here the controller thinks that it is controlling two ranks, but in fact the memory module has four ranks. So the memory -- let's say the memory module -- excuse me, the memory controller says, I can control two ranks so I'm going to take whatever this data is, whether it's a video or whether it's audio from music, I'm going to take this and I'm going to tell the module to load it into rank 1. That data gets across to the module, the module says, I'm going to put it in rank 3.

04:05 04:05 04:06 04:06

And so here we have a disconnect. Yes, you're storing the data, but the module is not communicating correctly back to the controller, so basically the controller has no idea where the data actually resides.

DR. ALBERT: And can we go to DDX 4-3 again, please?

Q. (BY DR. ALBERT) Now, for your first bullet point in item 2, what is your conclusion as to non-infringement for Samsung's products?

A. Well, I'll show it in some subsequent slides, but my conclusion is Samsung does not trick. The Samsung module correctly and accurately informs the memory controller about the number of ranks that it has.

DR. ALBERT: And let's go to DDX 4-10, please.

Q. (BY DR. ALBERT) Now, up at the top, is this part of the claim language of the '912 Patent claim?

A. Yes, it is.

Q. And what are you illustrating with this claim language for this '912 Patent claim?

A. Well, this particular language within the claim is directed to certain constructs that are on the memory module. And it says that -- that the circuit board, the printed circuit board has a plurality of double-data-rate, DDR, memory devices coupled to it, and these devices have a first number of DDR memory devices arranged in a first number of ranks.

So for a way of example, I'm saying there's 36 devices

and they are arranged in four ranks. So this part of the claim as read on a Samsung product, this is what it would look like.

DR. ALBERT: And can we go to the next slide, please?

04:07 Q. (BY DR. ALBERT) Now, up at the top we see the claim language has moved to another part of the claim element. What is this next part of the claim?

A. What this is directed to is that when you look at the communication between the microcontroller and the module, it will transmit control signals to the -- from the controller to the module.

04:07 And when it does, according to the claim, the set of input control signals that are sent are configured to control a second number of devices arranged in a second number of ranks. The language continues to where the second number of devices and the second number of ranks is less than the first number.

So, by way of example, if the controller has a limitation 04:08 to 18 devices across two ranks, that's a lesser number, so the control signals that are coming from the controller represent only up to two ranks and 18 devices, where in physical reality the number of ranks and the number of devices is larger.

DR. ALBERT: And can we go to the next slide, please?

Q. (BY DR. ALBERT) And so what is your conclusion then or your determination as to whether -- how the Netlist claim on the left compares to what Samsung does on the right?

04:08 A. The Netlist claim recognizes in its claim that there's a limitation to the amount of ranks and -- and devices that the memory controller can control. And so it says in the network device that -- Netlist device, that the memory controller has a limitation to two ranks and 18 devices. But my module has twice that number of ranks, twice that number of devices, so 04:09 in order to make this work, I'll have to trick the controller into believing what it thinks it has and it's in reality not what is there.

Q. So in Samsung's memory module, is the Samsung memory module tricking the controller at all?

A. No.

Q. And how do you know that?

A. I've looked at the data from the memory controller, I've looked at the architecture of the memory cards themselves, and I've looked at the communication that takes place between the 04:09 controller and the memory module. And much of that goes to the SPD device, the serial presence detect device, which has the characteristics embedded in it of what the module is and it sends that exact information over to the controller.

Q. So how does the memory controller then get the information about how many devices and ranks the memory module

04:10 actually has in the Samsung products?
A. The small device that I'm circling here called the serial presence detect device has loaded in it the characteristics--the pinout, the number of DRAMs, the number of ranks, and lots more information, but it basically holds within it the characteristics of that module.

And during the power-up phase, that serial protect presence device loads that information into the memory controller so now the memory controller knows exactly what's on the module.
Q. Now, looking at all those Samsung data sheets, did you see anything in those data sheets saying that it was tricking the memory controller?
A. No.
Q. Did you see anything in any of the third-party data sheets saying that the Samsung products are tricking the memory controller?
A. No, none.
Q. Did you see anything from Mr. Mangione-Smith analyzing data sheets saying that the Samsung products are tricking the memory controller?
A. No, I did not.
Q. Now, if the Samsung products were designed to trick the memory controller, would you expect to see that in the documents?

A. Oh, clearly, yes. The documents have to specify what the operation of that circuit. So, yes, I would expect to see it if it existed, but it did not.
Q. Now, you mentioned this SPD device. What kind of information does it provide to the memory controller?
04:12 A. There's a lot of information, especially at the DDR4 level, but the -- but it will identify the construct of the module, it will indicate whether it has the -- indicate the number of DRAM devices that are on the module, it indicates the number of ranks that they're located in.
It also indicates the bandwidth of the data path, like 72 04:12 bits of data. It can be processed in parallel. It will also identify the level of the device, whether it's a DDR3, DDR4, or whatever. So, yes, the information about the arrangement and the content, anything about that module, that's loaded in the serial protect device, the SPD, and that is the very information that during start-up is loaded to the microcontroller.
DR. ALBERT: Now, Mr. Jackson, can we go to DTX 28 04:13 at the fifth page, please? And zoom in, starting at the parsing the SPD. Actually let's go ahead and start at the first page. Sorry.
04:13 Q. (BY DR. ALBERT) Now, right there after introduction, at the end of that first line, it says, "The SPD data provides critical information about all modules on the memory channel

and is intended to be used by the system's BIOS in order to properly initialize and optimize the system memory channels." Do you see that?
A. Yes, I do.
Q. What is that saying?
04:13 A. Basically it says I'm telling the truth. The SPD device has that critical data that information about the module. And so as I said, during start-up, which is the system BIOS -- BIOS is part of the process when it starts up, and it sends -- it provides that critical information to the system in order to properly initialize and optimize the system.
Q. So by optimizing the system, you're able to run these
04:14 devices, these Samsung memory devices at high speeds with low errors?
A. Yes. That would be part of the optimization process, because it's informing the controller of exactly what the configuration is that it's -- will be talking to and addressing when it has data transactions.
04:14 DR. ALBERT: Okay. Can we go to page 5, please? And starting with parsing the SPD.
Q. (BY DR. ALBERT) You see a table here for parsing SPD bytes. What is parsing SPD bytes?
A. Well, the SPD is again a serial presence detect. And bytes, different generations--DDR, DDR2, 3, 4, and now 5--have different amounts of information that it can store about the

04:15 module. And so they're stored in bytes, eight-bit numbers, eight bits, if you will. And so this says that there are 319 SPD bytes that -- that we are looking at in this table. And if I look, for instance, in the bytes 0 to 127, that's the base configuration of the DRAM parameters.

So what the memory controller needs to know about configuring that system is going to be provided to it. These 04:15 critical parameters will be provided to the memory controller from the SPD device.

Q. And what does it say here in this first sentence as to how the memory controller uses this information in the SPD to configure how it operates?

A. Well, I think first and foremost is that SPD device does not make a decision to determine and to send anything to the system. It's the system that acquires the information from 04:16 the SPD device so that the memory controller can be properly configured.

Q. And so the signals coming from the memory controller would be, in part, relying on the configuration from the SPD data?

A. In part. It receives that information from the SPD that characterizes how the module is configured. And so clearly the memory controller needs to have that information so that it can properly set up the communication to it.

04:17 DR. ALBERT: Can we go to page 20, please? And

right there with module organization.
Q. (BY DR. ALBERT) And what are you seeing here as examples of the types of information that this SPD device is providing from that Samsung memory module?
A. Well, what's been highlighted here is it shows specific locations of the data, the information that's encoded. And so it says, as an example, bits 2 to 0, that's an encode the device with the SDRAM devices. So that gives you a width of the DRAM devices. Then you have other bits that encode the number of package ranks on the module.
So now the controller, when it receives the information, knows the number of devices and the number of ranks.
Q. And so from this data, does the memory -- is the memory controller able to configure its signals to correspond to the actual number of ranks and devices that are on the memory module?
A. Yes. In fact, the specification for this is such that you can actually expand; in other words, the memory controller is not limited as the patent had suggested it was back in 2004. Here you actually have a roadmap for the future, too, because the SDRAM device width can be by 4, by 8, by 16, by 32. So actually it's organized in such a way that it sees future as well.
So you can program in and have available data for the device width, the number of packaged ranks, and much more

information is provided.

DR. ALBERT: You can take this down, please.

04:19 Q. (BY DR. ALBERT) Now, we heard some testimony about different types of modes, an encoded mode, direct mode. Do you remember that?

A. Yes, I do.

Q. Now, each of those modes, is your understanding that they're optional features that a customer can use or choose not to use?

A. Yes, that's my understanding.

Q. But we've heard particular testimony about one of those modes, encoded QuadCS. Do you recall that testimony from Mr. Mangione-Smith?

04:19 A. Yes, I do.

Q. And encoded QuadCS, does that work any differently as far as sending accurate information to the memory module?

A. No, because the SPD has cooperated with the memory controller, the system, and has provided the information. So regardless of the mode of operation, the memory controller is

04:19 fully aware of the actual ranks and number of devices that are on the memory module.

Q. So in the encoded QuadCS mode, is the memory controller still selecting exactly where the data's going to go?

A. Yes, in every case.

DR. ALBERT: And let's go to JX 11, please.

04:20

Q. (BY DR. ALBERT) And is this one of those Renesas data sheets for that RCD part?
A. Yes. This specifically says it's the register command address buffer with parity and DDR4 RCD 02. So it's the registered device.
Q. And highlighting just on the right there, we see those three different modes that are supported--direct dual, direct quad, and encoded QuadCS mode. Do you see that?

04:20

A. Yes. It says that these three modes are supported.
Q. Now, when Mr. Mangione-Smith was offering his analysis, which of the modes was he addressing?
A. The encoded QuadCS.
DR. ALBERT: Can we go to the JX 11.9, please, the ninth page of this document? And if we zoom in the whole section of encoded QuadCS mode down to initialization.

04:21

Q. (BY DR. ALBERT) Okay. And so down here we see a sentence, "All commands, including read, write, precharge, refresh, and MRS commands, are sent to the rank selected by the two chip selects and chip ID bit coming from the host." Why is that important for this case? Why does it matter that the commands are sent to the place that is selected by the host?

04:21

A. What is important for this case is that there is still a one-to-one correspondence in understanding between the memory controller and the module. The memory controller knows

exactly how many ranks, how many devices.

And no matter which mode you send the information to or which mode you select as the option, it still operates the same way. The controller knows and knows exactly where the information is going to be stored, commands the information to be stored there, and knows that that's where it's going to be.

04:22

DR. ALBERT: Can I get access to the elmo, please?

Q. (BY DR. ALBERT) What I'm putting here on the screen is one of Dr. Mangione-Smith's slides where he's going through his theory as to the input chip selects versus the ranks?

04:22

MR. SHEASBY: Your Honor, just a point of clarification. This is beyond their 20 slides demonstratives. I just want to make clear if that's appropriate and consistent with the Court's order.

THE COURT: Do you have a response, Dr. Albert? I haven't been keeping up with the number you've been using.

04:23

DR. ALBERT: This is -- we want to use one of Netlist's expert's slides so he can address what -- it is above our 20.

THE COURT: You can certainly use it, but does that put you over the limit the Court's imposed?

DR. ALBERT: If this counts, this would be over the 20. I can not use it if that's the Court's preference.

THE COURT: Well, I've imposed a limit, and I intend to hold both sides to that limit.

DR. ALBERT: Thank you, Your Honor.

04:24 Q. (BY DR. ALBERT) Were you here when Mr. Mangione-Smith talked about encoded QuadCS having two input chip selects? Do you recall that?

A. I do, yes.

Q. And he said, well, that corresponds to two ranks and the output chip selects were four, and so then you had a four on the second number. Do you recall that general testimony?

A. I do.

04:24 Q. Okay. Does the claim require you to compare signals coming in to signals going out?

A. No, not at all. It's not a question of comparing or looking at the number going in and the number coming out of signals. It's ranks and parts, not signals.

Q. The claim requires you to look at the number of devices that the memory controller's configured to control and the devices that are actually controlled rather than number of signals?

A. That is correct.

04:24 Q. Okay. Now, we heard a big deal about what encoding is. Can you give the jury a brief overview of how you can control more than two components by using two signals?

A. Sure. I can, for instance, have in this courtroom a light switch that turns all of the lights on. So it's either
04:25 on or off. Or I could, for instance, have two switches, one

of which turns the overhead lights on, the second switch turns the lights that are on the walls.

And so now I've got two switches and I've got two different sets of lights. If I turn switch one on, the wall lights come on. If I turn it off and turn switch two on, the ceiling lights come on. If I turn both off, there are no lights, it's dark, and we are in trouble. Or I can turn them both on and have, as it is now, the ceiling and these wall lights. So I have two switches, but I can combine that into four separate results. That's called encoding.

04:25

04:26

DR. ALBERT: And can we go to DDX 4.3, please?

Q. (BY DR. ALBERT) And so what is your conclusion then, after looking at all the documents, all of the source code, all of the deposition testimony, regarding whether Samsung products practice that first limitation of the '912 claim?

A. There is no trick involved between Samsung products and the memory controller. The SPD device gives you exact information that's necessary for the controller to control the ranks and the devices on the module.

04:26

So Samsung's products do not trick the memory controller and, therefore, they do not practice the claim of the '912 Patent.

Q. And so moving on to the -- your next point, what is your conclusion about whether Samsung products use this claimed row address signal?

A. There are row address signals used on the product, but not as claimed, and I've got some slides to go through that.

DR. ALBERT: Okay. Can we go to DDX 4-13?

Q. (BY DR. ALBERT) Now, does how does the claim for the Netlist patent on the left compare to the Samsung product on the right?

A. The claim, as I have written it on the left side, says that there's a requirement that you receive a set of input signals comprising at least one row/column address signal. So within the input signal set, there has to be a row/column address signal.

Secondly, the circuit responds to a command signal and the set of input signals. So it must respond now to a command signal and the set of input signals that requires the row/column address.

And the third aspect says that now you transmit that command signal to only one DDR memory device at a time. That's what the claim requires.

Q. Now, does Samsung's products do that for this accused PDA mode?

A. No. The accused PDA mode utilizes a mode in which the row/column address signal is not even used.

DR. ALBERT: And let's go to JX 30, please.

Q. (BY DR. ALBERT) And here do we have a specification for one of Samsung's DDR4 products?

A. Yes. It's called a DDR4 SDRAM specification.

DR. ALBERT: And let's go to page 64, please. And if you can zoom in on the top section there and highlight No. 6.

04:29 Q. (BY DR. ALBERT) So in that accused per-DRAM addressability mode, or PDA mode, what is the only type of command that is allowed for the system to issue?

A. The only type of command in per-DRAM addressability is the MRS command.

DR. ALBERT: Okay. Can we go to page 29, please? And can we zoom into the top half? This is perfect right here.

04:29 Q. (BY DR. ALBERT) This is that truth table that we saw yesterday?

A. Yes, we did.

Q. Okay.

DR. ALBERT: And so can you highlight the top row there for mode register set? And then above the table, we have -- above the table, we have some entries for RA row address and CA column address. Can you highlight that?

04:30 Q. (BY DR. ALBERT) So in that -- first off, what is this entry for RA and CA?

DR. ALBERT: Not that.

Q. (BY DR. ALBERT) What is the entry at the top for RA and CA? What does that mean?

A. What that means is row address and column address are used to access the actual storage locations in the DRAM memory, and you can look at it like a coordinate system. I go north in one direction X number of streets until I get to the second cross street, and I go in. And so wherever the cross is, that's what I'm talking about. So you can identify yourself as to where you live by an address, and it's north and east a certain amount. And so that's called an XY coordinate system.

And so if we want to locate space in memory where we're storing stuff, we give it an X address, we give it a Y address, and wherever the two cross, that's where we store it.

Q. And so for all of this information that's shown across the table for mode register set commands or MRS commands, do you see any entry for RA or CA?

A. No. In fact, on the address lines themselves, the only entry that you see is OP code. So in the MRS mode, there is no associated row or column address because you're not addressing the storage locations; you're accessing registers that are outside the storage location. There is no row/column address used for the MRS mode at all.

Q. So what is your conclusion then for whether in this accused PDA mode that -- whether the system could be receiving row address or column address signals?

A. The accused mode is in per-DRAM mode. In that mode,

there is only MRS signals, there is no row address signals. So there's no way that the Samsung devices can practice these claims because they do not meet this limitation.

Q. Now, are row/column address signals received in other modes?

A. Oh, yes. In the normal mode where you're actually writing information from the controller or the system into the memory device and you're putting in the storage location, yes, because you're addressing those particular houses on that particular street, you're putting the information there.

But -- so in normal mode of writing and reading, yes. In fact, you can see if you look, for instance, in the area here for bank in this section, if you can highlight this row, you can see the row address here and you can see column addresses, too. So there are other modes in which row and column addresses are used.

Q. But did Mr. Mangione-Smith offer any analysis that any of those other modes practice this claim?

A. No, because he specifically said the command that has to be part of the claim is the MRS command. And in the MRS mode -- MRS command, there is not any address involved.

THE COURT: Dr. Albert, it's Dr. Mangione-Smith. You've called him mister about three times. He has the same Ph.D. you do. You need to call him Dr. Mangione-Smith.

DR. ALBERT: I appreciate that, Your Honor. I

should know better.

THE COURT: All right.

DR. ALBERT: Can we go to DDX 4-3?

Q. (BY DR. ALBERT) And so what is your conclusion then as to whether the Samsung products practice this row/column address signal?

04:34 A. My conclusion is they do not. That MRS command is never sent during a mode in which the row/column address signal is activated.

Q. Okay. And we are getting a little long on time. I know we told the Court a certain amount of time for this direct, but I do want to ask you a few more questions about the invalidity for the '912.

What is your position on the '912 claim, whether that's invalid?

A. Well, if the claim can be read in such a way that it doesn't require the row/column address signal, I don't see any

04:34 written description support for that at all. And if the claim can be read in such a way that it can cover a memory controller that one-to-one corresponds to what it knows is in the module device, again, I see no written description support in the spec for that.

MR. SHEASBY: Your Honor, just to preserve the objection, that's not a proper written description analysis to say "if that".

THE COURT: Mr. Sheasby, that's not a valid objection, either. You can address it in cross examination and that's what's cross examination is for. Don't interrupt the direct unless you have an evidentiary-based exception to put to the Court.

MR. SHEASBY: Thank you, Your Honor.

THE COURT: Let's continue, Dr. Albert.

DR. ALBERT: Thank you.

Q. (BY DR. ALBERT) Moving on to item No. 3, what is your conclusion as to the '417 Patent?

A. My conclusion here is that Samsung products do not have the claimed multiple buffer control signals.

Q. Okay.

DR. ALBERT: And can we bring up JX 1.2, please?

Q. (BY DR. ALBERT) And is this the '417 Patent that you analyzed?

A. Yes, it is.

Q. All right.

DR. ALBERT: And can we go to JX 1.21? And zoom in on 5C, please.

Q. (BY DR. ALBERT) And we've heard a lot about whether the system generates a single buffer control signal or multiple signals. Do you see an example of a system that generates multiples in the specification?

A. Well, in figure 5C, there is a circuit 122 that has two

lines that are coming out, and so that represents generating two control signals.
Q. Okay.
DR. ALBERT: And let's go to DDX 4-14. Sorry. DDX 4-14.
Q. (BY DR. ALBERT) And where do you see the requirement in the claim for outputting data buffer control signals, plural, as opposed to one?
A. Well, I've taken a snippet as a section of the claim itself, and you'll see that the logic is further configurable in the top line to output data buffer control signals, in the plural, in response to the read/write memory command.
Q. And what else does that -- there's multiple buffer control figures -- excuse me, multiple data buffer control signals then do as according to this claim?
A. Well, the buffer control signals are output, and it's in response to the read or write memory command. And the result of that is that, in response to those data buffer control signals, that a transfer of a burst of N-bit wide data signals between the N-bit wide memory bus and the memory devices in one of the plurality of N-bit wide ranks. In other words, it's a transfer of data.
DR. ALBERT: And can we go to the next slide, please?
Q. (BY DR. ALBERT) And what are you showing here -- how are

you comparing the requirements for the claim on the left versus the Samsung product on the right?
04:38 A. What I'm saying is the claims require two signals, and in Samsung's device clearly there's only one signal.
Q. Now, did you hear any testimony from Mr. Davey that the -- in response to that read or write command that comes into the system, that that generates a BCOM signal?
A. Yes, I recall that testimony.
04:39 DR. ALBERT: And can we go to JX 11.18, and go to the top there?
Q. (BY DR. ALBERT) And here we have a table from one of those Renesas data sheets or the company that Mr. Davey works for. Do you see on the left WR and RD? Do you see that?
A. Yes, I do.
Q. What does that correspond to?
A. It corresponds to a write command or a read command.
04:39 Q. And in response to that write command and read command, what is this document saying is being generated?
A. What is being generated is a BCOM signal. It's a four-bit encoded signal.
DR. ALBERT: Okay. And can we go to JX 27 on the first page, please? 27, sorry. JX 27.1, please, and zoom in on the figure.
04:40 Q. (BY DR. ALBERT) And do we see here the diagram of the buffer itself in Samsung's products?

A. Yes. This is the buffer that we've looked at previously.

04:40 Q. So once that BCOM signal is generated from the RCD, does it then get sent to this left side of this diagram for the buffer?

A. Yes. It -- you can see on the left side, the BCOM -- the signal that's a four-bit encoded signal.

Q. And so once that BCOM signal comes into the buffer, what did -- what happens with regards to enabling the data transmission?

A. It first has to be decoded because it's a four-bit encoded signal. 04:41 So you decode it to determine what to do. And if -- remember in the previous slide, there were two states. There was one four-bit code that said transfer the data to the DRAM write, and there was another four bits encoded that said if it has this four-bit code, you read from the RAM and bring it back to the controller. So it defines the direction based upon decoding that BCOM bit.

Q. And that BCOM input signal, how does it control this 04:41 transaction block here in this middle? What does it do for the transmission?

A. Well, first of all, the BCOM is provided so that it is decoded, so that the transaction control block then determines, based upon that information that the BCOM signal gives it, which way to have the data flow. The data either is received from the memory controller and passed to the DRAM

interface or it's received from the DRAM interface and passed to the controller. So it determines the direction.
Q. Now, do you remember the testimony from Dr. Mangione-Smith discussing the number whether there was more than one signals coming out of BCOM?
A. Yes, I do.
Q. And do you agree with that testimony?
A. No. I mean, this is standard in the art. It's an encoded signal, it's a single signal, and any one bit of that four-bit that's missing, you have an error. It requires all four bits in order to decode it to determine what it says. It's a single signal.
DR. ALBERT: And so let's go to DDX 4-16.
Q. (BY DR. ALBERT) And so what did Mr. Davey say about whether the BCOM signal was one signal or multiple signals?
A. He said it's one, it's a four-bit wide signal. He said correct.
Q. And what did he say about whether all four of those bits have to be set properly in order for the data buffer to perform the write command?
A. It's exactly what he said. It confirms what I said previously, all four bits are required.
Q. So only together will that BCOM signal be generated by that read command and then go over to that buffer and then cause the data transmission? Is that right?

A. That's correct.
Q. But the claim requires multiple signals to be generated and multiple signals to be causing data transmission.
04:44 A. That is correct.
Q. And that's different.
A. Yes. To me, they are very different.
Q. So what is your conclusion then about whether Samsung's products practice the '417 claims?
A. Samsung's products do not use the two-signal approach that's required by the claim. Therefore, they do not practice the claim of the patent.
Q. And then going to invalidity for the '417 Patent, were
04:44 you here for Dr. Mangione-Smith's testimony about whether he was accusing distributed data buffers of infringement?
A. Yes, I did.
Q. And did you see up on the screen the testimony from Mr. Solomon about whether his ideas had anything to do with distributed buffers? Did he work on distributed buffers?
A. What I saw in his testimony is he did not work on distributed buffers at all, was not even part of anything he was working with.
04:44 Q. And did you see any description in the patent itself about distributed buffers?
A. No.
Q. So what is your conclusion as to whether the claims of

the '417 Patent are invalid under written description?
A. I don't believe the claims can be -- they're not properly supported if there's a belief that it covers distributed buffer concept.
Q. Okay. Let's go to -- can we go to the next section, Mr. McAlexander?
A. Yes, on the technical benefit?
04:45 DR. ALBERT: And can we go to DDX 18, please? Can you back up one slide?
Q. (BY DR. ALBERT) We heard some testimony from Dr. Mangione-Smith regarding the importance of -- the alleged importance of the features of these patents. Did you take a
04:45 look at all of the technology in -- in these products to see what else could be contributing to the speed and capacity of the Samsung products?
A. I looked at the documents in this case as well as my experience and understanding as an engineer in integrated circuits as to what can be done.
Q. And besides the features that are accused in this case, what are the other kinds of features here that are showing on
04:46 DDX 4-17 contribute to the incredible speed and capacity of Samsung's products?
A. Well, I've listed here on the screen a number of different contributors to speed, but I will tell you the first one is the DRAM chip manufacturing technology. That is the

04:46 04:47 04:47

principal detail for the technology to get speed.

Even within a generation such as the DDR4, they're continuing to make process improvements and gain speed advantages just even within the same technology. But it's that manufacturing, it's the transistor sizes, it's the voltage that you provide to the chip. There's a lot of things that go into the actual speed contribution of this chip.

Thermal management sake factor. If you've got a very hot spot located within the chip, that means some of the storage locations will operate slower than others. So by amortizing or leveling out that thermal gradient across the chip also makes a significant contribution to speed.

So I've listed some refresh modes--the way in which the tracing of the metal routing takes place; pinout; changing the input and output capacitance; the loading, you know, that's on each one of these pins; using the types of metal that's involved in -- in the traces. Lots contribute to speed.

Q. Now, has Samsung been able to advance its chip manufacturing technology to create speeds far in excess of these DDR4 products?

A. Yes. Current product on DDR5 more than doubles the speed.

MR. SHEASBY: Your Honor, objection. May I approach?

THE COURT: Approach the bench.

(The following was had outside the hearing of the jury.)

MR. SHEASBY: He just elicited testimony about DDR5 and Samsung being able to advance DDR5. Samsung's DDR5 products infringe Netlist patents, and I'm preserving -- I'm raising the objection now because if it's not stricken, I'm going to request for a door opening that Netlist patents were previously -- that Samsung DDR5 products --

THE COURT: Slow down.

MR. SHEASBY: I'm going to request that the door has been opened and seek any testimony from Mr. McAlexander that Samsung's DDR5 products also infringe Netlist's technology.

THE COURT: Well, DDR5 is not accused in this case.

MR. SHEASBY: Right. So I have no idea why he's bringing it up because he just brought it up and talked about how Samsung has advanced products --

THE COURT: He's clearly bringing it up because he wants the jury to know that the products that are accused are a slower, older version, and it goes to the damages issue, they're not worth as much. That's clearly why it's brought up.

And that's not a proper purpose. It has creeped into this case in a couple of small ways, but it does not need to be brought into this case on an ongoing basis.

I'm going to instruct the jury to disregard the testimony

about DDR5.

MR. SHEASBY: Thank you.

THE COURT: Don't go into it again.

DR. ALBERT: Understood. Thank you.

(The following was had in the presence and hearing of the jury.)

THE COURT: Members of the jury, disregard any testimony from this witness about DDR5. It is not an accused product, it is not in this case.

Let's continue.

DR. ALBERT: Can we move on to DDX 18, please?

Q. (BY DR. ALBERT) And what are you showing here with
04:49 regards to whether there were other alternatives available to Samsung other than what Netlist is accusing in this case?

A. Yes. There were other alternatives available. As I said, in my opinion going through the analysis, I do not believe any of the Samsung-accused products practice any of the claims of these asserted patents; but beyond that, there are other alternatives that are available.

Q. Can you briefly describe them?

04:50 A. Sure. One is, as I had shown earlier, the modules have edge connectors. The edge connectors are metalized, gold-plated, and they come all the way down to the edge. So if they don't come all the way to the edge, just back it off a little bit. That's a non-infringing alternative. Very easy

04:50 to do. In fact, it saves some money. You can also -- and that applies to both the '608 and the '417 Patent.

Secondly, in terms of the modes, there were three modes that were available that I talked about. And the encoded QuadCS was the one that's accused. Use the other modes and just delete the other one. So that's another alternative.

You can also use a -- one of the claims requires a tri-state buffer. It's a type of circuit. You can use a different circuit. There are a number of different circuits you can use to achieve the same result.

04:51 The next-to-last one is, instead of programming each individual DRAM, you can program a group of DRAMs, program them together. So that's another one.

And you can also do some analyses with the chip selects, that which selects the actual rank in the chip, and you can maneuver that in such a way that that avoids, too. So a number of non-infringing alternatives.

DR. ALBERT: Can we move to the next slide, please?

04:52 Q. (BY DR. ALBERT) Now, there are some testimony about the Netlist/hynix agreement. Did you take a look at the amount of Netlist patents involved in the Netlist/hynix agreement compared to the amount that are involved in this case?

A. First of all, it's been a while. I don't remember the exact number. But when I did my analysis, I looked at the

04:52 patents themselves and I was able to divide them. There was

about 40 percent that fell into a group of patents that I would say would be applicable.

Q. And is -- that 40 percent would fall under the same general category of the patents that are involved in this case?

A. Yes, that's correct.

Q. And the other 60 percent of the Netlist portfolio would fall outside that category?

A. It would not be relevant to this case.

04:52 DR. ALBERT: Can you move to the next slide, please?

Q. (BY DR. ALBERT) Did you form any conclusions as to whether certain license agreements that Samsung has with others are comparable to the situation that -- for this case?

A. Yes, I did.

Q. And what was your conclusion?

A. I found a number of license agreements that I felt were comparable for consideration, and I've identified these on 04:53 this one slide. I've pulled up four.

May I just talk through the four of them?

Q. Start with the first one, please.

A. All right. So the Monterey Research is around 900-and-some-odd patents; just a little less than 900. And I've identified one patent in particular here. It's about memory buffering. It's a way to improve latency, which is speed and performance. So many of those patents are

applicable.

04:53 The BiTMICRO has about -- a little less than 50 patents in it, and I've -- and it's primarily directed to package stacking; how you can take these modules and stack the chips on top of each other, and so that's applicable.

The FLS is around 200 patents, as I recall, and that one of the patents here in particular that I pulled out is a memory controller and how to network with memory. And so that's applicable.

04:54 And the Hamilcar is only a small set of patents, I think it's maybe 17 or so, but again, it does deal with memory systems and memory access. So I found within these portfolio of patents and these license agreements patents that were related.

Q. And so for each of these license agreements, Monterey Research, BiTMICRO, FLC, and Hamilcar Barca, do they offer comparable technology at issue in this case?

04:54 A. In my opinion, yes.

DR. ALBERT: Pass the witness, Your Honor.

THE COURT: Cross examination by the Plaintiff.

Are there cross examination binders to distribute in this case?

MR. SHEASBY: Your Honor, they've all been handed out already.

THE COURT: All right. Then let's proceed with

cross examination.

MR. SHEASBY: Good late, late, late afternoon, ladies of the jury.

CROSS EXAMINATION

04:55 BY MR. SHEASBY:

Q. Good late afternoon, Mr. McAlexander. It's nice to speak with you again.

A. Likewise.

Q. Mr. McAlexander, I want to start by focusing on what you were entered into as an expert. So you were entered into as 04:55 an expert in the computer and memory field. Is that correct?

A. I believe that's correct, yes.

Q. And you understand that this case is about something very, very specific. This case is about DDR5 -- DDR4 RDIMMs and LRDIMMs that go into advanced servers. Correct?

A. DDR4, yes; DDR5, no.

Q. DDR4.

THE COURT: Counsel, adjust the microphone a little bit.

Q. (BY Mr. SHEASBY) These are about DDR4 products, DDR4 04:56 specific designs that go into advanced servers. Correct?

A. They can go into advanced servers.

Q. And they have RCDs, for example. Correct?

A. Yes, they do.

Q. They have data buffers. Correct?

A. Some of them do.
Q. The LRDIMMs?
A. LRDIMMs, yes.
Q. And just for the jury's edification, you have never in your career designed an RCD. Correct?
A. Yes, that's correct. I have not done an RCD.
Q. You have never in your career designed a data buffer. Correct?
04:56 A. That's correct.
Q. You have never in your career designed a DDR4 DIMM. Correct?
A. That is correct.
Q. In fact, you've never designed a dual-inline memory module at all. Is that correct?
A. That is correct.
Q. And there are different types of physicians that we take our children to. Correct?
04:57
A. I guess that's generally correct, yes.
Q. When we have babies, we take them to pediatricians. Correct?
A. I would hope so, yes.
Q. When we have the flu, we take our kids to a general practitioner or a family doctor. Correct?
A. I would think so.
Q. Ms. Truelove's son just broke his arm. She took him to

04:57
an orthopedist. Correct?
A. Sorry about that. Yes.
Q. So you can be an absolutely great general practitioner, but you may not be the best person to deal with broken bones. That's possible. Correct?
A. Yeah, that's possible.
Q. Yeah. And, in fact, Samsung uses you as their general practitioner. Correct?
A. I don't know what you're saying.
Q. Well, Samsung has paid you to be an independent expert about 10 to 12 times. Correct?
04:58
A. I'd say it's probably less than that, but that's close, yes, as an expert.
Q. And, in fact, you've described Samsung as your largest return customer. Correct?
A. They have been in the past, yes.
Q. And so in this case what we're focused on and what we need to be laser-light focused on is the specifics of the highly technical LRDIMMs at issue in this case. Fair?
A. That's fair, sure.
04:58
Q. With RCDs on them and buffers. Correct?
A. Correct.
Q. RCDs and buffers that you've never designed at any point in your career. Correct?
A. Correct.

MR. SHEASBY: And why don't we go to slide 154 in the McAlexander deck, Mr. Svenson.

Q. (BY MR. SHEASBY) So I'm going to start with the '608 Patent.

04:59 And just to level set for the ladies and gentlemen of the jury, the '608 Patent has a number of limitations in it. Correct?

A. Yes, it does.

Q. And you don't dispute that limitation A is satisfied. Correct? Well, let me withdraw that question and re-ask it.

In your testimony to the ladies and gentlemen of the jury today, you didn't say, I dispute element A is present in Samsung's products.

04:59 A. That's correct. I did not address that element A.

Q. Same with element B. Correct?

A. That is correct.

Q. Same with element C. Correct?

A. I did not dispute it directly. That's correct.

Q. Element D, also didn't show that to the jury and say, I dispute it. Correct?

05:00 A. No. That's correct.

Q. Element E, didn't show that to the jury and say, I dispute its presence. Correct?

A. No, I did not.

Q. But you did dispute part of element E -- element F.

Correct?
A. That is correct.
Q. And you disputed a delay circuit to configure to delay a signal through the data path by an amount determined by the command processing circuit. Correct?
05:01
A. That is correct.
Q. Now, I want to be very precise about this.
MR. SHEASBY: And to do this, why don't we go to slide 159, please.
Q. (BY MR. SHEASBY) So this is --
MR. SHEASBY: Let's go back two more slides just to level set it. Let's go to slide 157.
05:01
Q. (BY MR. SHEASBY) So 157 is JX 27. Do you see that?
A. Yes, I do.
MR. SHEASBY: And then if we go to the next slide, this is a blown-up version.
Q. (BY MR. SHEASBY) This is one of those data buffers that's in all of Samsung's LRDIMMs. Correct?
A. That's correct.
Q. And that data buffer has in it what's known as buffer control words. Correct?
05:01
A. Yes, it does.
Q. And that's the case for all of the data buffers in all of Samsung's LRDIMMs. Correct?
A. Diagrammatically correct, yes.

05:02 Q. And the buffer control words in the data buffer store delays. Correct?
A. That's correct. They tabulate the delays. They are put there by the host.
Q. Sir, they store a lot of different things, but one of the things they store is the delay. Correct?
A. That is correct.
Q. And that delay that's stored there will be applied to
05:02 reads and writes to determine the speed at which they're released from the FIFOs. Correct?
A. They will be applied to the read/write path so that read/write path would be obeyed in accordance with those delays.
Q. And this is inside the DIMM itself, and, in fact, it's inside the data buffer on the DIMM. Correct?
05:03 A. That's correct. It applies the delay that was posted there by the host.
MR. SHEASBY: Your Honor, I move to strike anything beyond "That's correct."
THE COURT: Sustained.
MR. SHEASBY: And if we go back to claim 15 -- to
05:03 claim -- the '608 Patent at page 154, Mr. Svenson.
Q. (BY MR. SHEASBY) And we're back here--"a delay circuit configured to delay a signal through the data path by an amount determined by the command processing circuit." I

didn't hear you dispute for the ladies and gentlemen of the jury that there is a command processing circuit in Samsung's buffers. Fair?
A. I did not dispute that there is a circuit there, yes.
05:04 Q. And you didn't say that circuit is not a command processing circuit. Correct?
A. I didn't address that.
Q. You also didn't say -- didn't dispute that in Samsung's buffers there's a delay circuit. Correct?
A. There is a delay circuit.
Q. And to be precise, when we look at the language of the claim, it says, "an amount determined by the command processing unit." Correct?
A. Correct.
05:04 Q. And it doesn't say determined only by the command processing unit. Correct? The word 'only' doesn't appear there. Correct?
A. The word 'only' is not present in that claim.
Q. And, in fact, what you think is only required -- well, I withdraw the question.
You concede that the patent actually contemplates
05:05 receiving information from the host. Correct?
A. There is some information contemplated as being received by the host, sure.
Q. And to be precise, the patent contemplates that because

05:05

you're going to be receiving information from the host, you've got to have commands from the host. Correct?
A. Yeah, in general you have to have commands from the host.
Q. And the patent contemplates -- and the host -- host controller is what provides that information. Correct?
A. It's a source, yes. That's correct.
Q. And the claim doesn't say a signal through the data path by amount determined by the command processing unit and nothing else can help. Those words are not present in the claim. Correct?
A. The words you've added are not in the claim.
Q. And, in fact, there's nothing in the claim that requires the command processing circuit to be a self-sufficient state machine that does everything on its own. Correct?

05:06

A. Those words are not in the claim.
MR. SHEASBY: And if we now go to -- let's go back to slide 158, please, Mr. Svenson.
Q. (BY MR. SHEASBY) Buffer control words store that delay data. Correct?

05:06

A. That's correct.
Q. And that's in the buffer circuit. Correct?
A. The storage is in the buffer circuit, yes.
Q. And you agree with the testimony of Mr. Davey regarding the operation of these buffers. Correct?

05:07

A. I cited his testimony, yes.

Q. Well, you don't just cite it; you actually agree with it. Correct?
A. With his testimony? Yes.
Q. In fact, you endorse it. Correct?
A. I stated such.
05:07 Q. And Mr. Davey testified that it's the buffers that are used in Samsung's products to determine the delay. Correct?
A. I'm trying to recall one instance where he did, but I represent what I had shown earlier in my testimony.
05:08 Q. Why don't you turn to your deposition.
A. Okay.
Q. 7/19/2024. And to give you some orientation, it's the
05:08 last tab in your deposition binder. Let me know when you're there.
A. I'm not sure what you mean by the last half of my deposition binder. I have a cross examination depositions, and I have the very first tab.
Q. So it's called "Depositions for cross examination of Mr. McAlexander."
A. I have that.
05:09 Q. And the last tab in it is your July 19th, 2024 deposition.
A. Okay. Thank you. I have that.
Q. And if you go to column -- page 74, lines 21, through 75, lines 2. And this is one of those kooky things where the page

number is in the top right-hand corner.

THE COURT: They're actually in the bottom right-hand corner.

MR. SHEASBY: Bottom right-hand corner on this one, Your Honor? Thank you.

05:10 THE WITNESS: And the page again, please?

Q. (BY MR. SHEASBY) 74, lines 21, through 75, lines 2.

A. All right. I have page 74.

05:10 Q. And go lines 21, through 75, lines 2.

A. All right. I have read it.

Q. Mr. Davey used the term that the design of the buffers that are used in Samsung's products determine the delay.

05:11 Correct?

A. I apologize, but I must not be looking at the right document because the last tab that I show here is my deposition.

Q. Yes, sir. It's your deposition. It's discussing Mr. Davey's testimony.

A. And I'm looking at page 74.

Q. And you're looking at page 74, lines 21, through 75, lines 2.

05:11 A. Okay. I have it now. Sorry about that. Give me just a second.

Q. It's no problem. It's important. Take as much time as

05:11 you need.

A. Okay.
Q. Sir, you confirmed that Mr. Davey, who you agreed with, testifies that the design of the buffers that are used in Samsung's products determine the delay. Correct?
A. I said that again is the term he used. That was my statement.
Q. Mr. Davey, who you previously told the ladies and gentlemen of the jury you agree with, described the buffers as determining the delay. Correct?
A. That is not an understanding of what I just read.
Q. Okay.
MR. SHEASBY: May I publish it for the ladies and gentlemen of the jury, Your Honor?
THE COURT: He doesn't give an inconsistent statement. No, you don't have authority to publish.
MR. SHEASBY: Okay. I'll re-ask the question.
Q. (BY MR. SHEASBY) You confirm that Mr. Davey testified that the design of the buffers that are used in Samsung's products as determine the delay. Correct?
A. That, in part, is correct, but you have to go back and look at lines 18 through 20.
MR. SHEASBY: Your Honor, I move to strike everything after that is correct.
THE COURT: The witness in fact said, That, in part, is correct. That part I will maintain is responsive. I'll

05:13 strike the balance of his response.
Q. (BY MR. SHEASBY) And, in fact, we heard extensively from Mr. Davey in his deposition. Correct?
A. He did have a deposition, yes.
Q. And you showed the ladies and gentlemen of the jury a number of portions of his testimony. Correct?
A. I did.
Q. You did not show them this portion of his testimony, did you?
A. I did not, no.
05:14 Q. And it says the transaction control block will determine the amount of further delay by decoding the buffer control words. Correct?
A. Well, what you read is correct.
Q. And this is the data buffer that we see on the right-hand side. Correct?
A. I believe it's referring to that, yes.
Q. And the buffer control words are in the data buffer. Correct?
A. Yes, they are.
05:14 Q. And the transaction control block is also in the data buffer. Correct?
A. Yes, that's correct.
Q. Now, you didn't look at any -- yesterday Mr. Cordell, my brother, spoke at length to Dr. Mangione-Smith about looking

at source code for memory controllers. Correct?
A. Yes, he did.
Q. You didn't look at any source code for memory controllers. Correct?
05:15 A. That's correct. I did not.
Q. And, in fact, you primarily listed as the information that can determine this question as being the data sheets for the buffers that are used. Correct? Those are the first two sets of things you gave to the jury to look at. Correct?
A. In part, correct.
Q. Yeah. Now, you also showed some source code. Correct?
05:16 A. That I did.
MR. SHEASBY: And, Your Honor, I'm unfortunately going to have to now seal the courtroom.
THE COURT: You're going to request that I seal the courtroom?
MR. SHEASBY: Yes, Your Honor.
THE COURT: All right. Then based on your request, I will order the courtroom sealed and direct the Court Security Officer to escort those who are not subject to the protective order in this case from the courtroom until it's reopened and unsealed.
05:16 (Courtroom sealed.)
[redacted].

[redacted]

Q. [redacted]?
05:17
A. [redacted].
Q. [redacted]?
A. [redacted].
05:17 Q. [redacted]?
A. [redacted].
Q. [redacted]?
A. [redacted].
Q. [redacted]?
A. [redacted].
Q. [redacted]?
05:17 A. [redacted].
Q. [redacted]?
A. [redacted].
Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

[redacted]

(Courtroom unsealed.)

MR. SHEASBY: And, Your Honor, may I approach counsel's table to get some water?

THE COURT: You may.

MR. SHEASBY: Thank you so much.

THE COURT: All right. The courtroom is reopened. You may proceed.

MR. SHEASBY: Thank you, Your Honor.

Let's go to slide 10 now. Slide .10. Thank you so much, Mr. Svenson.

Q. (BY MR. SHEASBY) So now the next claim that you spoke to

the ladies and gentlemen of the jury about is the '912 Patent, claim 16. Correct?
A. Yes, that's correct.
Q. And I didn't see you dispute in front of the jury that the first limitation of A is satisfied. Correct?
A. No, I did not dispute that.
Q. You didn't dispute that the second limitation B is satisfied in claim 16. Correct?
A. That is correct.
Q. Third limitation C in claim 16, you don't dispute. Correct?
A. No, I did not dispute that.
Q. The E limitation in claim 6, you didn't dispute. Correct?
A. Are you saying D?
Q. E as in Eric.
A. Eric. Okay. You skipped one. I did dispute that.
Q. Oh, so you did dispute E?
A. Yeah. It involved the command signal and the set of input signals.
Q. Okay. That's right. D and E are the two you disputed. Correct?
A. Correct.
Q. You didn't dispute F. Correct?
A. I did not discuss F.

Q. And; you didn't dispute G. Correct? And by dispute, let me be precise. Did you tell the ladies and gentlemen of the jury that element G was not present in the claims?
A. I'm glad you rephrased that. I did not tell them that.
Q. Okay. So now let's dig in and look at the two you disputed, and we'll start with E. And element E requires -- actually, we'll start with element D.
Element D requires the set of input figures configured to control a second number of DDR memory devices. Correct?
A. Correct.
Q. And that is smaller than -- and that's a range in the second number of ranks. Correct?
A. Correct.
Q. And it says that the second number of ranks is less than the first number of ranks. Correct?
A. Correct.
Q. Now, I wrote this down. You said this claim is about tricking the memory controller. I think you must have said that--and I have it right, I hope--12 times between you and your counsel. This claim is about tricking the memory controller. Do you remember saying something to that effect?
A. Yes.
Q. Does the word 'tricking the memory controller' occur anywhere in this claim?
A. No.

05:22
Q. And what it describes is a first number of ranks that are smaller than a second number of ranks, and the set of output signals configured to control the first number of ranks arranged -- first number of memory devices in a first number of ranks. Let me re-ask that because that was a muddle beyond all conception.

THE COURT: No need to talk about it being a muddle beyond all conception; just withdraw the question and re-ask it.

05:23

MR. SHEASBY: Sure.

Q. (BY MR. SHEASBY) The claim limitation requires the second number of ranks is less than the first number of ranks. Correct?

A. Correct.

Q. And then output signals are sent to control the first number of ranks. Correct?

A. Correct.

05:23

MR. SHEASBY: And if we go to slide 27, Mr. Svenson.

Q. (BY MR. SHEASBY) This is a memory controller. This is a first rank and a second rank. Correct?

A. As shown in this illustration, yes.

Q. And then -- and you don't dispute that that exists in Samsung's products. Correct?

05:24

A. I don't dispute that Samsung's products have ranks.

Q. Multiple ranks. Correct?

A. Yes.
Q. And then Samsung's products have a number of different modes in which they can operate. Correct?
A. They can. They have optional modes, yes.
05:24 MR. SHEASBY: And, in fact, if we go to slide 31.
Q. (BY MR. SHEASBY) This is PX 31. This is a Samsung document. Correct?
A. Correct.
MR. SHEASBY: And if we advance one page.
Q. (BY MR. SHEASBY) You'll see it talks about the CS modes--direct DualCS mode, direct QuadCS mode, and encoded QuadCS mode. Correct?
A. That is correct.
Q. And this is Samsung confirming that those modes are present in all of the RCDs that it uses in its modules. Correct?
05:25
A. I understand the options are available.
MR. SHEASBY: And if we now go to slide 51.
05:25 Q. (BY MR. SHEASBY) This is one of those data sheets that you believe with fidelity describes how Samsung's RCDs operate. Correct?
A. It is a Renesas data sheet on the RCD, yes.
Q. And you don't dispute this is an accurate description of how the RCDs in Samsung's modules operate. Correct?
A. No, I do not.

MR. SHEASBY: And if we go to page 11, which I think is on slide 51, Mr. Svenson. 52. Actually let's scroll even further down. Let's go to page 9. This is perfect. Right there. And can we -- I want to focus on this.

05:26

Q. (BY MR. SHEASBY) So these are the different modes that exist. Correct?
A. That is correct.
Q. And in one of the modes, which is encoded QuadCS mode, how many chip select signals will come in to the module?

05:26

A. You have two chip select signals plus a D0. You have three total.
Q. And then how many chip select signals will come at the output?
A. For the encoded, four.
Q. And my math is not stellar, but four is greater than two. Correct?
A. Four signals is greater than two signals.
Q. And this can operate in a design in which there's four ranks; four actual ranks. Correct?

05:27

A. It can, yes.
Q. And in that design in which it operates and which there's four actual ranks, it can be receiving two chip select signals. Correct?
A. Again, it's three total, but -- it's two chip selects plus a D0.

Q. Three signals that are involved in rank selection come in?
A. Right.
05:27
Q. But it's for four actual ranks. Correct?
A. It's for four separate signals going out, so it's three in and four out.
Q. And that can apply to a four-rank physical module. Correct?
A. You can apply that to a four-rank module, yes.
MR. SHEASBY: And if we go back to slide 10.
05:28
Q. (BY MR. SHEASBY) The second number of ranks is less than the first number of ranks. Do you see that?
A. The claim requires that, yes.
Q. And three is less than four. Correct?
A. Three what?
Q. Three signals coming in is less than four signals coming out being addressed to four ranks. Correct?
A. Three signals is less than four signals, yes.
Q. Okay. Now, you also spoke about the fact that there is a
05:29
requirement for address signals to be used as part of this process. Correct?
A. That is correct.
MR. SHEASBY: If we go to slide 12, please. And let's advance I think two slides.
Q. (BY MR. SHEASBY) A0 through A17 are described as address

05:29 signals. Correct?

A. That's not what that says.

Q. They're described as address inputs. Correct?

A. That's what the description says here, yes.

MR. SHEASBY: And if we go to JX 30.

Q. (BY MR. SHEASBY) So let's just do this for the ladies and gentlemen of the jury. 'A' is a nomenclature for

05:30 'address' in these types of DIMMs, a big A.

A. It's -- generally it's a big A is identified as address, then you look at address signal, address pin, address line. There's different ways in which you can look at that.

Q. But A means address. Correct?

A. The A part is address.

MR. SHEASBY: Now, if we can go to JX 30 at PDF page

05:30 22. And why don't we blow this up, Mr. Svenson. That's even better. Thank you.

Q. (BY MR. SHEASBY) And the -- in Samsung's documents, A6 is identified as an address signal. Correct?

05:30 A. That is one of the address pins.

05:31 MR. SHEASBY: And then if we go to JX 10 at page 60. And let's pull up this version, good sir. Pull up that paragraph that was right there. Sorry. It's the paragraph that begins with "Vref DQ calibration mode is entered via MRS command."

Q. (BY MR. SHEASBY) It says Vref calibration mode is

entered into via an MRS command. Correct?

05:31 A. Correct. It's the MRS command.

Q. And it uses A6. Correct?

A. It uses that pin. Correct.

Q. And you describe A6 as an address?

A. It's an address -- the big A is address, but that refers to the address pin.

Q. Sir, it's identified as address. Correct? A6.

A. It is an address pin.

Q. Well, why don't we go to your deposition. This is the 05:32 same deposition at page 45, lines 9 through 18. Little pages at the bottom.

A. Page again, please?

05:32 Q. Sure--45, lines 9 through 18. Let me know when you get there, and take as much time as you need.

A. All right. I've read it.

Q. A6 is identified as an address. Correct?

A. I stated in places, yes, it is identified as an address.

05:33 Q. Okay. And that's for the MRS command. Correct?

A. What do you mean that's for the MRS command?

Q. A6 is used for the MRS command. Correct?

A. The A6 pin is used for the MRS command.

Q. And the MRS command identifies a location on the register in the RCD where information will be stored. Correct?

A. Yes, it's a location on the register.

Q. And that location is a physical location in space. Correct?
05:34 A. I think anything that's physical is in space, yes, so it's a physical location in space.
Q. Okay. Now let's go to the -- and by the way, it was -- you told the ladies and gentlemen of the jury it's the MRS command that is used as part of the '918 Patent. Correct?
A. I referred to the MRS command that Dr. Mangione pointed
05:34 to which uses OP code, yes.
Q. And you referred to the fact that one of the command signals has to be an address. Correct?
A. No. It's an address signal -- it's an address pin. A6 is an address pin.
Q. You said that the claim requires that one of the components is an address signal. Correct?
A. That is -- no. It does require a row or a -- a row/column address signal; yes, it does.
Q. Row/column address signal. Correct?
A. That's correct. It has to be an address.
05:34 Q. And row/column address signal. Correct?
A. The signal has to be an address signal, yes.
Q. The claim limitation is row/column address signal. Correct?
A. I think I said that three times. It's an address signal. I agree.

05:35

Q. Okay. And you agree that a signal is passed on the A6 line. Correct?
A. Under what conditions, if I may ask?
Q. During operation, a signal would be carried on that A6 line. Correct?
A. There will be a signal of some type on the A6 line. It depends upon the mode as to what that signal is.
Q. But to be clear on that A6 line, there will be a signal. It may be different as to what the contents of that signal will be, but on that A6 line in MRS there will be a signal. Correct?
A. Yes. And the spec is very clear on what that is; it's a signal.

05:35

MR. SHEASBY: Okay. Now let's go to the slide 213, which is the '417 Patent. Go back one, Mr. Svenson. There we go.
Q. (BY MR. SHEASBY) The '417 Patent is the next claim that you discussed with the ladies and gentlemen of the jury. Correct?
A. That's what I discussed with the ladies of the jury, yes.

05:36

Q. Ladies on the jury. I apologize.
And if we go to -- give me one second and I'll get there. Claim 1, you don't dispute that element 1A is present. You

05:36

didn't tell the ladies and gentlemen of the jury that wasn't present. Correct.

A. I did not discuss that.
Q. 1B, didn't tell the ladies of the jury that it wasn't present.
A. I did not discuss that.
Q. 1C, didn't tell the ladies of jury it wasn't present. Correct?
A. Correct.
Q. We'll go back to 1D.
05:37 1E, you didn't tell the ladies in the jury it wasn't present. Correct?
A. I don't believe I discussed that one either.
Q. 1F, didn't tell the ladies of the jury it wasn't present. Correct?
A. That's correct.
Q. 1G, you didn't tell the ladies of the jury it wasn't present. Correct?
05:38 A. I did not discuss that.
Q. But what you did discuss is this part at the end, "output data buffer control signals in response to a read or write memory." Correct? "Read or write memory command." Correct?
A. That is correct.
Q. And you felt that wasn't present. Correct?
05:38 A. That's correct.
Q. And you don't identify any technical inaccuracies in the
05:38 Renesas or Montage data buffer data sheets that are used in

Samsung's products. Correct?
A. No, I did not.
Q. And, in fact, the Renesas and Montage data sheets describe for Samsung how the buffers in its infringing products operate. Correct?
A. It describes the buffers, yes.
MR. SHEASBY: And if we go to -- let's go page 220, which is JX 11.
05:39 Q. (BY MR. SHEASBY) These are data buffer control. Correct?
A. Correct.
Q. And it says BCOM 3 through 0. Correct?
A. Correct.
Q. And it describes them as data buffer control signals, plural. Correct?
A. It states that.
Q. And the Renesas data sheets actually list them as four signals. Correct?
A. Correct. It's four bits in this encoded signal.
Q. The data sheet says the data buffer command signals, signal count--4. Correct?
05:40
A. That is correct in what it states there.
Q. And for my math, we all agree that four is greater than one. Correct?
A. Well, if you count, four is greater than one.

05:40

Q. And we all agree that the 'S' at the end of 'signal' is plural. Correct?
A. It's correct for what it's written here for, yes.
Q. And the claim also refers to 'signals' in the plural. Correct?
A. The claim does, yes.
Q. And you understand that Samsung actually prepared its own documentation on this exact issue. Correct?
A. I have seen documentation on this issue, yes.
Q. And did you talk to Samsung's engineers about this issue?
A. About which issue, please?
Q. Data buffer control signals -- command signals.

05:40

A. As I recall, I did have at least one time where I did talk with engineers about it.
MR. SHEASBY: Okay. Why don't we go to slide 224.
Q. (BY MR. SHEASBY) This is JX 16. This is a Samsung document on DDR4 data buffer operation. Correct?
A. That's correct.
MR. SHEASBY: And if we advance one slide. And why don't we blow that up, Mr. Svenson, types of D bus control signals. Types of DB control signals, blow that up and everything below it.

05:41

Q. (BY MR. SHEASBY) And this is Samsung's own document. Correct?
A. Yes, that's correct.

Q. And it says 'signal count'. Do you see that?
A. Yes.
Q. It says 'DB command signals', plural. Correct?
A. For the types of signals, yes, that's the entire chart.
Q. And it says signal Count--4. Correct?
A. Correct.
05:41 MR. SHEASBY: Now, if we go back to the claim.
Q. (BY MR. SHEASBY) It talks about --
MR. SHEASBY: Go back to slide 213, please.
Q. (BY MR. SHEASBY) It talks about data buffer control signals in response to the read or write command. Do you see that?
A. Yes, I do.
Q. And you agree that a separate data buffer control signal
05:42 is sent for the read and a separate data control buffer signal is sent for the write. Correct?
A. Yeah, it's read or write. That's correct.
Q. And a separate one for each one. Correct?
05:42 A. Yes, it's a separate command.
MR. SHEASBY: And if we go to slide 221.
Q. (BY MR. SHEASBY) This is the separate command for the read and the separate command for the write. Correct?
A. Yes, that's correct.
Q. And if you add one read command signal and -- if you can send a read command signal and you can send a write command

signal, how many signals can you send?
A. How many signals can you send?
05:43 Q. Yeah.
A. I'm not sure I understand your question.
Q. Sure. A read command signal is one signal under your interpretation. Correct?
A. That is a signal, yes.
Q. A write command signal is a second signal under your interpretation. Correct?
A. It's a different signal, yes.
Q. And what's one plus one?
A. One plus one is read or write, according to the claim. It's 'or'.
05:43 Q. And what's one plus one as a matter of math, sir?
A. Well, as a matter of math, one plus one is two.
Q. And if you refer to two, is that single or plural?
A. Well, two is plural. If you look at read or write, those are two; each one's a separate command.
Q. You spoke now about -- a bit about invalidity. Is that correct?
A. Yes.
05:44 Q. And you understand when the Patent Office originally granted these patents it analyzed whether there was support for each of the claim limitations in the claims. Correct?
A. That's what they're supposed to do, yes.

Q. And I want to be --

DR. ALBERT: Objection, Your Honor.

THE COURT: State your objection.

DR. ALBERT: It seems like we're getting into areas outside his direct that he -- determinations at the Patent Office are not at issue in this case.

05:44 THE COURT: Well, they're not, and the Court ordered to not either bolster or denigrate the Patent Office, so we're not going do go into what the Patent Office did or didn't do.

MR. SHEASBY: I understand, Your Honor.

THE COURT: Let's move on. Sustain the objection.

Q. (BY MR. SHEASBY) So the next issue you talked about was damages-related issues. Is that correct?

A. Yes. They would relate to damages. Yes, correct.

MR. SHEASBY: And Your Honor, with your forgiveness, may I approach --

05:45 THE COURT: You may get something off your table. Let's save your request for forgiveness for something more important.

MR. SHEASBY: It's a long day, Your Honor.

THE COURT: Let's go ahead. Let's go forward.

Q. (BY MR. SHEASBY) Before we go to the elmo, a couple of things I want to focus on.

05:45 You've previously testified that speed and density have been a market driver for every DRAM that's been sold since

1972. Correct?
A. Yes, I've testified to that.
Q. And speed and density have been the two primary components of marketing decisions on every generation of product. You've testified to that, too. Correct?
A. Speed, density, and power are the three.
Q. Yes. Now, the -- you also agree that some patents are extremely valuable. Correct?
A. Some are, yes.
05:46 Q. And in some senses there could be a single patent that's more valuable than an entire portfolio that could exist. Correct?
A. Well, if you have a patent that's a part of a portfolio and it has a value, the patent portfolio at least has that value.
Q. I understand. I'm saying a single patent could be more valuable than a completely different patent portfolio. Correct?
A. Then a completely different patent portfolio, yes.
Q. And you showed the ladies and gentlemen of the jury --
05:46 MR. SHEASBY: If I could have this elmo.
Q. (BY MR. SHEASBY) -- these features. Correct? DRAM chip manufacturing, DRAM package outputs, module pin-outs, et cetera, et cetera. Correct?
A. Yes.

Q. You didn't identify a single Samsung patent that covers any of these technologies. Correct?
A. I didn't compare this to a patent, no, I didn't.
Q. And you didn't identify a single Samsung or third party patent --
THE COURT: Just a minute. Pull this down. Approach the bench, counsel.
(The following was had outside the hearing of the jury.)
05:47
MR. SHEASBY: I saw it has the same thing.
THE COURT: I ordered this reference to DDR5 taken off. I don't know why it wasn't.
MR. SHEASBY: This is the only copy I've had. I'll mark it off right now, Your Honor.
THE COURT: We need to remove that.
MR. SHEASBY: Thank you, Your Honor.
(The following was had in the presence and hearing of the jury.)
05:48
Q. (BY MR. SHEASBY) You didn't identify a single Samsung or third-party patent that covers any of the technology at issue --
THE COURT: Slow down, please, Mr. Sheasby.
Q. (BY MR. SHEASBY) You didn't identify a single Samsung or third-party patent that covers any of the technology at issue in this case. Correct?

A. I didn't address that, no.

05:48 Q. And you didn't analyze whether any of these features that you've listed here were already present in DDR3, the previous generation of memory. Correct?

DR. ALBERT: Your Honor, may we approach?

THE COURT: Approach the bench.

(The following was had outside the hearing of the jury.)

DR. ALBERT: Your Honor, DDR3 is not accused. He 05:48 seems to be getting in the same area of DDR5. This case is about DDR4.

THE COURT: Well, what's your response?

MR. SHEASBY: Sure. I want to make clear that all these features he identified were already present in DDR3 and could not have been the advance that caused increase speed in DDR4.

THE COURT: We are going to talk about DDR4 exclusively. We're not going to go below to 3 and we're not going to go above to 5.

MR. SHEASBY: I understand, Your Honor.

THE COURT: Now, while we have you-all here, we are over seven hours of trial time and we need to get this witness 05:49 finished. How much more have you got on cross?

MR. SHEASBY: Eight minutes.

THE COURT: How much redirect have you got?

DR. ALBERT: They've given me only a few minutes, Your Honor. I'll try to keep it very brief.

THE COURT: All right. Let's go forward.

(The following was had in the presence and hearing of the jury.)

THE COURT: Let's proceed.

Q. (BY MR. SHEASBY) You did not -- you understand that Netlist also manufactures its own DIMMs. Correct?

05:50 A. I believe that is correct, yes, at one time.

Q. For example, this is a data sheet on Netlist DDR4 DIMMs. Do you see that?

A. I see that, yes.

Q. And when I turn the page, can you see how it talks about Netlist DDR4 DIMMs are 3200 megatransfers per second? Do you see that?

A. I see that.

05:50 Q. Does Samsung sell any DDR4 faster than 3200 megatransfers per second?

A. As I sit here, I'm not aware of that.

Q. Okay. Now, you didn't ask -- you said you spoke to Samsung's engineers. Correct?

A. I did.

Q. And you did not ask the engineers what the value is that they placed on Netlist's patents. Correct?

A. No, I didn't call them for that purpose.

Q. And you list these, what you describe as infringing alternatives. Correct?
A. Yes, that's correct.
Q. And you actually didn't analyze whether they were non-infringing. Correct?
A. I'm not sure what you mean. I'm proposing these as non-infringing to the patents-in-suit in this case.
Q. I understand that. And you did not analyze whether they infringed Netlist's patents. Correct?
A. Are you asking Netlist patents as a whole or part of this case?
Q. You understand for an alternative to be acceptable, it must be non-infringing. Correct?
A. My understanding is it needs to be an acceptable non-infringing alternative to the patents at issue in this case.
Q. Right. And did you analyze whether any of these options would infringe the patents at issue in this case under the doctrine of equivalents?
A. No, I did not do that.

DR. ALBERT: Objection, Your Honor.

THE COURT: What's your objection, counsel?

DR. ALBERT: We dealt with this at the pretrial conference regarding the doctrine of equivalents.

THE COURT: Say that again.

DR. ALBERT: The doctrine of equivalents was subject to Your Honor's rulings at the pretrial conference.

MR. SHEASBY: As to -- I'm talking about his alternatives, Your Honor.

THE COURT: Well, it seems like you're going back and forth between doctrine of equivalents and non-infringing alternatives.

MR. SHEASBY: I'm asking about whether he analyzed whether these alternatives were infringing under the doctrine of equivalents.

THE COURT: And your objection to that is what, Dr. Albert?

05:52 DR. ALBERT: Doctrine of equivalents issues were excluded, Your Honor, in previous rulings. We believe it's outside the scope.

THE COURT: I think that's correct, Mr. Sheasby.

MR. SHEASBY: I understand. I'll withdraw the question, Your Honor.

THE COURT: All right. Let's move on.

Q. (BY MR. SHEASBY) You -- all these alternatives you described involve modifying the DIMMs or modifying the buffers or modifying the RCDs. Correct?

A. Sure. You have to modify something.

Q. You've never designed a DIMM. Correct?

05:53 A. I have never designed a DIMM. That's correct.

Q. Never designed an RCD. Correct?
A. No, I have not.
Q. Never designed a buffer. Correct?
A. Not this type of buffer. I've designed buffers.
Q. You've never designed the type of buffers that are used in DIMMs. Correct?
A. Not for the DIMM.
Q. Mr. McAlexander, thank you for your time.
MR. SHEASBY: I pass the witness, Your Honor.
THE COURT: All right. Is there redirect,
05:53 Dr. Albert?
DR. ALBERT: Yes, Your Honor. I will try to keep this brief. I understand the jury's been here a long time.

REDIRECT EXAMINATION

BY DR. ALBERT:
Q. Thank you, Mr. McAlexander, and the Court.
I'll start where Mr. Sheasby left off. I heard some questions about your experience. How many years of experience do you have in the memory field?
A. Since 1972, so it's 52 years.
05:53 Q. And you were asked a number of questions regarding some data buffers and buffer control words. Do you remember those?
A. Yes.
DR. ALBERT: And can we pull up JX 27? And zoom in at the bottom.

Q. (BY DR. ALBERT) And you see at the top the buffer control words?
05:54 A. Yes.
Q. Now, to make it clear for the jury, what component sets the values that are in that buffer control words block? Is it the memory controller or is it the memory module?
A. The memory controller is the only integrated circuit that can actually place that value, determine the value and put it in that control word. It's -- what you see in the buffer
05:55 control words table, it can go up and select it and pull it out and use it and apply it, but the buffer itself does not have any capability to tell that buffer control word what the value is. That comes from the host.
DR. ALBERT: And can we go to DDX 4-5, please?
05:55 Q. (BY DR. ALBERT) Now, looking up at the top, going back to the claim, does the claim -- is the claim satisfied if all you do is store and access the delay time in the buffer?
A. No. Storing, accessing, decoding, applying, those are different than determining.
Q. Okay. And does the buffer control word block or the
05:55 transaction block in the buffer do any of that determining?
A. No; none whatsoever.
Q. Now, you were asked about memory controller source code. Did Mr. Mangione-Smith go look at any memory controller source code to see what it was doing in analyzing the feature

required by the claim?

A. I don't recall Dr. Mangione-Smith looking at any host controller-type code.

05:56 DR. ALBERT: And let's go ahead and go to --

Q. (BY DR. ALBERT) Well, before we go on, so did you hear anything in your cross about the '608 Patent or the buffers that changes your opinion as to whether the '608 Patent -- whether Samsung's products infringe any of the claims of the '608 Patent?

05:56 A. No. The positions I took on the lack of the elements that I described, I still support those positions--the Samsung products do not infringe.

DR. ALBERT: Okay. And can we go to DDX 4-10, please. Actually 4-11. Next slide, please.

05:57 Q. (BY DR. ALBERT) And so you were asked about the '912 Patent claims in your cross by Mr. Sheasby.

To be clear, does the '912 Patent claim recite a different number of input signals than a different number of output signals, or does it recite a different number of DDR memory devices and ranks than are actually stored on the module?

05:57 A. I addressed this in my cross, and that is the set of input signals is configured to control a second number of devices and a second number of ranks, so it is -- there's no -- nothing in the claim that addresses how many output

05:58

signals you have versus input signals. It's not a signal-to-signal comparison.

Q. And you were asked to compare two signals versus four signals. Do you remember that?

A. I remember that.

Q. And -- now, with two signals in encoded mode, how many different things can you control? One, two, three, or four?

A. Four.

Q. Okay.

DR. ALBERT: May I use the easel, Your Honor?

THE COURT: You may use it.

DR. ALBERT: Thank you.

05:58

Q. (BY DR. ALBERT) So if I have two signals coming in, what permissible values would they have? 0 and 1?

A. You can look at it as high, low, 0, 1, on off. Let's use the 0 and 1 for off versus on.

Q. So 0 and 1 on one signal and 0 and 1 on the other.

A. Right.

Q. How many combinations of 0 and 1 do you have?

A. You can have four combinations. You can have a combination that's 0-0, a second combination 0-1, a third combination that's 1-0, and a fourth combination that's 1-1.

05:59

Q. So if you wanted to use encoding with two signals, how many ranks could you control?

A. Four.

Q. Would it operate as shown here--one, two, three, four, according to --
A. Yes, that's correct.
Q. Now, is it correct that the system's only using two input signals to determine where the data's going to go, or was there a third signal?
A. Well, if you're talking about the Samsung product, as I had mentioned in the cross, not only is it two chip select signals, but there's also a D0. It's using three signals.
Q. And so with that additional third signal, can you control even more ranks?
A. You can control up to eight ranks with the three signals.
Q. Now, you were asked about some of your depo testimony, and I'd like to ask you about --
DR. ALBERT: Additional testimony under the rule of completeness, Your Honor, about whether an address is -- on the A6 line is an address versus a line, an input. And I would direct the Court to page 44 of Mr. McAlexander's deposition at lines 18 through 23.
THE COURT: Counsel, I don't believe Plaintiff's counsel actually published this section. He asked him questions after he refreshed his recollection. I'd suggest you do the same thing.
DR. ALBERT: Yeah.
Q. (BY DR. ALBERT) Looking -- can you look at your

deposition, Mr. McAlexander, at page 44? That would be the page before Mr. Sheasby was asking you about.
A. All right. I'm there.
Q. And do you see lines 18 through 23?
THE COURT: Just ask him the questions that are there. Don't read them to him; just ask him the questions.
DR. ALBERT: Thank you, Your Honor.
06:02 Q. (BY DR. ALBERT) What was -- what do you say whether A6 was an address?
A. What I said is that A6 is identified as an address line, it sometimes is an address, sometimes it's a control signal or controller. It's not an address.
06:02 DR. ALBERT: And can we pull up JX 30, please? And go page 29. And highlight the first row for mode register set.
Q. (BY DR. ALBERT) And again, for the jury, is this mode register set the only command that can be sent in that PDA 06:02 mode that Netlist is accusing?
A. Yes. In a PDA mode that is being accused, only the MRS command can be sent.
Q. And for that A or address line that Mr. Sheasby was asking you about, is there anything identified in that truth table for a row/column address signal?
A. No. In fact, just the opposite, because here for the 06:03 address lines it's showing an OP code. It's a control signal.

Q. Okay. So in that PDA mode, is there an actual row/column address signal?
A. No. If there was an actual row address control signal, you'd be trying something in a memory storage array, which you're not. So no, there would be -- there's no row address control signal ever in a mode register set mode.

06:03 DR. ALBERT: And let's go to the '417 Patent. And
06:04 let's take a look at DDX 4.13. Sorry. Next slide. 4.14.

Q. (BY DR. ALBERT) Actually before we move on into the '417 Patent, you presented two different non-infringement theories for the '912 Patent. Was that correct?
A. Correct.
Q. Now, is it your understanding that Netlist has to satisfy all of the claim in order for Samsung's products to be found to infringe?
A. Yes. All of the limitations of that claim have to be
06:04 satisfied or found for Samsung to infringe.
Q. So is it your understanding that if either of the claim elements that you identified are not found to be present, then Samsung would not be infringing?
A. That's my understanding, yes.

DR. ALBERT: Okay. Let's move on to the next slide, please.

Q. (BY DR. ALBERT) Now, you were asked a lot of questions about signal versus signals. Is signals the only part of that

claim?
A. No.
06:05 Q. Now, that output data buffer control signals, what is it in response to?
A. It's in response to a read or write memory command, which does not exist in the MRS mode.
Q. And here we're talking about the '417 with the generating of the BCOM?
A. Correct.
Q. And so -- but for the '417, when the read/write memory
06:05 command comes in and the -- and BCOM signal goes out, is that responsive to the read or write command?
A. Yes. When the BCOM signal is generated, it is in response to the read or write command.
Q. Now, Mr. Sheasby was asking you questions about two different signals, a read and then a write, but does the claim
06:06 make it specific as it's referring to a -- the read or write memory command, not multiple read or write memory commands?
A. It is very specific, and it also uses, as I said in the cross, the disjunctive word 'or'. It's 'read or write', and it's 'the read or the write'.
Q. So whatever comes in, whether it's a read or write, you have to send out to -- from that specific signal, that
06:06 specific command multiple data buffer control signals. Is that right?

A. That is correct. I think it's a proper reading of the claim.
Q. Now, once you send out that BCOM signal or that signal in the Samsung products, will the memory buffer cause a transfer of data if you only have part of that BCOM?
06:07 A. No. It's -- the BCOM has two states 1001 or 1000, depending upon that encoded state. When it's decoded it will either generate a transfer in or a transfer out. You have to have every bit.
Q. So the next part of the limitation where the "in response to the data buffer control signals, you transfer the bursts and bid-wide data signals" in pink, that's not satisfied by just having one part of the BCOM, one of the bits?
A. No.
06:07 Q. You have to have it all?
A. I'm sorry. No. If you get -- if only three of those bits are used or two of the bits of the BCOM signal are used, you will not get a transfer, so it requires all four bits of that encoded signal in order to get a transfer.
Q. And you were asked some questions about Samsung's patents. Do you recall those?
A. I do.
06:08 Q. Now, was it your role in this case to go look at all 130 -- or whatever massive amount of Samsung patents they have and figure out how to apply them to Samsung's products?

06:09

A. I'm not aware that I was asked to do that, nor does it have any bearing on my opinion.
Q. Instead, were you responding to what Mr. -- Dr. Mangione-Smith was providing as far as his analysis?
A. Yes. Dr. Mangione-Smith had the burden to prove infringement, and my response is in response to him.
Q. Now, did Dr. Mangione-Smith go and look at all of Samsung's portfolio and determine which patents practice -- which Samsung patents are practiced by Samsung's products?
A. I don't recall any testimony to that effect.
Q. And you were asked whether certain specific features would have value if somehow you didn't tie it to a specific Samsung patent. Do you recall that?
A. I recall that, yes.
Q. Now, is it your understanding that to actually make the products in this industry, it's not just patents; you have thousands of people working thousands -- tens of thousands of hours to develop these advancements into these products and the features that you were identifying on your slide are all part of that effort?

MR. SHEASBY: Your Honor, objection; leading.

THE COURT: Sustained.

Q. (BY DR. ALBERT) What is your understanding on the amount of work that it takes for a company like Samsung to develop all of the features of the product that contribute to the

06:10

speed and capacity that are in the products today?

A. The wafer fabrication alone runs $20 billion today, and that's even beyond the number of people that you have to have to design it, to create the simulations, to create the modeling, to do all the photo lithography, to actually people that actually are the workers that make the product, and then you have to assemble it, and you have to test it, you have to prove it, you have to -- there's a lot that goes into the construct, a lot of money and a lot of people and a lot of hours.

DR. ALBERT: Pass the witness, Your Honor.

06:10

THE COURT: Is there additional cross?

MR. SHEASBY: May it please the Court, no additional cross.

THE COURT: All right. Then you may step down, Mr. McAlexander.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're welcome.

Members of the jury, we're going to stop for the day. If you will, take your notebooks with you to the jury room when you leave the courtroom. Leave them there.

Please prepare and plan to be back in the morning. As I've told you, we're not going to be in session all day

06:11

tomorrow. I expect us to end tomorrow's portion of the trial somewhere around the lunch hour. And then we will reconvene

06:11
on Thursday of the following week, which I believe is the 19th. No; the 21st. I'm sorry.

But in the meantime if you'll continue to follow all my instructions. Travel safely. Be back in the morning ready to go at 8:30. I will certainly appreciate it. Thank you for your attention today.

The jury's excused until tomorrow morning.

06:12
(Whereupon, the jury left the courtroom.)

THE COURT: Is there a request for Mr. McAlexander to be excused?

MR. CORDELL: Yes, Your Honor, we would appreciate that, but I'd will also like to ask if Mr. Ji could be excused.

THE COURT: I gather there's no objections.

MR. SHEASBY: No objections, Your Honor.

THE COURT: Both of those former witnesses are excused. They're free to stay; they're free to leave.

All right. Be seated, counsel.

As of right now, the Plaintiff has 1 hour and 47 minutes of remaining trial time. The Defendants have 4 hours and 4 minutes.

06:12

I will be here in the morning to take up your overnight disputes, because I am convinced beyond a doubt there will be some.

Is there anything else we need to hear from either party

on before we recess for the evening?

MR. SHEASBY: Nothing from Plaintiff, Your Honor.

MR. CORDELL: Nothing from Defendant, Your Honor. Thank you.

THE COURT: We stand in recess until tomorrow morning.

06:13 (The proceedings were concluded at 6:13 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.

S/Shawn McRoberts 11/14/2024

___________________________DATE____________
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER