1                 IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
2                     MARSHALL DIVISION

3   NETLIST, INC.,                (  CAUSE NO. 2:22-CV-293-JRG
                                  )
4          Plaintiff,             (
                                  )
5   vs.                           (
                                  )
6   SAMSUNG ELECTRONICS CO., LTD., (
    et al.,                       )  MARSHALL, TEXAS
7                                 (  NOVEMBER 22, 2024
            Defendants.           )  8:00 A.M.
8   _____

9
                           VOLUME 6
10
    _____
11
                     TRIAL ON THE MERITS
12
            BEFORE THE HONORABLE RODNEY GILSTRAP
13             UNITED STATES CHIEF DISTRICTJUDGE
                        and a jury
14  _____

15

16

17

18

19

20

21

22              SHAWN McROBERTS, RMR, CRR
                 100 E. HOUSTON STREET
23              MARSHALL, TEXAS  75670
                    (903) 923-8546
24          shawn_mcroberts@txed.uscourts.gov

25

```
 1                    A P P E A R A N C E S

 2        FOR THE PLAINTIFF:    IRELL & MANELLA, LLP -
                                LOS ANGELES
 3                              1800 AVENUE OF THE STARS
                                SUITE 900
 4                              LOS ANGELES, CA 90067-4276
                                (310) 203-7096
 5                              BY:  MR. JASON SHEASBY
                                     MS. LISA GLASSER
 6                                   MR. TONY ROWLES
                                     MR. ANDREW STRABONE
 7                                   MR. DAVID KAHN

 8                              McKOOL SMITH, P.C. - MARSHALL
                                104 E. HOUSTON ST., SUITE 300
 9                              MARSHALL, TEXAS  75670
                                (903) 923-9000
10                              BY:  MS. JENNIFER TRUELOVE

11        FOR THE DEFENDANTS:   FISH & RICHARDSON, PC -
                                WASHINGTON DC
12                              1000 MAINE AVE., SW
                                SUITE 1000
13                              WASHINGTON, DC 20024
                                (202) 783-5070
14                              BY:  MR. RUFFIN CORDELL
                                     MS. LAUREN DEGNAN
15                                   MR. DANIEL TISHMAN

16                              FISH & RICHARDSON, PC - DALLAS
                                1717 MAIN STREET, SUITE 5000
17                              DALLAS, TEXAS  75201
                                (214) 292-4084
18                              BY:  MR. THOMAS REGER

19                              FISH & RICHARDSON, PC -
                                NEW YORK
20                              7 TIMES SQUARE, 20TH FLOOR
                                NEW YORK, NEW YORK  10036
21                              (404) 724-2764
                                BY:  MS. KATHERINE REARDON
22
                                GILLAM & SMITH, LLP
23                              303 SOUTH WASHINGTON AVENUE
                                MARSHALL, TEXAS  75670
24                              (903) 934-8450
                                 BY:  MS. MELISSA SMITH
25
```

```
 1              OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                      100 E. HOUSTON STREET
 2                                    MARSHALL, TEXAS  75670
                                      (903) 923-8546
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THE COURT:  Be seated, please.

07:58    Counsel, are the parties prepared to read into the record

07:58    any items from the list of pre-admitted exhibits used during

yesterday's portion of the trial?

MS. TRUELOVE:  Yes, Your Honor.

THE COURT:  All right.  Let's proceed to do that.

MS. TRUELOVE:  Plaintiffs have one exhibit used

yesterday that needs to be read into the record, and that is

PX 16.

THE COURT:  All right.  Is there any similar

rendition from Defendants?

MS. SMITH:  There is not, and we have no objection

to PX 16.

THE COURT:  All right.  Thank you, counsel.

07:58    Yesterday after the close of evidence in this case, the

Court took up and heard fulsome argument from the parties

regarding motions presented under Rule 50(a) of the Federal

Rules of Civil Procedure from both Plaintiff and Defendants.

After argument, the Court ruled on those motions.

After completing practice under Rule 50(a), the Court

recessed and met with counsel for all the parties in chambers

07:59    informally and had a lengthy and again fulsome review of the

most current proposed final jury instruction and verdict form.

The Court had an opportunity to ask questions and to respond

to questions from counsel to hear competing views and ideas,

           1    and the Court took that input into account.

           2         After the conclusion of the informal charge conference,
07:59      3    the Court applied and considered the parties' input and

           4    revised what it believes to be a -- revised and came up with

           5    what it believes to be the appropriate final jury instructions

           6    and verdict form for use in this trial.

           7         Earlier this morning the Court furnished copies

           8    electronically to both sides of both the final jury
08:00      9    instructions and verdict form.  The parties have had an

          10    opportunity to review and consider the same, and the Court is

          11    now ready to conduct a formal charge conference on the record

          12    where both documents can be reviewed carefully and each side

          13    will have an opportunity to lodge any objections to the same

          14    that they believe are necessary and warranted.

          15         So with that and as we discussed during the informal

          16    charge conference, I'd like to invite a single spokesperson
08:00     17    from each side to go to the podium.  We'll begin with the

          18    final jury instructions, and we'll review those on a

          19    page-by-page basis, beginning with page 1 and going through to

          20    the last page.

          21         And as we get to each page in the document, either side

          22    may lodge such objections as they believe are necessary and

          23    appropriate either to something that has been included or

          24    something that has been omitted from that particular page.
08:01     25         So with that, whoever's going to speak for Plaintiff and

1    Defendant, please go to the podium.

2              MR. ROWLES:  Good morning, Your Honor.  Tony Rowles

3    for Netlist.

4              MS. DEGNAN:  Good morning, Your Honor.  Lauren

5    Degnan for Samsung.

6              THE COURT:  All right, counsel.  Let's begin with

7    the final jury instructions, and we'll focus first on the

8    cover page or page 1.  Are there any objections here from

9    either Plaintiff or Defendants?

10             MR. ROWLES:  None from Plaintiff.

11             MS. DEGNAN:  No, Your Honor.

12             THE COURT:  Turning then to page 2, are there any

13   objections here from either party?

14             MR. ROWLES:  None from Plaintiff.

08:01   15             MS. DEGNAN:  None for Samsung.

16             THE COURT:  Turning then to page 3, are there any

17   objections here from either party?

18             MR. ROWLES:  None from Plaintiff.

19             MS. DEGNAN:  No, Your Honor.

20             THE COURT:  Turning then to page 4 of the final jury

21   instructions, are there any objections here from either side?

22             MR. ROWLES:  None from Plaintiff.

23             MS. DEGNAN:  No, Your Honor.

24             THE COURT:  Turning next to page 5, are there any

25   objections here?

08:02

1     MR. ROWLES:  None from Plaintiff, Your Honor.

2     MS. DEGNAN:  None from Samsung.

3     THE COURT:  Turning then to page 6, are there

4     objections from either Plaintiff or Defendants?

5     MR. ROWLES:  None from Plaintiff.

6     MS. DEGNAN:  No, Your Honor.

7     THE COURT:  Turning next to page 7, are there any

8     objections here?

9     MR. ROWLES:  Yes, from Plaintiff, Your Honor.

10    At the bottom of page 7, the sentence beginning, "In

11    other words, Samsung and Netlist were each licensed," Netlist

12    objects that this inaccurately suggests that Netlist has lost

13    its license to Samsung's patents which is an incorrect

14    statement of the law given the breach by Samsung.

15    THE COURT:  All right.  That objection's overruled.

16    Any other objections from either Plaintiff or Defendants

17    to anything included on or deleted from page 7?

18    MR. ROWLES:  Nothing further on page 7 from

19    Plaintiff, Your Honor.

20    MS. DEGNAN:  No, Your Honor.

21    THE COURT:  Turning to page 8, are there any

22    objections here from either party?

23    MR. ROWLES:  Yes, Your Honor.

24    At the top of page 8, the sentence beginning "You may not

25    rely on the JDLA as evidence of infringement," Netlist objects

08:03

the JDLA is relevant at least to questions of willful

infringement.

            THE COURT:  All right.  That objection is overruled.

        Anything further on page 8 from either party?

            MR. ROWLES:  Nothing further from Plaintiff.

            MS. DEGNAN:  No, Your Honor.

            THE COURT:  Turning then to page 9, any objections

here from either party?

            MR. ROWLES:  None from Plaintiff, Your Honor.

            MS. DEGNAN:  No, Your Honor.

            THE COURT:  All right.  Next then is page 10.  Are

there any objections here?

            MR. ROWLES:  Nothing from Plaintiff.

            MS. DEGNAN:  No, Your Honor.

            THE COURT:  Turning then to page 11, are there any

objections here?

            MR. ROWLES:  Nothing from Plaintiff, Your Honor.

            MS. DEGNAN:  No, Your Honor.

            THE COURT:  Next is page 12.  Are there any

objections here?

08:04

            MR. ROWLES:  No from Plaintiff, Your Honor.

            MS. DEGNAN:  No, Your Honor.

            THE COURT:  All right.  Next is page 13.  Are there

any objections here from either side?

            MR. ROWLES:  There is from Plaintiff, Your Honor.

08:04

1       The sentence beginning, "An accused product does not

2  infringe simply," and continuing on to "at least once in the

3  claim required environment," Netlist objects to these

4  constructions as incorrect in view of Federal Circuit law

5  including fantasy sports which make clear that where

6  activation of an existing feature by the customer is available

7  in the product, no further evidence is required to show

8  infringement of a capability claim.

9            THE COURT:  All right.  That objection is overruled.

10       Any objections otherwise on page 13 from either side?

11            MR. ROWLES:  Not from Plaintiff, Your Honor.

12            MS. DEGNAN:  Yes, Your Honor.

13       On this page after the sentence that ends with, "at least

14  once in the claim required environment," we would insert the

08:04

15  following sentence:  "When a claim device operates in an

16  environment that involves actions of another device, the

17  operations of the other device must be known to establish

18  infringement."

19            THE COURT:  All right.  Obviously, counsel, we

20  discussed this at length in the informal charge conference.

21  I'm going to overrule Defendants' objection.

22       Anything further before we move on?

23            MS. DEGNAN:  No, Your Honor.

24            MR. ROWLES:  No, Your Honor.

25            THE COURT:  Then we'll turn next to page 14 of the

08:05    1    final jury instructions.  Are there objections here from

         2    either party?

         3              MR. ROWLES:  Not from Plaintiff, Your Honor.

         4              MS. DEGNAN:  Yes, Your Honor.

         5              THE COURT:  State your objection, please.

         6              MS. DEGNAN:  In the middle paragraph that starts

         7    with -- we would strike these sentences.  I'll read them

         8    slowly.  "If Samsung was willfully blind to Netlist's patent

         9    rights and Samsung's state of mind coupled with such willful

         10    blindness shows a deliberate or intentional mindset, then

08:05    11    willful infringement can be shown.  You may find that a

         12    defendant is willfully blind when it is indifferent to the

         13    rights of another or when it proceeds in disregards of a high

         14    or excessive danger of infringement that is known to it or

         15    would have been apparent to a reasonable person in its

         16    position."  We would strike that, Your Honor.

         17         In addition, should those sentences not be stricken, we

08:06    18    would rewrite the last sentence that I just read to say, "You

         19    may find that a defendant is willfully blind when it

         20    subjectively believes that there is a high or excessive danger

         21    of infringement and it takes deliberate action to avoid

         22    learning of that infringement."

         23              THE COURT:  All right.  That objection is overruled.

         24         Anything further on page 14?

         25              MS. DEGNAN:  No, Your Honor.

```
           1          MR. ROWLES:  Not from Plaintiff.

08:06      2          THE COURT:  All right.  We'll turn next then to page

           3   15 of the final jury instructions.  Are there objections here

           4   from either party?

           5          MR. ROWLES:  Not from Plaintiff, Your Honor.

           6          MS. DEGNAN:  Yes, Your Honor.

           7          THE COURT:  State your objection, please.

           8          MS. DEGNAN:  In the last sentence of the top

           9   paragraph that currently reads, "This presumption of validity

          10   extends to all issued United States patents," we would insert

          11   the word "ordinarily' before extends.  We would then insert

08:07     12   the following sentence:  "However the presumption does not

          13   apply with respect to the asserted claims of the '912 and '417

          14   Patent which the Patent Office has determined are unpatentable

          15   in separate proceedings."

          16      Then in the next paragraph, we would strike this clause:

          17   "In order to overcome this presumption."

08:08     18          THE COURT:  Anything further, Ms. Degnan?

          19          MS. DEGNAN:  No, Your Honor.

          20          THE COURT:  Those objections are overruled.

          21      Anything further before we turn to page 16?

          22          MR. ROWLES:  No, Your Honor.

          23          MS. DEGNAN:  No, Your Honor.

          24          THE COURT:  Then we'll turn next to page 16.  Are

          25   there any objections here?
```

                    MR. ROWLES:  Not from Plaintiff, Your Honor.

                    MS. DEGNAN:  Yes, Your Honor.

          We would add the following sentence in the second

     paragraph after the sentence that adds "in what" -- that ends

08:08  with, "in what the specification discloses," we would add the

     following:  "It is not sufficient that the specification

     discloses only enough to make the claimed invention obvious to

     a person having ordinary skill."

                    THE COURT:  All right.  That objection is overruled.

          Anything further on page 16?

                    MR. ROWLES:  No, Your Honor.

                    MS. DEGNAN:  No, Your Honor.

                    THE COURT:  Turning then to page 17, are there any

     objections here?

                    MR. ROWLES:  Yes, Your Honor.

          In the final paragraph, the second sentence reading

     "actual notice means that Netlist communicated to Samsung a

08:08  specific charge of infringement of the asserted patents by a

     specified product or products," that sentence on its own does

     not make clear for the jury that a proposal for license to the

     asserted patents is adequate to communicate such a charge as

     shown by the *SRI International* case discussed in our proposed

     instruction.

          So our proposed remedy would be to add a comma at the end

     of that sentence, followed by, "Which may include a proposal

08:09    1    for a license to the asserted patents."

2         THE COURT:  All right.  That objection is overruled.

3         Anything further?

4         MS. DEGNAN:  No, Your Honor.

5         MR. ROWLES:  No, Your Honor.

6         THE COURT:  Turning then to page 18, are there any

7    objections here from either party?

8         MR. ROWLES:  None for Plaintiff, Your Honor.

9         MS. DEGNAN:  No, Your Honor.

10        THE COURT:  Turning to page 19, are there any

11   objections here?

12        MR. ROWLES:  Yes, Your Honor.

13        Plaintiff objects to the instructions beginning in the

08:09   14   bottom paragraph at "a lump-sum royalty is when the

15   infringer," continuing through the next sentence that ends

16   "throughout the life of the patent," the term lump sum

17   Plaintiff believes is distinct from a fully paid-up license.

18   While it refers to one payment, it does not necessarily mean a

19   single payment for the life of the patent, and when combined

20   with the verdict form which we'll get to in the evidence in

21   the case could lead the jury to a verdict unsupported by

22   evidence here where there was no evidence about usage post

23   date of trial.

08:10   24        THE COURT:  All right.  That objection's are

25   overruled.

1       Anything further on page 19?

2              MR. ROWLES:  Not from Plaintiff, Your Honor.

3              MS. DEGNAN:  No, Your Honor.

4              THE COURT:  Turning next to page 20, are there any

5    objections here?

6              MR. ROWLES:  Not from Plaintiff, Your Honor.

7              MS. DEGNAN:  No, Your Honor.

8              THE COURT:  I gather both sides agree that the Court

9    properly should charge the jury with all 15 of the

10   *Georgia-Pacific* factors?

11             MR. ROWLES:  Plaintiff agrees, Your Honor.

12             MS. DEGNAN:  Yes, Your Honor.

13             THE COURT:  All right.  Turning to page 21, any

14   objections here from either party?

15             MR. ROWLES:  Yes, Your Honor.

08:10   16    In the final paragraph at the bottom, the reference to

17   consideration of acceptable non-infringing substitutes, the

18   instruction does not make clear that this would be Samsung's

19   burden, if any, to present.

20             THE COURT:  All right.  That objection's overruled.

21        Turning then to page 22, are there any objections here?

22             MR. ROWLES:  Yes, Your Honor.

08:11   23    The reference in the second sentence to non-infringing

24   alternatives, Plaintiffs submit that next best alternatives

25   would be the proper phrasing, consistent with Your Honor's

1    prior orders on this subject.

2         THE COURT:  All right.  That objection is overruled.

3      Anything further on page 22?

4         MR. ROWLES:  Nothing else from Plaintiff, Your

5    Honor.

6         MS. DEGNAN:  Yes, Your Honor.

7         THE COURT:  What is it, Ms. Degnan?

8         MS. DEGNAN:  Yes.  In the second to last sentence in

08:11  9    the clause that says that "a proposed non-infringing

10    alternative was available at the time of the hypothetical

11    negotiation," we would insert "acceptable and available".  So

12    before available, we'd say "the alternative -- the proposed

13    non-infringing alternative was acceptable and available at the

14    time of the hypothetical negotiation" in that sentence.

15         In the next sentence we'd make a similar revision.  Where

08:12  16    it says, "You should not consider for damages purposes any

17    alternatives that have not been shown were available at the

18    time of the hypothetical negotiation," we would edit to say

19    "have not been shown were acceptable and available at the time

20    of the hypothetical negotiation."

21         THE COURT:  All right.  In the last sentence of the

08:12  22    paragraph on page 22, I will add the word "acceptable" and

23    available, or the words "acceptable and" preceding the word

24    "available".  I don't see any reason to put it in both

25    sentences and be redundant.  I will add it to the last

1    sentence.

2        Otherwise, your objection's overruled.

3        MR. ROWLES:  And just for the record, Your Honor,

4    Plaintiff objects to the addition of "acceptable" as you so

5    stated.

6        THE COURT:  I'm sure you do.  Thank you.  So noted.

7        All right.  Let's turn to page 23 of the final jury

08:13  8    instructions.  Are there any objections here from either

9    party?

10        MR. ROWLES:  Not from Plaintiff, Your Honor.

11        MS. DEGNAN:  No, Your Honor.

12        THE COURT:  Turning then to page 24, are there any

13    objections here?

14        MR. ROWLES:  Not from Plaintiff, Your Honor.

15        MS. DEGNAN:  No, Your Honor.

16        THE COURT:  All right.  That is the last page of the

17    final jury instructions.  We'll next move to the verdict form.

18    We'll follow the same approach.

19        Beginning with the cover page or page 1 of the verdict

20    form, are there objections from either Plaintiff or

21    Defendants?

08:13  22        MR. ROWLES:  Not from Plaintiff, Your Honor.

23        MS. DEGNAN:  No, Your Honor.

24        THE COURT:  Turning then to page 2 where various

25    definitions are included, are there any objections here from

1    either party?

2              MR. ROWLES:  Not from Plaintiff, Your Honor.

3              MS. DEGNAN:  No, Your Honor.

4              THE COURT:  Turning to page 3 where instructions are

5    set forth, are there any objections here?

6              MR. ROWLES:  None from Plaintiff, Your Honor.

7              MS. DEGNAN:  No, Your Honor.

8              THE COURT:  Turning to page 4 where Questions 1(a),

9    1(b), and 1(c) are included, are there any objections here?

10             MR. ROWLES:  None from Plaintiff.

11             MS. DEGNAN:  No, Your Honor.

12             THE COURT:  Turning then to page 5 of the verdict

08:14    13   form where Questions 2(a), 2(b), and 2(c) are included, are

14   there any objections here?

15             MR. ROWLES:  None from Plaintiff.

16             MS. DEGNAN:  Your Honor -- yes, Your Honor.

17        For Question 2(b), we would separate out the claims into

18   separate questions, and for 2(c) the same, we would separate

19   out the claims making it two questions.

20             THE COURT:  All right.  Assuming that what you would

21   do is offered in the form of an objection, that objection is

22   overruled.

23             MS. DEGNAN:  Thank you, Your Honor.

08:14    24             THE COURT:  Turning then to page 6 where Question 3

25   is found, is there any objection here?

1    MR. ROWLES:  Not from Plaintiff, Your Honor.

2    MS. DEGNAN:  Your Honor, we do not object to

3  Question 3, but we would insert another question after

4  Question 3.  So we would object to the extent the form does

5  not include a question on actual notice.

6    THE COURT:  All right.  That objection's overruled.

7    Turning to page 7 where Questions 4(a), 4(b), and 4(c)

8  are found, any objections here from either party?

08:15  9    MR. ROWLES:  Yes.  Plaintiff objects to these

10  questions to the extent they fail to limit the time period to

11  the date of trial.

12    THE COURT:  All right.  Any other objections on page

13  7?

14    MR. ROWLES:  Not for Plaintiff.

15    MS. DEGNAN:  No, Your Honor.

16    THE COURT:  All right.  Plaintiff's objection is

17  overruled on page 7.

18    We'll turn to page 8 where Question 5 is found, is there

19  objection here?

20    MR. ROWLES:  Yes, Your Honor.

21    Plaintiff objects to the question being given as

22  unnecessary in view of the evidence in the case and also

08:16  23  objects to the question as phrased for the same reason just

24  stated--it should be limited to the time through the date of

25  trial.

```
 1              THE COURT:  All right.  That objection is overruled.

 2   Is there any objection here from Defendants?

 3              MS. DEGNAN:  No, Your Honor.

 4              THE COURT:  Turning to page 9, which is the final

 5   page calling for the signature of the foreperson and the date,

 6   do we have any objections to that?

 7              MR. ROWLES:  Not from Plaintiff, Your Honor.

 8              MS. DEGNAN:  No, Your Honor.

 9              THE COURT:  All right.  That completes the formal

10   charge conference, counsel.

08:16  11         I'll make the necessary changes and get eight copies of

12   the instructions or the charge printed for the benefit of the

13   members of the jury, and I will then be back on the bench

14   thereafter, at which time I hope to bring in the jury and

15   begin with the Court's final instructions to the members of

16   the jury.

17         With that, the Court stands in recess.

18                   (Brief recess.)

08:17  19              THE COURT:  Be seated, please.

08:31  20         Counsel, is there anything the Court needs to hear from

21   you on before I bring in the jury, proceed to give them the

22   Court's final instructions, and allow counsel to present their

23   closing arguments?

24              MR. SHEASBY:  Nothing for Plaintiff, Your Honor.

25              THE COURT:  Anything from Defendants?
```

08:31   1              MR. CORDELL:  No, Your Honor, except that this

        2    morning we filed a notice of objections to issues that we

        3    dearly hope do not get raised during closing arguments.  But

        4    pursuant to the Court's very direct comments about objections

        5    during closing arguments, we wanted to make sure that those

        6    issues were aired and that we all understand kind of what the

        7    guardrails are.  And we're ready to proceed, and I'll do my

        8    absolute best to keep my seat and not disrupt the process.

08:31   9              THE COURT:  And when did you file this, Mr. Cordell?

       10              MR. CORDELL:  It was early this morning, Your Honor.

       11              THE COURT:  Well, as you're aware, the Court's been

       12    involved in a formal charge conference and printing revised

       13    copies of the final instructions to give to the jury as well

       14    as the verdict, and, honestly, I have had no opportunity to

       15    see whatever it is you filed.

       16         I have had obviously a discussion with lead counsel for

08:32  17    both parties in chambers about their closing arguments, and I

       18    want to be clear I have in no way precluded either party from

       19    raising an objection you feel compelled to make.

       20         I have simply indicated the Court's preference that

       21    unless it is material, substantive, and requires for

       22    preservation purposes an objection during closing, that the

       23    Court prefers there be no disruptions caused by objections

       24    unless it's absolutely necessary.

       25              MR. CORDELL:  And I certainly didn't mean to suggest

08:32    1    otherwise, Your Honor.  It's truly in the hope that the

         2    parties understand what the Court's prior rulings have been

         3    and it's been hopefully a good reminder.

         4             THE COURT:  All right.  Is there anything else?

         5             MR. CORDELL:  Not from Samsung.  Thank you.

         6             THE COURT:  All right.  For those of you in the

         7    gallery, I want to be completely clear before I bring in the

         8    jury that the Court considers its final instructions to the

         9    jury and counsels' closing arguments the most serious part of

08:33   10    an inherently serious process.

        11         Therefore, I just want to be completely clear if you have

        12    any kind of a device that under any circumstances can make any

        13    kind of sound or noise, make completely sure it will not to do

        14    that.  If it does, I will order it confiscated.  If you need

        15    to bring in a box of documents, if you need to shuffle papers,

        16    if you need to lean over and whisper to the person next to

        17    you, do it before I bring the jury in.

        18         I don't want any disruptions.  I don't want anything to

08:33   19    occur in the gallery or elsewhere in the courtroom that could

        20    detract from the jury's attention to the Court during its

        21    final instructions and the jury's attention to counsel as they

        22    present their closing arguments.

        23         With that, let's bring in the jury, please.

08:35   24             (Whereupon, the jury entered the courtroom.)

        25             THE COURT:  Good morning, members of the jury.

08:35

Please have a seat.  Welcome back.  Thank you for being prompt, as you have been throughout the trial.

Members of the jury, I now have final instructions on the law to present to you orally as I indicated yesterday.  I have already printed eight hard copies of the same instructions, and I'm going to send those copies back to you when you retire to the jury room to deliberate so you'll each have your own printed copy of those instructions I'm about to give you orally which you can refer to throughout your deliberations if you find it helpful or advantageous in any way.

08:35

So with that, I'll proceed to give you the Court's charge to the jury at this time.

You've now heard all the evidence in this case, and I'll now instruct you on the law that you must apply.

It's your duty to follow the law as I give it to you.  On the other hand and as I've said, you, the jury, are the sole judges of the facts in this case.  Do not consider any statement that I have made over the course of the trial or may make in the course of these instructions as an indication that I have any opinion about the facts in this case.

08:36

Now, you are about to hear closing arguments for the attorneys for both sides.  Statements and arguments of the attorneys are not evidence, and they are not, members of the jury, instructions on the law.  They are intended only to assist the jury in understanding the evidence and the parties'

competing contentions.

08:36    A verdict form has been prepared for you, and you'll take this verdict form with you to the jury room.  And when you've reached a unanimous agreement as to your verdict, you'll have your foreperson fill in the blanks in that form to reflect those unanimous answers, date it, sign it, and then advise the Court Security Officer you've reached a verdict.

Answer the questions as directed in the verdict form from
08:37    the facts as you find them to be.  Do not decide who you think should win the case and then answer the questions to reach that result.  Again, your answers and your verdict must be unanimous.

Now, in determining whether any fact has been proven in this case, you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them, and you may consider all the exhibits received and admitted into evidence, regardless of who may have
08:37    introduced them.

You, the jury, are the sole judges of the credibility of all the witnesses and the weight and effect of all the evidence.  In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You alone, members of the jury, are to determine the questions of credibility or truthfulness of the witnesses.

In weighing the testimony of the witnesses, you may

08:38    1    consider a witness' manner and demeanor on the witness stand,

2    any feelings or interest they may have in the case, any

3    prejudice or bias about the case that the witness may have,

4    and the consistency or inconsistency of their testimony,

5    considered in the light of the circumstances.

6         Has the witness been contradicted by other evidence?  Has

7    he or she made statements at other times and other places that

08:38    8    are contrary to what he or she said on the witness stand?  You

9    must give the testimony of each witness the amount of

10    credibility and weight that you think it deserves.

11         You must also keep in mind, members of the jury, that a

12    simple mistake does not mean that a witness is not telling the

13    truth.  You must consider whether any misstatement was an

14    intentional falsehood or a simple lapse in memory, and what

15    significance should be attached to that testimony.

08:39    16         As I've told you, the attorneys in this case are acting

17    as advocates for their competing clients and they have a duty

18    to raise objections when they believe evidence is being

19    offered that should not be admitted under the rules of the

20    Court.

21         Now, when the Court sustained an objection to a question

22    addressed to a witness, you must disregard that question

23    entirely, and you may draw no inference from its wording or

08:39    24    speculate or guess what the witness would have said if the

25    Court had permitted them to answer the question.

On the other hand, if the objection was overruled, then you should treat the answer to the question just as you would any other answer to any other question, as if the objection had not been made in the first place.

Now, by allowing the testimony or other evidence to be introduced over the objection of an attorney, the Court in so doing did not indicate any opinion as to the weight or the effect of that evidence.

Now, at various times during the trial, it's been necessary for the Court to talk to the lawyers outside of your hearing, either by having a conference here at the bench, or by calling a recess and talking to them while you were not in the courtroom.  This happens during trials because there are things that sometimes arise that do not involve the jury.  You should not speculate about what was said during any of those discussions which took place outside of your presence.

Also, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case.  One is direct evidence, such as the testimony of an eyewitness.  The other is indirect evidence, often called circumstantial evidence, that is, the proof of a chain of circumstances that indicates the existence or non-existence of certain other facts.

As a general rule, the law makes no distinction between direct evidence and indirect evidence or circumstantial

evidence, but simply requires that you find the facts based on all the evidence presented, both direct and circumstantial.

Now, during the course of the trial, you may have been shown documents with some portions of those documents which were redacted or blacked out. In those situations, you should not speculate or guess about what may have been redacted or why it was redacted. Those redactions you should know were approved by the Court prior to when the trial began. And as I told you earlier, your job was to focus on what you could see, not what you couldn't see because of redactions.

Now, certain testimony in this case has been presented to you through depositions. A deposition is the sworn, recorded answers to questions asked to a witness in advance of the trial. If a witness can't be hear to testify in person, then the witness' sworn testimony can be presented under oath in the form of a deposition.

Before the trial began, the attorneys representing the competing parties in the case questioned these deposition witnesses under oath. At that time, a court reporter was present, the witnesses were sworn and placed under oath, and then they were asked questions and they gave answers. Those questions and answers were recorded and taken down.

Deposition testimony, members of the jury, is entitled to the same consideration by you as testimony given by a person -- by a witness in person from the witness stand in

open court.  And you should, accordingly, judge the

credibility and the importance of deposition testimony to the

best of your ability, just as if the witness had testified in

person in open court.

08:43      Now, while you should consider only the evidence in this

case, you are permitted to draw such reasonable inferences

from the testimony and the exhibits as you feel are justified

in the light of common experience.  Said another way, you may

make deductions and reach conclusions that reason and common

sense lead you to draw from the facts that have been

08:43 established by the testimony and evidence in the case.

However, you should not base your decision on evidence

not presented by the parties during the case, including any

personal experience with any of the products that you might

have that were at issue in the case.

Now, unless I instruct you otherwise, you may properly

determine that the testimony of a single witness is sufficient

to prove any fact, even if a greater number of witnesses may

08:44 have testified to the contrary, if after considering all the

evidence you believe that single witness.

Also, when knowledge of a technical subject matter might

be helpful to you, the jury, a person who has special training

and experience in that technical field--they're called an

expert witness--is permitted to state his or her opinions on

those technical matters.  However, members of the jury, you're

08:44    1    not required to accept those opinions.  As with any other

2    witness, it is solely up to you to decide whether or not to

3    rely on what any expert witness or any witness, for that

4    matter, tells you.

5        Also, certain exhibits were shown to you over the course

6    of the trial that were illustrations.  We call these types of

7    exhibits demonstrative exhibits or often they're referred to

8    simply as demonstratives.  Demonstrative exhibits are a

08:45    9    party's depiction, picture, or model to describe something

10    involved in the trial.

11        If your recollection of the evidence differs from the

12    demonstratives, you should rely on your recollection of the

13    evidence.  Demonstratives are sometimes called jury aids and

14    demonstrative exhibits themselves are not evidence, but a

15    witness' testimony concerning a demonstrative is evidence.

16    Demonstrative exhibits will not be available for you to review

08:45    17    during your deliberations in the jury room.

18        Now, in any legal action, facts must be proven by a

19    required amount of evidence.  This is known as the burden of

20    proof.  The burden of proof in this case is on the Plaintiff

21    for some issues and on the Defendants for other issues.  And

22    there are two burdens of proof that you will apply in this

23    case.  As we've already discussed, these are the preponderance

08:46    24    of the evidence and clear and convincing evidence.

25        The Plaintiff in this case, Netlist, Inc., which you've

heard referred to throughout the trial either simply as the
Plaintiff or as Netlist, has the burden of proving patent
infringement by a preponderance of the evidence.  Netlist also
has the burden of proving willful patent infringement by a
preponderance of the evidence.  And Netlist has the burden of
proving damages for any patent infringement by a preponderance
of the evidence.

    As we've discussed, a preponderance of the evidence means
evidence that persuades you that a claim is more probably true
than not true and is sometimes talked about as being the
greater weight and degree of credible testimony.

    Now, the Defendants in this case, Samsung Electronics
Company, Limited, Samsung Electronics America, Inc., and
Samsung Semiconductor, Inc., which you've heard referred to
collectively throughout the trial either as the Defendants or
simply as Samsung, they have the burden of proving invalidity
of Netlist's patent claims by clear and convincing evidence.

    As we've discussed, clear and convincing evidence means
evidence that produces in your mind an abiding conviction that
the truth of the parties' factual contentions are highly
probable.  Although proof to an absolute certainty is not
required, the clear and convincing evidence standard requires
a greater degree of persuasion than is necessary for the
preponderance of the evidence standard.  If proof establishes
in your mind an abiding conviction in the truth of the matter,

08:48

1    then the clear and convincing evidence standard has been met.

2        And as I've previously told you, these two burdens of

3    proof are not to be confused at all with a different -- a

4    completely different burden of proof known as beyond a

5    reasonable doubt, which is the burden of proof applied in a

6    criminal case, and which has no application at all in a civil

7    case such as this one.  Beyond a reasonable doubt is a higher

8    standard than both the preponderance of the evidence and clear

9    and convincing evidence.

10       Now, as I did at the beginning of the case, I'll first

11   give you a summary of each side's contentions in this case.

12   I'll then provide you with detailed instructions on what each

08:48

13   side must prove to win on each of its contentions.

14       As I previously told you, this is an action for patent

15   infringement.  The Plaintiff Netlist contends that the

16   Defendants Samsung infringe certain claims of the asserted

17   patents.

18       Remember, there are three asserted United States patents

19   at issue in this case.  They are United States Patent No.

08:49

20   7,619,912, which you've heard referred to consistently as the

21   '912 Patent; United States Patent No. 11,093,417, which you've

22   heard referred to consistently as the '417 Patent; and United

23   States Patent No. 10,268,608, which you've heard referred to

24   consistently as the '608 Patent.  And I'll also refer to

25   these, as you've heard during the trial, collectively as the

08:49    1    asserted patents.

2         Now, Netlist contends that Samsung infringes the

3    following claims of the asserted patents:  Claim 16 of the

4    '912 Patent, claims 1, 2, and 8 of the '417 Patent, and claims

5    1 and 5 of the '608 Patent.  These are the asserted claims.

6         Netlist contends that Samsung has infringed the asserted

08:50    7    claim of the '912 Patent by making, using, selling, importing,

8    or offering for sale DDR4 RDIMM products and DDR4 LRDIMM

9    products.

10        Netlist contends that Samsung has infringed the asserted

11   claims of the '417 and the '608 Patents by making, using,

12   selling, importing, or offering for sale DDR4 LRDIMM products.

08:50    13       Netlist further alleges that Samsung's infringement of

14   the asserted patents has been willful.

15        Netlist contends that it's entitled to money damages in

16   the form of a reasonable royalty for Samsung's alleged

17   infringement.

18        Netlist has the burden to prove these issues by the

19   preponderance -- or by a preponderance of the evidence.

20        Now, Samsung denies that it infringes any of the asserted

08:51    21   claims from the asserted patents.  Samsung denies that it

22   makes, uses, offers for sale, sells, or imports any accused

23   product that infringe any of the asserted claims.

24        Samsung denies that any alleged infringement was willful.

25        Samsung further contends that the asserted claims from

08:52

08:52

08:52

08:53

1    the asserted patents are invalid because the specification in

2    those patents do not contain a sufficient written description

3    of the invention that's claimed.

4        Samsung has the burden to prove invalidity by clear and

5    convincing evidence.

6        Now, you may have heard that some old modes or devices in

7    this case referred to as prior art.  A previous device,

8    system, method, publication, or patent that predates the

9    claimed invention, that is, it is older than the patent, is

10   generally called prior art.

11       Whether any of the asserted patents are invalid over the

12   prior art is not a question for you to decide in this case,

13   and you should draw no inference from the fact that you're not

14   being asked to decide that question in that way.

15       Also, Samsung denies that it owes Netlist any money

16   damages.

17       Also, members of the jury, I'd like to remind you again

18   that prior to this case being filed, the parties, Netlist and

19   Samsung, entered into a written agreement between themselves,

20   which they called the Joint Development and License Agreement,

21   or JDLA for short.  And you have seen the JDLA and you've

22   heard about it as a part of this trial.

23       The JDLA provided that each party would have a license to

24   use the other party's patents during the existence of the

25   JDLA.  As of July 15, 2020, the JDLA was no longer in effect.

1    In other words, Samsung and Netlist were each licensed to the

2    other's patents under the JDLA until September [sic] 15, 2020.

3        I want to be clear, ladies of the jury, the JDLA itself

4    does not evidence that Samsung, in fact, needed a license to

5    the asserted patents owned by Netlist.  You may not rely on

08:53    6    the JDLA as evidence of infringement as to any of the asserted

7    Netlist patents.  However, you are permitted to take the JDLA

8    for what it says and for what it provides.

9        Now, invalidity and infringement, members of the jury,

10    are separate and distinct issues.  And your job is to decide

11    whether Samsung has infringed any of the asserted claims and

08:54    12    whether that infringement, if you find it, was willful, and

13    whether certain of the asserted claims are invalid.

14        If you decide that any claim has been infringed and is

15    not invalid, you will then need to decide what amount of money

16    damages, if any, are to be awarded to Netlist to compensate it

17    for that infringement.  If you decide that there was any

18    infringement and it was willful, that decision should not

19    affect any damages that you make.  The Court will take

08:54    20    willfulness into account later, if you find it.

21        Now, before you can decide many of the issues in this

22    case, you'll need to understand the role of the patent claims.

23    The patent claims are those numbered sentences at the end of

24    each patent.  The claims are important because it's the words

25    of the claims that define what a patent covers.  The figures

08:55

1    and the text in the rest of the patent provide a description

2    and/or examples of the invention, and they provide a context

3    for the claims, but it is the claims themselves that define

4    the breadth of the patent's coverage.

5        Each claim is effectively treated as if it were a

6    separate patent, and each claim may cover more or less than

7    another claim.  Therefore, what a patent covers depends, in

8    turn, upon what each of its claims covers.  You will first

08:55

9    need to understand what each claim covers in order to decide

10   whether or not there is infringement of the claim and to

11   decide whether or not the claim is invalid.

12       Now, the law says that it's my role to define the terms

13   of the claims and it's your role to apply my definitions to

14   the issues that you are asked to decide in this case.

15   Accordingly, as I explained to you at the start of the case,

16   I've already determined the meaning of certain language from

08:56

17   the claims, and I've provided to you my definitions of that

18   claim language and they're included in your jury notebooks.

19       These definitions are in the notebooks and can and should

20   be referred to throughout your deliberations.  And you must,

21   members of the jury, accept my definitions of these words in

22   the claims as being correct.  It's your job to take these

23   definitions that I have supplied and apply them to the issues

24   that you are deciding, including the issues of infringement

08:56

25   and invalidity.  And you should disregard any evidence

08:57

08:57

08:58

1  presented at the trial that contradicts or is inconsistent

2  with the constructions or definitions that I have given you.

3      Now, for claim language or limitations that I have not

4  construed or defined--that is, limitations I haven't

5  interpreted--you are to use and apply the plain and ordinary

6  meaning of that claim language and those limitations as

7  understood by a person of ordinary skill in the art, which is

8  to say, in the field of the technology of the patent at the

9  time of the alleged invention.  The meaning of the words of

10  the patent claims must be the same when deciding both

11  infringement and invalidity.

12      And as you are aware, you've been provided in your

13  notebooks with complete copies of each of the three asserted

14  patents, and you may refer to them throughout your

15  deliberations.

16      Now, several times in these instructions, I have or will

17  refer to a person of ordinary skill in the field of the

18  invention, or a person of ordinary skill in the art.  In

19  deciding the level of ordinary skill in the field, you should

20  consider all the evidence introduced at trial, including but

21  not limited to:  (1) the levels of education and experience of

22  the inventor or other persons actively working in the field;

23  (2) the types of problems encountered in the field; (3) the

24  previous solutions to those problems; (4) the rapidity with

25  which innovations are made; and (5) the sophistication of the

technology.

Now, the claims are intended to define, in words, the boundaries of the inventor's rights.  Only the claims of a patent can be infringed.  Neither the written description, nor the drawings of a patent can be infringed.  And each of the claims must be considered individually.

I'll now explain to you, members of the jury, how a claim defines what it covers.

A claim sets forth, in words, a set of requirements.  Each claim sets forth its requirements in a single sentence.  If a product satisfies each of these requirements, then it is covered by the claim.  And there can be several claims in a patent, and each claim may be narrower or broader than another claim by setting forth more or fewer requirements.

The coverage of a patent is assessed on a claim-by-claim basis.  And in patent law, the requirements of a claim are often referred to as the claim elements, or they're often referred to as the claim limitations.  When a product meets all of the requirements of a claim, the claim is said to cover that product, and that product is said to fall within the scope of that claim.

In other words, a claim covers a product where each of the claim elements or limitations is present in that product.  And if a product is missing even one limitation or element of a claim, the product is not covered by the claim.  And if the

1    product is not covered by the claim, the product cannot

2    infringe the claim.

3        Now, the beginning portion, or preamble, of a claim often

09:00    4    uses the word 'comprising'.  The word 'comprising', when used

5    in the preamble, means including but not limited to, or

6    containing but not limited to.  Now, when comprising is used

7    in the preamble, if you decide that an accused product

8    includes all the requirements of that claim, that claim is

9    infringed.  And that is true even if the accused product

10    contains additional elements.

11        For example, a claim to a table comprising a tabletop,

09:00    12    legs, and glue, would be infringed by a table that includes a

13    tabletop, legs, and glue, even if that table also contains

14    other structures, such as leaves that would expand the size of

15    the tabletop or wheels that might go on the ends of the legs.

16        Now, this case involves two types of patent

17    claims--independent claims and dependent claims.  An

09:01    18    independent claim, ladies of the jury, does not refer to any

19    other claim in the patent.  An independent claim sets forth

20    all the requirements that must be met in order to be covered

21    by the claim.  It is independent.  It's not necessary to look

22    at any other claim to depend -- or, excuse me, to determine

23    what an independent claim covers.

24        On the other hand, a dependent claim does not itself

25    recite all the requirements of the claim, but it refers to

09:02    1    another claim for some of its requirements.  In that way the

2    claim depends on another claim.  A dependent claim

3    incorporates all the requirements of the claim to which it

4    refers or, as we say, from which it depends, as well as all

5    the requirements in the dependent claim itself.

6         So a dependent claim includes all the requirements of the

09:02    7    claim to which it refers or from which it depends, and then

8    the dependent claim adds its own additional requirements.  So

9    to determine what a dependent claim covers, it's necessary to

10    look at both the dependent claim itself and any other claim to

11    which it refers or, we say, from which it depends.  A product

12    that meets all the requirements of both the dependent claim

13    and the claim or claims to which it refers is covered by that

09:02    14    dependent claim.

15         Now, for the '912 Patent, claim 16 is an independent

16    claim.

17         For the '417 Patent, claim 1 is an independent claim, and

18    claims 2 and 8 are dependent claims that each depend from

19    independent claim 1.

20         For the '608 Patent, claim 1 is an independent claim, and

21    claim 5 is a dependent claim that depends from independent

22    claim 1.

09:03    23         I'll now instruct you on infringement in more detail.  If

24    a person or a corporation makes, uses, sells, or offers to

25    sell within the United States, or imports into the United

        1   States what is covered by a patent claim without the patent

        2   owner's permission, that person or corporation is said to

        3   infringe the patent.

        4       In reaching your decision on infringement, keep in mind,

09:03   5   members of the jury, that only the claims of a patent can be

        6   infringed.  And you must compare the asserted claims as I

        7   might have defined or construed them for you to the accused

        8   products in order to determine whether or not there is

        9   infringement.  This is the only correct comparison.  Let me

       10   say that again.  You must compare the asserted claims as I

       11   have construed some of the language within them to the accused

09:04  12   products, the claims to the accused products, to determine

       13   whether or not there is infringement.

       14       And you should not compare the accused products with any

       15   specific examples set out in the patent, with any prior art,

       16   with Netlist's own products in reaching any decision on

       17   infringement.

       18       In deciding infringement, let me be clear, the only

       19   correct comparison is between the accused Samsung products and

09:04  20   the limitations of the claims as the Court has interpreted any

       21   language within them.

       22       You must reach your decision as to each assertion of

       23   infringement based on my instructions about the meaning and

       24   scope of the claims, the legal requirements for infringement,

       25   and the evidence presented to you by both of the parties

during the trial.

Further, the JEDEC standards that you have heard about in this case and any adopted standards that emanate from the JEDEC committee or group does not impact the issue of infringement or non-infringement.

I'll now instruct you on the specific rules that you must follow to determine whether Netlist has proven that Samsung has directly infringed one or more of the asserted claims involved in this case.

A patent can be directly infringed even if the alleged direct infringer did not have knowledge of the patent and without the direct infringer knowing that what it did was infringement of the claim. A patent may also be directly infringed even though the accused direct infringer believed in good faith that what it did or was doing was not infringement of the patent. Infringement does not require proof that a party copied its product from the asserted claims.

Now, you must determine, separately for each asserted claim, whether or not there is infringement. However, if you find that an independent claim upon which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers directly or indirectly to that independent claim.

On the other hand, if you find that an independent claim has been infringed, then you still must decide, separately,

1    whether the product meets the additional requirements of any

2    claims that depend from that independent claim--that is,

3    whether those claims have also -- those dependent claims also

4    have been infringed.  A dependent claim includes all the

5    requirements of any claim to which it refers or from which it

6    depends, plus its own additional requirements.

7         Now, in order to prove direct infringement of an asserted

09:07   8    claim, the Plaintiff Netlist must show by a preponderance of

9    the evidence that the accused products include each and every

10   limitation or element of the asserted claim.  In determining

11   whether the accused products directly infringe a patent claim

12   in this case, you must compare the accused Samsung products

13   with each and every one of the requirements or limitations of

09:07   14   that claim to determine whether the accused product contains

15   each and every requirement or limitation recited within that

16   claim.

17        An accused product infringes a claim if it satisfies all

18   of the claim elements, even though it may also be capable of

19   non-infringing modes of operation.  An accused product does

20   not infringe simply because it is possible to alter it in a

21   way that would satisfy all the requirements of a claim.

09:08   22   Instead, where claim language describes capabilities of a

23   claimed device, the patent holder must prove that the accused

24   product is reasonably capable of performing the claimed

25   functions without significant alteration and that the accused

1    product, when put into operation, in fact executes all of the

2    claimed functions at least some of the time or at least once

3    in the claim-required environment.

09:08    4        Now, a claim requirement is literally present if it

5    exists in an accused product just as it is described in the

6    claim language, either as I have construed that language for

7    you or, if I did not construe or explain it, as it would have

8    been understood by its plain and ordinary meaning by a person

9    of ordinary skill in the art.  If an accused product omits any

10    element recited in a claim, then you must find that the

11    product in question does not literally infringe that claim.

09:09    12        So long as an accused product has each and every one of

13    the claim requirements, infringement of that claim is shown,

14    even if the product contains additional features or elements

15    that are not required by the claim.

16        Now, Netlist also contends in this case that Samsung has

17    willfully infringed the asserted patents.  If you decide that

18    Samsung has infringed, then you must go on to address the

09:10    19    additional issue of whether or not that infringement was

20    willful.  Netlist has the burden of proving willful

21    infringement by a preponderance of the evidence.  You may not

22    determine that infringement was willful just because Samsung

23    knew of the asserted patents and infringed them.

24        Also, knowledge of patents in the same portfolio or

25    family in and of itself is insufficient to establish a

09:10  1    willfulness claim.  Netlist must show that Samsung knew of the

2    specific asserted patents.  At the same time, knowledge of the

3    existence of a patent, pending patent application, or a patent

4    family can be relevant to the question of willful

5    infringement.  You may find that Samsung willfully infringed

6    if you find that Samsung deliberately or intentionally

7    infringed the asserted patents.

09:10  8         To determine whether Samsung acted willfully, consider

9    all the facts and assess Samsung's knowledge at the time of

10   the challenged conduct.  Facts that may be considered include

11   whether or not Samsung reasonably believed that it did not

12   infringe or that the asserted patents were invalid.

13        If Samsung was willfully blind to Netlist's patent rights

14   and Samsung's state of mind, coupled with that willful

09:11  15   blindness, shows a deliberate or intentional mindset, then

16   willful infringement can be shown.

17        You may find that a dependent is willfully blind when it

18   is indifferent to the rights of another or when it proceeds in

19   disregard of a high degree or an excessive danger of

20   infringement that is known to it or that would have been

21   apparent to a reasonable person in its position.

09:11  22        Your determination, members of the jury, of willfulness

23   should incorporate the totality of the circumstances based on

24   the evidence presented during this trial.  Willfulness can be

25   established by circumstantial evidence.  Now, the JEDEC

1    standards and their development may be considered as a part of

2    the totality of the circumstances in deciding whether Netlist

3    has proven that any infringement by Samsung was willful.

09:12    4        If you decide that any infringement was willful, that

5    decision should not affect any money damages that you award.

6    The Court will take willfulness into account later, if you

7    find it.

8        I'll now instruct you on the rules that you must follow

9    in deciding whether or not Samsung has proven that any of the

10    asserted claims of the asserted patents are invalid.

11        An issued United States patent is accorded a presumption

09:12    12    of validity based on the presumption that the United States

13    Patent and Trademark Office, which you've heard referred to

14    throughout the trial simply as the PTO, sometimes as the

15    Patent Office, acted correctly in issuing the patent.  This

16    presumption of validity extends to all issued United States

17    patents.

18        In order to overcome this presumption, Samsung must

19    establish by clear and convincing evidence that a claim is

09:13    20    invalid.  Like infringement, invalidity is determined on a

21    claim-by-claim basis.  And you must determine separately for

22    each claim whether that claim is invalid.  If one claim of a

23    patent is invalid, this does not mean that any other claim is

24    necessarily invalid.

25        Now, claims are construed in the same way for determining

09:13

1    infringement as for determining invalidity.  And you must

2    apply the claim language consistently and in the same manner

3    for the issues of infringement and for the issues of

4    invalidity.  In making your determination as to invalidity,

5    you should consider each claim separately.

6        Now, Samsung contends that the asserted claims are

7    invalid for failure to satisfy the written description

8    requirement.  As I previously explained, to obtain a patent,

9    one must first file an application with the United States

10   Patent and Trademark Office, the PTO.  This process of

09:14   11   obtaining a patent is called patent prosecution.  And the

12   specification is required to contain a written description of

13   the claimed invention telling what the invention is, how it

14   works, how to make it, and how to use it.  The written

15   description requirement is designed to ensure that the

16   inventor was in possession of the full scope of the claimed

17   invention as of the patent's priority date.

09:14   18       To succeed on its claims of a lack of an adequate written

19   description, Samsung must show by clear and convincing

20   evidence that a person having ordinary skill in the field

21   reading the patent specification as of the priority date of

22   the patent would not have understood that the specification

23   describes the full scope of the invention as it is claimed in

24   the claims of the patent.

25       In other words, a patent may be invalid if its

09:15    1    specification does not describe the claimed invention with

2    sufficient detail that someone skilled in the art can

3    reasonably conclude that the inventor actually had full

4    possession of the invention that he or she is claiming.  If a

5    patent claim lacks an adequate written description, it is

6    invalid.

7        In deciding whether the asserted claims satisfy this

8    written description requirement, you must consider the

09:15    9    description from the viewpoint of a person having ordinary

10    skill in the field of the technology of the patent as of the

11    filing date of the patent.  The specification must describe

12    the full scope of the claimed invention, including each

13    element thereof, either expressly or inherently.

14        A claimed element is disclosed inherently if a person

15    having ordinary skill in the field as of the priority date

09:16    16    would have understood that the element is necessarily present

17    in what the specification discloses.

18        Now, the written description does not have to be in the

19    exact words of the claim.  The requirement may be satisfied by

20    any combination of the words, structures, figures, diagrams,

21    formulas, et cetera, contained in the patent specification.

22    An adequate written description does not require either

23    examples or an actual reduction to practice of the claimed

24    invention.

09:17    25        However, a mere wish or plan for obtaining the claimed

1  invention is not an adequate written description.  Rather, the

2  level of disclosure requirement depends on a variety of

3  factors, such as the existing knowledge in the particular

4  field, the scope and content of the prior art, the maturity of

5  the science or technology, and other considerations

6  appropriate to the subject matter.

09:17  7      Prior art, members of the jury, includes a previous

8  device, system, method, publication, or patent that predates

9  the claimed invention, and may include items that were

10  publicly known or have been used or offered for sale, or

11  references, such as publications or patents, that disclose the

12  claimed invention or elements of the claimed invention.  Prior

13  art may be authored or created by anyone.  The issue of

09:17  14  written description is decided on a claim-by-claim basis, not

15  as to the entire patent or groups of claims.

16      Now, if you find that Samsung has infringed any valid

17  claim of the asserted patents, then you must go on to consider

18  the amount of damages, if any, to award to Netlist.

19      I'll now instruct you about the measure of damages, but

20  by instructing you on damages, members of the jury, I am not

09:18  21  suggesting which party should win this case on any issue.  If

22  you find that Samsung has not infringed any valid asserted

23  claim, then Netlist is not entitled to any damages.

24      Now, for the accused RDIMM products, the damages period

25  begins on August the 1st, 2022, for the '912 Patent.  For the

09:18

accused LRDIMM products, the Plaintiff Netlist contends that
the damages period begins on July 15, 2020, for the '912
Patent, and on June 8th, 2022, for the '417 and '608 Patents,
while the Samsung Defendants contend that the damages period
begins on August the 1st, 2022, for the '912 Patent, and on
August 15th, 2022, for the '417 Patent, and on January the
20th, 2023, for the '608 Patent.

09:19

You must determine when the damages begin for the accused
LRDIMM products.  Damages commence on the date that Samsung
has both infringed and been notified of the alleged
infringement by Netlist.  Netlist must prove actual notice in
order to recover on any pre-suit damages.

You may only award damages to Netlist for infringement
that occurred after Netlist gave actual notice to Samsung.

09:19

Actual notice means that Netlist communicated to Samsung a
specific charge of infringement of the asserted patents by a
specified product or products.

Actual notice of a related patent is not by itself actual
notice.  The filing of the complaint in this case qualifies as
actual notice, such that the damages period in this case
begins no later than the date the complaint was filed, which

09:20

is August the 1st, 2020, for the '912 Patent; August 15th,
2022, for the '417 Patent; and January 20th, 2023, for the
'608 Patent.  However, members of the jury, actual notice
prior to filing the complaint can be shown and established if

         1    the above circumstances are met.

         2        Now, Netlist has the burden to establish the amount of

         3    its damages by a preponderance of the evidence.  In other

09:20    4    words, you should award only those damages that Netlist

         5    establishes that it more likely than not suffered as a result

         6    of Samsung's infringement, if any.  While Netlist is not

         7    required to prove the amount of its damages with mathematical

         8    precision, it must prove them with reasonable certainty.  And

         9    Netlist is not entitled to damages that are remote or that are

        10    only speculative.

        11        And the damages that you award, members of the jury, if

09:21   12    any, must be adequate to compensate Netlist for any

        13    infringement that you may find.  You must not award to Netlist

        14    more damages than are adequate to compensate it for the

        15    infringement, and you must not include any additional amount

        16    in any damages you award for the purpose of punishing Samsung

        17    or for the purpose of setting an example.

        18        I'll now instruct you on how to calculate reasonable

        19    royalty damages.

09:21   20        A royalty, members of the jury, is a payment made to a

        21    patent holder in exchange for the right to make, use, or sell

        22    the claimed invention.  A reasonable royalty is the amount of

        23    royalty payment that a patent holder and the alleged infringer

        24    would have agreed to in a hypothetical negotiation taking

        25    place at a time prior to when infringement first began.

09:22

1    In considering this hypothetical negotiation, you should

2    focus on what the expectations of the patent holder and the

3    alleged infringer would have been had they entered into an

4    agreement at that time, and had they acted reasonably in their

5    negotiations.

6    In determining this, you must assume that both parties

7    believed the patent was valid and infringed and that both

8    parties were willing to enter into an agreement.  The

9    reasonable royalty that you determine must be a royalty that

10   would have resulted from the hypothetical negotiation and not

09:22

11   simply a royalty that either party would have preferred.

12   Evidence of things that happened after infringement first

13   began can be considered in evaluating the reasonable royalty,

14   but only to the extent that that evidence aids in assessing

15   what royalty would have resulted from a hypothetical

16   negotiation.

17   In the context of the hypothetical negotiation, it's not

18   necessarily the case that each valid and infringed patent in

09:23

19   the hypothetical negotiation contributes equally to the amount

20   that an alleged infringer would pay for that license, or that

21   each patent covered by other licenses that were presented

22   contributes equally to the amount that was paid for those

23   licenses --

24   The law requires that any royalty awarded to Netlist

25   correspond to the value of the alleged inventions within the

09:23    1    accused products, as distinct from other unpatented features

2    of the accused products.  And this is particularly true where

3    the accused products have multiple features and multiple

4    components not covered by the patents and where the accused

5    products work in conjunction with other non-patented items.

6        Now, the amount you find as damages must be the value

7    attributable to the patented technology.  If unpatented

8    features contribute to the accused products, you must

09:24    9    apportion that value to exclude any value attributable to

10   unpatented features.  You must determine the appropriate

11   royalty rate and the appropriate royalty base that reflect the

12   value attributable to the patented invention alone.  Netlist

13   bears the burden to establish the amounts attributable to the

14   patented features.

15       Now, in addition to determining the reasonable royalty,

09:24    16   you must also determine the type of royalty that Netlist and

17   Samsung would have agreed to in a hypothetical negotiation

18   regarding Samsung's alleged use of the accused -- of the

19   asserted patents.

20       Now, one type of reasonable royalty is a lump-sum

21   royalty.  A lump-sum royalty is when the infringer pays a

22   single price for a license to use a patent throughout the life

09:25    23   of the patent.  As such, a lump sum royalty compensates the

24   patent holder for damages for both past infringement and for

25   future infringement throughout the life of the patent.

09:25

Another type of reasonable royalty is a running royalty. A running royalty, members of the jury, is a fee paid for the right to use the patent that is paid for each unit of the infringing products that have been or that will be sold. If there are additional units sold in the future, damages for these future sales will not be addressed by you today, but can be recovered by the Plaintiff in the future.

If you decide that a running royalty is appropriate, then the damages that you award, if any, should reflect the total amount necessary to compensate Netlist for Samsung's past infringement from the first date of infringement through the date of the trial, understanding that Samsung will still have to pay Netlist for each patent practicing unit that it sells after the date of the trial and throughout the remaining life of the patent, even though you will not have to factor those future amounts into any award that you may make in your verdict in this case.

09:26

Now, in determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the alleged infringement began.

09:26

Some of the factors that you may consider in making your determination are:

1. The royalties received by the patentee for licensing of the patents-in-suit, proving or tending to prove an established royalty;

2.   The rates paid by the licensee for the use of other patents comparable to the patents-in-suit.  Comparable license agreements include those covering the use of the claimed invention or similar technology;

3.   The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted, in terms of territory or with respect to whom the manufactured product may be sold;

4.   The licensor's established policy and marketing program to maintain its patent exclusivity by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity;

5.   The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same lines of business;

6.   The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales;

7.   The duration of the patent and the term of the license;

8.   The established profitability of the product made under the patents, its commercial success, and its current popularity;

09:28

09:29

09:29

        9.   The utility and advantages of the patented property

over the old modes or devices, if any, that had been used for

working out similar results;

        10.  The nature of the patented invention, the character

of the commercial embodiment of it as owned and produced by

the licensor, and the benefits to those who have used the

invention;

        11.  The extent to which the infringer has made use of

the invention and any evidence probative of the value of that

use;

        12.  The portion of the profit or of the selling price

that may be customary in the particular business or in

comparable businesses to allow for the use of the invention or

analogous inventions;

        13.  The portion of the realizable profits that should be

credited to the invention as distinguished from non-patented

elements, the manufacturing process, business risks, or

significant features or improvements added by the infringer;

        14.  The opinion and testimony of qualified experts; and

        15.  The amount that a licensor (such as the patentee)

and a licensee (such as the infringer) would have agreed upon

(at the time the infringement began) if both had been trying

reasonably and voluntarily to reach an agreement--that is, the

amount which a prudent licensee, who desired as a business

proposition to obtain a license to the patented invention,

09:30

1    would have been willing to pay as a royalty and yet be able to

2    make a reasonable profit and which amount would have been

3    acceptable to a prudent patentee who was willing to grant a

4    license.

5         You may have heard these factors referred to as the

6    *Georgia-Pacific* factors.  No one of these factors is

7    dispositive, and you can and you should consider the evidence

8    that's been presented to you in this case on each of these

9    factors.  You may also consider, members of the jury, any

09:30

10   other factors which, in your mind, would have increased or

11   decreased the royalty the alleged infringer would have been

12   willing to pay, and the patent owner would have been willing

13   to accept, acting as normally prudent business people.

14        Now, in determining a reasonable royalty, you may also

15   consider evidence concerning the availability, or lack

16   thereof, of acceptable non-infringing substitutes or

09:31

17   alternatives to the patented invention.  To be an acceptable

18   non-infringing alternative, the product must have the

19   advantages of the patented invention that were important to

20   people who purchased an alleged infringer's product.

21        You may compare the patented invention to non-infringing

22   alternatives to determine the value of the patented invention,

23   including the utility and advantages of the patent over the

24   old modes or devices, if any, that had been used for achieving

25   similar results.

09:31    1    The party asserting that there is a non-infringing

2    alternative has the burden to show by a preponderance of the

3    evidence that a proposed non-infringing alternative was

4    available at the time of the hypothetical negotiation and

5    during the damages period.  You should not consider for

6    damages purposes any alternatives that have not been shown to

7    be acceptable and available at the time of the hypothetical

8    negotiation.

09:32    9    Now, members of the jury, with this and at this time,

10    we'll proceed to hear closing arguments from the attorneys in

11    the case.

12    The Plaintiff may present its first closing argument to

13    the jury.

14    Would you like a warning on your time, Mr. Sheasby?

15    MR. SHEASBY:  Your Honor, could I have a warning

16    with 10 minutes used and with 18 minutes used.

17    THE COURT:  I will give you those warnings when they

18    are reached.  You may proceed with your closing argument at

19    this time.

09:32    20    MR. SHEASBY:  May it please this Honorable Court.

21    Honorable ladies of this jury, I want to express on

22    behalf of Netlist our gratefulness for your service this week

23    and last.  We understand that it's a personal sacrifice, we

24    understand it is a professional sacrifice, but I hope you can

25    understand how incredibly important this case is to Netlist.

09:33    1    Netlist was founded in 2000 in Irvine, California, to

2    innovate in the field of memory modules.  And at PX 30 at 10,

3    you can see that some of the most important and innovative

4    companies in the world have sought out our designs.  Many of

5    those companies are now Samsung's customers.

09:34    6    We spoke to Samsung at a presentation about how our

7    patented technology would be able to dramatically improve the

8    performance of RDIMM and LRDIMM.

9    In contemporaneous meeting notes, PX 13 at 1 and 2, we

10    presented this to some of the most senior Samsung engineers,

09:34   11    and their statements were candid and true--that our technology

12    had -- was a threat to them, that our technology would take

13    away their market dominance in LRDIMM and RDIMM, and they were

14    very focused on our patents at DDR4.  The products that

09:34   15    infringe the Netlist patents-at-issue in this case are those

16    products--the DDR4 LRDIMM and RDIMM.

17    Samsung launched those products without permission from

18    us before the joint development agreement was signed.  Upon

19    termination of the joint development agreement, it had an

09:35   20    absolute, clear contractual and legal obligation to cease the

21    use of our patents, full stop, just like everyone in this room

22    is obligated to comply with United States law.  And they chose

23    not to.  And they chose not to because after 10 years they

24    have never found anything more powerful, they have never found

25    anything more advanced than the patents of Netlist that are

09:35    1    being used since the termination of the agreement.

         2        There are four questions you'll be asked to

         3    decide--infringement, validity, willfulness, and damages.  And

         4    I will speak to all four of those questions.  But before I do

         5    so, I spoke to you at the beginning of this case about your

         6    constitutional power, your constitutional power to sit and

09:36    7    decide the most important questions in our society.

         8        And part of that constitutional power is that you are the

         9    gatekeepers of truth.  There's no system somewhere that stops

        10    witnesses from presenting you with inaccurate information or

        11    telling you things that are contradicted by the record

        12    evidence.  The gatekeepers in this case are you.  And the

09:36   13    Judge expressly instructed you of that fact when he spoke

        14    about the fact that you are the sole judge of credibility.

        15        And I'm going to give you some examples of what I think

        16    the record showed about credibility and about the gatekeeper

        17    function in this case.

        18        We heard from Samsung's expert, Mr. McAlexander.  And I

        19    liked him quite a bit.  I thought his voice was so powerful,

        20    and it's not shocking to me that Samsung has hired him 10 or

        21    12 times to be their expert witness and he describes them as

09:37   22    his biggest customer.  But what Samsung did to him is a

        23    powerful evidence of credibility.  They made him show this

        24    slide which had a little snippet of code, and he told you that

        25    this code showed that the determination of delay did not occur

1    in the buffer.

2        But the reality is that Samsung had snipped out the code.

09:37   3    You see the lighted portion of the code?  That lighted portion

4    of the code which I then underlined says BCBx.  He told you

5    this code showed you that the delay was not in the buffer.

6    But when he was confronted with that code on cross

7    examination, he admitted that BCBx, which was obscured in the

09:38   8    slide he made to you, was in the buffer itself.

9        You are the gatekeepers of truth.  And, in fact, if you

10    look at JX 27, you will see that that hidden code, BCBx and F9

11    as he told you means bits 0 through 8, BCBx, which is in the

12    buffer, is in the control -- is in the buffer itself.  You are

13    the gatekeepers of truth.

09:38   14    Let me give you another example.  The Court instructed

15    you that the question of whether Samsung intended to use these

16    patents, they knew they used these patents, they believed they

17    didn't use these patents is utterly irrelevant to the question

18    of infringement, because this is a constitutional property

19    right.  It's a sacred property right.  It doesn't matter if

20    you intended or not, you cannot use it without permission.

21        And we heard testimony from Mr. Yoon.  And I like Mr.

22    Yoon very much.  He spoke about his daughter, he spoke about

09:39   23    how loyal he was to the company, and he testified multiple

24    times, he said, I have checked, ladies and gentlemen of the

25    jury, and I spoke to an engineer, and his name was Seung-Mo

1    Jung, and he told me, we never used these patents, we never

2    heard of these patents.

3         Now, there's a procedure in place that made sure that Mr.

4    Yoon could not hear the testimony of any other fact witness

09:39    5    who had testified in this case.  Samsung allowed him to give

6    this testimony pointing to Seung-Mo Jung as having reported to

7    him that no one had looked at our patents.

8         This is the testimony of Seung-Mo Jung which was given

9    under oath in this case by deposition earlier before Mr. Yoon

10    testified.  As the Court said, it is equal to the same level

09:40    11    of seriousness and the same oath as given in person.  And Mr.

12    Jung testified that he did nothing to investigate who used our

13    patents.  You are the gatekeepers of truth.

14         The first issue you are asked to decide--infringement.

15    Infringement means that all the elements must be present in a

16    claim.  But if the claim does -- if the device does other

09:40    17    things, that's irrelevant; it only needs to do what's claimed.

18    Additional features are irrelevant.

19         I'd like Dr. Mangione-Smith to stand now, please.

20         Dr. Mangione-Smith -- Dr. Mangione-Smith, you've got to

21    stand up one more time.

22         Four-and-a-half hours he testified for you.  He walked

23    you through each limitation of each claims.  He didn't make

09:41    24    silly analogies, he didn't gloss over things.  He showed you

25    every piece of evidence that establishes infringement.

09:42

1    For the '608 Patent, claims 1 and claims 5 are alleged to

2    be infringed, and the only dispute is as to one element of

3    claim 1.  And that element that was in dispute, and I walked

4    Mr. McAlexander through every single one of these limitations,

5    if you remember, and I got him to admit he wasn't disputing

6    the presence of any single one of these limitations except he

7    was disputing about whether the delay is determined by a

8    processing unit in the buffer.  That was the only basis of

9    non-infringement.

10   The Court has said you must compare the asserted claims

11   as I have construed them.  And when I cross-examined Mr.

12   McAlexander, his explanation for why he thought that

13   limitation was not made about determination was not about how

14   the claim had been construed by the Court, it wasn't about the

15   plain language of the claims.  It was because he added

16   language to the claims of saying, oh, it has to have an

17   independent state machine.  He added language to the claims

18   which say only the buffer can be involved in the determination

19   and nothing else can apply.

20   THE COURT:  Ten minutes have been used.

21   MR. SHEASBY:  That is a violation of the

22   instructions given to you by the Court.

23   Now, the reason why Mr. McAlexander had to add

24   limitations to the claims is because in the LRDIMMs there are

25   data buffers, and these are the read and write data paths on

1239

                the right.  Dr. Mangione-Smith spoke to you about those.

                    And what those data buffers include is buffer control

                words.  And what those buffer control words are is the delay

09:43           that is used for reads and writes.  If someone says to you,

                are you sure the buffer is what's causing the delay, in

                deliberations, you take them to JX 27-95.  You write that down

                and you tell them it's in the confidential documents.

                    Samsung got up in this court and told you the buffers

                don't determine the delay, and it's the exact opposite, the

                exact opposite, of what is presented in the confidential

09:43           documents that are in evidence in this case.

                    Dr. Mangione-Smith also showed you code.  The code that

                talks about delay.  And you see those plusses and minuses in

                that, being the code that's highlighted?  He taught you how to

                read that code.  He taught you that those plusses and minuses

                mean that the calculation of the delay is in the buffer.  This

                code was entirely ignored by Mr. McAlexander on his

                examination.

09:44               The importance of the '608 Patent, if someone tells you

                this technology is not important, you don't need it for high

                speed, I heard some Samsung lawyer tell me that, you point him

                to JX 27 at 35.  JX 27 at 35, in which the confidential

                documents admit that it is required for speeds above 2400

09:45           MT/s.

                    '912 Patent, claim 16, Mr. McAlexander was forced to

1    admit that element A, B, C, D, E -- D, F, and G were all

2    undisputed, and then when we pressed him on what was his

3    reason for why the other elements he was claiming were not

4    infringed, it was the same tactic.  He didn't base it on what

5    the claim said, he didn't base it on the Court's claim

6    construction.  He just added limitations about tricking the

09:45    7    memory controller.

8         In your binder, you will see a chart of claim

9    constructions.  Tricking the memory controller will not appear

10    in that chart of claim constructions.  And, in fact, what the

11    claims show in element D is they speak about a set of input

12    signals coming in.  And Dr. Mangione-Smith taught you this, JX

13    11 at 2.  Those input signals are the chip select signals.

09:45    14         The claim then talks about a set of output signals that

15    come out of the RCD.  Those are also the chip select signals.

16    JX 11 at 18 -- at 8 makes clear that those signals, input chip

17    select signals and output chip select signals, are exactly

18    what is specified in the claims, inputs and outputs.  And JX

09:46    19    33 at 7 makes clear that they control an internal rank.

20         Someone says, I'm not so sure that those chip select

21    signals control ranks, you point them to JX 33 at 7, and you

22    ask them to explain how Samsung's lawyers can stand up in this

23    court and deny that the chip select signals control ranks, the

24    exact opposite of what is said in their documents.

25         And what the system achieves is an elegant system in

1241

09:46

1    which a set of chip select signals come in which are smaller.

2    The RCD outputs a larger set of chip select signals.  And so a

3    memory controller can send in, for example, four chip select

4    signals and the RCD can use it to control eight ranks, for

5    example.

6        He also disputed element E, but his dispute was that,

7    well, a command signal is not sent with inputs.  JX 30 at 29,

09:47

8    the MRS command is defined as a command signal.  If someone

9    says, there's no command signal sent, you point them to JX 30

10   at 29.  And if someone says, those are not input signals, the

11   chip select, the bank address, and the address signals, you

12   point them to JX 33 at 7, which definitively establish

13   infringement of these claims.

14       Every limitation is met, and it's met based on the

15   confidential documents of Samsung's and their third-party

09:48

16   partners' own engineers.

17       Samsung spoke about the fact that the '912 Patent is not

18   important, and they threw up this slide of all these different

19   alternatives that they claim could have been used.  Not a

20   single Samsung engineer testified that these alternatives were

21   viable and, in fact, Mr. McAlexander testified that, despite

22   having this long relationship with Samsung, they never once

09:48

23   gave him access to Samsung engineers to ask their opinions

24   about the importance of our invention.  I would submit there's

25   a reason for that, and the reason is since the termination of

1   this agreement, our technology is being infringed.

2       The '417 Patent, claims 1, 2, and 8, the only disputed

3   limitation?  Configurable to output the data control buffer

4   signals.  In other words, there must be an output of signals,

09:48   5   plural.  I walked him through every single one of these other

6   limitations, and he conceded there was no dispute as to

7   infringement.  He conceded it.

8       JX 16 at 39, if someone says, I'm not so sure there's

9   output signals coming in plural, you can point them to JX 19

10  at 39.  You can look at Samsung's own documents which talks

11  about control bus signals from the buffer, and that those have

09:49   12  a signal count of four, a plural number.

13      And the technical importance of the '417, someone says

14  this is not important, this is old technology, one of their

15  most senior engineers who testified for 29 years -- excuse me,

16  who worked for 29 years at Samsung testified under oath that

17  at high speed and high density, the buffer must be used.

09:50   18      You are the gatekeepers of truth, and the truth lies not

19  in arguments that Samsung counsel stands up and makes and,

20  respectfully, it does not even lie in the arguments that I

21  stand up and make.  It lies in the documents whose exhibit

22  numbers I have read into the record for you that establish

23  definitively that these limitations are met.

09:50   24      Validity.  There is a presumption of validity.  And

25  validity must be proven by clear and convincing evidence,

whereas simply a 51 percent pebble in our favor is sufficient to establish infringement.  The burden of establishing invalidity, which is solely the burden of Samsung, is quite significant.

09:50    Let me give you an example what the evidence shows.  Mr. McAlexander was forced to speak about the fact that he --

THE COURT:  18 minutes have been used.

MR. SHEASBY:  -- forced to speak about the fact that he did not believe there was a disclosure of the memory controller having a role in passing data to the buffer.  If you look at JX 3 at 2 and 9 and 36, which is the exact '608 Patent, if you look at figure 1, if you look at column 40, 09:51    lines 20 through 25, you will see an express contemplation of the memory controller being involved in this process.

What Mr. McAlexander was forced to tell you by Samsung is the exact opposite of what the patent says.  And this is the passage at 9:27 through 38 making clear that the signals from the memory controller, which are on the host, are used to control the isolation devices.

09:52    The next issue you'll be asked to decide is willfulness. Willfulness begins upon the termination of the joint development agreement, and it begins because the parties agreed that, upon the termination of that agreement, all 09:52    licenses and rights granted under it will cease forthwith.

Think about the demands that are placed on you when you

```
 1    sign contracts.  Think of the demands that are placed on you

 2    by United States law, by Texas law, and how strictly they are

 3    applied to you.  Samsung knew it had no right to continue to

 4    use our technology, and for five years, almost five years, has

 5    chosen to infringe United States patents law and the

 6    consequences for that are this week.

 7         Damages.  The final issue you'll be asked to decide is

 8    damages.  We presented the testimony of Mr. David Kennedy.

 9         And I'd like Mr. Kennedy to stand right now.

10         Mr. Kennedy -- thank you, Mr. Kennedy.  You can sit down

11    now.

12         Mr. Kennedy has negotiated in the real world over 200

13    license agreements, and he has done something that no other

14    witness in this courtroom has ever done.  In the real world,

15    he has negotiated with Samsung.  In the real world, he knows

16    how Samsung behaves in real negotiations.

17         And what he did is he did something incredibly

18    conservative.  He did not take damages for the entire period

19    of infringement, which is after the end of the JDLA; instead,

20    he took the damages from three important points--from July

21    2020 when we sent them a letter saying this agreement has

22    been -- from the time period the agreement is terminated, and

23    at that point because they had already been repeatedly told

24    about the importance of our '912 Patent, they were on notice.

25         For the RDIMMs, which represent the vast, vast majority
```

09:52 — line 5
09:53 — line 13
09:53 — line 20

09:54

1    of the damages in this case, he was even more conservative.

2    He didn't start the damages until the beginning of this

3    lawsuit which this Court has said is per se notice of

4    infringement.  And for the '608 and '417 Patent, he didn't

5    start until June of 2022, which is when Samsung's own witness

6    admitted they received notice of these patents.

7         The number of products that they sold for RDIMMs, for

8    example, just from the beginning of the license -- the

09:54

9    beginning of this case has been vast.  And the reasonable

10   royalty that is due is no less than $457 million.

11        Ladies and gentlemen of the jury, I will have the

12   privilege of speaking to you one more time.  I thank you for

13   your attention.

14        THE COURT:  Defendants may now present their closing

15   argument to the jury.

16        Would you like a warning on your time, Mr. Cordell?

17        MR. CORDELL:  I would, Your Honor.  Can I have 15

09:55

18   minutes remaining, 10 minutes remaining, and 5 minutes

19   remaining?

20        THE COURT:  All right.  I'll give you those warnings

21   when they're reached.  You may proceed with Defendants'

22   closing argument.

23        MR. CORDELL:  May it please the Court.

24        Good morning, ladies of the jury.  Again, I am Ruffin

25   Cordell, and I'm very pleased to stand before you on behalf of

Samsung.

And let me echo what His Honor said and Mr. Sheasby said, that we really do thank you for your time and attention. We know we have disrupted your lives, and again we really appreciate all the work you've put in. And we know this has been complicated, but you've hung in there with us and, again, thank you for your service.

Now, you know, we've heard a lot from Mr. Sheasby, and -- and he's a great lawyer. He can spin a tale as good as anybody. But I disagree with a lot of what he said obviously, but some of the things I do agree with. What he and I say are not evidence. You've got to focus on the evidence.

You've got to make credibility determinations, and the issues we've given you to decide are pretty complicated, but it's really our job to boil it down to the evidence that you actually need and help focus the analysis so that you can make the decisions you have to make.

So over the next 40 minutes or so, that's what I'm going to try to do. I'm going to try to help you review the evidence that you've seen. And I can't tell you what to decide, but I'll try to help you make those decisions as we go forward.

Now, I have a lot to talk about, so let's get into it. Remember that these products are not something that Samsung makes in a vacuum. They can't just make a memory chip and

1    then try to sell it.  They've got to make sure the memory chip

2    works in a computer or a phone or a car or a vacuum cleaner.

3    They've got to make it so that all of the industry can use the

4    product.

5        So that means they've got to work with Dell, they have to

6    work with General Motors, they have to work with Apple, they

09:57    7    have to work with anybody that makes one of these devices.

8    And so these products are not made in a vacuum.  Remember the

9    standards analysis that we talked about, that when you buy a

10   toaster at Walmart, you know it's going plug into your wall

11   because that was decided long ago by the industry.  And the

12   same is true here.

13       So we know that Samsung got together with the industry,

14   and they worked on these products.  Mr. Sheasby just made all

15   kinds of accusations about Samsung and what Samsung was

16   thinking and doing.  But ladies and gentlemen -- I'm sorry,

09:58    17   just ladies, remember that these products were designed over

18   10 years ago.  These are very old products, and they were

19   designed in collaboration with everybody else in the industry.

20       So no matter what motives Mr. Sheasby keeps suggesting

21   are attributable to Samsung, that's just not true because

22   that's not the way these products are designed.  They're

23   designed with everybody in that big room that we talked about

24   earlier.

25       What we do know is that Netlist wasn't in the room.  They

09:58    1   didn't participate.  They actually did sneak in now and then

2   to, you know, monitor things, but here is Mr. Hyun Lee or

3   Dr. Hyun Lee.  He is one of the inventors.  You heard a little

4   bit from him by deposition, and he said they never -- they

5   never participated in that industry process.

6        We know they had a representative, Mr. Martinez.  We

7   played his deposition as well, that he went to some of these

8   meetings, but they didn't make any contributions.  They didn't

9   try to help the industry design those DDR4 products.

09:58   10        What did we hear?  We heard a lot of what I call

11   distractions.  So you heard His Honor tell you just a few

12   minutes ago that the Netlist products are not relevant to this

13   case, and he's exactly right.  The Court gave you that

14   instruction.

15        But what did we hear over and over again?  We heard that,

16   look at the HCDIMM architecture, these are old products that

17   Netlist had made.  But what they want you to do is they want

18   you to say, oh, that's how Samsung got this technology,

19   somehow they were using their products.

09:59   20        But that's not true, because when we asked the inventor,

21   not Mr. Milton, not their corporate witness but the actual

22   inventor about this, what did he say?  He said that

23   distributed buffer business that Mr. Milton was talking about

24   was not my invention at all.

25        We didn't really hear from the inventors about what their

09:59

1    inventions were, that they were great or good or how they made

2    them; instead, we heard what their corporate witness had to

3    say.  And, again, the Court has given us instructions on this

4    and said, you don't look at the Netlist products to decide

5    infringement.  That's not the way the process works.

6        So what do you need to do?  You need to look at these

7    three old patents, patents that were done, some of them, 20

8    years ago.  The '912 Patent they say was filed in 2004.  And

9    that technology, ladies of the jury, is just old.  We moved

10   forward.  That's the way this process works.  So those

10:00

11   industry meetings, as they're designing new things, they move

12   forward, and it just turns out these patents are just not used

13   anymore.

14       Now, let's talk about the decisions you have to make.

15   And Mr. Sheasby did a nice job of talking about how you have

16   to weigh credibility, and we agree with that.  So you put the

17   evidence for any particular issue on both sides of the scale

18   and you weigh it.

19       So one of the things that we talked about in this case is

20   this meeting.  They had a meeting in April of 2015, and we

21   heard all about that from Mr. Milton over and over again.  And

10:00

22   he tells us there were all these meetings that happened before

23   and after in 2008 and 2012.  He went on and on.

24       But here is the problem.  That's his evidence on that

25   side of the scale.  The problem is, and I thought Mr. Milton

1    did his best, but he wasn't there.  He didn't go to a single

2    one of the meetings that he took that stand and testified

3    about before you ladies.  That's not exactly right, and it's

4    hard.  Right?  It's understandable that he might make mistakes

5    because he wasn't there.  He didn't live it.

10:01    6        We know he didn't go to a single one of those meetings.

7    So all of the meetings he described, he got from somebody

8    else.  And the question is, who did he get it from?  Well, we

9    know the answer to at least part of that, is he got it from

10   Netlist's lawyers.  They told him about the meeting because

11   they told him what occurred.  He then takes the stand and

12   offers that as his own sworn testimony.

13       On the other side of the scale, we have Mr. Ji.  Mr. Ji,

14   who was at the meetings, who remembered where they were,

10:01   15   remembered who showed up.  He remembered what they talked

16   about.  He remembered that it was Netlist that wanted that

17   collaboration.  Those are facts that Mr. Milton just would

18   never know.  So on that side of the scale, the Samsung side is

19   getting pretty heavy.

20       We know that he talked about documents.  That they

21   followed up a few days after the meeting with a proposal, a

22   proposal for that collaboration that Netlist wanted.

23       So when you're weighing that issue, Samsung has the

10:02   24   better of it, and that's how you decide it.  So those are the

25   kinds of decisions you are going to face as you go through all

of the issues in this case.

So the first one is, did Netlist prove infringement? They've got to prove it. That scale's got to tip on the Netlist side in order for them to prevail to actually win the infringement issues.

Remember my football -- my soccer ball, and His Honor took us through this again. The Court took us through this again about how you have to have every element of a claim, and you check them off one at a time, is it made of leather, is it stitched together, is it filled with compressed air, is it round? Well, it's not. It's oblong, and it's a difference. And the Court's instructions told you that again this morning, that if there is even one difference, there can be no infringement.

And Mr. Sheasby just took Mr. McAlexander to task--Mr. McAlexander is with us today--and said, you know, he only -- he only contested one limitation or one or two limitations in each claim. Well, ladies, we're all thankful that he didn't drag us through all of them, but I have to correct my friend Mr. Sheasby, because Mr. McAlexander didn't agree with him; he just said, look, I didn't offer any opinions about those other elements. But remember if there's only one that's different, there's no infringement. So let's talk about the patents.

The '608, remember, has -- Patent has to do with delay. These signals travel very fast, but they do travel different

        pathways.  And so there's a little bit of a difference.  And

        the example I used, if Mr. Sheasby and I both wanted to arrive

10:03   in Shreveport to share a ride, I would have to delay my flight

        from Florida in order to arrive at the same time as Mr.

        Sheasby.  And that's what these systems do.  Something has to

        calculate, has to determine that delay.

            Netlist and its patents say you have to do it in the

        buffer.  We say we don't do it in the buffer because we do it

        in the controller.  And that's the issue.

            We showed you document after document after document

        showing you that the determination of delay, and that's what

10:04   the claim says, happens in the controller.  We showed you the

        specification documents.  We showed you source code.  We

        showed you the documents from the memory controller

        manufacturers at Intel.  And these are confidential so we've

        turned the display so that they're not shown to the gallery,

        but you ladies can all see them, and if you'd like to, you can

        request them.  The Intel document is DTX 15, the Renesas

        document is JX 27.

            Now, Mr. Sheasby just said, but wait a minute, look at

10:05   that -- if I can go back to the -- I'll go back to the source

        code.  He says we only showed you part of the source code.

        But we didn't, ladies; we showed you the whole thing.  And he

        said, look, there's a -- there's a register address, and he

        called it out, DBXc -- I forget exactly what he said.  He

1   said, aha, look, there it is, that's in the buffer.  And that

2   is in the buffer.

3       But here is his problem.  The claim says which part

10:05 4   determines the delay, not which part stores it or uses it or

5   knows about it--which part determines the delay.  And what

6   happens in these systems is that the memory or sometimes we

7   call it the host controller determines the delay and then

8   writes it in those buffer control words.

9       When the Court tells us that we're going to take a

10  45-minute break for lunch, the Court has determined the delay.

11  The Court has told us when we have to be back here.  I may

12  need to write it down so I don't forget, but I don't get to

13  determine it.  None of us do.  And the same thing is true with

10:05 14  these systems.  The controller determines this delay; it's

15  written in these buffer control words.

16      Now, what did Dr. Mangione-Smith say?  He said, well, you

17  know, a lot of things happen.  There's some decoding, some

18  storing, some only, reading.  He had lots of verbs he used,

19  but he didn't use determining, and that's what the claim says.

20      Mr. Sheasby said, well, but you know in the specification

21  some place, they talk about the controller being used.  But,

10:06 22  ladies, look at the patent, if you want to.  Right under the

23  background section, it tells us, don't use the controller.

24  Remember, this is years and years ago when the controllers

25  weren't very smart.  Don't use the controller; you have to use

1    the buffer.  That's what the patent tells us.  We do exactly

2    what the patent says not to do.

3        We have this dust-up, Dr. Mangione-Smith and I did, over

4    the word decode, because he said, well, it's just decoding,

5    it's decoding it, as if that was some big deal.  But the

10:07  6    designer of these parts, Mr. Davey, tells us that decode

7    simply means looking up that value.  It's already been written

8    down.  There's not determining anything; it's just looking at

9    it.

10       And he told us definitively, he told us that the data

11   buffer itself isn't determining the amount of delay.  And Dr.

12   Mangione-Smith admits that this fellow, Mr. Davey, knows a lot

13   more about this than he does.  There's no infringement, ladies

14   of the jury.  That element is missing; they can't prove it.

15       Don't let Mr. Sheasby out of here without explaining to

16   you where he can prove that the buffer determines the delay,

17   because he can't do it.

18       The written description issue is pretty straightforward.

19   Mr. McAlexander looked and looked to see if there was any

20   disclosure of using that memory controller the way they say

21   our parts work, and it's simply not there.  And so we believe

22   that if they insist on pressing this forward -- we didn't

23   start this fight.  We're not trying to take their patent away

24   from them.  But if they insist on redefining their claims,

25   then it's invalid.

1        Let's talk about the '912.  Now, this is a little more

2    complicated, and I apologize about that, but I've tried to

3    streamline it.  So we have this notion that, remember, the

4    '912 Patent was for old controllers that couldn't control more

5    than two ranks of memory, and so they would trick it.

6        The controller would say, I want you to store the Johnny

7    Cash song and put it in ranks 1 and 2, and the memory board

8    would say, no, I don't care what you say, I'm going to put it

9    in four ranks because I know better, because back then the

10   controllers weren't very good.  Today, the controllers are

11   great.  They can control four ranks of memory, no problem.  So

12   it's just not used anymore.

13       And Mr. McAlexander -- can you stand, Mr. McAlexander?

14       He took us through this in great detail and said, you

15   just don't need to trick the controller.  And Mr. Sheasby

16   says, well, trick is not in the claim.

17       What is in the claim is that you have to have a fewer

18   number of ranks that are being controlled when you have more

19   number of ranks than are available.  That's what's in the

20   claim.  It's about ranks, it's about devices.

21       It's not about signals.  We heard a lot from Mr. Sheasby

22   about signals.  And Mr. McAlexander's testimony about this was

23   unchallenged.  He took on the signals business, the idea that

24   somehow the signal numbers really count here.  But that's not

25   it.  It's the number of ranks and the number of devices.  They

1    can't dispute this.  So there's no infringement of the '912

2    Patent for this reason.

3        But there's more.  We have this row/column address signal

4    transmitting to just one device.  And I know this is

5    complicated, but this is one of my favorites.  This is my MRS

6    command.

7        So the MRS command Dr. Mangione-Smith admits only happens

8    in PDA mode.  That's what we're talking about is per-device or

9    Per-DRAM addressability mode.  The documents tell us that in

10   that mode, only MRS commands are allowed.  And what do we

11   need?  We need an MRS command at the same time that there is a

12   row/column address signal.  Right?  We've got to have those

13   two things.

14       So now we look at the documents.  And Mr. Sheasby urged

15   that you pull out JX 30, and I do the same thing, JX 30, page

16   29, because this mode register set truth table, and I'd argue

17   they can't handle the truth table, but they can't show you

18   that in this mode register set, which is the only thing

19   available in PDA, there are no row/column address signals.

20       Don't let Mr. Sheasby sit down without proving to you

21   that something in this black box represents a row/column

22   address.  He can't do it.  It tells you right at the top what

23   row and column addresses look like and the abbreviations they

24   use.  That are row addresses down here and column addresses

25   down here in the lower columns, but those are not in the mode

1257

1    register set and so they just don't count, they can't prove

2    it, there's no infringement on that basis as well.

3        This one came in very quickly, and I apologize about

4    that, but it has to do with whether these two modes happen at

5    the same time.  And the Court's instructions told you this

6    morning that claims, you know, can sometimes articulate a

7    bunch of different elements, but you have to actually show

8    they exist at least at some point.  You can't just assume it

9    because they're available.

10       And this is complicated because you got to have PDA mode

11   and this encoded QuadCS mode at the same time.  It's a little

12   bit like when you're driving your car, you can turn on your

13   windshield washer, if you want to, press the button and, you

14   know, it washes the windshield, and you can put the car in

15   reverse.  Those both are operating modes of the car.

16       But most people wouldn't do that.  In fact, I don't think

17   anybody would do that; it wouldn't be safe.  To wash your

18   windshield while you're backing up, that would seem odd.  But

19   they have got to prove that these two modes actually happen.

20   And we know they're optional, but not everybody uses them.

21       We know that Dr. Mangione-Smith couldn't identify even a

22   single customer who's ever done it.  And we know he didn't

23   bother to look at any product specification for any memory

24   controller.  So if this could happen, we just don't know, but

25   he didn't prove it and so there's no infringement for that

1    reason as well.

2        Now let's talk about written description and invalidity.

3    What the Court just instructed us all is that the purpose of

4    written description is that you got to write your invention

5    down.  You've got to put it in to the Patent Office so that

6    everybody knows you thought of it back then.  Right?  We don't

7    want you to file something in the Patent Office and come along

8    years later and say, oh, no, I really invented something

9    different.  You've got to write it down.  You've got to prove

10    you knew it.

11        So this '912 Patent is all about this PDA.  We've heard

12    PDA over and over and over again.  And look at what the

13    inventor, not the lawyers, look at what the inventor said

14    about PDA.  He was deposed in November of last year, about a

15    year ago, ladies, talking about an invention he made two

16    decades ago.  And they asked him, Have you ever heard about

17    this PDA mode?  And he says, No, the lawyers told me about it.

18        Well, the lawyers aren't here to testify; the lawyers

19    didn't file that patent application.  He did.  He's telling us

20    he didn't know about it, he didn't possess this invention.

21    Therefore, the claim is invalid.  And Mr. McAlexander verified

22    that as well, that he couldn't find it in the text in the

23    written description of the patent, and so the claim is

24    invalid.

25        Let's talk about the '417.  So, remember, this is two

1    doesn't equal one, pretty straightforward.  And the whole

2    debate here is about this BCOM signal.  And if you look at it

3    on the diagram, and everybody points to JX 21, there is this

4    BCOM signal.  And you can see it's just one line, one signal.

5    And yet we have this the continuing debate about whether one

6    is two.  And what they say because it has four bits -- I think

7    what they're saying, I'm not quite sure, is that somehow there

8    are four signals here.  But Mr. McAlexander looked at this and

9    he put it to rest, no, that's a single signal.  It's got four

10   bits, but it's just one signal.

11        We -- I took Dr. Mangione-Smith through example after

12   example after example where he and his lawyers called this a

13   single signal.  So I don't know how they get out of that.

14   They told you over and over again, Mr. Sheasby showed you a

15   document that said there are signals floating around in here,

16   but this is asking him about the BCOM signal.

17        "You called the BCOM signal a singular signal.  Correct?"

18        "Yes, I do."

19        That's their expert, ladies, not mine.

20        We know that Mr. Davey tells us it's a singular signal.

21   And the example I like to use, it's like a passcode on your

22   phone.  So, you know, I'm one of those guys that has -- my

23   passcode's 1, 2, 3, 4, not the best I know, I'll change it,

24   but that's a single passcode.  It's got four digits.  I've got

25   to put 1, 2, 3, and 4 in.  If I don't, the phone won't open.

1    And if I put just one digit in, even though it's got all four,

2    but it's a single passcode.  The same is true for the BCOM

3    signal.  It's a single signal that happens to have four bits,

4    but it's one signal.

5        We then have this issue which Dr. Mangione-Smith and I

6    went round and round on, because he says in one breath that

7    the claims and the products have this N bit wide data signals

8    of 72 bits.  He then says there were address signal lines of

9    18.  He then says there were control signal lines of 10.  And

10   then he says you have this N bit wide memory bus that adds all

11   those up and somehow he comes up with 72.

12       Again, I don't understand it.  I don't understand how he

13   can do this.  I hope that when he gets back up here, Mr.

14   Sheasby can explain to you all why they have shown

15   infringement based on Dr. Mangione-Smith's failure to do

16   fourth grade math.  He can't seem to add 72, 18, and 10

17   because he says a hundred is the same as 72.  I don't

18   understand it.  So there's no infringement for that.  It's

19   their burden of proof; they've got to prove it.

20       On the '417, once again, we have the inventor himself

21   saying, I don't know anything about these distributed buffers,

22   I didn't do that work, it's not my invention.  Again, this is

23   the inventor saying this about his patent.  We didn't hear

24   from Netlist from the inventors outside of what we played in

25   court.

1  Okay.  So let's talk about willfulness.  Mr. Sheasby

2  says, oh, well, you know, we had a deal and the deal went away

3  and that somehow means that we were willful.  But, ladies, you

4  know, here in Texas when we have a problem with our neighbors,

5  we talk to them.  Right?  You think they put a fence in and

6  it's kind of on your side and, you know, you want to -- you

7  want to say something.

8  Well, keep in mind these products, they tell us, have

9  been on sale for over 10 years.  And yet during that time Mr.

10  Hong, the CEO of Netlist, admitted they never once told

11  Samsung, we think you're infringing.  They never once picked

12  up the phone.  We heard about all those meetings over and over

13  again, we don't know whether -- you know, they say that we had

14  meetings in California, we showed you the one in Korea.  They

15  never mentioned this.  Why is that?

16  We know that Google -- somehow they talked to Google and

17  it was like being back in high school, you know, they told

18  Google and Google had to come and tell us there might be a

19  problem, so Mr. Yoon investigated.  He looked into this, and

20  he told them that -- he confirmed that there was no

21  infringement and explained the reasons to Netlist in detail.

22  And what did they do in response?  The answer is nothing until

23  they filed a lawsuit.

24  We know that during these meetings they had back in 2015,

25  they came and showed patents, but they never said anything

1  about Samsung using those patents.  And, again, according to

2  them these products were out and being sold back then.  They

3  never said a word.

4      We know they needed our help.  They came to Mr. Ji, and

5  they said, give us -- you know, try to help us deal with this

6  other company called hynix, and here's a list of our best DDR4

7  patents.  And they put checkmarks in them showing which ones

8  they really thought were the bee's knees, these are the ones

9  that really count.  And, ladies, you can read this list all

10  day and you won't find any of the three patents in this case.

11  Two of them hadn't even issued yet.

12      We know that whenever they tell you that Samsung is

13  somehow using their technology, keep in mind, wait a minute,

14  Samsung designed this in conjunction with the whole industry.

15  This wasn't Samsung.  This was the whole industry.  And so

16  they just can't suggest to you that somehow there is a willful

17  character.

18      So when you get to that verdict form, we're going to ask

19  that for infringement, you say no all the way through; and

20  invalidity, you say yes; and then on willfulness, you say no.

21      Okay.  So let's talk about damages.

22      So as a defendant I just spent the last, you know, what,

23  20 minutes trying to convince you that, in fact, there is no

24  infringement in this case and the evidence is overwhelming and

25  please don't let Mr. Sheasby out of here unless he explains

1    those holes that we have shown because it's his burden of

2    proof.

3          So, now, why am I talking about damages?  And, you know,

4    again, I said this earlier, I've been married for 36 years.

5    We have three beautiful children, and both my wife and kids

6    often disagree with me.  It's not just sometimes.  I've got a

7    17-year-old boy.  Believe me, I can tell you that those

8    disagreements happen.

9          So if you disagree with me, I've got to address this.

10   But make no mistake:  the proper amount of damages in this

11   case, very simple, is zero, because if they can't prove

12   infringement, if the patents survive our invalidity challenge,

13   that's the only time that you're going to get to damages is if

14   they can prove infringement and I fail on invalidity.

15         If you agree with me that there's no infringement, if you

16   agree with me that any of the claims are invalid, there are no

17   damages for those patents.

18         But how do you do it?  How do you go about setting

19   damages if you find infringement?  Well, it's pretty simple.

20   It's like buying a used car.  You pull out the Kelley Blue

21   Book, and you see what your neighbors have paid for similar

22   cars.  Same make and model, same number of miles or about the

23   same, and you kind of make adjustments.  Right?  Because if

24   you're buying a car that's a year newer, well, then you're

25   going to pay a little more than what the Kelley Blue Book

1  says.  And that's the way the process works.

2      And that process happens in what the Court just

3  instructed you on is a hypothetical negotiation.  He talked

4  about all the things that you take into account there.

5          THE COURT:  15 minutes remain.

6          MR. CORDELL:  Thank you.

7      And that means that we look at these other agreements,

8  but they're all face up on the table.  Mr. Netlist and Mr.

9  Samsung are trying to reach a deal, and they're doing it a few

10  years ago, about the same time the hynix deal was done.  And

11  what do they do?

12      Well, we know that -- from Mr. Kennedy and Mr. Yoon that

13  that's where -- that's how this really works, that when we go

14  to negotiate license agreements in the real world, we look at

15  what other people have paid because you don't want to overpay

16  or underpay.  Right?  Both sides want to try to get a fair

17  deal.

18      We know that the most significant piece of evidence in

19  the damages case is the hynix agreement.  Why is that?

20  Because hynix and Samsung are kind of the Hertz and Avis of

21  this business.  We heard that.  They are the biggest

22  competitors out there.

23      But, remember, these products are not really different

24  from one another at all.  Remember, these are standard

25  products.  They got to fit into the Dell server or the Apple

1    phone or the Roomba vacuum cleaner.  So they all have to have

2    the same technology in it.  We heard over and over again that,

3    well, Samsung is making use of this technology.

4         Well, ladies, hynix is making the exact same use.  It's

5    the same products.  They have to be the same products.  So

6    when we're doing the Kelley Blue Book, the car's the exact

7    same year, it's got the exact same mileage, it's got the exact

8    same features, it's the same color, it's exactly the same.

9         So that hynix agreement is the most significant piece of

10   evidence that we have.  And we know what they paid for this.

11   They paid $40 million.  They don't like that.  They layered in

12   a whole bunch of other stuff because they don't like the fact

13   that that $40 million covered over a hundred patents.  And

14   what are they offering Samsung in this case?  Three.

15        Mr. Kennedy was forced to admit that, in fact, it was a

16   $40 million deal.  And we know that that was a one-time fee.

17   It was a lump sum agreement is what we've come to call it in

18   this case.

19        We heard a little bit during the trial about supply, and

20   Mr. Sheasby didn't mention it, and that's to his credit

21   because it's really not relevant.  We see in the hynix

22   agreement itself, it says, look, supply considerations are

23   separate.  That's not something we're talking about here when

24   we're talking about the license deal.

25        We heard a lot about supply, and I don't really

1    understand why they keep bringing it up.  Samsung's in the

2    business of selling memory.  That's what Samsung does.  And

3    Netlist sometimes buys that memory to then sell to other

4    people.  That's their business.  And that's all great.  We're

5    happy to sell it.  You heard Mr. Hong tell you that they still

6    buy Samsung memory, and we want them to.  That's a good thing.

7    But that doesn't have anything to do with this patent license,

8    and we need to keep the value focused on what it really is.

9        There is no question, ladies, that the $40 million is the

10   right valuation for the hynix agreement.  We have it in a

11   sworn document that Mr. Hong submitted to the Securities and

12   Exchange Commission.  He gave this to the government.  He said

13   right here that the license fee for a license agreement with

14   SK hynix was $40 million.  That is the number.  There is no

15   dispute about that.  And that's in DTX 25 if you want to see

16   it.

17       So what did Ms. Kindler do?

18       Ms. Kindler, can you stand?

19       She did a lot of work, did a lot of analysis, and she

20   said, yep, that 40 million is the right number, I'm going to

21   start with that.  But you know what?  Samsung, you know, is

22   going to -- going to use this a little more.  Their market

23   share is a little bigger.  She went to 48 million.  But then

24   she said, wait a minute, that's for over a hundred patents;

25   this is only for three.

1       And you heard Mr. Hong say something interesting

2  yesterday.  Again, it was by video so it was quick, but he

3  said, you know, they don't really value the patents

4  differently.  They treat them all the same.  All hundred are

5  the same value to them, to Netlist.

6       But, Ms. Kindler, to be conservative, said, no, I'm going

7  to give a lot of value to those three patents, and she said 24

8  million would be the right number if you had to value those

9  three patents.

10      So when you look at it and you're deciding who's

11  reasonable in this case, ladies, I urge you to look at this

12  analysis.  So what is it that the Kelley Blue Book says, what

13  is it that everybody in the industry pays for these kinds of

14  patents?  Well, we had 40 million for a hundred patents for

15  hynix; and 51 million, and I won't the names into the record,

16  but from another company for 2,000 patents; we had 65 patents

17  for 25 million to yet another; 200 patents for 9 million to

18  another; and 41 patents for 6 million.

19           THE COURT:  Ten minutes remaining.

20           MR. CORDELL:  Thank you, Your Honor.

21      So we're talking about three patents here.  And yet what

22  is it that Netlist demands?  457.81.  I've rounded it to 458.

23  Does that sound fair?  Does that sound reasonable?

24      You're buying a car from Marshall Ford, and they want

25  $40,000 for it.  And then your neighbor goes and wants the

1268

1  same car, and they want $400,000?  Does that sound fair?  Ten

2  times more?  That makes no sense.

3      The closest competitor making the exact same products

4  almost in the exact time that this negotiation was to take

5  place paid 40 million for a hundred patents and they want 458

6  for three.  It's not fair.

7      Now, we have this issue about whether it's going to be a

8  lump-sum royalty or a running royalty.  There's no question in

9  this case--both sides prefer lump-sum royalties.  We have

10  Netlist saying that they will accept a lump-sum royalty.  They

11  just want money, and they're happy to get it as a lump sum.

12  That's what they got in the hynix agreement.  And we know Mr.

13  Kennedy looked at it and decided that Samsung prefers lump sum

14  as well.

15      So you're going to be asked in the verdict form whether

16  this is a running royalty or lump sum in Question No. 5, and

17  we want -- we believe the evidence shows overwhelmingly that

18  lump sum is the right approach.

19      Now, we have Mr. Kennedy's analysis and Mr. Kennedy's

20  analysis went into this regression that was offered by another

21  witness, Dr. Groehn.  But we know very little about what Dr.

22  Groehn did.  Mr. Kennedy didn't tell us about it.  He told us

23  just kind of the basics.  But we really wanted to know kind

24  of -- kind of what it was all about.  And 90 percent, 90

25  percent, of Mr. Kennedy's opinion depended on the work this

1    other fellow did.  90 percent.

2         And Ms. Kindler pointed out that, you know, we don't

3    really know a lot about Dr. Groehn's mystery regression that

4    this -- this analysis that he did that somehow he came up with

5    these numbers.  We wanted to know, well, look, you know, if he

6    went the wrong way on an issue, could we confront him?  And,

7    no, we can't.  And did Mr. Kennedy offer that?  Well, no, he

8    didn't because that was somebody else's work.

9         Dr. Perryman is here.

10        If you would stand, please, sir.

11        And Dr. Perryman is an expert in this regression.  He

12   said, look, this is a good tool, it's used for a lot of

13   things, but it's like trying to bake a cake with a hammer.

14   It's the wrong tool.  It doesn't apply here.  And so

15   the -- you know, the sources that Netlist used for their

16   regression were just wrong, and they were kind of designed to

17   get to a result.  They wanted a big damages number, and that's

18   how they used this mystery regression analysis.

19        But Dr. Perryman explained that if you do this right, you

20   get wildly different numbers, and it's just not appropriate

21   for this case.

22        We know and you heard the Court's instructions that you

23   as a jury are supposed to remove from the damages the

24   contributions from other sources like industry contributions

25   and research done by Samsung and Samsung's manufacturing

1    capabilities.

2         Mr. Calandra took you through a lot of that, all the

3    wonderful work Samsung has done to make these products in the

4    first place.  And the reality is they can't claim that value.

5    They can't come in here and say, give us almost a half a

6    billion dollars when it's Samsung and Samsung's manufacturing

7    and the decades of work they put into this that actually are

8    what make that a success.

9         We also have, if you remember, Dr. Mangione-Smith said,

10   oh, yeah, all the -- all the benefits are attributable to the

11   '608 Patent.  That's how you get over 2400 MT/s, he said.  And

12   then he said, well, that's also true for some of the other

13   patents.  And he couldn't really tell us why, when you use two

14   of the patents, you don't get twice the benefit, for example.

15   He kept saying that it's all attributable to those.

16        Well, you can't do that, ladies.  You got to have real

17   evidence.  He did no analysis.  He did no experiments.  He did

18   no calculations.  We need real evidence in these cases.

19        There's no dispute that Samsung designed these products

20   with others.  So the contributions that went into these

21   products were not Netlist's, and Mr. Halbert told us about

22   this.  They were not Netlist's contributions; they were

23   contributions by people across the industry.  That's what made

24   the products successful.  These are the modern ways, not the

25   old ways.  Remember, we've got the modern controllers that are

1    very capable, not the old ones that Netlist patented.

2        And then Ms. Kindler, I thought, had a really nice

3    analysis at the end of this, a really nice analysis where she

4    told us kind of where the hand meets the sandwich, if you

5    will--that, you know, Mr. Kennedy did a lot of work, he's a

6    very capable fellow, but he really missed the mark.

7        THE COURT:  Five minutes remaining.

8        MR. CORDELL:  Thank you.

9        He should have looked into exactly why it is that the

10   damages were a particular way.  He should have looked at those

11   comparable agreements, he should have offered you the kind of

12   analysis that she did, and he just didn't do it.

13       So at the end of the day if you're asking me what the

14   damages ought to be, I would say zero because there's no

15   infringement in this case and a bunch of those claims are

16   invalid.  But if you disagree, they've got to be reasonable.

17   We've got to go to something that the rest of the industry

18   would recognize as a fair and reasonable rate, and that, Ms.

19   Kindler tells us, is 24 million.

20       Now we have another problem.  The way the verdict form is

21   structured, you can't just -- well, you could just write 24

22   down for one of them and leave the other two blank or write in

23   zeros, but I'm not sure that's what the intent is.

24       If I could have the elmo.

25       So the way the verdict form is structured is it requires

1    you to write a number for each of the three patents.  And the

2    $24 million lump sum is obviously one.  We certainly don't

3    want you to write 24 in each of the blanks.  So the question

4    is, how do you divide between them?

5         We have Mr. Hong's testimony that they treat them all the

6    same.  So you could write 8 million in each.  That would be a

7    reasonable thing to do.  But we also have evidence in this

8    case that most of the units that were sold were sold within

9    that time period in the product categories that the Court

10   instructed you on for the '912 Patent.  About 80 percent of

11   them fell under the '912.  A little less, but we can round it

12   to 80, and about 10 percent for the other two.

13        So if I could go back to the slides.  A reasonable thing

14   to do would be to divide it 80, 10, 10, which would be 18

15   million for the '912, 3 million for '608, and 3 million for

16   the '417.

17        So I want to thank you again for your time and attention.

18   Again, the right number here is zero, and that's the easiest

19   one to remember.  You don't even have to write it down because

20   there's just no infringement in this case.

21        Now, I'm going to sit down now and Mr. Sheasby's going to

22   get back up here.  And, again, he's a very capable fellow.

23   I've known him for a long time, and -- but, you know, I want

24   you to hold us both accountable.  So I've gotten the

25   opportunity to get up and address you and talk about the

1    issues, and so did he.

2        If he gets up after me and says things that you haven't

3    heard before, that's not really fair, is it?  He should have

4    said this in the first part of his remarks and not wait until

5    after I spoke to try to spring something on us.  I don't think

6    he'll do that, but if he does, I hope you keep that in mind as

7    you're making your decisions.

8        So with that, again, we thank you for your time and

9    attention.  I really appreciate the hard work.  I know some of

10   this is complicated, but at the end of the day you've got old

11   patents on old technology versus new devices and new

12   technology, and the decision shouldn't be this difficult.

13       Thank you.

14           THE COURT:  Plaintiff may now present its final

15   closing argument.

16       You have 17 minutes and 42 seconds remaining, Mr.

17   Sheasby.

18       What warnings, if any, would you like on your time?

19           MR. SHEASBY:  Your Honor, if it would please the

20   Court, could I have a warning at 10 minutes left and 3 minutes

21   left?

22           THE COURT:  I will give you those warnings.  You may

23   proceed with Plaintiff's final closing argument.

24           MR. SHEASBY:  Slide 73, please.

25       Gatekeeper.  What determines the amount of delay?  JX 27

1    at 35.  The data buffer determines the delay.

2         Slide 87.

3         The Intel document which was flashed up so quickly and

4    speaks about MRD training, and there was a suggestion that

5    that shows that the determination was not in the buffer.

6         Gatekeeping.  JX 27 at 35.  The training occurs in the

7    buffer.  And JX 27 at 35 expressly says the data buffer uses a

8    data pattern comparator to determine the exact language of the

9    claim.  If anyone tells you, are you sure it's the data buffer

10   that determines them, you point them to JX 27 at 35, and you

11   ask them why a Samsung lawyer spent minutes in front of you in

12   this august court telling you the exact opposite.

13        72.

14        Even the third-party engineers who Samsung purchases its

15   chips for admit that the transaction control block in the

16   buffer will determine the amount of delay.

17        And I did something very important.  I did not try to cut

18   out quotes or retype them.  These are directly from the

19   transcript prepared by the honorable court reporter in this

20   matter with the pin cites so you can be sure that I'm not

21   misstating the record.

22        The '912 Patent.  Let's go to slides 107 and 108.

23        The suggestion that there are not multiple ranks in these

24   designs that need to be controlled has no connection to

25   reality.  If someone asks you, are there multiple ranks in

1    these devices, you point them to JX 28 at 5, you point them to

2    JX 36 at 4 where it talks about multiple ranks.

3        Let's go to slide 117.

4        The suggestion that MRS commands don't use address

5    inputs.  JX 10 at 60.  This is talking about the MRS command,

6    and it uses A6.  And Mr. McAlexander admitted that A6

7    identifies a location in the memory.  And A6 is expressly

8    defined in Samsung's own documents as an address.

9        Let's go to slide 105.

10       The suggestion that Samsung doesn't use this chip

11   functionality capability.  PX 31 at 20.  If anyone asks you,

12   are they sure you use chip select -- they use chip selects,

13   you point them to PX 31 at 20 which is a confidential Intel

14   document prepared by one of their senior engineers which

15   expressly says that they test for and verify that these chip

16   select functionality exists in every document.

17       Slide 120.

18       The suggestion never argued by Mr. McAlexander, but now

19   argued in this closing that the last element wherein the

20   command signal was transmitted to only one DDR memory device

21   at a time is not met is contradicted by their own documents.

22   JX 30-64, JX 30 at 151--a single DRAM device can be put into

23   command.  And, in fact, Mr. Jung, the witness who denied that

24   he'd investigated any information about whether our patents

25   had been used by the people who designed these products,

1    admitted under oath that their system controls only one

2    device.

3        125.

4        The idea that this technology is not valuable, they admit

5    in their own confidential internal documents that it's

6    required, that it needs to be done.

7        Slide 159.

8        Our patent teaches of sending a set of command signals

9    across a rank.  This is at column 8:44 through 63 of the '912

10   Patent, which is JX 2.  And then out of that, only one device

11   in the rank will receive the command.  It's the exact system

12   Samsung advertises in its documents.  If someone says we

13   didn't invent this, you ask them to explain why JX 2 at 26,

14   column 8:44 through 63, matches exactly Samsung's advertising

15   materials at PX 9 at 5.

16       The '417 Patent, slide 142.

17       The suggestion that multiple signals are not sent is

18   contradicted by Mr. McAlexander himself who says multiple

19   signals are sent.  It's not just one document; it's document

20   after document.  JX 11 at 17, signal count--4, plural.  JX 12

21   at 39--signal count 4, plural.  JX 14 at 23--signal count 4,

22   plural.  And even Mr. McAlexander admitted it's a signal for

23   read and a signal for write.  JX 11 at 19 and 21 shows there's

24   a BCOM signal for read and a BCOM signal for write--signals

25   plural.

```
 1        You are the gatekeeper to someone standing up in this

 2   court and saying the exact opposite of what the documents say.

 3        Let's go to slide 134.

 4        The new argument that we just heard that Mr. McAlexander

 5   could not even bring himself to support that there's not a

 6   72-bit bus in Samsung's designs.  Mr. Han, 29 years, what did

 7   he admit under oath?  What is the bit width?  It's 72 bits.

 8   Samsung's attorneys are making arguments that an expert they

 9   paid 10 times to testify could not even bring himself to

10   defend under oath in front of this honorable jury.

11             THE COURT:  Ten minutes remaining.

12             MR. SHEASBY:  Slide 173.

13        The suggestion that our inventors testified they didn't

14   invent this powerful technology.  Mr. Solomon testified under

15   oath that he believed Netlist invented LRDIMM technology.  Dr.

16   Lee invented -- testified under oath that he believed we

17   invented the distributed buffer architecture.

18        And if we go to 163.

19        Our documents itself show that we invented the

20   distributed buffer architecture.  Someone says we didn't

21   invent this, you take them to JX 3 at 12, which is figure 2C,

22   the '608 Patent, and you ask them to square what was just said

23   to you by Samsung's attorneys with the definitive evidence of

24   what the United States Patent Office granted us.

25        Willfulness.  Let's go to slide 180.
```

1278

1       We presented them detailed information on our patents,

2   including the '912 Patent.  Mr. Milton testified under oath

3   that after the end of the agreement, we sent them a formal

4   letter saying we have over a hundred patents and they need to

5   take a license.  And he also confirmed that after that license

6   request, we specifically listed all the patents-in-suit, as

7   did slide 183, Samsung's own licensing representative, Mr.

8   Yoon.

9       Laws make us free, and they protect us.  And when the

10  laws of the United States of America are not followed, the

11  consequences are severe.

12      This idea that they're shocked that we believed our

13  technology was important.

14      Let's go to slide 194.

15      JX 6 at 1, a presentation attended by Samsung's most

16  senior engineers.  At 12, DDR4 was being discussed and an IP

17  tracking list was being created.  And at 11 and at 12, the

18  '912 Patent was disclosed to these witnesses, these engineers

19  who then designed their products.

20      Let's go to damages.  211.

21      No less than a reasonable royalty for the use made of the

22  invention.

23      Your Honor, may I approach the table just briefly?

24          THE COURT:  You may.

25          MR. SHEASBY:  The fundamental dispute in this case

1    is that Samsung has invited you to ignore the law of the

2    United States of America.  Mr. Yoon said, we love lump sums.

3    But did you listen carefully to why he said he wants a lump

4    sum?  It's because we don't have to look at how much these

5    patents are being used.

6         A lump sum is the exact opposite of what the United

7    States patent law requires.  The exact opposite.  You can sell

8    as many products as you want in this country, but you follow

9    the law of this country.

10        Ms. Kindler advocated a lump sum as well, and she said

11   something that was striking to me.  She said, when she was

12   asked by Ms. Glasser, did you ask any engineers what they

13   thought about the value of Netlist patents, she said she

14   didn't.

15        If you turn to page 19 of the Judge's instructions, it

16   says the law requires any royalty awarded to Netlist

17   correspond to the value of the alleged inventions within the

18   accused products.  That is the law of the United States of

19   America, and it's the law that was ignored in the damages

20   analysis by Samsung.  She didn't even bother to ask the

21   engineers who are using the patents what the value was.

22        If someone says, why don't we think about this lump sum

23   idea, you take them to page 19 of the Judge's instructions and

24   you ask them how you can square that express instruction

25   requiring the assessment of use with this lump-sum analysis

 1    which doesn't have anything to do with use.

 2         Can I have slide 217?

 3         There are a large number of *Georgia-Pacific* factors, only

 4    two of which were considered at Samsung's request by Ms.

 5    Kindler.  She never explained why Samsung did not allow her to

 6    analyze the other factors.  The reason, I would submit, is

 7    because those factors make clear the extraordinary importance

 8    of this invention, the profitability of the invention.

 9    Samsung has never found another use.

10         Your Honor, could I also be identified when I have one

11    minute left?

12              THE COURT:  I'll do that.

13              MR. SHEASBY:  Thank you so much.

14         Samsung has never found an alternative to this

15    technology.

16         From the time of notice forward, the vast amount of

17    revenue they have generated.  And the documents, JX 27 at 35,

18    the testimony of Mr. Han made clear they had no alternative to

19    our technology.  And Mr. Kennedy made clear that if they did

20    not infringe our technology, they would have lost every single

21    one of these sales.

22         Slide 221.

23         The second issue, the commercial and strategic licensing

24    relationship between the parties.  Samsung recognized the

25    importance of our technology.  Our HyperCloud lists the '912

1    Patent, for example.  PX 17 at 30.

2              THE COURT:  Three minutes remaining.

3              MR. SHEASBY:  I'm sorry?

4              THE COURT:  Three minutes remaining.

5              MR. SHEASBY:  Thank you, Your Honor.

6         Mr. Hong testified that a competitor like Samsung who

7    takes our technology severely damages us.

8         If we can go to slide -- the idea that Samsung said

9    supply is unimportant, this is our technology showing that our

10   technology is not old, it's used at the fastest way forward.

11        If we can go to slide 225, please.  Sorry; 228.

12        The rates received by the patents and the rates paid by

13   the licensee.  I want to speak about this issue in

14   particular--the supply issue.  We received something of

15   extraordinary value from Samsung in supply, and the records

16   show, JX 18, that that supply was going to be essential to our

17   company.

18        JX 20, when that supply ended, they recognized it would

19   have a dramatic impact on our future financials in business.

20   The idea that Samsung would sell us any product they wanted,

21   which Mr. Cordell just said, the exact opposite of what their

22   record shows.  PX 25 at 1 showing them pulling our products

23   and sending them to other people.  Why is this so important?

24   This is so important because the SK hynix agreement was

25   entered into, as Mr. Milton said, after and to protect against

1    the impact of the loss of Samsung's supply.  And it saved us

2    as a company.

3        The gall, the gall, of Samsung saying that this SK hynix

4    agreement is comparable, when we entered into this agreement

5    so we could obtain supply for the survival of our company, it

6    is the exact opposite of a comparable agreement.

7        If we can go to slide 228.

8        THE COURT:  One minute remaining.

9        MR. SHEASBY:  Samsung hiding agreements that it

10   didn't disclose to you until we cross-examined them.  Samsung

11   admitted that those agreements have no connection to the

12   issues here because none of them were used.

13       And, finally, ladies and gentlemen of the jury, we will

14   ask you to award damages in an amount no less than $438

15   million dollars.  Damages that are based on the law, not based

16   on Samsung's express violation of the terms of the damages

17   statute in this case.

18       Thank you.  This case is in your hands.

19       THE COURT:  Your time's expired.

20       MR. CORDELL:  Your Honor, may we approach?

21       THE COURT:  Approach the bench, counsel.

22       (The following was had outside the hearing of the

23       jury.)

24       MR. CORDELL:  Request a curative instruction on two

25   grounds:  The first, that counsel suggested that a lump sum is

1   not authorized.  Your Honor's instructions at the bottom of 19

2   told the jury point-blank that in fact it was a viable method

3   to calculate a reasonable royalty for use of the patents.

4        And then, secondarily, you know, I've lost count -- it's

5   seven specific references to the United States, laws in the

6   United States, and the sort of pejorative suggestion that

7   because Samsung's from another country, that somehow they're

8   violating the laws of the United States as opposed to just

9   complying with the patent statute.

10        THE COURT:  As to the first request, that's granted.

11   As to the second, it's denied.

12        MR. SHEASBY:  Your Honor, can I be heard on the

13   first one?

14        THE COURT:  You may.

15        MR. SHEASBY:  The issue is not that a lump sum is

16   not proper.  It's that the lump sum that's not based on use is

17   not proper.  That was the argument I made.

18        THE COURT:  The argument you made was that a lump

19   sum violated the statutory requirement that the reasonable

20   royalty covered the use made of the patented invention.

21        MR. SHEASBY:  Yes, the lump sum that they provided,

22   Your Honor, and that's all --

23        THE COURT:  I'm going give the jury an additional

24   instruction that it is completely proper for them to designate

25   any reasonable royalty that they may award as either a lump

```
1    sum or a running royalty.  That's all I'm going to say.

2               MR. SHEASBY:  Can you also say consistent with your

3    other instructions?

4               THE COURT:  I think that's okay, too, because I

5    think that's what my earlier instructions say.

6               MR. SHEASBY:  Okay.

7               MR. CORDELL:  As I told you --

8               THE COURT:  Have a seat, gentlemen.

9               MR. SHEASBY:  Thank you.

10              (The following was had in the presence and hearing

11              of the jury.)

12              THE COURT:  Members of the jury, I want to give you

13   a few final instructions before you begin your deliberations.

14        First, I'd like to make it clear to you that if you award

15   a running royalty to the Plaintiff in this case -- excuse me,

16   a reasonable royalty to the Plaintiff in this case, it is

17   perfectly acceptable that you designate it as either a lump

18   sum or a running royalty, consistent with the other

19   instructions I've earlier given you today.

20        Also, you must perform your duty as jurors in this case

21   without any bias or prejudice as to any party.  Please be

22   aware that the law does not permit you to be controlled by

23   sympathy, prejudice, or public opinion.  And all the parties

24   expect that you will carefully and impartially consider all

25   the evidence, follow the law as the Court has given it to you,
```

1    and reach a just verdict regardless of the consequences.

2         You should answer each question in the verdict form based

3    on the facts as you find them to be, following the

4    instructions that the Court has given you on the law.  One

5    more time--do not decide who you think should win this case

6    and then answer the questions to reach that result.

7         And, finally, I'll remind you that your answers to the

8    questions in the verdict form must be unanimous.

9         You should consider and decide this case as a dispute

10   between persons of equal standing in the community, of equal

11   worth, and holding the same or similar stations in life.  This

12   is true in patent cases between corporations, partnerships,

13   and individuals.

14        A patent owner is entitled to protect his rights under

15   the laws of the United States, and that includes bringing a

16   suit in a United States District Court for money damages based

17   on allegations of infringement.  By the same token, members of

18   the jury, an accused infringer is entitled under the law to

19   defend against assertions of infringement, including by

20   arguing that it does not infringe the asserted patents and

21   that the asserted patents are invalid.

22        The law recognizes no distinction between types of

23   parties, and all corporations, partnerships, or other business

24   organizations stand equal before the law, regardless of their

25   size and regardless of who owns them, and they are to be

1   treated as equals.

2       Now, when you retire to the jury room to deliberate on

3   your verdict, as I've told you, you'll each have your own

4   printed copy of the final jury instructions that I've given

5   you orally.  If during your deliberations you desire to review

6   any of the exhibits that the Court has admitted into evidence

7   and have been shown to you during the course of the trial,

8   then you should advise me by a written note delivered to the

9   Court Security Officer and I will then send you that exhibit

10  or those exhibits.

11      Once you retire, you should first select your foreperson

12  and then conduct your deliberations.  If you recess at any

13  time during your deliberations, follow all the instructions

14  the Court has given you about your conduct during the trial.

15      After you have reached your unanimous verdict, your

16  foreperson is to fill in the verdict form reflecting those

17  unanimous answers, date it, sign it, and advise the Court

18  Security Officer that you've reached a verdict.  Do not reveal

19  your answers until such time as you are discharged, unless

20  otherwise instructed by me, and you must never disclose to

21  anyone, not even to me, your numerical division on any

22  unanswered question.

23      Any notes that you've taken over the course of the trial

24  are aids to your memory only.  If your memory should differ

25  from your notes, rely on your memory and not your notes.

1    A juror who has not taken notes or has taken very slight

2    or skimpy notes must still rely on her own

3    recollection -- independent recollection of the evidence and

4    should not be unduly influenced by the notes of other jurors.

5    Notes are not entitled to any greater weight than the

6    recollection or impression of each juror about the testimony

7    that's been given.

8        If you want to communicate with me at any time during

9    your deliberations, you should give a written message or a

10   question to the Court Security Officer and it should be signed

11   by your jury foreperson.  The Court Security Officer will then

12   bring it to me, and I will then respond to you as promptly as

13   possible, either in writing or by having you brought back into

14   the courtroom where I can address you orally.

15       And I will always first disclose to the attorneys in the

16   case your question and my intended response before I answer

17   any question you might send me.

18       After you've reached a verdict and after I have

19   discharged you as jurors in this case, I want you to be clear

20   you're not required to talk with anyone about your service in

21   this case, but at that point, if you choose to, you will be

22   completely free to talk about your service as jurors in this

23   case.  The decision at that time will be yours and yours alone

24   100 percent.

25       I'm now going to hand eight printed copies of the Court's

1   final jury instructions and one clean copy of the verdict form

2   to the Court Security Officer to deliver to you in the jury

3   room.

4        Members of the jury, you may now retire to the jury room

5   to deliberate on your verdict.  We await your decision.

6             (Whereupon, the jury left the courtroom.)

7             THE COURT:  Counsel, you are free to wait in the

8   courtroom while the jury deliberates.  If you elect to wait

9   off premises, make sure that you can be reached by cell phone

10  promptly and get here quickly in the event the Court receives

11  a message, a note, or the jury returns a verdict.

12       Awaiting either a question from the jury or the return of

13  their verdict, we stand in recess.

14            (Jury deliberates.)

15            THE COURT:  Be seated, please.

16       Counsel, I've received the following note from the jury,

17  and I have a Xerox copy, one for each side, I'll hand to the

18  Courtroom Deputy, which after I've read it into the record you

19  can approach and get your own copy of it.  It's dated with

20  today's date and it says:  "The jurors request Exhibit PX 51

21  and the JX 30 exhibit."  And it's signed by Ms. Dennis, who is

22  Juror No. 5, as the foreperson.

23       If you'll approach, you can get a copy of it.

24       The Courtroom Deputy and I have made a cursory search of

25  the exhibits in the case, and JX 30 appears to be the DDR4

1    SDRAM specification, which I've identified.  However, we do

2    not find a PX 51.  We do not find a DX 51, but we find a

3    JX 51, which is the JEDEC agreement, and I am assuming that's

4    what the jury wants.  I'm open to input from either side,

5    though, on this issue.

6              MS. GLASSER:  Your Honor, did you mean the JDLA?

7              THE COURT:  What did I say?

8              MS. GLASSER:  I may have misheard you.

9              THE COURT:  It's the joint license and development

10   agreement, the JDLA.  That's JX 51.  I'm assuming the jury's

11   note PX 51 meant JX 51, and I don't find there is a PX 51

12   among the admitted exhibits published to the jury during the

13   trial.  However, if either side knows something different or

14   has additional information, I'm happy to hear it.

15       My suggestion is that in response to the jury's note I

16   send them JX 30, which is clearly what they asked for in their

17   note, but instead of -- and in response to their question for

18   PX 51, I send them JX 51, which is the JEDEC document.

19       Does either side object to that?

20       Plaintiff, do you have any objection?

21             MR. SHEASBY:  No objection from Plaintiff, Your

22   Honor.

23             THE COURT:  Defendants?

24             MR. CORDELL:  Could we have just a moment to confer,

25   Your Honor?

1    THE COURT:  You may take a moment, certainly.

2                (Pause in proceedings.)

3    MR. SHEASBY:  Your Honor, the only thing I would --

4    THE COURT:  If you have something to add,

5    Mr. Sheasby, stand and address the Court.

6    MR. CORDELL:  So, Your Honor, while we're waiting,

7    we have no objection.

8    THE COURT:  All right.  Is there anything further

9    from Plaintiff on this?

10    MR. SHEASBY:  No, Your Honor; no objections.

11    THE COURT:  Okay.  Have a seat, counsel.

12    All right, counsel.  I'll read you the written response

13    I'm prepared to send to the jury and then I'll hear any

14    objections or responses to it.

15    "Members of the jury, in response to Jury Note No. 1, I

16    am sending you the following:  JX 30 as requested; JX 51.  I

17    am sending you JX 51 in lieu of your requested PX 51, as we do

18    not find an exhibit numbered as PX 51.  JX 51 is the JDLA

19    agreement.  If this is not what you wanted and if you can

20    clarify another exhibit that you intended to ask for as PX 51

21    other than JX 51, please let me know by subsequent note

22    describing what you want as clearly as possible.  If JX 51,

23    the JDLA agreement, is what you intended to ask for, then no

24    further response is needed."

25    Does either side have any comment or objection with

1    regard to that written response?

2            MR. SHEASBY:  No, Your Honor.

3            MR. CORDELL:  Not from Samsung, Your Honor.

4            THE COURT:  All right.  Then I'll print it, sign it,

5    and send it in by way of the Court Security Officer with JX 51

6    and JX 30.

7        All right.  Mr. Richardson, I am going to hand you that

8    original written response together with JX 51 and JX 30, and

9    direct that you deliver it to the jury.

10       I also have printed a duplicate of my written response,

11   which I'll sign and hand to the Courtroom Deputy for the

12   Court's records.

13       I'll also hand her the original Jury Note No. 1, which

14   I've marked with a "1"  in the upper right-hand corner for

15   identification.

16       That having been done and pending another note or return

17   of the jury's verdict, we stand in recess.

18               (Deliberations continue.)

19           THE COURT:  Be seated, please.

20       Counsel, I've received the following message from the

21   jury:  "We have a verdict."  It is dated with today's date and

22   signed by Ms. Dennis as our jury foreperson.  I will mark this

23   original note with a "2" to identify it, and I'll hand the

24   original message to the Courtroom Deputy.

25       All right.  I'm about to bring in the jury and receive

1    their verdict.  Is there anything I need to hear from either

2    party on before I do that?

3              MR. SHEASBY:  Nothing from Plaintiff, except thank

4    you for your time this last two weeks, Your Honor.

5              MR. CORDELL:  Samsung echoes that sentiment.  Thank

6    the Court and the staff for a good trial.

7              THE COURT:  All right.  Let's bring in the jury,

8    please.

9              (Whereupon, the jury entered the courtroom.)

10             THE COURT:  Please be seated, members of the jury.

11        Ms. Dennis, I understand you are the foreperson of the

12    jury.  Is that correct?

13             THE PRESIDING OFFICER:  Yes, sir.

14             THE COURT:  Has the jury reached a verdict?

15             THE PRESIDING OFFICER:  Yes, Your Honor, we have.

16             THE COURT:  Will you hand the completed verdict form

17    to the Court Security Officer who will bring it to me?

18        Members of the jury, I'm about to announce the verdict

19    into the record, and I'd like to ask you to listen very

20    carefully as I do this, because after I've announced the

21    verdict into with the record I'm going to poll the jury to

22    ensure that it is the unanimous verdict of all eight members

23    of our jury.

24        Turning to the verdict form and beginning on page 4 where

25    Questions 1A, 1B, and 1C are found, Question 1A, "Did Netlist

1    prove by a preponderance of the evidence that Samsung

2    infringed claim 16 of the '912 Patent?"

3         The jury's answer is "Yes."

4         Question 1B, "Did Netlist prove by a preponderance of the

5    evidence that Samsung infringed claims 1, 2, and/or 8 of the

6    '417 Patent?"

7         The jury's answer is "Yes."

8         Question 1C, "Did Netlist prove by a preponderance of the

9    evidence that Samsung infringed claim 1 and/or 5 of the '608

10   Patent?"

11        The jury's answer is "Yes."

12        Turning to page 5 where Questions 2A through C are found,

13   Question 2A, "Did Samsung prove by clear and convincing

14   evidence that claim 16 of the '912 Patent is invalid?"

15        The jury's answer is "No."

16        Question 2B, "Did Samsung prove by clear and convincing

17   evidence that claims 1, 2, and 8 of the '417 Patent are

18   invalid?"

19        The jury's answer is "No."

20        Question 2C, "Did Samsung prove by clear and convincing

21   evidence that claims 1 and 5 of the '608 Patent are invalid?"

22        The jury's answer is "No."

23        Turning to page 6 of the verdict where Question 3 is

24   found, "If you found infringement, did Netlist prove by a

25   preponderance of the evidence that such infringement by

 1    Samsung was willful?"

 2        The jury's answer is "Yes."

 3        Turning to page 7 where Questions 4A through 4C are

 4    found, Question 4A, "What sum of money, if paid now in cash,

 5    has Netlist proven by a preponderance of the evidence would

 6    compensate it for its damages for infringement of the '912

 7    Patent?"

 8        The jury's answer is "$94 million."

 9        Question 4B, "What sum of money, if paid you in cash, has

10    Netlist proven by a preponderance of the evidence would

11    compensate it for its damages for infringement of the '417

12    Patent?"

13        The jury's answer is "$12 million."

14        Question 4C, "What sum of money, if paid now in cash, has

15    Netlist proven by a preponderance of the evidence would

16    compensate it for its damages for infringement of the '608

17    Patent?"

18        The jury's answer is "$12 million."

19        Question 5 found on page 8 of the verdict form, "Are the

20    damages for infringement you found in Questions 4A, 4B, and/or

21    4C a lump sum or a running royalty?"

22        The jury's answer is "Lump sum."

23        Turning, then, to page 9, which is the final page of the

24    verdict form, I find that it is dated with today's date,

25    November the 22nd, 2024, and it is signed by Ms. Dennis as

1    foreperson of the jury.

2        Members of the jury, let me poll you to make sure that

3    this verdict as I have read it into the record unanimously

4    reflects the decision of all eight members of the jury.  If

5    this is your verdict as I have read it, would you please stand

6    up?  Thank you, members of the jury.  Please be seated.

7        Let the record reflect that all eight members of the jury

8    immediately rose and stood in response to the Court's question

9    to poll the jury.  This confirms for the Court that this is

10   the unanimous verdict of all eight members of the jury.  The

11   Court accepts the jury's verdict, and I'll hand the original

12   verdict form to the Courtroom Deputy at this time.

13       Members of the jury, this now completes the trial of this

14   case.  From the very beginning I have instructed you about

15   your conduct during the trial, what you were permitted to do,

16   and many times what you were not permitted to do.  I am

17   discharging you as jurors in this case, having accepted your

18   unanimous verdict, and you are no longer jurors and you are no

19   longer subject to the limitations or restrictions or

20   instructions that I have given you throughout the trial.

21       That means, ladies, that you are completely free to

22   discuss this case and your experience as a juror with anybody

23   of your choosing.  If you got that question on day one that I

24   prognosticated you would get when you walked through the door

25   at home, "Tell me what happened in federal court in Marshall,"

1    you are free to answer that question now if you want to answer

2    it.  By the same token, you are under absolutely no obligation

3    to talk to anybody about your service in this case, and if you

4    choose not to, nobody is going to force you in any way to

5    discuss your service as jurors in this case.

6         I will let you know a little bit about the custom and

7    history of how this is done in the federal courthouse in

8    Marshall, because I've been practicing law in this community

9    since the 1980s, so I've been here a while.  As you're well

10   aware, there is one way in and there's one way out, and that's

11   up and down those front steps of this building.  The lawyers

12   and their staff, and anybody else connected with in case,

13   cannot initiate a conversation with you about your service,

14   but they can make themselves attractively close by if you

15   should want to stop and initiate a conversation with them.

16        And what that's meant for the past at least three or four

17   decades has been when you come out the front door and go down

18   those steps, don't be surprised if there aren't people

19   associated with both sides of this case standing on the

20   sidewalk so that it will be convenient for you to stop and

21   have a conversation if you want to stop and have a

22   conversation.  They are not going to initiate a conversation

23   with you, they are not going get in your way, they are not

24   going to make it hard for you to walk to your vehicles, if

25   that's what you choose to do, but if you choose to stop and if

1  you choose to initiate a conversation, you will have no

2  shortage of people available to converse with you about your

3  service in this case.  That's the practice and the custom in

4  the Marshall Division of the United States District Court for

5  the Eastern District of Texas, and I can tell you from

6  personal knowledge it has been that way for over 30 years.

7      So when you leave the building, if you want to stop and

8  talk to somebody, stop and talk.  If you don't, don't feel

9  under any obligation to.  No one is going to impede your

10 walking or your progress from here to where you're parked.  It

11 is 100 percent, 100 percent your decision.

12     There is one other thing I want to mention to you, and

13 I'll do that at this time.  I'm going to ask each of you for a

14 personal favor.  Now that the trial is over, now that I've

15 accepted your verdict and released you and discharged you as

16 jurors, I'm no longer prohibited from talking to you, and so

17 when you get up in a few minutes from those chairs in the jury

18 box and leave the courtroom and go into the jury room, I'd

19 like you to stay there for just a minute and give me the

20 privilege of coming into the jury room and shaking each one of

21 your hands and looking each one of you in the eye and telling

22 you personally how much the Court appreciates the sacrifice

23 and the service that you've provided and rendered as a part of

24 this jury.  I think the time and the effort and the resources

25 that you've each brought to bear in making this system work as

1    it has is completely worthy of a word of personal thanks, and

2    I would consider it a personal privilege if you'd give me just

3    a minute to come in and thank you in person before you leave.

4         I know it's Friday afternoon, I know this process has

5    taken several days and has been in all respects a real

6    sacrifice, so I am not going to keep you, but if you'd give me

7    the personal privilege and honor of coming in and thanking you

8    in person before you leave, I would very much appreciate that.

9         All right, counsel.  The Court has accepted the jury's

10   verdict.  That completes the trial of the case.

11        Ladies, I'll meet you in the jury room.

12        Counsel, you're excused.

13             (The proceedings were concluded at 3:08 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1        I HEREBY CERTIFY THAT THE FOREGOING IS A

2        CORRECT TRANSCRIPT FROM THE RECORD OF

3        PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4        I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5        FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6        COURT AND THE JUDICIAL CONFERENCE OF THE

7        UNITED STATES.

8

9        S/Shawn McRoberts                11/22/2024

10       _____DATE_____
         SHAWN McROBERTS, RMR, CRR
11       FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25